Receipt #058014

ORIGINAL

ECF

FILED
JUN 3 0 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BELL BCI COMPANY, Plaintiff, | |
| v. | No. 03-1613C |
| THE UNITED STATES OF AMERICA, Defendant. | |

## COMPLAINT

COMES NOW the Plaintiff, Bell BCI Company ("BELL"), by counsel, and for its Complaint against The United States of America, acting by and through the Department of Health & Human Services, states as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491. BELL brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*

## PARTIES

2. Plaintiff, BELL, is a Maryland corporation with a principal place of business located in the State of Maryland. BELL is in the construction contracting business and is duly authorized to transact business within the State of Maryland and is a qualified federal government contractor.

3. The Defendant is the United States of America acting through its agency, bureau, instrumentality, and/or agent, the Department of Health & Human Services, acting through its agency, bureau, instrumentality, and/or agent, National Institutes of Health ("NIH").

## FACTS

4. On or about December 11, 1997, NIH solicited bids for the construction of a new laboratory research building, referred to as NIH Building 50, to be located at NIH's Bethesda, Maryland campus (hereinafter the "Project" or "NIH Building 50"). NIH retained HLM Design to prepare the Project design plans and specifications.

5. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and laboratory space, including approximately 2,788 gross square meters of laboratory animal holding.

6. The original design for the Project provided for each of the 6 occupancy levels (*i.e.*, basement plus floors 1-5) to be divided into distinct areas commonly referred to as "neighborhoods." Each of these "neighborhoods" was to be a discrete laboratory/research area that, depending upon the need, could operate independently or share certain specialty rooms with other "neighborhoods." The original design was intended to accommodate different missions and occupants with features such as removable partition walls, interchangeable furniture, rolling casework and mechanical redundancy.

7. As originally designed, the floors of the Project were to be used as follows: (i) the basement was to house the vivarium and fermentation laboratories, the mechanical and electrical rooms, and NMR and electron microscope research; (ii) 1st Floor was to be used as the central receiving and distribution center for personnel and materials as well as five lab "neighborhoods;" and (iii) 2nd through 5th Floors were to share a common floorplan of six "neighborhoods" each, with slight variations in specific room groupings, doors and partitions. Per the original design, each of the occupied floors was to have its own corresponding interstitial floor located

immediately above its corresponding primary floor. Each interstitial floor was to be accessed via stairs from each of the primary floors and one maintenance elevator.

8. NIH required the use of unit price lists for two discrete areas: (i) "Laboratory Casework" and (ii) " Kit of Parts" ("KOP"). The unit price lists for Laboratory Casework was to include agreed upon prices to be used for changes to the casework, *i.e.*, certain identified cabinetry, shelving and tables. The KOP was a similar unit price listing mechanism, but addressed certain identified laboratory-related items other than casework, *i.e.*, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractor and suppliers. NIH was permitted to alter the quantities of items identified in the Laboratory Casework and KOP unit price lists within 550 calendar-days of contract award. If NIH made more than fifty changes for casework or five changes for KOP, the contractor would be entitled to renegotiate the unit prices.

9. NIH's contract solicitation was termed a "best value contract" and required an oral presentation as well as a written submission. On or about February 19, 1998, in reliance upon NIH's original Project design, BELL submitted a fixed-price bid that included pricing for various options identified in the bid documents. On March 13, 1998, NIH notified BELL that BELL was the apparent successful bidder.

10. On or about March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with NIH for the fixed-price sum of $63,663,745.00 to construct the Project in accordance with the Project design documents provided by NIH.

11. The Contract required the original scope of work to be completed not later than 821 calendar days following NIH's issuance of Notice to Proceed ("NTP"). NIH issued NTP effective as of April 1, 1998. Thus, June 29, 2000 was the original Contract completion date.

12. Under the Contract, NIH precluded BELL from submitting a Project Schedule that showed completion occurring any earlier or later than the Contract completion date. The Contract also provided that, if BELL did not complete the work within the agreed upon time as may be adjusted, NIH could assess liquidated damages of $3,721.00 for each day beyond the completion date.

13. NIH was required by the Contract to accept or reject BELL's Schedule and Schedule Updates within 14 days of submission. The Contract prohibited BELL from inputting a Contract Modification into the Project Schedule until the modification had actually been approved by NIH, no matter how long it actually took NIH to approve the submission.

14. The Contract recognized that owner-caused changes would entitle BELL to submit a cumulative impact claim and it contained provisions dealing with the presentation of those claims as well as claims for delay. Specifically, the Contract required a claim for delay and/or impact to be "submitted within 60 days after completion of the work" that NIH changed. The Contract, however, allowed for an exception to this 60 day time period if circumstances prevented BELL from ascertaining the delay impact.

15. The Contract incorporated the prompt payment provision of Federal Acquisition Regulation ("FAR") Section 52.232-27. Pursuant to that provision, NIH agreed that "[a]n interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable."

16. When NIH wanted to change the Project design or correct a design error, NIH would issue BELL a request for information called a "CMRFI," or a Change Bulletin, asking BELL to submit a proposed price to perform the additional work. In response, BELL would

submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, NIH and BELL would then execute a Modification of Contract ("Mod.") setting forth the change and agreed upon price.

17. BELL was not obligated to perform additional work until a change order was issued. In practice, and with NIH's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for NIH's execution of a change order. As a result, NIH obtained the benefit of avoiding greater delay.

18. BELL accepted the Project site "as is" and immediately commenced work.

19. From April 1998 through December 1998, BELL was able to perform the work in a timely manner. During that period, NIH made approximately 53 changes to the work. BELL, however, met the required completion milestones for that timeframe. As of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 noted that the Project was actually 13 days ahead of schedule.

20. Starting in or about December 1998, however, NIH initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, timely and cost-effective manner.

21. At that time, NIH notified BELL that it was adding a completely new 4th Floor to the Project, changing it from a 5-story to a 6-story building. NIH directed BELL to prepare a proposal for the 4th Floor addition.

22. NIH, however, did not provide BELL with any design plans and specifications for the new 4th Floor. NIH represented to BELL that the 4th Floor simply would be a duplicate of the originally-designed 3rd Floor, and it directed BELL to submit a proposal on that basis. NIH

advised BELL that it would provide the 4th Floor design and specifications by no later than March 1999.

23. Based on NIH's representations and assurances that the 4th Floor would replicate the 3rd Floor and that design documents would be provided by March 1999, BELL proceeded to put together a proposal.

24. On or about January 14, 1999, BELL submitted to NIH an initial proposal to construct the 4th Floor for approximately $9.8 million, with additional costs to address other items. In further reliance upon NIH's representations regarding the scope of the 4th Floor work, and taking into account that the Project was then 13 days ahead of schedule, BELL estimated that an approximately 90 calendar-day extension would enable it to complete the additional 4th Floor work and the remaining base Contract work.

25. The negotiations between BELL and NIH relating to the 4th Floor then proceeded in 3 phases.

26. The first phase involved the structural steel and concrete work for the 4th Floor.

27. On or about January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and concrete for the 4th Floor (hereinafter "structural work"). In accordance with NIH's representations that the 4th Floor would replicate the 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00, and to extend the Contract time by 30 calendar days.

28. On or about February 1, 1999, BELL received Change Order No. 13 pursuant to which NIH agreed to BELL's proposal for the structural work set forth in BELL's EWO No. 100.

29. On or about April 20, 1999, NIH executed Mod. No. 5 to the Contract pursuant to which NIH agreed to pay BELL $1,579,127.00 for the structural work associated with the 4th Floor, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000.

30. The second phase involved certain subsequent changes to the 4th Floor by NIH.

31. On or about February 16, 1999, NIH issued Change Bulletins 6, 7 and 10 which added additional work to the 4th Floor that was not included in BELL's initial proposal.

32. On or about March 2, 1999, NIH issued Change Bulletin 3 as a partial infrastructure or "shell" design for the 4th Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the 4th Floor that was materially different from that found in the 3rd Floor of the Project and which had served as the basis for BELL's initial proposal for the 4th Floor.

33. On or about March 29, 1999, NIH issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10.

34. On or about May 4, 1999, BELL submitted EWO 101 to NIH for the extra work in Change Bulletins 3, 6, 7 and 10, which is commonly referred to as the "core and shell" of the 4th Floor.

35. On or about June 23, 1999, NIH executed Mod. No. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000.

36. The third phase involved certain "fit out work" that NIH wanted BELL to perform.

37. BELL notified NIH that, because of NIH's failure to honor its commitment to provide BELL with the final 4th Floor plans in March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999.

38. On or about September 30, 1999, approximately 6 months later than promised, NIH issued Bulletin 35 containing the final plans and specifications for the 4th Floor.

39. The changes that NIH made that were reflected in Bulletin 35 were so extensive that the 4th Floor no longer bore any resemblance to the 3rd Floor that was used as the basis for BELL's initial proposal that had been submitted nearly 9 months previously.

40. NIH's issuance of Bulletin 35 coincided with the release and pricing of the "Kit of Parts" changes. This presented an extraordinary challenge for BELL to perform the base Contract work and changed work, while at the same time carrying out the necessary estimating and procurement work to respond to NIH's changes. BELL was severely burdened at this time trying to put together price proposals to address NIH's numerous changes as well as maintain progress on completion of the work. As a result, BELL's efficiency was further negatively impacted.

41. On or about February 11, 2000, BELL submitted EWO No. 240 to NIH for completing the "fit-out" work identified in Change Bulletin 35. In accordance with BELL's effort to expedite completion of the additional work directed by NIH, EWO No. 240 noted that certain work identified therein "has occurred" and further stated that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal included the final 30 calendar days of extended overhead agreed for the added floor only."

42. On or about April 14, 2000, NIH unilaterally issued Mod. No. 78 which, among other things, directed BELL to proceed with the work associated with Bulletin 35.

43. Pursuant to its unilateral Mod. No. 78, NIH committed to pay BELL at least $1,803,037.00 for the work required by Bulletin 35 and the referenced RFIs "so that work can proceed." NIH further agreed to a 30 calendar day extension and to continue negotiations with BELL for the costs of the additional work.

44. In or about August 2000, as part of its continuing negotiation with NIH regarding the 4th Floor, BELL submitted a Time Impact Analysis ("TIA") to NIH that incorporated a limited number of the changes made to that point and the impact to the schedule from those changes that could be identified at that time. BELL's TIA incorporating the limited number of changes showed that the Project could be substantially completed on or about September 1, 2001.

45. As the negotiation process continued, BELL and NIH had extensive discussions regarding the Project Schedule. NIH recognized that a disproportionate number of the changes it made related to the electrical work. In an effort to mitigate the impact to the electrical work, BELL solicited pricing from another electrical subcontractor familiar with NIH standards to do the changed electrical work. That would have enabled the electrical work to proceed more quickly. NIH, however, chose not to use the other electrical subcontractor.

46. BELL made it clear to NIH during the negotiations that additional changes by NIH would have a profoundly negative impact on meeting the Project milestones. BELL's TIA and other Project Schedule data confirmed that virtually all then remaining Project work activities were near critical.

47. With full knowledge of these facts and circumstances, NIH represented and promised to BELL that, after August 2000, there would be no more than 4 or 5 minor additional changes to the Project. In order to minimize impacts to the Project Schedule, it was understood that these few additional changes would be done on an accelerated basis and that BELL would be compensated accordingly.

48. After giving its promise of limited future changes that would be performed on an accelerated basis, NIH persisted in seeking BELL's agreement to a Contract modification that would establish April 30, 2001 as the revised Contract completion date.

49. On or about October 2, 2000, in reliance upon NIH's promise that only a few additional changes would be made, and after performing a substantial portion of the work in accordance with NIH's unilateral Mod. No. 78, NIH issued into Mod. No. 93.

50. Mod. No. 93 expressly referenced BELL's EWO No. 240, and stated that NIH would pay BELL "for the remaining direct and indirect costs of the Floor 4 Fit-Out," but did not include compensation for adverse cumulative impacts incurred by BELL related to the multitude of other changes issued by NIH. Mod. 93 reflected a Contract completion date of April 30, 2001. Implicit in Mod. 93 was BELL's reservation of right to seek additional costs and time related to cumulative impacts and other damages.

51. Mod. No. 93 changed the original Liquidated Damages provision of the Contract from a single liquidated damage amount of $3,721 based on the overall Project completion date, to a series of 14 substantial completion milestone dates, each having its own liquidated damage amount of $266 per day for failure to complete on time.

52. Furthermore, Mod. No. 93 stated that payment was expressly limited to compensating BELL for "delays resulting from any and all Government changes transmitted to

the Contractor on or before August 31, 2000." Mod. 93 did not include payment for labor inefficiencies and cumulative impact and other damages.

53. Pursuant to NIH's representation that only a few more minor changes would be made thereafter, Mod. No. 93 dealt only with certain limited costs associated with "Government changes" given to BELL as of August 31, 2000.

54. When BELL agreed to Mod. No. 93, it did so in reliance upon NIH's promise that only 4-5 minor changes would be made thereafter, and that NIH would pay for acceleration costs for those few changes. If NIH had not made those promises, BELL would not have agreed to Mod. No. 93.

55. As of August 31, 2000, BELL had generated 461 EWOs in response to the changes that NIH made. After Mod. No. 93 was issued, and contrary to its promises to BELL, NIH issued numerous changes. In fact, BELL had to generate approximately 300 more EWOs after August 31, 2000, and over 90 additional Contract modifications were issued thereafter.

56. NIH breached its promise to make only a few additional changes, as well as its promise that the remaining changes would be performed on accelerated basis and that BELL would be compensated accordingly. Furthermore, NIH refused to provide BELL with any additional time extensions as a result of the numerous post-August 2000 changes that NIH made.

57. BELL notified NIH that NIH's continued changes were negatively impacting BELL's ability to timely and efficiently complete the work. BELL reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering.

58. The post-August 2000 changes that NIH issued were numerous, substantial and prevented BELL from timely and efficiently completing the work.

59. Other actions by NIH also negatively impacted BELL's ability to timely and efficiently complete the work.

60. Contrary to the limits agreed to in the KOP in terms of items that could be changed and the quantity of changes, NIH proceeded to invoke the KOP as a tool for making wholesale architectural, structural, mechanical and electrical design changes. Moreover, NIH asserted that the number of changes it could make before BELL was entitled to renegotiate the unit prices was to be determined by the "net" number of changes. Accordingly, NIH contended that if it ordered 10 additional isotope rooms from the KOP but deleted 10 others, it had made zero "net" changes towards the total that would allow BELL to renegotiate.

61. BELL notified NIH that its actions with regard to the KOP were contrary to the terms and spirit of the Contract. BELL notified NIH that the BELL's costs just to coordinate all the additions and deletions that NIH made to the KOP list were substantial and that BELL would pursue recovery of those costs. BELL established EWO No. 651 to track the additional costs it incurred as a result of NIH's failure to abide by the KOP provisions in the Contract.

62. NIH exacerbated the impacts caused by the 4th Floor and the KOP by failing to process changes in a timely manner and/or by reneging on agreements reached with BELL to pay for these changes.

63. BELL notified NIH that its failure to act in a reasonable manner with regard to timely processing changes and honoring agreements previously reached with BELL was negatively impacting BELL's ability to complete the work and was adding to BELL's damages.

64. As early as on or about March 26, 2001, NIH took beneficial occupancy of the Project when it began to occupy and use the 2nd Floor.

65. Bell achieved substantial completion of the base Contract work on or about December 31, 2001.

66. On or about February 5, 2002, BELL substantially completed the changed work that NIH had directed. But for the number and magnitude of changes that NIH issued after Mod. No. 93, Bell would have met all of the milestone completion dates set forth therein. NIH unjustifiably refused to provide any extension of the Contract milestone completion dates. NIH also unjustifiably refused to pay BELL for Contract changes that occurred years ago. NIH also unjustifiably refused to pay BELL for the Contract balance and retention that NIH withheld.

67. BELL entered into the Contract with the reasonable understanding that its work would proceed in an orderly fashion that minimized idleness of labor and equipment and avoided stacking of trades and duplication of efforts.

68. But for the numerous changes NIH made, BELL would have been able to complete the work in an efficient manner and in accordance with the Contract schedule.

69. NIH's changes caused BELL's supervision and labor to be severely diluted and forced BELL to redirect its workforce in order to address the changes and complete the work. BELL's productivity was significantly reduced and BELL incurred damages.

70. BELL could not assess the cumulative impact of NIH's changes until the changed work was completed on or about February 5, 2002.

71. On or about April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted to the Contracting Officer a Request for Equitable Adjustment ("REA").

72. On or about April 5, 2002, in accordance with the provisions of the Contract and BELL's subcontracts, BELL passed through to the Contracting Officer for consideration Requests for Equitable Adjustments prepared by five subcontractors to BELL on the Project, to

wit, Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc. (hereinafter the "Subcontractors' REAs").

73. On July 1, 2002, NIH, through the Contracting Officer, issued a written rejection of BELL's REA in its entirety.

74. The Contracting Officer's Decision also rejected, in their entirety, the Subcontractors' REAs that BELL had passed through.

75. The Contracting Officer's Decision asserted that NIH had a claim against BELL of $877,625.00. The Contracting Officer's decision stated that NIH's claim against BELL was based on purported liquidated damages owed to NIH of $481,726.00, credits purportedly due NIH for alleged deleted scopes of work totaling $121,000.00, purported costs of $61,399.00 allegedly incurred to perform retests, and estimated costs of $213,500.00 to correct alleged deficiencies in the work.

76. The Contracting Officer's Decision rejecting BELL's REA, which was a final decision, was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the pertinent facts and law.

77. BELL properly performed its work under the Contract, fulfilled its material obligations under the Contract, and has satisfied all conditions precedent for bringing this action.

**COUNT I**
**(Review Of Contracting Officer's Denial Of BELL's REA)**

78. BELL incorporates herein by reference the allegations contained in ¶¶ 1-71, ¶ 73, and ¶¶ 75-77 above.

79. The Contracting Officer's Decision rejecting BELL's REA should be overruled and judgment should be entered in BELL's favor on its REA, because the Contracting Officer's

decision was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts.

80. At NIH's direction, BELL performed a substantial amount of additional work and was forced by NIH's actions and inaction to work in a disruptive manner that negatively impacted and delayed BELL's performance. In accordance with the Contract terms, and as a matter of law, BELL is entitled to an equitable adjustment of at least $5,200,00.00, plus a 245 calendar day extension of time.

**COUNT II**
**(Review Of Contracting Officers Determination Of NIH's Claims Against BELL)**

81. BELL incorporates herein by reference the allegations contained in ¶¶ 1-71, ¶ 73, and ¶¶ 75-77 above.

82. NIH is not entitled to recover any liquidated damages from BELL because NIH delayed BELL, directly and/or indirectly, from timely completing its work, and/or waived completion date(s) by continuing to issue changes to the work after said date(s) had passed, and/or unreasonably refused to grant BELL an extension of time to complete the work.

83. The Contracting Officer's Decision determination that NIH had claims against BELL for alleged liquidated damages, credits owed, retesting costs and estimated costs for major deficiencies and any other alleged set-offs should be overruled and judgment should be entered in BELL's favor on those claims, because the Contracting Officer's determination was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts.

**COUNT III**
**(Breach Of Contract)**

84. BELL incorporates herein by reference the allegations contained in ¶¶ 1-71, ¶ 73, and ¶¶ 75-77 above.

85. At NIH's direction, BELL performed a substantial amount of additional work and was forced by the actions of NIH to work in a disruptive manner that negatively impacted and delayed BELL's performance.

86. NIH materially and inexcusably breached the Contract by delaying and disrupting BELL's performance, by directing BELL to perform additional work without paying BELL for its direct costs and for the delays and inefficiencies that BELL incurred, by refusing to grant BELL an extension of time to complete the work, and by refusing to pay BELL its Contract balance.

87. As a direct and foreseeable result of NIH's material breaches of the Contract, BELL is entitled to recover damages of at least $5,200,000.00, plus a 245 calendar day extension of time.

**COUNT IV**
**(Cardinal Change)**

88. BELL incorporates herein by reference the allegations contained in ¶¶ 1-71, ¶ 73, and ¶¶ 75-77 above.

89. The numerous changes that NIH made to the scope of work, particularly with regard to the 4th Floor, were beyond the changes provision agreed to in the Contract and so substantial as to constitute a cardinal change entitling BELL to recover damages, plus delay and other costs arising therefrom.

**COUNT V**
**(Review Of Contracting Officer's Denial Of Subcontractors' REAs)**

90. BELL incorporates herein by reference the allegations contained in ¶¶ 1-74 above.

91. The Subcontractors' REAs contained certifications by each of the respective subcontractors that NIH was liable for the damages that each of them alleged to have incurred due to delays, disruptions and inefficiencies, and/or extra work performed.

92. BELL, on behalf of its subcontractors, seeks that the Contracting Officer's decision rejecting the Subcontractors' REAs and denying recovery of the amounts set forth therein be overruled.

**COUNT VI**
**(Promissory Estoppel)**

93. BELL incorporates herein by reference the allegations contained in ¶¶ 1-71, ¶ 73, and ¶¶ 75-77 above.

94. When BELL agreed to Mod. No. 93, it did so in reasonable reliance upon NIH's promise that only 4-5 minor changes would be made thereafter, and that NIH would pay for acceleration costs for those few changes.

95. BELL reasonably and to its detriment relied upon NIH's promises.

96. Pursuant to the doctrine of promissory estoppel, NIH is bound by its promises and is liable to BELL for damages for damages of at least $5,200,000.00, plus a 245 calendar day extension of time, arising from NIH's failure to keep its promises.

WHEREFORE, BELL prays for the following relief:

(i) Under Count I, that the Contracting Officer's Decision rejecting BELL's REA be reversed, that judgment be entered in BELL's favor and against NIH for an amount in excess of

$5,200,000.00, plus interest, legal fees and costs to the extent allowed by the Contract and/or law, plus an extension of time of at least 245 calendar days, and such further relief that this Court deems just and proper to equitably adjust BELL's Contract.

(ii) Under Count II, that that the Contracting Officer's Decision finding that NIH has claims against BELL of approximately $877,625.00 for alleged liquidated damages and other set-offs be overruled and that the Court declare and adjudge that BELL is not liable for any liquidated damages or set-off claims, that judgment be entered in BELL's favor on all claims for liquidated damages and set-off, that BELL be awarded interest, legal fees and costs to the extent allowed by the Contract and/or law, and any further relief that this Court deems just and proper.

(iii) Under Count III, that judgment be entered in BELL's favor and against NIH for breach of contract and that BELL be awarded damages in excess of $5,200,000.00, plus an extension of time of at least 245 calendar days, plus interest, legal fees and costs to the extent allowed by the Contract and/or law, and any further relief that this Court deems just and proper, and such further relief that this Court deems just and proper to equitably adjust BELL's Contract.

(iv) Under Count IV, that judgment be entered in BELL's favor and against NIH pursuant to the doctrine of cardinal change and that BELL be awarded damages in excess of $5,200,000.00, plus an extension of time of at least 245 calendar days, plus interest, legal fees and costs to the extent allowed by the Contract and/or law, and such further relief that this Court deems just and proper to equitably adjust BELL's Contract.

(v) Under Count V, that the Contracting Officer's decision rejecting the Subcontractors' REAs be overruled and that NIH pay damages in excess of $2,500,000.00 for the claims set forth therein, plus interest, legal fees and costs to the extent allowed by the Contract and/or law, and such further relief that this Court deems just and proper.

(vi) Under Count VI, that judgment be entered in BELL's favor and against NIH and that BELL be awarded damages in excess of $5,200,000.00, plus an extension of time of at least 245 calendar days, plus interest, legal fees and costs to the extent allowed by law, and such further relief that this Court deems just and proper to equitably adjust BELL's Contract.

Respectfully submitted,

BELL BCI COMPANY

By Counsel:

Dated: June 27, 2003

Charlie C.H. Lee
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-Mail: c.lee@mooreandlee.com
ATTORNEY OF RECORD

Of Counsel:

Richard O. Wolf
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-Mail: r.wolf@mooreandlee.com