Deposition of JEREMY BARDIN, called for examination pursuant to notice of deposition, on Wednesday, February 16, 2005, in Washington, DC, at the U.S. Department of Justice, 1100 L Street, N.W., at 10:03 a.m., before MEGAN HASSEL, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

RICHARD O. WOLF, ESQ.
Moore & Lee, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
703-506-2050
On behalf of Plaintiff

KYLE CHADWICK, ESQ.
U.S. Department of Justice
1100 L Street, N.W., Room 7062
Washington, D.C. 20530
202-305-7562
On behalf of Defendant

Also Present: Steven Ruether



PROCEEDINGS

Whereupon,

JEREMY BARDIN

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CHADWICK:

Q Good morning. My name's Kyle Chadwick. I represent the Government in this case. Just for purpose of the record we're here to take a deposition of a corporate representative of Bell BCI Company.

And I can almost read your name tag, but would you just state your name and spell your last name for the record, please.

A Sure. Jeremy Bardin, B-a-r-d-i-n.

Q And have you been deposed before?

A Yes, sir.

Q So presuming you know -- just to remind you you're under oath. I'm going to try to ask questions that are understandable. If you don't understand, just let me know. It's relatively



informal in that sense. We need to try to remember to speak up so that the court reporter can get everything; try not to speak over each; and it's difficult for her to take down a shake of the head or a uh-huh, huh-uh, so try to say yes and no if you can for her. I don't anticipate this'll take very long. We should be out before lunch in my anticipation.

This is technically a corporate representative deposition, but just for my context can you tell me what -- I assume you work for Bell BCI?

A No, sir, I do not.

Q Where do you work now?

A I work with Hitt Contracting.

Q What do you do there?

A I am a senior contractor.

Q Did you used to work there?

A Yes, sir.

Q When was that?

A I worked for them approximately 11 years.

Q And you were working during the period of



the Building 50 NIH --

A Yes, sir.

Q -- construction? Okay. During the entire period?

A Yes.

Q Okay. And what was your position with Bell at that time, or positions?

A I was a project manager with Bell.

Q And was this your project?

A Yes, sir.

Q Okay. All right. The topic we've identified for this from the complaint basically paragraphs 21 through 37, and paragraph 57, I've given you a date-stamped copy. You can follow along if you want to, but my purpose is not so much to parse each word of the complaint, but just understand what Bell is saying in each section. So I don't know if it'll be necessary to treat that as an exhibit or not. We can decide that as we go along.

Why don't I just jump in here. Our story begins on page 21 -- excuse me -- paragraph 21.

Page 6

Approximately December 1998 it appears to be NIH says it wants to add a completely new fourth floor to the project, changing it from a five-story building to a six-story building.
Do you remember how Bell first heard about that idea?
A Yes, sir. It was -- I believe it was brought about by George Williams who is the engineering director, I believe, and I'm not sure if that's his direct title, and Frank Kutlack who was the project director for NIH requested, and he asked if we could price up the additional floor. It was at a time that we needed to make a decision or a decision needed to be made based upon the current stage of construction, and that we were approximately pouring the third floor, and we were, based upon our schedule, we need to know in a short period of time whether we're going to add a floor or not.
Q Right; right. And was Bell's -- was Bell reluctant to price this additional work, or how did you react?

Page 7

A Reluctant in the manner that we needed, you know, as complete of a scope as possible, and it was the idea that a feasibility study was being prepared I think by NIH. Again, because of the timeliness of the execution of the work it was -- there were probably efforts made on Bell's part to price as best they could the addition of a fourth floor without having a complete set of documents.
Q And did Bell express to NIH concerns such as you've just mentioned? Did they suggest there was some problems with the pricing given the information that you had?
A Right. I think Bell laid out some guidelines, but in a partnering sense we wanted to comply with their requests for us to price this, but we laid out some guidelines to -- what we would be able -- what would be necessary down the road in the immediate future, say the next three months from December until March, what would have to happen for us to be able to carry out this plan.
Q And what format was it? Do you remember any particular meetings or was there some writing or

Page 8

how were these things communicated?
A My memory doesn't serve me well as far as meetings, but there were meetings, yes, sir. Ultimately I believe it was in a letter form, a proposal given by Jerry Romandino, who was my boss, to NIH.
Q And in the letter as you recall it, Mr. Romandino's letter set out the types of conditions or things that Bell would need in the coming months that you just described to proceed?
A As best I can recall, yes.
Q Okay. What were -- the complaint says NIH represented to Bell the fourth floor would be a duplicate of the originally designed third floor. What context -- who said that?
A I believe it's stated in possibly the feasibility study. Again, my memory, this is a while back, but I believe it was stated in several documents from the government that it would be a representative of the fourth floor -- the third floor. In essence that's really all we had to go off of, and, you know, in order to formulate a

Page 9

price, a GMP if you will, for the additional floor.
Q Well, would it be fair to say or not that, for pricing purposes, you were pricing it as identical to the third floor and that any changes from that baseline down the line would be subject to the change order process? I mean, is that -- or are you saying it was literally described that it would be literally -- in finished product it would be literally like the third floor?
A The -- this was represented by the government as a guarantee maximum price GMP, but it was not set up as such, and that was one of the complaints we had. What I'm getting at is there was -- this was a change order, and for the -- for an identical third floor and that's the way it was priced and represented to every one of our subcontractors to price it as such.
During the time of formulating a price, we went back to our subcontractors that were under contract, and we asked them to, based upon their total bid value of the project, separate an additional floor, and that's what was -- this was

Page 10

based upon.
To answer your question, I guess if there were other changes, and I think that was evident in Modifications 5 and 6, possibly for the HVAC system, they would need to be priced up.
Q As mentioned in the complaint of Bell's expectation that it would get design documents by March 1999, do you recall that, generally?
A Absolutely.
Q What were you looking for by March 1999?
A A complete design. This was a very important part of the process. It really was the catalyst of why we're probably sitting here today is because the government did not provide those documents by March. And what I mean by that is when we provided a price in December of '98, we attempted or we planned on tying down contractually all of our subcontractors and vendors to commit to this price by a date certain of April 1st or so, that approximate date, and it was our expectation that a change order would be issued at that time for the complete scope of work. The government prevented us

Page 11

from doing that by issuing the documents in September, and when -- at a time when the project was -- it was clearly a different project for each and every one of the subcontractors.
Q Let me break that down. When you say a complete -- maybe it's obvious, but when you say a "complete design," can you just give me in rough terms of it, what do you mean by "complete"? What would it have to include?
A It would have to include the -- which ultimately, the three phases of the project or the three phases of that fourth floor, the structural which was issued, the core and the shell, life safety systems, ductwork, mains, you know, your HV/AC system, and the fit-out of that floor, the tenant fit-out.
Q And let's be -- in March 1999 now, did you have some design but not complete? What did you have?
A We had the structural only, and I believe, if memory serves, in the March/April time frame we received the core mechanical and electrical design.

Page 12

Q But you don't have the fit-out?
A No, sir.
Q And the fit-out is what came in September?
A Yes, sir.
Q And did Bell, you know, roughly in March '99 complain to NIH about the fact that the fit-out wasn't released yet?
A I believe there's several letters, yes, sir.
Q And as you recall, what did NIH -- how did NIH respond?
A I believe they were in the process of going through the fit-out of the other floors with the -- their compliant or NIH and the various groups of laboratory groups. My belief is that that -- if they maybe attempted to do that, but they couldn't for whatever reason unbeknownst to me, they could not get it done, they could not meet the end user and come up with a design in time, and it's a very important part of the process because the core electrical and mechanical systems that we were given in March or April of '99, without the fit-out

Page 13

information, it's almost counterproductive to put in the core mechanical systems.
What I mean by that is the core mechanical systems would have HVAC boxes or VAV boxes, electrical panels and whatnot that would be shown normally on a fit-out drawing. We didn't know where to put these boxes. We ordered VAV boxes, but as I've indicated in many letters to NIH, it was really a worthless process, and what happened was the boxes that we ordered, VAV boxes, could not be reused when finally the fit-out drawings came in September because they were for different room capacities and different -- and that was just one example of how the two go hand in hand.
It was almost counterproductive for us. We ripped out -- I think if you look at the ultimate proposal for the fit-out you'll see a lot of demolition of ductwork that was put in under the March or April drawings. That was the result of not having all the information, and, you know, this lent to really a -- why we're here today.
Q Okay. Do you recall in, let's say,

Page 14

January 1999, was Bell ahead of schedule, behind schedule? What do you recall about that?
A I believe we had an analysis at that time where we were 13 days ahead of schedule. It was kind of interesting looking back over the last couple days at this project, that when the job started in April of '98 to January of '99, there were relatively few changes as you might expect in a building as you're putting up your concrete, you know, your foundations were done, in essence, the unknowns were taken out, and we were building the concrete foundation with relatively few changes.
We hit the project right off the get-go in April pouring concrete within 10 days of the notice to proceed, and -- an interesting to note to me, that we were 13 days ahead of schedule at that point and it was a result of not having any major changes on our plate, but yet after that things kind of went downhill when the changes started coming.
Q In terms of the schedules submitted to the government, did they show you 13 days ahead?
A This was our schedule.

Page 15

Q Your internal?
A No, this was this was the project schedule. The baseline was approved by the government's representative. To give you an idea, I think it took until September of '98 to get that approved. A job of this size and whatnot, we submitted probably four iterations of schedules, back and forth, comments, back and forth, and I think it was finally approved, a baseline, was approved in September or so of '98. So it wasn't that far removed from that approval date where we showed ourselves 13 days ahead of schedule. So I think in essence, yes, the government had approved that schedule.
Q Now, the complaint talks about phases of negotiation for the section. There were three phases; right?
A Yes, sir.
Q Now, was it anticipated, did Bell anticipate going into this that there would be three phases? Was that a surprise?
A No, sir. It was understood that there

Page 16

would be a structural, and then a core and shell, and a fit-out.
Q But -- okay. Did Bell expect that these phases would move faster than they'd moved?
A Absolutely.
Q Okay. In general, under Bell's expectation, when should this have all been wrapped up, all three phases of the negotiation?
A I think it would be reasonable to expect by early to late spring of '99, we would have a change order for all of the work, but more importantly we would have the information on which to build the job at that time.
Q There's a discussion of "in March '99 NIH issued Change Bulletin 3 as a partial infrastructure or shell design," this is paragraph 32 of the complaint. Do you recall that in general, a change bulletin?
A In general, yes.
Q And the complaint indicates that Change Bulletin 3 showed mechanical, electrical, architectural work for the fourth floor that was

Page 17

different from what it had been on the third floor. Was that a surprise to Bell at that point?
A Yes. I think at this point as we're, you know, we may have started to realize that it was not going to be a duplication of the fourth floor, that the items or the material or the information that we're getting was materially different than what was on the third floor.
Q And did Bell communicate to NIH concerns about -- upon seeing that?
A There were letters, yes.
Q In general what -- did you write the letters by the way?
A No. At this time it was probably by Michael Raycraft or Jerry Romandino.
Q What were the nature of Bell's concerns upon seeing that there were going to be differences from the third floor? Was it in the pricing of the subcontractors or other things as well?
A The nature of the concern would be mostly, as I stated, to maintain our price that we tried to -- our price was based upon a representative

Page 18

third floor portion of work, and now we're getting away from that.
Q. Now, what -- okay. Tell me about the negotiations then for this, mechanical, electrical, and architectural work. You see that there are changes, and is it correct you're still, at this point, March '99, you're still in the process of negotiating the actual final price of this change for the floor; correct?
A It was a little different in that each phase of the work was negotiated on its own merits.
Q Okay.
A The structural phase was we had to produce the backup and whatnot that would be expected on a government change order. This phase of work we had to produce the backup that would be expected on a government change order. Okay. So to take that a step further, it became painstakingly -- a painstaking process for us because we had to, Bell, had to prove that this was no longer a representative portion of the third floor, and that this is why we need the price increase or a --

Page 19

increase or decrease, or this is why there's a change to the contract now from what we submitted in December.
And looking back on it, it was a difficult task because we started to do -- in order to achieve and prove to the government that this is, in fact, a change, we basically had to take off the third floor, and what I mean is do a complete estimate on the third floor and then you had to do a complete estimate on these new drawings, and then you had to figure out what changed and highlight and bubble what changed.
And so as, you know, we are builders. I'm not an estimator. I started to be an estimator during this process, and that was just one little portion that was going to get much, much worse.
Q Now, you said it's painstaking. Did you encounter some resistance on the part of -- reaction of NIH that made it more difficult in that process?
A NIH, of course, and NIH, and I'll use the term "their representative," obviously needed the backup to substantiate why we would ask for

Page 20

additional money as a result of these bulletins or as a result of any change to the baseline, and this is where it started to become -- there were starting to be concerns that we may or may not be able to meet our originally submitted value for the added floor.
So I think -- I believe there might be pressure on NIH to substantiate why there might be an additional cost for the fourth floor.
Q Did you feel that the NIH -- when you say the government "representative," who do you mean?
A I believe they were from CRSS at that time or Jacobson.
Q So Brian Temme primarily?
A Brian, and he had several people working for him, yes.
Q Did you -- did Bell perceive that the government representatives were uncooperative in some way or not understanding that there were, in fact, changes?
A No, but it was incumbent upon the contractor to now prove where the changes are coming

Page 21

rather than this is a third -- typical third floor, and this is our price, and we wouldn't have to go through that process of having to prove what changed and where it changed. It was -- again, it was up to us, I'd say, Bell, to figure out what changed, rather than have a nice shopping list of this is what changed, and now it was like there's the new set of drawings now. Okay, well, then it got to open up the old set of drawings, or the third floor drawings, and now figure out what's different, and that's where it became a very cumbersome task for Bell.
Q Eventually, though, a price for this -- is this called the "infrastructure" at this phase, or what do you call it?
A I think it was EW-0101. We'll call it that I guess.
Q Okay. Eventually the parties negotiated a price; correct?
A Correct.
Q For that work?
A Yes.

Page 22

Q Did -- coming out of those negotiations, did Bell still have some concerns about what was coming next, I guess now it's approximately June 1999, and the price for that work?
A That sounds correct, yeah.
Q Okay. At this point you still hadn't received the fit-out?
A Correct.
Q Okay. Did Bell still have some concerns about what was going to happen with the next phase?
A Absolutely. And when that was going to occur, that was more important.
Q And what was NIH representing to Bell at this point about when this fit-out information would come out, do you recall?
A I don't recall exactly when, what their anticipated timeline was revised to, no.
Q Now, you -- I think you said earlier that by the time the fit-out information came out in September of '99, I think you used the words -- let met just say what I recall, it sounded like you said it was a different project for the subs than it had

Page 23

been earlier in the year. What do you mean by that?
A I mean by that, is when we committed to offer a price for the additional floor, many of the trades, individual trades, in the fit-out trades were not on the project yet. They weren't physically on the project; drywaller, painter, you know, the finisher, the finishing trades, et cetera, et cetera. Even the majority of the electrical and the HVAC work and most of the trades except for the concrete, they were not on the job yet.
As a result of that the government, I think, benefitted from our initial proposal for the fourth floor because we were able to go back to these trades and utilize their existing quotes to us for their contracts, and in essence give a percentage, you know, break the floors into a percentage and have that as a guideline, and I think both, you know, Bell and NIH were happy with those -- with that method and with the results that it yielded in December.
Unfortunately in September of '99 these trades that are now on the project, they're starting

Page 24

to and have experienced what this job's all about. And what I mean by that is the difficulty in working at NIH, was building 10 next door was -- CRC was under construction by McCarthy. They were, McCarthy was, you know, sucked up a lot of the work force in the Washington, D.C., metropolitan market. Parking, major problems on the job site. Just the logistics of working at NIH on a postage-stamp-sized site. Moving materials three to four times, these trades didn't know that going in.
It's their responsibility under our contract, but now I'm asking them to, okay, now I need your price for the fourth floor, and here they have an out now. They have an opportunity because we were not locked down in March of '99 to a price with them. Now I'm asking them okay, now, price this, and they say, okay, well I'm going to cover all of my holes and my inefficiencies and everything else, and that's what our worst fear, was in offering this proposal and not having them, not having the government issue the fourth floor fit-out in a timely manner. It became impossible for us to

Page 25

get these contractors to commit to the original scope of work.
Q And so tell me a little more about these negotiations. So what -- did you fail to actually retain some of these subs or did you pay them more? In the end, how did that work out?
A No, we were contracted with I'll say most every one of the subs, yes, and we ended up -- what happened was that they had an opportunity to price, now price, this work as a change order. No longer could I go back and rely on a representative portion of the third floor and say to the subcontractor listen, your contract is for $100,000, and divide that by five floors, and so this work ought to be worth $20,000 plus a reasonable markup. I could no longer use that leverage that I did back in December.
Now I'm going to have to say to them listen, here's a new set of drawings. You've got to take this off, and by the way, you need to show me what's different from the old set of drawings and give me a credit for that work, and then add for

Page 26

this work, and then, by the way, I also want you to use any existing materials you might have had over here on this work and reuse those so I don't have to reorder them, because some of the things I'm reordering, I don't need to reorder them. Like VAV boxes, I can use those on the second floor, and now I might be able to use them on the fourth floor.

That kind of thing went on a lot, and, you know, we were trying to work with NIH to, in order to meet their schedule dates, to reuse materials that we had already ordered under this bulletin, we had already talked about here, bulletin three, to try to salvage some of those materials that were on bulletin three so that we didn't have to throw them in the dumpster.

And down the road a year or two from then, we could find out that -- how much of a problem it is in the commissioning process with the government's commissioning agent because now we had a box that he was trying to, a VAV box, that he's trying to identify that were on the original set of drawings. Well, that wasn't used because that's not

Page 27

the same box, because it was on the second floor, and we reused it and now we're getting written up because we have a deficiency. Well, it's not a deficiency because he didn't, the government, didn't update their drawings. It's a snowball effect.

Q Now, how did this -- talk about the negotiations with your sub. How did that affect you in negotiating with NIH with the price for the fit-out? I mean, did you have to eat some of these costs, Bell eat some of the costs, of the subs, or what was the result?

A As a general contractor, we felt a commitment as a partner in this process to try to meet the original goal of -- you know, the financial goal of this added floor. We ended up, I think, I'd say pressuring ourselves to try to meet that same goal. Sometimes it was successful, sometimes it was unsuccessful. Ultimately we did come to terms with all of the subcontractors for the direct cost of work.

Q Did that process of, you say "pressuring them," I think I understand what you mean, did that

Page 28

process have any lasting negative effects for finishing the job? Do you feel there was some hangover or resentment or any lasting effects after you completed the negotiations?

MR. WOLF: Did he think the subs were resentful?

MR. CHADWICK: Yeah. The question just occurred to me.

BY MR. CHADWICK:

Q I mean you've described this process as difficult to negotiate the price. You said you reached an agreement, and then once that's reached, is that sort of the end of that difficulty or is there some lingering problem once you've negotiated out your price with the subs?

A Once the price is established with subcontractors, and -- I mean, the first step is to establish a price with the government. The subs would present their proposals to us. We passed that on to the government after we reviewed the proposals, and ultimately we'd get a timely change order, and the subs would go about their business,

Page 29

and that's their responsibility for that price that they submit to us. I mean, I don't know. I can't speculate on if the subs felt if they were -- if they got cheated out of something or didn't have enough money for something.

Q Right. I'm -- just from your perspective, anything you could think of.

Did NIH end up compromising at all on the original price, the December 1998 maximum price, by the end of the negotiations for this new floor? In other words, did Bell actually exceed the price somewhat?

A Yes.

Q Okay. So there was some acknowledgments on the part of the NIH that that's the price you come out with at this point?

A Yes.

Q Were you involved in the negotiations for each of these three phases?

A Some more than others. The third phase more than the first two.

Q And who do you recall taking a lead in the

Page 30

negotiations for the NIH side?
A The representatives, Brian Temme. Oftentimes it was, you know, trade breakdowns would be between I think Earl Johnson, one of their estimators or maybe another estimator. But ultimately Brian Temme. And Bart Taylor, of course, was the contracting officer.
Q What about Frank Kutlack? Did he get involved in the negotiations?
A He would be sometimes with negotiations, but it was more, when he was involved, in my opinion, it was more for an operational-type input. His --
Q Meaning what the customers would want?
A I think so, yes. His job by description doesn't allow him the opportunity to make financial decisions for NIH.
Q Did -- you said you expressed, Bell, expressed to NIH concerns that Bell did not receive by March 1999 the plans that Bell expected, fair enough? I'm just trying to set the stage.
A Fair to say.

Page 31

Q Did NIH respond by saying it had met -- did anybody from NIH say no, we met the obligation that we said we would?
A No, sir.
Q Did they say that at the time?
A No, sir.
Q And -- okay. Do you feel there could have been any misunderstanding, any basis upon reasonable people could disagree whether you had in March of 1999 what they told you they'd give you?
A The fact that we're talking about it is -- here is -- I find it amazing because it was well known on the job and it's documented in the feasibility study, so why it's being brought up I have not a clue, but I'll -- no. It's in the feasibility study.
Q This is Bell's feasibility study?
A No, sir, it's NIH's.
Q What does it say?
A I believe -- and I don't know the document. It's been a long time, but I believe there is a document there that represents that the

Page 32

design will be complete by March of '99, the complete design.
Q Let me flip it the other way. You say it's well known. Do you remember having discussions with anyone, including people from CRSS, where a government representative came out and said in effect we dropped the ball, we didn't get you in March of 1999 what we were supposed to give you? Do you remember anyone affirmatively saying that?
A I believe there were several discussions regarding that, yes. My concerns, again, were not only to protect Bell's interest, but to protect the interest of the project team, in that we were not getting this information that we needed, and above all things else, all of the things I wanted to avoid, just why we're here today in litigation.
I wanted to avoid that and give NIH the information and say hey, we need this information. We need it now or there's going to be problems. You know, I could never have anticipated the type of problem, but I saw this as a big problem, yes.
Q Well, who from the government, who among

Page 33

the government representatives, do you recall who you think actually said we, you know, said yes, we didn't get you what we were supposed to get? And, I mean, do you remember Brian Temme actually that?
A No, I can't recall every conversation, but I can recall me saying that to them. Whether that registered, I don't know.
Q And as you testified before, you don't remember anybody disagreeing with you saying no, that's not right?
A Absolutely.
Q You said you -- I'm going to go back to pricing out these three phases. You said you did some of the estimating work for Bell?
A Overseeing it, yes.
Q Overseeing it. Who else was involved in that for Bell?
A Several persons, Jerry Romandino, who was my boss, the division manager for Bell. Mike Raycraft was the onsite manager while the first two phases of this negotiation took place. He reported to me and I reported to Jerry. Those would be I

Page 34

guess the hierarchy of the leadership. Ultimately Tom Bell is the principal of the company. Below us doing the nuts and bolts takeoff, we had several project managers, subcontractors. I don't know how far down the line you want to go.

Q I guess -- well, who would put together the estimate package, if you will? I mean, who would sit down and actually put the numbers together, collect the numbers?

A I would say in the first two phases it would be Jerry Romandino and Mike Raycraft, and in the last phase, which was the fit-out phase, would be myself.

Q Was you. Okay.

MR. WOLF: Can we take a few minutes?

MR. CHADWICK: Sure.

(Recess.)

BY MR. CHADWICK:

Q We jump ahead in time here, and the next topic identified is paragraph 57, and this is just for context, this is identified as post-August 2003 -- 2000, I'm sorry.

Page 35

A Okay.

Q You were still at Bell at this point?

A Yes, sir.

Q And it's -- it says "generally," well, it says "Bell notified NIH that NIH's continued changes were negatively impacting Bell's ability to timely and efficiently complete the work. Bell reserved its right to seek equitable adjustment, both delays and impacts that Bell was suffering."

Do you recall communicating with NIH in the post-August 2000 period the changes were affecting Bell's schedule, if you will?

A Yeah, through several different mechanisms; verbally, orally, written obviously, written many times.

Q And what -- how did NIH respond? In other words, were they receptive to that idea?

A They were -- they responded I guess negatively.

(Discussion off the record.)

BY MR. CHADWICK:

Q They responded negatively?

Page 36

A What I mean by that is I'm trying to get my time period correct here. Negatively through a couple different ways. One, when we submitted a change order with acceleration costs as we had agreed to do, they would for the most part strike that from the proposal, void it. They would not allow it.

They would also at that time, again, I'm trying to get my time period correct here, but I believe it was late 2000, they would put language in their directives to us that we were to proceed without impact to the project schedule, these changes. That they reserved the right for liquidated damages, and that they reserved their right for taking over our portion of the work.

So at that time I felt that they were responding negatively to our request to perform additional work with acceleration.

Q And you mentioned that -- well, did you feel that was not a good-faith implementation of what had been agreed to up to that point?

A I believe that we had an agreement, and I

Page 37

think it's memorialized in a letter, in, I want to say, late 2000, from me that the -- what we believed to be the agreement was not being adhered to by NIH, and these are the reasons why, and the reason I wrote that letter was, again, to try to avoid this process, the one we're here today. I was trying to protect Bell's interest and NIH's interest, in what I saw as a potential problem, in that they were issuing changes.

They were telling us to proceed without impact to the project schedule. That would be impossible to do so in many cases because there were virtually -- because of the lead time, if nothing else, on products that we were having to order, in my opinion they were -- NIH, didn't want to hear it, and they didn't -- they were basically nonresponsive to these concerns.

The only thing that I recall being a proactive measure on NIH's part was a meeting that took place between Brian Temme, myself, Barbara Taylor, and I think Frank Kutlack, and that after writing numerous letters, after I wrote numerous

Page 38

letters, saying that we need direction on these changes -- and by the way, you know, there's a litany of statistics that I wrote and have put in this correspondence of, you know, we have 47-so changes that you haven't told us to proceed on. I think they did after that meeting that one time issue a bunch of directives to proceed. Unfortunately that process didn't -- it just kind of fizzled out at that point.

Q It also says "Bell reserved its right to seek an inequitable adjustment for the delays and impacts Bell was suffering."

Does that refer to in-contract modifications, Bell reserved its right?

A Yes, sir.

Q That -- does it mean anything else in that, or is that what it refers to?

A I believe that's where that verbiage was found, is in the contract modifications. We added that to our modifications when it became apparent that NIH was going to pursue any and all remedies for liquidated damages or delays.

Page 39

Q If I said there were some bilateral modifications between August 2000 and the summer of 2001, where it appeared that Bell did not include a reservation of rights of that kind, does that sound right or wrong? Why would that be?

A I think this became apparent to me, at least, that NIH was reserving their right, and I think that they represented to me at that time after discussions when I came to them and said wait a minute, why are you adding this language to your proposal saying that you're going to -- in order to proceed without getting the job done or -- excuse me -- without delay, finish on time, and that you don't want to talk about our impacts and our acceleration, but you want to reserve your right for liquidated damages and such, it was always -- and they represented to me at that time, that they -- that we somehow had waived our rights to indirect cost and whatnot, and it was never in my mind, never the intent that we ever waived our rights.

So at that time, this time period again in late 2000, I found it necessary to put in language

Page 40

and start adding language that made it crystal clear on Bell's behalf that we had never waived our rights for indirect cost.

Q And who was it that communicated to you what you just said about the waiver?

A It was a meeting. Again, I think this was a meeting between Barbara Taylor, Frank Kutlack, Brian Temme, and myself, and it was about the -- I think it was in response to my letter listing out several concerns where what had been agreed to in September of 2000 was not actually happening.

MR. CHADWICK: Okay. I think that's it. Let me take a quick break if you would. Do you guys just want to go out for a second?

MR. WOLF: Sure.

(Recess.)

MR. CHADWICK: I guess -- yes, that's it. Unless you have any questions.

MR. WOLF: No, at this time.

MR. CHADWICK: I appreciate you coming.

MR. WOLF: Thank you.

(Whereupon, at 11:00 a.m., the deposition

Page 41

was concluded.)