**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BELL BCI COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-1613C** |
| | ) | **Judge Wolski** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT AND PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

## I. PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1) of the Court's Rules, the plaintiff, BELL BCI Company ("BELL"), respectfully submits its Proposed Findings of Uncontroverted Fact in support of its Cross-Motion for Partial Summary Judgment.

1. On or about December 11, 1997, the Government solicited bids for the construction of a new laboratory research building, referred to as NIH Building 50, to be located at the National Institutes of Health's ("NIH") Bethesda, Maryland campus (hereinafter the "Project" or "Building 50" or "Stokes Laboratories").

2. The Government retained an architectural firm, HLM Design, to prepare the Project design plans and specifications. See Defendant's Answer, ¶ 4.

3. The Government retained CRSS Constructors, Inc. (which was later acquired by Jacobs Facilities, Inc. (hereinafter "CRSS/Jacobs") to be its construction quality manager. In effect, CRSS/Jacobs was the Government's "eyes and ears" on the Project and was considered to

be an extension of the Government's staff. See Government's RCFC Rule 30(b)(6) Deposition Transcript ("Dep. Tr.") at p. 19, Line 19 – p. 20, Line 19, Plaintiff's Appendix ("Ptf. App.") at 20-21 (emphasis added).

4. On or about March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with the Government for the fixed-price sum of $63,663,745.00 to construct the Project in accordance with the Project design documents provided by the Government. See Defendant's Answer, ¶ 4.

5. BELL was not the lowest bidder for the Project. See Government's Rule 30(b)(6) Dep. Tr. at p. 24, Lines 8-14, Ptf. App. at 24. The Government determined, however, that BELL's bid provided the best value. Id.

6. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and laboratory space, including approximately 2,788 gross square meters of laboratory animal holding areas. See Defendant's Answer, ¶ 5.

7. The Government required the use of unit price lists for two discrete areas: (i) "Laboratory Casework" and (ii) " Kit of Parts" ("KOP"). The unit price lists for Laboratory Casework was to include agreed upon prices to be used for changes to the casework, *i.e.*, certain identified cabinetry, shelving and tables. The KOP was a similar unit price listing mechanism, but addressed certain identified laboratory-related items other than casework, *i.e.*, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractor and suppliers. NIH was permitted to alter the quantities of items identified in the Laboratory Casework and KOP unit price lists within 550 calendar-days of

contract award. If NIH made more than fifty changes for casework or five changes for KOP, the contractor would be entitled to renegotiate the unit prices. See Defendant's Answer, ¶ 8.

8. The Contract required the original scope of work to be completed not later than 821 calendar days following NIH's issuance of Notice to Proceed ("NTP"). NIH issued NTP effective as of April 1, 1998. Thus, June 29, 2000 was the original Contract completion date. See Defendant's Answer, ¶ 11.

9. The Contract recognized that Government-caused changes would entitle BELL to submit a cumulative impact claim and it contained provisions dealing with the presentation of those claims as well as claims for delay. Specifically, the Contract required claims to be "submitted within 60 days after completion of the work" that the Government had changed. The Contract, however, allowed for an exception to this 60 day time period if circumstances prevented BELL from ascertaining the delay or impact. See Defendant's Answer, ¶ 14.

10. The Contract incorporated the prompt payment provision of Federal Acquisition Regulation ("FAR") Section 52.232-27. Pursuant to that provision, the Government agreed that "[a]n interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable." See Defendant's Answer, ¶ 15.

11. When the Government wanted to change the Project design or correct a design error, it would issue BELL a request for information called a "CMRFI," or a Change Bulletin, asking BELL to submit a proposed price to perform the additional work. In response, BELL would submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, the Government and BELL

would then execute a Modification of Contract ("Mod.") setting forth the change and agreed upon price. See Defendant's Answer, ¶ 17.

12. BELL was not obligated to perform additional work until a change order was issued. In practice, and with NIH's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for NIH's execution of a change order. As a result, NIH obtained the benefit of avoiding greater delay. See Defendant's Answer, ¶ 17; and Affidavit of Jeremy Bardin, ¶ 8, Ptf. App. at 2-3.

13. From April 1998 through December 1998, BELL was able to perform the work in a timely manner. See Executive Report on the Possibility of Adding an Additional Floor to Building 50 (the "Government's Executive Report"), Ptf. App. at 42 ("The project currently is on schedule . . ."). During that period, the Government had made relatively few changes to the scope of the Project work. See Justification for Other Than Full and Open Competition, Ptf. App. at 48 (the "Government's JOFOC") ("Due to few changes, sound design, construction, and financial management has resulted in a budget surplus . . . creating an opportunity to add chronically needed space to the project scope."). In fact, as of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 noted that the Project was actually 13 days ahead of schedule. See CPM Schedule Narrative Update No. 7, Ptf. App. at 36-37; and Affidavit of Jeremy Bardin, ¶ 9, Ptf. App. at 3.

14. Starting in or about December 1998, however, the Government initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, timely and cost-effective manner. See Affidavit of Jeremy Bardin, ¶ 10, Ptf. App. at 3.

15. In mid-December 1998, the Government determined that it had a project budget surplus of $15,600,000.00. The Government then undertook various actions regarding the feasibility of using that contingency surplus to fund the addition of an extra floor that would increase the Building 50 area by 15%, and change the structure from five to six stories. See Government's JOFOC, Ptf. App. at 45-46. The Government concluded that the:

> **. . . total cost that can be expected to provide the additional floor to Building 50 would be the hard cost of $10,230,131 plus the soft cost of $732,343 for a total of $10,962,474 . . .**

See Government's Executive Report, Ptf. App. at 43.

16. Pursuant to Section 6.3 of the FAR and HHSAR Section 306.3, the Government decided that it would not solicit competitive bids from other contractors to construct the new 4th Floor. The Government determined that, if it pursued competitive procurement for the construction of the new 4th Floor, "Bell would probably be the successful offeror; however, the cost to the Government of the procurement process ($1,260,000 and 180 days) would exceed the benefits of adding [the new floor]." See Government's JOFOC, Ptf. App. at 47. The Government's $1,260,000.00 figure was based on its estimate that it would be liable to BELL for general condition costs of $7,000 for each day that BELL was delayed in working on the Project. Id. Subsequently, during negotiations with BELL regarding the cost to add the new 4th Floor, the Government estimated that BELL's extended general conditions costs were $9,122.43 per day. See Government's Summary of Negotiations for Mod. 93, Ptf. App. at 65-67.

17. In or about December 1998, the Government notified BELL that it was contemplating adding a new floor to the Project that would be inserted on top of the original 3rd Floor. The Government advised BELL that the timeframe to make a final decision on whether to add the new 4th Floor was very limited (*i.e.*, before the end of January 1999). The Government

provided BELL with a copy of a "Feasibility Study for the Vertical Expansion of Building 50" (the "Government's Feasibility Study") and it directed BELL to quickly prepare a price proposal for the new 4th Floor addition. See Affidavit of Jeremy Bardin, ¶ 11, Ptf. App. at 3; and Government's Executive Report, Ptf. App. at 42. As noted above, the Government decided not to undertake a competitive procurement for the construction of the new 4th Floor. See Government's JOFOC, Ptf. App. at 44-48.

18. Paragraph 4 of the Government's "Proposed Findings of Uncontroverted Fact" asserts that BELL "jointly developed" the design of the new 4th Floor. The Government's assertion is not true. See Affidavit of Jeremy Bardin, ¶ 15, Ptf. App. at 4.

19. In fact, BELL was not involved in designing the new 4th Floor. Rather, the Government retained an architectural firm, HLM Design, to prepare the Government's Feasibility Study and to prepare the design documents for the new 4th Floor. See Affidavit of Jeremy Bardin, ¶ 15, Ptf. App. at 4; Government's Feasibility Study, Ptf. App. at 39; and Government's JOFOC, Ptf. App. at 47 ("In fact, the Government has instructed the Architect to produce drawings for [the new floor]...").

20. BELL was somewhat reluctant to submit a price proposal for the construction of the new 4th Floor because, at that time, the Government did not have a detailed design proposal. The Government, however, repeatedly advised BELL in writing and orally that the new 4th Floor would be a duplicate of the original 3rd Floor, both on the interior and exterior. See Affidavit of Jeremy Bardin at ¶¶ 11-12, Ptf. App. at 3.

21. In its Answer to BELL's Complaint, the Government "specifically denie[d] that NIH represented that the new floor would follow the original third floor design . . ." See

Defendant's Answer, ¶ 22. There is no factual basis for the Government to make such a "specific" denial.

22. The Government's own contemporaneous records indisputably show that, in fact, the Government expressly and repeatedly stated that the new 4th Floor would be a duplicate of the original 3rd Floor. For example, the Government's Feasibility Study, dated January 8, 1999, stated that:

> **The skin of the new floor will be a duplication of the third floor as shown on the enclosed elevations. * * * The interior layout of the new floor will be a duplication of the Third Floor . . .**

See Government's Feasibility Study, Ptf. App. at 40 (emphasis added).

23. The Government's Executive Report, dated January 15, 1999, described the scope of the work of adding the new 4th Floor as follows:

> **It is proposed to add an additional floor to Building 50 that would be a repeat of the third floor. *** The additional floor and interstitial plans will require little architectural or engineering rework as they are literally a repeat and thus a reissue of existing floor plans.**

See Government's Executive Report, Ptf. App. at 41-42 (emphasis added).

24. Similarly, the Government's JOFOC, dated February 10, 1999, and which sets forth the bases upon which the Government decided not to procure bids from contractors other than BELL, stated:

> **In fact, the Government has instructed the Architect to produce drawings for [the new floor] by merely duplicating those of another floor. This economy in design will carry forward into construction.**

See Government's JOFOC, Ptf. App. at 47 (emphasis added). Notably, the JOFOC expressly identified the Government's Feasibility Study, and both the Project Officer and the Contracting Officer certified the accuracy of the representations made in the Government's JOFOC. Id., Ptf. App. at 45, 48.

25. Consistent with its representations that the new 4th Floor would be a duplicate of the original 3rd Floor, and that the work on the new floor would have to proceed quickly, the Government told BELL that the final design documents would be prepared in a matter of a few weeks, by no later than March 1999. See Defendant's Answer, ¶ 22 (admitting allegations in third sentence of Complaint).

26. Indeed, the Government's Executive Report stated:

> **NIH would have to instruct [BELL] to proceed on or about January 22nd. Since we have determined that the existing structure is sufficient to safely carry another level, there is little engineering required to produce the contract documents to release the structural work to BELL. The shop drawings also will be a repeat of the previous floor and can be prepared and approved quickly . . . We have a little more time to complete the remainder of the engineering drawings. The design team can have a bulletin for the remainder of the work ready to issue to BELL on February 15th.**

See Government's Executive Report, Ptf. App. at 42 (emphasis added).

27. In addition, the Government's JOFOC stated that preparation of the contract documents had commenced and that:

> **After an intensive effort, the structural bulletin is complete and ready for issue to the construction contractor [BELL]. The statement of work for the balance of the work will be complete and ready for issue to the contractor [BELL] in early March.**

See Government's JOFOC, Ptf. App. at 46 (emphasis added).

28. On January 14, 1999, in reliance on the Government's repeated representations that the new 4th Floor would be a duplicate of the existing 3rd Floor and that the final design documents would be received by no later than March 1999, BELL submitted a price proposal to the Government to construct the new 4th Floor for approximately $9.8 million. See BELL's January 14, 1999 Price Proposal, Ptf. App. at 49-50; and Affidavit of Jeremy Bardin, ¶ 14, Ptf. App. at 4.

29. In further reliance upon the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and taking into account that the Project was then ahead of schedule, BELL estimated that an approximately 90 calendar-day extension would enable it to complete the proposed new 4th Floor and the remaining base Contract work. Id.

30. The Government recognized that BELL's price proposal was based on the representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and that the final design documents would be given to BELL in a matter of a few weeks. See Government's Executive Report, Ptf. App. at 43 (noting that BELL's price proposal was "based on the feasibility study . . .").

31. The Government found that BELL's price proposal for constructing the new 4th Floor:

> **. . . was actually lower than the Government's estimate bid price by about 11%.**
>
> *******
>
> **The Bell Company has been extremely cooperative and open in this proposal and their subcontractors have given them reasonable bids.**

See Government's Executive Report, Ptf. App. at 43.

32. On January 22, 1999, the proposal to construct the new 4th Floor was approved by the Director of NIH, Dr. Harold Varmus. See Government's JOFOC, Ptf. App. at 46.

33. The negotiations between BELL and the Government relating to the new 4th Floor proceeded in three phases. The first phase involved the structural steel and concrete work for the 4th Floor. The second phase involved certain changes to the 4th Floor by the Government that were made after BELL submitted its price proposal. The third phase involved certain "fit out work" on the new 4th Floor that was added by the Government after BELL submitted its price

proposal and which the Government unilaterally directed BELL to perform. See Affidavit of Jeremy Bardin, ¶¶ 17-25, Ptf. App. at 5-6.

34. With regard to the first phase of negotiations, on January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and concrete for the 4th Floor (hereinafter "structural work"). In accordance with the Government's representations that the 4th Floor would replicate the 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00, and to extend the Contract time by 30 calendar days. See Affidavit of Jeremy Bardin, ¶ 18, Ptf. App. at 5.

35. On or about April 20, 1999, the Government executed Mod. 5 to the Contract pursuant to which it agreed to pay BELL $1,579,127.00 for the structural work associated with the 4th Floor, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000. See Mod. 5, Ptf. App. at 51-52.

36. The second phase of negotiations followed the Government's issuance of Change Bulletins 6, 7 and 10 on February 16, 1999. These Change Bulletins added additional work to the 4th Floor that was not included in BELL's initial price proposal. See Affidavit of Jeremy Bardin, ¶¶ 20-21, Ptf. App. at 5.

37. Shortly thereafter, on March 2, 1999, the Government issued Change Bulletin 3 as a partial infrastructure or "shell" design for the 4th Floor. As noted previously, BELL's initial price proposal for the new 4th Floor was based on the Government's representations that it would duplicate the existing 3rd Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the 4th Floor that was materially different from that found in the 3rd Floor. See Affidavit of Jeremy Bardin, ¶ 21, Ptf. App. at 5.

38. On March 29, 1999, NIH issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10. See Defendant's Answer, ¶ 33; and Affidavit of Jeremy Bardin, ¶ 22, Ptf. App. at 6.

39. During this time period, BELL notified the Government that, because of the Government's failure to honor its commitment to provide BELL with the final 4th Floor plans by no later than March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999. See Affidavit of Jeremy Bardin, ¶ 23, Ptf. App. at 6.

40. On June 23, 1999, the Government executed Mod. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000, and concluded the second phase of negotiations. See Mod. 24, Ptf. App. at 53-54.

41. On or about September 30, 1999, approximately 7 months later than promised, the Government gave BELL the final design plans for the new 4th Floor via issuance of Change Bulletin 35. See Affidavit of Jeremy Bardin, ¶ 27, Ptf. App. at 6-7. The third phase of negotiations commenced thereafter.

42. The design changes that the Government made that were set forth in its Bulletin 35 were so extensive that the new 4th Floor no longer bore any resemblance to the existing 3rd Floor that was used as the basis for BELL's initial price proposal that had been submitted nearly 9 months previously. In fact, BELL had completed various aspects of the new 4th Floor work based upon the Government's representations that it would duplicate the existing 3rd Floor. As a result of the numerous changes the Government made in Change Bulleting 35, BELL had to remove, relocate and demolish a significant amount of the work that had been previously

completed. This had not been previously accounted for and disrupted the Project schedule and work flow. See Affidavit of Jeremy Bardin, ¶ 27, Ptf. App. at 6-7.

43. On February 11, 2000, BELL submitted EWO No. 240 to NIH for completing the "fit-out" work identified in Change Bulletin 35. In accordance with BELL's effort to expedite completion of the additional work directed by NIH, EWO No. 240 noted that certain work identified therein "has occurred" and further stated that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal included the final 30 calendar days of extended overhead agreed for the added floor only." See EWO 240, Ptf. App. at 55-56. The Government did not accept EWO 240.

44. Instead, on April 14, 2000, NIH unilaterally issued Mod. 78 which, among other things, directed BELL to proceed with the work associated with Change Bulletin 35. See Mod. 78, Ptf. App. at 58-59. Pursuant to its unilateral Mod. 78, the Government committed to pay BELL at least $1,803,037.00 for the work required by Bulletin 35 "so that work can proceed." The Government further agreed to a 30 calendar day extension and to continue negotiations with BELL for the costs of the additional work. Id. BELL proceeded with the work as directed by the Government and continued to negotiate with the Government.

45. Paragraph 8 of the Government's "Proposed Findings of Uncontroverted Fact" asserts that, in August 2000 "Bell submitted to NIH a time impact analysis that, according to Bell, incorporated all changes that Bell alleged were impacting its progress. The Government's assertion is not true. See Affidavit of Jeremy Bardin, ¶ 31, Ptf. App. at 8.

46. In fact, the time impact analysis ("TIA") that BELL submitted to the Government in August 2000 expressly stated that it pertained only to seven specific EWOs identified therein and further stated:

> **We caution that there are still other significant changes which have not yet been developed into a TIA . . .**

See BELL's August 2000 TIA, Ptf. App. at 61 (emphasis added). Thus, BELL's TIA made it expressly clear that it covered only a limited number of changes. See Affidavit of Jeremy Bardin, ¶ 31, Ptf. App. at 8.

47. As the negotiation process continued, BELL and NIH had extensive discussions regarding the Project Schedule. BELL made it clear to NIH during the negotiations that additional changes by NIH would have a profoundly negative impact on meeting the Project milestones. BELL's TIA and other Project Schedule data confirmed that virtually all the remaining Project work activities were near critical. See Affidavit of Jeremy Bardin, ¶ 32, Ptf. App. at 8.

48. During these negotiations, the Government represented to BELL that, after August 2000, there would be no more than 4 or 5 minor additional changes to the Project. In order to minimize impacts to the Project Schedule, it was agreed that the Government would pay BELL to perform these few additional changes on an accelerated basis. See Affidavit of Jeremy Bardin, ¶ 33, Ptf. App. at 8. See also, BELL's 2/20/01 letter to Contracting Officer, Ptf. App. at 72-74 (noting that "it was stated by the Government in our partnering session [during negotiations] that the remaining changes would be minimal.").

49. After giving its promise of limited future changes that would be performed on an accelerated basis, the Government persisted in seeking BELL's agreement to a Contract modification that would establish April 30, 2001 as the revised Contract completion date. Additionally, the Government requested a "partial occupancy plan" for the turn-over of the building. Bell only agreed to this based upon the Government's need to uphold certain

relocation dates previously established and in motion by the Government's contract representatives. See Affidavit of Jeremy Bardin, ¶ 34, Ptf. App. at 8-9.

50. On October 2, 2000, in reliance upon the Government's representation that only a few additional changes would be made and that the Government would pay to have the work for such future changes performed on an accelerated basis, and after performing a substantial portion of the work in accordance with the Government's unilateral Mod. 78, BELL signed Mod. 93. See Affidavit of Jeremy Bardin, ¶ 35, Ptf. App. at 9.

51. Mod. 93 expressly referenced BELL's EWO No. 240, and stated that the Government would pay BELL "for the remaining direct and indirect costs of the Floor 4 Fit-Out." Mod. 93 established a Contract completion date of April 30, 2001, created 14 interim milestones and further, assigned a liquidated damage amount of $266.00 per calendar-day to each individual milestone. See Mod. 93, Ptf. App. at 62-64.

52. Mod. 93 did not include payment for labor inefficiencies and/or cumulative impact and/or other damages. Rather, the language of Mod. 93, like the negotiations preceding it, reflects compensation for delay (i.e., extended performance duration), not labor inefficiencies or cumulative impacts of changes issued prior to Mod. 93. See Affidavit of Jeremy Bardin, ¶ 37, Ptf. App. at 9.

53. The language in paragraphs 4, 5, and 8 of Mod. 93 underscore that compensation for delay, but not labor inefficiency and/or cumulative impact, was included in its scope:

> **4. Increase the contract amount by $2,296,963 ($4,100,000-$1,803,037 from Mod 77 [actually Mod 78]) as full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000.**

**5. This agreement does not in any way affect entitlement to the direct cost of performance of any disputed changes. It does; however, incorporate the time impact of any disputed changes issued on or before August 31, 2000.**

***

**8. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to the Modification.**

See Mod. 93, Ptf. App. at 63-64 (emphasis added).

54. Likewise, the Government's contemporaneous summary of the Mod. 93 negotiations reflect that labor inefficiency was not negotiated and, therefore, was not part of Mod. 93's scope. For example, the Government stated that it and BELL "agreed to a 6.5-month time extension with 14 individual milestones, and compensation in the amount of $686,459 for the time impact of all changes issued on or before 8/31/00. This amount is equal to the previously agreed rate of $102,450 per month and less than the Governments [sic] estimate of $278,234 for a General Contractors extended overhead." See Government's Summary of Negotiations, ¶ K (emphasis added), Ptf. App. at 66. The Government stated that, "A Delay Costs of $700,000 was added to this Modification in an effort to compensate the Contractor for any delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000. The design delay cost was estimated at a substantially higher cost than the amount settled with Contractor (see estimated extended overhead and general conditions cost). Id. (emphasis added).

55. The Government's Rule 30(b)(6) designee confirmed that Mod. 93:

**. . . was the mod. where we paid them for delays up to that date, and that was it . . . They accepted that mod. as all of the delays up to that date, whatever was issued.**

<u>See</u> Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 51, Lines 10-14, Ptf. App. at 23 (emphasis added).

56. The Government's Rule 30(b)(6) designee further confirmed that delay was the basis for negotiation of Mod. 93:

> **Q. Was the basis of the negotiation of Mod. 93 the extra work orders that Bell had submitted?**
>
> **Mr. Chadwick: Objection. Go ahead.**
>
> **A. I think it's quite clear in [paragraph] number 4. It just simply says, "all <u>delays</u> resulting," <u>period</u>.**

<u>See</u> Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 53, Lines 2-6, Ptf. App. at 24 (emphasis added).

57. Similarly, the Government's interrogatory responses in this case stated that Mod. 93 covered delay, but not labor inefficiency or cumulative impact:

> **Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all <u>delays</u> resulting from change orders transmitted on or before August 31, 2000.**

<u>See</u> Government's Response to Interrogatory No. 5, Ptf. App. at 69 (emphasis added).

58. The Government interprets the reference in Mod. 93 to "changes" transmitted to BELL on or before August 31, 2000 to include only executed change orders that the parties had agreed to by that date. <u>See</u> Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 53, Lines 7-17, Ptf. App. at 24.

59. The Government, through one of its proposed expert witnesses, Colin Daigle, concedes that there is a difference between delay and inefficiency; you can have one without the other. <u>See</u> Daigle Dep. Tr. at p. 48, Line 7 – p. 49, Line 2, Ptf. App. at 30-31.

60. In short, labor inefficiency and/or cumulative impact were neither discussed, nor negotiated, nor any part of, Mod. 93. See Affidavit of Jeremy Bardin, ¶¶ 36-37, Ptf. App. at 9.

61. When BELL agreed to Mod. 93, it did so in reliance upon the Government's representation that only 4-5 minor changes would be made thereafter, and that it would pay for acceleration costs for those few changes. If the Government had not made those representations, then BELL would not have agreed to Mod. 93. See Affidavit of Jeremy Bardin, ¶ 39, Ptf. App. at 9-10.

62. As of August 31, 2000, BELL had generated 461 EWOs in response to the changes that the Government made. After Mod. 93 was issued, and contrary to its promises to BELL, the Government issued numerous changes. In fact, BELL had to generate approximately 300 more EWOs after August 31, 2000, and over 90 additional Contract modifications were issued thereafter. See Affidavit of Jeremy Bardin, ¶ 40, Ptf. App. at 10.

63. Thus, contrary to its representation that only a few minor changes would be made after Mod. 93, the Government made numerous changes. The Government also reneged on its promise to have the work for subsequent changes performed on an accelerated basis. In addition, the Government refused to grant BELL any additional time extension for all of the changes that the Government made after Mod. 93. See Affidavit of Jeremy Bardin, ¶ 41, Ptf. App. at 10; and BELL's 11/20/00 letter to CRSS/Jacobs, Ptf. App. at 70-71.

64. Moreover, after Mod. 93 was executed, the Government repeatedly directed BELL to perform additional work "without impact to the project schedule," yet it refused to authorize or compensate BELL to accelerate its manpower to accomplish that directive. See BELL's 11/20/00 letter to CRSS/Jacobs, Ptf. App. at 70-71.

65. Subsequent to Mod. 93, BELL repeatedly notified the Government in a series of executed contract modifications and in other writings, that it expressly reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering due to the Government's ongoing changes. See Affidavit of Jeremy Bardin, ¶¶ 42-43, Ptf. App. at 10; and Mods. 142, 144-145, 147-149, 152, 156, 159-160, 162-173, 175-176, 178-200, 202-205 (excerpted), Ptf. App. at 77-127.

66. As the contract modifications and contemporaneous records show, BELL did not negotiate away or otherwise waive labor inefficiency and/or cumulative impact claims. Nevertheless, subsequent to Mod. 93, BELL deemed it prudent to reiterate that it was reserving its rights with regard to such claims because, contrary to the parties' agreement in Mod. 93, the Government began to issue directives to BELL to perform additional work with no impact to the Project schedule and with express statements that the Government was reserving its rights against BELL. See Bardin Dep. Tr. at p. 39, Line 6 – p. 40, Line 11, Ptf. App. at 138-139.

67. On or about February 5, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. 93, Bell would have met all of the interim milestone completion dates set forth therein. See Affidavit of Jeremy Bardin, ¶ 44, Ptf. App. at 10.

68. During the course of the Building 50 Project, NIH issued annual reports on the construction progress pursuant to its statutory reporting obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31 U.S.C. §§ 1115, et seq. Among other things, the GPRA required NIH to submit a report to the Congress setting forth its success in achieving its performance goals in the preceding year. See 31 U.S.C. § 1116.

69. In February 2002, NIH issued its "Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Plan" (hereinafter "NIH's GPRA Report"). See NIH's GPRA Report (excerpted), Ptf. App. at 14-17. According to NIH, the "GPRA is . . . expected to make information on program performance more readily available to the Congress for policymaking, spending decisions, and program oversight." Id., Ptf. App. at 15.

70. NIH's GPRA Report expressly represented to the President and Congress that the construction of Building 50 was competed on time. In relevant part, NIH's GPRA Report stated:

> **NIH completed construction of the Stokes Laboratories building [50] on schedule.**
>
> *******
> **Performance was measured by the percent of construction completed at the end of each fiscal year. Process milestone data were obtained from the CMMS and PIN systems. Performance data were verified through quality control systems that track, monitor, verify, and validate project goals consistent with internationally recognized standards of operations.**

See NIH GPRA Report, Ptf. App. at 17 (emphasis added).

71. Despite its representation to Congress in the NIH GPRA Report that the Project was completed on schedule, the Government subsequently asserted that BELL failed to complete its work on schedule and has assessed liquidated damages against BELL of $447,678.00. See Daigle Dep. Tr. at p. 63, Line 2 – p. 64, line 4, Ptf. App. at 32-33.

72. On April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted to the Contracting Officer a Request for Equitable Adjustment ("REA"). See Defendant's Answer, ¶ 71.

73. Also on April 5, 2002, and in accordance with the provisions of the Contract and BELL's subcontracts, BELL passed-through to the Contracting Officer for consideration Requests for Equitable Adjustments prepared by five subcontractors to BELL on the Project, to

wit, Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc. (hereinafter the "Subcontractors' REAs"). See Defendant's Answer, ¶ 72.

74. On July 1, 2002, the Government, through the Contracting Officer, issued a written rejection of BELL's REA and the Subcontractors' REAs, in their entirety. See Defendant's Answer, ¶¶ 73-74; and Contracting Officer's Final Decision, Ptf. App. at 128-135.

75. On June 27, 2003, BELL filed its Complaint in this case.

76. In total, BELL and the Government executed 205 bilateral modifications, the final one being Mod. 205. See Mod. 205, Ptf. App. at 127.

77. BELL's Cross-Motion for Partial Summary Judgment and the Government's Motion for Partial Summary Judgment address only Mods. 93-140; they do not involve Mods. 142, 144-145, 147-149, 152, 156, 159-160, 162-173, 175-176, 178-200, 202-205. See Government's Motion at p. 2, n. 1.

78. The Government relies solely upon one of its proposed expert witnesses, Ted Scott, to allocate all responsibility for delay as between BELL and the Government, including the assessment of liquidated damages against BELL for allegedly being unable to meet the interim milestones established in Mod. 93. See Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. at 19; Government's 1/13/05 letter, Ptf. App. at 34-35 ("The Government's current position, which we have developed in litigation, regarding the specific allocation of excusable and unexcused delay, and the corresponding delay costs, has been explained by our experts in their reports, and will presumably be further explained during the experts' depositions."); and Daigle Dep. Tr. at p. 63, Line 11 – p. 64, Line 4, Ptf. App. at 32 (testimony by Government's other proposed expert stating that he did not conduct any delay

analysis and that he relies entirely on Mr. Scott for delay analysis and assessment of liquidated damages).

79. The Government, through its proposed expert witness, Mr. Scott, admitted that each of the 14 interim milestones established in Mod. 93 would have an independent critical path to each particular milestone. See Scott Dep. Tr. at p. 75, Line 20 – p. 76, Line 4, Ptf. App. at 26.

80. The Government also admitted through Mr. Scott that the critical path for each of the 14 interim milestones would have to be analyzed to determine whether any delay associated with achieving each milestone was compensable or excusable to BELL. See Scott Dep. Tr. at p. 76, Lines 5-11, Ptf. App. at 27.

81. Further, the Government admitted through Mr. Scott that in order to determine whether liquidated damages could properly be assessed for allegedly not meeting any of the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone. See Scott Dep. Tr. at p. 77, Lines 1-14, Ptf. App. at 28. Mr. Scott, however, testified that he did not perform any such analysis:

> **A. I did not analyze each milestone. So I didn't come to an opinion as to what the delays were for each interim milestone.**
>
> **Q. So if I understand your testimony, for each window you established, you did not analyze the effect any change had during that window on each individual milestone.**
>
> **A. That's correct.**
>
> *******
>
> **Q. Well, isn't it true that you would have to analyze the effect on each individual milestone to determine whether or not the contractor [BELL] is due an excusable delay for liquidated damages for that milestone?**
>
> **A. That's correct.**

See Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28.

82. Thus, the Government, through its proposed expert Mr. Scott, as the person upon whom it solely relies with regard to delay and the assessment of liquidated damages, admits that it has not performed the analysis required to determine whether liquidated damages could be assessed against BELL for allegedly being unable to meet the interim milestones established in Mod. 93. Id.

## II. BELL's Responses And Objections To Defendant's Proposed Findings Of Uncontroverted Fact

Pursuant to RCFC 56(h)(2), the plaintiff, BELL BCI Company ("BELL"), hereby responds to the Defendant's Proposed Findings of Uncontroverted Fact.

### A. REQUESTED FINDINGS TO WHICH BELL AGREES

BELL agrees to the following requested findings submitted by the Government in Defendant's Proposed Findings of Uncontroverted Fact: Paragraph Nos. 1, 2, 3, 9, 10, 11, 14-57, and 59.

### B. REQUESTED FINDINGS TO WHICH BELL DISAGREES

For the reasons discussed below, BELL disagrees and objects to the following requested findings submitted by the Government in Defendant's Proposed Findings of Uncontroverted Fact: Paragraph Nos. 4, 5, 6, 7, 8, 12, 13, 58, and 60.

#### (1) Paragraph 4 of Government's Proposed Findings:

"4. Beginning in December 1998 and continuing in January 1999, NIH and Bell discussed the possibility of adding a floor to the building, by designing a new fourth floor. On January 14, 1999, Bell submitted a price estimate and initial proposal for the new floor, based upon a design developed jointly by Bell and NIH. Bell projected that it could complete the new floor for approximately $10 million, with a time extension of approximately 90 days."

**<u>BASES FOR OBJECTIONS</u>:** There is absolutely no support for the Government's assertion that BELL "jointly" designed the new 4th Floor. In fact, the record shows indisputably that the Government retained an independent architectural design firm, HLM Design, to design the new 4th Floor. Moreover, the Government repeatedly represented to BELL orally and in writing that the new 4th Floor would be a duplicate of the existing 3rd Floor. BELL's price proposal of January 14, 1999 expressly stated that it was based on HLM's design and the Government's representation that the new 4th Floor would be a duplicate of the existing 3rd Floor.

**<u>PROPOSED REVISION TO PARAGRAPH 4 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

4. Beginning in December 1998 and continuing in January 1999, NIH and Bell discussed the possibility of adding a floor to the building. The new floor was to be designated as the new 4th Floor, because it was to be inserted between immediately above the existing 3rd Floor. In or about December 1998, the Government retained an independent architectural design firm, HLM Design, to design the proposed new 4th Floor and to prepare a feasibility study for the addition of an entirely new floor that was added during construction of the Project (the "Government's Feasibility Study"). <u>See</u> Government's Feasibility Study, Ptf. App. at 39-40. During this period, the Government repeatedly represented to BELL both orally and in writing that the new 4th Floor would be a duplicate of the existing 3rd Floor. <u>See</u> Affidavit of Jeremy Bardin, ¶¶ 11-13, Ptf. App. at 3-4. Among other things, the Government's Feasibility Study stated that the interior and exterior of the new 4th Floor would be a "duplication" of the existing 3rd Floor. <u>See</u> Government's Feasibility Study, Ptf. App. at 39-40. Based on the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, BELL submitted a price proposal to construct the new 4th Floor for approximately $9.8 million. In further reliance upon NIH's representations regarding the scope of the 4th Floor work, and taking

into account that the Project was then 13 days ahead of schedule, BELL estimated that an approximately 90 calendar-day extension would enable it to complete the additional 4th Floor work and the remaining base Contract work. BELL's price proposal expressly stated that it was based on the Government's Feasibility Study. See BELL's Price Proposal dated January 14, 1999, Ptf. App. at 49-50; and Affidavit of Jeremy Bardin at ¶¶ 11-14, Ptf. App. at 3-4.

**(2) PARAGRAPH 5 OF GOVERNMENT'S PROPOSED FINDINGS:**

"5. NIH decided to proceed with the new floor, and the negotiations between NIH and Bell regarding the changed work proceeded in phases. The first phase addressed the structural steel and concrete work. Id. ¶ 26. On or about February 1, 1999, NIH accepted Bell's offer of a price of $1,579,127, and an extension of 30 calendar days, to complete the structural work. Compl. ¶ 28. On or about April 20, 1999, the parties signed bilateral Modification No. 5, reflecting those terms."

**BASES FOR OBJECTIONS:** The Government's proposed finding omits two critical material facts: (i) the Government had repeatedly represented that the new 4th Floor would be a duplicate of the existing 3rd Floor; and (ii) the Government told BELL that the final design documents would be completed by March 1999. BELL relied on these representations by the Government in entering into negotiations with the Government.

**PROPOSED REVISION TO PARAGRAPH 5 OF GOVERNMENT'S PROPOSED FINDINGS:**

5. NIH decided to proceed with the new 4th Floor and, based on the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor and that the final design documents would be completed by March 1999, the negotiations between NIH and Bell regarding the changed work proceeded in phases. On or about January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and

concrete for the 4th Floor (hereinafter "structural work"). In accordance with NIH's representations that the new 4th Floor would duplicate the existing 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00, and to extend the Contract time by 30 calendar days. See Affidavit of Jeremy Bardin, ¶ 18, Ptf. App. at 5. On or about February 1, 1999, NIH accepted Bell's offer of a price of $1,579,127, and an extension of 30 calendar days, to complete the structural work. On or about April 20, 1999, the Government signed Modification 5, reflecting those terms. Id., ¶ 19, Ptf. App. at 5; and Defendant's Answer, ¶ 29.

**(3) PARAGRAPH 6 OF GOVERNMENT'S PROPOSED FINDINGS:**

"6. The second phase of negotiations involved the "core and shell," or first-stage infrastructure, of the new floor. The parties executed bilateral Modification No. 24 on June 23, 1999, establishing a price of $6,891,118, and an extension of 30 calendar days, for the core and shell work."

**BASES FOR OBJECTIONS:** The Government's proposed finding omits material facts regarding the changes made by the Government, its directive to BELL to proceed with the changes well before the second phase of negotiations were completed, and its failure to provide final design documents by March 1999.

**PROPOSED REVISION TO PARAGRAPH 6 OF GOVERNMENT'S PROPOSED FINDINGS:**

6. The second phase of negotiations involved the "core and shell," or first-stage infrastructure, of the new floor. On or about February 16, 1999, the Government issued Change Bulletins 6, 7 and 10 which added additional work to the new 4th Floor that was not included in BELL's initial price proposal. Later, on or about March 2, 1999, the Government issued Change Bulletin 3 as a partial infrastructure or "shell" design for the new 4th Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the new 4th Floor that was

materially different from that found in the existing 3rd Floor of the Project and which had served as the basis for BELL's initial price proposal for the new 4th Floor. On or about March 29, 1999, the Government issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10. During this period, BELL notified the Government that, because of the Government's failure to honor its commitment to provide BELL with the final new 4th Floor plans in March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999. On or about June 23, 1999, the Government executed Mod. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000. See Affidavit of Jeremy Bardin, ¶¶ 24, Ptf. App. at 6; and Defendant's Answer, ¶ 35.

**(4) PARAGRAPH 7 OF GOVERNMENT'S PROPOSED FINDINGS:**

"7. The third and final phase of negotiations involved certain "fit-out," or detail, work that NIH wanted Bell to perform. Compl. ¶ 36. Bell submitted a proposal for the fit-out work in February 2000, but the Government rejected that proposal in April 2000 and issued a unilateral modification pending further negotiations."

**BASES FOR OBJECTIONS:** The Government's proposed finding omits several material facts: (i) BELL's proposal expressly stated that the proposed 30-day extension was "for the added floor only;" (ii) BELL notified the Government that it was virtually impossible for BELL to maintain its prior price proposal because the Government had failed to honor its representation that the final design plans would be provided to BELL by March 1999; and (iii) when the Government finally gave BELL the final design for the new 4th Floor on September 30, 1999, so many changes had been made that it bore little resemblance to the existing 3rd Floor.

**PROPOSED REVISION TO PARAGRAPH 7 OF GOVERNMENT'S PROPOSED FINDINGS:**

7. The third and final phase of negotiations involved certain "fit-out," or detail, work that NIH wanted Bell to perform. See Defendant's Answer, ¶ 36. BELL notified the Government that, because of its failure to honor its commitment to provide BELL with the final 4th Floor plans in March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999. See Affidavit of Jeremy Bardin, ¶¶ 23-26, Ptf. App. at 6. On or about September 30, 1999, approximately 6 months later than promised, the Government issued Bulletin 35 containing the final plans and specifications for the new 4th Floor. The changes that the Government made that were reflected in its Bulletin 35 were so extensive that the new 4th Floor no longer bore any resemblance to the 3rd Floor that was used as the basis for BELL's initial price proposal that had been submitted nearly 9 months previously. In fact, Bell had to remove, relocate and demolish much of the work that had been previously completed based upon the direction provided to construct a "duplicate" floor. This had not been previously accounted for and disrupted the Project schedule and work flow. Id. On or about February 11, 2000, BELL submitted EWO No. 240 to NIH for completing the "fit-out" work identified in Change Bulletin 35. In accordance with BELL's effort to expedite completion of the additional work directed by NIH, EWO No. 240 noted that certain work identified therein "has occurred" and further stated that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal included the final 30 calendar days of extended overhead agreed for the added floor only." See EWO 240, Ptf. App. at 55. On or about April 14, 2000, NIH unilaterally issued Mod. 78 which, among other things, directed BELL to proceed with the work associated with Bulletin 35 pending further negotiations. See Defendant's Answer, ¶¶ 41-43.

**(5) <u>PARAGRAPH 8 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

"8. Negotiations concerning the fit-out, and certain changes and enhancements that NIH had made to the fourth floor design, continued through August 2000. In August 2000, as part of the negotiations regarding the fourth floor, Bell submitted to NIH a time impact analysis that, according to Bell, incorporated all Government changes that Bell alleged were impacting its progress."

**<u>BASIS FOR OBJECTION</u>:** The Government's proposed finding incorrectly states that the time impact analysis ("TIA") BELL submitted incorporated all Government changes. In fact, BELL's TIA expressly stated that it included only a limited number of the changes that the Government had made. There is no factual support for the Government's assertion.

**<u>PROPOSED REVISION TO PARAGRAPH 8 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

8. In or about August 2000, as part of its continuing negotiation with the Government regarding the 4th Floor, BELL submitted a Time Impact Analysis ("TIA") that incorporated a limited number of the changes made to that point and the impact to the schedule from those changes that could be identified at that time. <u>See</u> TIA, Ptf. App. at 60-61; Affidavit of Jeremy Bardin, ¶ 30, Ptf. App. at 7; and Defendant's Answer at ¶ 44. BELL's TIA incorporating only the limited number of changes showed that the Project could be substantially completed on or about September 1, 2001. TIA, Ptf. App. at 60-61. It further stated, however, that, that there are still other significant changes which have <u>not</u> yet been developed into a TIA." <u>Id</u>.

**(6) <u>PARAGRAPH 12 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

"12. The Government's summary of negotiations for modification 93 states that NIH paid Bell $700,000 in the modification for "delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000."

**<u>BASES FOR OBJECTIONS</u>:**

The Government's proposed finding omits a number of material facts regarding the matters that were – and were not – negotiated and as part of Modification 93. Most importantly, the Government's own summary of negotiations for Modification 93, as well as the deposition testimony of the Government's Rule 30(b)(6) designee, shows that labor inefficiency caused by the Government's changes was not negotiated and, therefore, was not part of Modification 93. Rather, negotiations focused only on the time impact caused by the Government's changes.

**<u>PROPOSED REVISION TO PARAGRAPH 12 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

12. On September 27, 2000, the Government documented its version of the negotiations regarding Modification 93 in a document titled "Summary of Negotiations." <u>See</u> Government's Summary of Negotiations, Ptf. App. at 65-67 . The Government's contemporaneous summary reflects that labor inefficiency was not negotiated as part of Modification 93 and, therefore, was not part of it. For example, the Government stated that it and BELL "agreed to a 6.5-month time extension with 14 individual milestones, and compensation in the amount of $686,459 for the <u>time impact</u> of all changes issued on or before 8/31/00. This amount is equal to the previously agreed rate of $102,450 per month and less than the Governments estimate of $278,234 for a General Contractors extended overhead." <u>Id</u>., ¶ K (emphasis added), Ptf. App. at p. 66. Likewise, the Government stated that, "A <u>Delay</u> Costs of $700,000 was added to this Modification in an effort to compensate the Contractor for any <u>delay</u>

claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000. The design delay cost was estimated at a substantially higher cost than the amount settled with Contractor (see estimated extended overhead and general conditions cost). Id., ¶ L, Ptf. App. at 66 (emphasis added). The Government's Rule 30(b)(6) designee confirmed that Modification 93 "was the mod. where we paid them for delays up to that date, and that was it . . . They accepted that mod. as all of the delays up to that date, whatever was issued." See Government's RCFC Deposition Transcript ("Dep. Tr.") at p. 51, Lines 10-14, Ptf. App. at 23 (emphasis added). The language in paragraphs 4 and 5 of Modification 93 underscore that compensation for delay, but not labor inefficiency, was included in its scope:

> 4. Increase the contract amount by $2,296,963 ($4,100,000-$1,803,037 from Mod 77 [Actually Mod 78]) as full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000.
>
> 5. This agreement does not in any way affect entitlement to the direct cost of performance of any disputed changes. It does; however, incorporate the time impact of any disputed changes issued on or before August 31, 2000.

See Modification 93, Ptf. App. at 63-64 (emphasis added).

**(7) PARAGRAPH 13 OF GOVERNMENT'S PROPOSED FINDINGS:**

"13. As Bell acknowledged in a letter dated July 31, 2001, Def. App. 164, Bell continued to negotiate and sign contract modifications as "full and equitable adjustments" with no time extensions, and no language reserving any claims or rights, through and including bilateral Modification No. 140, executed on April 5, 2001. Def. App. 27-162. (In its July 31, 2001 correspondence, Bell attempted to assert reservations of rights retroactively, for modifications that Bell had previously signed, addressing changes initiated after September 1,

2000. Def. App. 169. As of the date of that letter, Bell had missed all of the milestones established by modification 93. Def. App. 22.)"

**<u>BASES FOR OBJECTIONS</u>:**

The Government's proposed finding misstates and misrepresents BELL's July 31, 2001 letter. BELL's letter expressly states that BELL had reserved its rights and was forced to reiterate the point because the Government had inundated BELL with additional changes after Modification 93 was negotiated and executed, and had recently informed BELL that it was reserving its rights to withhold payment, etc. if BELL failed to meet the interim milestone dates set forth in Modification 93.

**<u>PROPOSED REVISION TO PARAGRAPH 12 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

13. On July 31, 2001, BELL reiterated to the Government in writing that BELL reserved it rights to make a claim for damages for changes made by the Government because the Government had not honored its commitments to issue only a few changes after Modification 93 and to pay BELL for acceleration costs for additional changes. <u>See</u> BELL's 7/31/01 Letter, Ptf. App. at 75-76; and Bardin Dep. Tr. at p. 38, Line 10 – p. 40, Line 3, Ptf. App. at p. 137-139. BELL's letter noted that the Government had issued unilateral directives to BELL to proceed with additional work "without impact to the project schedule or completion date," but refused to pay for the costs associated with such performance. It further noted that, because the Government had recently notified BELL that it reserved its right to withhold payment, etc. if BELL failed to meet the interim milestone dates set forth in Modification 93, BELL would likewise reiterate that it reserved its rights to seek damages. <u>See</u> BELL's 7/31/01 letter, Ptf. App. at 76.

**(8) <u>PARAGRAPH 58 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

"58. The language quoted in paragraph 11 above is the final paragraph of each and every bilateral modification described in paragraphs 14-57 above."

**<u>BASIS FOR OBJECTION</u>**

As with Mod. 93, the Government's assertion ignores the fact that labor inefficiency and/or cumulative impact were not addressed by the contract modifications referred to in paragraphs 14-57. Moreover, BELL does not seek a time extension with regard to the subject contract modifications referred to in paragraphs 14-57.

**(9) <u>PARAGRAPH 60 OF GOVERNMENT'S PROPOSED FINDINGS</u>:**

"60. NIH made payment to Bell of the prices agreed upon in all modifications cited above."

**<u>BASIS FOR OBJECTION</u>:**

The Government has failed to pay BELL for all base contract work and for all additional work covered by change orders. The Government concedes that it has not paid BELL its Contract balance of $563,125.00, which includes monies owed for change order work. <u>See</u> Daigle Dep. Tr. at p. 62, Lines 2-5, Ptf. App. at 31. In addition, the Government has failed to pay BELL for additional work that was not the subject of agreed upon contract modifications. Furthermore, the Government has assessed $447,678.00 purported liquidated damages against BELL. <u>See</u> Daigle Dep. Tr. at p. 63, Lines 2-10, Ptf. App. at 32. Simply put, the Government has not made payment to BELL for all amounts agreed to in all bilateral modifications.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

/s/ Richard O. Wolf
Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

Dated: July 15, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of July, 2005, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

/s/ Richard O. Wolf
Richard O. Wolf