**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **BELL BCI COMPANY,** | |
| **Plaintiff,** | |
| **v.** | **No. 03-1613C** |
| | **Judge Wolski** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**PLAINTIFF'S APPENDIX IN SUPPORT OF**
**PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND**
**OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Richard O. Wolf**
**Robert D. Windus**
**MOORE & LEE, LLP**
**1750 Tysons Boulevard, Suite 1450**
**McLean, Virginia 22102-4225**
**Telephone: (703) 506-2050**
**Facsimile: (703) 506-2051**
**E-mail: r.wolf@mooreandlee.com**

**Dated: July 15, 2005**

**Counsel for Plaintiff**

# INDEX TO PLAINTIFF'S APPENDIX


| DESCRIPTION | PTF. APP. |
|---|---|
| Affidavit of Jeremy Bardin……………………………………………………… | 1 |
| NIH's GPRA Report……………………………………………………………….. | 14 |
| Government's Rule 30(b)(6) Deposition Transcript……………………………….. | 18 |
| Scott Deposition Transcript……………………………………………………… | 25 |
| Daigle Deposition Transcript……………………………………………………. | 29 |
| Government's 1/13/05 Letter……………………………………………………. | 34 |
| CPM Narrative for Schedule Update No. 7………………………………………... | 36 |
| Government's Feasibility Study………………………………………………… | 38 |
| Government's Executive Report…………………………………………………... | 41 |
| Government's JOFOC……………………………………………………………….. | 44 |
| BELL's January 14, 1999 Price Proposal………………………………………. | 49 |
| Mod. 5…………………………………………………………………………………... | 51 |
| Mod. 24……………………………………………………………………………. | 53 |
| EWO 240…………………………………………………………………………….. | 55 |
| Mod. 78……………………………………………………………………………. | 58 |
| BELL's August 2000 TIA……………………………………………………… | 60 |
| Mod. 93……………………………………………………………………………. | 62 |
| Government's Summary of Negotiations…………………………………………. | 65 |
| Defendant's Response to Interrogatory No. 5…………………………………….. | 68 |
| BELL's 11/20/01 Letter to CRSS/Jacobs…………………………………………. | 70 |
| BELL's 2/20/01 Letter to Contracting Officer……………………………………. | 72 |
| BELL's 7/31/01 Letter……………………………………………………………. | 75 |

| DESCRIPTION | PTF. APP. |
|---|---|
| Mod. 142 | 77 |
| Mod. 144 | 78 |
| Mod. 145 | 79 |
| Mod. 147 | 80 |
| Mod. 148 | 81 |
| Mod. 149 | 82 |
| Mod. 152 | 83 |
| Mod. 156 | 84 |
| Mod. 159 | 85 |
| Mod. 160 | 86 |
| Mod. 162 | 87 |
| Mod. 163 | 88 |
| Mod. 164 | 89 |
| Mod. 165 | 90 |
| Mod. 166 | 91 |
| Mod. 167 | 92 |
| Mod. 168 | 93 |
| Mod. 169 | 94 |
| Mod. 170 | 95 |
| Mod. 171 | 96 |
| Mod. 172 | 97 |
| Mod. 173 | 98 |
| Mod. 175 | 99 |
| Mod. 176 | 100 |

| DESCRIPTION | PTF. APP. |
|---|---|
| Mod. 178 | 101 |
| Mod. 179 | 102 |
| Mod. 180 | 103 |
| Mod. 181 | 104 |
| Mod. 182 | 105 |
| Mod. 183 | 106 |
| Mod. 184 | 107 |
| Mod. 185 | 108 |
| Mod. 186 | 109 |
| Mod. 187 | 110 |
| Mod. 188 | 111 |
| Mod. 189 | 112 |
| Mod. 190 | 113 |
| Mod. 191 | 114 |
| Mod. 192 | 115 |
| Mod. 193 | 116 |
| Mod. 194 | 117 |
| Mod. 195 | 118 |
| Mod. 196 | 119 |
| Mod. 197 | 120 |
| Mod. 198 | 121 |
| Mod. 199 | 122 |
| Mod. 200 | 123 |
| Mod. 202 | 124 |

| **DESCRIPTION** | **PTF. APP.** |
| --- | --- |
| Mod. 203 | 125 |
| Mod. 204 | 126 |
| Mod. 205 | 127 |
| Contracting Officer's Final Decision | 128 |
| Bardin Deposition Transcript | 136 |

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of July, 2005, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

/s/ Richard O. Wolf
Richard O. Wolf

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BELL BCI COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-1613C** |
| | ) | **Judge Wolski** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF JEREMY BARDIN IN SUPPORT OF**
**BELL BCI COMPANY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jeremy Bardin, being duly sworn, affirms the following:

1. I am over 21 years of age, of sound mind, and make this affidavit based upon personal knowledge.

2. On or about March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with the United States (the "Government" or "NIH") for the fixed-price sum of $63,663,745.00 to construct a new laboratory research building, referred to as NIH Building 50, to be located at NIH's Bethesda, Maryland campus (hereinafter the "Project" or "NIH Building 50").

3. I was the Project Manager for BELL BCI Company ("BELL") on the Project. As Project Manager, I had overall day-to-day responsibility for BELL's work on the Project. As part of my regular duties, I reviewed the Contract's terms and conditions and dealt with the Government and its representatives regarding the matters arising under the Contract, including negotiating change orders to the Contract.

4. The Government retained HLM Design to prepare the Project design plans and specifications bids for the construction of the Project. BELL was required to construct the Project in accordance with the plans and specifications that the Government, through HLM Design, prepared.

5. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and laboratory space, including approximately 2,788 gross square meters of laboratory animal holding space.

6. The Contract required the original scope of work to be completed not later than 821 calendar days following the Government's issuance of Notice to Proceed ("NTP"). The Government issued NTP effective as of April 1, 1998. Thus, June 29, 2000 was the original Contract completion date. The completion date was extended as the Government made numerous changes to the Contract.

7. When the Government wanted to change the Project design or correct a design error, it would issue BELL a request for information called a "CMRFI," or a Change Bulletin, asking BELL to submit a proposed price to perform the additional work. In response, BELL would submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, the Government and BELL would then execute a Modification of Contract ("Mod.") setting forth the change and agreed upon price.

8. BELL was not obligated to perform additional work until a change order was issued, or a directive to proceed was issued by the Contracting Officer. In practice, however, and with the Government's knowledge, encouragement and consent and in order to mitigate delays,

BELL typically began performing the additional work without waiting for the Government's execution of a change order. This arrangement provided the benefit of avoiding delay.

9. From April 1998 through December 1998, BELL was able to perform the work in a timely manner. During that period, the Government made approximately 53 changes to the work. BELL, however, met the required completion milestones for that timeframe. As of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 noted that the Project was actually 13 days ahead of schedule.

10. Starting in or about December 1998, however, the Government initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, timely and cost-effective manner.

11. At that time, the Government notified BELL that it was contemplating adding a completely new 4th Floor to the Project, changing it from a 5-story to a 6-story building. The new 4th Floor was to be inserted between the original 3rd and 5th Floors. The Government advised BELL that the timeframe it to make a final decision on whether to add the new 4th Floor was very limited (*i.e.*, before the end of January 1999) and it directed BELL to quickly prepare a price proposal for the 4th Floor addition.

12. BELL was somewhat reluctant to submit a price proposal because, at that time, the Government did not have a detailed design proposal for the new 4th Floor. The Government advised BELL that the new 4th Floor would be a duplicate of the existing 3rd Floor both on the interior and exterior.

13. The Government provided BELL with a feasibility study prepared by HLM Design (the Government's Feasibility Study"), an architectural design firm, that reiterated that the new 4th Floor would be a duplicate of the existing 3rd Floor.

14. Based on the Government's repeated oral and written representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, BELL obtained prices from its subcontractors and then, on January 14, 1999, submitted its price proposal to the Government to construct the new 4th Floor for approximately $9.8 million. In reliance upon the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and taking into account that the Project was then 13 days ahead of schedule, BELL estimated that an approximately 90 calendar-day extension would enable it to complete the proposed new 4th Floor and the remaining base Contract work.

15. I have reviewed the Government's "Proposed Findings of Uncontroverted Fact" that it filed in this case. In Paragraph 4 of the Government's "Proposed Findings of Uncontroverted Fact" the Government asserts that BELL's price proposal was based on a design developed jointly by BELL and the Government. The Government's assertion is totally inaccurate. BELL did not jointly or otherwise develop the design for the new 4th Floor. Rather, as stated in the Government's Feasibility Study, and as noted in BELL's January 14, 1999 price proposal, the Government (through HLM Design) was solely responsible for preparing the design. To be clear, BELL had no design responsibility for the new 4th Floor or the Project.

16. In fact, when the Government directed BELL to prepare a price proposal for the new 4th Floor, it advised BELL that it would complete the final design plans by no later than March 1999. The Government, however, did not keep its commitment.

17. The negotiations between BELL and the Government relating to the new 4th Floor proceeded in three phases. I was personally involved in the negotiations on BELL's behalf, particularly with regard to the third and final phase. The first phase involved the structural steel and concrete work for the 4th Floor.

18. On or about January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and concrete for the 4th Floor (hereinafter "structural work"). In accordance with the Government's representations that the 4th Floor would replicate the 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00, and to extend the Contract time by 30 calendar days.

19. On or about April 20, 1999, the Government executed Mod. No. 5 to the Contract pursuant to which it agreed to pay BELL $1,579,127.00 for the structural work associated with the 4th Floor, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000.

20. The second phase of negotiations involved certain subsequent changes to the 4th Floor by the Government.

21. On or about February 16, 1999, the Government issued Change Bulletins 6, 7 and 10 which added additional work to the 4th Floor that was not included in BELL's initial proposal. Later, on or about March 2, 1999, the Government issued Change Bulletin 3 as a partial infrastructure or "shell" design for the 4th Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the 4th Floor that was materially different from that found in the 3rd Floor of the Project and which had served as the basis for BELL's initial price proposal for the new 4th Floor.

22. On or about March 29, 1999, NIH issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10.

23. During this period, BELL notified the Government that, because of the Government's failure to honor its commitment to provide BELL with the final 4th Floor plans in March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999.

24. On or about June 23, 1999, the Government executed Mod. No. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000.

25. The third phase of negotiations involved certain "fit out work" on the new 4th Floor that the Government directed BELL to perform.

26. The Government's delay in providing BELL with a complete design for the new 4th Floor had a major negative impact on BELL's performance of the work and its ability to lock in prices from subcontractors. As noted above, BELL obtained prices from its subcontractors in the December 1998 through January 1999 time period based on the assumption that the new 4th Floor would duplicate the existing 3rd Floor and that the final design would be completed by no later than March 1999.

27. On or about September 30, 1999, approximately 7 months later than promised, the Government issued Bulletin 35 containing the final plans and specifications for the new 4th Floor. The changes that the Government made that were reflected in its Bulletin 35 were so extensive that the new 4th Floor no longer bore any resemblance to the 3rd Floor that was used as

the basis for BELL's initial price proposal that had been submitted nearly 9 months previously. In fact, Bell had to remove, relocate and demolish much of the work that had been previously completed based upon the direction provided to construct a "duplicate" floor. This had not been previously accounted for and disrupted the Project schedule and work flow.

28. NIH's issuance of Bulletin 35 coincided with the release and pricing of the "Kit of Parts" changes. This presented an extraordinary challenge for BELL to perform the base Contract work and changed work, while at the same time carrying out the necessary estimating and procurement work to respond to NIH's changes. BELL was severely burdened at this time trying to put together price proposals to address NIH's numerous changes as well as maintain progress on completion of the work. As a result, BELL's efficiency was further negatively impacted

29. On or about April 14, 2000, NIH unilaterally issued Mod. No. 78 which, among other things, directed BELL to proceed with the work associated with Bulletin 35. Pursuant to its unilateral Mod. No. 78, NIH committed to pay BELL at least $1,803,037.00 for the work required by Bulletin 35 and the referenced RFIs "so that work can proceed." NIH further agreed to a 30 calendar day extension and to continue negotiations with BELL for the costs of the additional work.

30. In or about August 2000, as part of its continuing negotiation with NIH regarding the 4th Floor, BELL submitted a Time Impact Analysis ("TIA") to NIH that incorporated a limited number of the changes made to that point and the impact to the schedule from those changes that could be identified at that time. BELL's TIA incorporating the limited number of changes showed that the Project could be substantially completed on or about September 1, 2001.

31. As stated above, I have reviewed the Government's "Proposed Findings of Uncontroverted Fact" that it filed in this case. In Paragraph 8 of the Government's "Proposed Findings of Uncontroverted Fact" the Government asserts that the TIA that BELL submitted in August 2000 incorporated all changes that the Government had made. The Government's assertion is totally inaccurate. BELL's TIA did not include all changes that the Government had made. In fact BELL's TIA expressly stated that it incorporated only a limited number of the changes that the Government had made.

32. As the negotiation process continued, BELL and NIH had extensive discussions regarding the Project Schedule. BELL made it clear to NIH during the negotiations that additional changes by NIH would have a profoundly negative impact on meeting the Project milestones. BELL's TIA and other Project Schedule data confirmed that virtually all the remaining Project work activities were near critical.

33. During these negotiations, the Government represented and promised to BELL that, after August 2000, there would be no more than 4 or 5 minor additional changes to the Project. In order to minimize impacts to the Project Schedule, it was understood that these few additional changes would be done on an accelerated basis and that BELL would be compensated accordingly.

34. After giving its promise of limited future changes that would be performed on an accelerated basis, the Government persisted in seeking BELL's agreement to a Contract modification that would establish April 30, 2001 as the revised Contract completion date. Additionally, the Government requested a "partial occupancy plan" for the turn-over of the building. Bell only agreed to this based upon the Government's need to uphold certain

relocation dates previously established and in motion by the Government's contract representatives.

35. On or about October 2, 2000, in reliance upon the Government's representation that only a few additional changes would be made, and after performing a substantial portion of the work in accordance with NIH's unilateral Mod. No. 78, BELL signed Mod. No. 93.

36. Mod. No. 93 expressly referenced BELL's EWO No. 240, and stated that NIH would pay BELL "for the remaining direct and indirect costs of the Floor 4 Fit-Out," but did not include compensation for adverse cumulative impacts incurred by BELL related to the multitude of other changes issued by NIH. Mod. 93 reflected a Contract completion date of April 30, 2001, along with other interim milestones. Implicit in Mod. 93 was BELL's reservation of right to seek additional costs and time related to cumulative impacts and other damages.

37. Furthermore, Mod. No. 93 stated that payment was expressly limited to compensating BELL for "delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000." Mod. 93 did not include payment for labor inefficiencies and cumulative impact and other damages. The language of Mod. 93, like the negotiations preceding it, reflects compensation for time, not inefficiencies or cumulative impacts.

38. Pursuant to the Government's representation that only a few more minor changes would be made thereafter, Mod. No. 93 dealt only with certain limited costs associated with "Government changes" given to BELL as of August 31, 2000.

39. When BELL agreed to Mod. No. 93, it did so in reliance upon the Government's representation that only 4-5 minor changes would be made thereafter, and that it would pay for

acceleration costs for those few changes. If the Government had not made those representations, then BELL would not have agreed to Mod. No. 93.

40. As of August 31, 2000, BELL had generated 461 EWOs in response to the changes that NIH made. After Mod. No. 93 was issued, and contrary to its promises to BELL, NIH issued numerous changes. In fact, BELL had to generate approximately 300 more EWOs after August 31, 2000, and over 90 additional Contract modifications were issued thereafter.

41. Thus, contrary to its representation that only a few minor changes would be made after Mod. 93, the Government made numerous changes. The Government also reneged on its promise to pay for subsequent changes on an accelerated basis. In addition, the Government refused to grant BELL any additional time extension for all of the changes that the Government made after Mod. 93.

42. BELL notified the Government orally and in writing that the Government's continued changes were negatively impacting BELL's ability to timely and efficiently complete the work.

43. In a series of executed contract modifications and in other writings, BELL expressly reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering due to the Government's changes.

44. On or about February 5, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. No. 93, Bell would have met all of the milestone completion dates set forth therein.

45. The Government's post-Mod. 93 changes caused BELL's supervision and labor to be severely diluted and forced BELL to redirect its workforce in order to address the changes and complete the work. As a result, BELL's productivity was significantly reduced.

46. BELL could not assess the cumulative impact of the Government's changes until the changed work was completed on or about February 5, 2002. In accordance with the terms of the Contract, BELL then timely submitted a Request for Equitable Adjustment ("REA") to the Contracting Officer. BELL's REA was denied.

47. Other actions beyond the Government's pre and post-Mod 93 changes negatively impacted BELL's ability to timely and efficiently complete the work.

48. The Contract contained what was called a " Kit of Parts" ("KOP") pricing mechanism for certain laboratory items, *i.e.*, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractor and suppliers. The Government was permitted to alter the quantities of items identified in the KOP unit price lists within 550 calendar-days of contract award. If the Government made more than five changes for KOP, BELL would be entitled to renegotiate the unit prices.

49. Contrary to the limits agreed to in the KOP in terms of items that could be changed and the quantity of changes, the Government proceeded to invoke the KOP as a tool for making wholesale architectural, structural, mechanical and electrical design changes. Moreover, the Government asserted that the number of changes it could make before BELL was entitled to renegotiate the unit prices was to be determined by the "net" number of changes. Accordingly, the Government contended that if it ordered 10 additional isotope rooms from the KOP but deleted 10 others, it had made zero "net" changes towards the total that would allow BELL to renegotiate.

50. BELL notified the Government that its actions with regard to the KOP were contrary to the terms and spirit of the Contract. BELL further notified the Government that BELL's costs just to coordinate all the additions and deletions that NIH made to the KOP list were substantial and that BELL would pursue recovery of those costs.

51. The foregoing statements are true and correct to the best of my knowledge and belief.

*[Remainder of page intentionally left blank]*

Respectfully submitted,

7/11/05

Jeremy Bardin

SWORN AND SUBSCRIBED TO BEFORE ME THIS 11TH DAY OF JULY, 2005.

Notary Public

My Commission expires: SYNDEE ALEXANDRA WHILEY NOTARY PUBLIC COMMONWEALTH OF VIRGINIA MY COMMISSION EXPIRES DEC. 31, 2005

# National Institutes of Health

## Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Report

U.S. Department of Health and Human Services

February 2002

# Introduction

In 1993, Congress passed and the President signed into law the Government Performance and Results Act (GPRA), P.L. 103-62. This legislation's broad intent is to enhance the effectiveness, efficiency, and accountability of government programs by directing federal agencies to more sharply focus their management efforts on the results that program spending yields. With better information on spending and program effectiveness, federal managers are expected to be better able to improve program performance. GPRA is also expected to make information on program performance more readily available to the Congress for policymaking, spending decisions, and program oversight.

Consistent with the Department of Human Health and Service's (DHHS) approach, this document integrates the National Institute of Health's (NIH) Annual Plan and Annual Report into a single document to eliminate redundancy and to facilitate presentation of the overall thrust of the agency's program strategies and accomplishments across multiple years. NIH's FY 2003 performance plan represents the culmination of lessons learned from previous GPRA performance plans and reports. It provides a picture of NIH's key activities, strategies, and performance goals undertaken to accomplish NIH's mission.

The planning elements of this document describe NIH's mission and long term goals; the resources available; and the programs, strategies, and performance expectations that mark the agency's intended path toward achieving these goals. The goals and targets described for FY 2003 are "initial" and FY 2002 are "revised final." The document also includes previously published "revised final" FY 2001 goals and targets.

The reporting elements of this document describe NIH's accomplishments and progress toward goal achievement during FY 1999 - FY 2001.

The Office of Evaluation, Office of Science Policy in NIH's Office of the Director prepared this document. If you have questions or comments, please contact John Uzzell, Director, Office of Evaluation on (301) 496-9285.

An electronic version of this document will be available in March 2002 from NIH's World Wide Web server at the following address: http://www1.od.nih.gov/gpra/default.htm. Previous performance plans and reports are available now.

## Goal b) Complete the Louis Stokes Laboratories Building.

The Louis Stokes Laboratories (LSL, Building 50) provides laboratories, support spaces, work stations and office space for 650 scientists performing the work of various NIH Institutes and Centers. This six-story, 24,154 gross square meters (260,000 gross square feet) consolidated research laboratory includes specialized areas such as animal facilities, a nuclear magnetic resonation lab, and a cryogenic electron microscope suite. Its state-of-the-art design incorporates such features as generic open labs to foster interaction between researchers, flexible work stations, interstitial space to provide greater adaptive capabilities to changing research requirements, and unique energy saving features.

The Louis Stokes Laboratories support research functions previously housed in various laboratory structures that can no longer meet the needs of today's research and technological advancements. The consolidated laboratory provides an environment where collaborative research can take place and potentially result in faster delivery of cures for infectious diseases and disorders. Various NIH ICs plan to use this facility, including the National Institute of Diabetes and Digestive and Kidney Diseases, National Human Genome Research Institute, National Cancer Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute on Deafness and Other Communication Disorders, and National Heart Lung and Blood Institute.



Ptf. App. 16

| Performance Targets | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
|---|---|---|---|---|---|
| Complete 65% of the construction. | ◇→ | ◆ | | | |
| Complete 95% of the construction. | | ◇→ | ◆ | | |
| Complete construction. | | | ◆ | | |

| ◆ Target Met | ◇ Target Active | ◇→ Target Not Met and Extended | ✖ Target Not Met |
|---|---|---|---|

## *Summary of Performance Results*

- **NIH completed construction of the Stokes Laboratories building on schedule.** By the end of FY 1999, NIH had completed 56.4% of the construction, somewhat less than the 65% target. Delays were primarily due to the need to make space adjustments to support current and projected research requirements. The balance of this work was completed in December 1999. By the end of FY 2000, NIH had completed 90% of the construction, which was close to its 95% target. NIH met this target in the first quarter of FY 2001. NIH met its long-term goal to complete construction of the Louis Stokes Laboratories building in FY 2001.

## *Verification/Validation of Performance Measures and Data Issues*

Performance was measured by the percent of construction completed at the end of each fiscal year. Process and milestone data were obtained from the CMMS and PIN systems. Performance data were verified through quality control systems that track, monitor, verify, and validate project goals consistent with internationally recognized standards of operations.