IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - -x

BELL BCI COMPANY, :

Plaintiff, :

vs. : No. 03-1613C
: (Judge Wolski)

THE UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, February 24, 2005

Deposition of FRANK MICHAEL KUTLAK, called for examination by counsel for the plaintiff, pursuant to notice, at the office of Richard O. Wolf, Esq., Moore & Lee, LLP, 1750 Tysons Boulevard, Suite 1450, McLean, Virginia, before Laurel P. Platt, a Registered Diplomate Reporter and a Notary Public in and for the State of Virginia, beginning at 10:05 a.m., when were present on behalf of the respective parties:

Q Now, one point of clarification in that regard, and this deals with delay and allocation of delay and those issues, the costs associated with delay. Counsel for the Government had sent us a letter I believe dated January 13, 2005. It deals with topic number 12 in the deposition notice there. Basically, it just said essentially that the Government had designated experts to speak to the issue of delay in terms of allocation, et cetera. Is that your understanding as well that essentially the Government will rely on its experts for those issues?

A Yes.

Q In other words, I don't want to -- if that's going to be the case, I don't want to spend time discussing an issue that the Government is going to rely on someone else for. So it's correct?

A Yes.

Q Okay. So we will deal with that issue accordingly with the experts.

Have you ever met with the experts that the Government has retained in this case?

A I am not sure who you're referring to or the

project, is it correct that you were involved in some negotiations but not all?

A Correct. Yes.

Q Besides yourself, who on behalf of the Government was involved in negotiating change orders with Bell?

A The contracting officer and Jacobs personnel.

Q And the contracting officer is Barbara Taylor?

A Correct.

Q In terms of the Jacobs personnel, can you identify who was involved in that?

A It would be -- Brian Temme was the manager, and Earl Johnson was the change order engineer.

Q What does the change order engineer do?

A He evaluates and quantifies both the contractor's change request and the Government's position.

Q Since we are speaking of Jacobs, generally what were Jacobs' duties on the Building 50 project?

A Jacobs is what we call a CQM, a construction quality manager. They essentially are extensions of

me. They're extensions of my staff.

The Government does not, simply because of continuing workload and assignability, maintain all of these people as full-time Government employees, so they hire the services of companies like that. And on this project, they were essentially my staff. They performed project management. They performed construction inspections and things like that.

Q For lack of a better phrase, they were your eyes and ears in various areas on the project?

A Yes. Yes.

Q Approximately how much was Jacobs paid for its services on Building 50?

A A few million dollars. Three or four million is my guesstimate. I really don't remember, but somewhere -- I would think it's somewhere in that range. It's essentially a fee-for-service type of thing. It's an accumulation of hours at agreed-upon rates.

Q With regard to this litigation between Bell and the Government, has the Government also retained Jacobs' services?

After all the orals are completed, then we meet. We compile the scores. Then we determine who we feel technically is the best.

After that is all done and it's all recorded, then we meet with the contracting officer, and she tells us what the prices are. And then we decide what is the best value to the Government.

In both cases on Building 50, the lowest bidder did not get the award. In both cases we determined that the criteria of somebody whose price was slightly higher was much more of a value to the Government. In other words, it was a better value for the Government to pay a little bit more money to get what we all scored as a more qualified contractor.

Q In that regard, you look at the past performance of whatever contractor, and you check references and that type of thing?

A You check references. You look at past performance. You review their conformance to the criteria. You review their plans on how they propose to implement the project and so forth, their manpower, their various -- they basically put forth their

And this is just a follow-up lessons learned prepared by or for somebody. I had not been involved in this one at all. I literally haven't seen it.

Q All right.

A I mean I basically stopped working on this project three years ago, and I've been heavily, heavily involved in another major project.

Q I take it you're generally familiar with what's known as Mod. 93 in this case, Mr. Kutlak?

A Yes. Mod. 93 was the mod. where we paid them for delays up to that date, and that was it.

Q Paid Bell for delays?

A Yes. They accepted that mod. as all of the delays up to that date, whatever was issued.

Q Sure. Let me show you a copy. Let me ask you, you were involved in the negotiations of at least part of Mod. 93?

A I believe so, yes.

Q Do you recall who besides yourself for the Government was involved in that process?

A Well, the contracting officer, of course, and Brian Temme and probably Earl Johnson.

A Yes.
Q Was the basis of the negotiation of Mod. 93 the extra work orders that Bell had submitted?
MR. CHADWICK: Objection. Go ahead.
A I think it's quite clear in number 4. It just simply says, "all delays resulting," period.
Q In that regard, how does the Government interpret changes transmitted to the contractor by August 31, 2000, that language there?
A I would take that at face value.
Q How does the Government define changes as that term is used in this mod.?
A Any change from the previously agreed-upon scope of work, any agreed change.
Q By that do you mean an executed contract change or something more than that?
A Yes, an executed contract change. Well, I mean, obviously, you know that the contractor considers many things change, and the Government or whatever the owner is doesn't always consider them changes.
Q Fair enough. And the process often works,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - -x

BELL BCI COMPANY, :

Plaintiff, :

vs. : No. 03-1613C
: (Judge Wolski)

THE UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Friday, January 28, 2005

Deposition of TED M. SCOTT, called for examination by counsel for the plaintiff, pursuant to notice, at the office of Robert D. Windus, Esq., Moore & Lee, LLP, 1750 Tysons Boulevard, Suite 1450, McLean, Virginia, before Laurel P. Platt, a Registered Diplomate Reporter and a Notary Public in and for the State of Virginia, beginning at 10:03 a.m., when were present on behalf of the respective parties:

Q You agree with me that before Modification No. 93, we had one completion date, and it was tied to one liquidated damage amount for each day late.

A Correct.

Q Modification 93 established 14 individual milestones, and each milestone had a separate liquidated damage amount associated with the milestones; correct?

A Correct.

Q Prior to Modification No. 93, there were no interim substantial milestones that existed that were tied to liquidated damages; correct?

A That's correct.

Q When the schedule was revised to establish 14 substantial completion dates for each milestone, or actually one substantial completion date for the 14 -- let me try and rephrase that. You know what I'm trying to say.

A Right.

Q When the schedule was revised to establish the 14 milestone substantial completion dates, isn't it true that that revised schedule then contained

multiple parallel critical paths to these individual substantial milestones?

A Each milestone would have had a critical path to achieve that milestone.

Q So based on that, isn't it true that any effect of changes issued after Modification 93 would need to examine the individual critical path to each milestone in order to determine whether or not excusable delay or compensable delay existed with respect to each particular milestone?

A That's true.

Q In referencing page 77, all the way at the end is a table of planned versus actual substantial completion dates for each milestone. Am I correct in understanding that for each milestone under the substantial completion milestone dates, it does not have an asterisk on it in your table here? You have reached an opinion that Bell is solely responsible for all delays to that milestone.

A I did not analyze each milestone. So I didn't come to an opinion as to what the delays were for each interim milestone.

Q So if I understand your testimony, for each window you established, you did not analyze the effect any change had during that window on each individual milestone.

A That's correct.

Q Your analysis instead focused solely on the effect of the final substantial completion milestone.

A That's true.

Q Well, isn't it true that you would have to analyze the effect on each individual milestone to determine whether or not the contractor is due an excusable delay for liquidated damages for that milestone?

A That's correct.

Q So without doing that analysis, would you agree with me that you could not determine whether or not the contractor is in fact due an excusable delay to any of the milestones?

A Other than the overall one, that's correct.

Q Okay. Now, if I understand windows -- can we go off the record?

(Discussion off the record.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -x

BELL BCI COMPANY, :

Plaintiff, :

vs. : No. 03-1613C

: (Judge Wolski)

THE UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, January 27, 2005

Deposition of COLIN A. DAIGLE, called for examination by counsel for the plaintiff, pursuant to notice, at the office of Richard O. Wolf, Esq., Moore & Lee, LLP, 1750 Tysons Boulevard, Suite 1450, McLean, Virginia, before Laurel P. Platt, a Registered Diplomate Reporter and a Notary Public in and for the State of Virginia, beginning at 10:03 a.m., when were present on behalf of the respective parties:

contract types and the billing and costing methods used, looked at project accounting software used, the various construction software modules used.

Q Were you working under the supervision of a more senior person?

A I was, yes.

Q In your experience overall -- and I've looked at your CV -- you have references to involvement with delay claims, and likewise you have references to inefficiency claims.

A Yes.

Q Fair? I mean that's reflected in your CV. There's a difference between the two; correct?

A Generally, yes, there is.

Q They are not duplicative. They're not one and the same; correct?

A Right.

Q You can have an inefficiency claim without necessarily being delay.

A That's fair. I'd say that there are some interpretations that I have seen in the cases that I have been involved with where people have taken

latitude with the definition of delay or inefficiency. But generally I agree with what your statement was.

Q Okay. In approximately 2000, you said you got to KPMG?

A Correct.

Q What was your title there?

A Senior associate, I believe, or senior consultant.

Q Were you working under the supervision of someone else?

A I was.

Q What were your duties at KPMG?

A Approximately the same that I listed for PriceWaterhouseCoopers. I'd say at KPMG I had more responsibility for overall project management, managing projects start to finish, writing reports start to finish, performing the analysis, scoping out the analysis, determining what steps would need to be done, executing those steps, managing staff.

Q I was just going to ask. When you say management, what are you managing and who are you managing?

against Bell.

Q Okay. Let's look at that. You list that the Government has liquidated damages against Bell, as modified by Mr. Scott's report, of $447,678; correct?

A In footnote number 6 I show 481,726, which is what the Government had in one of the documents I reviewed. But the number that Mr. Scott has developed is slightly less at 447,678.

Q Is that the number you accept?

A That is the number I accept, yes.

Q How did Mr. Scott arrive at that?

A He arrived at that through his delay analysis of using a windows approach, looking at the milestones. And as a result of some of the changes on the project, liquidated damages were calculated. They were spread evenly I believe across 12 or 14 new milestones. And he followed the changes or he followed the procedures for calculating liquidated damages using the milestones and the days that he found Bell was entitled to.

Q And you testified earlier, I believe, you did not participate in performing that analysis.

A I did not.
Q Okay. So you rely on Mr. Scott entirely for that; correct?
A Correct.
Q Have you done any independent analysis with regard to the $121,000 for unilateral Contract Modification 206 that the Government claims?
A Other than looking for that amount in contract -- project correspondence -- I have seen that -- I have not investigated or analyzed the issues that make up that 121,000, no.
Q You have not investigated the issues that comprise the $61,399 in retesting costs that the Government claims.
A No, I have not.
Q Likewise, you have not investigated the issues that comprise the $20,000 for purported incomplete and deficient work that the Government claims.
A No.
Q You have not?
A I have not investigated that, no.

U.S. Department of Justice

Civil Division

PDK:DMC:KChadwick
DJ No. 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

Telephone: (202) 305-7561
Facsimile: (202) 305-7644

*Washington, D.C. 20530*

January 13, 2005

BY FACSIMILE AND MAIL

Richard O. Wolf
Moore & Lee, LLP
1750 Tysons Blvd., Suite 1450
McLean, VA 22102-4225

Re: Bell BCI Co. v. United States,
Fed. Cl. No. 03-1613C

Dear Mr. Wolf:

This letter continues our recent correspondence regarding discovery. First, this case seems to be subject to more than its share of unfortunate events: I learned yesterday that Barbara Taylor's mother passed away earlier in the week and that, as a result, Ms. Taylor will be unable to help us complete our interrogatory responses until next week. I will get our responses to you as quickly as I can, but, once again, I have little choice but to ask you for additional time. I expect to provide our responses no later than Friday, January 21.

Second, with regard to your RCFC 30(b)(6) topics, we continue to object to number 18 as overly broad and unduly burdensome. I am amenable to jointly contacting the Court by telephone about that issue, at a mutually convenient time. As for topic number 12, we will designate a witness, but you should be aware that the agency - as distinct from the United States in its litigating capacity, represented by the Department of Justice - has formed very few pertinent conclusions with respect to delays. I expect our RCFC 30(b)(6) witness to testify that (1) Bell did not complete the project on schedule, (2) the agency does not believe it is at fault, to any substantial degree, and (3) Bell's now-superseded REA did not change the agency's opinion.

The Government's current position, which we have developed in litigation, regarding the specific allocation of excusable and

unexcused delay, and the corresponding delay costs, has been explained by our experts in their reports, and will presumably be further explained during the experts' depositions. The primary purpose of RCFC 30(b)(6) is to permit parties to discover facts from one another, without having to guess which deponents would be most knowledgeable about particular issues. RCFC 30(b)(6) should not be used as a substitute for expert discovery, and an agency witness cannot be expected to testify regarding ultimate merits issues that can be meaningfully addressed only through expert review, analysis, and testimony. I look forward to discussing these matters further with you.

Sincerely,

KYLE CHADWICK
Trial Attorney
Civil Division
Commercial Litigation Branch

cc: D. Kornreich
K. Jordan, HHS