# SUMMARY of NEGOTIATIONS

Contractor: Bell Company
10605 Concord Street, Suite 205
Kensington, MD 20895

W.R. No.: HVX30019

Request for Proposal No.: NA

Contract No.: 263-98-C-0102

Change No.: 384

Modification No.: **093**

A. Description of Articles and Services and Period of Performance

Items:

1. Reference: NIH's Request for Proposal - Change No. 384 dated September 30, 1999, to provide Deferred Design construction changes for the 4th floor, per Bulletin # 35.

Delivery: April 15, 2001 (no time extension)

Total Price: $2,296,963.00 (after deduction of unilateral amount):
(Negotiated settled amount of $4,100,000.00 minus Mod. 78 unilateral amount of $1,803,037.00)

B. Acquisition Planning

N/A

C. Synopsis of Proposed Acquisition

The acquisition has not been publicized under FAR Subpart 5.2. This contract action is made under the terms of an existing base contract that was previously synopsized in sufficient detail to comply with the requirements of 5.207 with respect to the current contract action.

D. Contract Type

This is a firm fixed-price contract.

E. Extent of Competition

N/A

F. Technical Evaluation

The Project Officer's technical evaluation is included under Tab No. 5.

G. Business Evaluation

A Request for Proposal was issued to the Contractor on September 30, 1999. The Government received a proposal from the Contractor (EWO # 240-R1) dated August 30th, 2000.

H. Competitive Range

N/A

I. Cost Breakdown and Analysis

The cost breakdown and analysis for the negotiation of Change No. 384 is as follows:

| | |
|---|---|
| Government Estimate: | $2,573,619.00 |
| Contractor's Proposal: | $3,481,749.00 |
| Difference: | ($908,130.00) |
| Total Price: | **$4,100,000.00** |

1. All costs are considered by the Government to be allocable, allowable and reasonable.

J. Government-Furnished Property and Government-Provided Facilities

No Government furnished property or Government furnished facilities will be provided.

K. Negotiations

Negotiation of the subject subcontractors proposal's were not required, inasmuch, technical discussions were held between CRSSC and Bell and their subcontractors which clarified issues related to the correct scope of work. In addition, EWO 240R1 included extended overhead for a month @ $102K as previously agreed for the added floor. During negotiations regarding extended overhead, it was agreed that it would be most beneficial to the project to address all changes to date and establish a revised contract completion date, with phased completion milestones to facilitate the Governments occupancy schedule. The Government and Contractor agreed to a 6.5-month time extension with 14 individual milestones, and compensation in the amount of $686,459 for the time impact of all changes issued on or before 8/31/00. This amount is equal to the previously agreed rate of $102,450 per month and less than the Governments estimate of $278,234 for a General Contractors extended overhead. Therefore, these clarifications led to the re-issuance of the Contractor's proposal, which is deemed reasonable. Acceptance is recommended for the reasons noted below in par. L.

L. Other Considerations

A Delay Costs of $700,000 was added to this Modification in an effort to compensate the Contractor for any delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000. The design delay cost was estimated at a substantially higher cost than the amount settled with Contractor (see estimated extended overhead and general conditions cost). In addition, the Contractor shall adhere to and comply with the revised contract completion date and substantial completion milestones (as outlined in the Modification No. 093 dated Sept. 25, 2000).

M. Terms and Conditions

The terms and conditions of the base contract apply to this change.

N. Recommendation

It is hereby recommended that a bilateral modification in the amount of **$2,296,963.00** with no time extension be awarded to Bell Company as fair and equitable. Execution of a bilateral contract modification for the scope of work specified in Paragraph A above at the credit amount of **$2,296,963.00** is in the best interest of the Government.

O. Signature

Barbara Taylor [signature] 9/27/00

Barbara Taylor – Contracting Officer    Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BELL BCI COMPANY, )
)
Plaintiff, )
)
v. ) No. 03-1613C
) (Judge Wolski)
THE UNITED STATES OF AMERICA, )
)
Defendant. )

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

The United States responds as follows, pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), to the interrogatories served by Bell BCI Company on December 9, 2003.

## GENERAL OBJECTION

We object to the definitions and instructions accompanying the interrogatories to the extent they may purport to impose obligations beyond those imposed by the RCFC.

PENGAD 800-631-6989
Taylor
DEPOSITION EXHIBIT
1

Interrogatory No. 5

Identify all facts and documents upon which you rely, in whole or in part, to support the Affirmative Defenses alleged in your Answer to the Complaint.

Response:

Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000. That modification was negotiated upon the basis of a time impact analysis submitted by Bell in August 2000 that purportedly incorporated all change orders to date and projected an approximate substantial completion date of September 1, 2001. Modification 93 contained a complete release, covering both direct costs and time, and no reservation of claims.

As a result, (1) plaintiff's claims are barred by accord and satisfaction, and have been fully paid, to the extent the claimed damages are traceable to change orders issued on or before August 31, 2000; (2) modification 93 constitutes a waiver of those claims; and (3) the defenses of equitable estoppel and laches are applicable because, in negotiating and implementing modification 93, the Government relied to its detriment upon Bell's express representation in the modification that Bell would seek no further compensation for delays resulting from pre-September 2000 change orders, while Bell exhibited a lack of diligence in

10605 Concord St., Suite 205 • Kensington, MD 20895 • (301) 962-7700 • FAX (301) 962-7701

BELL

RECEIVED
NOV 21 2000
JACOBS FACILITIES, INC.

November 20, 2000

CRSS Constructors Inc.
9000 Rockville Pike
Building TR-50A MSC 5901
Bethesda, MD 20892-5901

Attn: BT CC: BTa, FK, File
ACTION: [illegible]
CSI 1000 Issue Changes

Attention: Brian Temme

Subject: Directives to Proceed and Pending Notification of Cost Impacts

Reference: NIH Building 50 - Bid Package II - Bethesda, Maryland

Dear Mr. Temme,

As we agreed in our 8/28/00 partnering session, Bell will require a notification to proceed with additional work for the remainder of this project. While we have received several directives from your office to proceed with the work without impacting the project completion dates, there are many more which we are awaiting direction prior to proceeding. Furthermore, some of these directives may effect the completion milestones even with acceleration. For example, depending on when a design can be provided by the engineer, we are uncertain if we will be able to complete the elevator sump pump work (EWO 507) in time for the elevator inspection. We do not wish these type of issues to become a scapegoat for not completing our work on time. Therefor, we have created the attached log to try and recognize the status of what appears to be an increasing amount of work. This log is a bi-product of our EWO log and only contains information for changes received after 9/1/00.

In order to effectively carry out and direct the completion of all changes issued by the Government after 9/1/00, we request that an understanding be reached between the Government and Bell.

1. Directives received from your office are often hand written on a transmittal form. We do not object to this procedure as long as the Contracting Officer recognizes this as an equal and binding document similar to an official change order from the Government.
2. When directed to proceed without impacting the project schedule, Bell will do one of three things within 5 work days.
   - A. Notify your office that additional information is required.
   - B. Notify your office that we are proceeding with whatever acceleration is necessary with acknowledgment that the work will be completed within the contract performance period.
   - C. Notify your office that we cannot complete the work without effecting the project completion milestones.
3. We require the Government's assurance that when a directive to proceed without impact to the project schedule is given, the Government will also endorse, authorize and compensate the use of any acceleration of manpower, management and procurement resources required to complete the work.

PENGAD 800-631-6989 Taylor DEPOSITION EXHIBIT 11

BELL

We feel that these clarifications will enable us to confidently communicate and direct our workforce and subcontractors to complete all the changes that are initiated for the remainder of this project. We will transmit the attached form every Monday for your review and action. If you would like us to modify this form in any way to better suite your needs we will be happy to do so.

Please contact our office with any questions related to this subject and forward an acknowledgment for the three items listed above as soon as possible.

Sincerely,
BELL BCI COMPANY

11/20/00

Jeremy Bardin
Project Manager

encl: Notification of Cost Impact Form

cc: Jerry Romandino
Roger Lonneville
Scott Stevenson
Bill Rothrock
Pat Reilly
File, Govt-OUT

10605 Concord St., Suite 205 • Kensington, MD 20895 • (301) 962-7700 • FAX (301) 962-7701

BELL

February 20th, 2001

National Institutes of Health
Building 13, Room 2S75
Bethesda, MD 20892

Attention: Barbara Taylor, Contracting Officer

Subject:: Response to Government Letters Regarding Substantial Completion

Reference: NIH Building 50 - Bid Package II - Bethesda, Maryland
January 3, 2001 "Basement Vivarium Substantial Completion Milestone"
January 26, 2001 "Basement Vivarium Substantial Completion Inspection"
February 2, 2001 "2nd Floor, Basement and Site Hardscape Substantial Completion Milestones
February 2, 2001 "Request to Overturn Retention Decision by Construction Manager"

Dear Mrs. Taylor,

In response to your recent letters regarding Bell's failure to meet the substantial completion milestones agreed to in Modification No. 93 and your concerns with Bell completing the project on time, we offer the following.

1. The Government has repeatedly referenced the Modification No. 93 agreement which was based upon all changes up to August 31, 2000. This document makes no reference to agreements made for the execution and completion of changes occurring after September 1, 2000. The additional work that you suggest that Bell wanted to be afforded an opportunity to price was for "four or five major floor by floor equipment fit out changes" that the end users would be circulating. To date, we have priced only one of these changes on the first floor and assume the remainder will be issued under separate contract. Additionally, it was stated by the Government in our partnering session that the remaining changes would be minimal. Since August 31st, we have received, or created through the RFI process, 120 new extra work orders, of which 63 have been priced and are awaiting negotiation, 11 have been negotiated and 2 have been issued as a modification to our contract. Additionally, the government has not provided a notice to proceed on 42 of the 111 changes and has rejected 4.

We have worked with your team extensively over the past two months in an effort to negotiate and process changes. We are aware of several change orders that have recently been processed and forwarded to our office as well as an estimated $1,000,000 worth of changes that are "in the pipeline" to our office. Most of this work has already been completed and that is why we continue to be perplexed and frustrated with your decision to continue to withhold retention. We must state that the Government is sending the wrong message to Bell and the supporting subcontractors that continue to act pro-actively to initiate, coordinate and execute the work and related changes on this project well ahead of the paperwork. Bell has continually demonstrated a willingness to initiate these changes throughout the project as well as finance the associated subcontractors efforts. We believe that had this policy not been in place, the current project

BELL

schedule would be much further behind.

2. During the past two months, we have had several discussions regarding Bell's ability to complete the project on schedule . We genuinely share your concerns and have acted positively in initiated changes that have enabled us to react to the schedule demands. We had previously placed a full time assistant project manager on our staff to estimate the large number of changes that were outstanding as well as turn around the RFP's that have been generated. We have transmitted an RFP log to your office on a weekly basis and have maintained your requested two week turn-around for RFP's in most cases. We have added a mechanical engineer recently to assist in the many commissioning activities that are occurring. We have also added an additional QC manager to assist in the completion of above ceiling inspections and the review and preparation of close out documents. We solicited an additional electrical contractor and turned in standard pricing data as well as a couple of estimates based upon the Government's concerns with the performance of our existing electrical subcontractor. The Government decided not to exercise this option. Despite being 90% complete with the project and having completed the submittal process, our staff is at an all-time high. These changes may be considered late by your staff but we maintain that had the Government forecast of "only a handful of changes left" been accurate, we would not have had to add to our staff and would actually have reduced our personnel numbers by now.

3. The Government has expressed a concern with maintaining accurate and timely forecast dates in order to project the occupancy dates of your personnel. We share your concerns and have asked that our scheduler initiate a "close-out" schedule that will detail the many nagging problems currently preventing substantial completion of many of the areas throughout the building. The existing CPM lacks many of these minor details and also prevents us from getting timely information back to the Government and the contractors due to the billing / progress evaluation timetable. We will have this "three month look-ahead" available within two weeks and it will be updated weekly for use in our progress meetings and subcontractor coordination meetings.

4. The Government has continually stated that all rights to liquidated damages, termination and withholding of payments are reserved.. While we hope that this is just a necessary measure and statement that must be made when any milestone is missed, we cannot overlook the tone and action of the Government. Bell has forwarded your statements to the respective contractors that are involved with the delinquent work. While we have seen a willingness to accelerate with overtime and additional manpower, it is very difficult to tone down the intent of these statements. We have always worked to protect the Government's best interest when it comes to subcontractors extended overhead. This has become a difficult task with your notifications as Bell has been advised by several subcontractors that they wish to pursue extended overhead for those changes occurring after September 1st, 2000.

It is obvious that several of the project turn-over and completion milestones have been missed. The reasons for this are not the responsibility of one party. While we maintain that the impact of the many changes is a major factor to the contractor's ability to complete the project on schedule, we do not suggest that the fault stops there. We realize that there are procurement delays and installation deficiencies that are not the Government's responsibility that continue to inhibit the substantial completion of the project. Additionally, there are several oversights or misunderstandings resulting from the Modification 93 agreement that must be overcome in order to provide the Government occupants with the facilities necessary to carry out their missions. We are working to achieve these goals by segregating some of the central piping systems such as lab gas, domestic water, R.O. water and the security system. We recognize that your commissioning contractor has been very cooperative in scheduling his work in relation to the difficulties associated with a partial occupancy. Finally, we are encouraged by your teams efforts and being pro-active with working with us to complete the work that is required while maintaining a cooperative and realistic approach.

We are very close to achieving the milestones that we have all worked hard to bring about. We hope that the Government will continue to respond positively to our efforts and ask again that Bell not be penalized with

BELL

additional retention for the efforts that have been extended on our behalf. We have stated our position relative to the extensive change orders and their impact on the project and are committed to completing the remaining work on this project as expeditiously as possible.

If there are additional concerns regarding this information, please contact our office at once.

Sincerely,
BELL BCI COMPANY

2/20/01

Jeremy Bardin
Project Manager

cc: Frank Kutlak, Project Officer
Scott Stevenson, APM
File, Gov't out

10605 Concord St., Suite 205 • Kensington, MD 20895 • (301) 962-7700 • FAX (301) 962-7701

BELL

July 31st, 2001

National Institutes of Health
Building 13, Room 2S75
Bethesda, MD 20892

Attention: Barbara Taylor, Contracting Officer

Subject:: Modification Language to Reserve Rights

Reference: NIH Building 50 - Bid Package II - Bethesda, Maryland

Dear Mrs. Taylor,

Several of the most recent contract modifications that we received contained indemnification language that we have crossed out and revised as it pertains to our Modification No. 93 supplemental agreement. This revised wording simply protects our rights to seek additional compensation for delays, disruptions and/or damages resulting from the changes that have occurred. The revised wording is similar to that of which was included in some of the Government's previous Modifications (reference Mod No. 81). We wish to add this wording to our bilateral modification for all extra work orders, (EWO's), which were initiated after our September 1st, 2000 supplemental settlement and have not been specifically identified to include acceleration or extension cost on the Bell EWO cover sheet.

We hope that the Government understands that it has become necessary to protect our rights regarding the execution of additional change orders that have occurred since September 1st, 2000. In our negotiations for Modification 93, we agreed to include several milestone completion dates for the occupancy of the building. These dates were substantially compacted from what we had presented in our Time Impact Analysis Study, showing a September, 2001 completion based upon the changes that had occurred through August 15th, 2000. We stated that these revised dates were contingent upon minimal changes that would be executed with complete acceleration. The Government confirmed this by saying that there would be only 4-6 more changes to our scope of work and agreed to accelerate changes so not to effect the completion schedule. We then began to price and negotiate change orders with acceleration and extended overhead cost. It soon became apparent that there would be many more changes before the completion of the project, yet we continued to price the changes with acceleration costs. In January, 2001, we met to discuss the negotiation of acceleration costs at which time we stated that we had reached the limits of our ability to execute the base contract work while accelerating the many changes without time delays. Additionally, many of the specialty subcontractors refused to perform any work on an accelerated basis, no matter the cost. Finally, it was apparent that the Government clearly believed that our estimated overhead and acceleration costs were too high for most of the changes. (This can be demonstrated by reviewing the few proposal cuts in which we agreed to execute the work on an accelerated basis). Furthermore, even though the Government issued RFI's with a directive to proceed "without impact to the project schedule or completion date", you

BELL

still refused to pay management and supervisory acceleration expenses to the contractors involved with the changes, (Young Electrical and Bell BCI, for example). Our efforts to accelerate were further compounded by the amount of time that it has taken to negotiate and receive contract modifications. Most of our EWO's have exceeded our standard 30 day evaluation period in which the proposal remains valid.

With over 200 new EWO's issued in the past 10 months and the lack of support from the Government to pay the acceleration costs of subcontractor's supervision as well as the delay in receiving contract modifications, it became apparent that we would not be able to achieve the Modification 93 milestones or continue to accelerate our work force. Therefor, we stopped including acceleration cost in our proposals many month's ago and have revised some others that previously had these costs associated with them. We are excluding the few EWO's that have been negotiated with acceleration.

In addition to the comments stated above, we find it necessary to further protect our rights due to the fact that the Government has written letters related to each missed Modification 93 milestone stating to "reserve all rights and remedies provided by law or under this contract with respect to timely completion of the work including, but not limited to, the rights to terminate the contract for default, withhold payments, or assess liquidated damages". Fortunately, none of these (with the exception of withholding $100,000 in retention for "inadequate progress") has occurred. However, under the circumstances, we're sure you understand our need to secure our rights for impacts resulting from contract changes based upon the contents of your correspondence.

Please approve our amendments to the attached modifications so that we may proceed with the remainder of the work accordingly. If you should have any questions related to this information, please advise our office at once.

Sincerely,
BELL BCI COMPANY

[signature] 7/31/01

Jeremy Bardin
Project Manager

Enclosure: Modifications

cc: Tom Bell, President
BobDeRoo, CFO
Mike Dimmick, Vice President
Scott Stevenson, APM
Gov't Out
File