THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 60 | 890 | 009 | Construction Joint for Post-Tensioned Slabs, ref, CM RFI-039 (EWO-050). | $5,500.00 |
| 395 | 248 | 177 | Delete MH's #3 and #4 with Related Piping, ref, CM RFI-015 (EWO-024). | ($5,000.00) |
| 801 | 892 | 000 | Railings at interstitial steps, ref, RFI-1693 (EWO-608). | ($4,800.00) |
| 816 | 894 | 000 | Additional heat detectors in elevator machine rooms, ( ref EWO-627). | $4,200.00 |
| 856 | 891 | 000 | Lock modification for security interface with fire alarm system ( Ref. EWO-528 and RFI 1598) (EWO-664). | $2,100.00 |
| 921 | 893 | 000 | Condensate pump for loading dock cold room, ref, RFI - CM 281 (EWO-686). | $1,589.00 |
| | | | **Total:** | **$3,589.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may have occurred as a result of this work.

This modification and the language reserving to the Contractor Certain rights does not constitute an admission by the Govt that the Contractor is entitled to an equitable adjustment.

B. Tafoya

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 309 | 184 | 123 | Interference Between Cross Bracing & AHU-1 & 4 at Penthouse, ref, RFI-642 (EWO-186). | $15,000.00 |
| 382 | 235 | 164 | Banding at W-4 Window Sills on East and West Elevations, ref; RFI-587 (EWO-179). | $4,718.00 |
| 792 | 895 | 000 | Neutralization System Chemicals, ref, RFI-1602 (EWO-548). | $2,895.00 |
| 900 | 896 | 000 | Second floor type 28/29 light fixtures, ref, CM RFI 247 (EWO-629). | $0.00 |
| 910 | 880 | 000 | Heat recovery wheel isolation dampers, ref, RFI-1824 (EWO-720). | $4,068.00 |
| 915 | 897 | 000 | Biosafety cabinet connection at 6th floor BL3 suite, ref, CM RFI-280 (EWO-687). | $976.00 |
| | | | **Total:** | **$27,657.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may have occurred as a result of this work.

This Modification and the language reserving to the Contractor certain rights does not ~~[illegible]~~ constitute an admission by the Govt that the Contractor is entitled to an equitable adjustment.

B. Taf

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 748 | 898 | 000 | Safety relief valve from clean steam generator (EWO-590). | $21,500.00 |
| 840 | 899 | 000 | Neutralization system power requirements (EWO-649 R1). | $2,764.00 |
| 878 | 834 | 1020 | Provide credit for the deletion of Cold Room Testing, Spec. Sect. 11615 Parag 3.05.A.5 Testing (EWO-712). | ($4,536.00) |
| 892 | 900 | 000 | Glass and stainless steel screen walls at security desk, ref; RFI 1811 (EWO-704). | ($1,894.00) |
| 897 | 901 | 000 | Finish schedule / 1st floor conference partition closets / wall finishes, ref; RFI 1788 (EWO-677). | $637.00 |
| | | | **Total:** | **$18,471.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may have occurred as a result of this work.

This modification and the language reserving to the Contractor certain rights does not constitute an admission by the Govt. that the Contractor is entitled to an equitable adjustment. B. [signature]

Page 2 of 2
**Modification No. 202**
Contract No. 263-98-C-0102
EWO No. 's 412, 441R1, 448, 708, 414 & 718.

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 596 | 383 | 000 | RFI # 1383 response - Terminal Units serving Modules 3244/3246, ref; RFI-1443 (EWO-441R1). | $21,624.00 |
| 652 | 449 | 000 | Fit out B.R. 6119 per Part Plan - Breakroom D as shown on M.3.09 - ref; RFI-1414 (EWO-448). | $6,400.00 |
| 768 | 906 | 000 | Response to NIH ltr-6/29/01. Also ISR costs to run wire thru the door in lieu of running wire to the strike side of the frame (EWO-412). | $11,488.00 |
| 887 | 907 | 000 | Warm/Cold room support dry pendant, ref; RFI 1301 (EWO-718). | $5,930.00 |
| 894 | 908 | 000 | Lab post gaskets, ref; Meeting minutes from ISEC's equipment mock-up review of 6/2/99 (EWO-714). | ($1,142.00) |
| 919 | 909 | 000 | Installation of 4 remaining EM suite chillers,ref, RFI-1806 (EWO-708). | ($3,200.00) |
| | | | **Total:** | **$41,100.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may have occurred as a result of this work.

This modification and the language reserving to the Contractor certain rights Does Not Constitute an admission by the Govt that the Contractor is entitled to an equitable adjustment.

B. [signature]

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 13 | 912 | 003 | Grade Beam Steps at Isolation Slab, ref; RFI-CM010 (EWO-39). | $0.00 |
| 63 | 060 | 009 | Partition Type Symbol and Dimension Changes; ref, CBA-8 (EWO-145). | $29,948.00 |
| 863 | 911 | 000 | Changing Clestra Hauserman demountable partitions from wood veneer to vinal veneer, ref:Bell's ltr dtd 6/10/01 (EWO-656). | $0.00 |
| 874 | 913 | 000 | Light cove 1st floor preassembly area, ref: RFI 1792 (EWO-680). | $0.00 |
| 926 | 910 | 000 | Deletion of shaft access doors (EWO-730). | ($1,000.00) |
| | | | **Total:** | **$28,948.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

*****

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may occur as a result of this work.

[initials] 9/22/03

NIH-10-06047

9/22/03 This Modification and the Language reserving to the Contractor certain rights does Not Constitute an admission by the Government that the Contractor is entitled to an equitable adjustment

Barbara Taylor
Contracting Officer

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part 1, Section C, Paragraph I – Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and Associated Dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 836 | 916 | 000 | Vivarium / BL3 Static Limitations (EWO-637R1) | $3,300.00 |
| 912 | 918 | 000 | Delete Breakroom Cushions (EWO-721)<br>[ref. Progress Meeting Minutes 97.01] | ($11,000.00) |
| 928 | 914 | 000 | FM-3 Steam Requirements (EWO-119)<br>[ref. RFI-319] | $39,000.00 |
| 929 | 915 | 000 | Warm / Cold Room Services (EWO-404)<br>[ref. RFI-1402] | $19,000.00 |
| 936 | 917 | 000 | Drywall & Metal Stud Connection Deviations (EWO-637) | $0.00 |
| | | | **Total:** | **$50,300.00** |

Note: Any outstanding changes from the above-noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustment attributable to this Modification.

******

This agreement does not affect the contractor's rights for damages due to any delays or disruptions that may occur as a result of this work.

[signature] 9/22/03

NIH-10-06221

(REVISED 5/12/03)

9/22/03 This Modification and the Language Reserving to the Contractor Certain Rights does Not constitute an admission by the Government that the Contractor is entitled to an equitable adjustment.

Barbara Taylor
Contracting Officer

THE GOVERNMENT AND THE CONTRACTOR MUTUALLY AGREE AS FOLLOWS:

1. Part I, Section C, Paragraph I - Statement of Work is hereby modified by adding work identified below by Change Number, Issuing Change Order, Description and associated dollar amount:

| PCN | CHG NO. | CO | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 277 | 155 | 104 | Revisions to accommodate finishes on stairs & walls | $0.00 |
| 922 | 928 | | Incorporate arch'l, civil & Struct'l changes per Bulletin No. 18, supplemental CBS-23 dtd7/7/99 & Bull # 18R dtd 8/3/99. | $49,390.00 |
| | | | **Total:** | **$49,390.00** |

Any outstanding changes from the above noted Change Orders will be definitized in a later modification.

2. All other terms and conditions of this contract remain unchanged.

3. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification.

*****

This agreement does not affect the contractors rights for damages due to any delays or disruptions that may occur as a result of this work.

Cel
9/22/03

9/22/03

This Modification and the language reserving to the Contractor certain rights does Not Constitute an admission by the Government that the Contractor is entitled to an equitable adjustment

Barbara Taylor
Contracting Officer

NIH-10-06395

DEPARTMENT OF HEALTH & HUMAN SERVICES Public Health Service

National Institutes of Health
Bethesda, Maryland 20892

www.nih.gov

CERTIFIED MAIL-Return Receipt Requested

Via Fax.

9000 Rockville Pike
Bldg. 13, Room G800
(301) 435-4333

July 1, 2002

Mr. Thomas F. Bell, President
Bell Company
10605 Concord Street, Suite 205
Kensington, MD 20895

RE: The National Institutes of Health Louis Stokes Laboratories - Building 50
Bid Package No. 2 Construction
Contract No. 263-98-C-0102

SUBJECT: Project Completion Delays

REF: Request for Equitable Adjustment Dated April 5, 2002

Dear Mr. Bell:

The Government has reviewed your April 5, 2002 Request for Equitable Adjustment (REA), as well as, all relevant correspondence and the relevant contract provisions. Your REA was submitted in the total amount of $12,705,682.00, interest, plus an extension time of 245 calendar days, and that includes the Prime Contractor i.e. Bell's claim for $8,189,721.00 and all their subcontractors' claims for $4,515,961.00. After careful consideration of the issues, the Government hereby rejects your claim in its entirety for the following reasons:

1. BELL alleges that the NIH issued over 700 changes over the course of the project and that the cumulative impact of these changes caused BELL's extended performance costs, excessive general conditions costs, and loss of efficiency costs. In fact, the majority of these changes were issued on or before August 31, 2000. NIH and BELL negotiated a time extension and monetary settlement for all changes issued on or before August 31, 2000 during their August 30, 2000 partnering meeting. That settlement was incorporated in the contract via Modification No. 93, which provided "full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000" (reference Modification No. 93). The subject REA fails to segregate the impact of the pre-August 31, 2000 changes that are actually BELL's responsibility.

2. BELL alleges that the "greatest disruption to BELL's work occurred when NIH made an extensive change to the contract by requiring an additional floor…to be constructed". The Floor 4 addition was initiated by Request For Proposals, to which BELL responded enthusiastically. It was incorporated in the contract by Modification Nos. 5, 24, and 93, all of which included time extensions and extended overhead costs, and all of which provided "full compensation for the changed work, including both contract cost and time".
3. BELL alleges that NIH failed to live up to representations it made to BELL with regard to the addition of Floor 4. NIH maintains that it complied with all its commitments. NIH did not represent that Floor 4 would be identical to Floor 3. The Government and BELL met on numerous occasions in late 1998 and early 1999 (December 30, 1998; January 14, 1999; January 15, 1999; January 26, 1999 and February 16, 1999) to jointly develop a plan for adding Floor 4. From the initial meeting, the plan included a custom design of the added floor through the Kit of Parts process by the contract milestone. The Government met its commitment by issuing the Floor 4 Kit of Parts bulletin, as well as all other Kit of Parts bulletins, by the contract milestone. The extent of the Floor 4 work was in fact less than that of Floor 3, as it included Kit of Parts fit-out for only 4 of the 6 neighborhoods. Regardless, any the Governments failures perceived by BELL were certainly known to BELL prior to execution of Modification No. 93, and therefore were included in that comprehensive settlement.
4. BELL alleges that the concurrent issue of the Kit of Parts changes compounded the problems associated with Floor 4. The Government's right to issue the Kit of Parts changes within 550 days of contract award at the unit prices identified in the Contractor's offer with no increase in the contract period is well documented in Contract Section F paragraph 5. The Government issued the Kit of Part Changes within the specified time limit. Moreover, all of the Kit of Part changes were issued prior to August 31, 2000 and are therefore included in the Modification No. 93 settlement, and the "compounding effect was known to BELL at the time of Modification No. 93.
5. BELL alleges that NIH's numerous changes constitute a cardinal change. Modifications up to and including 93 incorporated 83% of the dollar value of change experienced on this project. The time impact of more than half of the remaining 17% was also included in the Modification No. 93 settlement because the changes were initiated prior to August 31, 2000. BELL was well aware of the vast majority of the project's change when it willingly accepted the Modification No. 93 settlement as "equitable adjustment for the Contractor's direct and indirect costs… full compensation, including both Contract cost and time."
6. BELL alleges that its August 2000 Time Impact Analysis incorporated "a limited number of the changes made to that point". In fact, it incorporated all changes alleged by BELL to have a time impact on the project, and served as the basis for the Modification No. 93 settlement.
7. BELL alleges that NIH represented that "there would be no more than 4 - 5 changes to the Project, none of which would approach the magnitude of the 4th Floor addition" subsequent to August 31, 2000. The Government denies that it made this representation. In fact, Government representatives present at the August 30, 2000 Partnering session maintain that the Government represented that it could not prevent change, and proposed bringing on another contractor to implement its changes. BELL objected strenuously to this proposal and requested that the Government instead allow BELL to perform the changes on an accelerated basis (reference NIH February 2, 2001 letter to BELL, included in this REA

under Volume 2 Tab 37). The Government complied with BELL's request; only turning to another Contractor when it became clear BELL's pricing was exorbitant. Even then, NIH continued to compensate BELL for acceleration. BELL's inference that the Government committed "to no more than 4-5 changes" probably stems from BELL's misinterpretation of its own February 20, 2001 letter, which complains that BELL had only been afforded the opportunity to price one of the "four or five major floor-by floor equipment fit out changes that the end users would be circulating." The Government did not request proposals after the first one because BELL's price far exceeded that of the Government's competing contractor.

8. BELL alleges that Modification No. 93 "did not address the indirect costs (e.g., loss of productivity) caused by other "Government changes" given to BELL by August 31, 2000." In fact, per Modification No. 93 paragraph 8, "The modification agreed to herein is fair and equitable adjustment for the Contractor's direct *and indirect* costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustment attributable to the modification" (italics added for emphasis). Modification No. 93 clearly was not limited to the Floor 4 EWO 240-R1 work as alleged by BELL, as it included "full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000". The intent and extent of the Modification No. 93 agreement is well documented not only in the Modification itself, but also in the correspondence and Government diary entries leading up to and subsequent to the agreement, including BELL's own schedule updates.

9. BELL alleges that NIH's actions-vis-à-vis the Kit of Parts were contrary to the contract, and that it initiated EWO 651 accordingly. The Government is confused by this allegation. EWO was never submitted to the Government. Indeed, the copy included under tab 15 is dated March 25, 2002. All of the Kit of Parts Bulletins were settled with full accord and satisfaction for the direct cost of performance, and any reservations related to time or indirect costs were superseded by Modification No. 93. For example, Modification No. 84 addressed the Bulletin 33 (Floor 5) Kit of Parts changes. It was executed by BELL on August 1, 2000, well after BELL's May 13, 2000 letter addressing the net-versus-absolute pricing issues.

10. BELL alleges that it "had to generate approximately 300 more EWOs <u>after</u> August 31, 2000". In fact, 155 of those 300 EWOs are for changes that were transmitted to BELL on or before August 31, 2000. Therefore, BELL is responsible not only for the delay impact of the proposals it acknowledges as pre-August 31, 2000, but even for the majority of the proposals it considers to be post –August 31, 2000.

11. BELL alleges that NIH reneged on its agreement that its remaining (i.e., post August 31, 2000) changes would be performed on an accelerated basis and BELL would be compensated accordingly. In fact, it was BELL that reneged on this agreement. NIH compensated BELL and its subcontractors for overtime and additional supervision and management time for post August 31, 2000 changes. Many changes were negotiated and modifications issued as full and equitable adjustments without time extensions on this basis, until July 2001, when BELL began to insert reservation of rights language before executing modifications. BELL even inserted this language on modifications for changes that had been initiated prior to August 31, 2000, and proposals that had been negotiated and approved with overtime and acceleration costs. BELL began inserting this language after it had missed virtually all of the contract completion milestones.

12. BELL alleges that NIH failed to process changes in a timely manner. The Government maintains that most delays in the processing and payment of changes were in fact BELL's responsibility. BELL was extremely slow in submitting proposals, sometimes submitting proposals as much as two years after the fact. BELL insisted on grouping proposals for negotiation by subcontractor, resulting in dozens of partly negotiated proposals that could not be concluded. BELL took as long as ten weeks just to sign modifications. The Government, on the other hand, deviated from its normal policy and paid BELL for changes that had yet to be incorporated in the contract in order to ease the financial burden on BELL and its subcontractors.
13. BELL alleges, "NIH has so far refused to provide any extension to the contract milestone completion milestone dates". This is correct, because BELL has yet to submit a time impact analysis with any of its change order proposals as required by Contract Section H Paragraph 8. It should be noted that per Contract Section H Paragraph 8.g, "When the Contractor submits a change proposal without including a corresponding Time Impact Analysis meeting the requirements of the pertinent Specification Section, the Contractor acknowledges that the particular change order, modification, delay or Contract request does not require an extension of the contract time (or milestone) and the Contractor shall not thereafter be entitled to request or receive any such extension(s)."
14. BELL alleges that it "could not assess the cumulative impact of NIH's changes until the changed work was completed on or about February 5, 2002". As noted above, 83% of the dollar amount of change was actually negotiated and modified into the contract when BELL executed the Modification No. 93 delay settlement, and more than half of the 300 changes identified by BELL as post-August 31, 200 were actually initiated prior to August 31. Therefore, BELL was aware of and took responsibility for the direct and indirect costs of delay for approximately 91% of the project change when it executed Modification No. 93. BELL should have been well aware of the cumulative effect of the changes when over 90% of the changes had occurred.
15. This REA includes a schedule analysis; however, the analysis is flawed in the following ways:
    a. It includes changes issued to the Contractor prior to August 31, 2000 (e.g., EWO 463, the first one listed)
    b. It includes many changes that were issued after August 31, 2000, but were incorporated in the contract via modifications with no time extension and language confirming the modification "provides full compensation for the changed work, including both Contract cost and Contract time", because the changes had in fact been approved including acceleration costs.
    c. It includes lengthy delays for activities such as "Prep and Submit EWO", Negotiate and Approve EWO", and "Issue EWO Mod", when BELL has acknowledged repeatedly, including within this REA, that it proceeded with the work immediately without negotiation. In some cases, it appears that the duration of the "Perform work" activities was only a few days, but the proposal activities account for months of "delay".
    d. No activity listing or logic reports are provided. The fragmentary network plots provided have no schedule logic shown, or linkages to baseline schedule activities, making it impossible to analyze the information provided.
    e. The analysis is completely at odds with the contemporaneous monthly schedule updates provided by BELL. This analysis states that 6 ½ of the total 8 month (actually 7 month

Bell-307

7 month based on the last substantial completion date of December 4, 2001) delay had occurred as of November 1, 2000. However, BELL's October 2000 CPM update and narrative stated that BELL was only 14 days behind schedule, including the 40 EWOs that had been issued during the period. BELL's November 2000, December 2000, and January 2001 CPM updates continued to acknowledge changes issued by the Government, and continued to show the project no more than 30 days behind schedule, thanks to the Government's willingness to authorize overtime compensation and flexibility in allowing BELL to complete contract requirements after substantial completion. From the January 2001 narrative: "BELL and the Government made a concerted effort to resolve many of the pending changes with the electrical contractor as it realized this work is the driving activity for the remainder of the finishes throughout the building. Major milestones are close to being realized… the electrical work has accelerated through the use of overtime… which the Government has agreed to reimburse the contractor for…The Government and the Commissioning Agent have displayed a willingness to incorporate several of the FPTs into the post occupancy phase, which will enable the contractor and the government to collectively achieve their goals." BELL stopped submitting schedule narratives after January 2001, but the CPM updates continued to project optimistic dates despite the Government's changes.

f. The later months' analyses show actual completion dates as much as five months ahead of the impacted schedule projected dates, confirming that the lengthy delays inserted in the November 1, 2000 analysis are fictitious.

g. This analysis "revealed no instances of BELL contributing to the delays caused by the Government's change orders". Bell's own February 20, 2001 letter to NIH states "it is obvious that several of the project turn-over and completion milestones have been missed. *The reasons for this are not the responsibility of one party.* While we maintain that the impact of the many changes is a major factor … *we do not suggest that the fault stops there. We realize that there are procurement delays and installation deficiencies that are not the Government's responsibility that continue to inhibit the substantial completion of the project.*" (italics added for emphasis) Likewise, BELL's monthly CPM update narratives repeatedly cited current or anticipated delays that were solely BELL's responsibility; the Type 28/29 lights, procurement of the precast steps, cagewash ceiling, breakroom countertops, balcony handrails, NMR grating, and vivarium wall protection. Even a cursory review of BELL's contemporaneous monthly updates reveals extensive negative floats associated with activities that were either virtually unaffected by Government change, or had no significant change since August 31, 2000 (e.g., from BELL's April 2001 update: fume hood mock up –66 days, deliver glass store front – 44 days, deliver systems furniture – 64 days, deliver lighting fixtures –70 days, deliver demountable partitions -64 days, backfill north basement – 45 days, install light poles – 45 days, deliver EM sound curtains –50 days, install elevator #5 – 64 days, standing seam metal roof – 66 days). This schedule analysis conveniently makes no mention of the exterior (site landscape and hardscape) milestones. These were the areas of BELL's greatest delays and deficiencies, with virtually no Government change. The site milestone was the last milestone completed, a full 10 months late. There are substantial deficiencies in the metal panels, window caulking, and roofing that have yet to be corrected and cause damage to finishes and property within the building even today, as long as 18 months after they were documented in writing by the Government and seven months after

Bell-307

documented in writing by the Government and seven months after substantial completion. The Government's numerous substantial completion request rejection letters document the extensive incomplete work that existed months after the contract milestones. The demountable partition late deliveries and extensive repairs, the late delivery of light fixtures, incomplete and unreliable cold rooms, and card access system test failures delayed virtually every floor. The lighting control system still has not been completed to perform an essential function stipulated in the contract, 16 months after the contract MEP systems milestone, and 10 months after NIH granted MEP substantial completion. As acknowledged by BELL's own February 20, 2001 letter, installation deficiencies were a major Contractor delay. Some floor punchlists contained as many as 2500 deficiencies - roughly one deficiency for every 15 square feet. The Government maintains that BELL's own delays and deficiencies not only contributed to the delays caused by the Government changes, they overwhelmed the Government's changes. The Government can document dozens of Contractor delays and deficiencies for every Government delay.

16. The Government hereby denies Bell's claim submitted on behalf of their Subcontractors for the following reasons:
    1) There is no logical connection to Bell's claim.
    2) The Subcontractors' claims contradict Bell's claim.
    3) The schedule analysis submitted is flawed.
17. BELL's damages analysis includes "Changes Negotiated, Awaiting Modification" and Changes Submitted, Awaiting Negotiation". All of BELL's EWOs submitted to date have either been negotiated, rejected, or will be issued in a unilateral modification in the event that the Government and BELL have been unable to reach agreement. Modifications have been issued or will be issued shortly.
18. BELL's damages analysis includes "Changes Submitted with this REA". The Government's final decision on those changes follows:
    a. EWO 651 Negotiation of Kit of Parts Changes: The Government rejects your position because all of the Kit of Parts Bulletins were settled with full accord and satisfaction for the direct cost of performance, and any reservations related to time or indirect costs were superseded by Modification No. 93. For example, Modification No. 84 addressed the Bulletin 33 (Floor 5) Kit of Parts changes. It was executed by BELL on August 1, 2000, well after BELL's May 13, 2000 letter addressing the net-versus-absolute pricing issues.
    b. EWO 734 Subcontractor Bond Premium: The Government rejects your position because Contract Section H Paragraph 8 Proposal Submission Due To Changes clearly states that bond will be allowed on "Prime Contractor only". Furthermore, all contract modifications to date have included only the prime contractor bond and have been executed as full and equitable adjustments for the direct cost of performance. Subcontractor bond is a direct cost of performance.
    c. EWO 735 Extension of MEP Warranties: The Government rejects your position because BELL did not achieve substantial completion of the MEP systems until September 12, 2001. The Government did not "take possession" of the MEP systems until that date, and neither Government maintenance nor the warranties commenced until that date. In fact, the Government could not possibly have assumed control and maintenance of the MEP systems in March 2001 because training activities were among

Bell-307

the last activities completed, as late as August 2001. BELL initially insisted that it was substantially complete despite ample evidence to the contrary as documented by the Government's rejection letters. Only now has BELL decided to change tactics by acknowledging it was not substantially complete, but for reasons beyond its control. The Government agrees that BELL did not complete the MEP systems prior to September 12, 2001, but maintains that the reasons were not beyond BELL's control for reasons stated herein.

d. EWO 738 Interest Reimbursement for Changes: The Government rejects your position because most delays in the processing and payment of changes were in fact BELL's responsibility. BELL was extremely slow in submitting proposals, sometimes submitting proposals as much as two years after the fact. BELL insisted on grouping proposals for negotiation by subcontractor, resulting in dozens of partly negotiated proposals that could not be concluded. BELL took as long as ten weeks just to sign modifications. The Government, on the other hand, deviated from its normal policy and paid BELL for changes that had yet to be incorporated in the contract in order to ease the financial burden on BELL and its subcontractors.

19. BELL's damages analysis includes "Contract Balance and Retention". The Government has rejected or reduced BELL's most recent invoices due to incomplete work, deficient work, outstanding credit proposals, and liquidated damages. The Government will release payment once the incomplete and deficient work is corrected, outstanding credit proposals have been approved, and BELL has substantiated delays beyond its control.

In addition the Government has the following claims against the BELL Company.

| | |
|---|---|
| Liquidated Damages | <$481,726.00> |
| Credits due to the Government | <$121,000.00> |
| Costs of Retests (Ref, JFI No. DCB-101) | <$61,399.00> |
| Estimated Costs of Outstanding Major Deficiencies | <$213,500.00> |
| Total of Claim against BELL Company: | <$877,625.00> |

Liquidated damages are assessed based on Revised Contract Section F Paragraph 2 @ ($3,721/14)=$266 for each calendar day of delay to each following 14 milestones: LAN Rooms 0 days, Basement Vivarium 129 days, Floor#2 69 days, Elevator#5 117 days, Basement 134 days, Site Hardscape 306 days, Floor#3 54 days, Floor#4 68 days, Elevators #1, #2, and #3 58 days, All MEP Systems 195 days, Floor#5 167 days, Floor#6 130 days, Floor#1 166 days and Site Landscape 218 days for total of 1,811 days for a LS credit of $481,726.

Credits due to the Government is based on Independent Government Estimates for the deleted scopes of work: RFP-19 MEP Maintenance for $98,000, RFP-26 Metal Runtals for $14,000, C. O. #2 R. O. Diaphragm Valve Size for $8,000, and RFI-626 Asphalt Prime Coat for $1,000.

Costs of Retests is Bell's responsibility as per Contract Section H Special Contract requirement Paragraph 15 Commissioning plan Subparagraph V.H.5 Deficiencies and Retesting for a lump sum price of $61,399. This includes Specification Sections 15995, 16995, 15950, 01404.

Estimated costs of Outstanding Major Deficiencies consist of Incomplete PH shaft firesafing for $3,000, Electrical raceway wire terminations not UL compliant for $100,000, incomplete commissioning action items for $15,000, incomplete EM Room sound curtains, incomplete Floor 1 door types, acid trays @ fume hood, sharp casework handle edges and Humidifiers for $5,000, AHU safeties for $15,000, Tremco roof deficiency list for $5,000, drains @ rustal units for $10,000, toilet room wall insulation for $20,000, and dark room revolving door trim for 3,000 for a total of $213,500.

This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within ninety (90) days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify that contract by number. Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U. S. Court of Federal Claims within 12 months of the date you receive this decision. There are other rights and remedies that may affect your appeal.

If you have any questions regarding this issue, please call me at (301) 435-4333.

Sincerely,

Barbara Taylor
Contracting Officer

cc: F. Kutlak
J. Robbins
B. Temme, JFI

Bell-307

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| BELL BCI COMPANY, | : | CASE NUMBER 03-1613C |
| Plaintiff, | : | |
| vs. | : | |
| THE UNITED STATES OF | : | |
| AMERICA, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - -x

DEPOSITION OF JEREMY BARDIN

Washington, DC

Wednesday, February 16, 2005

REPORTED BY:

MEGAN HASSEL

letters, saying that we need direction on these changes -- and by the way, you know, there's a litany of statistics that I wrote and have put in this correspondence of, you know, we have 47-so changes that you haven't told us to proceed on. I think they did after that meeting that one time issue a bunch of directives to proceed. Unfortunately that process didn't -- it just kind of fizzled out at that point.

Q It also says "Bell reserved its right to seek an inequitable adjustment for the delays and impacts Bell was suffering."

Does that refer to in-contract modifications, Bell reserved its right?

A Yes, sir.

Q That -- does it mean anything else in that, or is that what it refers to?

A I believe that's where that verbiage was found, is in the contract modifications. We added that to our modifications when it became apparent that NIH was going to pursue any and all remedies for liquidated damages or delays.

Q If I said there were some bilateral modifications between August 2000 and the summer of 2001, where it appeared that Bell did not include a reservation of rights of that kind, does that sound right or wrong? Why would that be?

A I think this became apparent to me, at least, that NIH was reserving their right, and I think that they represented to me at that time after discussions when I came to them and said wait a minute, why are you adding this language to your proposal saying that you're going to -- in order to proceed without getting the job done or -- excuse me -- without delay, finish on time, and that you don't want to talk about our impacts and our acceleration, but you want to reserve your right for liquidated damages and such, it was always -- and they represented to me at that time, that they -- that we somehow had waived our rights to indirect cost and whatnot, and it was never in my mind, never the intent that we ever waived our rights.

So at that time, this time period again in late 2000, I found it necessary to put in language

and start adding language that made it crystal clear on Bell's behalf that we had never waived our rights for indirect cost.

Q And who was it that communicated to you what you just said about the waiver?

A It was a meeting. Again, I think this was a meeting between Barbara Taylor, Frank Kutlack, Brian Temme, and myself, and it was about the -- I think it was in response to my letter listing out several concerns where what had been agreed to in September of 2000 was not actually happening.

MR. CHADWICK: Okay. I think that's it. Let me take a quick break if you would. Do you guys just want to go out for a second?

MR. WOLF: Sure.

(Recess.)

MR. CHADWICK: I guess -- yes, that's it. Unless you have any questions.

MR. WOLF: No, at this time.

MR. CHADWICK: I appreciate you coming.

MR. WOLF: Thank you.

(Whereupon, at 11:00 a.m., the deposition