No. 03-1613C
Judge Wolski

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BELL BCI COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
Assistant Director

KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:
DOUGLAS KORNREICH
KRYSTAL A. JORDAN
Attorneys
Procurement, Fiscal and Information Law Branch
Office of General Counsel
Department of Health and Human Services

August 15, 2005

INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

Transcript of deposition of
Brian A. Temme (excerpts)....................................1

Transcript of deposition of
Jeremy Bardin (excerpts)....................................9

Transcript of deposition of
Frank Michael Kutlak (excerpts)..............................22

Executive Monthly Report, December 1998........................27

Executive Monthly Report, April 1999...........................29

Project diaries of Brian A. Temme (excerpts)...................31

Speed memo dated 11/09/00 from Bell to Jacobs
Facilities.................................................35

Letter dated February 2, 2001 from contracting
officer to Bell.............................................36

Bell's response to defendant's interrogatory
number 4 (December 17, 2003)..................................38

Patrick W. Brannon Expert Report (excerpts)....................41

Ted M. Scott Expert Report (excerpts)..........................49

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

BELL BCI COMPANY, :
Plaintiff, :
vs. : No. 03-1613C (Judge Wolski)
THE UNITED STATES OF AMERICA, :
Defendant. :

--------------------------------x

McLean, Virginia

Thursday, March 10, 2005

Deposition of BRIAN A. TEMME, called for examination by counsel for the plaintiff, pursuant to notice, at the office of Richard O. Wolf, Esquire, Moore & Lee, LLP, 1750 Tysons Boulevard, Suite 1450, McLean, Virginia, before Bobbi J. Case, a Certified Court Reporter and a Notary Public in and for the Commonwealth of Virginia, beginning at 10:00 a.m. when were present on behalf of the respective parties:

154-03-163-04

FOR THE PLAINTIFF:
RICHARD O. WOLF, ESQUIRE
Moore & Lee, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225

FOR THE DEFENDANT:
KYLE CHADWICK, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 7062
Washington, D.C. 20530
BRIAN T. SCHER, ESQUIRE
Jacobs (In-House Counsel)
1100 North Glebe Road, Suite 500
Arlington, Virginia 22201



INDEX


| DEPONENT | EXAMINATION BY COUNSEL FOR: PLAINTIFF, MR. WOLF | DEFENDANT, MR. CHADWICK |
|---|---|---|
| BRIAN A. TEMME | 5 | |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition of Jacobs Facilities, Inc. | 9 |
| 2 | Letter to Frank Kutlak from Brian A. Temme, P.E., dated March 21, 2000, Re: Institute Funding Forecast | 52 |
| 3 | Letter to Frank Kutlak from Brian A. Temme, P.E., dated January 14, 1999, Re: Proposed Addition of Floor 5A | 56 |
| 4 | E-mail to Brian Temme from WeismanInc-JSW, dated January 14, 1999, Re: Floor 6 | 63 |
| 5 | A Report on the Resolution of Operational Issues and Lessons Learned, compiled July 19, 2004 | 83 |
| 6 | The National Institutes of Health, The Louis Stokes Laboratories - Building 50 Project, Deferred Fit-Out Narrative | 85 |
| 7 | Handwritten notes, 5/31/00 and 6/1/00 | 91 |




EXHIBITS (Continued)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 8 | Spreadsheet, Post Sept 1 RFI's tracking List of 11-28-00 Earls Stuff cd 1.xls, Printed on 3/9/2005, eight pages | 93 |
| 9 | National Institutes of Health, the Louis Stokes Laboratories - Building 50 Project (Bid Package No. 2), dated April 5, 2001 | 98 |
| 10 | Speed Memo to Brian Temme/JE from William R. Rothrock III, dated 11/9/00, Re: Mechanical Proposal Pricing (Labor) | 107 |
| 11 | Handwritten notes, dated 1/14/04 and 1/15/04 | 108 |




PROCEEDINGS

Whereupon,

BRIAN A. TEMME,

was called for examination by counsel for the plaintiff, and after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF:

BY MR. WOLF:

Q Could you please state your name and business address?

A Brian A. Temme, 1100 North Glebe Road, Arlington, Virginia.

Q Good morning, again, Mr. Temme. I'm Richard Wolf. I'm one of the attorneys for Bell BCI Company in a case in the Court of Federal Claims against the United States. We're here today to take the deposition of you as well as your company. You've been designated on behalf of Jacobs to testify today.

And before we get down to business, I just want to go over a few ground rules so that we're all clear on how this will proceed.

Have you ever been deposed before?

58

**reflect -- this last page of Exhibit 3 -- Jacobs' independent estimate, or is this done in conjunction with HLM?**

A In conjunction. The bulk of the work is the construction cost estimate, and they provided that number.

I don't really recall. What I'm trying to do is try to interpret from what I'm reading.

**Q Sure. Sure.**

A They provided the construction cost estimate, and apparently we added on some other stuff, right, 81,000 for --

**Q If I could stop you there, what it says there -- you're looking at the first page of Exhibit 3 under "Cost," about approximately in the middle of the page. And you state in your letter, quote, "HLM has provided a construction cost estimate of $11,178,287."**

**And if you go to the last page, which has a budget -- I confess that number doesn't leap off the page to me. I see what appears to me to be Jacobs' estimate that the construction cost for adding the new floor would be $10,230,131.15. And then it goes on --**

59

**Jacobs, apparently in this estimate, goes on to add costs for design services and construction administrative costs and something called client project costs. The two numbers don't seem to tie.**

**I guess that was my question. Did HLM do its own estimate on that and then Jacobs sort of do a due diligence on that or its own independent, or are the two one and the same, basically?**

A No. We did not do an independent estimate. The government relied on Jacobs' -- I'm sorry, HLM's estimate. I think -- here's the link, right? This $10,230,000.

**Q Number, yes, sir.**

A You see here?

**Q Uh-huh.**

A Okay. That's this number right here. Right?

**Q Referred to on the first page of your letter.**

A So I believe that when we did this, what we were actually doing, since we already had the contractor's proposal, rather than using HLM's

60

estimate, we used Bell's proposal plus these couple of things because it says the Bell proposal lump sum of $9,800,000 plus these budgetary numbers. And then assuming an additional 81,000 for the annual review comments, you get this 10,230,000.

**Q Okay.**

A So it looks like the budget was not based on HLM's estimate. It was based on the latest and greatest, being Bell's proposal.

**Q Okay. And this letter, this Exhibit 3 we've been talking about, is dated January 14, 1999, and under "Scope of Work" you stated, quote, "The proposed scope is to duplicate the most generic laboratory floor, Floor 3, and insert it between the current Floors 5 and 6."**

**I take it that statement was true when you wrote it?**

A Yes.

**Q And likewise, you refer in there to a January 8, 1999, feasibility study for the vertical expansion of Building 50 that was prepared by HLM. Correct?**

61

A Yes.

**Q HLM prepared one feasibility study, correct, to your knowledge?**

A Yes.

**Q And is it likewise your understanding that the bid estimate submitted by Bell, that you referred to a moment ago, was based on HLM's feasibility study?**

A I would assume so. I don't really -- it's possible that they didn't have the feasibility study. I don't recall.

**Q Okay. Well, do you recall -- I take it that there were no new design documents that had been prepared at least as of January 14, 1999 for the new floor, had there?**

A I don't think so.

**Q Okay.**

A I don't think we prepared any design documents until the decision had been made to proceed.

**Q In fact, your letter predates the decision by the government to add the new floor, doesn't it?**

A Yes.

**Q So essentially what was being proposed was**

62

whatever was stated in the feasibility study. Correct?

A Well, again, I'm not sure what Bell based their estimate on. I'm not sure whether we gave them a copy of the feasibility study and said "Use this." I don't recall --

Q Okay.

A -- that level of detail.

MR. SCHER: Richard, can we take five minutes?

MR. WOLF: Certainly. Certainly.

MR. SCHER: Sorry to interrupt.

(Recess.)

BY MR. WOLF:

Q Mr. Temme, if you look at the first page of Exhibit 3, approximately the fourth line from the bottom, you stated there, "We recommend an initial contingency of 10 percent on a project of this size and complexity."

Was that the recommendation that Jacobs had made to the government in terms of preparing the construction budget for the entire project?

63

A That's what I don't recall. That would have been 1995 or something. Right? So...

Q Do you recall that Jacobs made a recommendation?

A No. I don't recall.

Q So as you sit here today, you have no recollection of what the construction budget contingency was for the project?

A I don't recall.

Q You said "project of this size and complexity." Was this a relatively large and complex project?

A Yes.

Q I'm going to show you what I will mark as Deposition Exhibit 4, which is e-mails to and from you in the January 1999 time frame. I'll ask you to take a look at these, please.

(E-mail to Brian Temme from WeismanInc-JSW, dated January 14, 1999, Re: Floor 6 marked for identification as Temme Deposition Exhibit 4.)

BY MR. WOLF:

Q Have you had a chance to look that over,

64

Mr. Temme?

A Yes.

Q Is that your handwriting that appears on this?

A Yes.

Q And looking not quite a third of the way down under the little heading "Original Message," it says from you to Lon Brightbill and Joe Weisman. There's a CC to Frank Kutlak, dated January 5, 1999, and the subject is "Floor 6." Do you see that?

A Yes.

Q Who is Lon Brightbill?

A Lon Brightbill was a representative for Facilities Fluid Dynamics Engineering, who was our commissioning agent on the project.

Q When you say "ours," were they under contract to Jacobs?

A Yes.

Q And who is Mr. Weisman -- or is it Weisman? I've heard both pronunciations.

A So have I.

Q Let me ask you, what did you call him? Or

65

Joe?

A I called him Joe.

Q Fair enough. Fair enough. For purposes of our deposition, I'll say Weisman. Who is Mr. Weisman?

A He's president of Weisman, Inc., I think, who was the testing and balancing agent.

Q Okay. And likewise, was Weisman, Inc. under contract to Jacobs?

A Yes.

Q And what were Weisman -- I'll use the shorthand -- Weisman's duties towards Jacobs on the Building 50 Project?

A To perform the HVAC testing and balancing.

Q Anything else?

A No.

Q Was Weisman given the task of determining whether changes in the work were due to owner-caused changes or some other cause?

A I would not say so. I think there may have been occasions where we would ask their opinion because they had a hands-on perspective on some things.

**Q That wasn't one of the reasons they were retained, was it?**
A No.
**Q And that wasn't within their scope of work?**
A Correct.
**Q Ballpark estimate, how much did Jacobs pay Weisman for its services on the Building 50 Project?**
A Three to four hundred thousand.
**Q And were you involved in reviewing the payments that were made to Weisman?**
A Yes.
**Q Was there someone to whom you had delegated day-to-day responsibility for dealing with Weisman?**
A Yes.
**Q Who was that?**
A Rocco.
**Q Rocco Yetz?**
A Yes.
**Q Who you identified earlier.**
**And was the purpose of this e-mail to contact Facilities Dynamics and Weisman to tell them that NIH was considering adding a duplicate Floor 3 to**



**the structure and to get whatever cost impacts that might be in their scope of work?**
A Yes.
**Q We've talked a bit before about the change order process between the government and Bell. I just want to make sure I understand the process.**
**Essentially it worked that Bell would -- there would be some change, and then Bell would submit an extra work order, or EWO for short, and set forth its cost proposal for doing the work, this changed work?**
A Yes.
**Q And then what would -- when the government receives Bell's EWO, how did the process work? Who did what after that?**
A I think we -- I guess I would triage all the correspondence that came in, so I always assigned it to someone. I think the change order proposals -- frankly, the EWO stage, probably didn't even need to triage it. It would automatically go to Zahid or Earl, and then they would consult with whoever would be directly involved in that change, either me or one



of the inspectors. For example, if it was a mechanical, we would go to Rocco to determine whether there was entitlement or not, and we'd either draft a rejection letter if there was no entitlement, or if there was entitlement, then we would start the estimating negotiations process.
And when I say start the process, in an ideal world when you get to the EWO stage, you're already partway down the path, right, in that we already recognized there's a change. Most of them come out of the R-5 process.
And I believe on the R-5 we say whether we believe it to be a change or not. So we may well have already started the estimate process before we got the EWO, if we thought it was a change. And if we didn't think it was a change, we wouldn't do that.
**Q So then, if I understand correct, the RFI or request for information would start the process, if Bell says there's an issue here.**
A For most of them.
**Q Right. Well, how else would the process begin?**



A Oh, it could have been an RFP, if it was totally an owner-initiated change.
**Q Okay. Were there also times when Jacobs independently determined when there was a change in the work and would issue its own sort of RFI too, or no?**
A Oh, we had CMRFIs.
**Q How did that process work, the CMRFI? and if you could spell out the acronym for me.**
A Construction Manager Request For Information.
**Q And what were those -- what caused a CMRFI to be issued?**
A Well, if one of our staff, one of our inspectors recognized that there was some kind of a conflict or whatever, they could initiate an RFI, which would go to the AE for a response, and sometimes that response would be -- result in a change.
**Q And you said go to the AE. Is that HLM it would go to?**
A Correct.
**Q So it could be a situation where one of the**

70

Jacobs' inspectors sees, for lack -- a conflict in the electrical wiring or something like that, and then they would ask HLM, is this a conflict, or is that essentially what they're doing, or how should this conflict be resolved?

A Yes.

Q And would you, you being Jacobs, also solicit HLM's inputs as to whether that resolution constituted a change to the work, or did Jacobs independently make that determination?

A HLM, we asked HLM to give their recommendation. And our inspectors, when RFIs -- be they Bell RFIs or CMRFIs -- when they got the answer back, they would review the response and make sure it made sense, and they also reviewed that recommendation.

Q Now, you mentioned -- let me take a step backwards.

So after the RFI commences, there's still a belief that this is a change. Is it at that juncture, then, that an EWO would be generated by Bell?

A Yes.

71

Q And you described how you triaged that.

You also mentioned, though, about if Jacobs was of the opinion that there was no entitlement to additional compensation, that it would draft a rejection letter?

A For the EWO?

Q Yes.

A Yes.

Q And when Jacobs -- was that something that Jacobs drafted on its own and issued back to Bell?

A I believe the process that was established with Bell was that the first pass or the rejection letter would be from Jacobs. And then if Bell disagreed, then they would respond with their reasons, and then this contracting officer would draft the next rejection letter.

Q And at that stage, you said, the contracting officer would draft the next rejection letter. Would, in fact, Jacobs provide a draft of that rejection letter to the contracting officer?

A Yes.

Q And who would draft those letters for the

72

contracting officer?

A Myself; when Adam was there, he would do it; Earl; and Zahid did some. And I think at the end Karl did some as well.

Q As best you recall, who internally at Jacobs drafted most of those rejection letters for the government's contracting officer?

A I would say I did.

Q Do you recall any instances in which you recommended that Bell's EWO be rejected and that the contracting officer overruled you and allowed it?

A No.

Q Was it one of the roles at Jacobs as the construction management firm for the owner -- this may seem utterly simplistic -- to minimize costs to the owner during the construction process?

A Yes.

Q And in that regard would Jacobs look at requests for additional compensations from Bell, HLM, or other contractors to the government and make a recommendation?

A Yes.

73

Q Now, you had mentioned you talked before your deposition with Mr. Kutlak and Ms. Taylor about Mod 93 and some of the questioning. Were you involved in negotiating Mod 93 with Bell?

A Yes.

Q Who else, besides you, were involved in negotiating with Bell with regard to Mod 93?

A Frank Kutlak and Barbara Taylor, and then NIH's counsel reviewed the agreement.

Q When you say "the agreement," the actual text of the Mod 93?

A Yes.

Q And who was that counsel? Who did that?

A I can't recall his name.

Q Do you know if he's still there?

A No. He's retired.

Q Do you remember his first name?

A No.

Q Is he someone with whom you had dealt prior to Mod 93?

A Yes.

Q On what issues?

A There were negotiations for each floor of kit-of-part changes. Right? And his recollection is that those accounting issues were addressed in the negotiations.

**Q And did he provide you with any documentation or are you aware of any documentation that details his recollection?**

A He did not provide me with any documentation. There were records of negotiations. I assume it was addressed in those.

**Q I've seen documents entitled Summary of Negotiations signed by the contracting officer. Are you generally familiar with those documents?**

A Yes.

**Q And I take it those documents, those summaries of negotiations, are prepared to list the issues that are in dispute and what resolution, if any, the parties, i.e., Bell and the government, came to regarding those issues?**

A Yes.

**Q And those documents are ultimately signed off by the contracting officer. Correct?**



A Yes.

**Q And those documents, as far as you know, are prepared to reflect the issues that are on the table at any given time regarding the change or changes. Correct?**

A Yes.

**Q One thing I want to show you here is -- and we'll mark this as Exhibit 7. This is an excerpt from diaries, I believe your diaries, that were produced by Jacobs in this case. And this particular entry is dated May 31, 2000, and I'll ask you to please take a look at this.**

**(Handwritten notes, 5/31/00 and 6/1/00 marked for identification as Temme Deposition Exhibit 7.)**

**BY MR. WOLF:**

**Q Have you had a chance to review Exhibit 7, Mr. Temme?**

A Yes.

**Q It is true this is an excerpt from your diary. Correct?**

A Yes.



**Q And from May 31, 2000. Correct?**

A Yes.

**Q If you go to the second page of this exhibit, it has Page 31 -- I see you're open there -- and under what you've numbered, I guess, as Paragraph 5.**

A Yes.

**Q And you've -- it says "ISEC" -- who was a subcontractor to Bell. Is that correct?**

A Yes.

**Q -- "not going to pursue net versus ABS val." What does that refer to?**

A Absolute value.

**Q And that is dealing with the kit-of-parts. Correct?**

A Yes.

**Q So it says, quote, "ISEC not going to pursue net versus absolute value, k-of-p," referring to kit-of-part issues?**

A Yes.

**Q "Bell may. They want the 10 percent back on any over limit. We will consider when final count is**



**done." Do you see that?**

A Right.

**Q So does that refresh your recollection that at least as of May 31, 2000, I take it that this was an issue that was going to be addressed when it was completed, for lack of a better term? In other words, Bell said, we have a dispute. You said, all right, we'll look at it when we're all done. Is that essentially what you're reflecting here in your notes?**

A Yes.

**Q And the final determination on the kit-of-parts issue rested with the contracting officer. Correct?**

A Yes.

**Q We had mentioned before about Mod 93 and its covering changes. Again, the language states what it states, but essentially covering changes through August 31, 2000. Correct? Do you recall that?**

A Yes.

**Q I'm going to show you a document that we will mark as Exhibit 8 which was produced to us by Jacobs in this litigation in response to a subpoena.**

94

I'll ask you to take a look at it, please.

(Spreadsheet, Post Sept 1 RFI's tracking, list of 11-28-00 Earls Stuff cd 1.xls, printed on 3/9/2005, eight pages marked for identification as Temme Deposition Exhibit 8.)

BY MR. WOLF:

Q Mr. Temme, Exhibit 8, again, as I said, was produced to us by Jacobs. At the bottom there's a title that says "Post Sept 1 Tracking List as of RFI's." Do you see that?

A Yes.

Q And it refers to Earl's stuff. I take it that refers to Earl Johnson?

A I assume so.

Q Okay. And he was -- reported to you on this project. Correct?

A Yes.

Q Why was Mr. Johnson tracking post September 1 RFIs?

A Well, that's where we drew the line in the sand, and Bell was responsible for any impact of the changes prior to that, and the government could be

95

responsible for the changes after that.

Q So was this something you -- was this a process that you had him implement to track those?

A I don't recall.

Q I notice there's -- and you've seen this document or one like it at some point, I take it?

A This is the first time I recall seeing it.

Q Did Mr. Johnson or anybody else on your staff report to you generally about the RFIs that were issued after August 31, 2000?

A I don't recall.

Q So seeing this document doesn't refresh your recollection at all about this tracking process one way or the other?

A No.

Q How about -- you see these columns at the far right? It says construction time change, contract change, and it says true or false. Do you see what I'm referring to?

A Yes, I see that.

Q You don't know what that reflects, then, or do you?

96

A I can surmise what it means.

Q I would prefer if you know one way or the other. I'm not really interested in a guess, just if you know.

A Well, again, I don't recognize the document. I don't recall it. All I can do is surmise what those columns mean.

Q I take it your surmise on this is Mr. Johnson's or somebody's opinion about yes or no, true or false, this is a contract time or a cost and time change or a contract change?

A Yes.

Q Okay. Did you, in some other format to Jacobs, track these changes that you are familiar with? And these changes I'm referring to, these changes made after August 31, 2000, or I should say RFI?

A Well, we tracked changes --

Q -- throughout the life of the project?

A Right.

Q My question was a little more narrow, though.

97

Regardless of the document format here in Exhibit 8, do you recall Jacobs using other documentation to track RFIs after August 31, 2000?

A No, I don't.

Q Do you recall your staff advising you generally about the RFIs that had been issued after that date?

A No.

Q Essentially, those RFIs, those are tasks that had been delegated to whatever staff person and discipline was involved in the RFIs. Is that how it worked?

A Well, again, I think it was the project engineer's responsibility to kind of keep track -- the PMCS system, keep track of changes. We may well have made like a separate report of post August 31. I don't recall.

Q Okay. Mr. Temme, I want to go back for a moment to charging institutes for changes that they made. And there was a document produced to us by Jacobs, and I just want to ask you if you're familiar with it and if it's one -- and what it represents, if

CR
MH



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - -x

BELL BCI COMPANY, : CASE NUMBER 03-1613C

Plaintiff, :

vs. :

THE UNITED STATES OF :

AMERICA, :

Defendant. :

- - - - - - - - - - - - - -x

1-03-1613-04

DEPOSITION OF JEREMY BARDIN

Washington, DC

Wednesday, February 16, 2005

REPORTED BY:

MEGAN HASSEL