A Okay.
Q You were still at Bell at this point?
A Yes, sir.
Q And it's -- it says "generally," well, it says "Bell notified NIH that NIH's continued changes were negatively impacting Bell's ability to timely and efficiently complete the work. Bell reserved its right to seek equitable adjustment, both delays and impacts that Bell was suffering."
Do you recall communicating with NIH in the post-August 2000 period the changes were affecting Bell's schedule, if you will?
A Yeah, through several different mechanisms; verbally, orally, written obviously, written many times.
Q And what -- how did NIH respond? In other words, were they receptive to that idea?
A They were -- they responded I guess negatively.
(Discussion off the record.)
BY MR. CHADWICK:
Q They responded negatively?

A What I mean by that is I'm trying to get my time period correct here. Negatively through a couple different ways. One, when we submitted a change order with acceleration costs as we had agreed to do, they would for the most part strike that from the proposal, void it. They would not allow it.

They would also at that time, again, I'm trying to get my time period correct here, but I believe it was late 2000, they would put language in their directives to us that we were to proceed without impact to the project schedule, these changes. That they reserved the right for liquidated damages, and that they reserved their right for taking over our portion of the work.

So at that time I felt that they were responding negatively to our request to perform additional work with acceleration.

Q And you mentioned that -- well, did you feel that was not a good-faith implementation of what had been agreed to up to that point?

A I believe that we had an agreement, and I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

BELL BCI COMPANY, :

Plaintiff, :

vs. : No. 03-1613C

: (Judge Wolski)

THE UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, February 24, 2005

Deposition of FRANK MICHAEL KUTLAK, called for examination by counsel for the plaintiff, pursuant to notice, at the office of Richard O. Wolf, Esq., Moore & Lee, LLP, 1750 Tysons Boulevard, Suite 1450, McLean, Virginia, before Laurel P. Platt, a Registered Diplomate Reporter and a Notary Public in and for the State of Virginia, beginning at 10:05 a.m., when were present on behalf of the respective parties:

FOR THE PLAINTIFF:

RICHARD O. WOLF, ESQ.
Moore & Lee, LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102 4225

FOR THE DEFENDANT:

KYLE CHADWICK, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 7062
Washington, D.C. 20530

KRYSTAL A. JORDAN, ESQ.
DOUGLAS KORNREICH, ESQ.
U.S. Department of Health & Human Services
Office of the General Counsel
330 Independence Avenue, S.W.
Room 4653, Cohen Building
Washington, D.C. 20201



INDEX


| WITNESS | EXAMINATION BY COUNSEL FOR: PLAINTIFF, MR. WOLF. |
|---|---|
| Frank Kutlak | 4 |


EXHIBITS


| KUTLAK DEPOSITION | FOR IDENTIFICATION |
|---|---|
| No. 1 (Amended Notice of Deposition of Defendant) | 7 |
| No. 2 (3/16/98 memorandum) | 17 |
| No. 3 (3/12/98 memorandum) | 21 |
| No. 4 (3/12/98 memorandum) | 25 |
| No. 5 (7/15/98 memorandum and attachment) | 31 |
| No. 6 (Feasibility Study for the Vertical Expansion of Building 50) | 36 |
| No. 7 (Bell 1/14/99 letter) | 38 |
| No. 8 (3/10/99 e-mail) | 41 |
| No. 9 (2/24/99 e-mail) | 42 |
| No. 10 (Report on the Resolution of Operational Issues and Lessons Learned) | 44 |
| No 11 (Mod. 93) | 52 |
| No. 12 (Summary of Negotiations) | 54 |




PROCEEDINGS

Whereupon,

FRANK MICHAEL KUTLAK,

was called for examination by counsel for the plaintiff, and after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. WOLF:

Q Good morning again, Mr. Kutlak. I'm Richard Wolf, one of the attorneys for Bell BCI in this lawsuit in the Court of Federal Claims. You've just been administered the oath.

Could you please state your full name and business address, please?

A Frank Michael Kutlak, National Institutes of Health, 9000 Rockville Pike, Building 13, Suite 210, Bethesda, Maryland 20892.

Q Thank you.

Have you ever been deposed before, Mr. Kutlak?

A Yes.

Q Approximately how many times?



A Once for three days with a team of nine lawyers until I finally grabbed a lawyer by the tie and told him the only time I ever hurt anybody in my life was when they bullied me, and he was getting real close, and suddenly the deposition ended.

It was a case with HOK Architects. It was about almost 20 years ago. I was with HOK Architects.

Q Since you've been through the drill, I'll give you the abbreviated version. Perhaps the most important thing is please don't answer any question you don't understand. If I use a term or make a reference to something that you are unclear on, please tell me, and I'll clarify.

Secondly, because we do have a court reporter, it's very important for both of us, for me to let you finish speaking so that she can take down everything you say and likewise what I say.

Another important point is please make all your answers audible. The shake of a head or uh-huh doesn't transcribe well, so just to avoid any confusion.

A Right.

Page 30

for the contingency?

A It can vary. It can vary with the scope, the scale, the complexity. Each project has different challenges. Each project has a certain what we call level of unknown or risk. And dependent upon the risk and dependent upon the construction methodology, dependent upon when you actually bid the documents, the contingency is a sliding scale that is set to reflect the risk analysis.

We have contracts that we don't do that, but contracts -- the industry in some cases will bid jobs on partial documents. And the contingency is significantly higher because at the time it's not known what the final scope of work will be.

Q Is that what occurred here?

A No. The documents were totally complete when they were bid.

Q And so the contingency then wasn't going to vary depending on that.

A No. The contingency was set by, as I said, standard construction procedures for science buildings.

Page 31

Q Is it correct that sometime in about December 1998, the Government asked HLM to do a feasibility study for adding a new floor?

A Yes.

Q Is it also correct in about January 1999 an executive report was prepared to summarize the proposal?

A Yes. I believe so.

Q I show you what we'll mark as Exhibit 5.

(The 1/15/99 memorandum and attachment were marked Kutlak Deposition Exhibit No. 5 for identification.)

Mr. Kutlak, I hand you what's been marked as Exhibit 5 which was a document produced by the Government to us in this litigation.

The first page appears to be an e-mail from you to various individuals, and it says, "Attached for your use is the Microsoft Word File of the Executive Report and the Excel spreadsheet file on the potential of adding a floor to Building 50."

If you'd go to the -- first of all, let me ask you, were you involved in the preparation of this

Page 32

executive report?

A I wrote it.

Q The first page of the Executive Report in the second paragraph under Background, it says in the second sentence, "This floor would be a duplicate of a typical laboratory floor." Do you see that?

A Correct.

Q Likewise under Scope, it states, "It is proposed to add an additional floor to Building 50 that would be a repeat of the third floor."

A Which is what we did.

Q Okay. So in fact the plan was that the new floor would be a duplicate of the third floor?

A Not -- not an exact duplicate. For purposes of guidance, it would be essentially the same type of floor. It would have the same core, the same areas, the same six neighborhoods. Essentially, it would be a floor in kind, but it was understood by all parties that it would be designed to suit different users and would have different fractional designs. It was totally understood by everybody from the beginning.

Q How was that understanding imparted to Bell?

Page 33

A You'll have to find Jerry Romandino. Jerry Romandino represented Bell and told us that they would be able to do this with no problem. Jerry Romandino gave us assurances and figures that that's how we would do it.

Q Isn't it correct that the feasibility study said that both the interior and the exterior of the new floor would be a replication of the third floor?

A Yes, but the word replication is -- the word replication in this case has been, you know, used with different interpretations.

Basically the replication was that it would be a floor of research science labs with six neighborhoods similar to the other floors, and that's where it ended. We never said we would copy any ot floor. And it was understood by everybody that all six neighborhoods would be specifically designed. They would be similar. We would not radically depa from the other 36 neighborhoods that were on the oth floors, but never did we say it was going to be a carbon copy or an exact replica.

The bottom line is that Bell volunteered to

Multi-Page™

Page 34

this extra floor. When we had discussions with them, we negotiated prices. The prices were higher per square foot than the original bid. They were not outrageous change order prices. They were higher.

Q If I could interrupt you. You said "Bell volunteered." I assume the Government asked Bell to submit a cost proposal as part of the feasibility, didn't they?

A Ultimately -- no. The feasibility was done before any cost was arrived at.

There were simultaneous discussions with Jerry Romandino and others at the time as to whether or not they were receptive to this and whether or not they thought they could do it and what their feeling was on what the prices were going to be. If they were going to come back and say sure, they would do it, but it would be ten times the cost per square foot of what the other floors were, we wouldn't have bothered.

We had discussions with them, and they gave us some ballpark figures which were pretty much acceptable, which ultimately they never were able to hold, and we ended up paying a lot more for the extra

Page 35

floor than those figures.

Q Well, the figures Bell gave you were based on the feasibility study that the Government gave to Bell; correct?

A And significant verbal discussions.

Q Okay. In these significant verbal discussions, did they alter what was in the feasibility study?

A No, not to my knowledge. I don't -- I can't say that there weren't changes or that -- the feasibility study was just that. It was a feasibility study. Subsequent engineering had to be put in place after the feasibility study.

Q Okay. Well, in that regard, when you solicited a cost proposal from Bell, all that you were able to provide at that point was the feasibility study.

A No. They gave us pricing on drawings. We actually provided engineering modification drawings, and that's what we got the formal change order prices on.

Q My question was a little different, though.

Page 36

When Bell submitted its initial cost proposal, isn't it true that the only thing you had provided to them at that point was the --

A No, I don't believe so. I believe that the costs that they ultimately gave us were based on mods., on actual drawn mods. that the architect prepared.

Q Again, maybe I'm just misunderstanding you, but when you say the prices "they ultimately gave us," I want to go back to Bell's initial cost proposal.

A There was no initial cost proposal. There was discussions, but there was no proposal. If you can find a proposal, I'll look at it, but I don't think you'll find a proposal.

Q Let's take a quick break. I think I can find one.

A Sure.

(A short recess was taken.)

(The Feasibility Study for the Vertical Expansion of Building 50 was marked Kutak Deposition Exhibit No. 6 for identification.)

Page 37

BY MR. WOLF:

Q Mr. Kutlak, I've handed you what's been marked as Exhibit 6. It's a document titled Feasibility Study for the Vertical Expansion of Building 50. We were discussing the feasibility study. This is the document to which we are referring; correct?

A Yes.

Q This is dated January 8, 1999, if you look at the bottom right corner?

A Yes.

Q Going to the sixth page, I believe, it has a Bates number at the bottom of NIH-2-13578. Do you see that? Under the Exterior, it says, "The skin of the new floor will be a duplication of the third floor as shown in the enclosed elevations"?

A Right.

Q Under Interior it states, "The interior layout of the new floor will be a duplication of the third floor as shown in the enclosed floor plan"?

A Right. That's what it says.

Q Now, I want to hand you what we will mark as

Page 42

know. I didn't write this. Or maybe
... I don't know. I don't recall.
Q Let me show you Exhibit 9.
(The 2/24/99 e-mail was marked Kutlak Deposition Exhibit No. 9 for identification.)
Exhibit 9 is a copy of an e-mail produced to us by the Government. It appears it's from you to certain individuals at NIH dated February 24, 1999. Is it correct that the purpose of this e-mail was to see if funding would be available so that the final design drawings could be issued sometime in March of 1999?
A Well, what this is talking about is the shell. It specifically is talking about the shell, meaning the additional structural, the additional overall floor. At least that's what I see from the first, you know.
Q I understand. If you go down to the sixth paragraph of your e-mail, it says, "The design team has saved their original work and can switch over and issue a 100% set of additional floor documents in

Page 43

short order if that is the way we can go."
My question is were you inquiring whether funding would be available to accomplish that?
A I don't recall. I -- reading this, I'd have to think about this and read it some more. I'm not sure.
Q Well, as you sit here today, do you recall --
A No.
Q -- one way or the other?
A No. This is six years ago, five or six years ago; and no, I don't recall exactly what this was all about. This is the first time I've seen this in six years.
Q You do recall generally, however, that there were plans to try to issue the final design drawings in February, March 1999 at some point?
A No, I would not say I recall that, no.
Q Based on the documents I've showed you today, does that refresh your recollection?
A No. I wouldn't necessarily agree. That was a plan, but I don't know that that was ever put in place.

Page 44

Q Well, in fact, the final design wasn't issued until approximately September '99; correct?
A I don't know. I know that the final final, yes. But the whole point about this is that what was agreed to was to proceed with the shell, which is what we talked about throughout, and that the final kit of parts and the absolute final design would follow. It even says that later. It says that we are going to define spaces generically and customize them using the kit of parts, in the second to the last paragraph.
Q Well, in fact, there were design changes made to the new floor beyond just the kit of parts, weren't there?
A I'm not going to get into that until we discuss what the kit of parts was. There's tremendous differences on what that means to people, so.
Q Well, why don't we start there then. In that regard, I show you what we will mark as Exhibit 10.
(A Report on the Resolution of Operational Issues and Lessons Learned was marked Kutlak Deposition Exhibit No. 10 for identification.)

Page 45

I hand you a document marked as Exhibit 10. This was the document produced to us by Jacobs. It appears to be a revised draft of a document titled A Report on the Resolution of Operational Issues and Lessons Learned, end quote. The date of the particular document appears to be July 2004.
Are you familiar with this document or one like it, Mr. Kutlak?
A I have never actually seen this or read it. Basically, what this is all about, as you read through it, are all the problems of the finished building, the final building that Bell delivered to us.
Q If you go to the first page of this report -- technically page 2, I beg your pardon -- under Introduction, it says, "Building 50 is a shining star on the NIH campus as it represents the latest in laboratory planning and engineering, and has been highly recognized for its energy saving features."
A Right.
Q Is that a statement you generally agree with?
A I was responsible for it, and I won national awards and notoriety for the energy-saving features in

| | | | | | |
|---|---|---|---|---|---|
| Project Costs | $2,000,000.00 | $0.00 | $556,357.76 | ($308,577.24) | $2,308,577.24 |
| Non-Project Costs | $1,000,000.00 | $0.00 | $119,400.00 | $119,400.00 | $880,600.00 |
| **Totals** | **$93,100,000.00** | **$67,573,296.88** | **$76,768,222.04** | **$78,139,833.34** | **$14,960,166.66** |

**SCHEDULE – PERCENT COMPLETE** *(planned-average start vs. actual)*






**THE NATIONAL INSTITUTES OF HEALTH**
**CONSOLIDATED LABORATORY FACILITY – BUILDING 50**
**BETHESDA, MARYLAND**

**EXECUTIVE MONTHLY REPORT**

**DECEMBER, 1998**

*23-Aug-04* — *Distribution: GW, KL, FK, JS, BT, CS, QL, File*

**W.R. No. HVX30019** — **Contract No. GS-03P-94-DXD-0010**

**EXEC[illegible] E BRIEF**

[illegible]e most significant accomplishment of December 1998 was commencement of stru[illegible]l steel interstitial deck installation. This will allow MEP trades to begin installing overhead work in the coming month. Other significant accomplishments were as follows:

- Completion of the pouring of the Third Floor slab and post-tensioning of the west and center areas of the Third Floor.
- Completion of approximately 70% of the backfill.
- Successful off-site fume hood test. This test demonstrated both static (ASHRAE 110) and dynamic performance of the laboratory control system, VAV box and fumehood combination proposed by BELL.

The Critical Issues report is our "Things to do" list for the next 60 days. We anticipate the following significant events during that period:

- Completion of elevated slab pours at the rate of one floor per month.
- Commencement of mechanical piping work in the building shafts.
- Exterior enclosure mock-up in February.
- Commencement of AHU fabrication in February.

BELL improved concrete production during November and early December and made schedule adjustments so that AHU fabrication became critical and concrete had eleven days of float. Although BELL's CPM update shows them on schedule with zero float, their total work in place continues to fall behind plan as illustrated by the percent complete graph, an early indicator of future delays. BELL needs to maintain the scheduled pour sequences and ensure AHU fabrication proceeds as scheduled in order to prevent critical path delays. Moreover, BELL needs to start subsequent trades as soon as possible to improve overall work in place.

BELL requested and the Government approved staggered submission milestones (structural by 20%, MEP by 30% and the balance by 40%). With 34% of the contract period elapsed, BELL has received approval on only 83% of the required structural submittals, 37% of the required MEP and 33% of submittals overall. BELL has received approval on all structural submittals through Floor Five and on the basement interstitial coordination drawings. Therefore, BELL is not in imminent danger of having to install work without approval or delay work, but needs to complete MEP submissions as soon as possible to prevent future delays.

The project is well within budget in all categories except A/E Post-Design Services and Integrated Quality Control Services (IQCS), which is over budget due to the addition of Commissioning. Surpluses in the other budget categories more than make up for the Post-Design and IQCS overruns. Note that the Anticipated Costs do not include contingency. We consider a contingency of 8% (approximately $6,000,000) to be appropriate at this time. Client Project Costs have been updated to include $1,000,000 for the Building 50 share of the PEPCO rebate.

**PROGRESS**

**DESIGN**

BP 1 and BP 2 design is complete. HLM is developing BP1 CAD record drawings and specifications based on Manhattan and CRSSC as-built documents. HLM began NHLBI Kit of Parts design. Kit of Parts decisions are due to BELL by October 2, 1999. NIH, CRSSC and HLM will meet in the upcoming month to develop a schedule showing floor by floor Kit of Parts decisions.

**CONSTRUCTION**

By the beginning of December, BELL had completed pouring and post-tensioning the west and center areas of the Second Floor. BELL also completed pouring the grade beams for the lobby slab on grade and approximately 75% of the waterproofing and backfilling operations on the West and South sides.

During the month of December, BELL completed pouring all three areas of the third floor and post-tensioning the west and center areas. BELL also completed approximately 90% for the waterproofing and backfilling operations on the West and South sides. Long Masonry completed approximately 90% of the masonry in the basement mechanical area, but only approximately 25% in the basement laboratory areas. BELL brought their structural steel sub-contractor, Baltimore Steel Erectors (BSE), on site earlier than planned in an effort to overcome learning curve problems that have plagued other sub-contractors. However, Long Masonry's lack of progress in the laboratory areas is causing BSE to place structural steel without the supporting masonry. BELL needs to coordinate their sub-contractors in order to maintain progress and prevent any schedule impacts. Basement level coordination drawings were approved in December and duct fabrication commenced. BELL should begin MEP installation on the basement interstitial level in January.

**CONTRACT ADMINISTRATION**

NIH has issued ten BP 2 Construction Change Orders and one Request for Proposal to date encompassing 78 changes to the contract documents. 43 of these changes were issued as having cost or time impacts. BELL has submitted proposals for 14 of these 43 changes. The N[illegible] negotiated 11 of the 14 proposals received to date. NIH has prompted BELL to submit timely proposals. BELL has n[illegible]ested any time extensions to date or disputed any of the 35 changes that were issued as having no cost or time impact.

NIH has issued three A/E Post-Design Change Orders to date encompassing 14 changes. The NIH has negotiated and executed modifications for all 10 of the proposals HLM has submitted to date.



EAST ELEVATION – 1-Dec-98



BASEMENT INTERSTITIAL STEEL – 30-Dec-98

**CRITICAL ISSUES**

| No. | Action | Responsibility | Due Date |
|---|---|---|---|
| 17.2 | Execute CRSSC 1999 GSA Delivery Order | GSA | 31-Jan-99 |
| 18.1 | Partnering Refresher Meeting | CRSSC | 31-Jan-99 |
| 18.4 | Provide Y2K Certification | BELL | 31-Jan-99 |
| 20.2 | Implement MEB Valve Revisions | NIH/CRSSC | 31-Jan-99 |
| 21.1 | Submit Exterior Enclosure Mock-up | BELL | 08-Feb-99 |
| 21.4 | Submit Steam Station Spence/Bell Substitution Request | BELL | 31-Jan-99 |
| 23.1 | Develop Accelerated Schedule for Kit of Parts Decisions | NIH/CRSSC | 31-Jan-99 |
| 23.2 | Begin NHLBI Deferred Design (Kit of Parts) | HLM/NIH | 31-Dec-98 |

BUDG" "UMMARY

| Service Component | Budget | Award Amount | Obligations To Date | Anticipated Costs | Budget Surplus/ (Deficit) |
|---|---|---|---|---|---|
| General Contracting | | | | | |
| BP1 Construction | $4,000,000.00 | $3,174,020.00 | $3,891,103.00 | $3,891,103.00 | $108,897.00 |
| BP2 Construction | $72,600,000.00 | $63,663,745.00 | $65,390,233.00 | $73,364,209.15 | ($764,209.15) |
| Intramural Contracts | $500,000.00 | $0.00 | $0.00 | $15,000.00 | $485,000.00 |
| Design/Bid | | | | | |
| Design Services | $5,700,000.00 | $299,958.88 | $5,007,798.98 | $5,170,695.30 | $529,304.70 |
| Post-Design Services | $1,300,000.00 | $0.00 | $1,320,613.30 | $1,471,445.06 | ($171,445.06) |
| Construction Administration | | | | | |
| Design Phase | $1,000,000.00 | $435,573.00 | $562,742.00 | $562,742.00 | $437,258.00 |
| Construction Phase | $3,750,000.00 | $0.00 | $2,246,098.00 | $2,504,995.00 | $1,245,005.00 |
| IQCS | $500,000.00 | $0.00 | $611,379.00 | $611,379.00 | ($111,379.00) |
| Occupancy Phase | $750,000.00 | $0.00 | $0.00 | $0.00 | $750,000.00 |
| Client | | | | | |
| Project Costs | $2,000,000.00 | $0.00 | $627,895.06 | $464,920.67 | $1,535,079.33 |
| Non-Project Costs | $1,000,000.00 | $0.00 | $619,400.00 | $619,400.00 | $380,600.00 |
| **Totals** | **$93,100,000.00** | **$67,573,296.88** | **$80,277,262.34** | **$88,675,889.18** | **$4,424,110.82** |

**SCHEDULE – PERCENT COMPLETE** ***(planned average start vs. actual)***




**CRSS**
**Constructors**
A Jacobs Company

BUILDING **50**



**THE NATIONAL INSTITUTES OF HEALTH**
**THE LOUIS STOKES LABORATORIES – BUILDING 50**
**BETHESDA, MARYLAND**

**EXECUTIVE MONTHLY REPORT**

**APRIL, 1999**

*23-Aug-04* *Distribution: GW, KL, FK, JS, BTa, CS, QL, File*
**W.R. No. HVX30019** **Contract No. GS-03P-94-DXD-0010**