[illegible] has decided to add a floor to building 50. The added floor will provide 36,200 GSF ([illegible]00 NSF) of state of the art lab[illegible]ry space at a lower cost and much faster than any other delivery method. The project team has proceeded with design and construction of the additional floor as "shell space". The shell space is funded by the project's budget surplus, which has resulted from effective management, design and bidding. Lab fitout will be designed, funded, and constructed once occupants have been designated.

The most significant accomplishment of April 1999 was commencement of Mechanical Penthouse Deck pour activities. Other significant accomplishments were as follows:

- Commencement of mechanical, electrical and plumbing activities on the Second Floor Interstitial level.
- Commencement of erection of exterior precast panels.
- Factory Testing of AHU's 1-4.
- Commencement of Deferred Design.
- Delivery of Sterilizers LST 1&2.

The Critical Issues report is our "Things to do" list for the next 60 days. We anticipate the following significant events during that period:

- Concrete topping out in mid-May.
- Commencement of exterior brick in mid-May.
- Deferred Design Meetings
- Proximity Card Access System Specification
- Penthouse steel erection in early June.
- Delivery of AHU's 1-4 & 6 in late June.

The contract period has been extended 1 month for the added floor structure. We estimate 2 additional months for the added floor shell and fitout modifications. BELL fell 8 working days behind schedule during April due to poor Mechanical Penthouse concrete productivity. Penthouse activities continue to fall behind schedule as of this writing, and we expect the delay to grow to 30 days based on our current projections for the critical path AHU installation. BELL plans to recover from the delay by beginning the GWB partition work prior to completion of the roof. The total work in place has improved substantially in recent months, as illustrated by the Schedule-Percent Complete graph.

BELL requested and the Government approved staggered submission milestones (structural by 20%, MEP by 30% and the balance by 40%). With 49% of the contract period elapsed, BELL has received approval on only 55% of submittals overall. Nonetheless, BELL has managed to keep the submittals ahead of the construction. The re-coordination effort initiated last month to address the interstitial access problems has been completed and lessons learned will be applied to the upper floors.

The project is well within budget in all categories except BP2 Construction, A/E Post-Design Services and Integrated Quality Control Services (IQCS), which is over budget due to the addition of Commissioning. Surpluses in the other budget categories more than make up for the BP2 Construction, Post-Design and IQCS overruns. Note that the Anticipated Costs do not include contingency. We consider a contingency of 6% (approximately $4,156,880) to be appropriate at this time. The current budget surplus of $4,424,110 provides adequate contingency, at this time.

**PROGRESS**

**DESIGN**

BP 1 and BP 2 design is complete. CRSSC developed a CPM schedule for the deferred design process to ensure delivery of decisions to BELL by October 2, 1999 as required by the construction contract. Deferred Design Lab Interviews were begun during the month of April. The Project Team will continue to conduct Lab Interviews during the coming month and HLM will issue all the changes on a floor-by-floor basis. HLM Design also continues to address program change requests by various Institutes (NCI, NIAID and NHLBI). Some of the deferred design and program changes are significant and may effect the project budget and schedule.

**CONSTRUCTION**

During the month of April, BELL completed pouring and post-tensioning Floor 6. BELL also completed pouring the west and center areas of the Mechanical Penthouse Deck. BELL completed approximately 35% of the mechanical and plumbing activities in the basement, 25% on the First Floor and 10% on the Second Floor. YOUNG ELECTRIC completed approximately 70% of the main feeder, panel box, transformer and cable tray installation in the basement during April. YOUNG ELECTRIC also completed approximately 65% of this work on the First and Second Floors and approximately 25% on the Third Floor. YOUNG ELECTRIC also completed approximately 40% of the busduct installation in the basement. LONG MASONRY completed approximately 95% of the masonry walls in the basement laboratory areas. LONG MASONRY also completed approximately 90% of the cmu masonry walls on the First, Second and Third Floors and approximately 30% of the masonry walls on the Fourth and Fifth Floors. BALTIMORE STEEL has completed erection of approximately 80% of the interstitial support steel and decking in th[illegible]ment, completed all of the structural steel on the First and Second Floors, approximately 75% on the Third Floor and app[illegible]ely 10% on the Fourth Floor. BELL also accepted delivery of Sterilizer Nos. LST 1&2 during the month. Modern Mosai[illegible]an precast installation on the West face.

**CONTRACT ADMINISTRATION**

NIH has issued thirty-eight BP 2 Construction Change Orders and two Requests for Proposal to date encompassing 146 changes to the contract documents. 79 of these changes were issued as having cost or time impacts. BELL has submitted proposals for 46 of these 74 changes. BELL has also submitted 7 unsolicited proposals. The NIH has negotiated and modified 23 of the 46 proposals received to date. Of the 23 other proposals, NIH has rejected 5 for being incomplete. BELL has requested and been granted a thirty calendar-day extension for constructing the structure of the additional floor. BELL has not disputed any of the 69 changes that were issued as having no cost or time impact.

NIH has issued five A/E Post-Design Change Orders to date encompassing 16 changes. HLM has submitted proposals for 11 of the changes. The NIH has negotiated and executed modifications for 11 of these changes.



**PRECAST ERECTION AT LOADING DOCK AREA**
**15-Apr-99**



**DUCT MAINS ON INTERSTITIAL LEVEL**
**15-Apr-99**

**CRITICAL ISSUES**

| No. | Action | Responsibility | Due Date |
|---|---|---|---|
| 13.4 | Re-Submit Generator MDE Permit | BELL | 30-Jun-99 |
| 16.4 | Revise/Resubmit NHLBI Occupancy Services SOW/Proposal | CRSSC | 15-May-99 |
| 18.11 | Issue Change Order to Re-design NHLBI Third Floor Neighborhood | CRSSC | 19-Mar-99 |
| 18.12 | Issue Change Order to Re-design EM Suite | CRSSC | 02-Apr-99 |
| 18.14 | Issue RFP for Electronic Security Design | CRSSC | 15-May-99 |
| 18.15 | Issue Change Order for Lactation Room Design | CRSSC | 21-May-99 |
| 19.1 | Relocate Site Fence at Northwest Parking | BELL | 30-Jun-99 |
| 20.5 | Electron Microscope Suite (NCI) Re-design | HLM | 30-Jun-99 |
| 21.7 | Fabricate/Deliver Penthouse AHU's | BELL | 30-Jun-99 |

no longer req'd
~~the dribbles.~~

8/24/00 NIH50 Security Negotiations (BT, FM, BTa, JB, ZB, Doug Courtney, D. Huntington, Joe Costa)
1) We presented our position. ISR will provide a revised proposal on Monday, incl.

8/30/00 NIH50 Partnering (BT, FM, RB, BTa, JB, JR, TB)
1) Agreed to disagree on resp for changes to date. I layed out what we need in terms of compl sched:

| Floor # | Subst Compl | Move-in |
|---|---|---|
| 1 | Apr 15 | May 15 |
| 6 | Mar ~~Apr~~ 30 | May 1 |
| 5 | Mar 15 | Apr 15 |
| 4 | Mar 1 | Apr 1 |
| 3 | Feb 15 | Mar 15 |
| 2 | Feb 1 | Mar 1 |
| Bsmt | Feb 1 | Mar 1 |
| Vivarium | Jan 1 (FC Feb 1) | Mar 1 |
| Systems | Mar 1 | |

Bell says they are clo-based on changes to date. We said we doubt it - they will review manpower etc & confirm to us by Oct 1 based on changes issued thru Aug 31. We will investigate (for issue to BURS) triggering changes after Aug 31 & authorizing acceleration for those

we do issue to Bell
2) Disputes: We are willing to meet w/ Ceco. SB to schedule - he will also begin requesting audiences before writing CO final decision requests. We will set aside Tues 9-12 for CO neg & these mtgs.
3) CRSSC & Bell meet next wk to agree on list of CO's for execution by end of ~~month~~ Oct.
4) Bell gave us PM4 fixed proposal - 3.4M. We offered 3M, they did not accept - we discussed PM4 & all delay to date lump sum settlement - they offered $4.1M. We will respond by next Friday. If we say no, we will still try to negotiate PCH by mid Sep to get it this yr.

9/6/00 Commissioning Progress (BT, RY, Lon, Pat, Norm, Wilson)
1) We will all renumber submittals from .A, B etc to .1, .2 & follow this approach hereafter.
2) Lon will update log (part

[illegible]
energize 3rd feeder, PP will
confirm w/ J. Greenfeld, & tell
Bell to energize.

3) Bell will advise RY before
starting motorized equip
& show completed checklists.

4) Norm working on getting
Smith (Bldg 4 guy) to do
on-site 1974 tests.

5) Bell provide EF18 E/AHU-3
checklists - AHU 3 not
completed! No motor stuff
checked off.

6) Bell putting in clg tiles
on Fl 2 - Norm can
start air balance on Monday
11/6. Bell still working
on preparing pre-heat system.

7) Norm said sketches don't
answer his questions. RY will
fwd ques via CMAFI to
SD. (respond w/ next week) Bell to get Norm
office today

11/2/00 LC Office Negotiation (BT, ES,
JB, Steve Young, JB).

1) Negotiated - we backed off
on 10% discount & settled
They agreed to delete clean-up
based on DFCA.

2) Steve & Gunn SDB story

about how hard it is to do work now – he will be looking for add'l costs in other late (post Aug 31) changes & repricing some old ones, he will come back @ a later date & we will discuss. I noted concern that if we pay OT etc, we expect job to finish on time w/no delay claim for cumulative effect etc – when they sign mod w/ no time ext they must mean it – They agreed – they will include all impact costs in proposal, no come-backs later.

11/6/00 NIH 50 Type 28/29 Light review: (CBT, AK, PP, Wes, HO, JB, Pat, Glen, Chris, str of Kramer)

1) Kramer will powder coat to match clg color – Bell will provide them w/ sample can't be a true "brushed alum", but powder coat to match is ok w/ us.

2) Agreed to change fixture type lengths – Typical

BELL

***BELL BCI***
*Louis Stokes Laboratories-NIH Bldg. 50*
*Bid Package II*
*Bethesda, MD*
*Phone: (301)215-8445 Fax: (301)215-8446*

## SPEED MEMO

**To: Brian Temme / JE**
**From: William R. Rothrock III** WRR III
**Subject: Mechanical Proposal Pricing (Labor).**
**Date:** *11/09/00*

***MESSAGE:***

To date Bell has been pricing all mechanical work per MCA unit rates without modification. Given the final negotiation of contract extension and the continuing abundance of changes, Bell can no longer absorb the costs associated with escalating inefficiencies. All proposals associated with extra work resulting from changes (i.e. RFIs, Bulletins, etc.) received after 9/01/00 will be priced on overtime, and will include Engineering / Estimating time (minimum 8 hrs.) and the following modifications per MCA Management Methods Committee Bulletin No. CO 1 (see attached):

-Errors and Omission add 3%
-Stacking of Trades add 20%
-Morale and Attitude add 15%

These are the current additions to the MCA base labor that will be used. Bell reserves the right to add to or modify these factors given changes in job conditions. If you have any questions or concerns regarding this issue, please feel free to contact me at this office.

Thanks,
Bill

attachment: Appendix B (MCA Management Methods Committee Bulletin No. CO 1)
cc: Jeremy Bardin
Scott Stevenson

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

National Institutes of Health
Bethesda, Maryland 20892

9000 Rockville Pike
Bldg. 13, Room G800
(301) 435-4333

February 2, 2001

Mr. Jeremy Bardin
Project Manager
Bell Company
9000 Rockville Pike, MSC5903
Bethesda, MD 20892

RE: The National Institutes of Health Louis Stokes Laboratories - Building 50
Bid Package No. 2 Construction
Contract No. 263-98-C-0102

SUBJECT: Request to Overturn Retention Decision by Construction Manager

REF: Bell January 27, 2001 Letter to NIH, Bell December 2000 Invoice

Dear Mr. Bardin:

I have reviewed JFI's retention recommendation with Mr. Kutlak and JFI. I concur with the recommendation and have therefore decided to retain $100,000 due to insufficient progress.

Jeremy, as we have said on numerous occasions, timely and predictable completion of this project is very important to the NIH. Numerous other projects depend on timely relocation of hundreds of scientists into Building 50. Retention and recruitment of world-class scientists could be adversely affected by delayed completion. It is of the utmost importance that Bell and its subcontractors make every effort to complete the project as quickly as possible. I believe that the subject retention is appropriate in order to ensure that this project receives appropriate Bell Company management attention.

During our August partnering session, the Government suggested it would direct future changes to another contractor. You requested that the Government direct the changes to you, and authorize reasonable acceleration costs. The Government agreed to compensate Bell for reasonable acceleration costs for changes initiated after August 31, 2000. Bell, for its part, agreed to complete all base contract work, changes initiated on or before August 31, 2000, and later changes including acceleration costs by the Modification No. 93 milestone dates without additional compensation. I believe that the Government has lived up to its commitment, yet Bell clearly is not on schedule to complete the work by the milestone dates.

I share your concern regarding the volume of changes. I have instructed the Government and JFI staff to make every effort to finalize the negotiated changes, and either negotiate or void the

Bell-091.doc

NIH-1-02587

remaining changes. I understand that the Government has notified you of many changes that it is ready to negotiate, and I encourage you to schedule negotiations as soon as possible. Most importantly, I encourage you to provide realistic and timely completion date forecasts in order to minimize the damage of delays to the Government's occupancy schedule.

I understand that you have met with Messrs. Kutlak and Temme to discuss these issues. I would be pleased to participate in further discussions if you wish.

If you have any questions regarding this issue, please call me at (301) 435-4333.

Sincerely,

Barbara Taylor
Contracting Officer

cc: F. Kutlak
B. Temme, JFI

Bell-091.doc

NIH-1-02588

**Answer to Interrogatory No. 3**

Jeremy Bardin primarily oversaw the preparation of BELL's schedules, updates, narratives and time impact analysis reports. In accordance with RCFC 33(d), the requested dates can be determined from the dates set forth on the aforementioned schedules, updates, narratives and reports.

**Interrogatory No. 4**

Identify all documents and witnesses upon which Bell may rely at a trial of this action to prove the allegation in paragraph 66 of the complaint that Bell achieved substantial completion on or about February 5, 2002.

**Answer to Interrogatory No. 4**

BELL objects to this interrogatory because it improperly demands information that is exempt from disclosure pursuant to the attorney work product doctrine. Interrogatories are properly used to discover facts; they cannot be used to force pretrial disclosure of how a party intends to prove its case-in-chief.

Furthermore, even assuming *arguendo* that this interrogatory does not improperly demand production of attorney work product, BELL objects to this interrogatory because, at this time, it is impossible for BELL to respond to the interrogatory as phrased. BELL has not received production of documents from the Government, or from third parties, and no depositions have been taken. BELL cannot "[i]dentify all documents and witnesses upon which Bell may rely at a trial of this action to prove the allegation in paragraph 66 of the complaint," because BELL does not yet have all documents and deposition testimony relevant to this issue. Furthermore, this interrogatory imposes an unfair burden on BELL by placing it in the position of potentially having to supplement its answer *ad infinitum*. That is, as discovery progresses, this

request would require BELL to make a determination whether it might use a particular document as an exhibit or call a particular witness and, if so, then require it to produce those documents and/or identify the witness in piece-meal fashion. Failure to do so would then subject BELL to the Government's assertion that BELL "failed" to provide discovery and that BELL should not be allowed to use the document(s) and/or call the witness at trial. BELL cannot and will not be placed in this type of game of "gotcha." Indeed, this is precisely why proposed exhibits and witness lists are exchanged after discovery is concluded, not before.

Without waiver of its objections, BELL incorporates herein by reference the parties' respective initial disclosures and the persons and documents identified therein. BELL further states that, at trial, it may rely upon all documents and things relating to its contract with the Government, including without limitation, all documents that will be produced during discovery, all documents to be produced by BELL, all documents to be produced by the Government, all documents that may obtained from third parties, all transcripts of depositions that will be taken, and all RCFC 26(a)(2) disclosure materials, in order to prove the allegations set forth in ¶ 66 of the Complaint. BELL cannot identify all documents at this time, because certain of these documents do not yet exist, and/or certain of these documents are not yet in BELL's care, custody and control.

**Interrogatory No. 5**

Identify all documents and witnesses upon which Bell may rely at a trial of this action to prove the allegation in paragraph 64 of the complaint that "on or about March 26, 2001, NIH took beneficial occupancy of the Project[.]"