VERIFICATION

The foregoing responses are true and correct to the best of my knowledge and belief.

BELL BCI COMPANY

Steven Ruether

Subscribed and sworn to on the 17th day of December, 2003.

Notary Public

My Commission expires: 9/30/07

As to prior objections,

Charlie C.H. Lee
Richard O. Wolf
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-Mail: r.wolf@mooreandlee.com

Dated: December 17, 2003

# BELL BCI Company
# vs.
# The United States of America

USCFC CASE NO. 03-1613C

UNITED STATES COURT OF FEDERAL CLAIMS

## The National Institutes of Health
## Louis Stokes Laboratories / Building 50
Bethesda, Maryland

# Expert Report
**September 9, 2004**

Prepared for:

Moore & Lee, LLP
Attorneys at Law
McLean, Virginia

Prepared By:

Oxley & Brannon Construction Consultants, Inc.
Saint Petersburg, Florida

Patrick W. Brannon, P.E.

transmitted to the Contractor. For example, Mod 94, issued on October 2, 2000, was a change transmitted to the Contractor after August 31, 2000, based on the effective date, yet the creation of this Mod began with RFI 1051[2], and EWO 338, which were both generated on January 24, 2000. The RFI was answered by the government on February 16, 2000. The question therefore is: which date constitutes the transmittal of the "change" to the Contractor? Is it the date the RFI was generated, the date it was answered by the Government, the date BELL requested compensation of the additional work as reflected in the generation of an EWO, the date the Government directed the work to proceed, or the date the Government agreed it was a change in scope by the issuance of a Modification?

It would be perfectly reasonable to conclude that the term "change" as used in Mod 93 refers to a bilateral modification executed by both parties or at least a unilateral modification issued by the Government.

However, for purposes of our analysis of the time impact we have taken a very conservative approach to this question, analyzing only EWO's that the Contractor generated after August 31, 2000. The fact is that the universe of "changes" which

---

[2] RFI 1051 was selected for this review only because it was associated with Mod 94, the immediate successor to Mod 93. The Contractor's suggested solution to the design problem identified in RFI 1051 actually resulted in a credit, which was accepted by the Government. Despite the fact that a change may result in a credit in the cost of a discrete component of the direct work, the execution of the change may well adversely impact the project schedule and productivity.

are not covered by Mod 93 may be much larger than the subset we have identified[3]. The result of our time analysis indicated that, based on the Contract's procedure for determining the Contractor's entitlement to additional time, there was sufficient time entitlement within the subset of EWO's generated after August 31, 2001, to extend the individual milestones to or beyond the actual completion dates achieved by BELL[4]. Therefore, there was no need to continue the process of time impact analysis for either EWO's generated prior to August 31, 2000, but incorporated by the Government into the work as a change subsequent, or for EWO's generated after August 31, 2000, but where the entitlement is disputed by the Government.

Our conclusion as to the first of the two questions we posed above for the purposes of our analysis is that all EWO's generated prior to August 31, 2000 are included as to the "time impact", but only in relationship to extensions of the Contract Time. By its plain terms Mod 93 called out only "time impact" and did

[3] The government has taken conflicting positions as to the language of paragraphs 4 and 5 in Mod 93. For example, the Government in its answer to Interrogatory 13 above included several EWO's generated prior to Mod 93, including EWO 433 generated on 8/11/00 which increased the contract by over $340,000 associated with the changes ordered by the Government in Bulletin 80 while the Contracting Officer's rejection of BELL's REA took a different position as to these "changes".

[4] It is not unusual in using the TIA process dictated by the Government that a contractor can demonstrate an entitlement to more time than it actually takes to perform the work. This is because in the prospective methodology employed in the TIA process, efficiencies or improvement that mitigate the time impact projected often occur as work is resequenced and the schedule are modified to reflect the actual conditions encountered that were not fully contemplated in the schedule in effect at the time the fragnet for the changed work was analyzed.

**EWO #465: Change Bulletin #27/RFI #1452 Lighting Control for the Nuclear-Magnetic Resonance (NMR) Toilet/Locker Room B213, B215 (Reference Exhibit #8)**

***Narrative***

Young Electrical Contractors, Inc. was in the process of installing the rough-in electrical for the NMR Toilet/Locker Room area when a walkthrough was conducted by Wes Miller, CRSS Constructors, on September 6, 2000. During Mr. Miller's visit, he noted that some changes should be made to the lighting and the lighting controls. A Request for Information (RFI #1452) was subsequently written and submitted on September 7th by BELL to verify the changes that were discussed by Mr. Miller. These changes included a modification to the design to conform to the National Electrical Code (NEC), and an approval of an offset in the placement of the shower lights due to potential interferences with the vertical exhaust duct drops.

BELL received an answer to RFI #1452 on September 14, 2000. This response confirmed most of the questions regarding lighting with the exception of the shower lights. BELL was asked to move the light fixtures in the large shower stalls, however in the smaller shower stalls they were requested to relocate the exhaust duct so that the light would be in the center of the stalls. CRSS then

revised this reply on September 20th by documenting that the shower lights (regardless of the size of the shower stall) would be offset in the event of an interference with an exhaust duct. These basement rooms are shown in red below.



**Basement**

Young Electrical Contractors, Inc. provided a cost estimate of $1,813.78 for the changes relating to RFI #1452 and this information was compiled and submitted by BELL on September 22, 2000 as Extra Work Order (EWO) #465. This change was approved on October 12, 2000 after a period of pricing negotiations in the amount of $887.00 in Contract Modification Number #121. The

timeframes except for the Contract Completion milestone. Work associated with EWO #465 resulted in a 23 calendar day delay to the Contract Completion date. This milestone slipped from an ahead-of-schedule completion of April 24, 2001 to May 17, 2001; forcing the completion of the project behind schedule by 17 calendar days.

***Summary***

As mentioned in the TIA above, the only milestone that was delayed beyond the contract-specified dates was the Contract completion milestone. The illustration below shows the delays inflicted on the milestones as a result of EWO #465.

| Project Milestone | N127 Date | C127 Date | Delay (calendar days) |
|---|---|---|---|
| Vivarium | 12/05/00 | 12/05/00 | 0 |
| Balance of Basement | 01/09/01 | 01/09/00 | 0 |
| 1st Floor | 03/08/01 | 03/08/01 | 0 |
| 2nd Floor | 12/27/00 | 12/27/00 | 0 |
| 3rd Floor | 01/03/01 | 01/17/01 | 14 |
| 4th Floor | 01/18/01 | 02/12/01 | 25 |
| 5th Floor | 02/09/01 | 03/06/01 | 25 |
| 6th Floor | 03/05/01 | 03/28/01 | 23 |
| MEP Milestone | 02/02/01 | 02/28/01 | 26 |
| Contract Completion | 04/24/01 | 05/17/01 | 23 |

If a fragnet had been introduced into the project schedule at the time that BELL was asked to proceed with EWO #465, a time extension of 17 days to the completion of the Contract would have been justified. The Claim Digger report

A fragnet was presented for each change outlined in this report and inserted into the project schedule in effect at the time that BELL was notified to proceed with the change. The fragnet work activities were logically tied to pertinent activities in the project schedules to properly assess the delay, if any, to the project milestones.

The post-Modification #93 changes to the Contract also caused delays to the majority of the fourteen interim milestones. The table below is a list of these milestones. The actual completion dates were obtained from Government-issued letters approving substantial completion dates for each interim milestone (See Exhibit #93). The TIA date noted is the latest date calculated from the window analyses, if applicable, along with the corresponding EWO number.

| AREA | Actual Completion Date | TIA Date | EWO # |
|---|---|---|---|
| LAN Rooms | 10/01/00 | N/A | N/A |
| Vivarium | 05/10/01 | 05/24/01 | 484 |
| Balance of Basement | 06/15/01 | 06/26/01 | 484 |
| First Floor | 09/28/01 | 11/19/01 | 487 |
| Second Floor | 04/11/01 | 06/21/01 | 478 |
| Third Floor | 04/10/01 | 07/17/01 | 543 |
| Fourth Floor | 05/08/01 | 08/03/01 | 478 |
| Fifth Floor | 08/29/01 | 10/08/01 | 487 |
| Sixth Floor | 08/09/01 | 10/29/01 | 487 |
| MEP Milestone | 09/12/01 | 10/12/01 | 700 |
| Elevators 1, 2, and 3 | 04/28/01 | N/A | N/A |
| Elevator 5 | 05/29/01 | N/A | N/A |
| Site Hardscape | 12/04/01 | N/A | N/A |
| Site Landscape | 12/04/01 | N/A | N/A |

impact analysis for this month justifies a time extension of 11 calendar days to February 8, 2002 for the completion of the project. Exhibit #91 is a Claim Digger report of the comparison between schedules N242 and C142.

| Project Milestone | N242 Date | C142 Date | Delay (calendar days) |
|---|---|---|---|
| Balance of Basement | 12/12/01 | 12/12/01 | 0 |
| 1st Floor | 12/17/01 | 12/17/01 | 0 |
| 6th Floor | 12/12/01 | 12/12/01 | 0 |
| MEP Milestone | 12/12/01 | 01/04/02 | 23 |
| Contract Completion | 01/28/02 | 02/08/02 | 11 |

## Conclusions of Time Impact Analysis

The changes we have analyzed resulted in a delay to the Contract completion milestone of 284 calendar days from April 30, 2001 to February 8, 2002. This figure was obtained in accordance with the requirements of the Contract as found in the Contract Specification Section 01310 – Schedules and Reports, Part 7 Schedule Time Extensions, Paragraph 7.01.B as excerpted below (See Exhibit #92 for the Contract Specification Section 01310 document).

> "Each TIA shall demonstrate the estimated time impact based on the date the change was issued to the Contractor, the events of the delay, the status of construction at that point in time, and the event time computation of all activities effected by the change or delay. The event times used in the TIA shall be those included in the latest update of the Project Schedule in effect at the time the change or delay was encountered."

MARSH

August 30, 2003

# NIH Building 50
# Louis Stokes Laboratory

## Expert Report of Ted M. Scott

MMC Marsh & McLennan Companies