IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BELL BCI COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-1613C (Judge Wolski) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Court's Rules ("RCFC"), defendant, the United States, responds to the proposed findings of uncontroverted fact submitted by plaintiff, Bell BCI Company, in connection with Bell's cross-motion. As demonstrated in our briefs, even to the extent that Bell's allegations are supported and uncontroverted, they do not support judgment for plaintiff.

Many of Bell's assertions, as noted below, lack record support, as they are conclusory or cite only the conclusory affidavit of a former Bell manager. We further object generally to Bell's proposed findings upon the grounds that they impose an undue burden upon the responding party, inasmuch as they are repetitive, and they contain both misplaced legal argument and verbose details that are irrelevant to either party's motion. See RCFC 56(h)(1) (proposed findings must be "relevant" and "concise").[1]

[1] Similarly, we have condensed, within brackets, Bell's verbose citations to its appendix materials.

1. On or about December 11, 1997, the Government solicited bids for the construction of a new laboratory building, referred to as NIH Building 50, to be located at the National Institutes of Health's ("NIH's") Bethesda, Maryland[,] campus (hereinafter the "Project" or "Building 50" or "Stokes Laboratories").

Response:

This is conclusory, see RCFC 56(h)(1), but uncontroverted.

2. The Government retained an architectural firm, HLM Design, to prepare the Project design plans and specifications. See Defendant's Answer, ¶ 4.

Response:

Although the answer alone provides no independent support for this proposed finding - and Bell never alleges any reason why the identity of the design firm might be relevant - the proposed finding is uncontroverted.

3. The Government retained CRSS Constructors, Inc. (which was later acquired by Jacobs Facilities, Inc. (hereinafter "CRSS/Jacobs") to be its construction manager. In effect, CRSS/Jacobs was the Government's "eyes and ears" on the Project and was considered to be an extension of the Government's staff. See [Pl. App.] 20-21 [. . . .]

Response:

Uncontroverted.

4. On or about March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with the Government for the fixed-price sum of $63,663,745.00 to construct the Project in accordance with the Project design documents provided by the Government. See Defendant's Answer, ¶ 4.

Response:

Although the answer alone provides no independent support, we have already agreed. See Def. PFF ¶ 1.

5. BELL was not the lowest bidder for the Project. See [Pl. App.] 24. The Government determined, however, that BELL's bid provided the best value. Id.

Response:

Uncontroverted.

6. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and laboratory space, including approximately 2,788 gross square meters of laboratory animal holding areas. See Defendant's Answer, ¶ 5.

Response:

Although the answer alone provides no independent support, this proposed finding is uncontroverted. See Def. PFF ¶ 2.

7. The Government required the use of unit price lists for two discrete areas: (i) "Laboratory Casework" and (ii) "Kit of

Parts" ("KOP"). The unit price lists for Laboratory Casework [were] to include agreed upon prices to be used for changes in the casework, <u>i.e.</u>, certain identified cabinetry, shelving and tables. The KOP was a similar unit price listing mechanism, but addressed certain identified laboratory-related items other than casework, <u>i.e.</u>, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractor[s] and suppliers. NIH was permitted to alter the quantities of items identified in the Laboratory Casework and KOP unit price lists within 550 calendar days of contract award. If NIH made more than fifty changes for casework or five changes for KOP, the contractor would be entitled to renegotiate the unit prices. <u>See</u> Defendant's Answer, ¶ 8.

<u>Response:</u>

Paragraph 8 of the answer, which merely refers the reader to the contract, does not admit or support these allegations, which are, in any event, legal conclusions to which RCFC 56 requires no response here.

9. The Contract recognized that Government-caused changes would entitle BELL to submit a cumulative impact claim and it contained provisions dealing with the presentation of those claims as well as claims for delay. Specifically, the Contract required claims to be "submitted within 60 days after completion

of the work" that the Government had changed. The Contract, however, allowed for an exception to this 60 day time period if circumstances prevented BELL from ascertaining the delay or impact. See Defendant's Answer, ¶ 14.

Response:

Paragraph 14 of the answer, which merely refers the reader to the contract, does not admit or support these allegations, which are, in any event, legal conclusions to which RCFC 56 requires no response here. We note further that Bell does not make this conclusory legal argument in its moving brief.

10. The Contract incorporated the prompt payment provision of Federal Acquisition Regulation ("FAR") Section 52.223-27. Pursuant to that provision, the Government agreed that "[a]n interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable." See Defendant's Answer, ¶ 15.

Response:

Paragraph 15 of the answer, which merely refers the reader to the contract, does not admit or support these allegations, which are, in any event, legal conclusions to which RCFC 56 requires no response here.

11. When the Government wanted to change a Project design or correct a design error, it would use a BELL request for information called a "CMRFI," or a Change Bulletin, asking BELL to submit a proposed price to perform the additional work. In response, BELL would submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, the Government and BELL would then execute a Modification of Contract ("Mod.") setting forth the change and agreed upon price. See Defendant's Answer, ¶ 17.

Response:

The answer provides no independent support (even assuming, as we do, that Bell intended to cite paragraph 16 of the answer). If considered, this proposed finding is mistaken and potentially misleading: A CMRFI was a construction manager's RFI – which, as the name suggests, would have been issued by Jacobs/CRSS, not by Bell. Bell's RFIs were called "Bell RFIs." Def. Supp. App. _-_ (Temme Dep. 69-70.) Furthermore, we know of no occasions (certainly Bell cites none) on which the Government issued a change bulletin directive for a major change, such as the ones discussed by Bell below, all of which were initiated through requests for proposals ("RFPs"). Change directives addressed relatively minor changes and clarifications. None of the work discussed below originated in a change bulletin.

12. BELL was not obligated to perform additional work until a change order was issued. In practice, and with NIH's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for NIH's execution of a change order. As a result, NIH obtained the benefit of avoiding greater delay. See Defendant's Answer, ¶ 17; and [Pl. App.] 2-3.

Response:

The first sentence is a legal conclusion to which RCFC 56 requires no response here. The other two sentences are uncontroverted.

13. From April 1998 through December 1998, BELL was able to perform the work in a timely manner. See [Pl. App.] 42 [. . . .] During that period, the Government had made relatively few changes to the scope of the Project work. See [Pl. App.] 48 [. . . .] In fact, as of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 noted that the Project was actually 13 days ahead of schedule. See [Pl. App.] 36-37; and [Bardin Aff.] ¶ 9, [Pl. App.] 3.

Response:

This proposed finding is irrelevant to whether Bell has a current right to relief under the contract. If considered, the first two sentences are vague ("timely," "relatively few") and misleading. In reality, Bell fell at least eight days behind

schedule before the end of September 1998. Although Bell resequenced work to regain those days by December 1998, its "total work in place" in December was significantly below the planned level, mainly due to low productivity in pouring concrete, foreshadowing future delays. See Def. Supp. App. 27-28. The final sentence is accurate but misleading, for essentially the same reasons. Indeed, four months after December 1998, Bell was once again at least eight days behind schedule because of slow progress with concrete – which had nothing to do with the addition of the new floor. Def. Supp. App. 29-30.

14. Starting in or about December 1998, however, the Government initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, timely and cost-effective manner. See Affidavit of Jeremy Bardin, ¶ 10, Ptf. App. at 3.

Response:

We cannot meaningfully respond, as the terms "efficient, timely and cost-effective" are rhetorical, conclusory, and vague. Bell's rhetoric is irrelevant, as well as misleading, for the reasons given in our preceding response and in responses below.

15. In mid-December 1998, the Government determined that it had a project budget surplus of $15,600,000.00. The Government then undertook various actions regarding the feasibility of using

that contingency surplus to fund the addition of an extra floor that would increase the Building 50 area by 15%, and change the structure from five to six stories. See Governmnent's JOFOC, Ptf. App. at 45-46. The Government concluded that the

> total cost that can be expected to provide the additional floor to Building 50 would be the hard cost of $10,230,131 plus the soft cost of $723,343 for a total of $10,962,474 . . .

See Government's Executive Report, Ptf. App. at 43.

Response:

The paraphrases and quotation are accurate.

16. Pursuant to Section 6.3 of the FAR and HHSAR Section 306.3, the Government decided that it would not solicit competitive bids from other contractors to construct the new 4th floor. The Government determined that, if it pursued competitive procurement [. . .], "Bell would probably be the successful offeror; however, the cost to the Government of the procurement process ($1,260,000 and 180 days) would exceed the benefits of adding [the new floor]." See Government's JOFOC, Ptf. App. at 47. The Government's $1,260,000.00 figure was based on its estimate that it would be liable to BELL for general condition costs of $7,000 for each day that BELL was delayed in working on the Project. Id. Subsequently, during negotiations with BELL regarding the cost to add the new 4th Floor, the Government

estimated that Bell's extended general conditions costs were $9,122.43 per day. See [Pl. App.] 65-67.

Response:

Uncontroverted.

17. In or about December 1998, the Government notified BELL that it was contemplating adding a new floor to the Project that would be inserted on top of the original 3rd Floor. The Government advised BELL that the time frame to make a final decision on whether to add the new 4th Floor was very limited (i.e., before the end of January 1999). The Government provided BELL with a copy of a "Feasibility Study for the Vertical Expansion of Building 50" [. . .] and it directed BELL to quickly prepare a price proposal for the new 4th Floor addition. See Affidavit of Jeremy Bardin, ¶ 11, Ptf. App. at 3; and Government's Executive Report, Ptf. App. at 42. As noted above, the Government decided not to undertake a competitive procurement for the construction of the new 4th Floor. [. . .]

Response:

The first two sentences are uncontroverted. As to the third sentence, there is no evidence, and it is untrue, that the Government "directed" Bell to participate in this process. To the contrary, and as would be expected, Bell responded eagerly and promptly to the possibility of obtaining millions of dollars

of new work. The final sentence is admittedly repetitive. See RCFC 56(h)(1) (proposed findings must be "concise").

18. Paragraph 4 of the Government's "Proposed Findings of Uncontroverted Fact" asserts that BELL "jointly developed" the design of the new 4th Floor. The Government's assertion is not true. See [Bardin Aff.] ¶ 15, [Pl. App.] 4.

Response:

Our proposed finding is arguably imprecisely worded: We intended to convey, in lay terms, that Bell and NIH jointly devised the three-phase plan to complete the design and pricing of the new floor. That is, Bell and NIH agreed that Bell would prepare an initial price estimate, based upon an initial design, and that Bell and the Government would negotiate the pricing over a period of months, as the Government finalized the design and employed the "kit of parts." See Pl. App. 129 (¶ 3). In any event, nothing in our motion or Bell's cross-motion turns upon the extent to which Bell was involved in the design.

19. In fact, BELL was not involved in designing the new 4th Floor. Rather, the Government retained an architectural firm, HLM Design, to prepare the Government's Feasibility Study and to prepare the design documents for the new 4th Floor. See [Bardin Aff.] ¶ 15, [Pl. App.] 4; [Pl. App.] 39 [. . .], 47 [. . . .]

Response:

Uncontroverted but irrelevant. See our preceding response. Bell uses two "proposed findings" merely to repeat its objection - already noted in Bell's response to our proposed findings - to one word in one of our proposed findings. See RCFC 56(h)(1) (proposed findings must be "concise").

20. BELL was somewhat reluctant to submit a price proposal for the construction of the new 4th Floor because, at that time, the Government did not have a detailed design proposal. The Government, however, repeatedly advised BELL in writing and orally that the new 4th Floor would be a duplicate of the original 3rd Floor, both on the interior and exterior. See [Bardin Aff.] ¶¶ 11-12, [Pl. App.] 3.

Response:

Both sentences are irrelevant and unsupported. Bell was eager to submit a price estimate, and it cites no probative, contemporaneous evidence - because it is untrue - that the Government ever said, much less stated "in writing," that the new floor would duplicate the third floor. Def. Supp. App. 24 (Kutlak Dep. 33-34) ("We never said we would copy any other floor.") Bell's appendix contains no such writing, because none exists. The facts are that Bell agreed to develop an estimate for the added floor, based on the existing third floor drawings, for use in the Government's decision making process only. The

parties agreed that, if the Government approved the plan for the added floor, the Government would issue drawings in February and March 1999 for the structure and "core and shell" of the added floor, for firm pricing by Bell. Def. Supp. App. 26 (Kutlak Dep. 43-44). The contract, as awarded, gave the Government 550 days from award – that is, almost until the end of 1999 – to design the interior of the new floor, using the "kit of parts." Compl. ¶ 8. The Government met all of these deadlines.

21. In its Answer to BELL's Complaint, the Government "specifically denie[d] that NIH represented that the new floor would follow the original third floor design . . . ." See Defendant's Answer, ¶ 22. There is no factual basis for the Government to make such a "specific" denial.

Response:

The quotation in the first sentence is accurate. The second sentence is conclusory and no response is required.

22. The Government's own contemporaneous records indisputably show that, in fact, the Government expressly and repeatedly stated that the new 4th Floor would be a duplicate of the original 3rd Floor. For example, the Government's Feasibility Study, dated January 8, 1999, stated that:

> The skin of the new floor will be a duplication of the third floor as shown on the enclosed elevations. * * * The interior layout of the new floor will be a duplication of the Third Floor . . .

See [Pl. App.] 40 (emphasis added).

Response:

This is both irrelevant and unsupported. The quotations from the feasibility study are accurate, but Bell has omitted pages from the HLM study from its appendix and, more important, the study plainly assumes, for purposes of analysis only, that the new floor would duplicate the third floor. This is very clear from the sentence in which HLM notes that the third floor "most closely approximates a typical laboratory floor." Pl. App. 39 (emphasis added). That is, the parties viewed the third floor design as a "typical" proxy, for planning purposes. See our response to proposed finding number 20. This issue has nothing to do, in any event, with whether Bell may recover damages. Bell admittedly knew throughout the contract negotiations concerning the fourth floor that it would not duplicate the third floor. Compl. ¶ 31; Def. Supp. App. 15 (Bardin Dep. 17) ("I think at this point [March 1999] . . . we may have started to realize that . . . the information that we're getting was materially different than what was on the third floor.").

23. The Government's Executive Report, dated January 15, 1999, described the scope of work of adding the new 4th Floor as follows:

> It is proposed to add an additional floor to Building 50 that would be a repeat of the third floor. * * * The additional floor and interstitial plans will require little

> architectural or engineering rework as they are <u>literally a repeat</u> and thus a reissue <u>of existing floor plans</u>.

<u>See</u> [Pl. App.] 41-42 (emphasis added).

<u>Response:</u>

This proposed finding, and the ones following it, are potentially misleading, to the extent it might appear that the cited documents are among the "writings" concerning the new floor that Bell alleged above were communicated to it. <u>This is obviously an internal Government document that was never communicated to Bell</u>. It is irrelevant. That said, the quotation above is accurate, but it simply indicates that the additional floor would repeat the third floor <u>only</u> from "architectural [and] engineering" standpoints – which was true – and does <u>not</u> say that the interior fit-out details would be identical. In any event, this issue has nothing to do with whether Bell may recover damages. Bell admittedly knew throughout the contract negotiations concerning the fourth floor that it would not duplicate the third floor. Compl. ¶ 31; Def. Supp. App. 15 (Bardin Dep. 17).

24. Similarly, the Government's JOFOC, dated February 10, 1999, and which sets forth the bases upon which the Government decided not to procure bids from contractors other than BELL, stated:

> In fact, the Government has instructed the Architect to produce drawings for [the new

> floor] by merely duplicating those of another floor. This economy of design will carry forward into construction.

See [Pl. App.] 47 (emphasis added). Notably, the JOFOC expressly identified the Government's Feasibility Study, and both the Project Office and the Contracting Officer certified the accuracy of the representations made in the Government's JOFOC. Id., Ptf. App. at 45, 48.

Response:

The quotation is accurate but immaterial. This, too, is an internal Government document that was never communicated to Bell. In any event, the justification notes that "each floor [of Building 50] is nearly identical to the others," Pl. App. 47 (emphasis added) - thus clearly using a looser, more pragmatic definition of "identical" than Bell wishes to promote here - and it states accurately that some - not all - of the architectural drawings for the new floor would duplicate existing drawings. The justification expressly noted, "The Government is not able to perform final design at this time, because it has not decided which Institutes will occupy the additional floor." Pl. App. 46 (emphasis added). The latter sentence completely refutes Bell's reading of this document. This document has nothing to do, in any event, with whether Bell may recover damages, as Bell admittedly knew throughout the contract negotiations concerning

the fourth floor that it would not duplicate the third floor. Compl. ¶ 31; Def. Supp. App. 15 (Bardin Dep. 17).

25. Consistent with its representations that the new 4th Floor would be a duplicate of the original 3rd Floor, and that the work on the new floor would have to proceed quickly, the Government told BELL that the final design documents would be prepared in a matter of a few weeks, by no later than March 1999. See Defendant's Answer, ¶ 22 [. . . .]

Response:

Paragraph 22 of the answer fails to support these allegations, because paragraph 22 of the complaint differs materially from this proposed finding and does not use the term "final design documents." The Government agreed to provide, and did provide, infrastructure design documents in March 1999. See also our response to proposed finding number 20 and Compl. ¶¶ 32-33.

26. Indeed, the Government's Executive Report stated:

> NIH would have to instruct [BELL] to proceed on or about January 22nd. Since we have determined that the existing structure is sufficient to carry another level, there is little engineering required to produce the contract documents to release the structural work to BELL. The shop drawings also will be a repeat of the previous floor and can be prepared and approved quickly. . . . We have a little more time to complete the remainder of the engineering drawings. The design team can have a bulletin for the remainder of the work ready to issue to BELL on February 15th.

See [Pl. App.] 42 (emphasis added).

Response:

Again, this is an internal Government document that was not communicated to Bell. Furthermore, NIH met every deadline that it agreed to with Bell. The Government's internal targets are irrelevant. That said, the quotation is accurate – and, consistent with the executive report, "[o]n or about February 16, 1999, NIH issued Change Bulletins 6, 7 and 10" concerning work on the new floor. Compl. ¶ 31 (emphasis added). Bell admittedly knew throughout the negotiations concerning the fourth floor that it would not duplicate the third floor. Id.; Def. Supp. App. 15 (Bardin Dep. 17)

27. In addition, the Government's JOFOC stated that preparation of the contract documents had commenced and that:

> After an intensive effort, the structural bulletin is complete and ready for issue to construction contractor [BELL]. The statement of work for the balance of the work will be complete and ready for issue to the contractor in early March.

See [Pl. App.] 46 (emphasis added).

Response:

The quotation is accurate but irrelevant. This is an internal Government document that was never communicated to Bell. Also, NIH met every deadline that it agreed to with Bell.

28. On January 14, 1999, in reliance on the Government's repeated representations that the new 4th Floor would be a

duplicate of the existing 3rd Floor and that the final design documents would be received by no later than March 1999, BELL submitted a price proposal to the Government to construct the new 4th Floor for approximately $9.8 million. See [Pl. App.] 49-50; [Bardin Aff.] ¶ 14, [Pl. App.] 4.

Response:

Bell's allegation of "reliance" is baseless since, as shown above, Bell cannot establish its factual premises, i.e., that the Government told Bell, orally or "in writing," that the new floor would duplicate the third floor, or that NIH would provide "final design documents" in March 1999. See Def. App. 26 (Kutlak Dep. 43-44). Further, although Bell's January 1999 submittal can be called a "proposal," it is more accurate to call it a nonbinding price estimate. Def. Supp. App. 3-4 (Temme Dep. 60-62). That price estimate is irrelevant because it was the only basis for the negotiation of a series of bilateral contract modifications – into which all negotiations are merged and subsumed. Id.; Compl. ¶¶ 29, 35, 50-54.

29. In further reliance upon the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and taking into account that the Project was then ahead of schedule, BELL estimated that an approximately 90 calendar day extension would enable it to complete the proposed 4th Floor and the remaining base Contract work. Id.

Response:

Bell's allegation of "reliance" is baseless for the reasons given in our preceding response. It is uncontroverted that Bell submitted such an estimate.

30. The Government recognized that BELL's price proposal was based on the representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and that the final design documents would be given to BELL in a matter of weeks. See [Pl. App.] 43 (noting that BELL's price proposal was "based on the feasibility study . . . ").

Response:

Bell continues to distort the documents in the record. See our responses to proposed findings number 20 and 24-28 above.

31. The Government found that BELL's price proposal for constructing the new 4th Floor

> . . . was actually lower than the Government's estimate bid price by about 11%.
> * * *
> The Bell Company has been extremely cooperative and open in this proposal and their subcontractors have given them reasonable bids.

See [Pl. App.] 43.

Response:

The quotations are accurate.

32. On January 22, 1999, the proposal to construct the new 4th Floor was approved by the Director of NIH, Dr. Harold Varmus. See [Pl. App.] 46.

Response:

This is true but potentially misleading. Dr. Varmus made the Government's internal decision, and it had nothing directly to do with Bell.

33. The negotiations between BELL and the Government relating to the new 4th Floor proceeded in three phases. The first phase involved the structural steel and concrete work for the 4th Floor. The second phase involved certain changes to the 4th Floor that were made after BELL submitted its price proposal. The third phase involved certain "fit out work" on the new 4th Floor that was added by the Government after BELL submitted its price proposal and which the Government unilaterally directed BELL to perform. See [Pl. App.] 5-6.

Response:

The first two sentences are uncontroverted. The third sentence, alleging "changes" in the second phase, is unsupported and incorrect. Bell cites no evidence, nor is it true, that the drawings for the structural steel and concrete were "changed" from anything Bell previously saw for this floor. Instead, and consistent with the schedule agreed by the parties, these were simply the first drawings of this kind for the new floor. See

Def. Supp. App. 12-13 (Bardin Dep. 11-12). The fourth sentence, alleging "added" work in the third phase, is wrong for the same reason: The parties agreed from the beginning that the scientific "neighborhoods" of the new floor would be designed in phase three with the "kit of parts." Def. Supp. App. 26 (Kutlak Dep. 43-44). Thus, no "changes" or "additions" were being made to existing drawings in phase three. Def. Supp. App. 22 (Bardin Dep. 22) ("Q. . . . [In June 1999] you still hadn't received the fit-out? A. Correct.") Bell's description below of the negotiations amply confirms that the parties knowingly negotiated Bell's full compensation for the work associated with the new floor. Indeed, Bell signed a bilateral modification covering the entire fourth-floor fit-out. See Bell's proposed finding number 51 and our response.

34. With regard to the first phase of negotiations, on January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and concrete for the 4th Floor [. . . .] In accordance with the Government's representations that the 4th Floor would replicate the 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00 and to extend the Contract time by 30 calendar days. See [Pl. App.] 5.

Response:

This proposed finding is both incorrect and misleading, as Bell fails to mention that it submitted EWO 100 based upon drawings issued in an NIH bulletin. See Def. Supp. App. 12, 16-17 (Bardin Dep. 11, 20-21). Because Bell was working from design drawings, the allegation that it prepared its structural cost proposal "[i]n accordance with" some other, alleged Government "representations" is nonsensical and false. As for Bell's allegation in the second sentence regarding "representations," see our responses to proposed findings number 20 and 24-28.

35. On or about April 20, 1999, the Government executed Mod. 5 to the Contract pursuant to which it agreed to pay BELL $1,579,127.00 for the structural work associated with the 4th Floor, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000. See [Pl. App.] 51-52.

Response:

It is more accurate and relevant to say that both parties executed bilateral modification number 5, in which Bell agreed to the above price, reserved no rights, and expressly "release[d] the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification." Pl. App. 52 (emphasis added).

36. The second phase of negotiations followed the Government's issuance of Change Bulletins 6, 7 and 10 on February 16, 1999. These Change Bulletins added additional work to the 4th Floor that was not included in BELL's initial price proposal. See [Pl. App.] 5.

Response:

The date of the change bulletins is uncontroverted. Bell's allegation of "changes" in phase two is incorrect for the reasons given in our response to proposed finding number 33. In any event, this statement only further confirms that Bell knowingly and voluntarily negotiated modifications covering the changes associated with adding the new floor. See Compl. ¶ 31.

37. Shortly thereafter, on March 2, 1999, the Government issued Change Bulletin 3 as a partial infrastructure of "shell" design for the 4th Floor. As noted previously, BELL's initial price proposal for the new 4th Floor was based on the Government's representations that it would duplicate the existing 3rd Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the 4th Floor that was materially different from that found in the 3rd Floor. See [Pl. App.] 5.

Response:

The date of the change bulletin is uncontroverted. We rebutted above Bell's admittedly repetitive second sentence. See RCFC 56(h)(1) (proposed findings must be "concise"). Bell's

allegations of "changes" are incorrect for the reasons given in our response to proposed finding number 33.

38. On March 29, 1999, NIH issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10. See [Ans.] ¶ 33; and [Pl. App.] 6.

Response:

Paragraph 33 of the answer, which merely refers the reader to the text of the document, does not admit or support this proposed finding. There was no document on this project formally called a "change order." Mr. Bardin's conclusory description of the supposed "Change Order 29" should be disregarded, as it is not the best evidence and would, therefore, be inadmissible at trial. See FRE 1004; Bannum, Inc. v. United States, 59 Fed. Cl. 241, 244-45 (2003). The interpretation of such a document would, in any event, be a question of law to which RCFC 56 requires no response here.

39. During this time period, BELL notified the Government that, because of the Government's failure to honor its commitment to provide BELL with the final 4th Floor plans by no later than March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999. See [Pl. App.] 6.

Response:

This is both irrelevant and unsupported. As noted above, there is no evidence that the Government promised to deliver "final" plans in March 1999. Mr. Bardin's affidavit is conclusory throughout, and Bell cites no other evidence, such as correspondence, which one would expect to see. Finally, the issue is wholly irrelevant because NIH never insisted that Bell "meet the proposed price" that it first estimated, and Bell signed bilateral modifications covering the changes associated with the new floor. Def. Supp. App. 19 (Bardin Dep. 29).

40. On June 23, 1999, the Government executed Mod. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000 and concluded the second phase of negotiations. See [Pl. App.] 53-54.

Response:

It is more accurate and relevant to say that both parties executed bilateral modification number 24, in which Bell agreed to the above price, reserved no rights, and expressly "release[d] the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification." Pl. App. 54 (emphasis added).

41. On or about September 30, 1999, approximately 7 months later than promised, the Government gave BELL the final design plans for the new 4th Floor via issuance of Change Bulletin 35. See [Bardin Aff.] ¶ 27, [Pl. App.] 6-7.

Response:

As noted, no evidence supports Mr. Bardin's conclusory allegation that the Government "promised" that it would provide "final design plans" in March 1999. See our response to proposed finding number 25. It is true that change bulletin 35 is dated September 30, 1999.

42. The design changes that the Government made that were set forth in its Bulletin 35 were so extensive that the new 4th Floor no longer bore any resemblance to the existing 3rd Floor that was used as the basis for BELL's initial price proposal that had been submitted nearly 9 months previously. In fact, BELL had completed various aspects of the new 4th Floor work based upon the Government's representations that it would duplicate the existing 3rd Floor. As a result of the numerous changes the Government made in Bulletin 35, BELL had to remove, relocate and demolish a significant amount of the work that had been previously completed. This had not been previously accounted for and disrupted the Project schedule and work flow. See [Bardin Aff.] ¶ 27, [Pl. App.] 6-7.

Response:

This is irrelevant to the parties' cross-motions, see RCFC 56(h)(1), unsupported, and misleading. If considered, Mr. Bardin's conclusory statement, which echoes this proposed finding verbatim, cannot support it. E.g., Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984) (noting affiants should "set forth [evidence] in detail"). No probative evidence supports these allegations. Far from not "resembl[ing]" one another, the third and fourth floors are both laboratory floors; they were both designed from the modular "kit of parts"; and the elevators, stairs, and utilities are identically situated on each floor. See generally Def. App. 4-5. Moreover, Bulletin 35 actually involved far less work than was originally anticipated, since it obligated Bell to fit out only three scientific "neighborhoods," rather than the five that Bell had fit out on the third floor, a 40 percent reduction.

43. On February 11, 2000, BELL submitted EWO No. 240 to NIH for completing the "fit-out" work identified in Change Bulletin 35. In accordance with BELL's efforts to expedite completion of the additional work directed by NIH, EWO No. 240 noted that certain work identified therein "has occurred" and further stated that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal include[s] the final 30 calendar days of the extended overhead agreed for the

added floor only." See [Pl. App.] 55-56. The Government did not accept EWO 240.

Response:

Bell's selective quotations from EWO 240 are accurate but potentially misleading. As quoted, Bell stated in EWO 240 that the proposal "include[d] the final 30 calendar days" of extended overhead previously agreed to. This plainly meant that Bell was not requesting another time extension. Thus, although Bell's conclusory statement in the second sentence that NIH "did not accept EWO 240" is true, this does not mean that the Government denied (or even considered) a request for an extension. The Government did not agree to Bell's proposed price.

44. Instead, on April 14, 2000, NIH unilaterally issued Mod. 78 which, among other things, directed BELL to proceed with the work associated with Change Bulletin 35. See [Pl. App.] 58-59. Pursuant to its unilateral Mod. 78, the Government committed to pay BELL at least $1,803,037.00 for the work required by Bulletin 35 "so that work can proceed." The Government further agreed to a 30 calendar day extension and to continue negotiations with BELL for the costs of the additional work. Id. BELL proceeded with the work as directed by the Government and continued to negotiate with the Government.

Response:

Bell's reading of modification 78 - in addition to being irrelevant and a legal argument to which no response is required - lacks support in the text of the modification. The Government obviously did not promise to "pay . . . at least" the approximately $1.8 million cited. Rather, modification 78 authorized Bell to proceed in good faith at a price "not to exceed" that amount, pending negotiations. Pl. App. 59. See also our preceding response.

45. Paragraph 8 of the Government's "Proposed Findings of Uncontroverted Fact" asserts that, in August 2000[,] "Bell submitted to NIH a time impact analysis that, according to Bell, incorporated all changes that Bell alleged were impacting its progress." The Government's assertion is not true. See [Bardin Aff.] ¶ 31, [Pl. App.] 8.

Response:

We acknowledge that we may have misinterpreted the narrative for Bell's August 2000 time impact analysis. The point is irrelevant, however, as Bell's version of events only confirms the importance of modification 93 - in which Bell knowingly agreed to "full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-Out (EWO 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes [disputed and undisputed] transmitted to

the Contractor on or before August 31, 2000." Def. App. 22 (emphasis added).

46. In fact, the time impact analysis ("TIA") that BELL submitted to the Government in August 2000 expressly stated that it pertained only to seven specific EWOs identified therein and further stated:

> We caution that there are still other significant changes which have not yet been developed into a TIA . . .

See [Pl. App.] 61 (emphasis added). Thus, BELL's TIA made it expressly clear that it covered only a limited number of changes. See [Bardin Aff.] ¶ 31, [Pl. App.] 8.

Response:

Although we disagree with the assertion that the TIA is "clear," we will not dispute Bell's reading, which is irrelevant now – except to the extent it may confirm that Bell knew how reserve delay claims if it intended to do so. Comparing Bell's reading of the TIA here to the language of modification 93 reinforces the importance of the fact that, despite what Bell may have said in its TIA, it knowingly agreed to "full and equitable adjustment for . . . all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000." Def. App. 22 (emphasis addded).

47. As the negotiation process continued, BELL and NIH had extensive discussions regarding the Project Schedule. BELL made

it clear to NIH during the negotiations that additional changes by NIH would have a profoundly negative impact on meeting the Project milestones. BELL's TIA and other Project Schedule data confirmed that virtually all of the remaining Project work activities were near critical. See [Bardin Aff.] ¶ 32, [Pl. App.] 8.

Response:

The first sentence is uncontroverted. The second sentence is argumentative and conclusory, and should be disregarded. Mr. Bardin's conclusory affidavit, which relies upon hearsay documents and echoes this proposed finding verbatim, cannot support Bell's allegations in the third sentence regarding what the "TIA and other Project Schedule data" allegedly showed. FRE 1004; RCFC 56(h)(1).

48. During these negotiations, the Government represented to BELL that, after August 2000, there would be no more than 4 or 5 minor additional changes to the Project. In order to minimize impacts to the Project Schedule, it was agreed that the Government would pay BELL to perform these few additional changes on an accelerated basis. See [Bardin Aff.] ¶ 33, [Pl. App.] 8. See also [Pl. App. 72-74].

Response:

These allegations are controverted, as Bell is aware. See RCFC 56(h)(1) (moving party to set forth "material facts . . . as

to which the party believes there is no genuine dispute"); 11(b)(3). There is no contemporaneous evidence to support the first sentence – which would obviously be an absurd thing for a project manager to say in the middle of the construction of a complex scientific facility. In reality, the Government stated during this period that it could not prevent changes, and it proposed bringing in another contractor (Brown & Root) to implement changes, in order to lessen the burden upon Bell. <u>Bell objected to being replaced and asked NIH to allow Bell to perform the changes upon an accelerated basis</u>. Pl. App. 129-30 (¶¶ 7, 11). This is confirmed in the construction manager's notes from the August 2000 negotiations:

> Bell says they can do [the job] – based on changes to date. We doubt it - they will review manpower etc & confirm to us by Oct 1 based on changes issued thru Aug 31. We will investigate triaging changes (for issue to [Brown & Root]) after Aug 31 & authorizing acceleration for those we do issue to Bell.

Def. Supp. App. 31-32. NIH ultimately paid Brown & Root to perform severable changes, when it became clear that Bell could not handle its existing work and was proposing unacceptable pricing. <u>See</u> Pl. App. 129-30.

49. After giving its promise of limited future changes that would be performed on an accelerated basis, the Government persisted in seeking BELL's agreement to a Contract modification that would establish April 30, 2001 as the revised Contract

completion date. Additionally, the Government requested a "partial occupancy plan" for the turn-over of the building. Bell only agreed to this based upon the Government's need to uphold certain relocation dates previously established and in motion by the Government's contract representatives. See [Bardin Aff.] ¶ 34, [Pl. App.] 8-9.

Response:

The premise of the first sentence, that the Government promised "limited future changes," is false and unsupported, as noted above. The phased occupancy plan noted in the second sentence was negotiated by the parties for their mutual benefit, notwithstanding Bell's argumentative characterization. The third sentence is only marginally intelligible and, equally important, cannot be supported by Mr. Bardin's conclusory statement, which is identical.

50. On October 2, 2000, in reliance upon the Government's representation that only a few additional changes would be made and that the Government would pay to have the work for such future changes performed on an accelerated basis, and after performing a substantial portion of the work in accordance with the Government's unilateral Mod. 78, BELL signed Mod. 93. See [Bardin Aff.] ¶ 35, [Pl. App.] 9.

Response:

The only portion of this proposed finding that finds adequate support in Mr. Bardin's conclusory affidavit - and the only part that is relevant - is Bell's acknowledgment that "BELL signed Mod. 93." As established in our briefs, Bell is bound by the plain language of that agreement.

51. Mod. 93 expressly referenced BELL's EWO No. 240, and stated that the Government would pay BELL "for the remaining direct and indirect costs of the Floor 4 Fit-Out." Mod. 93 established a Contract completion date of April 30, 2001, created 14 interim milestones and further, assigned a liquidated damage amount of $266.00 per calendar day to each individual milestone. See [Pl. App.] 62-64.

Response:

Modification 93 speaks for itself, but the first sentence of this proposed finding is revealingly incomplete: Modification 93 provides for "full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-Out (EWO 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000." Pl. App. 63; Def. App. 22.

52. Mod. 93 did not include payment for labor inefficiencies and/or cumulative impact and/or other damages. Rather, the language of Mod. 93, like the negotiations preceding

it, reflects compensation for delay (i.e., extended performance duration), not labor inefficiencies or cumulative impacts of changes issued prior to Mod. 93. See [Bardin Aff.] ¶ 37, [Pl. App.] 9.

Response:

This entire proposed finding consists of legal argument to which RCFC 56 requires no response here. As demonstrated in our briefs, Bell reserved no rights and expressly released its claims. Furthermore, Bell cites no evidence to rebut the logical presumption that the price of the modification included a premium for anticipated disruptions. See Pl. App. 130 (¶ 11).

53. The language in paragraphs 4, 5, and 8 of Mod. 93 underscore compensation for delay, but not labor inefficiency and/or cumulative impact, was included in its scope:

[lengthy quotations by Bell from modification 93 omitted]

Response:

This proposed finding consists of legal argument to which RCFC 56 requires no response here. As demonstrated in our briefs, Bell reserved no rights and expressly released its claims in a series of 44 modifications. Furthermore, Bell cites no evidence to rebut the logical presumption that the negotiated price of modification 93 included a premium for anticipated disruption and cumulative impact. See Pl. App. 130 (¶ 11).

54. Likewise, the Government's contemporaneous summary of the Mod. 93 negotiations reflect[s] that labor inefficiency was not negotiated and, therefore, was not part of Mod. 93's scope. For example, the Government stated that it and BELL "agreed to a 6.5-month time extension with 14 individual milestones, and compensation in the amount of $686,459 for the time impact of all changes issued on or before 8/31/00. This amount is equal to the previously agreed rate of $102,450 per month and less than the Governments' [sic] estimate of $278,234 for a General Contractors extended overhead." See [Pl. App.] 66. The Government stated that, "A Delay Costs of $700,000 was added to this Modification in an effort to compensate the Contractor for any delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000. The design delay cost was estimated at a substantially higher cost than the amount settled with Contractor (see estimated extended overhead and general conditions cost).["] Id. (emphasis added).

Response:

The quotations are accurate, but this proposed finding consists of legal argument to which RCFC 56 requires no response here. As established in our briefs, Bell should have timely raised with the Government the issue of cumulative impact, if it wished to reserve such a claim when agreeing to compensation.

55. The Government's Rule 30(b)(6) designee confirmed that Mod. 93:

> . . . was the mod. where we paid them for delays up to that date, and that was it . . . [.] They accepted that mod. as all of the delays up to that date, whatever was issued.

See [Pl. App.] 23 (emphasis added).

Response:

The quotation is accurate, but RCFC 56 requires no response here to Bell's misplaced legal argument concerning the significance of modification 93.

56. The Government's Rule 30(b)(6) designee further confirmed that delay was the basis for negotiation of Mod. 93:

> Q. Was the basis of the negotiation of Mod. 93 the extra work orders that Bell had submitted?
>
> Mr. Chadwick: Objection. Go ahead.
>
> A. I think it's quite clear in [paragraph] number 4. It just simply says, "all delays resulting," period.

See [Pl. App.] 24.

Response:

The quotation is accurate; but (i) the Government's objection was well founded, since the question was ambiguous (the witness presumably understood counsel to be asking whether modification 93's scope was limited to the extra work orders) and it called for a legal conclusion, and (ii) RCFC 56 requires no response here to Bell's legal argument.

57. Similarly, the Government's interrogatory responses in this case stated that Mod. 93 covered delay, but not labor inefficiency or cumulative impact:

> Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000.

See [Pl. App.] 69.

Response:

The quotation is accurate, but RCFC 56 requires no response here to Bell's legal argument. Our interrogatory response also noted that

> after the issuance of modification 93, Bell negotiated and signed other bilateral modifications providing full equitable adjustments for changes related to the new fourth floor, without attempting to reserve any rights until a letter of July 31, 2001 – after Bell had missed all of the substantial completion milestones established by modification 93. Bilateral modifications executed by Bell after modification 93 and before July 31, 2001 without any reservations of rights bar plaintiff's claims for the same reasons as modification 93 itself.

58. The Government interprets the reference in Mod. 93 to "changes" transmitted to BELL On or before August 31, 2000 to include only executed change orders that the parties had agreed to by that date. See [Pl. App.] 24.

Response:

It is uncontroverted that this was our witness's testimony at his deposition. We (and the witness) believe the testimony

was legally mistaken. In fact, the parties consistently used the term "changes" to include unpriced RFPs and change bulletins. For example, Bell advised the construction manager in November 2000 that "[a]ll" of Bell's price proposals for "changes (i.e. RFIs, Bulletins, etc.)" that were received "after 9/01/00 will be priced on overtime" and marked up for disruptions. Def. Supp. App. 35. By the same token, "changes transmitted on or before August 30, 2001" include unpriced RFPs and change directives, not only signed modifications. This issue is to a large extent irrelevant, since Bell executed 43 more bilateral modifications after modification 93, covering most or all of the unpriced changes that were pending in August 2000.

59. The Government, through one of its proposed expert witnesses, Colin Daigle, concedes that there is a difference between delay and inefficiency; you can have one without the other. See [Pl. App.] 30-31.

Response:

Uncontroverted.

60. In short, labor inefficiency and/or cumulative impact were neither discussed, nor negotiated, nor any part of, Mod. 93. See [Bardin Aff.] ¶¶ 36-37, [Pl. App.] 9.

Response:

This proposed finding consists of legal argument to which RCFC 56 requires no response here. (Notwithstanding Bell's

argumentative, "In short," its conclusion does not follow from the allegations above.)

61. When BELL agreed to Mod. 93, it did so in reliance upon the Government's representation that only 4-5 minor changes would be made thereafter, and that it would pay for acceleration costs for those few changes. If the Government had not made those representations, then BELL would not have agreed to Mod. 93. See [Bardin Aff.] ¶ 39, [Pl. App.] 9-10.

Response:

Bell's allegations of representations and promises are controverted and unsupported, as noted above. In any event, this paragraph consists essentially of legal argument to which RCFC 56 requires no response here.

62. As of August 31, 2000, BELL had generated 461 EWOs in response to the changes that the Government made. After Mod. 93 was issued, and contrary to its promises to BELL, the Government issued numerous changes. In fact, BELL had to generate approximately 300 more EWOs after August 31, 2000, and over 90 additional Contract modifications were issued thereafter. See [Bardin Aff.] ¶ 40, [Pl. App. 10].

Response:

No source is cited for the first sentence and no response is required. Mr. Bardin's affidavit is conclusory throughout. The second sentence is argumentative, vague, and controverted, as the Government never made the alleged "promises," as noted above.

The third sentence is vague ("approximately 300," "over 90"), but generally uncontroverted.

63. Thus, contrary to its representations that only a few minor changes would be made after Mod. 93, the Government made numerous changes. The Government also reneged on its promise to have the work for subsequent changes performed on an accelerated basis. In addition, the Government refused to grant BELL any additional extension for all of the changes that the Government made after Mod. 93. See [Bardin Aff.] ¶ 41, [Pl. App.] 10; and [Pl. App.] 70-71.

Response:

The allegations in the first two sentences of representations and promises by the Government are unsupported. To the extent the Court deems any of this relevant, it was, in fact, Bell that "reneged on its promise" to price its changes with an acceleration premium and not to bring a cumulative impact claim. For example, the construction manager made the following notes during negotiations in November 2000:

> I noted concern that if we pay OT etc, we expect job to finish on time w/no delay claim for cumulative effect etc - when they sign mod w/no time ext they must mean it - [Bell] agreed - they will include all impact costs in proposal, no come-backs later

Def. Supp. App. 34 (emphasis added); see also id. at 35 (Bell promises pricing with impact costs). The third sentence is correct, but Bell omits the inconvenient fact that it never

submitted a critical path analysis to support an extension. See Pl. App. 131 (¶ 13).

64. Moreover, after Mod. 93 was executed, the Government repeatedly directed BELL to perform additional work "without impact to the project schedule," yet it refused to authorize or compensate BELL to accelerate its manpower to accomplish that directive. See [Pl. App.] 70-71.

Response:

Uncontroverted, although the language is unduly argumentative.

65. Subsequent to Mod. 93, BELL repeatedly notified the Government in a series of executed contract modifications and in other writings, that it expressly reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering due to the Government's ongoing changes. See [Bardin Aff.] ¶¶ 42-43, [Pl. App. 10]; and [Pl. App.] 77-127.

Response:

This is legal argument to which RCFC 56 requires no response here. It is also entirely irrelevant to either party's motion: The Government's motion requests the Court to interpret modifications 93-140 – whereas Bell cites here only modifications after number 140. Bell could not "reserve[] its right[s]" retroactively, regarding previously signed modifications.

66. As the contract modifications and contemporaneous records show, BELL did not negotiate away or otherwise waive

labor inefficiency and/or cumulative impact claims. Nevertheless, subsequent to Mod. 93, BELL deemed it prudent to reiterate that it was reserving its rights with regard to such claims because, contrary to the parties' agreement in Mod. 93, the Government began to issue directives to BELL to perform additional work with no impact to the Project schedule and with express statements that the Government was reserving its rights against BELL. See Bardin Dep. [39:6, 40:11], [Pl. App. 138-39].

Response:

To the limited extent that this statement consists of more than purely legal argument to which RCFC 56 requires no response here, it is argumentative, conclusory, and irrelevant to either party's motion.

67. On or about February 5, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. 93, Bell would have met all of the interim milestone completion dates set forth therein. See [Bardin Aff.] ¶ 44, [Pl. App.] 10.

Response:

The substantial completion date alleged in the first sentence is unsupported and incorrect. Contractual substantial completion occurred in December 2001. Def. Supp. App. 47 (Brannon expert report), 52 (Scott expert report). (We do not know why Bell alleges the February 2002 date. We asked Bell in

an interrogatory why it alleged that date in the complaint, but Bell responded with lengthy objections, promising to supplement the response, which it never did. Def. Supp. App. 38. The Court should construe this as an admission that Bell has no evidence.) The second sentence cannot be supported by Mr. Bardin's conclusory lay opinion, see Wunderlich Contr. Corp. v. United States, 173 Ct. Cl. 180, 351 F.2d 956, 968-69 (1965), and it is, in any event, irrelevant to either party's motion.

68. During the course of the Building 50 Project, NIH issued annual reports on the construction progress pursuant to its statutory reporting obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31 U.S.C. § 1115 et seq. Among other things, the GPRA required NIH to submit a report to the Congress setting forth its success in achieving its performance goals in the preceding year. See 31 U.S.C. § 1116.

Response:

RCFC 56 requires no response to Bell's characterizations of the statute.

69. In February 2002, NIH issued its "Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Plan" [. . . . Pl. App.] 14-17. According to NIH, the "GPRA is . . . expected to make information on program performance more readily

available to the Congress for policymaking, spending decisions, and program oversight." [Pl. App.] 15.

Response:

The quotations are accurate.

70. NIH's GPRA Report expressly represented to the President and Congress that the construction of Building 50 was comp[l]eted on time. In relevant part, NIH's GPRA Report stated:

> NIH completed construction of the Stokes Laboratories building [50] on schedule.
>
> * * *
>
> Performance was measured by the percent of construction completed at the end of each fiscal year. Process milestone date were obtained from the CMMS and PIN systems. Performance data were verified through quality control systems that track, monitor, verify, and validate project goals consistent with internationally recognized standards of operations.

See [Pl. App.] 17 (emphasis added).

Response:

The quotations are accurate but misleading: The report states that NIH met its "long-term goal to complete construction of . . . [Building 50] in FY 2001," which ended on September 30, 2001. That is accurate: The only substantial completion milestones that remained unfinished after September 2001 were the exterior hardscaping and landscaping. See Def. Supp. App. 47. Thus, Building 50 was fully "construct[ed]" in fiscal 2001. The

GPRA report does not discuss whether Bell met its contractual completion schedule.

71. Despite its representation to Congress in the NIH GPRA Report that the Project was completed on schedule, the Government subsequently asserted that BELL failed to complete its work on schedule and has assessed liquidated damages against BELL of $447,678.00. See Daigle Dep. [63:2, 64:4, Pl. App.] 32-33.

Response:

Bell's premise regarding the meaning of the term "on schedule" in the report is mistaken, as noted in our preceding response. Indeed, this proposed finding is a non sequitur: NIH properly negotiated "owner's float" in the project schedule, i.e., a cushion between Bell's scheduled completion and the scheduled occupancy date. Bell's delays consumed much of the owner's float, yet Building 50 was occupied more or less "on schedule," from NIH's managerial perspective - not from a contractual perspective. It is true that liquidated damages were assessed in accordance with modification 93.

72. On April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted to the Contracting Officer a Request for Equitable Adjustment ("REA"). See Defendant's Answer, ¶ 71.

Response:

Paragraph 71 of the answer, which merely refers the reader to Bell's correspondence, does not admit or support this allegation. Moreover, Bell's characterization of the REA contains legal argument to which RCFC 56 requires no response here.

73. Also on April 5, 2002, and in accordance with the provisions of the Contract and BELL's subcontracts, BELL passed-through to the Contracting Officer for consideration Requests for Equitable Adjustments prepared by five subcontractors to BELL on the Project, to wit, Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc. [ . . .] See Defendant's Answer, ¶ 72.

Response:

Paragraph 72 of the answer, which merely refers the reader to Bell's correspondence, does not admit or support this allegation. Moreover, Bell's characterization of these REAs contains legal argument to which RCFC 56 requires no response here.

74. On July 1, 2002, the Government, through the Contracting Officer, issued a written rejection of BELL's REA and the Subcontractors' REAs, in their entirety. See Defendant's Answer, ¶¶ 73-74; and [Pl. App. 128-35].

Response:

Uncontroverted.

75. On June 27, 2003, BELL Filed its Complaint in this case.

Response:

Uncontroverted, despite being conclusory and irrelevant.

76. In total, BELL and the Government executed 205 bilateral modifications, the final one being Mod. 205. See [Pl. App.] 127.

Response:

This is unsupported, as some modification numbers were skipped and not used. See Def. PFF ¶¶ 49-52 (no modification 131 or 134); Pl. App. 77-127.

77. BELL's Cross-Motion for Partial Summary Judgment and the Government's Motion for Partial Summary Judgment address only Mods. 93-140; they do not involve Mods. 142, 144-145, 147-149, 152, 156, 159-160, 162-173, 175-176, 178-200, 202-205. See [Def. Mot. 2] n.1.

Response:

This is legal argument to which RCFC 56 requires no response here. It is also admittedly irrelevant. See RCFC 56(h)(1). See our response to proposed finding number 65.

78. The Government relies solely upon one of its proposed expert witnesses, Ted Scott, to allocate all responsibility for

delay as between BELL and the Government, including the assessment of liquidated damages against BELL for allegedly being unable to meet the interim milestones established in Mod. 93. See [Pl. App.] 19 [. . .], 34-35 [. . .]; and [. . .] 32 [. . . .].

Response:

This is essentially legal argument. As explained in our briefs, Bell is mistaken as to which party bears the burden of proof "to allocate . . . responsibility for delay . . . ." Bell admits that it missed all 14 contractual milestones. Pl. Resp. Def. PFF ¶ 13. It must therefore prove its delays were excused.

79. The Government, through its proposed expert witness, Mr. Scott, admitted that each of the 14 interim milestones established in Mod. 93 would have an independent critical path to each particular milestone. See [Pl. App.] 26.

Response:

Uncontroverted, although labeling this an "admi[ssion]" is argumentative. (It will be difficult for Bell to prove excusable delay with respect to the individual milestones, especially as its expert, Patrick Brannon, did not break out the 14 separate critical paths, although he did purport to show, post hoc, changes to the projected milestone completion dates. Def. Supp. App. 47.)

80. The Government also admitted through Mr. Scott that the critical path for each of the 14 interim milestones would have to be analyzed to determine whether any delay associated with achieving each milestone was compensable or excusable to BELL. See [Pl. App.] 27.

Response:

Uncontroverted, although labeling this an "admi[ssion]" is argumentative (and mistakenly so). See our preceding response.

81. Further, the Government admitted through Mr. Scott that in order to determine whether liquidated damages could properly be assessed for allegedly not meeting any of the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone. See [Pl. App.] 28. Mr. Scott, however, testified that he did not perform any such analysis:

> A. I did not analyze each milestone. So I didn't come to an opinion as to what the delays were for each interim milestone.
>
> Q. So if I understand your testimony, for each window you established, you did not analyze the effect any change had during that window on each individual milestone.
>
> A. That's correct.
>
> * * *
>
> Q. Well, isn't it true that you would have to analyze the effect on each individual milestone to determine whether or not the contractor [BELL] is due an excusable delay for liquidated damages for that milestone?

A. That's correct.

See [Pl. App.] 27-28.

Response:

Bell is legally mistaken regarding the burdens of proof, as we demonstrate in our opposition brief, and it gravely mischaracterizes this testimony. Mr. Scott plainly did not testify that the critical path to each interim milestone must be analyzed "in order to determine whether liquidated damages could properly be assessed" by the Government in the first instance. Rather, as quoted here, he correctly testified that Bell must analyze each critical path, in order for Bell to "prove [entitlement to] excusable delay" and disprove liability for "liquidated damages for [any] milestone[.]"

82. Thus, the Government, through its proposed expert Mr. Scott, as the person upon whom it solely relies with regard to delay and the assessment of liquidated damages, admits that it has not performed the analysis required to determine whether liquidated damages could be assessed against BELL for allegedly being unable to meet the interim milestones established in Mod. 93. Id.

Response:

We rebut this erroneous legal argument in our opposition brief. RCFC 56 requires no response here.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/
BRYANT G. SNEE
Assistant Director

OF COUNSEL:

DOUGLAS KORNREICH
KRYSTAL A. JORDAN
Attorneys
Procurement, Fiscal and
Information Law Branch
Office of General Counsel
Department of Health and
Human Services

s/Kyle Chadwick
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

August 15, 2005

CERTIFICATE OF FILING

I certify that on August 15, 2005, the foregoing response to proposed findings was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kyle Chadwick