**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BELL BCI COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-1613C** |
| | ) | **Judge Wolski** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Richard O. Wolf**
**Robert D. Windus**
**MOORE & LEE, LLP**
**1750 Tysons Boulevard, Suite 1450**
**McLean, Virginia 22102-4225**
**Telephone: (703) 506-2050**
**Facsimile: (703) 506-2051**
**E-mail: r.wolf@mooreandlee.com**

**Dated: September 1, 2005**

**Counsel for Plaintiff**

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES……………………………………………………….. ii

I. SUMMARY………………………………………………………………… 1

II. ANALYSIS OF THE GOVERNMENT'S RESPONSES TO "PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT"……………………………………………………………………….. 2

A. FACTS WHICH THE GOVERNMENT ADMITS ARE UNCONTROVERTED.... 2

B. FACTS WHICH THE GOVERNMENT ASSERTS REQUIRE NO RESPONSE... 4

C. FACTS WHICH THE GOVERNMENT ASSERTS INVOLVE LEGAL ISSUES... 4

D. FACTS WHICH THE GOVERNMENT ASSERTS ARE CONTROVERTED…... 6

III. DISCUSSION……………………………………………………………... 10

A. NEITHER THE LAW NOR FACTS SUPPORT THE GOVERNMENT'S ASSERTION OF ACCORD AND SATISFACTION…………………………. 10

B. THE GOVERNMENT CANNOT MEET ITS BURDEN TO JUSTIFY ITS ASSESSMENT OF LIQUIDATED DAMAGES……………………………... 18

IV. CONCLUSION…………………………………………………………..... 21

# TABLE OF AUTHORITIES

PAGE NO.

FEDERAL CASES

Atlantic Dry Dock Corp. v. United States,
773 F. Supp. 335 (M.D. Fla. 1991)…… 13, 14

Cannon Constr. Co. v. United States,
162 Ct. Cl. 94, 319 F.2d 173 (1963)…… 12

Jackson Construction Co. v. United States,
62 Fed. Cl. 84 (2004)…… 11

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996)…… 10, 11

McLain Plumbing & Electric Service, Inc. v. United States,
30 Fed. Cl. 70 (1993)…… 11

PCL Construction Services, Inc. v. United States,
53 Fed. Cl. 479 (2002)…… 18, 19

Safeco Credit v. United States,
53 Fed. Cl. 479 (2002)…… 19

Seeds & Derham v. United States,
92 Ct. Cl. 110 (1941)…… 17

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 7.2 and Rule 56 of the Court's Rules, the plaintiff, BELL BCI Company ("BELL"), respectfully submits this Reply Memorandum in Support of its Cross-Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Partial Summary Judgment.

## I. SUMMARY

The cross-motions for partial summary judgment before the Court present two issues. First, BELL submits that the Government has not and cannot meet its burden to prove that a portion of BELL's labor inefficiency and cumulative impact claims is barred by application of the doctrine of accord and satisfaction. The Government's "Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment; Reply in Support of Cross-Motion for Partial Summary Judgment; and Supplemental Appendix" (hereinafter referred to as the "Government's Opposition") confirms that it has failed to prove several of the elements required to establish accord and satisfaction, including proper subject matter, a meeting of the minds, and consideration. As discussed below, the Government regrettably resorts to misrepresenting the allegations in BELL's Complaint and the testimony of its Project Manager in a vain attempt to create support for its accord and satisfaction theory.

Second, BELL submits that it is entitled to summary judgment with regard to the Government's assessment of liquidated damages. There is a unique set of facts regarding this issue that differentiates the present case from those involving typical disputes over liquidated damages. The Government has "put all its eggs in one basket," i.e., it relies entirely upon the opinion of one of its proposed expert witnesses to support its liquidated damages assessment.

The Government's proposed expert, however, has admitted that he did not perform the necessary analysis – or any analysis – of the 14 interim milestones and the relevant matters affecting each milestone. The Government seeks to avoid summary judgment on this issue by asserting that it has met its prima facie burden of going forward. As discussed below, that assertion is both legally and factually incorrect. Among other things, the Government ignores the contract's provisions and the fact that BELL did perform the necessary analysis of each of the 14 interim milestones and has shown that any failure to meet them was caused by the Government's actions and inactions. Thus, even assuming arguendo that the Government met its burden of going forward, BELL's analysis of the 14 interim milestones shifted the ultimate burden back to the Government. The sole source upon which the Government relies to justify its assessment of liquidated damages – its proposed expert – has no contrary analysis or opinion to offer.

## II. ANALYSIS OF THE GOVERNMENT'S RESPONSES TO "PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT"

### A. FACTS WHICH THE GOVERNMENT ADMITS ARE UNCONTROVERTED

Pursuant to the "Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact" ("Government's Response"), the Government has conceded that the matters set forth in the following paragraphs from "Plaintiff's Proposed Findings of Uncontroverted Fact" are uncontroverted, or accurate, or true: ¶¶ 1, 2, 3, 4, 5, 6, 7, 12 (last two sentences); 15; 16; 17 (first two sentences); 19; 21 (first sentence); 23 (as to quotations); 24; 26 (as to quotations); 27 (as to quotations); 29 (as to submission of estimate); 31; 32; 33 (first two sentences); 36 (first sentence regarding date); 37 (first sentence regarding date); 43 (as to quotations); 45 (acknowledges that Government "may have misinterpreted the narrative for Bell's August 2000 time impact analysis); 46; 47 (first sentence); 54 (as to quotations); 55 (as to quotations); 56 (as to quotations); 57 (as to quotations); 58 ("It is uncontroverted that this was

our witness's testimony at his deposition."); 59; 63 (third sentence); 64; 69 (as to quotations); 70 (as to quotations); 74; 75; 79; and 80. See Government's Response.

Based on the foregoing, the uncontroverted facts include the following:

- "[W]ith NIH's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for NIH's execution of a change order. As a result, NIH obtained the benefit of avoiding greater delay." See Government's Response, ¶ 12 at p. 7.

- "The Government interprets the reference in Mod. 93 to 'changes' transmitted to BELL on or before August 31, 2000 to include only executed change orders that the parties had agreed to by that date." See Government's Response, ¶ 58 at pp. 39-40.[1]

- The Government "concedes that there is a difference between delay and inefficiency; you can have one without the other." See Government's Response, ¶ 59 at p. 40.

- "[A]fter Mod. 93 was executed, the Government repeatedly directed BELL to perform additional work 'without impact to the project schedule,' yet it refused to authorize or compensate BELL to accelerate its manpower to accomplish that directive." See Government's Response, ¶ 64 at p. 43.

- "[T]he Government refused to grant BELL any additional time extension for all of the changes that the Government made after Mod. 93." See Government's Response, ¶ 63 at p. 42.

- The Government "admitted that each of the 14 interim milestones established in Mod. 93 would have an independent critical path to each particular milestone." See Government's Response, ¶ 79 at p. 50.

---

[1] The Government's Response states that "[i]t is uncontroverted that this was our witness's testimony at his deposition. We (and the witness) believe the testimony was legally mistaken." Id. As discussed below, the Government's attempt to change its mind as to which "changes" are covered by Mod. 93 further shows that the Government cannot prove the required elements of accord and satisfaction, particularly with regard to proper subject matter, a meeting of the minds, and consideration. BELL is constrained to point out that the Government designated its witness to testify about "Modifications issued by the Government relating to the Project." See Plaintiff's Supplemental Appendix ("Ptf. Supp. App.") at 1-4 (Amended Notice of Deposition and Government's Rule 30(b)(6) Dep. Tr. at p. 7). The Government's Rule 30(b)(6) designee was deposed on February 24, 2005. At that time, the Government made no objection to his testimony and did not examine him. In the almost 6 months that elapsed between the deposition and the filing of the Government's Response, neither the Government nor its Rule 30(b)(6) Designee ever asserted that his sworn testimony was "legally mistaken." Indeed, even as of today's date, over 7 months after the deposition, the Government has not proffered an affidavit from its Rule 30(b)(6) designee purporting to recant his sworn deposition testimony.

- "The Government also admitted through Mr. Scott that the critical path for each of the 14 interim milestones would have to be analyzed to determine whether any delay associated with achieving each milestone was compensable or excusable to BELL." See Government's Response, ¶ 80 at p. 51.

### B. FACTS WHICH THE GOVERNMENT ASSERTS REQUIRE NO RESPONSE

The Government asserts that the matters set forth in the following paragraphs from "Plaintiff's Proposed Findings of Uncontroverted Fact" state legal conclusions to which it purportedly is not obligated to respond: ¶¶ 8; 9; 10; 12 (first sentence); 21 (second sentence); 44; 52; 53; 54(Government admitted only that quotation was accurate); 55 (Government admitted only that quotation was accurate); 57 (Government admitted only that quotation was accurate); 60; 65; 66; 68; 72; 73; 77; 82. See Government's Response.

### C. FACTS WHICH THE GOVERNMENT ASSERTS INVOLVE LEGAL ISSUES

The Government neither admits nor controverts the matters set forth in the following paragraphs from "Plaintiff's Proposed Findings of Uncontroverted Fact," but rather, asserts that BELL's position is not legally correct: ¶¶ 78; and 81. See Government's Response. The Government's responses to these two particular proposed findings, both of which deal with its proposed expert, is substantively incorrect and merely a tactical maneuver to avoid the following uncontrovertable facts set forth therein, to wit:

> "78. The Government relies solely upon one of its proposed expert witnesses, Ted Scott, to allocate all responsibility for delay as between BELL and the Government, including the assessment of liquidated damages against BELL for allegedly being unable to meet the interim milestones established in Mod. 93. See Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. at 19; Government's 1/13/05 letter, Ptf. App. at 34-35 ("The Government's current position, which we have developed in litigation, regarding the specific allocation of excusable and unexcused delay, and the corresponding delay costs, has been explained by our experts in their reports, and will presumably be further explained during the experts' depositions.")"

> "81. Further, the Government admitted through Mr. Scott that in order to determine whether liquidated damages could properly be assessed for allegedly not meeting any of

the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone. See Scott Dep. Tr. at p. 77, Lines 1-14, Ptf. App. at 28. Mr. Scott, however, testified that he did not perform any such analysis:

**A. I did not analyze each milestone. So I didn't come to an opinion as to what the delays were for each interim milestone.**

**Q. So if I understand your testimony, for each window you established, you did not analyze the effect any change had during that window on each individual milestone.**

**A. That's correct.**

*****

**Q. Well, isn't it true that you would have to analyze the effect on each individual milestone to determine whether or not the contractor [BELL] is due an excusable delay for liquidated damages for that milestone?**

**A. That's correct.**

See Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28."

BELL submits that the Court should treat the foregoing findings as uncontroverted facts. Neither the Government's Opposition nor the Government's Response challenge the accuracy of the evidence upon which BELL relies to support these facts, i.e., the sworn deposition testimony of the Government's Rule 30(b)(6) Designee and its proposed expert and the letter from the Government's counsel. The indisputable facts are that the Government has repeatedly stated that it relies solely upon its proposed expert to support its assessment of liquidated damages and that its proposed expert did not do any analysis of the 14 interim milestones. See Government's Rule 30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. at 19; Government's 1/13/05 letter, Ptf. App. at 34-35; and Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28 In short, these are uncontroverted facts, not "legal" issues.[2]

[2] Obviously, even if they are "legal" issues, they are not controverted facts that would preclude summary judgment in BELL's favor.

## D. Facts Which The Government Asserts Are Controverted

Finally, the Government asserts that the matters set forth in the following paragraphs from "Plaintiff's Proposed Findings of Uncontroverted Fact" are controverted: ¶¶ 11; 13; 14; 17 (third sentence); 20; 22; 25; 28; 29 (as to reliance on Government's representations); 30; 33 (last sentence); 34; 35; 36 (as to everything but the date); 37 (second sentence); 38; 39; 40; 41; 42; 43 (as to everything but the quotations); 47 (second and third sentence); 48; 49; 50; 51; 61; 62; 63 (first two sentences); 67; 70 (as to everything but the quotations); 71; and 76.

The Government's assertion that several of these facts are controverted is belied by the record evidence and should be rejected. For example, the Government purports to controvert the fact that it represented to BELL that the new floor would duplicate the third floor and that final design plans would be issued by March 1999. The Government asserts that "it is untrue – that the Government ever said, much less stated 'in writing,' that the new floor would duplicate the third floor." See Government's Response at p. 12. The Government further asserts that BELL cannot establish the factual premise "that NIH would provide 'final design documents' in March 1999," and that "there is no evidence that the Government promised to deliver 'final' plans in March 1999." Id. at p. 19 and p. 26. The Government's assertions are wholly refuted by the following:

- BELL's Project Manager, Jeremy Bardin, submitted a sworn affidavit stating his personal knowledge that the Government made these representations to BELL.

- The Government has not submitted any affidavit to rebut Mr. Bardin.

- The Government's Feasibility Study, which BELL expressly relied upon in submitting its initial price proposal for constructing the new floor, stated in relevant part that, "The skin of the new floor will be a duplication of the third floor as shown on the enclosed elevations. * * * The interior layout of the new floor will be a duplication of the Third Floor . . ." See Government's Feasibility Study, Ptf. App. at 40 (emphasis added); and BELL's January 14, 1999 Price Proposal, Ptf. App. at 49-50 (citing Feasibility Study).

- The Government's Executive Report stated: "It is proposed to add an additional floor to Building 50 that would be a repeat of the third floor. *** The additional floor and interstitial plans will require little architectural or engineering rework as they are literally a repeat and thus a reissue of existing floor plans." See Government's Executive Report, Ptf. App. at 41-42 (emphasis added).

- The Government's Executive Report further stated: "The shop drawings also will be a repeat of the previous floor and can be prepared and approved quickly . . . We have a little more time to complete the remainder of the engineering drawings. The design team can have a bulletin for the remainder of the work ready to issue to BELL on February 15th. See Government's Executive Report, Ptf. App. at 42 (emphasis added).

- The Government's Justification for Other Than Full and Open Competition (the "Government's JOFOC") stated: "After an intensive effort, the structural bulletin is complete and ready for issue to the construction contractor [BELL]. The statement of work for the balance of the work will be complete and ready for issue to the contractor [BELL] in early March." See Government's JOFOC, Ptf. App. at 46 (emphasis added)

- The Government relies upon the deposition testimony of its Rule 30(b)(6) Designee to assert that ¶ 28 of Plaintiff's Proposed Findings of Uncontroverted Fact is controverted. See Government's Reponses at p. 19, citing, Def. Supp. App. at 26 (Kutlak Dep. 43-44). The Government's Rule 30(b)(6) designee, however, testified the "I don't recall exactly what this was all about." See Def. Supp. App at 26 (Kutlak Dep. Tr. at p. 42, Line 19 – p. 43, Line 13).

- Moreover, after reviewing the Government's documents which stated that the Government would issue the final design plans in February or March 1999, the Government's Rule 30(b)(6) designee testified that: "That was a plan, but I don't know that that was ever put in place." See Def. Supp. App at 26 (Kutlak Dep. Tr. at p. 43, Lines 14-22) (emphasis added)).

Thus, the Government's own records confirm that, as stated in ¶¶ 20, 28, 39, and 41 of Plaintiff's Proposed Findings of Uncontroverted Fact, and in Mr. Bardin's unrebutted affidavit, the Government represented that the new floor would duplicate the third floor and that the final design documents would be issued by March 1999. There is simply no good faith basis for the Government to assert that these matters are controverted.

The Government seeks to avoid the content of its own documents by asserting that some were "internal Government document[s] that [were] not communicated to BELL."[3] See Government's Response at p. 18. The Government's tactic is remarkable for two reasons. First, the Government misses the fundamental point that its "internal" documents, regardless of whether or not each one of them was communicated to BELL, are wholly consistent with Mr. Bardin's Affidavit about the representations that the Government made to BELL.

Second, and more broadly, the Government's tactic reveals a startling lack of credibility. The Government apparently contends that it was free to make one set of representations about the new floor "internally" in order to obtain approval for avoiding a competitive procurement process for the construction of the new floor (see Government's JOFOC, Ptf. App. at 44-48), and then make directly contrary representations to BELL in connection with soliciting a proposal to construct the new floor (see Government's Response at pp. 18-19). If this was an isolated tactic, perhaps it could be ignored. Regrettably, however, it is part of a pattern of the manner in which the Government has dealt and continues to deal with BELL. To further illustrate:

**STATUS OF WORK AS OF DECEMBER 1998 – ¶ 13**

- The Government asserts that that, contrary to ¶ 13 of Plaintiff's Proposed Findings of Uncontroverted Fact, BELL was behind schedule in performing its work as of December 1998 (which is when the Government proposed to add a new floor). See Government's Response at p. 7.

- The Government's Response, however, truncates ¶ 13 and thereby omits the identification of the Government's contemporaneous records which confirmed that BELL was performing its work on schedule. See Executive Report on the Possibility of Adding an Additional Floor to Building 50 (the "Government's Executive Report"), Ptf. App. at 42 ("The project currently is on schedule . . ."). The Government's Executive Report is dated January 15, 1999. The Government's Rule 30(b)(6) Designee, who authored the Government's Executive Report, confirmed at his deposition that he accurately stated that

[3] It is undisputed that the Government's Feasibility Study, which expressly stated that the new floor would be a "duplication of the third floor," was communicated to BELL. See BELL's January 14, 1999 Price Proposal, Ptf. App. at 49-50 (citing Feasibility Study).

"[t]he project is currently on schedule." See Ptf. Supp. App. at 5 (Government's Rule 30(b)(6) Dep. Tr. at p. 41, Lines 2 – 6). The Government does not assert that the Government's Executive Report or the testimony of its Rule 30(b)(6) Designee is false, misleading, or otherwise inaccurate. Rather, as it did with the documents regarding its representations that the new floor would duplicate the third floor, the Government merely pretends that these facts do not exist.

- The two Executive Monthly Reports upon which the Government relies to try to controvert ¶ 13 do not show that BELL was behind schedule as of December 1998. See Defendant's Supplemental Appendix ("Deft. Supp. App.") at 27-30 In fact, the Executive Monthly for December 1998 states that "BELL's CPM update shows them on schedule . . ." Id. at 28. See also, CPM Schedule Narrative Update No. 7, Ptf. App. at 36-37. The other Executive Monthly Report that the Government cites purports to summarize work completed during the month of April 1999, and does not deal with the project status as of December 1998. Id. at 29-30. April 1999 was several months after the Government had directed BELL to commence with the work to add the new floor. Id. at 30 (discussing work performed in connection with adding the new floor).

**CHANGE ORDER NO. 29 – ¶ 38**

- The Government asserts that ¶ 38 of Plaintiff's Proposed Findings of Uncontroverted Fact, regarding the issuance of Change Order No. 29, is controverted because, "There was no document on this project formally called a change order. Mr. Bardin's conclusory description of the supposed 'Change Order No. 29' should be disregarded." See Government's Response at p. 25 (emphasis in original).

- A copy of "Change Order No. 29" is set forth in Plaintiff's Supplemental Appendix. See Ptf. Supp. App. at 6 (Change Order No. 29). Change Order No. 29 expressly directed BELL to "[i]mplement the Government direction" to proceed with work for the new floor. Id. Moreover, the Contracting Officer confirmed, in writing, that: "The Contractor was issued Change Order No. 29 on March 29, 1999." See Ptf. Supp. App. at 7 (Summary of Negotiations, Section G, Business Evaluation (excerpted)), (emphasis added). This raises the question of how, in good faith, the Government could categorically assert to this Court that Change Order No. 29 does not exist and cast aspersions on Mr. Bardin simply because he referred to it.

**GOVERNMENT'S ASSERTION REGARDING DESIGN OF NEW FLOOR**

- Paragraph 4 of the "Defendant's Proposed Findings of Uncontroverted Fact" asserted that: "On January 14,1999, Bell submitted a price estimate and initial proposal for the new floor, based upon a design developed jointly by Bell and NIH" (emphasis added).

- When BELL's Proposed Findings of Uncontroverted Fact showed that the Government's assertion was untrue because the Government retained an architectural firm to design the new floor, the Government responded by saying that its proposed finding "is arguably imprecisely worded" and, "[i]n any event, nothing in our motion or BELL's cross-motion

turns upon the extent to which BELL was involved in the design." See Government's Response at p. 11.

- BELL submits that there is no imprecision in the words used by the Government; clearly the Government incorrectly stated the BELL was involved in "jointly" designing the new floor. The assertion in the Government's Response that this issue is irrelevant begs the question of why, in the first place, the Government included in its Proposed Findings of Uncontroverted Fact.

**GOVERNMENT'S ASSERTION REGARDING AUGUST 2000 TIME IMPACT ANALYSIS**

- Paragraph 8 of the "Defendant's Proposed Findings of Uncontroverted Fact" asserted that, in August 2000, "Bell submitted to NIH a time impact analysis that, according to Bell, incorporated all changes that Bell alleged were impacting its progress."

- When BELL's Proposed Findings of Uncontroverted Fact showed that the Government's assertion was untrue because, in fact, that time impact analysis expressly stated that it did not incorporate all changes, the Government responded by saying that "it may have misinterpreted" the time impact analysis, but that [t]he point is irrelevant . . ." See Government's Response at p. 30.

- It is virtually inconceivable that the Government legitimately "may have misinterpreted" the concise and simple words in BELL's time impact analysis. Once again, if, as the Government now contends, the issue is "irrelevant," then why did the Government make the demonstrably untrue assertion in its Proposed Findings of Uncontroverted Fact?

## III. DISCUSSION

### A. NEITHER THE LAW NOR FACTS SUPPORT THE GOVERNMENT'S ASSERTION OF ACCORD AND SATISFACTION

The Government asserts two legal theories as in support of its assertion that the doctrine of accord and satisfaction precludes BELL from pursuing any portion of its labor inefficiency and cumulative impact claims attributable to the changes covered by Modifications ("Mods.") 93-140. First, the Government, citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996), asserts that the parol evidence rule bars consideration of any matters outside the four corners of the modifications, which would necessarily preclude consideration of the parties'

objective manifestations of intent. The Government's reliance on McAbee Constr., Inc. is misplaced, however, because that case did not involve an assertion of accord and satisfaction.[4]

Here, the Government is asserting accord and satisfaction. Therefore, as a matter of law, the Government bears the burden of proving each of the following elements before the doctrine of accord and satisfaction could be applied: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. Jackson Construction Co. v. United States, 62 Fed. Cl. 84, 92 (2004). "The absence of any of these elements results in a failure of the defense [of accord and satisfaction]." McLain Plumbing & Electrical Service, Inc. v. United States, 30 Fed. Cl. 70, 80 (1993). In order to determine whether there has been an accord and satisfaction, "the Court must look beyond the mere existence or nonexistence of any release language or reservation of rights in a bilateral modification." Jackson Construction Co., 62 Fed. Cl. at 92. Accordingly, "the Court must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with the respect to additional claims." Id. at 93 (emphasis added). Finally, "even if the parties have executed a clear and unambiguous release, this Court can void or reform the release on several grounds, including lack of consideration, lack of performance, lack of authority, unilateral or mutual mistake, misrepresentation, duress, or under other circumstances in which the parties' conduct evinces an intent to allow additional claims." Id. (emphasis added).

BELL reemphasizes the foregoing familiar principles of accord and satisfaction because the Government's Opposition completely ignores them. The bottom line is that the analysis set forth in Jackson Construction Co. should be applied to determine whether the Government has

---

[4] That case concerned a dispute over an easement agreement that "explicitly stated that the contract was fully integrated." Id. at 1434. The court found that the appellee "pointed to no evidence that supports its assertion that the contract was not fully integrated." Id.

met its burden of proof to establish accord and satisfaction. As discussed below, BELL submits that the Government has not and cannot meet its burden.

The Government's second legal theory, which relies upon Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F.2d 173, 177 (1963), asserts that it should prevail because BELL purportedly failed to reserve its right in Mods. 93-140 to make a claim for labor inefficiency and cumulative impact. Once again, the Government has relied on an inapposite case, because the contractor in Cannon Constr. Co. sought to recover lost profit delay damages after expressly stating that it would not seek such damages. Id., 319 F.2d at 175-176. It is also notable that, despite the Government's invocation of the parol evidence rule, the Cannon Constr. Co. court thoroughly analyzed the issues that the parties negotiated prior to entering into a contract modification, including the "unequivocal conduct of the parties." Id. at 175-176.

Moreover, the contract modification in Cannon Constr. Co. expressly stated that it "constituted full compensation for said delays." Id. Subsequently, after the contract modification had been entered into, the contractor sought to recover additional delay damages "alleged to be the reasonable profit contemplated under the original contract and lost because of the defendant's unreasonable delays." Id. at 176. The court held that, based on the express language in the contract modification that it constituted full compensation for delay, "and the unambiguous conduct of the parties – we must conclude that the plaintiffs knew that their claim for delays would be fully discharged . . ." Id.

A dramatically different situation is presented here. First, the Government "concedes that there is a difference between delay and inefficiency; you can have one without the other." See Government's Response, ¶ 59 at p. 40. Second, there is no statement in Mods. 93-140 addressing, let alone compromising, BELL's labor inefficiency and cumulative impact claims.

In fact, as the record shows, such claims were not discussed or negotiated as part of Mods. 93-140. See Government's Rule 30(b)(6) Dep. Tr. at p. 51, Lines 10-14, (Mod. 93 was "the mod. where we paid [BELL] for delays up to that date, and that was it . . ."), Ptf. App. 23 (emphasis added); and Government's Response to Interrogatory No. 5 ("Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000."), Ptf. App. at 69 (emphasis added).

The Government's assertion that BELL "failed" to reserve its labor inefficiency and cumulative impact claims is a tacit admission that Mods. 93-140 do not purport to settle or release such claims. Furthermore, the Government's inconsistency about the applicable law underscores the fact that BELL did not have a duty to reserve claims that were never even part of those modifications. In its Motion, the Government relied upon Atlantic Dry Dock Corp. v. United States, 773 F. Supp 335 (M.D. Fla. 1991), and stated that the release language in Mods. 93-140 "differ[ed] only slightly in wording, and not at all in meaning" from the release language in that case. See Government's Motion at p. 9. The release in Atlantic Dry Dock Corp. expressly addressed "delay and disruption," and the court held, therefore, that the plaintiff could not maintain its claims for delay and disruption. Id. at 338-339(emphasis added). The court went on to hold, however, that the release did not bar the plaintiff's cardinal change claim. Id. at 339.

The Government has taken a "180 degree turn" regarding Atlantic Dry Dock Corp. and now states that it disagrees with its finding and "that the issue is irrelevant, because we have not argued that Bell cannot pursue its cardinal change claim." See Government's Opposition, at p. 6, n. 2. The Government fails to understand that BELL is not barred from pursuing its cardinal

change claim, for the same reason that it is not barred from pursuing its labor inefficiency and cumulative impact claim, i.e., none of those claims were released in Mods. 93-140. The legal rationale of Atlantic Dry Dock Corp., which not so long ago the Government found compelling, applies with the same force to BELL's labor inefficiency and cumulative impact claims as its does to BELL's cardinal change claim.

BELL notes that the Government now asserts that its Interrogatory Response No. 5, which stated all the facts upon which the Government relied in support of its affirmative defenses (including accord and satisfaction), purportedly "did not refer only to 'delays,'" but supposedly also noted "that the modifications at issue 'contained a complete release, covering both direct costs and time, and no reservation of claims." See Government's Opposition at p. 7, n. 3 (emphasis in original). Ironically, a closer examination of the Government's Interrogatory Response No. 5, particularly its explanation of its defenses of accord and satisfaction and equitable estoppel and laches, further confirms that labor inefficiency and cumulative impact claims were never included in Mod. 93. In relevant part, the Government's Interrogatory Response No. 5 states:

> **Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000. That modification was negotiated upon the basis of a time impact analysis submitted by Bell in August 2000 that purportedly incorporated all change orders to date and projected an approximate substantial completion date of September 1, 2001. Modification 93 contained a complete releaser covering both direct costs and time, and no reservation of claims.**
>
> **As a result, (1) plaintiff's claims are barred by accord and satisfaction, and have been fully paid, to the extent the claimed damages are traceable to change orders issued on or before August 31, 2000; (2) modification 93 constitutes a waiver of those claims; and (3) the defenses of equitable estoppel and laches are applicable because, in negotiating and implementing modification 93, the Government relied to its detriment upon Bell's express**

> **representation in the modification that Bell would seek no further compensation for delays resulting from pre-September 2000 change orders…**

See Government's Interrogatory Response No. 5, Ptf. App. at 69 (emphasis added).

As the foregoing makes clear, delays, but not labor inefficiency and cumulative impact claims, were included in Mod. 93. The Government's Interrogatory Response No. 5 also belies several of the Government's other assertions. For example, as noted above, the Government now asserts that its Rule 30(b)(6) designee was "legally mistaken" when he testified that the Government interpreted the reference in Mod. 93 to "changes" transmitted to BELL on or before August 31, 2000 to include only executed change orders that the parties had agreed to by that date. This newly-minted assertion is directly contradicted by the Government's Interrogatory Response No. 5, wherein the Government twice stated that Mod. 93 covered "change orders" issued on or before August 31, 2000.

The Government's inability to keep its story straight as to which "changes" it contends are included in Mod. 93 refutes its assertion that Mod. 93 constituted an accord and satisfaction for all "changes" transmitted before August 31, 2000. The Government cannot prove proper subject matter, a meeting of the minds, and consideration – required elements of accord and satisfaction – when it keeps changing its position as to what it asserts is within the scope of Mod. 93.

The Government's Interrogatory Response No. 5 also states that Mod. 93 "was negotiated upon the basis of a time impact analysis submitted by Bell in August 2000 that purportedly incorporated all change orders to date . . ." As the Government now concedes, however, the time impact analysis that BELL submitted in August 2000 did not include all changes and, in fact, expressly stated, "We caution that there are still other significant changes which have not yet

been developed into a [time impact analysis] . . ." See Government's Response at p. 31 (discussing ¶ 46 of Plaintiff's Proposed Findings of Uncontroverted Fact).

The Government asserts that BELL was not forthright when it negotiated Mods. 93-140 because it purportedly did not reserve the right to make claims for labor inefficiency and cumulative impact. That assertion falls flat because, as noted in BELL' Cross-Motion, BELL's labor inefficiency and cumulative impact claims were not matured as of the time that Mod. 93 and Mods. 94-140 were executed but, instead, necessarily matured after these modifications were entered into by virtue of the myriad of additional changes that the Government subsequently directed BELL to perform.

In its futile attempt to overcome that fact, the Government resorts to a gross misrepresentation of the record. Specifically, the Government asserts that "the complaint alleges – and Bell's project manager testified under RCFC 30(b)(6) – that 'Bell notified NIH' after August 2000, but before March 2001, 'that NIH's continued changes were negatively affecting Bell's ability to timely and efficiently complete the work." See Government's Opposition at pp. 7-8 (emphasis in original), citing, Complaint, ¶ 57 and Def. Supp. App. 20-21 (Bardin Dep. 35-36). The Government asserts that such notification allegedly occurred "after August 2000, but before March 2001" in an attempt to fit the time period within which Mods. 93-140 were executed.

The Government's assertion about the time period of the alleged notification is patently untrue. In its entirety, ¶ 57 of the Complaint states:

> **BELL notified NIH that NIH's continued changes were negatively impacting BELL's ability to timely and efficiently complete the work. BELL reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering."**

See Complaint, ¶ 57 (emphasis added). There is simply no good faith basis for the Government to assert that ¶ 57 of the Complaint states that BELL's notification to the Government occurred "before March 2001." It is also inexplicable as to why the Government ignores the second sentence of ¶ 57 which expressly stated that BELL reserved its rights to seek an equitable adjustment.

Equally disturbing is the Government's misrepresentation of Mr. Bardin's deposition testimony regarding ¶ 57 of the Complaint. Mr. Bardin never testified that BELL notified the Government "before March 2001." In fact, several times during his testimony he made clear that he was not certain of the time frame when the Government was notified. See Def. Supp. App. at 21 (Bardin Dep. Tr. 36, Lines 1-2 and 8-9 ("I'm trying to get my time period correct here . . .")).

The Government tops off its misrepresentations regarding ¶ 57 of the Complaint and Mr. Bardin's deposition testimony by citing Seeds & Derham v. United States, 92 Ct. Cl. 110 (1941), for the proposition that it is "plainly wrong" for BELL to state that it could not reserve its inefficiency claims until they were actually matured. See Government's Opposition at p. 8. The Government is mistaken in citing Seeds & Derham because the court in that case held that it was "clear that that the claim now presented is an afterthought, and that the plaintiffs understood at the time they agreed to the change order that the sum therein was to cover the entire increase in cost." Id. Indeed, the court noted that "[t]he plaintiffs evidently understood that the additional sum to be paid [via the change order] was intended to cover the entire increase in cost, whether from delay or otherwise, because they made no claim for any additional compensation until over a year later when their attention happened to be directed to an opinion of this court . . ." Id. Thus, well after the fact, the plaintiffs in Seeds & Derham were plainly trying to take advantage of what was then new caselaw by creating a claim. That fact pattern has no application here.

In sum, BELL's labor inefficiency and cumulative impact claims matured after Mods. 93-140 were agreed to. The uncontroverted facts show that these claims were not discussed during the negotiations of those modifications, nor are they addressed in any manner in those modifications. There was, therefore, no proper subject matter, no meeting of the minds about releasing those claims, nor any consideration given for such a release. Accordingly, the Government cannot prove accord and satisfaction and partial summary judgment should be entered in BELL's favor holding.

### B. THE GOVERNMENT CANNOT MEET ITS BURDEN TO JUSTIFY ITS ASSESSMENT OF LIQUIDATED DAMAGES

The Government concedes that it bears the burden of going forward as well as the ultimate burden of proof with regard to its assessment of liquidated damages in excess of $447,000. See Government's Opposition at p. 9. The Government asserts, however, that it has met its prima facie burden of going forward and that the burden has shifted to BELL to show that any delay is excusable. Id. at 9-10. The Government's assertion fails as a matter of law and because of the unique facts in this case.

First, the Government's position would make the prima facie burden utterly illusory. That is, the Government asserts that it only has to make the arithmetic calculation of difference between the date the contract stated that the work was supposed to be completed and the date it was substantially completed. That is not correct. As a matter of law, "[t]he government may meet its initial burden by showing that 'the contract performance requirements were not substantially completed by the contract completion date and that the period for which the assessment was made was proper.'" PCL Construction Services, Inc. v. United States, 53 Fed. Cl. 479, 484 (2002) (emphasis added) (citation omitted). "In order to determine the correct method for computing liquidated damages under this contract, the court looks to the plain

language of all of the relevant contract provisions." Safeco Credit v. United States, 44 Fed. Cl. 406, 414-415 (1999). "The general rule . . . that, once the government has met its initial burden of going forward, the contractor must prove excusable delays to be relieved of all or part of the liquidated damages assessed, has not been applied, however, when the government has contributed to the delay of the completion of the contract." PCL Construction Services, Inc., 53 Fed. Cl. at 484.

Based on the foregoing principles, the Government has not and cannot meet its burden of going forward, nor its ultimate burden. The Government made the tactical decision in this case to rely solely on the testimony of one of its proposed experts, Mr. Ted Scott, to justify its assessment of liquidated damages. See Government's Rule 30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. at 19; Government's 1/13/05 letter, Ptf. App. at 34-35. It is undisputed that Mod. 93 established 14 interim milestone dates and assigned a liquidated damage amount of $266.00 per calendar-day to each individual milestone. See Mod. 93, Ptf. App. at 62-64. It is uncontroverted that "each of the 14 interim milestones established in Mod. 93 would have an independent critical path to each particular milestone." See Government's Response, ¶ 79 at p. 50

The Government has also admitted that, in order to determine whether liquidated damages could properly be assessed for allegedly not meeting any of the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone. See Scott Dep. Tr. at p. 77, Lines 1-14, Ptf. App. at 28. It is undisputed, however, that Mr. Scott, did not perform any such analysis of the individual milestones. See Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28.

Conversely, BELL did perform an analysis of each of the 14 milestones. Specifically, in accordance with Contract Specification Section 01310 – Schedules and Reports, Part 7 Schedule Time Extensions, BELL's expert looked at all changes to the work made by the Government after August 31, 2000, determined the cause and effect of delays to each of the milestones, and did a time impact analysis. See Ptf. Supp. App. at 9-26 (BELL's Expert Report (excerpted)). This detailed analysis showed that delays to each of the milestones were excusable and compensable to BELL. Id.

Thus, even assuming arguendo that the Government met its prima facie burden of going forward, BELL responded with a detailed analysis identifying the cause of delay to each milestone. The Government, however, has no analysis to offer, as Mr. Scott admitted:

**A. I did not analyze each milestone. So I didn't come to an opinion as to what the delays were for each interim milestone.**

**Q. So if I understand your testimony, for each window you established, you did not analyze the effect any change had during that window on each individual milestone.**

**A. That's correct.**

*******

**Q. Well, isn't it true that you would have to analyze the effect on each individual milestone to determine whether or not the contractor [BELL] is due an excusable delay for liquidated damages for that milestone?**

**A. That's correct.**

See Scott Dep. Tr. at p. 76, Lines 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28.

In response to the above-quoted passage from Mr. Scott's deposition, the Government asserts that, "as quoted here, he correctly testified that Bell must analyze each critical path, in order for Bell to 'prove [entitlement to] excusable delay' and disprove liability for 'liquidated damages for [any] milestone." See Government's Response at p. 52 (emphasis in original). As

is evident, Mr. Scott never referred to BELL in that passage of his testimony. The Government's assertion to the contrary is truly strange. Moreover, it is indisputable that BELL did, in fact, perform such an analysis and thereby shifted the burden back to the Government (assuming for the sake of argument that the Government met its prima facie burden).

The unique facts of this case are that the Government has assessed over $440,000 in liquidated damages, yet has made no attempt to analyze any of the interim milestones. As Mr. Scott succinctly put it, "I didn't come to an opinion as to what the delays were for each interim milestone." See Scott Dep. Tr. at p. 76, Lines 20 – 22, Ptf. App. at 27. Because the Government has not performed the necessary analysis, it cannot justify its assessment of liquidated damages and partial summary judgment should be entered in BELL's favor.

## IV. CONCLUSION

For the foregoing reasons, BELL respectfully moves the Court to:

1. Deny the Government's Motion for Partial Summary;
2. Grant BELL's Cross-Motion for Partial Summary Judgment in its entirety; and
3. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

/s/ Richard O. Wolf

Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

Dated: September 1, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of September, 2005, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

/s/ Richard O. Wolf
Richard O. Wolf