IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BELL BCI COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1613C<br>(Judge Wheeler) |

DEFENDANT'S STATEMENT OF CONTESTED FACTUAL ISSUES

Pursuant to paragraph 2.b of the amended pretrial order, defendant, the United States, respectfully identifies what we understand, at this time, to be the contested factual issues, and the facts relating to those issues which will be established at trial.

Some of the items below are probably not in dispute, but have not yet been reduced to stipulations, due to competing demands upon the time of counsel for the parties, relating to this trial and other matters. We are optimistic that the parties may be able file additional stipulations before trial, further narrowing the scope of our factual disputes.

I. Modifications Establishing Partial Accord And Satisfaction

1.1. We understand that neither party anticipates raising any objections to the admission of any contract documents, including modifications. At the same time, we are uncertain whether the Court considers the execution, and/or subject matter, of individual contract modifications to be discrete "factual contentions," within the meaning of the amended pretrial order. Out of an abundance of caution, we include here the information concerning bilateral modifications number 93 through 140, which were executed between October 2, 2000 and April 5, 2001, that we presented in connection with our motion for partial summary judgment in June 2005.

1.2. Modification No. 93 was signed by plaintiff ("Bell") and the National Institutes of Health ("NIH") on October 2, 2000. It states that the negotiated increase in price constitutes a "full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-Out (EWO [extra work order] 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000." It further provides, "This agreement does not in any way affect entitlement to the direct cost of performance of any disputed changes. It does, however, incorporate the time impact of any disputed changes issued on or before August 31, 2000 [in the amount of $686,459]."

1.3. The final paragraph of Modification 93 states:

> The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to the Modification.

1.4. NIH's summary of negotiations for Modification 93 states that NIH paid Bell $700,000 (i.e., $686,459) for "delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000."

1.5. As Bell acknowledged in a letter dated July 31, 2001, after Modification 93, Bell continued to sign contract modifications as "full and equitable adjustments," with no time extensions, and no language reserving any claims or rights, through and including bilateral Modification No. 140, executed on April 5, 2001. The additional modifications were as follows.

1.6. On October 2, 2000, Bell and the NIH contracting officer signed bilateral Modification No. 94, which addressed certain laboratory casework and decreased the contract price by $671, with no time extension.

1.7. Also on October 2, 2000, Bell and the NIH contracting officer signed bilateral Modification No. 95, which concerned certain work in first floor conference rooms and increased the contract price by $86,708, with no time extension.

1.8. On December 8 and 14, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 96, which concerned automatic faucets and flushers and increased the contract price by $20,550, with no time extension.

1.9. On November 3 and 9, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 97, which concerned a revised laboratory monitoring system and increased the contract price by $158,948, with no time extension.

1.10. On December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 98, which provided for a stainless steel steam control valve and increased the contract price by $20,022, with no time extension.

1.11. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 99, which added a lactation room and increased the contract price by $11,346, with no time extension.

1.12. On December 8 and 14, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 100, which concerned the penthouse acoustical topping slab and increased the contract price by $17,827, with no time extension.

1.13. On November 3 and 9, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 101, which concerned laboratory casework and NMR lighting and decreased the contract price by $14,271, with no time extension.

1.14. Also on November 3 and 9, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 102, which provided for an IMC conduit at the loading dock. Modification 102 did not change the contract price or extend the time.

1.15. Also on November 3 and 9, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 103, which addressed various changes and increased the contract price by $28,090, with no time extension.

1.16. Also on November 3 and 9, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 104, which concerned various changes and increased the contract price by $11,327, with no time extension.

1.17. On December 4 and 11, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 105, which provided for a metal raceway in room B526 and increased the contract price by $1,487, with no time extension.

1.18. On December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 107, which provided for an aluminum platform over the NMR pit and increased the contract price by $75,500, with no time extension.

1.19. On March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 108, which provided for additional convenience outlets and increased the contract price by $49,660, with no time extension.

1.20. On December 8 and 14, 2000, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 109, which provided for relocating the bus stop and <u>decreased</u> the contract price by $1,862, with no time extension.

1.21. On March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 110, which addressed various changes and <u>decreased</u> the contract price by $2,591, with no time extension.

1.22. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 111, which addressed various changes and decreased the contract price by $5,430, with no time extension.

1.23. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 112, which addressed various changes and increased the contract price by $15,448, with no time extension.

1.24. On December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 113, which concerned an in-floor conduit trench in the basement and increased the contract price by $920, with no time extension.

1.25. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 114, which provided for painting fire damper access doors red and increased the contract price by $8,319, with no time extension.

1.26. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 115, which addressed ductwork and increased the contract price by $824, with no time extension.

1.27. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 116, which addressed the telephone wiring and increased the contract price by $5,324, with no time extension.

1.28. On December 29, 2000 and an unknown date (probably January 5, 2001), respectively, Bell and the NIH contracting officer signed bilateral Modification No. 117, which addressed numbering changes to air handling units and increased the contract price by $1,100, with no time extension.

1.29. On December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 119, which concerned an emergency shower and increased the contract price by $1,705, with no time extension.

1.30. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 120, which addressed relocation of an "AF-8" and increased the contract price by $370, with no time extension.

1.31. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 121, which concerned locker room B213/215 and increased the contract price by $887, with no time extension.

1.32. Also on December 29, 2000 and January 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 122, which concerned shelving and increased the contract price by $1,968, with no time extension.

1.33. On March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 123, which concerned various changes and increased the contract price by $16,740, with no time extension.

1.34. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 124, which addressed various changes and increased the contract price by $3,564, with no time extension.

1.35. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 125, which concerned removal of a strainer and increased the contract price by $7,693, with no time extension.

1.36. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 126, which addressed various changes, including adding card readers on the fifth floor, and increased the contract price by $340,371, with no time extension.

1.37. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 127, which addressed various changes and increased the contract price by $832, with no time extension.

1.38. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 128, which provided for an additional tackboard and increased the contract price by $1,447, with no time extension.

1.39. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 129, which addressed various changes and did not increase the contract price or extend the time.

1.40. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 130, which addressed various changes and increased the contract price by $25,071, with no time extension.

1.41. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 132, which concerned first floor casework and other changes and increased the contract price by $145,942, with no time extension.

1.42. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 133, which addressed various changes and increased the contract price by $45,960, with no time extension.

1.43. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 135, which addressed various changes and increased the contract price by $14,929, with no time extension.

1.44. Also on March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 136, which concerned equipment in a fish room and increased the contract price by $67,709, with no time extension.

1.45. On April 3 and 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 137, which addressed various changes and increased the contract price by $4,745, with no time extension.

1.46. Also on April 3 and 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 138, which addressed various changes and increased the contract price by $30,282, with no time extension.

1.47. Also on April 3 and 5, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 139, which addressed various changes and increased the contract price by $2,112, with no time extension.

1.48 On March 9 and 12, 2001, respectively, Bell and the NIH contracting officer signed bilateral Modification No. 140, which provided for two additional granite countertops and two additional darkrooms and increased the contract price by $19,348, with no time extension.

1.49. The release quoted in paragraph 1.3 above is the final paragraph of each and every bilateral modification described above.

II. Contract Background And Procedures

2.1. The NIH Building 50 project was clearly complex. The statement of work in the solicitation warned potential bidders:

> The work of this Contract is complicated by . . . [t]he volume and complexity of the work: The Project is a large medical facility. Facilities of this type are by nature technically complex. They include varied and non-conventional finishes and extremely complex mechanical and electrical systems, which result in very "dense" construction. This dense construction in a high density of skilled trades working in a relatively small space; hence the need for extremely effective coordination scheduling.

Later, the statement of work advised that a variety of "factors conspire to make for a relatively complex project which will require a Contractor thoroughly experienced with large scale underground construction projects and [that it] be extremely well organized and responsive to change." (Emphasis added.)

2.2. Section H of the contract, as awarded, stated, in part:

> When change proposals are not submitted with a Time Impact Analysis, it is mutually agreed that the particular change order, modification, delay or Contractor request does not require an extension of the contract time (or milestone).
>
> . . .

> Any proposal for delay and impact. costs that is not submitted within 60 days after completion of the work identified in the change will not be considered. This requirement is in addition to the scheduling updates required for construction of the project. If there are circumstances which prevent the contractor from ascertaining delay for impact during this time, a status update, including but not limited to a critical path analysis, shall be submitted within this time and at 60 day intervals thereafter, explaining why the contractor cannot yet know the extent of the impact. If this is not done, a claim for delay will not be considered unless special circumstances are shown. This requirement is necessary to enable the government to respond to any claims for delay in light of conditions then current conditions.

2.3. The task of the testing and balancing representative retained by NIH, Weisman Inc. ("Weisman"), was to work with Bell to ensure that the systems were properly tested, adjusted, and balanced, and that the air flow measuring and control elements were properly calibrated.

2.4. NIH also retained a "commissioning authority," Facility Dynamics, to ensure that the systems, equipment, and interfaces were properly installed and tested.

2.5. To determine Bell's monthly compensation, NIH's construction quality manager, and "eyes and ears" on the project, CRSS Constructors, Inc., which was acquired by Jacobs Facilities, Inc. ("CRSS/Jacobs"), would perform a walk-through of the construction site with Bell and agree to progress achieved for each activity. Bell would then input the agreed upon progress into the schedule update and submit it for approval. Because the schedule was cost loaded, the progress achieved during each schedule update would determine how much Bell was paid for the time period. This process ensured that the schedule updates accurately reflected the progress achieved to date, and an agreed plan for completing the remaining work. Bell and NIH could

then use the schedule to identify potential delays and/or problems, and their estimated impact on performance and the Project completion date. In addition, Bell could identify alternatives for possible schedule recovery to mitigate potential delay and/or cost increases.

2.6. Before an area was deemed ready to be commissioned, the contract required Bell to complete and inspect the installation of systems and equipment as detailed throughout the contract documents. Bell would then start, adjust, and test the mechanical equipment and systems prior to verification and performance testing. This was typically performed by floor, and by area within floors.

2.7. Weisman would then validate the installation of the mechanical systems and equipment. This would also include certain interior finishes and mechanical, electrical, and plumbing ("MEP") trim-out items, such as ceiling tile, variable air volume ("VAV") boxes, and diffusers, which are necessary for testing and balancing. The Contract required Bell to remedy any deficiencies identified. Weisman would then perform the testing and balancing for each floor and area. Upon completion of this process, a floor was deemed substantially complete.

2.8. Although Bell's Schedule Update No. 7, dated December 31, 1998, indicated that the Project was ahead of schedule, CRSS/Jacobs's Executive Monthly Report on the project for this time period noted that "total work in place continues to fall behind plan[,] as illustrated by the percent complete graph, an early indicator of future delays."

2.9. When NIH requested a proposal for adding a new fourth floor in December 1998, Bell was very interested in the additional work. NIH did not need to persuade Bell to cooperate.

2.10. NIH did <u>not</u> represent to Bell that the new fourth floor would replicate the third floor. The design for the third floor was used solely to develop initial price/cost estimates for the

new floor, because the third floor provided the closest available approximation to the proposed fourth floor. NIH never stated – and Bell never believed– that the third and fourth floors would in the end be identical. Bell's allegation to that effect is irrelevant, in any event, because the changes for the new fourth floor were separately negotiated during 1999, based upon the actual fourth floor design and specifications.

2.11. NIH's sole source justification dated February 10, 1999, in which NIH memorialized its decision not to solicit competitive bids to construct the new fourth floor, was an internal Government document and was never shared with Bell.

III. Bell's Schedules And Progress

3.1. Starting with Schedule Update 28, BELL submitted monthly schedules (shown in the table below) after Modification 93. These schedules are BELL's representation of its progress as of each date, and its plan going forward.

| Update No. | File Name | Data Date | No. of Activities | Finish Date |
|---|---|---|---|---|
| 28 | NA28/N128 | 10/1/2000 | 2559 | 4/30/2001 |
| 29 | NA29/N129 | 11/1/2000 | 2576 | 5/14/2001 |
| 30 | NA30/N130 | 12/1/2000 | 2580 | 5/18/2001 |
| 31 | N131 | 1/1/2001 | 2592 | 5/23/2001 |
| 32 | N132 | 2/1/2001 | 2595 | 6/12/2001 |
| 33 | N133 | 3/1/2001 | 2641 | 6/28/2001 |
| 34 | N134 | 4/1/2001 | 2655 | 7/24/2001 |
| 35 | N135 | 5/1/2001 | 2734 | 8/20/2001 |
| 36 | N136 | 6/1/2001 | 2734 | 8/23/2001 |

| | | | | |
|---|---|---|---|---|
| 37 | NA37 | 7/2/2001 | 2734 | 9/13/2001 |
| 38 | NA38 | 8/1/2001 | 2805 | 10/4/2001 |
| 39 | NA39 | 9/1/2001 | 2826 | 11/5/2001 |
| 40 | N840 | 10/1/2001 | 2849 | 11/22/2001 |
| 41 | N141 | 11/1/2001 | 2851 | 12/26/2001 |
| 42 | N242 | 12/1/2001 | 2868 | 1/28/2002 |

3.2. For Updates 28, 29 and 30, Bell issued two schedules each. Although these duplicate schedules have different file names (e.g., NA28 and N128), they are virtually identical.

3.3. The substantial completion dates for each milestone established in Modification 93, as reflected in NIH's correspondence to Bell, were as follows:

| Milestone | Substantial Completion Date |
|---|---|
| LAN Rooms | October 1, 2000 |
| Basement Vivarium | May 10, 2001 |
| Second Floor | April 11, 2001 |
| Elevator No. 5 | May 29, 2001 |
| Basement | June 15, 2001 |
| Site Hardscape | December 4, 2001 |
| Third Floor | April 10, 2001 |
| Fourth Floor | May 8, 2001 |
| Elevators 1, 2 & 5 | April 28, 2001 |
| All MEP Systems | September 12, 2001 |
| Fifth Floor | August 29, 2001 |

| | |
|---|---|
| Sixth Floor | August 9, 2001 |
| First Floor | September 28, 2001 |
| Site Landscape | December 4, 2001 |

3.4. The statement in an NIH annual report issued in February 2003, that Building 50 was "completed . . . on schedule," which is quoted in paragraph 39 of the parties' statement of stipulated uncontested facts, refers to NIH's internal schedule for occupancy of the building by NIH personnel. The statement does not refer to Bell's schedule under the contract. NIH left a "cushion" between the contract completion date and the planned occupancy date(s).

IV. Fatal Flaws In Bell's Delay Analysis

4.1. As noted above, Bell achieved substantial completion of the final contract milestone on December 4, 2001. That was 218 calendar days past the April 30, 2001 completion date in Modification 93.

4.2. Bell's expert, Mr. Brannon, submitted a "Time Impact Analysis" as a justification for an extension of contract time. Mr. Brannon's method of application of the "Time Impact Analysis" approach and his conclusions are flawed for the following general reasons, which we will develop in greater detail at trial.

4.3. Mr. Brannon attempts to change history by creating modified schedules that do not match the contemporaneous schedules used by the project management team.

4.4. Mr. Brannon's analysis is incomplete. He makes no attempt to analyze Bell's performance or concurrent delays, thereby, in effect, presuming the Government was at fault for every single delay. (Bell's failure to address or disprove concurrent delay at trial will independently preclude any award of delay damages.)

4.5. Mr. Brannon double counts delays and makes no attempt to reconcile his estimate of total delay to the actual 284 days of overrun (from the original completion date).

4.6. Mr. Brannon's measurement of individual change order related delays is, in any event, demonstrably incorrect. The following events during the project are relevant to these errors, as we will demonstrate in detail at trial.

4.7. There are approximately 194 approved EWOs that are the result of changes that were transmitted to BELL after August 31, 2000, the cut-off date established in Modification 93. Those EWOs are listed in an appendix to the report of the Government's scheduling expert, Ted Scott, of Marsh USA.

4.8. NIH responded to Bell's request for information ("RFI") 1452 on September 13, 2000. This RFI addressed electrical rough-in situations in three areas: (a) entryway light switch; (b) GFCI receptacle location; and (c) shower lights offset to avoid exhaust duct drop interface. Young Electric's proposal for this work, dated September 20, 2000 treats only (b) as a contract change. Note 3 of Young's proposal states: "A time extension of 2 days is required for this portion of work." Bell submitted EWO 465, dated September 22, 2000 for this work. NIH accepted EWO 465 on October 12, 2000. According to Young Electric's daily job reports, this work was performed on October 23 and 24, 2000.

4.9. NIH responded to Bell's RFI 1148 on March 10, 2000. Bell submitted a "speed memo" on September 18, 2000 stating that work relating to RFI 1148 would "result in additional costs for this project."

4.10. As documented in a Bell letter dated October 10, 2000, Bell terminated its epoxy flooring system subcontractor during 2000.

4.11. WBH Industries submitted a proposal to Bell for work relating to RFI 1450 on December 20, 2000. Specifically, the proposal was to install 120 floor stops on lab alcove doors. Bell submitted EWO 511 on December 26, 2000 for the work related to RFI 1450. Bell's EWO estimated 24.48 man-hours to perform the work and included "[a]cceleration cost to maintain project schedule." NIH accepted EWO 511, and it was included in Modification 152.

4.12. NIH responded to RFI 178 on October 25, 2000, and directed Bell to "proceed with these items with no impact to completion schedule." Bell submitted EWO 484, dated March 9, 2000, for the work related to RFI 178, stating, "BELL is proceeding with this EWO."

4.13. On November 20, 2000, BELL submitted a speed memo stating that work relating to RFI 1543 "will result in additional cost to the contract." On December 14, 2000, Manganaro Corporation, a Bell subcontractor, submitted a proposal for the work relating to RFI 1543. Manganaro stated it was not proceeding with the RFI-related work. On December 18, 2000, NIH acknowledged RFI 1543 as a contract change and directed Bell to "proceed with no impact to the project completion schedule." Bell submitted EWO 497, dated January 18, 2001, for the work related to RFI 1543, and stated that Bell was "proceeding with this EWO."

4.14. The daily job report for ISEC, a subcontractor, for January 10, 2001 shows that ISEC was installing second floor stainless steel tables. ISEC's daily job reports for March 6 to March 12, 2001 do not show work being performed by ISEC on the second floor.

4.15. NIH responded to Bell's RFI 1481 on October 19, 2000. Among other things, NIH directed Bell to proceed with the RFI work "with no delay in the present schedule."

4.16. Bell submitted EWO 556 in January 2001 as a "no cost" change order, to delete work related to a short wing wall in Room B235.

4.17. On December 28, 2000, subcontractor WBH Industries ("WBH") submitted a cost proposal to Bell for work related to Bell's RFI 1555. WBH stated that it "ha[d] proceeded" with the work. Bell submitted EWO 525 for work related to RFI 1555 on February 8, 2001.

4.18. Bell submitted RFI 1678 on February 13, 2001, "[asking] if tag B515 should be field modified to receive a Vision Light to match the neighboring type 'C' FRP doors." NIH requested a proposal for this work on February 14, 2001. WBH gave Bell a cost proposal for RFI 1678 on April 10, 2001, noting, "Rather than wait 3 weeks for factory order on the vision lights, I picked up locally at a cost of $33.00 each . . . . " WBH's proposal again states that WBH had "proceeded" with the work.

4.19. The daily job reports for subcontractor Stromberg Metal Works, Inc. for March 29 and 30 and April 10, 2001 show work related to RFI CM203 and CM205 being performed.

4.20. Manganaro's cost proposal to Bell for work related to RFI 1550 shows Manganaro's estimate to complete the work as 10 man days. Bell submitted EWO 515, dated March 29, 2001, for work related to RFI 1550. Bell's proposal included extension costs and was accepted by NIH that same day.

4.21. Bell submitted EWO 473 on October 20, 2001, for electrical work on the third floor. The daily job report for subcontractor Young Electrical Contractors, Inc. for December 16, 2001 shows work relating to EWO 473 being performed.

4.22. Bell's daily time and manpower sheets for April 28 and 30, 2001 show that Bell was performing the "temporary" work related to EWO 632. Subcontractor ICONICS's cost proposal to Bell for this work, dated June 12, 2001, states that the lead time for delivery of the pumps required by EWO 632 is "typically . . . 2-3 weeks ."

4.23. Bell submitted a final cost proposal for EWO 646 on November 15, 2001 stating that Bell was "not proceeding with the work."

4.24. Bell submitted an initial proposal for EWO 509 on August 13, 2001. On August 14, 2001, Bell sent a speed memo to NIH stating that Bell had proceeded with the work related to EWO 509, "so not to delay the project." Bell submitted a revised proposal for EWO 509 on March 18, 2002. It was accepted by NIH the same day.

4.25. In response to Bell's RFI CM267, NIH sent Bell a letter on May 21, 2001, directing Bell to proceed "without impacting the final completion date." The invoice from vendor Ferguson Enterprises shows that the material ordered for RFI CM267 was delivered on June 1, 2001.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
by Patricia M. McCarthy
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-0476
Fax: (202) 305-7644

Attorneys for Defendant

July 6, 2007

CERTIFICATE OF FILING

I certify that on July 6, 2007, the attached document was filed by means of the Court's electronic filing system. I understand that service is complete upon filing.

s/Kyle Chadwick