**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **BELL BCI COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 03-1613C**<br>**Judge Wheeler** |

## STIPULATION OF UNCONTESTED MATERIAL FACTS

Pursuant to the Court's Amended Pretrial Order, the parties respectfully submit this Stipulation of Uncontested Material Facts. The parties stipulate that the following material facts are uncontested:

1. On or about December 11, 1997, the Government solicited bids for the construction of a new laboratory research building, referred to as NIH Building 50, to be located at the National Institutes of Health's ("NIH") Bethesda, Maryland, campus (hereinafter the "Project" or "Building 50" or "Stokes Laboratories").

2. The Government retained an architectural firm, HLM Design ("HLM"), to prepare the Project design plans and specifications.

3. The Government retained CRSS Constructors, Inc. (which was later acquired by Jacobs Facilities, Inc. (hereinafter "CRSS/Jacobs") to be its construction quality manager. In effect, CRSS/Jacobs was the Government's "eyes and ears" on the Project and was considered to be an extension of the Government's staff.

4. The Government retained a testing and balancing representative, Weisman Inc. ("Weisman").

5. The Government retained a Commissioning Authority, Facility Dynamics.

6. On March 13, 1998, NIH notified BELL that BELL was the successful bidder for a firm fixed price contract to construct NIH Building 50.

7. On or about March 26, 1998, NIH awarded BELL Contract No. 263-98-C-0102 to construct the Project in accordance with the Project design documents provided by NIH for the fixed price of $63,663,745.00.

8. BELL was not the lowest bidder for the Project. NIH determined, however, that BELL's bid provided the best value.

9. NIH issued the notice to proceed on April 1, 1998. As the contract provided 821 calendar days to complete the project, the original completion date was June 29, 2000.

10. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and laboratory space, including approximately 2,788 gross square meters of laboratory animal holding areas.

11. The completed Building 50 has six stories and a full and functional basement, totaling approximately 27,363 square meters of finished office and laboratory space, accommodating approximately 650 scientists from nine NIH institutes.

12. The Contract required the use of unit price lists for two discrete areas: (i) "Laboratory Casework" and (ii) "Kit of Parts" ("KOP"). The Contract provided that the unit price list for Laboratory Casework would include agreed prices for changes to the casework, *i.e.*, certain identified cabinetry, shelving and tables. The KOP was a similar unit price listing

13. The Contract required claims to be "submitted within 60 days after completion of the [changed] work." The Contract further stated: "If there are circumstances which prevent the contractor from ascertaining delay for impact during this time, a status update, including but not limited to a critical path analysis, shall be submitted within this time and at 60 day intervals thereafter, explaining why the contractor cannot yet know the extent of the impact. If this is not done, a claim for delay will not be considered unless special circumstances are shown."

14. The Contract incorporated the prompt payment provision of Federal Acquisition Regulation ("FAR") Section 52.232-27. Pursuant to that provision, the Government agreed that "[a]n interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable."

15. When NIH wanted to change the Project design or correct a design error, it would issue to BELL a request for information called a "CMRFI," or a Change Bulletin, asking BELL to submit a proposed price to perform the additional work. The Contract required EWO proposals to be submitted as promptly as possible, but in no event in more than 30 days. In response, BELL would submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, the Government and

16. BELL was not obligated to perform additional work until a change order was issued. In practice, and with NIH's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for NIH's execution of a change order. As a result, NIH obtained the benefit of avoiding greater delay.

17. From April 1998 through December 1998, BELL was able to perform the work in a timely manner. During that period, NIH made relatively few changes to the Project work. As of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 stated that the Project was 13 days ahead of schedule.

18. In mid-December 1998, NIH determined it had a Project budget surplus of approximately $15,600,000.00. NIH took steps to determine the feasibility of using the surplus to fund the addition of an extra floor that would increase the Building 50 area by 15 percent, and change the structure from five to six stories. NIH concluded that it could add the additional floor for a cost of approximately $10,962,474.00.

19. Pursuant to Section 6.3 of the FAR and HHSAR Section 306.3, NIH determined not to solicit competitive bids for the new 4th Floor. The Government determined that, if it pursued competition, BELL would likely be the successful offeror, but that the cost of the procurement process would exceed the benefits of adding the new floor.

20. In or about December 1998, NIH notified BELL that it was contemplating adding a new floor to the Project that would be inserted on top of the original 3rd Floor. NIH advised BELL that the decision whether to add the new floor must be made before the end of January 1999. NIH provided BELL with a copy of a "Feasibility Study for the Vertical

Expansion of Building 50" ("Feasibility Study") and requested BELL to prepare a price proposal.

21. BELL was not involved in designing the new 4th Floor. NIH had HLM prepare the Feasibility Study and the design documents.

22. The Feasibility Study stated the following: "Mechanically, the additional floor shall be fitted out in its entirety the same as the third floor. This includes all piping, ductwork, VAV terminal units, baseboard radiation, air devices and controls." It further stated that the "skin of the new floor," as well as the "interior layout of the new floor," would "be a duplication of the third floor . . .".

23. On or about January 15, 1999, the Government issued an Executive Report which described the scope of the work of adding the new 4th Floor as follows:

> It is proposed to add an additional floor to Building 50 that would be a repeat of the third floor. . . . The additional floor and interstitial plans will require little architectural or engineering rework as they are literally a repeat and thus a reissue of existing floor plans.

24. On or about February 10, 1999, pursuant to FAR Section 6.3, the Government prepared a Justification For Other Than Full And Open Competition ("JOFOC"), setting forth the grounds for a sole source award. The JOFOC stated:

> In fact, the Government has instructed the Architect to produce drawings for [the new floor] by merely duplicating those of another floor. This economy in design will carry forward into construction.

25. The JOFOC also stated:

> After an intensive effort, the structural bulletin is complete and ready for issue to the construction contractor [BELL]. The statement of work for the balance of the work will be complete and ready for issue to the contractor [BELL] in early March.

26. On January 14, 1999, BELL, submitted a proposal to construct the new 4th Floor for approximately $9.8 million. BELL's proposal expressly stated: "Our proposal is based on H.L.M.'s feasibility study for the vertical expansion of building 50."

27. The Government's Executive Report stated that BELL's price proposal for constructing the new 4th Floor "was actually lower than the Government's estimate bid price by about 11 percent, and that BELL "has been extremely cooperative and open in this proposal and their subcontractors have given them reasonable bids."

28. On January 22, 1999, the Director of NIH, Dr. Harold Varmus, approved the construction of the new 4th Floor.

29. Negotiations between BELL and NIH relating to the new 4th Floor proceeded in three phases. The first phase involved the structural steel and concrete work. The second phase involved certain changes to the 4th Floor that NIH made after BELL submitted its price proposal. The third phase involved certain "fit out work" on the new 4th Floor that NIH made BELL submitted its price proposal and which, eventually, NIH unilaterally directed BELL to perform.

30. As a result of the first phase of negotiations, on or about April 20, 1999, the parties executed Mod. 5 to the Contract. Mod. 5 established a price of $1,579,127.00 for the structural work associated with the 4th Floor, and extended the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000.

31. The second phase of negotiations began with the Government's issuance of Change Bulletins 6, 7, and 10, on February 16, 1999. On March 2, 1999, the Government issued Change Bulletin 3, containing a partial infrastructure or "shell" design for the 4th Floor.

32. On March 29, 1999, NIH issued Change Order No. 29, which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7, and 10.

33. On June 23, 1999, the Government executed Mod. 24, which established a price of $6,891,118.00 for the additional infrastructure work, and extended the Contract time by another 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000, and concluded the second phase of negotiations.

34. The third phase of negotiations began on or about September 30, 1999, when NIH issued Change Bulletin 35, containing what were described as the final design plans for the new floor.

35. On February 11, 2000, BELL submitted EWO 240 for completing the "fit-out" work identified in Change Bulletin 35. EWO 240 stated that certain work identified therein "has occurred," and that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal included the final 30 calendar days of extended overhead agreed for the added floor only." The Government did not accept EWO 240.

36. Instead, on April 14, 2000, NIH unilaterally issued Mod. 78. Among other things, Mod. 78 directed BELL to proceed with the work associated with Change Bulletin 35, for a minimum price of $1,803,037.00, "so that work can proceed" pending further negotiation. Mod. 78 contained a 30 calendar day extension. BELL proceeded with the Mod. 78 work in accordance with its directive.

37. On or about October 2, 2000, the parties executed Mod. 93. Mod. 93 expressly referenced BELL's EWO 240R1, and stated that it covered "the remaining direct and indirect costs of the Floor 4 Fit-Out and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000." Mod. 93 established a Contract completion date of April 30, 2001; established 14 interim completion

milestones; and established a liquidated damages assessment of $266.00 per calendar day for missing any individual milestone.

38. During the Project, NIH issued annual reports on the construction progress pursuant to its statutory reporting obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31 U.S.C. §§ 1115, et seq. Among other things, the GPRA required NIH to submit a report to the Congress setting forth its success in achieving its performance goals in the preceding year.

39. In February 2002, NIH issued its "Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Plan" (hereinafter "NIH's GPRA Report"). NIH's GPRA Report stated:

> NIH completed construction of the Stokes Laboratories building [50] on schedule.
>
> . . .
>
> Performance was measured by the percent of construction completed at the end of each fiscal year. Process milestone data were obtained from the CMMS and PIN systems. Performance data were verified through quality control systems that track, monitor, verify, and validate project goals consistent with internationally recognized standards of operations.

40. On April 5, 2002, BELL submitted a Request for Equitable Adjustment ("REA") to the NIH Contracting Officer.

41. Also on April 5, 2002, BELL "passed through" to the Contracting Officer REAs prepared by five subcontractors to BELL on the Project: Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc.

42. On July 1, 2002, the Government, through the Contracting Officer, issued a written rejection of BELL's REA and the subcontractors' REAs, in their entirety.

43. On June 27, 2003, BELL filed its Complaint in this case.

44. Mod. 205 was the last bilateral contract modification executed by the Parties.

45. BELL was paid a total of $84,485,390.00 under the Contract.

46. The adjusted Contract price is $85,048,515.00.

47. There is an unpaid Contract balance of $563,125.00.

Respectfully submitted,

BELL BCI COMPANY

By Counsel:

s/ Richard O. Wolf
Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102-4225
Telephone: 703-506-2050
Facsimile: 703-506-2051
E-Mail: r.wolf@mooreandlee.com
Counsel for Plaintiff

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
by Patricia M. McCarthy
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, DC 20530
Tele: (202) 616-0476
Fax: (202) 305-7644

Dated: July 6, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of January, 2007, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

s/ Richard O. Wolf
Richard O. Wolf