**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BELL BCI COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-1613C** |
| | ) | **Judge Wheeler** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S STATEMENT OF CONTESTED FACTUAL ISSUES AND CONTENTIONS OF FACT IT EXPECTS TO PROVE AT TRIAL**

Pursuant to the Court's Amended Pretrial Order, the Plaintiff, BELL BCI Company ("BELL" or "Plaintiff"), respectfully submits Plaintiff's Statement of Contested Factual Issues and Contentions of Fact It Expects to Prove at Trial.

## I. SUMMARY

Section II, *infra*, sets forth in numbered paragraphs the contentions of fact that BELL expects to prove at trial. The factual issues to be addressed at trial are broken down into five general categories: (i) Delays/Extended Performance; (ii) Cumulative Impact/Labor Inefficiency; (iii) Changed/Extra Work; (iv) Cardinal Change; and (v) Damages. As set forth in greater detail below, BELL will prove the following with regard to these categories:

### DELAYS/EXTENDED PERFORMANCE

- The Government is responsible for delay to the Project's substantial completion date, as well as for delay in completion of intermediate milestone completion dates, and the reasonable extended performance costs as a result of the delay.

### CUMULATIVE IMPACT/LABOR INEFFICIENCY

- The changes that the Government made and/or directed on the Project had a cumulative impact/disruption on the performance of the base contract work, thus

causing such work to be performed in an inefficient, unproductive and more costly manner, and resulted in reasonable inefficiency costs being claimed.

**CHANGED/EXTRA WORK**

- The Extra Work Orders ("EWO") claimed by BELL constitute a change or addition to the scope of work and the costs claimed by BELL are reasonable for the performance of the changed or extra work.

**CARDINAL CHANGE**

- The numerous changes that the Government made to the scope of work were beyond the changes provision agreed to in the Contract and so substantial as to constitute a cardinal change entitling BELL to recover damages, plus delay and other costs arising therefrom.

The Government, relying on Contract Modifications ("Mod.") 1-140, has asserted the legal defenses of accord and satisfaction and waiver in an attempt to bar BELL's delay and extended performance claims. In addition, the Government challenges BELL's claims for cumulative impact/labor inefficiency to the extent such claims are based upon Mods. 1-140. The contested factual issues to be addressed at trial involving the Government's legal defenses are as follows:

- The Parties' intent involving claims encompassed and/or waived or released in Mod. 93, as well as in Mods. 94-140.

- Whether there was a "meeting of the minds" on a waiver or release of disruption or cumulative impact claims when the Parties executed Mod. No. 93 and/or Mods. 94-140.

- Whether at the time of Mod. 93 or Mods. 94-140, there was an actual dispute between the Parties as to the cumulative impact/disruption of the changes to the contract and inefficiency resulting therefrom.

- Whether at the time Mod. 93 or Mods. 94-140 were executed, BELL knew or should have known it had a mature cumulative impact claim.

- Whether on Mod. 93 or on Mods. 94-140 there was any consideration for the waiver or release of BELL's cumulative impact, disruption and/or inefficiency claims.

## II. CONTENTIONS OF FACT BELL EXPECTS TO PROVE AT TRIAL

BELL expects to prove the following contentions of fact at trial:

1. On or about December 11, 1997, the Government solicited bids for the construction of a new laboratory research building, referred to as NIH Building 50, to be located at the National Institutes of Health's ("NIH") Bethesda, Maryland campus (hereinafter the "Project" or "Building 50" or "Stokes Laboratories").

2. The Government retained an architectural firm, HLM Design, to prepare the Project design plans and specifications.

3. The Government retained CRSS Constructors, Inc. (which was later acquired by Jacobs Facilities, Inc. (hereinafter "CRSS/Jacobs") to be its construction quality manager. In effect, CRSS/Jacobs was the Government's "eyes and ears" on the Project and was considered to be an extension of the Government's staff.

4. On or about March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with the Government for the fixed-price sum of $63,663,745.00 to construct the Project in accordance with the Project design documents provided by the Government.

5. BELL entered into the Contract with the reasonable understanding that its work would be able to be performed in an orderly, sequenced and efficient fashion without excessive changes, thus avoiding, among other things, delay, disruption, idleness of labor and equipment, stacking of trades and duplication of efforts.

6. BELL was not the lowest bidder for the Project. The Government determined, however, that BELL's bid provided the best value.

7. The Project was originally designed as a five-story structure with a full and functional basement area, totaling approximately 23,040 square meters of finished office and

laboratory space, including approximately 2,788 gross square meters of laboratory animal holding areas.

8. The Government required the use of unit price lists for two discrete areas: (i) "Laboratory Casework" and (ii) "Kit of Parts" ("KOP"). The unit price lists for Laboratory Casework was to include agreed upon prices to be used for changes to the casework, *i.e.*, certain identified cabinetry, shelving and tables. The KOP was a similar unit price listing mechanism, but addressed certain identified laboratory-related items other than casework, *i.e.*, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractor and suppliers. The KOP anticipated minor internal changes and reconfiguration of casework, pursuant to which NIH was permitted to alter the quantities of items identified in the Laboratory Casework and KOP unit price lists within 550 calendar days of Contract award. If NIH made more than fifty changes for casework or five changes for KOP, the contractor would be entitled to renegotiate the unit prices.

9. The Contract required the original scope of work to be completed not later than 821 calendar days following NIH's issuance of Notice to Proceed ("NTP"). NIH issued NTP effective as of April 1, 1998. Thus, June 29, 2000 was the original Contract completion date.

10. The Contract incorporated the prompt payment provision of Federal Acquisition Regulation ("FAR") Section 52.232-27. Pursuant to that provision, the Government agreed that "[a]n interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in subdivisions (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable."

11. When the Government wanted to change the Project design or correct a design error, it would issue BELL a request for information called a "CMRFI," or a Change Bulletin,

asking BELL to submit a proposed price to perform the additional work. In response, BELL would submit an Extra Work Order ("EWO") to perform the extra work which would, if accepted by NIH, result in a change order to the Contract. Finally, the Government and BELL would then execute a Modification of Contract ("Mod.") setting forth the change and agreed upon price.

12. BELL was not obligated to perform additional work until a Mod. was issued. In practice, and with the Government's knowledge, encouragement and consent and in order to mitigate delays, BELL typically began performing the additional work without waiting for the Government's execution of a Mod.

13. From April 1998 through December 1998, BELL was able to perform the work in a timely manner, and the Government's Executive Report on the Possibility of Adding an Additional Floor to Building 50 acknowledged this fact. During that period, the Government had made relatively few changes to the scope of the Project work. In fact, as of December 31, 1998, the Project CPM Narrative for Schedule Update No. 7 noted that the Project was actually 13 days ahead of schedule.

14. Starting in or about December 1998, however, the Government initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, productive, timely and cost-effective manner.

15. The Government provided BELL with a copy of a "Feasibility Study for the Vertical Expansion of Building 50" (the "Government's Feasibility Study") and it directed BELL to quickly prepare a price proposal for the new 4th Floor addition.

16. BELL was somewhat reluctant to submit a price proposal for the construction of the new 4th Floor because, at that time, the Government did not have a detailed design proposal. The Government, however, repeatedly advised BELL in writing and orally that the new 4th Floor would be a duplicate of the original 3rd Floor, both on the interior and exterior.

17. In fact, the Government's own contemporaneous records indisputably show that the Government expressly and repeatedly stated that the new 4th Floor would be a duplicate of the original 3rd Floor, which the Government now disputes in this litigation.

18. For example, the Government's Feasibility Study, dated January 8, 1999 (*see* Plaintiff's Exhibit No. 13, stated that:

> Mechanically, the additional floor shall be fitted out in its entirety the same as the third floor. This includes all piping, ductwork, VAV terminal units, baseboard radiation, air devices and controls.
>
> * * *
>
> The skin of the new floor will be a duplication of the third floor as shown on the enclosed elevations. * * * The interior layout of the new floor will be a duplication of the Third Floor . . . (emphasis added).

19. Consistent with its representations that the new 4th Floor would be a duplicate of the original 3rd Floor, and that the work on the new floor would have to proceed quickly, the Government told BELL that the final design documents would be prepared in a matter of a few weeks, by no later than March 1999.

20. On January 14, 1999, in reliance on the Government's repeated representations that the new 4th Floor would be a duplicate of the existing 3rd Floor and that the final design documents would be received by no later than March 1999, BELL submitted a price proposal to the Government to construct the new 4th Floor for approximately $9.8 million, which proposal was based on the Government's Feasibility Study.

21. In further reliance upon the Government's representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and taking into account that the Project was then ahead of schedule, BELL estimated that an approximately 90 calendar day extension would enable it to complete the proposed new 4th Floor and the remaining base Contract work.

22. The Government recognized that BELL's price proposal was based on the representations that the new 4th Floor would be a duplicate of the existing 3rd Floor, and that the final design documents would be given to BELL in a matter of a few weeks. The Government further recognized that BELL's price proposal for constructing the new 4th Floor was below the Government's estimate for the cost of the new 4th Floor.

23. In early January 1999, the proposal to construct the new 4th Floor was approved by NIH and the Parties proceeded to negotiate the specifics of the work.

24. The 4th Floor negotiations between the Government and BELL proceeded in three phases: (1) structural steel and concrete work; (2) core and shell work; and (3) fit-out work.

25. During negotiations with BELL regarding the cost to add the new 4th Floor, the Government estimated that BELL's extended general conditions costs were $9,122.43 per day.

26. With regard to the first phase of negotiations, on January 29, 1999, BELL submitted EWO No. 100 as a cost proposal to perform the anticipated structural steel work and concrete for the 4th Floor (hereinafter "structural work"). In accordance with the Government's representations that the 4th Floor would replicate the 3rd Floor, BELL's EWO No. 100 proposed to complete the structural work for $1,579,127.00, and to extend the Contract time by 30 calendar days.

27. On or about April 20, 1999, the Government executed Mod. 5 to the Contract pursuant to which it agreed to pay BELL $1,579,127.00 for the structural work associated with

the 4th Floor, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of July 29, 2000.

28. The second phase of negotiations followed the Government's issuance of Change Bulletins 6, 7 and 10 on February 16, 1999. These Change Bulletins added additional work to the 4th Floor that was not included in BELL's initial price proposal.

29. Shortly thereafter, on March 2, 1999, the Government issued Change Bulletin 3 as a partial infrastructure or "shell" design for the 4th Floor. As noted previously, BELL's initial price proposal for the new 4th Floor was based on the Government's representations that it would duplicate the existing 3rd Floor. Change Bulletin 3 included mechanical, electrical and architectural work for the 4th Floor that was materially different from that found in the 3rd Floor.

30. On March 29, 1999, NIH issued Change Order No. 29 which, among other things, directed BELL to proceed with the changes set forth in Change Bulletins 3, 6, 7 and 10.

31. During this time period, BELL notified the Government that, because of the Government's failure to honor its commitment to provide BELL with the final 4th Floor plans by no later than March 1999, it was virtually impossible for BELL to meet the proposed price that BELL had submitted in January 1999.

32. On June 23, 1999, the Government executed Mod. 24 pursuant to which it agreed to pay BELL $6,891,118.00 for the additional infrastructure work, and to extend the Contract time by 30 calendar days. This resulted in a revised Contract completion date of August 29, 2000, and concluded the second phase of negotiations.

33. On or about September 30, 1999, approximately 7 months later than promised, the Government gave BELL the final design plans for the new 4th Floor via issuance of Change Bulletin 35. The third phase of negotiations commenced thereafter.

34. The design changes that the Government made that were set forth in its Bulletin 35 were so extensive that the new 4th Floor no longer bore any resemblance to the existing 3rd Floor that was used as the basis for BELL's initial price proposal that had been submitted nearly 9 months previously.

35. On February 11, 2000, BELL submitted EWO No. 240 to NIH for completing the "fit-out" work identified in Change Bulletin 35. In accordance with BELL's effort to expedite completion of the additional work directed by NIH, EWO No. 240 noted that certain work identified therein "has occurred" and further stated that "[a] time extension of 90 days was previously agreed to with the government for the added work. This proposal included the final 30 calendar days of extended overhead agreed for the added floor only." *See* EWO 240, Plaintiff's Exhibit No. 29. The Government did not accept EWO 240.

36. Instead, on April 14, 2000, NIH unilaterally issued Mod. 78 which, among other things, directed BELL to proceed with the work associated with Change Bulletin 35. Pursuant to its unilateral Mod. 78, the Government committed to pay BELL at least $1,803,037.00 for the work required by Bulletin 35 "so that work can proceed." The Government further agreed to a 30 calendar day extension and to continue negotiations with BELL for the costs of the additional work. BELL proceeded with the work as directed by the Government and continued to negotiate with the Government.

37. BELL made it clear to NIH during the negotiations that additional changes on the Project by NIH would have a profoundly negative impact on meeting the Project milestones. BELL's TIA and other Project Schedule data confirmed that virtually all the remaining Project work activities were near critical.

38. It was the practice of the Parties to identify changes and/or additions to the scope of work, which BELL would then commence performance upon prior to the Parties' resolution of and agreement to an executed Contract modification. By the summer of 2000, there was a significant backlog of change order proposals. CRSS/Jacobs noted that BELL had submitted 248 proposals, of which NIH had negotiated resolution upon 130 and rejected 23. *See* Plaintiff's Exhibit No. 33, CRSS/Jacobs Monthly Report, July 2000.

39. During the 4th Floor negotiations, the Government represented to BELL that, after August 2000, there would be no more than a few relatively minor additional changes to the Project. In order to minimize impacts to the Project Schedule, it was agreed that the Government would pay BELL to perform these few additional changes on an accelerated basis.

40. In fact, the Government's own contemporaneous documents expressly state that, upon reaching an agreement with BELL for the 4th Floor fit-out, it was incumbent upon the Government to minimize subsequent Contract changes to avoid the need to further extend the Contract schedule. *See* Plaintiff's Exhibit Nos. 33 and 34, CRSS/Jacobs Monthly Report, July 2000, and CRSS/Jacobs Monthly Report, August 2000.

41. After giving its promise of limited future changes that would be performed on an accelerated basis, the Government persisted in seeking BELL's agreement to a Contract modification that would establish April 30, 2001 as the revised Contract completion date.

42. During the 4th Floor negotiations, there was no negotiation between the Parties that involved the disruption to base contract work and/or cumulative impact of all changes, including the 4th Floor addition, upon the performance of work. At the time of the 4th Floor negotiations and those change negotiations prior thereto, a dispute did not exist as to whether the disruption and/or cumulative impact changes to the Contract affected the performance of work.

43. Additionally, the Government wanted BELL to agree to a series of interim milestones whereby certain parts of the Building 50 could be used by the Government before the entire Project was completed. This was to accommodate the Government's "partial occupancy plan" for a phased turn-over of Building 50. Independent of its dealings with BELL, the Government planned to transfer NIH personnel from existing buildings on the NIH campus to Building 50 and then start construction-related work on those other buildings. Thus, the Government needed BELL to agree to interim milestones so that the Government could move NIH personnel into Building 50 in phases and thereby allow construction-related work on other buildings at the NIH campus to commence.

44. As a result, the Government effectively "painted itself into a corner" from a funding and scheduling standpoint. From a funding standpoint, the anticipated cost for the new 4th Floor was based on duplicating the 3rd Floor; substantial changes beyond that would be beyond the anticipated budget. From a scheduling standpoint, the Government could not extend interim milestone dates without conflicting with its planned construction-related work on the other buildings on the NIH campus. Thus, a final agreement with BELL to increase the Contract price and time for the 4th Floor fit-out had to fall within the Government's funding and scheduling limits.

45. On October 2, 2000, in reliance upon the Government's representation that only a few additional changes would be made and that the Government would pay to have the work for such future changes performed on an accelerated basis, and after performing a substantial portion of the work in accordance with the Government's unilateral Mod. 78, BELL signed Mod. 93.

46. Mod. 93 expressly referenced BELL's EWO No. 240, and stated that the Government would pay BELL "for the remaining direct and indirect costs of the Floor 4 Fit-

Out." It was not BELL's understanding and/or intent that the "indirect costs" referred to in the Mod. were for labor inefficiency costs or the cumulative impact of this and other changes. Mod. 93 established a Contract completion date of April 30, 2001, created 14 interim milestones and further, assigned a liquidated damage amount of $266.00 per calendar day to each individual milestone.

47. The language in paragraphs 4, 5, and 8 of Mod. 93 underscore that compensation for only delay, but not labor inefficiency and/or cumulative impact, was included in its scope.

48. The Government's deposition testimony confirms that Mod. 93 ". . . was the mod. where we paid them for delays up to that date, and that was it . . . They accepted that mod. as all of the delays up to that date, whatever was issued." *See* Plaintiff's Exhibit No. 96 Government's Rule 30(b)(6) Deposition Transcript.

49. The Government's deposition testimony further confirms that delay was the basis for negotiation of Mod. 93 and that the Mod. 93's language is clear in stating it covers "all delays . . . period." *Id*.

50. Similarly, the Government's sworn interrogatory responses in this case (*see* Plaintiff's Exhibit No. 79, Interrogatory No. 5) stated that Mod. 93 covered delay, but not labor inefficiency or cumulative impact:

> Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000. (emphasis added)

51. Likewise, documents prepared by the Government's Construction Manager, CRSS/Jacobs note that the negotiation of the 4th Floor fit-out change order proposal included a "delay agreement" for all changes issued on or before August 31, 2000. *See* Plaintiff's Exhibit No. 34, CRSS/Jacobs Monthly Report, August 2000.

52. Other Government documents related to Mod. 93 which will be in evidence further demonstrate that it encompassed delay costs, but provided BELL no payment whatsoever for labor inefficiency and/or cumulative impact costs. The Government's own documents, testimony of its witnesses and testimony of BELL's witnesses will demonstrate that the Parties neither intended nor mutually agreed that Mod. 93 included compensation for or waived or released additional claims involving labor inefficiency and/or the cumulative impact of all changes on the Project.

53. In short, labor inefficiency and/or cumulative impact were neither discussed, nor negotiated, nor any part of, Mod. 93.

54. Moreover, the documents supporting the costs sought on Mod. 93 are for the direct costs incurred by BELL and its subcontractors, plus general and administrative costs associated with the changed work itself and extended performance, rather than any labor inefficiency costs.

55. Furthermore, at the time BELL executed Mod. 93, it did not know, nor should it have known, that its cumulative impact claim had matured. Significant change order work was ongoing and yet to be performed. Moreover, BELL was unaware of the tremendous number, scope and breadth of Government-directed changes that were forthcoming contrary to the Government's promise, and which would have to be performed on top of the other ongoing and pending changes that existed at the time of Mod. 93.

56. When BELL agreed to Mod. 93, it did so in reliance upon the Government's representation that only a few relatively minor changes would be made thereafter, and that it would pay for acceleration costs for those few changes. Indeed, the Government's Construction Manager, CRSS/Jacobs, notified the Government in writing that, at the time BELL agreed to the

final changes reflected in Mod. 93, CRSS/Jacobs believed it was reasonable to conclude that BELL could complete the work on time.

57. After Mod. 93 was executed, the Government repeatedly directed BELL to perform additional work "without impact to the Project schedule," yet it refused to authorize or compensate BELL to accelerate its manpower to accomplish that directive.

58. As of August 31, 2000, BELL had generated approximately 461 EWOs in response to the changes that the Government made. After Mod. 93 was issued, and contrary to its promises to BELL, the Government issued numerous changes. In fact, BELL had to generate approximately 300 more EWOs after August 31, 2000, and over 90 additional Contract modifications were issued thereafter.

59. Thus, contrary to its representation that only a few relatively minor changes would be made after Mod. 93, the Government made numerous changes. The Government also reneged on its promise to have the work for subsequent changes performed on an accelerated basis.

60. Between October 2, 2000, and April 5, 2001, the Parties entered into 43 bilateral Contract modifications, designated as Mods. 94 through 140, which contained certain language similar to that in Mod. 93. Similar to Mod. 93, none of these Mods. provided BELL any compensation for costs of cumulative impact, disruption or labor inefficiency, nor were such claims in dispute or part of the negotiations for Mods. 94-140. Rather, BELL was compensated for the direct cost of labor and materials, as well as certain general and administrative costs associated with the changed work itself. In addition, similar to when Mod. 93 was issued, BELL did not know, nor could it have known, that it had a mature disruption or cumulative impact claim to the Government.

61. As the Government continued to make changes to the work, BELL came to the realization that the magnitude, scope and breadth of the Contract modifications being issued by the Government subsequent to Mod. 93, in addition to those issued prior thereto, were cumulatively impacting and precluding the efficient and productive performance of work. The number, timing and effect of the changes on BELL's performance of work caused it to work in an extremely unproductive manner and few, if any, areas of the building could be completed, thus resulting in performance in a piece-meal, start-stop manner that was extremely unproductive.

62. Upon the realization of the cumulative impact that the changes were having on the performance of work, BELL began to notify the Government in a series of executed Contract modifications, other writings and communications, that its work was being impacted, and BELL also expressly reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering due to the Government's ongoing changes.

63. The Contract modifications, contemporaneous records and other evidence will show that BELL did not negotiate away or otherwise waive labor inefficiency and/or cumulative impact claims.

64. Mod. 205 is the last bilateral Contract modification executed by the Parties. In addition, as detailed further herein, BELL is claiming that an additional 58 EWOs constitute valid changed or extra work to the Contract, the cost of which totals $1,610,987.

65. On April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted a Request for Equitable Adjustment ("REA") to the Contracting Officer.

66. The magnitude, nature, pervasiveness and timing of all changes to the work on the Project directed by the Government cumulatively impacted performance of the work in a negative manner and resulted in labor inefficiency and increased costs.

67. BELL's labor inefficiency and cumulative impact claims were not matured as of the time Mod. 93 and Mods. 94-140 were executed but, instead, necessarily matured after these modifications were entered into by virtue of the myriad of additional changes the Government subsequently directed BELL to perform, which were on top of those changes directed prior to Mod. 93. Testimony, both lay and expert, coupled with Project documentation will demonstrate that the number, timing and effect of changes that were issued on the Project impacted the ability to plan and perform work in an efficient and productive manner. The breadth and pervasive nature of the changes made to the Contract precluded completion of the Project in almost all areas requiring work to be performed in a piece meal, start-stop and extremely unproductive manner.

68. BELL's expert has analyzed the performance of work and cumulative impact effect on BELL's labor productivity based on, among other things, BELL's actual weekly tracking of labor on the Project.

69. Based on analysis performed by BELL's expert, the cumulative impact of changes on the Project resulted in a total labor productivity loss attributable to conditions created by the Government of 80,317 hours, or 19 percent of the total hours expended on the Project by BELL. BELL's expert has also quantified the loss of efficiency that occurred both before Mod. No. 93 and after Mod. 93, which resulted in labor inefficiency costs of $836,628 and $1,211,828, respectively, or a total loss of efficiency cost of $2,058,456 for the entire Project.

70. On or about February 5, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. 93, BELL would have met all of the interim milestone completion dates set forth therein.

71. The changes and/or additional work required on the Project subsequent to Contract Mod. 93 resulted in a delay to the Contract substantial completion milestone of 248 days from April 30, 2001, to February 8, 2002.

72. Based on the CPM schedule analysis that was performed in accordance with the requirements of the Contract specifications, fragnets have been created for certain Project changes and inserted into the Project schedule to determine the effect at the time BELL was notified to proceed with the change. The fragnet work activities were logically tied to pertinent activities on the Project schedules and properly assessed delay, if any, to Project milestones. The post-Mod. No. 93 changes to the Contract and fragnets associated with same demonstrate the validity of 248 days of compensable delay to the Project substantial completion date, but also demonstrate the Government's responsibility for delays to the interim milestones on the Project which were created by Mod. No. 93.

73. BELL will present a CPM analysis demonstrating that the cause of delays to the completion dates of the interim milestones were due to Government changes and, therefore, BELL cannot be held responsible for any liquidated damages erroneously assessed and wholly unproven by the Government as explained further below.

74. As a result of the 284 calendar days of compensable delay incurred due to changes in the Contract post-Mod. No. 93, BELL has incurred damages due to extended performance costs. BELL's records demonstrate that the actual daily cost of extended general

conditions incurred by BELL totals $5,641 per day for the 284 day extended performance period, totaling $1,602,053. This amount is unquestionably reasonable based on the Government's own estimate of BELL's general condition costs.

75. Pursuant to the Contract, BELL was entitled to an equitable adjustment and modification to the Contract cost and/or time to perform changes in the work. Significant changes to the scope of work occurred during BELL and its subcontractor's performance, for which BELL timely submitted Extra Work Orders ("EWO") seeking modifications to the Contract. BELL seeks compensation for the following Contract changes for which the Government has wrongfully refused to issue a Contract modification.

| EWO | Description | Amount |
|---|---|---|
| 33 | Splice Sleeves | 40,741.00 |
| 56 | RFI 232 Add Beams Over NMR Pit | 2,316.00 |
| 96 | CB 10 Added Steel at penthouse AHU's | 9,624.00 |
| 98 | CB 5 Lintels | 19,427.00 |
| 103 | Interstitial Hangar Rod | 16,996.00 |
| 104 | Hardware Revisions | 1,895.00 |
| 118 | RFI 454 Room Finishes | 883.00 |
| 125 | Interstitial Deck Support | 415,393 |
| 140 | RFI 450 and 531 Waterproofing at Columns | 31,489.00 |
| 145B | CBA 008 - Manganaro's credit $8,763.75 (Govt demanded $18,710) | 9,946.00 |
| 151 | RFI 342 Oil/Water Separator | 8,055.00 |
| 174 | CB 21 Penthouse Steel Bracing | 23,852.00 |
| 190 | CBM 31 Conn to Plant Air | 1,282.00 |
| 223 | RFI 619 Stair Pressurization Conflict Stair #3 (2nd and 4th Floor) | 54,487.00 |
| 244 | RFI 822 Conflict at Roof Trusses and Exterior Gutters | 30,815 |
| 271 | RFI 909 Davit Bases at Penthouse | 6,484.00 |
| 278 | CM 116 Elevator Frame Details and Wall Ratings | 24,340.00 |
| 287 | RFI 888 Ceiling and Steel Conflict | 7,307.00 |
| 305 | RFI 979 Light Fixture Elev. 1,2,3 | 8,901.00 |
| 357 | RFI 1140 5th Floor Administration Area Wall Support | 15,922.00 |
| 367 | Flashing at Parphet Wall | 5,762.00 |
| 378 | RFI 1208 Air Curtain/Roll-up Door Conflict | 2,559.00 |
| 391 | Revise Current Simplex Custom Message | 1,831.00 |
| 400 | RFI 1196 Linear Plenum Box Insulation | 23,068.00 |
| 474 | RFI 1490 Ceiling Type vs. Fixture Type Conflict 3rd Floor | 3,580.00 |
| 480 | RFI 1448 Gas Regulator Vents | 8,979.00 |
| 494 | RFI 1503 Gas Meter Tie In | 2,123.00 |
| 507 | CM 177 Elevator Sump Pump Clarification | 28,081.00 |
| 519 | Bull 66 Security Conduit Review | 78,351.00 |
| 532 | Penthouse Upper Maintenance Platforms | 75,660.00 |
| 546 | 1460 Outside Air Plenum Sloping Column Closure (Mod 143) | 1,457.00 |
| 561 | RFI 1627 Bulkhead at corridor 1500C lockers | 1,138.00 |
| 564 | RFI 1629 HRW Controller/Rotation Detector Power | 55,505.00 |
| 569 | RFI 1608 5th Floor Bio Safety Cabinet with Wire Mold | 4,728.00 |
| 581 | CM 200 Hood in Fermentation Room | 5,871.00 |
| 585 | RFI 1654 Main Fire Pump Auto Transfer Switch | 2,894.00 |
| 588 | RFI 1525, 709, 741 Intersection of Lab Chief Office and Demount | 14,466.00 |
| 602 | RFI 1663 Relocation of Penthouse Metal Stairs | 7,723.00 |
| 609 | RFI 1696 Auto/Glasswash Type B 6th Floor | 4,353.00 |
| 610 | RFI 1710 Compressed Air for Lst for Lst-1 and 2 | 4,377.00 |
| 626 | Temporary Cores for Interchangeable Core Cylinders | 6,928.00 |
| 628 | CM 246 Building Fume Hood | 1,187.00 |
| 638 | RFI 660 Cable System for Lobby Glass Screen | 10,255.00 |
| 651 | Kit of Parts | 248,201.00 |
| 670 | RFI 1785 Exposed Runtal Radiator Piping | 4,864.00 |
| 671 | RFI 1697 Interior Window Trim for W4 Type Window at Stair 1-4 | 7,348.00 |
| 672 | NNC. No. 79 Surface Mounted Raceway Wiring | 213,027.00 |
| 679 | ISEC Lab Case Work Relocation | 4,564.00 |
| 683 | Sloped Grating in Descaler Pit | 3,803.00 |
| 690 | RFI 1796 Duct Penetrations | 4,942.00 |
| 698 | RFI 1459 Air Distribution | 12,067.00 |
| 707 | Gravel Drainage/Filter Fab BELL's credit $176 (Govt demanded $1,500) | 1,324.00 |
| 715 | Manganaro Cost for EWO 364 LAN Room | 12,615.00 |
| 719 | CB 52 WBH Hardware Missed from EWO 137 | 8,715.00 |
| 724 | UL Door Inspections | 3,000.00 |
| 727 | Receiver and Counter Flashing at Penthouse Sloping | 5,486.00 |
| 729 | RFI 469 Masonry Lintels (Govt demanded unspecified deduct) | 0.00 |
| | | |
| | **TOTAL** | 1,610,987.00 |

76. Also on April 5, 2002, and in accordance with the provisions of the Contract and BELL's subcontracts, BELL passed-through to the Contracting Officer for consideration Requests for Equitable Adjustments prepared by five subcontractors to BELL on the Project, to wit, Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc. (hereinafter the "Subcontractors' REAs").

77. The foregoing subcontractors' claims involve delays, impacts, inefficiencies and other costs as set forth in their respective REAs, which the Government disputes. Based on the subcontractors' particular REAs, they will present facts involving their claimed additional costs due to delay/extended performance, impacts, extra costs and inefficiency they incurred.

78. The subcontractors will present evidence of their actual performance and how such work was delayed and/or impacted by the ability to perform such work in a timely, efficient, and productive manner due to actions and inactions by the Government, including issuance of changes to the Contract scope of work on the Project. The subcontractors will demonstrate costs associated with delays, impacts, inefficiency and other extra costs as summarized in paragraph 78.

79. Based on the above-described actions and/or omissions by the Government, BELL has incurred the following damages:

| | |
|---|---|
| **Contract Summary** | |
| Original Contract | $63,663,745 |
| Adjusted Contract Amount | $85,048,515 |
| Amount Paid to Date | $84,485,390 |
| **Unpaid Balance Due on Contract** | **$563,125** |
| | |
| **Unresolved Changes** | |
| Disputed EWOs | $1,610,987 |
| | |
| **Total of Contract Balance and Unresolved Changes** | **$2,174,112** |
| | |
| **BELL Extended General Conditions** | **$1,602,053** |
| **BELL Loss of Efficiency Costs - Entire Project** | **$2,058,456** |
| **Profit on Extended GC Costs and Inefficiency (10%)** | **$366,051** |
| | |
| **Subtotal** | **$6,200,672** |
| **Prejudgment Interest (6% from 4/5/02 - 8/6/07)** | **$1,953,211** |
| | |
| **TOTAL BELL DAMAGES** | **$8,153,883** |

80. Based on the foregoing actions and/or omissions by the Government, BELL's subcontractors have incurred the following damages:

**NIH BUILDING 50**
**SUBCONTRACTOR CLAIMS**

| | |
|---|---|
| **Stromberg Metal Works, Inc.** | |
| Loss of Productivity | $867,759 |
| | |
| **Young Electrical Contractors, Inc.** | |
| Inefficiency Due to Disruption | $1,977,309 |
| Extended Field Costs | $267,187 |
| Extended Overhead | $224,486 |
| | |
| **Manganaro Corporation** | |
| Extended Overhead Costs | $168,061 |
| | |
| **NLP Enterprises, Inc.** | |
| Extended Overhead, Loss of Efficiency, Additional Sundries, Additional Paint | $130,525 |
| | |
| **ISEC** | |
| Extended Project Management Costs and Material Storage/Handling Costs | $124,552 |
| | |
| **TOTAL SUBCONTRACTOR DAMAGES** | **$3,759,879** [1] |

81. The Government's asserts that BELL is responsible for all delays to the intermediate milestone dates, as well as delay to the Project substantial completion date and, thus, has assessed liquidated damages against BELL for such delays. There is no admissible evidence to support the Government's assertion

82. The Government admitted that each of the 14 interim milestones established in Mod. 93 would have an independent critical path to each particular milestone.

---

[1] The subcontractors will seek prejudgment interest on all amounts claimed due at the rate of 6%. BELL will seek the contractually allowable mark-up of five percent (5%) on subcontractor costs.

83. The Government also admitted that the critical path for each of the 14 interim milestones would have to be analyzed to determine whether any delay associated with achieving each milestone was compensable or excusable to BELL.

84. Further, the Government admitted that in order to determine whether liquidated damages could properly be assessed for allegedly not meeting any of the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone.

85. The Government, however, failed to perform any analysis that would permit it to determine the basis for responsibility of delay to each of the 14 intermediate milestone completion dates. The Government has failed to provide any analysis or testimony as to the causation of delay to the milestone completion dates. Consequently, the Government cannot proffer any analysis to rebut that analysis performed by BELL's expert demonstrating that there is excusable delay to the completion of each and every one of the 14 milestone completion dates for reason beyond BELL's control and for which it is not responsible; therefore, the assessment of liquidated damages is improper.

86. Furthermore, during the course of the Building 50 Project, NIH issued annual reports on the construction progress pursuant to its statutory reporting obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31 U.S.C. §§ 1115, *et seq*. Among other things, the GPRA required NIH to submit a report to the Congress setting forth its success in achieving its performance goals in the preceding year.

87. In February 2002, NIH issued its "Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Plan" (hereinafter "NIH's GPRA Report"). According to NIH, the "GPRA is . . .

88. NIH's GPRA Report expressly represented to the President and Congress that the construction of Building 50 was completed on time.

89. Despite its representation to Congress in the NIH GPRA Report that the Project was completed on schedule, the Government subsequently asserted that BELL failed to complete its work on schedule and has assessed liquidated damages against BELL of $447,678.00.

90. On April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted to the Contracting Officer a Request for Equitable Adjustment ("REA"). On July 2, 2002, the Government denied the REA, as well as the Subcontractor REAs.

91. On June 27, 2003, BELL filed suit in this Court.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

Dated: July 6, 2007

s/ Richard O. Wolf

Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of July 2007, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

s/ Richard O. Wolf
Richard O. Wolf