# Exhibit C

GSBCA

Appeals of DAVID J. TIERNEY JR., INC.
169 Gale Avenue
Pittsfield, MA 01201

Contract No. GS-01B-01620 Granted in part

May 3, 1988

Appearance for Appellant, David J. Tierney Jr., Inc.

Edward L. Genn, Esq.

Brown, Genn, Brown and Karp

American Forestry Assn. Bldg.

1319 18th Street, N.W.

Washington, DC 20036

Appearances for Respondent, General Services Administration

Robert T. Hoff, Esq.

Edward C. Hintz, Esq.

Office of General Counsel

General Services Administration

18th & F Street, N.W.

Washington, DC 20405

Opinion of Administrative Judge LaBella [FN1]

Background

Appellant constructed the Federal Building in Pittsfield, Massachusetts, under a fixed price construction contract awarded in the amount of $1,393,000. Changes during performance resulted in an increase of $78,897, for a final contract price of $1,471,897. Appellant now seeks an additional $2,927,300 on account of various alleged Government actions, including interference, defective specifications, constructive changes, and delays.

Appellant filed its first claim for damages on February 12, 1979. The contracting officer issued a decision denying that claim on September 10, 1979. Appellant's timely appeal from that decision is docketed as GSBCA 6198(5585)-REIN. Appellant subsequently filed a second claim, which incorporated the original claim, added further factual allegations, and increased the amount of recovery sought. On March 25, 1983, the contracting officer issued a decision denying the second claim. Appellant's timely appeal from that decision is docketed as GSBCA 7107. The two appeals have been consolidated.

The consolidated appeal was heard over eight days, from October 4 through 14, 1983, in Pittsfield and Boston, Massachusetts. Among those who testified on behalf of appellant were Mr. David Tierney, appellant's president and principal owner and the original project superintendent for the Pittsfield federal office building; Mr. Michael Makes, appellant's field engineer and subsequent project superintendant;

Mr. Thomas Bowler, appellant's foreman for the project; Mr. Michael Harrington, the owner of appellant's mechanical subcontractor for the project, Michaels Mechanical; Mr. James Maxymillian, the owner and president of appellant's excavation and site work subcontractor, J.H. Maxymillian & Son; Mr. Val Tornicelli, appellant's masonry subcontractor; Ms. Patricia Donovan, appellant's vice president and office manager; Mr. Edward Apple, the accountant for Michaels Mechanical; and Mr. Harry Wesley, appellant's accountant. Among the Government's principal witnesses were the following: Mr. Bradlee Sheridan, the Government's resident engineer for the project; Mr. George Perry, the Government's construction management engineer for the project; Mr. Frank D'Amore, the chief of the Projects Operations Branch, Public Buildings Service, GSA, and Mr. Sheridan's supervisor; Mr. Kapriel Kaprielian, the deputy director of the Design and Construction Division, Public Buildings Service, GSA, and the contracting officer for the project; Mr. Victor Bieniek, an owner of Caolo & Bieniek, the Government's architect for the project; Mr. Chester Dawicki, the resident architectural engineer for the project, under contract to Caolo & Bieniek; Mr. Russell Rosen, a scheduling consultant for C.T. Male Assocs. involved in drafting the critical path method (CPM) schedule for the project; and Messrs. William Sears and Richard Ruthfield, auditors for the Office of the Inspector General, GSA. Appellant has elected to proceed under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § § 601-613 (1982).

The appeals are granted in part and denied in part, for the reasons set out below. Principally, we find on balance that the Government's numerous changes to the contract impeded appellant's completion of the job, substantially increasing its costs and eradicating its anticipated profit. Although we are not able to pinpoint, day by day, the effect of each change on each item of work, we do find that some of those changes had a cumulative impact on job progress as a whole, for which appellant is entitled to compensation. In addition, the negotiated prices of the contract changes failed to address this cumulative impact experienced, and therefore do not preclude appellant's claim by way of an accord and satisfaction. We also find, however, that certain deficiencies in appellant's performance contributed to the losses it incurred, and we consider those deficiencies in determining the amount of compensation appellant is due.

Our award is not based upon any specific quantum associated with appellant's individual claims. Rather, the award is in the nature of a jury verdict based upon a perceived balance of liability between appellant and respondent for overall delay in the completion of the construction project as a whole.

## Findings of Fact

### A. Background

1. Contract number GS-01B-01620 for the construction of a two-story office building located on Columbus Avenue in Pittsfield, Massachusetts was awarded by the General Services Administration (GSA) to appellant on March 11, 1977, for the contract price of $1,393,000. Appeal File, Appendix C, Exhibit C.

2. The contract provided for work to be completed "within ... 365 calendar days" after receipt of the notice to proceed, which appellant received on March 23, 1977. Appeal File, Appendix C, Exhibits A, B, C. The deadline for completion of the project was thus established as March 22, 1978. Id. Appellant began work on March 28, 1977. During performance, the completion date was extended thirty-seven calendar days to April 28, 1978. Appellant had substantially completed performance by that date. Appeal File, Exhibits 4, 101; Appellant's Trial Exhibit Z4.

3. The contract contained Standard Form 23-A, General Provisions (Apr. 1975 Edition), which included the customary Changes, Inspection, and Suspension of Work clauses. The General Provisions were supplemented by MOD-11390, Modification of General Provisions (Apr.1980). The supplement to the Changes clause states:

23 EQUITABLE ADJUSTMENTS

23.1 The provisions of the Changes clause of Standard Form 23-A, General Provisions, are supplemented as follows:

23.1.1 Upon written request, the Contractor shall submit a proposal, in accordance with the requirements and limitations set forth in this "Equitable Adjustment" clause, for work involving contemplated changes covered by the request. The proposal shall be submitted within the time limit indicated in the request or any extension of such time limit as may be subsequently granted. The Contractor's written statement of the monetary extent of a claim for equitable adjustment shall be submitted in the following form:

(1) Proposals totaling $5,000 or less shall be submitted in the form of a lump sum proposal with supporting information to clearly relate elements of cost with specific items of work involved to the satisfaction of the Contracting Officer, or his authorized representative.

(2) For proposals in excess of $5,000, the claim for equitable adjustment shall be submitted in the form of a lump sum proposal supported with an itemized breakdown of all increases and decreases in the contract in at least the following detail:

Direct Costs

Material quantities by trades and unit costs (Manufacturing burden associated with material fabrication performed off the job site will be considered to be part of the material costs of the fabricated item delivered to the job site)

Labor breakdown by trades and unit costs (Identified with specific item of material to be placed or operation to be performed)

Construction equipment exclusively necessary for the change

Costs of preparation and/or revision to shop drawings resulting from the change

Workmen's Compensation and Public Liability Insurance

Employment taxes under FICA and FUTA Bond Costs--when size of change warrants revision

Overhead, Profit and Commission

23.1.2 The maximum allowable overhead, profit and commission percentage given in this paragraph shall be considered to include, but are not limited to, jobsite staff and office expense, incidental job burdens, small tools and general office overhead allocation. The percentages for overhead, profit and commission shall be negotiated and may vary according to the nature, extent and complexity of the work involved, but in no case shall exceed the following:

To Contractor on work performed by other than his own forces: Overhead = --; Profit = --; Commission = 10%

To first tier subcontractor on work performed by his subcontractors: Overhead = --; Profit = --; Commission = 10%

To Contractor and/or the subcontractors for that portion of the work performed with their respective forces: Overhead = 10%; Profit = 10%; Commission = --

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not more than four percentages, not to exceed the maximum percentages shown above, will be allowed regardless of the number of tier subcontractors. On proposals covering both increases and decreases in the amount of the contract, the application of overhead and profit percentages shall be on the net increase in direct costs for the Contractor or subcontractor performing the work. However, where the Contractor or first tier subcontractor receives proposals in additive and deductive amounts from separate lower tier subcontractors, the commission shall be allowed on the added amounts prior to subtraction of the credit amounts.

23.1.3 The Contractor shall submit with the proposal his request for time extension (if any), and shall include sufficient information and dates to demonstrate whether and to what extent the change will delay the contract in its entirety.

23.1.4 In considering a proposal, the Government shall make check estimates in detail, utilizing unit prices where specified or agreed upon, with a view to arriving at an equitable adjustment.

23.1.5 After receipt of a proposal the Contracting Officer shall act thereon, within 30 days; provided, however, that when the necessity to proceed with a change does not allow time properly to check a proposal or in the event of failure to reach an agreement on a proposal, the Government may order the Contractor to proceed on the basis of price to be determined at the earliest practicable date. Such price shall not be more than the increase or less than the decrease proposed, except that on proposals under $100,000, the increase shall not exceed the proposed increase plus 10%.

23.1.6 If a mutually acceptable agreement cannot be reached, the Contracting Officer may determine the price unilaterally.

Appeal File, Appendix C, Exhibit G.

4. In response to appellant's requested stipulations of September 9, 1983, the Government made numerous admissions pertinent to this appeal.Concerning the alleged disparity between the hours bid by appellant and the hours actually expended in performing its contract, the Government stated:

Admitted that David J. Tierney, Jr., Inc. bid the Pittsfield Federal Building Project on the basis of 3912 manhours for General Conditions, 312 manhours for the wood screen fence, 734 manhours for carpentry, 144 manhours for dampproofing, 36 manhours for toilet room accessories, 27 manhours for the construction engineer's office, 43 manhours for the insulation, and 2623 manhours for concrete for a total of 7831 manhours.

Admitted that based upon a review of certified payrolls by respondent's auditors, David J. Tierney, Jr., Inc. incurred a total of 10,564.5 manhours for the Pittsfield Federal Building Project. This total does not include 752 manhours for David J. Tierney, Jr., who is not job cost coded to any one specific project in appellant's accounting and financial records but is part of the G & A pool.

Respondent's Admissions and Objections to Appellant's Proposed Stipulations, 1- 2 (Sept. 16, 1983) (hereinafter Respondent's Admissions).

Similarly, concerning the alleged disparity between the hours bid by Michaels Mechanical and the hours it actually expended, the Government stated:

Admitted that Michaels Mechanical Contracting bid the Pittsfield Federal Building Project on the basis of 1,644 manhours for pipefitters, 1,069 manhours for sheet metal workers and 459 manhours for plumbers for a total of 3,172 manhours.

Admitted that based upon a review of certified payrolls by respondent's auditors Michaels Mechanical Contracting incurred a total of 7,167.5 manhours for the Pittsfield Federal Building Project broken down by trade as follows: 4,178 manhours for steamfitters, 2,159 manhours for sheet metal workers and 830-1/2 manhours for

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

plumbers.

Id. at 1.

Concerning appellant's initial projections for the period in which it would perform the contract, the Government "[a]dmitted that appellant calculated its bid on a performance period of nine (9) months--forty (40) weeks." Id. at 4. Mr. Tierney testified that appellant's anticipated profit margin was tied to completing the project within the nine month period on which its bid was based. Transcript at 100-03. He explained:

The dollars are really in taking a job and getting it done quicker than you estimated you could get done, because all of those expenses that you got for a month, all of a sudden become yours.

....

We bid this job at nine months knowing that the specifications said that we had a year, and believing in our hearts that we were going to beat the nine months.

The bids told us that we had nine months. Every intent was to beat the nine months. If we had bid a year and you go to our general condition sheet and wherever we have got things reduced from 52 weeks to 40 weeks and where we got everything reduced from 12 months to 9 months, if we expanded those out with the full 12 months or the full 52 weeks we would not have been low bidder. We were that close on our bid.

Id. at 101. We find this testimony to be credible. In addition, appellant established that, at the time of bidding, it had reasonably anticipated completing the project within that period, based on its long record of early completion of comparable jobs. Id. at 82-88, 113-16. Timely completion of the job depended substantially on close and effective coordination of the subcontractors and scheduling of their work. Id. at 136, 140-44, 644-45, 653-64, 679-80, 742-45, 756-82, 787-90. In this regard, both Mr. Tierney and Mr. Makes testified that the Government's numerous changes to the contract, and delays in issuing plans or granting approval for work that was critical to appellant's coordination and planning, substantially extended the amount of time necessary for performance. Id.

Concerning the losses of both companies during the course of contract performance, the Government stated:

Admitted that David J. Tierney, Jr., Inc.incurred a net operating loss of $184,458 on the Pittsfield Federal Building Project. Since operating costs (including overhead and G & A) exceeded revenues by the aforesaid amount, David J. Tierney, Jr., Inc. made no profit on this project.

Admitted that Michaels Mechanical Contracting incurred a net operating loss of $97,670 on the Pittsfield Federal Building Project. Since operating costs (including overhead and G & A) exceeded revenues by the aforesaid amount, Michaels Mechanical Contracting made no profit on this project.

Id. at 2. These figures were supported both by exhaustive testimony from the Government's auditors, Messrs. Sears and Ruthfield, and by extensive documentary submissions. Transcript at 1542-1732; Supplemental Appeal File, Volumes 4(A), 4(B), Exhibits 1-37. The combined net operating losses of appellant and Michaels therefore equal $282,128. The Government also admitted "that its budget amount for this project was about $2,100,000," and that "[t]he architect's estimate was $1,720,239." Requested Stipulations at 5; Respondent's Admissions at 5. In addition, "[t]he Government concedes that the bids were such that the first eight were more than $250,000 below the architect's estimate and that all came from experienced bidders." Requested Stipulations at 5; Respondent's Admissions at 5.

The Government also accepted appellant's characterization of both appellant and Michaels Mechanical, and of their contract performance, as follows:

The Government agrees, as its witnesses have thus far stated, that Tierney is and was a well-regarded firm with a reputation for performing first-class work and which it in fact performed in this case in that manner (first-class to excellent), both with regard to work and supervision; and that the services performed by the sub-contractors was [sic] good, workmanlike in all respects, or better than that kind of service; and that, as testified, Michael's [sic] also did first-class work and performed properly.

Requested Stipulations at 3-4; Respondent's Admissions at 3-4.

Government actions and inactions, as detailed below, individually and cumulatively adversely affected appellant's ability to complete the project within the contemplated schedule. As a result, appellant not only expended many more hours than anticipated, but was also unable to complete the project within its prescribed budget. Given the nature of such impact, the Board, in the following paragraphs, notes the instances where the Government impeded the appellant. Later, considering the liability of both parties increasing appellant's costs, we use the jury verdict method to mete out relief appropriate under the given facts and circumstances, with the record considered as a whole.

B. Appellant's Individual Claims

5. Underfloor Duct System: Appellant allocates $20,900 of its total claim to delays which it contends were encountered with respect to allegedly defective specifications and changes concerning the underfloor duct and electronic and telephone raceway systems. Second Amended Complaint at 43-49. Specification section 1611, Underfloor Duct Systems, provides for the installation of underfloor and trench ducts as raceways for electric and telephone wires. Appeal File, Appendix C, Exhibit G. The drawings and testimony indicate that the southern half of the first floor, built as slab on grade, required underfloor ducts, while the northern half of the first floor, which sits over the basement, and the whole of the second floor required a cellular deck with concrete fill and trench headers. Appeal File, Appendix C, Exhibit H; Transcript at 619-20, 1020-21. The duct systems, running the width of the building, provide conduits for the electrical and telephone lines, with periodic outlets. Transcript at 596-98, 1020-21, 1028-32. Paragraph 4.1.1 of specification section 1611 requires preset inserts for the underfloor duct every two feet, while paragraph 13.3 requires preset boxes for the trench header ducts, set at ten foot intervals. Appeal File, Appendix C, Exhibit G; Transcript at 1021-22, 1029.

Paragraph 2 of specification section 1611 required appellant to submit shop drawings for the system, as follows:

2.1 Shop Drawings: Shop drawings and catalog cuts of the underfloor duct, junction boxes, supports, service outlet fittings, trench ducts, transfer ducts, and other accessories shall be submitted for approval. Drawings shall show the layout of the duct systems, junction boxes, and terminations at panelboards, telephone closets, and cabinets.

Appeal File, Appendix C, Exhibit G. Paragraph 3 provided, in pertinent part:

3.2 Components: Complete underfloor duct systems shall be furnished and installed as specified, and as indicated on the drawings. The systems shall include all duct, junction boxes, fittings, supports, elbows, offsets, expansion joints, outlets, conduits, wiring (except telephone wiring), connections, and any necessary accessories to form complete installations.

3.3 Systems: Systems shall be single or multi-level types, as required, and shall consist of single, double, or triple duct as indicated on the drawings. Duct system shall be located in the structural slab.

Id. Pursuant to paragraphs 2.2.4, 4.1.1, 12.1, and 13.6, the specifications

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

contemplated that appellant would provide only preset inserts for the systems, along with plans and tools for the Government to install afterset inserts, if desired, following completion of the project. Id.; Transcript at 596-97. Paragraph 8.1 provided, "Underfloor duct drawings shall be furnished and installed at locations shown on the drawings, or at locations as directed by the Contracting Officer as follows," with the number and type of fitting detailed in the specifications. Id. Appellant's subcontractor, Collins Electric, construed the specification to mean "that the quantities listed were to be used if no locations were shown on the drawings." Appellant's Exhibit 170. Drawing 9-E-5 showed seventy-eight sample locations each for electrical and telephone outlets, requiring twenty-five percent of each to be activated, and Collins interpreted the specifications to therefore require twenty of each. Id.; Appeal File, Appendix C, Exhibit H. Although Mr. Sheridan, the Government's resident engineer, declined to categorize the specification as ambiguous, he readily admitted to his inability to understand it. Transcript at 1244-45. Finally, drawing 9-E-5 noted that the location of preset inserts would be determined by the architect "at time of construction." Appeal File, Appendix C, Exhibit H. On April 7, 1977, the Government's CPM consultant, C.T. Male Assocs., wrote to Mr. Perry enclosing the initial critical path schedule and noting an immediate need for the "Electrical and Telephone Layouts by GSA ... because of their effect on concrete embedded items and masonry." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A1. Appellant had earlier written to the Government's architect, Caolo & Bienek, on March 25, 1977, emphasizing the critical need for those layouts and their effect on "the sequence of operations." Appellant's Exhibit 240. On April 8, 1977, appellant again wrote to Caolo & Bieniek, stating that shop drawings and submittals were being prepared based on then-current plans and specifications and noting the need for any "revision to the underfloor electric and telephone duct systems ... [i]n order that the construction of the project not be delayed...." Id. The Government informed appellant at a meeting held on April 15, 1977, however, that the telephone and electrical outlet locations would not be provided until after installation of the underfloor duct system and pouring of the concrete, despite the requirement noted on drawing 9-E-5 that the Government provide the locations "at the time of construction" and the specifications' provision for only pre-set inserts. Id.; Appeal File, Appendix C, Exhibits G, H; Transcript at 610-11.

Appellant submitted separate shop drawings for the underfloor and the trench duct systems. It submitted shop drawings for the underfloor duct system on April 13, 1977. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A1. On May 9, 1977, the Government rejected the submittal, based on the Government's revision of the layout after the contract had been awarded. Id.; Transcript at 604. Appellant resubmitted its shop drawings for the underfloor duct layout on June 7, 1977, requesting "immediate attention as the slabs on grade will be ready to be poured shortly." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A1. The Government approved those drawings, as submitted, on June 21, 1977. Id. Appellant had submitted shop drawings for the trench ducts on May 11, 1977, which the Government approved on June 7, 1977. Id.

The Government issued its first field directive for this part of the contract on June 15, 1977, ordering appellant "to install additonal [sic] underfloor duct and header ducts as indicated in revised dwg. 9-E-5 (encircled in red), and issued at the May 11, '77 job site meeting." Appellant's Exhibit 95. The directive stated a price not to exceed $7,566, subject to subsequent negotiation, and required appellant to install two additional cross runs and ties to the underfloor duct system. Id.; Appellant's Exhibit 104. On July 12, 1977, the Government incorporated the field directive into Modification Request 4. Appellant's Exhibit 104. Mr. Sheridan's Finding of Fact for Contract Modification, dated July 1, 1977, stated that the "[s]pecified single underfloor header duct does not have the capacity to feed all potential floor outlets. The addition of 2 underfloor header ducts will insure of [sic] feeding all potential floor outlets." Id. The Government rejected appellant's first proposed price, and on July 25, 1977, appellant submitted a proposal of $5,103. Id. By letter of the same date, appellant clearly stated that the amount included only direct costs of the ordered work. Appellant's Exhibit 150. Appellant reserved any claims concerning delays or impact resulting from the change. Id. At the hearing, Mr. Makes testified that

Mr. Sheridan did not permit appellant to include any costs other than direct costs in the pricing of change orders. Transcript at 664-66. The Government accepted appellant's proposal on September 7, 1977, under Change Order 7. Appellant's Exhibit 104. Previously, on July 18, 1977, the Government had issued a second field directive changing the underfloor duct work. Appellant's Exhibit 95. That directive required appellant to extend by approximately five feet the new ducts ordered under the previous directive, "so that the header trench ducts will reach and span the first three electrical cells of the cellular deck." Id.; Transcript at 609, 1024. The Findings of Fact for Contract Modification note that "[a]dditional lengths of underfloor duct are required to correct error in Change Order 7 which was a constructive change." Appellant's Exhibit 109. At the time of the second field directive, appellant was engaged in pouring the concrete floors and had to stop to order and wait for the additional underfloor duct material. Transcript at 613, 1024. That material did not arrive for three to four weeks. Id. at 614. The resulting delay in pouring the floors both impeded the masonry work and required the removal of bulkheads that had been placed for the pour. Id. at 613-17, 653, 729, 1024-25. On September 19, 1977, the Government incorporated the second field directive, along with four others, into Modification Request 9. Id. Appellant proposed a price of $390 for that item, which the Government accepted on November 7, 1977, under Change Order 10. Id.

On November 15, 1977, the Government issued a field memo, attaching plans for telephone and electrical requirements, and noting that " 'After-set' inserts will have to be provided on the cellular floor deck where there are no 'Pre- set' inserts at the location indicated." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A1. The Government requested an estimate of costs for any work in excess of the contract requirements. Id.; Transcript at 618. By letter dated November 18, 1977, appellant reminded the Government that the contract failed to provide for after-set inserts, and by letter dated December 27, 1977, quoted a price of $4,211 for the additional work. Appellant's Exhibit 170. On January 20, 1978, however, the Government issued a field directive further revising the electrical and telephone outlet installation plans and ordering 280 accessory items or groups of items to provide for "present, future, and surplus requirements for elec[trical] and phone floor installations." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A1; Transcript at 618. The Government incorporated the outlet plans and accessory order into Modification Request 24, which issued on January 27, 1978. Appellant's Exhibit 170. Appellant submitted proposals of $6,341 for the outlet changes and $3,366 for the additional accessories, for a total price of $9,707. Id. Following extensive negotiations, appellant revised its proposal to a total price of $6,468, which it submitted by letter dated July 31, 1978. Id. On August 7, 1978, the Government accepted the proposal under Change Order 35. Id. We find that the Government's provision of defective plans and specifications, its failure to meet its responsibility timely to provide the electrical and telephone outlet locations, and the substantial changes to the contract delayed appellant's prosecution of this and other work under the contract. See finding 4.

6. Electrical Wiring and Motors: Appellant allocates $22,000 of its total claim to an alleged defect or ambiguity in the contract arising from the contract's failure to designate which of appellant's subcontractors would be required to complete the electrical wiring of the oil burner and its associated controls. Second Amended Complaint at 49-50. Specification section 1501, Mechanical and Electrical Equipment General Requirements, provides in pertinent part:

INSTALLATION OF EQUIPMENT

7.1 Install and connect all appliances and equipment as specified and indicated in accordance with the manufacturers' instructions and recommendations. Furnish and install complete, auxiliary piping, water seals, valves, electric connections, and similar items, recommended by the manufacturer or required for proper operation.

Appeal File, Exhibit G. Section 1570, Heating Apparatus (Hot Water Systems), states in relevant part:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

4. OIL BURNING EQUIPMENT

4.1 Furnish and install complete, a fully automatic oil burning system consisting of oil storage tank, burner, and all necessary accessories, control and safety devices for the safe and economical operation of the boiler.

25. GENERAL

25.1 All valves, appliances, piping, electrical work, ets., [sic] necessary to provide a complete and satisfactory oil burning installation, shall be provided whether especially mentioned in the specification or not.

Appeal File, Exhibit G. On November 7, 1977, appellant wrote to Frank D'Amore requesting a change order to require the electrical subcontractor to perform the wiring. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A2. By letter dated November 10, 1977, Mr. D'Amore responded that "the wiring in question is included as part of the overall contract requirements," but offered no comment concerning which subcontractor should be responsible for the work. Id. Mr. Makes, appellant's superintendent, and Mr. Sheridan discussed appellant's confusion concerning whether the work should be assigned to the mechanical subcontractor, Michaels Mechanical, or to the electrical subcontractor, Collins Electrical. Transcript at 408-10, 1032-34, 1843-44. Mr. Sheridan consistently maintained that the decision lay solely with appellant. Id. at 1033-34; Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A2. In the job meeting minutes for December 21, 1977, Mr. Sheridan noted, "Contractor will wire boiler under protest." Id. Appellant finally ordered Michaels Mechanical to perform the work, and on December 28, 1977, Michaels wrote to appellant agreeing "to proceed with this additional work under protest." Appellant's Exhibit 246. On December 30, 1977, appellant forwarded that letter to the Government, noting the work had been performed "and all bills pertaining to same will be forwarded to you for payment." Id. We find that the contract clearly required performance of the work and placed no obligation on the Government to coordinate work by, or assign work to, appellant's subcontractors.

7. Boiler High Limit Switch: Appellant allocates $10,500 of its total claim to extra work required to correct an alleged design deficiency relating to the boiler high limit switch and an alarm in the building engineer's office. Second Amended Complaint at 51-54. Specification section 1570, Heating Apparatus (Hot Water Systems), states in pertinent part:

13. CONTROLS AND SAFETY DEVICES

13.1 Controls shall ... maintain, practically constant, any water temperature leaving boiler from 120 degrees F. to design temperature +-10 percent adjustable range.

13.2 The controls shall also accomplish the following:

....

13.2.5 Shut off oil supply and burner on failure of induced draft fan, or forced air fan, in case of low water, or in case water temperature exceeds 220 degrees F.

13.3 Provide alarm in Engineer's office where directed.

Appeal File, Appendix C, Exhibit G. On January 9, 1978, the Government issued a field directive to "[t]ie the boiler's high temperature limit into the boiler alarm and the alarm in the Engineer's office on the First Floor." Supplemental Appeal

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

File, Volume 3(A), Exhibit 2AC-A3. In his Findings of Fact for Contract Modification, Mr. Sheridan noted as reason for the change, "The high temperature limit should be tied into the alarms to warn the bldg [building] custodian that the boiler has shut down and needs to be turned back on by manual reset." Id.; Transcript at 429, 1035. On April 17, 1978, appellant submitted to the Government's architects, Caolo & Bieniek, the engineering designs for approval. Appellant's Exhibit 169. Caolo & Bieniek finally approved the plans on June 29, 1978. Id. The parties engaged in extensive negotiations concerning pricing of a change order. Transcript at 430-31. Those negotiations also necessitated lengthy negotiations among appellant, Michaels Mechanical, which was responsible for the work, Collins Electric, which was the electrical subcontractor involved in wiring the switch, and TMI Sales Corporation, the boiler manufacturer's representative required to inspect the work. Appellant's Exhibit 123. On May 12, 1978, appellant proposed a price of $1,134 for the work. Id. By letter dated July 31, 1978, appellant increased its proposal to $1,192 as a result of a subsequent price increase on a switch needed for the work. Id. By letter dated August 21, 1978, appellant corrected its quotes to eliminate a double markup on the lower tier subcontract work and revised its proposal to total $937. Id.; Appeal File, Exhibit 25. On September 11, 1978, the Government accepted the revised proposal pursuant to Change Order 39. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A3; Transcript at 1035-39. On October 16, 1978, TMI Sales inspected and approved the completed work. Appellant's Exhibit 169. We find that the change delayed this and other work under the contract. See finding 4.

8. Fan Coil Condensate Drain: Appellant allocates $7,700 of its total claim to the extra work required to correct an alleged design deficiency in the fan coil condensate drainage systems. Second Amended Complaint at 54-56. The contract drawings provided that condensate collecting in the fan coil units on the first floor would be piped through the exterior walls on each side of the building, with the condensate discharged into a planting area on the south side of the building and onto the sidewalks on the north, east, and west sides. Appeal File, Appendix C, Exhibit H; Transcript at 1040. Appellant began construction of the masonry and brick exterior walls for the building on June 27 and July 7, 1977, respectively. On July 15, 1977, appellant wrote to Caolo & Bieniek, in pertinent part, as follows:

With reference to our jobsite meeting of July 6, 1977, please be advised that we have constructed the fan coil condensate lines at the south wall of the first floor as detailed in the contract drawings. The masonry for the east and west walls of the south half of the building is proceeding with no provision to drain the units at this time.

We feel the fan coil units can be drained by a line concealed in the pipe enclosures between units. The drains can terminate in exterior landscaped areas or can be run under the slab on grade to the basement.

As discussed, it appears that the units in the north half of the building can be drained in a manner similar to that used on the second floor at the north half of the building.

Please advise as to how we shall proceed on this matter.

Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A4. Principally in order to avoid drainage onto the sidewalks during the airconditioning season and to reduce the potential of damage in the building from possible vandalism, the Government issued a field directive on July 26, 1977, ordering changes to the first floor fan coil unit condensate drains. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A4; Transcript at 473-74, 1040-41. The field directive ordered appellant to install drain piping for parts of the east and west walls for eventual discharge into a landscaped area on the south side of the building; to provide piping to the boiler room for the remaining first floor drains on the east and west walls and all first floor north wall drains, for eventual discharge; to insulate all new condensate drain piping; and to delete traps previously required for each condensate drain line at each fan coil unit. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A4; Transcript at 1040-41. Mr. Makes and Mr. Harrington

testified that both the change and the Government's delay in ordering the change, from the date the subject was raised on July 6 until the directive issued on July 26, interrupted the work progress. Transcript at 477, 653-54, 841. Mr. Sheridan testified, however, that nonetheless "the masonry work continued all during this period." Id. at 1042. Negotiations concerning the pricing of the changed work were protracted and difficult. Transcript at 474-75. Appellant proposed a price of $4,731 on August 8, 1977. Appellant's Exhibit 112. Subsequently, appellant reduced that amount to $4,019, which was the price proposed on November 1, 1977. Id. On November 16, 1977, the parties negotiated a further reduction to $3,826 after adjusting appellant's proposal with a $193 credit for copper. Id. The Government accepted that price on November 28, 1977, under Change Order 12. Id.; Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A4. We find that the changes to the drainage system and the Government's delay in issuing those changes delayed appellant's prosecution of this and other work under the contract. See finding 4.

9. Fan Coil Units Sleeving: Appellant allocates $9,600 of its total claim to a constructive change allegedly imposed by the Government when it required appellant to provide sleeves for the fan coil unit pipes. Second Amended Complaint at 56-57. Specification section 1590, Refrigeration Systems (Airconditioning), provides in pertinent part:

SLEEVES AND PLATES

20.2 Vertical pipes passing through floors shall be provided with sleeves on [sic] zinc-coated steel not lighter than No. 26 U.S.S. gage or of moisture resistant fiber or plastic. Sleeves shall pass through the entire floor construction, including fill, and shall allow not less than 1/4-inch clearance around the pipe and covering if any. Sleeves in concrete work shall be flanged at the bottom, or provided with temporary centering caps, and nailed or screwed to forms before the concrete is poured.

Appeal File, Appendix C, Exhibit G. Appellant suggested the use of a six-and- one-half inch by six inch box to bring the fan coil unit pipes up through the floor, without providing sleeves for the individual pipes. Transcript at 470- 71, 1045-46. The Government permitted appellant to use the box, but nonetheless required appellant to provide sleeves, as well. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A5; Transcript at 1046. The Government informed appellant that sleeving was required in order both to meet the specifications and to preserve the fire rating. Transcript at 1045-46. Although appellant experienced substantial difficulty in complying with the Government's directions, and claims to have expended approximately 192 manhours in the effort, appellant completed the work satisfactorily. Id. at 470-72, 1047. Appellant failed to establish, however, that the Government required any more than performance as directed by the contract.

10. Insulation Behind Fan Coil Enclosures: Appellant allocates $7,500 of its total claim to additional work and delays caused by an alleged design deficiency concerning the enclosure and insulation of fan coil piping. Second Amended Complaint at 57-59. Drawing 9-M-2 provides a detail, drawn to the scale of 3" = 1'0", for the fan coil unit piping cover. Appeal File, Appendix C, Exhibit H. Specification section 1516, at paragraph 8, requires one-and- one-half inches of insulation behind the fan coil piping enclosures. Appeal File, Appendix C, Exhibit G. Appellant scaled for size the drawing detail and fabricated the enclosures for the piping. Transcript at 467-68, 1048. Appellant subsequently found that the enclosure was too small for the one-and- one-half inch thick insulation specified. Id. at 467-49, 1047-48. Appellant requested substitution of three-quarter inch armaflex insulation. Id. at 468, 1048. On September 26, 1977, Mr. Sheridan issued a field directive stating as follows:

Due to space limitations within the fan coil piping enclosures on the 1st floor South end, 3/4" thick Armaflex pipe insulation on the hot water supply and return piping will be accepted in lieu of the 1 1/2 " fiberglass insulation in this area.

As agreed between your Mr. M. Makes and our Mr. B. Sheridan, this is a minor change and will be accomplished at no change in contract price or time.

Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A6. Mr. Harrington testified that "sixty to eighty man hours [were] expended trying to resolve this problem." Transcript at 469. We find that the drawing and specification were defective and that the changes required to correct the defects delayed appellant's prosecution of this and other work under the contract. See finding 4.

11. Fresh Air-to-Air Handling Unit # 3: Appellant allocates $8,500 of its total claim to an alleged design deficiencywhich prevented the running of duct work from the duct shaft at the basement level to Air Handling Unit # 3 in the mechanical room in the basement because of a conflict with electrical apparatus. Second Amended Complaint at 59-60. Specification section 1501, Mechanical and Electrical Equipment General Requirements, provides in pertinent part:

8. COORDINATION

8.1 Coordinate the work of the different trades so that:

(1) Interferences between mechanical, electrical, architectural, and structural work, including existing services will be avoided; ...

....

8.4 Before any sleeves or inserts are set or any mechanical or electrical equipment or foundations are installed, prepare and submit for approval by the Government Representative composite coordination drawings for all equipment rooms, spaces and other areas in which work of two or more trades or subcontractors is to be installed and in which the probability of interference exists, as determined by either the Contractor or the Government Representative [.] Drawings shall show the work of all trades covered, shall be drawn to a scale not smaller than 1/2" = 1' - 0", and shall show clearly in both plan and elevation that all work can be installed without interference.

8.5 Any work installed prior to approval of coordination drawings shall be at the Contractor's risk. Subsequent relocations required to avoid interferences shall be made without additional expense to the Government. In case interference develops, the Government Representatives will decide which work shall be relocated, regardless of which was installed first.

Appeal File, Appendix C, Exhibit G. By field memo dated June 23, 1977, the Government requested that appellant provide coordination drawings "as specified in section 1501, par. 8.4." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A7. Again, at a job meeting on July 20 and by letter dated July 22, 1977, the Government "requested ... immediate action to complete these drawings as required by your contract." Id. The letter warned "[I]f work has to be altered in the future to provide proper installation because of the lack of drawings it will be your responsibility to do so at no additional cost to the Government." Id. On August 3, 1977, appellant submitted its completed drawings to the Government's engineer, Greenleaf. Id. The drawings failed to incorporate the electrical work, however. Transcript at 1051. An electrical conduit which interfered with the installation of the duct work was installed prior to the duct work. Id. at 1051-52. Appellant has failed to establish liability on the part of the Government for the conflict, and the contract placed responsibility on appellant for coordinating the work from which this problem arose.

12. Cabinet Heaters: Appellant allocates $15,300 of its total claim to delays experienced and extra work required as a result of an alleged design deficiency affecting the installation of cabinet heaters. Second Amended Complaint at 60-61. The contract specifications and drawings 9-M-2 and 9-M-4 required the use of Trane Company model B12A003 or equal cabinet heaters. Appeal File, Appendix C, Exhibit H; Transcript at 434. Those units had a depth of nine inches. Transcript at 436.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Appellant requested and received approval to install Aintherm Unitaire II units, which were nine-and-one-quarter inches deep. Supplemental Appeal File Volume 3(A), Exhibit 2AC-A8; Transcript at 434-35. Contract drawings 3-A-2 and 9-M-2 indicated that the heaters were to be recessed into walls that were one foot thick. Appeal File, Appendix C, Exhibit H. The specifications provide in section 1570, at paragraph 1, that appellant is responsible for installing the complete hot water heating system, including heaters. Appeal File, Appendix C, Exhibit G. Appellant's mason initially boxed out spaces in the walls of insufficient depth to completely recess the units. Transcript at 1052. Appellant's mechanical subcontractor, Michaels Mechanical, was unable to properly install the units, and appellant required the mason to return and chip out additional brick. Id. at 435-37, 1052. The mason enlarged the spaces sufficiently and Michaels properly installed all units, fully recessed into the walls. Id. at 437, 1052-53. Appellant has failed to prove any defect in the specifications or liability on the part of the Government either for the work performed, or for any impact on other work.

13. Reorientation of Exhaust Fan # 1: Appellant allocates $10,100 of its total claim to an alleged design deficiency which required reorientation of an exhaust fan and modification of ductwork for that fan. Second Amended Complaint at 61-62. At job meetings on July 6 and 20, 1977, the parties determined that the installation of Exhaust Fan Number 1 (EF 1) in the penthouse, in the manner required by contract drawing 9-M-3, would place that fan's connecting ductwork too close to the elevator doors and restrict access to the elevator. Appellant's Exhibits 91, 113; Appeal File, Appendix C, Exhibit H. On August 23, 1977, the Government issued a field directive ordering appellant to reorient EF 1 and to modify the accompanying ductwork in accordance with a drawing entitled "Revision: orientation of EF 1" which was issued at the August 17, 1977, job meeting. Appellant's mechanical subcontractor, Michaels Mechanical, rotated EF 1 ninety degrees and modified the ductwork in accordance with the Government's drawing. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A9. By letter dated September 23, 1977, appellant submitted to the Government an estimate of cost for the work of $2,149. Id. Following negotiations, appellant reduced its estimate to $1,677, and incorporated that amount into a proposal dated November 1, 1977. Id.; Appellant's Exhibit 113. The Government accepted this proposal on January 4, 1978, under Change Order 13. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A9; Appellant's Exhibit 113. In his inspection report for the week of November 21 through 25, 1977, however, Mr. Sheridan noted:

> Sheet metal ductwork has been installed in such a manner that it restricts access to the elevator in the penthouse. We have instructed the contractor to move the duct to provide more clearance to the elevator. The contractor contends that he installed the ductwork in accordance with our change sketch and that relocation will be another change.

Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A9. Mr. Sheridan issued a field memo on November 22, 1977, again requesting relocation of the ductwork for EF 1. Id. It was the Government's practice to issue a field directive to initiate changed work and to issue a field memo to direct work which it did not consider a change. Transcript at 1006-07. Michaels Mechanical completed the work by December 16, 1977, and in his inspection report for the week ending that date, Mr. Sheridan noted:

> Michaels Mechanical has relocated the ductwork to provide more clearance at the penthouse elevator. This work took 2 men approximately one day. Contractor indicated he will be submitting a claim for extra work. Our position is that it is a coordination error for which the contractor is responsible[.]

Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A9. We find, however, that Michaels Mechanical's initial reorientation of the exhaust fan and ductwork had complied with the Government's directive and drawing, which subsequently proved defective. Appellant is therefore entitled to compensation for the additional work required by Mr. Sheridan in his field memo. In addition, we find that the change delayed appellant's completion of this and other work under the contract. See finding 4.

14. Second Floor Fan Coil Units: Appellant allocates $6,000 of its total claim to additional work and delays incurred because of an alleged design defect which required relocation of fan coil units on the second floor. Second Amended Complaint at 62-63. On August 23, 1977, the Government issued a field directive ordering appellant to relocate those fan coil units toward the interior of the building. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A10. This was necessary in order to allow piping to those units to pass by the structural steel beams below the second floor. Id.; Transcript at 483-85, 1053. The Government incorporated the directive into Modification Request 18 as item 1. Supplemental Appeal File, Volume 3(A), Exhibit 2AC- A10; Appellant's Exhibit 118. Mr. Harrington testified:

> [The change] caused us a delay. We had to order the extension pieces to go behind these units. We were paid for these pieces. We were not paid for the negotiation time when the price was established. There was a delay to the job because we waited for these pieces to be fabricated and finished and shipped to the job and then installed.

Transcript at 1753. On December 27, 1977, appellant submitted its proposal in the amount of $483 for this item of additional work. Id. The Government accepted appellant's proposal on April 5, 1978, under Change Order 18. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A10; Appellant's Exhibit 118; Transcript at 1053-54. We find that the change affected appellant's completion of this and other work under the contract. See finding 4.

15. Heating Lines to Air Handling Units: Appellant allocates $5,500 of its total claim to an alleged design defect which required reversing the flow of hot water lines to and from the three way control valve in the air handling units. Second Amended Complaint at 63-64. The Government denies the allegations. Answer at ¶ IV. A. 11. Contract drawing 9-M-4 depicts piping to the control valve with arrows indicating the direction of the flow. Appeal File, Appendix C, Exhibit H. The arrows are not always consistent, however, at several points indicating flows in opposite directions in the same pipe. Id.; Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A11. Appellant alleges that, nevertheless, it initially followed the design depicted in the contract drawings but was subsequently required to correct the direction of the flow to and from the three way control valve. Appellant never briefed this claim, however, never proved its allegations, and failed to establish any damages or entitlement to additional recovery.

16. Four-Inch Condenser Chilled Water Return Line: Appellant allocates $11,000 of its total claim to an alleged design defect which required the relocation of a four inch chilled water return line. Second Amended Complaint at 64-65. As originally designed, the piping from the cooling tower would have run across the penthouse floor to the duct shaft, presenting a safety hazard. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A12; Appellant's Exhibit 129. On January 27, 1978, the Government issued a field directive ordering appellant to reroute the piping "through the penthouse floor ... across the 2nd floor janitor closet ceiling and through the duct shaft wall to the riser ... to create an unobstructed passage to both ends of the penthouse." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A12. On April 18, 1978, appellant submitted a proposal in the amount of $827 for the additional work. Id. As part of the same proposal, appellant offered a credit of $463 to permit deletion of the contract's "requirement for vibration isolation on HVAC piping outside the boiler room and penthouse." Id. On May 22, 1978, the Government accepted appellant's proposal under Change Order 25, for a total adjustment in contract price of $364. Id. Appellant acknowledges that the change order fully covered direct costs of the additional work, but still seeks recovery for alleged impact costs resulting from the change and for time spent negotiating the prices. Appellant's Reply Brief at 258. The record establishes only minimal negotiation efforts, however, with no disputes concerning appellant's proposed prices. We nonetheless find that the change affected appellant's performance of this and other work under the contract. See finding 4. Appellant also alleges that the Government obtained the concurrent credit through economic duress. Id. We address that claim in Finding 17, infra.

17. Vibration Isolation: The contract required appellant to furnish spring- type isolation hangers for water piping and the Government demanded a credit for unperformed work concerning the areas of the building that the parties agreed to exempt from this contract requirement. Appellant claims this requirement was unnecessary work resulting from a design defect and allocates $6,400 of its total claim to the alleged change in work, forced credit, and resulting performance delays. Second Amended Complaint at 66-67. Appellant contends that the contract required no particular type of vibration isolation. Id. Specification section 1515, Vibration Isolation, states in pertinent part:

14. VIBRATION ISOLATION HANGERS AND SUPPORTS FOR PIPES AND DUCTS

....

14.2.1 Water piping shall be resiliently supported by spring and neoprene combination isolation hangers. The spring elements for the pipe hangers provide 5/8-inch of static deflection and shall be designed so that the first harmonic natural frequency of no less than 360 cps. [sic] The neoprene element shall be of double deflection type capable of providing a minimum of 3/8-inch static deflection. The first two isolation hangers of each pipe connected to equipment shall have a deflection equal to the equipment isolation support static deflection.

Appeal File, Appendix C, Exhibit G. By field memo dated November 11, 1977, the Government reminded appellant of the requirement to install spring hangers for vibration isolation of water pipes. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A13. In his Findings of Fact for Contract Modification, dated March 31, 1978, Mr. Sheridan stated:

Vibration producing equipment is isolated between vibration pads and flexible connections, and piping in immediate vicinity of equipment receives vibration isolators. Therefore, vibration isolators for piping beyond the mechanical rooms are not necessary and are being deleted.

Id. The parties subsequently negotiated a partial waiver of the requirement so that spring-type isolation hangers would be installed only in the penthouse and boiler rooms. Id. Negotiations had been extended and difficult, with the mechanical subcontractor, Michaels Mechanical, insisting throughout that the hangers were unnecessary. Id.; Appellant's Exhibit 129; Transcript at 402. On May 22, 1978, the Government accepted appellant's proposal dated April 18, 1978, for a credit in the amount of $463 and allowed a partial deletion of the vibration isolation requirement, pursuant to Change Order 25. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-13A; Transcript at 402, 1054-55. We find that the contract, as awarded, required spring-type isolation hangers and appellant has failed to establish entitlement to additional compensation for either the work performed or the credit for work deleted.

18. Heating Line Anchors: Appellant allocates $8,400 of its total claim to an allegedly defective specification for heating line anchors. Second Amended Complaint at 67-68. Specification section 1570, Heating Apparatus (Hot Water Systems), provides at paragraph 33 for the installationof heating line anchors. Appeal File, Appendix C, Exhibit G. The specification states that anchors for heating pipes "shall be in accordance with paragraph 109" and that expansion joint anchor base supports and expansion joint anchors shall be "as detailed on the drawings" or "as specified in paragraph 109." Id. The contract drawings do not detail anchors and specification section 1570 contains no paragraph 109. Id.; Transcript at 446-47, 1057, 1747. The Government's posthearing brief indicates that paragraph 109 was intended to refer to the June 1961 edition of the GSA Standard Heating Specification, but admits the contract contained no reference to this specification. Government's Posthearing Brief at 19-20.

The function of heating line anchors is to brace the ends of the pipeline to absorb expansion and contraction caused by temperature changes. Transcript at 447, 1057-58. Appellant's mechanical subcontractor, Michaels Mechanical, installed anchors

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

that were each constructed from three-quarter inch threaded rod in a triangle, welded to both the pipe and the anchoring beam. Transcript at 447-48, 1746-47. Mr. Harrington testified that these anchors conformed to standard industry practice, and the Government offered no testimony in rebuttal. Id. at 447, 1747. We therefore find that Michaels had properly installed the anchors. Mr. Sheridan determined the anchors were inadequate, however, and on October 20, 1977, he ordered appellant to remove and replace them with triangular anchors of quarter-inch steel plate, welded to the pipe and beam. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A14; Transcript at 447-48, 1057-58, 1746. We find that the Government's defective specifications and ordered changes to the contract delayed appellant's prosecution of this and other work under the contract. See finding 4.

19. Cast Iron Boiler: Appellant allocates $9,600 of its total claim to increased costs which appellant alleges were caused by the Government's improper rejection of the cast iron boiler shop drawings. Second Amended Complaint at 68-69. On April 13, 1977, appellant's mechanical subcontractor, Michaels Mechanical, sent a purchase order, for a total price of $3,099.42, to the Watson Supply Corp. for a Peerless cast iron boiler "Per Plan & Specification" and "Pending Architect Engineer Approval." Appellant's Exhibit 291. Mr. Harrington testified that Michaels had previously issued a purchase order to the Slant Pin Boiler Co. at a lower price, but cancelled the order when told that the boiler would have to be capable of burning coal. Transcript at 379-80. On May 16, 1977, Michaels submitted to the Government shop drawings for the oil burning Peerless boiler. Appellant's Exhibit 263. The Government rejected the drawings at a job site meeting on June 1, 1977, on the basis that the contract required the capacity to burn both oil and coal. Appeal File, Exhibit 34; Appellant's Exhibit 91. Specification section 1570, at paragraph 3, which provides the boiler requirements, does not mandate the capacity to burn coal. Appeal File, Appendix C, Exhibit G. On June 13, 1977, Mr. Sheridan informed appellant by telephone "that there is no requirement for coal conversion of boiler" and requested resubmission of the shop drawings. Appeal File, Exhibit 34. On June 24, 1977, the Government approved the resubmitted original boiler shop drawings. Appeal File, Exhibit 35. Although appellant claims that its direct costs for the boiler increased because of the Government's improper rejection of the drawings, the record contains no evidence of a price difference between the Slant Pin and Peerless boilers or of any other cost increase or delays incurred in performing other work under the contract. We find, however, that the Government improperly rejected appellant's initial submission of the shop drawings, and to that extent appellant is entitled to some additional compensation for the resulting impact. See finding 4.

20. Friction Clamps: Appellant allocates $4,100 of its total claim to the installation of additional friction clamps. Second Amended Complaint at 69- 70. Specification section 1501, at paragraph 11.2, and section 1517, at paragraph 26.3, set out the requirements for vertical piping support. Appeal File, Appendix C, Exhibit G. On November 3, 1977, the Government issued a field memorandum ordering appellant to install friction clamps on all vertical piping in the duct shaft at the second floor level. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A16; Appellant's Exhibit 118. Appellant wrote to Mr. Frank D'Amore on November 9, 1977, that its subcontractor for the work, Michaels Mechanical, considered its work regarding the friction clamps to have complied with the contract's requirements, and appellant requested a field directive if the Government was requesting extra work. Appellant's Exhibit 118. On December 2, 1977, appellant again wrote to Mr. D'Amore, having received no reply to its earlier letter. Id. Appellant sent a third letter on December 13, 1977, requesting a directive. Id. That letter followed the receipt of minutes from the job site meeting on December 7, 1977, concerning which Mr. Sheridan wrote, "The contractor can proceed with the installation of hangars [sic] [i.e. friction clamps] ... regardless of who absorbs the cost or how much the agreed upon amount will be." Id.; Appellant's Exhibit 91. On December 15, 1977, the Government finally issued a Modification Request for the additional work. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A16. On December 27, 1977, appellant submitted a proposal in the amount of $718 for the direct costs of the changes. Id. On April 5, 1978, the Government accepted appellant's proposal of $718 under Change Order 18. Id.; Appellant's Exhibit 118. We find that the changes to the contract, and the Government's delays both in

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

responding to appellant's requests for clarification and in formally ordering the changes, delayed appellant's prosecution of this and other work under the contract. See finding 4.

21. Boiler Return Line Gate Valve: Appellant allocates $5,500 of its total claim to the extra work and delays incurred in correcting an alleged design defect that involved the omission of a gate valve from the boiler return line. Second Amended Complaint at 70-71. As a result of the contract's failure to include a gate valve on the boiler return line, the entire heating system would have to be drained in order to shut down the boiler. Transcript at 493. The contract drawings included above the boiler a globe valve, however, which served no purpose. Appeal File, Appendix C, Exhibit H; Transcript at 491-92, 1059-61. On April 18, 1978, the Government issued a field directive ordering appellant to remove the unnecessary globe valve that appellant had already installed and to install a gate valve in the return line to the boiler "so that the boiler may be isolated and drained without draining the entire heating system." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A17; Transcript at 493. This work had been discussed at a job site meeting on April 12, 1978, and on that date appellant's subcontractor for the work, Michaels Mechanical, submitted to appellant a quotation of $385 for installation of the gate valve, while stating that "[o]n the request for removing the ... globe valve ... no credit will be given." Supplemental Appeal File, Volume 3(A), Exhibit 2AC- A17. By May 9, 1978, Michaels apparently rethought the globe valve issue, upon the insistence of Mr. Sheridan, because on that date Michaels wrote to appellant offering a credit of $144. Id; Transcript at 493. Mr. Sheridan's negotiation notes indicate that credit on which he insisted was to cover the "salvage value" of the globe valve. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A17. The contract also required appellant, under specification section 1570 at paragraph 50, to clean and test the entire system. Appeal File, Appendix C, Exhibit G. Michaels delayed draining the system for that work until it had received the field directive for changing the valves, and the Government's belated issuance of the field directive therefore delayed Michaels's draining and cleaning of the system. Transcript at 493-94, 1060. Mr. Harrington testified that the disruption of job continuity because of the change resulted in a loss of approximately sixty-four man hours. Id. at 494-95. On June 13, 1978, appellant proposed a total price of $265 for both removing the globe valve and installing the gate valve, which the Government accepted on June 23, 1978, Change Order 33. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A17; Appellant's Exhibit 135. We find that the changes to the contract, and the Government's delay in formally ordering them, delayed appellant's prosecution of this and other work under the contract. See finding 4.

22. Welder Certification: Appellant allocates $3,800 of its total claim to an alleged delay in work because of the Government's requirement that it receive copies of each welder's certification before welding on low pressure pipes could proceed. Second Amended Complaint at 71. Specification section 1570, Heating Apparatus, provides in pertinent part:

> 30.9 Before assigning any welders to work covered by this specification, the Contractor shall provide the Contracting Officer with the names of pipe welders to be employed for the work, together with each welder's assigned number, letter or symbol which shall be used to identify the work of that welder and which shall be affixed immediately upon completion of each weld. Contractor shall also submit with the list of names, copies of each welder's certified qualification tests prescribed by the National Certified Welding Bureau, or by other reputable testing laboratory, using procedures covered in the American Society of Mechanical Engineers Boiler Construction Code, Section IX, "Qualification Standard for Welding and Brazing Procedures, Welders, Brazers, and Welding and Brazing Operators". Welders must be certified for all positions.

Appeal File, Appendix C, Exhibit G. Mr. Harrington testified that the Government ordered welding stopped until the welder's certificates were produced. Transcript at 427. Mr. Dawicki and Mr. Sheridan disputed this. Id. at 1061, 1447. Appellant fails to state when the order issued or for how long the work was stopped. Nevertheless, the contract required provision of "each welder's certified

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

qualification tests" before work could begin, and we therefore find that appellant has failed to establish any right to compensation under this claim.

23. Sprinkler Piping: Appellant allocates $2,100 of its total claim to the alleged additional work required when the Government insisted that appellant remove copper pipes and install the black steel sprinkler piping required by the contract. Second Amended Complaint at 72. Specification section 1517, Plumbing, provides in pertinent part:

40.4 Sprinkler piping shall be black steel, Weight A, Class I Federal Specification WW-P-406c. Couplings shall be of the same material as the pipe. Fittings other than couplings shall be cast iron, Type I, (black) class A, in accordance with Federal Specification WW-P-501d, or malleable iron, Type I, (black) with Federal Specification WW-P-521f. Where non-ferrous metal piping and zinc-coated metal piping are joined, dielectric (insulating) couplings, fittings, or unions shall be provided.

Appeal File, Appendix C, Exhibit G. Drawing 9-P-1 indicates the sprinkler line at issue, which runs into the basement trash room. Appeal File, Appendix C, Exhibit H. Appellant's subcontractor for this work, Michaels Mechanical, installed the sprinkler using copper piping, which complied with applicable state and local codes. Transcript at 413, 1062-63, 1755-56. By a field memorandum dated December 12, 1977, Mr. Dawicki instructed appellant that the use of black steel piping was mandatory. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A19; Appellant's Exhibit 96; Transcript at 413, 1061-63. The Government never accepted the substitution of copper pipes or waived the requirement for black steel piping, and appellant has failed to establish entitlement to any compensation for the Government's insistence that appellant comply with the contract requirements.

24. Duct Leakage Tests: Appellant allocates $2,800 of its total claim to increased costs that allegedly were caused by the Government's insistence that an unnecessary duct leakage test be conducted. Second Amended Complaint at 73. Specification section 1580, Sheet Metal and Air-Handling Apparatus (Airconditioning), provides in pertinent part:

9.3.2 A trial leak test, as specified herein, shall be made after installation of the first section of each type of ductwork of each pressure classification, to demonstrate adequacy of construction details. All testing shall be done in the presence, and to the approval of, the Government Representative.

Appeal File, Appendix C, Exhibit G. Appellant conducted the required test on October 28, 1977, and the Government accepted the test results on October 30, 1977. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A20; Appellant's Exhibit 245. Appellant failed to establish entitlement to any additional compensation for its performance of the contract requirements.

25. Security System: Appellant allocates $15,800 of its total claim to various allegations concerning changes to, and the installation and testing of, the security system. Second Amended Complaint at 73-75. First, appellant seeks compensation for changes in intruder detection equipment and entry access hardware and for related delays. Id. Specification section 1672, Security System, provides the requirements for "the furnishing and installation of a complete electrically operated building security system as described herein and as indicated on the drawings." Appeal File, Appendix C, Exhibit G. Drawing 9-E-5 states, at note 5, "Provide window contacts on all first floor windows and as indicated." Id., Exhibit H. In addition, that drawing indicates contacts for the front and rear entrances, while drawing 9-E-6 indicates a door contact on the roof hatch. Id. By letter dated November 7, 1977, appellant requested the Government's review of requirements for window and door contacts at the east and west entries. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A21. The Government subsequently deleted the contact devices and replaced them with ultrasonic motion detectors which it considered to be more effective. The Government's initial field directive, dated December 9, 1977, required appellant to install Aritech model 101B ultrasonic detectors in the center of the plaster ceilings in both vestibules. Id.

Before appellant began installation, however, the Government issued a second directive, on December 28, 1977, requiring substitution of Aritech 101W ultrasonic detectors, located at lower wall corners in each vestibule, and ordering appellant to tie electronically the detectors to the door entries and to an alarm. Id. The Government incorporated the second field directive, along with an unrelated item, into Modification Request 26, and Mr. Sheridan noted in his Findings of Fact for Contract Modification, dated January 27, 1978:

Security system, which was GSA designed, was designed to sound an alarm only when glass was being broken. The entrance doors could be forced open without breaking the glass and without triggering the alarm. Therefore Ultrasonic motion detectors will be installed in the vestibules in lieu of the window and door contacts.

Appellant's Exhibit 126. On March 8, 1978, appellant submitted a proposal of $5,224 for both items of work. Id. The Government negotiated the costs for both items down, and on June 16, 1978, the parties agreed to a total price of $3,402. Id. The Government accepted appellant's proposal on June 19, 1978, under Change Order 27. Id.; Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A21. Although appellant alleges that the change in the ultrasonic detector location required the replastering and repainting of the ceiling, it failed to prove the claim. Second Amended Complaint at 74. We find however, that the Government's changes to the security system and its installation delayed appellant's prosecution of this and other work under the contract. See finding 4.

In July 1977, the parties discussed changes to the hardware for the front entrance doors, and by letter dated July 28, 1977, appellant submitted its initial cost proposal in the amount of $1,076. Appellant's Exhibit 109. At the job site meeting on August 3, 1977, the Government announced that it would "issue [a] Field Directive adopting hardware and security control changes on [the] front entrance door." Appellant's Exhibit 91. On August 9, 1977, the Government's architect forwarded to appellant approved shop drawings for the hardware changes, and on August 29, 1977, the Government issued a field directive ordering appellant to proceed with the work. Appellant's Exhibits 95, 109. On October 11, 1977, appellant submitted its price proposal for the hardware changes plus four other items. Appellant's Exhibit 109. The proposal incorporated the same price quoted in appellant's letter of July 28, and on November 7, 1977, the Government accepted the proposal under Change Order 10. Id. Appellant experienced substantial delays in receiving the substituted hardware and installing the doors, as changed. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A21b. Appellant had orginally scheduled installation of the entrance doors for October 25, 1977. Appellant's Exhibit 142. Because of the ordered changes and resulting delay, appellant was required to erect a temporary door to provide security and permit heating of the building. Id. The Government compensated appellant under Change Order 40, in the amount of $370, for construction of the temporary door. Id. On April 12, 1978, the Government granted appellant a time extension of twenty- eight days based on the delays experienced in effecting the hardware changes. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A21b. The extension covered only the period of March 31, 1978, to April 28, 1978, the expected date of completion. Appellant's Exhibit 144. By letter dated July 31, 1978, appellant claimed $8,370 "for costs incurred due to delays sustained during the execution" of the contract. Id. By letter dated August 25, 1978, appellant reduced its claim to $6,726, and indicated that the costs concerned both the delay from the hardware changes and an extension of seven days at the contract's beginning resulting from the Government's failure to provide access to the site. Id. Appellant's first letter clearly stated, however, that the claim was "for direct costs ... only and does not alter or void any prior claims ... nor does it restrict the submittal of any legitimate claim ... in the future." Id.; Transcript at 824. Mr. Sheridan's negotiation notes dated September 22, 1978, indicate that the Government had agreed to a price of $6,438. Appellant's Exhibit 144. On October 23, 1978, however, Mr. Sheridan wrote that appellant had tentatively agreed to a price of $6,100, and on October 27, 1978, appellant submitted a proposal in that amount. Id. The Government accepted the proposal on November 3, 1978, under Change Order 44. Id. We find that the parties limited the applicability of Change Order 44 to direct costs resulting from the delays experienced over the period of March 31 through April 28, 1978. The change order

failed to address impact costs or any costs concerning delays because of the change that occurred outside of that period. We find that those costs were incurred. See finding 4.

Finally, appellant asserts that the Government delayed acceptance of the security system. Second Amended Complaint at 74-75. The contract terms require, however, that the entire security system be installed prior to testing and acceptance. Paragraph 6 of specification section 1672 provides in pertinent part:

6.1 The entire security system shall be tested and adjusted in the presence of an authorized Government Representative. The Contractor shall deliver to the Government Representative all operating data books and drawings as required by the "Mechanical and Electrical Equipment, General Requirements" section of the specification.

6.2 At the completion of the installation, the systems shall be tested to show that:

(1) The complete system is free from grounded and open circuits.

(2) Demonstrate, by opening selected alarm initiating devices, that all devices and alarm indicators are operating normally.

(3) Demonstrate that card reader is functioning properly and that dead- bolt holds door in a secure position.

6.3 Any defects shall be corrected at once and the test reconducted.

Appeal File, Appendix C, Exhibit G. Appellant informed the Government that a security system test would be conducted on March 29, 1978. Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A21a. Government witnesses attended the test, but the entire system had not been installed when the test was conducted. Id. The security system was tested again on April 6, 1978, but only two of the seven security zones had been completed. Id. Finally, on April 10, 1978, testing of the system was successfully completed. Id. Appellant failed to establish any delay by the Government in accepting the system or any entitlement to additional compensation under this part of its claim.

26. Water Connection: Appellant allocates $11,500 of its total claim to additional work required by a differing site condition. Second Amended Complaint at 75-76. On May 11, 1977, when commencing excavation for the water connection, appellant's excavation subcontractor, Maxymillian Inc., encountered a pipe that was not shown on the contract drawings and that blocked the connection. Supplemental Appeal File, Volume 1(A), Exhibit 6; Transcript at 1063-64. The parties considered various proposals for resolving the problem, coordinating their review with representatives of the city of Pittsfield. Appeal File, Volume IV, Exhibits 155-158; Supplemental Appeal File, Volume 1(A), Exhibits 6, 7, 8. Appellant was required to erect barriers and to install steel plates over the hole until the pipe could be removed. Transcript at 457, 1063-65. Finally, on June 23, 1977, the city water department tapped into the pipe and found it dead, allowing Maxymillian to break through the pipe and install the water connection. Supplemental Appeal File, Volume 1(A), Exhibit 12. The work was completed that day. Id. We find that appellant has established entitlement to additional compensation for the differing site condition, which delayed performance of subsequent work under the contract. See finding 4.

27. Precast Slabs and Penthouse Roof: Appellant allocates $7,600 of its total claim to an alleged design defect involving precast concrete slabs which were unstable when placed on the two-way sloped structural steel system in the penthouse roof, for the correction of which the Government required appellant to install shims under each slab. Second Amended Complaint at 76. For the penthouse roof, Contract Drawing 7-S-4 provided for five footwide concrete slabs placed on two-way sloped steel. Appeal File, Appendix C, Exhibit H; Transcript at 1065. Appellant installed eight foot wide slabs, however. On July 26, 1977, appellant wrote to Caolo & Bieniek, as follows:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

With reference to the installation of the precast roof at the penthouse, please be advised that the structural steel and the precast concrete were installed in accordance with the structural drawings and the approved shop drawings as directed by you.

There exists, however, a discrepancy between the structural and the architectural drawings relative to this item.

The structural drawing indicates the spandrel beams of the North, East and South as being level. The West beam is depressed at column D3 to provide drainage. This condition results in a rocking effect of the precast concrete.

Please advise the procedure you intend us to follow to eliminate the rocking effect and as to the method desired to provide roof drainage.

Appeal File, Volume IV, Exhibit 168. Mr. Sheridan noted on a copy of this letter two observations, the second of which is dated August 4, 1977, and the first of which apparently preceded the dated notation. Appellant's Exhibit 262. The first states "Does appear to be an impossible design criteria to meet. Precast planks would have to had [sic] warped surfaces to fit struct [ural] steel even if they were only 60" wide." Id. The second states, "Resolved in 8/3/77 meeting. Will shim up high side of P.H. ..." Id. To accommodate for the warp, appellant raised and shimmed the ends of the planks. Government's Trial Exhibit 110; Transcript at 1065, 1152. Appellant then flash patched the joints of the upper surface of the planks, leveling them in order to place the roof properly. Government's Trial Exhibit 110; Transcript at 1065-66. We agree with the implication of Mr. Sheridan's first contemporaneous notation that the specifications were defective, despite his testimony that the roof's rocking substantially resulted from appellant's use of the eight foot wide slabs. In addition, Mr. Bieniek placed responsibility on "the pitch of the steel," and we agree. Transcript at 1065, 1152. Although appellant failed to establish any specific increased costs it may have directly incurred in correcting the design defect, we find that the additional work ordered by the Government affected appellant's prosecution of subsequent work under the contract. See finding 4.

28. Glass Doors: Appellant allocates $6,100 of its total claim to the extra work allegedly incurred in relation to a defective design for the installation of three pairs of glass egress doors as swinging inward rather than outward. Second Amended Complaint at 77. We deny recovery because appellant states no intelligible claim. Appellant presents the following argument. The contract drawings for relocatable partitions depict partition egress doors as swinging inward. However, appellant installed the doors swinging outward because of the requirements of the applicable fire code. The Government then directed appellant to reinstall the doors to swing inward in the manner depicted in the contract drawings. Whether appellant reinstalled the doors is unclear, however. We glean from appellant's Exhibit 115 that the Government issued a Modification Request on November 18, 1977, which, among other items, deleted "three pairs of double doors and frames as specified in Section 1021 of the Contract documents" and required appellant to "[i]nstall three new pairs of glass doors, frames, and hardware ... as described on the relocatable partition plans." Appellant Exhibit 115. Presumably, those plans are the ones appellant believes conflicted with the fire code, and therefore its claim does not appear to be based on the fact of the contract change or any resultingdelays. On April 10, 1978, the Government accepted appellant's proposal for compensation for installing the doors as ordered under the Modification Request and paid appellant under Change Order 22. Id. Specifically, why appellant expects more money is a mystery. Second Amended Complaint at 77; Appellant's Reply Brief at 292-93.

29. Stanley Doors and Sensitivity: Appellant allocates $4,400 of its total claim to the additional work required to correct an alleged design deficiency which caused the automatic sliding doors at the west entry to the building to function improperly. Second Amended Complaint at 77-78. The automatic doors were activated by an ultrasonic motion detector which was extremely sensitive within a limited range. Transcript at 1066. This resulted in the doors being activated by

rainfall as well as any other nearby sound. Id. at 1067. The Government instructed appellant to decrease the sensitivity of the motion detector and to prevent the doors from being continuously and unnecessarily opened. Id. The installer of the motion detector made several visits to the site to correct the problem. Id. at 1067. By letter dated May 25, 1978, appellant informed Mr. D'Amore that it did not consider the work to be part of its contractual obligation, but it would be performed "at no change in contract amount." Supplemental Appeal File, Volume 3(A), Exhibit 2AC-A25. The Government never paid appellant for the work. Respondent's Posthearing Brief at 25. We find, however, that appellant waived any right to compensation and, therefore, deny this claim.

30. Catch Basin in South Planting and Grading: Appellant allocates $4,000 of its total claim to the additional work required to correct the landscape design. Second Amended Complaint at 78-79. The slope of the grading on the south side of the building, as depicted in the contract drawings, would have resulted in the lower courses of brick being buried in the event of heavy rainfall. Transcript at 662, 1068. Appellant brought this defect to the Government's attention. Id. On July 26, 1977, the Government issued a field directive to correct the problem, ordering appellant (1) to install a new catch basin and storm drain piping in order to direct run off water away from the building, (2) to grade the area at the building's south end to slope into the new catch basin, and (3) to modify the sidewalk and parking lot grades all around the building. Appeal File, Volume 3, Exhibit 108; Appellant's Exhibit 110; Transcript at 1068. On August 2, 1977, appellant forwarded to the city of Pittsfield for its approval the Government's plans for revising the grade and drainage for the project. Appeal File, Volume III, Exhibit 107. On August 9, 1977, appellant received a letter from the city approving the changes, which appellant forwarded to Caolo & Bieniek two days later. Id., Exhibit 106; Appellant's Exhibit 110. By letter dated August 25, 1977, appellant proposed a total cost of $5,382 for the additional work, which included a proposal of $4,893 for the subcontractor who performed the work, J. H. Maxymillian, Inc., plus a 10% commission to appellant. Appellant's Exhibit 110. Mr. Sheridan rejected the proposal, and negotiations between the parties followed on September 14, 1977. Id. Appellant submitted a proposal of $3,870 on September 30, 1977. Id. The Government accepted appellant's proposal on October 25, 1977, under Change Order 9. Id. We find that the Government's changes delayed appellant's prosecution of this and other work under the contract. See finding 4.

31. Integrated and Acoustical Ceiling System: Appellant allocates $19,500 of its total claim to the Government's alleged failure to cooperate and to delays resulting from the Government's initial rejection of appellant's plans for the integrated and acoustical ceiling system (ICS). Second Amended Complaint at 79-81. Specification section 1350, Integrated Ceiling and Background (ICB) System, provides performance requirements for the ceilings of the first and second floors. Appeal File, Appendix C, Exhibit G. Paragraph 1.5 requires submittal, within thirty days of contract award, of a ceiling plan, technical data, a photograph of four modules for aesthetic evaluation, and appellant's certification that the proposed system would meet all specified performance requirements. Id. Paragraph 1.5.2 requires the contracting officer's approval or rejection of the submittals within ten days, and resubmittal within ten days if rejected. Id. The paragraph finally notes, "Approval is required before any work covered by this section can be started." Id. Paragraph 1.5.3 provides, "After approval of the above data, [a] prototype of the system shall be erected on the project ... in a location selected by the Contracting Officer.... [T]he prototype shall serve as a standard for further production." Id. Contract drawings 5-A-15 and 5-A-16, both titled "Reflected Ceilings," were for the first and second floors respectively, and each contained the note "Integrated Ceiling shown hereon is 5' x 5' module." Id., Exhibit H. The specifications stated no requirement for module dimensions, and we find that the notations and module dimensions of the drawings were, at most, illustrative rather than mandatory. Our finding is buttressed by that of the Public Buildings Service, detailed below. Mr. Sheridan, however, interpreted the drawings to state mandatory dimensions. Transcript at 1070-72. At a job meeting on April 20, 1977, appellant's ICS subcontractor, Jacobson and Company, presented a preliminary layout of the integrated ceiling. Appellant's Exhibit 91. At the meeting, the Government questioned the preliminary layout's failure exactly to match up the track and module

lines. Id.; Transcript at 767. Jacobson's representative noted that Jacobson had installed similar systems for GSA in New York and Atlanta, and the parties agreed that Jacobson would prepare and submit shop drawings. Appellant's Exhibit 91. The Government's objections to the proposal caused Jacobson to reconsider and review the layout, delaying final submittal of the ICS plans. Transcript at 767. On June 20, 1977, Jacobson submitted its plans and drawings, certifying "that the ICB System which we are submitting meets each of the performance requirements specified, as called for in section 1.5.1.4 of Section 1350 of the Specifications." Appellant's Exhibit 256. Following much discussion, the Government finally rejected those plans on August 25, 1977, based on their failure to conform to the five foot by five foot module layout indicated in the drawings. Id. On August 29, 1977, Mr. Sheridan spoke by telephone to the chief of the Criteria and Research Branch of the Public Buildings Service (PBS) at GSA in Washington, D.C., and on the same date, the Acting Director, Professional Services Division, PBS, memorialized the conversation and advice as follows:

Mr. Sheridan requested an interpretation of the ICB system specification relative to whether or not suspension grid members are required to coincide with building planning module lines. The project specification for subject project is identical to PBS guide specification PBS (PCD): 4-13500, dated August 1976; however, a reflected ceiling plan has been shown on the drawings which indicates the suspension grid members coinciding with building module lines.

The guide specification does not require that the suspension grid members coincide with the building planning module lines. Further, General Note Number 4 of the guide specification cautions against showing a reflected ceiling plan on the drawings, as this can compromise system performance. Since specification take [sic] precedence over drawings, it is our opinion that suspension grid members are not requiredto coincide with the building planning module lines for the subject project.

Any requirement that grid members coincide with building planning module lines would virtually dictate the use of 5'-0" x 5'0 lay-in panels. Not only will this severely limit competition, but where a sprinkler system occurs would probably conflict with requirements for accessibility.

Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B1; Appellant's Exhibit 256. This letter was followed by another, with identical advice, dated August 31, 1977, from the Acting Assistant Commissioner for Construction Management of the Public Buildings Service and addressed to "All Directors, Construction Management Divisions--PBS." Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B1. On September 7, 1977, Mr. Sheridan spoke by telephone to Mr. Frank D'Amore "concerning contractor's claim that ICS grid is not required to coincide w[ith] bldg grid." Appellant's Exhibit 256. Mr. D'Amore agreed with appellant's, and PBS's, interpretation. Id. By field memorandum dated September 26, 1977, Mr. Sheridan asked appellant to explain its plan's compliance with several specification paragraphs, and finally demanded "Explanation as to why your reflected ceiling plans need not comply with these dwgs. [S-A-15 and S-A-16]." Id.; Appellant's Exhibit 96. Jacobson responded to appellant by letter dated October 4, 1977, which appellant forwarded to Caolo & Bieniek the following day. Appellant's Exhibit 256. On October 5, 1977, Mr. Sheridan noted on the bottom of the letter, apparently following the jobsite meeting of that date, an interpretation by Jacobson of the drawings that essentially conformed to that of appellant, the PBS, and Mr. D'Amore. Id.; Appellant's Exhibit 92. Mr. Sheridan's notes for that job site meeting, at item 200, also indicate that the Government had agreed to accept appellant's ICS plans. Appellant's Exhibit 92. The plans finally accepted by the Government were the same as those originally submitted. Respondent's Posthearing Brief at 27. On October 6, 1977, appellant wrote to Caolo & Bieniek requesting advice "of the location to construct the prototype of the integrated ceiling." Appellant's Exhibit 256. The architect responded with a location on October 19, 1977.

We find that the Government unreasonably delayed in approving the ICS plans, which affected appellant's prosecution of this and other work under the contract. See finding 4. Although appellant did not submit the final plans until June 20, 1977, it presented the intended layout at the job meeting on April 20, 1977. The

Government informally rejected appellant's proposal at the meeting, and the record establishes that appellant would have submitted its final plans for the ICS well before June 20, but for that rejection which the Government had based on the contract's defective drawings. We find that the unreasonable delay in approval, therefore, extended from May 10, 1977, a date by which we believe appellant would have submitted its plans and the Government should have accepted them, through October 19, 1977, the date the Government selected a location for the prototype. We find that appellant could not proceed without a location for the prototype, and the Government should have been prepared to designate one immediately, given the extraordinary and unreasonable delay already inflicted on appellant.

32. Partitions: Appellant allocates $25,500 of its total claim to the Government's alleged delay in providing the layout plan for relocatable partitions and to costs allegedly incurred as a result of succeeding changes to the layout plan and related items. Second Amended Complaint at 82-84. The record fully establishes not only appellant's need for early receipt of the layout plans, in order to schedule and prosecute other work items critical to timely completion, but also the repeated requests for plans and the Government's unexplained delay in delivering them.

By letter dated March 25, 1977, appellant advised Caolo & Bieniek of the need for GSA's partition layouts, as follows:

[T]he layout of the interior partitions must be finalized in order that doors, frames and hardware be detailed and prepared for approval. The hollow metal frames will be needed before the masonry can begin in the basement areas. Hardware templates must be approved before hollow metal fabrication can begin.

Appellant's Exhibit 240. By letter dated April 7, 1977, the Government CPM consultant, C.T. Male Assocs., submitted to GSA the initial critical path schedule, with related items, and noted a desirable completion date of April 20, 1977, for the Government's partition layout. Id. The consultant deemed an early submittal of the layout important "because of ... [its] effect on concrete embedded items and masonry." Id. The electrical subcontractor, Collins Electrical, similarly wrote to appellant on April 21, 1977, asserting that the locations of telephone and electric outlets must be known before pouring of the concrete in order to allow for placement of the pre-set inserts called for in the plans and specifications. Appellant's Exhibit 170. Appellant forwarded the letter to Caolo & Bieniek on April 27, 1977. Id. In addition, planning for electrical switching and lighting arrangements for the ICS depended on receipt of the partition layout. Transcript 1073, 1221-22. In his job meeting minutes of July 20, 1977, Mr. Sheridan noted:

Contractor is requesting date GSA will furnish relocatable partition layout. At present, relocatable partition plan will be furnished late in August. Contractor wants plans as soon as possible.

Appellant's Exhibit 91. In a memorandum dated July 22, 1977, and sent to both Mr. Sheridan and Mr. Perry, Mr. D'Amore requested final partition layouts by August 15, 1977, noting their need "in order that the present construction schedule can be maintained." Appellant's Exhibit 269. On September 1, 1977, appellant wrote to Mr. D'Amore again requesting the Government's relocatable partition plan and noting that "the furnishing and installing of the partitions is an item critical to our completion plans." Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B2; Appellant's Exhibit 242. Appellant informed Mr. D'Amore that delay in receiving the plans would delay the work progress and requested a time extension beginning August 31, 1977, through whatever date the plans were finally received. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B2; Appellant's Exhibit 242; Transcript at 762.

On September 26, 1977, Caolo & Bieniek sent to appellant shop drawings of the partition layout for the first and second floors. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B2. Appellant received those plans, marked "for your use," on September 30, 1977, and by letter dated October 6, 1977, wrote to Caolo & Bieniek, "[W]e are proceeding with the implementation of these plans with the understanding that they are finalized and approved for construction." Id. Appellant subsequently

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

became concerned that the plans might not have been final and approved, based in part on advice from the Government that the plans would undoubtedly change. Id.; Transcript at 763-64. On October 11, 1977, appellant wrote to Caolo & Bieniek that work would not proceed "until we have received an approved drawing," and by a second letter of the same date appellant ordered its subcontractor to hold any orders for materials until further notice. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B2. On October 14, 1977, Mr. D'Amore wrote a somewhat cryptic letter to appellant, stating in full, "We are aware that you are proceeding with the productions of partitions, etc as shown on the drawings provided to you by Caolo & Bieniek Assoc., and as noted in your letter to Caolo & Bieniekdated October 6, 1977." Id. On October 18, 1977, Mr. D'Amore wrote more definitively, "Since you now have the layouts, we see no reason why you should not proceed with the work." Id.

Following its initial issuance of the plans on September 26, 1977, the Government ordered substantial changes concerning the partition layouts. Id.; Appellant's Exhibits 95, 96, 124. On November 15, 1977, the Government issued a field memorandum to appellant along with sepias and prints for the telephone and electrical systems, followed by a field directive dated January 20, 1978, substantially revising the work shown in the memorandum. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B2; Appellant's Exhibits 95, 96, 124. On December 29, 1977, the Government issued a field directive concerning the installation of light fixtures and switches in the relocatable partitions. Appellant's Exhibit 95. Changes in the locations of partitions also issued. Id. On January 27, 1978, the Government formalized plans and changes for the telephone and electrical systems with Modification Request 24. Appellant's Exhibit 124. Appellant submitted its initial price proposal on March 6, 1978, which it corrected, by letter dated March 31, 1978, having found that costs for one item had not been included. Appellant's Exhibit 170. Substantial negotiations followed, and on July 31, 1978, appellant wrote to Mr. D'Amore reducing the combined proposal price for all items from $9,707 to $6,468. Id. The Government accepted appellant's reduced proposal on August 7, 1978, under Change Order 35. Id.

By field directives dated March 3 and 29, 1978, and Modification Request 32, dated May 26, 1978, the Government also ordered numerous changes to the June 5, 1978, appellant submitted its proposal of $1,692 for the changes, which the Government accepted on June 19, 1978, under Change Order 28. Appellant's Exhibit 132. Appellant has established no entitlement to additional compensation for direct costs under Change Orders 28 and 35, but has established that the Government's prolonged and unreasonable delay in issuing the partition layout plans, and the substantial revisions that followed, impeded performance and adversely affected the prosecution of other work under the contract. See finding 4.

33. Windows: Appellant allocates $13,000 of its total claim to the specifications' conflicting requirements, and to the Government's alleged delay in approving appellant's submissions, concerning the aluminum windows. Second Amended Complaint at 84-88. Specification section 0800, Aluminum Windows, states in relevant part:

7.9 Finish: Aluminum shall be chemically cleaned, anodized and sealed, with a minimum of .4 mil 215-R1 duronodic bronze film thickness.

Appeal File, Appendix C, Exhibit G. In addition, paragraph 9 provided, "Finish shall meet requirements of the Aluminum Association's Designation System for Aluminum Finishes for finish noted or scheduled." The contract drawings stated that the window finish was to be duronodic bronze. Appeal File, Appendix C, Exhibit H. Although 215-R1 indicates a different type of coloring than duronodic bronze, the parties had agreed by June 7, 1977, the date the Government's architect requested samples, that duronodic bronze would be the required color for the window finish. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B3. Appellant had first submitted drawings for the windows on May 2, 1977. The architect's notation on the submittal form of "215R1" over the "Dark Bronze Duranodic" written by appellant indicates the architect's initial confusion over the conflicting color requirements. Id. On June 6, 1977, appellant resubmitted the drawings, and shortly thereafter submitted samples for the windows. On June 14, 1977, the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Government approved a high limit for the color variation in the windows but failed to state an acceptable low limit. Id.; Appellant's Trial Exhibit R. The window manufacturer noted, however, in a letter to appellant dated June 17, 1977, "we require an approved high and low limit which would represent the maximum allowable color extremes." Id. The Government's architect received a copy of the letter on June 23, 1977. On July 19, 1977, the Government ostensibly approved a low limit finish, while stating, "We want to caution the window manufacturer that we have approved high and low limits but all windows provided to the job must be of a uniform color." Supplemental Appeal File, Volume 3(B), Exhibit 2AC- B3; Appellant's Trial Exhibit R. In a letter to appellant dated August 5, 1977, and received by the Government's architect four days later, the window manufacturer objected that the duranodic process did not permit exact maintenance of a uniform color. The manufacturer stated, "[I]t must be understood, that if there is a variance in shades and it does fall within the limits of the approved finish samples, that this shall not be grounds for rejection." Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B3. On August 18, 1977, the Government responded that although it understood there would be "some very slight variation" in finish, "we are emphasizing that we want all the windows manufactured with the material from the same duranodic processing run and not processed from various batches." Id. On August 23, 1977, the manufacturer responded by letter to appellant, stating in pertinent part, "It is impossible to have all of the aluminum processed in one run as the quantity involved for this project requires thirty separate loads in the finishing tank." Appellant's Exhibit 253. In addition, the manufacturer noted that variables must be expected even within the same load, but "we will attempt to be as consistent as possible to minimize the visual difference." Id. The manufacturer stated, "We are proceeding on the basis that there will be a variable not exceeding the high and low range samples." Id. On September 15, 1977, the Government finally wrote to appellant stating its agreement with the manufacturer's understanding of the variable in both the August 23 and August 5 letters. Id. Testimony by both Mr. Makes and Mr. Bieniek indicated that up to this point the Government insisted on a uniform color for the windows, despite the approval of a color range. Transcript at 788-89, 1153-64, 1841-42. In addition, Mr. Bieniek testified that the standards of the Aluminum Association, incorporated by reference at paragraph 9.1 of specification section 0800, permitted variation in the finish. Id. at 1155. The CPM schedule late start date for window installation was October 5, 1977. The windows arrived on November 22, 1977, and their installation began on November 28, 1977. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B3; Id., Volume 5, Exhibit A; Government Trial Exhibit 150; Transcript at 1076-81, 1153-59. Appellant's subcontractor completed installation of the windows on December 9, 1977. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B3. We find that the sole cause of appellant's delay in installing the windows was the Government's delay in approving the color samples, its inconsistent instructions once they were approved, and its insistence on a level of performance that was beyond the scope of the contract's requirements. We find that the Government unreasonably withheld approval and caused a delay in ordering the windows from June 14, the date the Government approved only one extreme for the allowable variation, through September 15, 1977. See finding 4.

34. The CPM (Critical Path Method): Appellant allocates $20,000 of its total claim to an alleged misuse or abuse of the CPM schedule by the Government and its CPM consultant, C.T. Male Assocs. Second Amended Complaint at 88-91. Appellant's dissatisfaction stems largely from the requirement that a CPM schedule be produced for the project, the schedule's repeated updating over the project's course, and the Government's reference to the schedule in arguing that appellant timely completed the project. Specification section 1170, Critical Path Method Scheduling, provides pertinent requirements for the CPM scheduling. Appeal File, Appendix C, Exhibit G. Paragraph 1.1 states, in part:

The Contractor shall provide all the information necessary for the Critical Path Method (CPM) Consultant, employed by the Government to develop a network plan demonstrating complete fulfillment of all construction contract requirements and for the CPM Consultant to keep the network plan up to date in accordance with the requirements of this Section. The Contractor shall utilize the plan in planning, coordinating, and performing the work under this contract (including all activities

of subcontractors, equipment vendors, and suppliers).... [T]he provisions of this section shall govern the planning, coordinating and the performance of the work under this contract.

Id. Paragraph 2.1 requires appellant to meet with the CPM consultant and submit sufficient information for the consultant's drafting of an initial "arrow diagram describing the activities to be accomplished and their dependency relationships together with a computer-produced schedule showing starting and completion dates for each activity...." Id. Following review by the contracting officer and a meeting of the three parties, paragraph 3.1 requires the consultant to revise the arrow diagram and computer-produced schedule in accordance with any agreements reached during the meeting. Id. In addition, that paragraph provides that the arrow diagram and computer-produced schedule "shall constitute the project work schedule until subsequently revised in accordance with the requirements of this Section." Id. Paragraph 6.1 requires a monthly review and revision of the arrow diagram:

showing all changes in the network logic, including, but not limited to changes in activity duration, and revised activity cost estimates as the result of contract modifications, changes in activity sequence and any changes in any contract completion date which have been made pursuant to the provisions of Clause, ADJUSTMENT OF CONTRACT COMPLETION TIME, of this section since the last revision of the arrow diagram.

Id. Paragraph 6.2 similarly requires a monthly review and updating of the computer produced schedule:

to show actual progress, to identify those activities started and those completed during the previous period, to show the estimated time required to complete each activity started but not yet completed, and to reflect any changes in the arrow diagram approved in accordance with the preceding paragraph.

Id. Finally, paragraph 6.3 requires the CPM consultant to prepare and submit to appellant a monthly narrative report describing job progress, problems encountered or anticipated, and recommendations for corrective actions.

The parties drafted and submitted several schedules to the Government before one was finally approved as the initial CPM schedule, on June 8, 1977. Supplemental Appeal File, Volume 5(A), Exhibits 1-4. Revisions and updates followed, as contemplated by the contract. Id., Exhibits 7, 8; Supplemental Appeal File, Volume 5(B), Exhibits 9-16. The purpose of the initial and updated schedules was to assist the parties in planning and coordinating work under the project. Transcript at 907. Appellant signed the contract, and the contract clearly required appellant's cooperation in the production and subsequent revisions of a CPM schedule. There is no indication that the consultant acted improperly in requiring the updates. We therefore deny this claim.

Under the circumstances of this case, and in light of the Government's stipulations noted in Finding 4, supra, however, we give little weight to the CPM schedules in determining whether appellant experienced delays in performing this contract. In addition, we reject as meritless appellant's assertion that the Government may not advance what we find to be a good faith argument based on these schedules.

35. Unauthorized Government Personnel on Job-Site: Appellant allocates $17,400 of its total claim to the Government's failure to prevent employees of future tenant agencies of the building from entering the job site, thereby allegedly breaching the Government's duty to cooperate and its duty not to interfere with construction progress. Second Amended Complaint at 91-92. Appellant alleged both damage to the carpeting and interference with construction progress by the unauthorized visitors. Id. Following installation of the carpet, appellant posted a sign barring unauthorized visitors from the building. Transcript at 1082. Mr. Sheridan testified that he made no efforts to control visitors, but rather referred all inquiries to appellant's superintendant, Michael Makes. Id. at 1082-84. Specification section 0968-6 requires appellant, following installation of the carpet, to provide clean-up services that include vacuuming of the entire

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

installation and to "[p]rotect installation from damage or soiling until inspected and accepted by the Government." Appellant failed to establish any damage to the carpeting or any quantifiable interference with job progress by unauthorized visitors, and therefore this claim is denied.

36. Fuel Oil Tank: Appellant allocates $12,600 of its total claim to the Government's alleged wrongful rejection of the fuel oil tank, as initially delivered, and refusal to permit field repairs of that tank. Second Amended Complaint at 92-95. Specification section 1570-16 required appellant to provide a 10,000 gallon fuel oil storage tank for use in the building's heating system. Appeal File, Appendix C, Exhibit G. Pursuant to section 1570-18, appellant excavated a site in the parking lot on the north side of the building for the tank's installation. Id.; Transcript at 458-59. Paragraph 1570- 17.2 required the manufacturer to coat and inspect the tank before shipping as follows:

[T]he exterior surfaces shall be treated with 2 shop coats of a catalized [sic] coal-tar epoxy containing not less than 33 percent epoxy resins. Each of the two coats shall be applied to a dry film thickness of not less than ten mils.... After each coat of epoxy is applied, the surfaces of the tank shall be thoroughly cleaned of all dirt and inspected for evidence of loose coating, holidays and areas of coating damaged in handling by means of a damp-sponge holiday detector operating at approximately 75 volts. Any such detected areas of damage shall be cleaned so as to expose the bright metal and these areas shall be recoated.

Appeal File, Appendix C, Exhibit G. Paragraphs 1570-17.3 through -17.5 required inspection and repair of the tank at the job site, as follows:

17.3 After transit from the fabrication shop to the job site and immediately prior to installation, tank shall again be tested for coating with the damp- sponge detector and where indicated defects appear, they shall be cleaned to bright metal and repaired to a fully dry film thickness of twenty mils in one coat. Epoxy coating shall not be applied when metal or ambient temperature is less than 45 F.

17.4 Coating shall be done by men who are thoroughly and specifically experienced in the application of catalized [sic] coal-tar epoxy, and in strict accordance with the recommendations of the coating manufacturer.

17.5 After field repairing of the epoxy coating has been completed, including application and drying, all coated surfaces of tanks shall be tested with an electric damp-sponge holiday detector operating at approximately 75 volts. Any missed places revealed by the test shall be promptly repaired by a single application of epoxy.

Id. Thetank first arrived at the job site on July 11, 1977. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B6. The tank contained a two-foot wide holiday near its center as well as damage to its coating under the straps that had secured it during shipment. Transcript at 1084-85. Mr. Sheridan testified that he rejected the tank. Id. He denied, however, that he ordered appellant to return the tank rather than effect field repairs. Id. Three of appellant's witnesses, Mr. Harrington, Mr. Bowler, and Mr. Makes, disputed this latter testimony, stating that Mr. Sheridan ordered the tank's return. Id. at 417, 1736-37, 1859. Mr. Harrington admitted, however, that he was not present when the order was given but subsequently learned of it from Mr. Makes. Id. at 416-17. On July 12, 1977, Michaels Mechanical wrote to the manufacturer, in pertinent part as follows:

We are in receipt of the 10,000 fuel oil tank for subject project. It was delivered to the jobsite yesterday afternoon.

As delivered, the tank is totally unacceptable to both the Federal Project Engineer and us.

....

[I]t is not as specified--not only are there chips from shipment, but it is evident just from looking at the tank that the "(2) coats of catalized [sic] coal

tar epoxy" have not been applied to the tank. There are holidays that are so evident that the tank as is will not do. This lack of coatings also strongly suggests that the "damp sponge holiday detector test" was not performed at the factory.

Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B6. The letter further noted that the tank required more than touch up work in the field to be acceptable. Id. Appellant sent the tank back to the manufacturer, and on July 26, 1977, the manufacturer returned the tank to the job site. Appellant effected field repairs of all minor defects, and Mr. Sheridan accepted the tank on July 28, 1977. Second Amended Complaint at 93-94; Answer at 15. Despite the testimony of appellant's witness, we accept Michaels Mechanical's contemporaneous letter to the manufacturer and Mr. Sheridan's testimony that the tank as originally delivered was properly rejected. The letter establishes that the tank's defects were too extensive to be repaired in the field, and appellant has failed to establish entitlement to compensation for any costs incurred because of the rejection and ensuing delays.

37. Fire Alarm: Appellant allocates $11,500 of its total claim to the Government's alleged failure to coordinate changes to the building's fire alarm system with the City of Pittsfield Fire Department, thereby requiring appellant to perform that task. Second Amended Complaint at 95-96. The claim addresses only appellant's allegedly uncompensated coordination costs; no allegation is made that delay damages were incurred as a result of the changes. Id.; Appellant's Reply Brief at 305-06. At a job site meeting on May 25, 1977, the Pittsfield Fire Department requested four additions to the project's fire alarm system, which request the department memorialized in a letter dated June 30, 1977. Appellant's Exhibit 106. The Government ordered those additions in Modification Request 6, which issued on July 21, 1977. Id. Appellant initially proposed a price of $2,853 for the additional work, while the Government estimated a cost of $2,209. Id. The parties subsequently negotiated a price of $2,227, which appellant submitted on July 27, 1977, Proposal 6. Id. On August 17, 1977, the Government accepted that proposal under Change Order 4. Id. Mr. Sheridan noted on his estimate sheet, dated July 12, 1977, "General's commission of 10% is less than the cost contractor encountered in preparing estimate, processing change paperwork, coordinating subs, & dealing w[ith] city Fire Dept. to determine their requirements." Id. Mr. Makes similarly testified to the disparity between appellant's coordination costs and the commission paid. Transcript at 736. It appears to us, however, that the coordination costs appellant is now seeking should have been included in the change order price. This claim is therefore denied.

38. Boiler Room Sleeves and Piping: Appellant allocates $16,400 of its total claim to extra work allegedly caused by a design deficiency concerning sleeves for the pipes in the boiler room ceiling. Second Amended Complaint at 96-97. On November 23, 1977, Mr. Sheridan ordered the "[m]echanical contractor ... to provide sleeves at all penetrations thru boiler room ceiling and pack same with rock wool in order to retain fire rating requirement." Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B8. Mr. Harrington testified concerning the requirement as follows:

Boiler--this particular boiler room has a dropped ceiling and it's wire lathe and plaster. Specification calls for any sleeve penetrating the boiler room ceiling--this is where I say the specifications were never edited--they say the sleeve has to be a steel type sleeve.

Your Honor, plaster ceiling is 3/4 of an inch thick. I don't know how you could get a schedule 40 steel pipe sleeve into that ceiling--I mean it's just ridiculous.

Q. Is it impossible or ridiculous?

A. I think it was possible because I think we ended up doing it somehow.

Transcript at 424. The pipes had already been installed at the time of the order, however, and Mr. Sheridan testified:

The contractor said, well, I can't get the sleeves on now without disassembling

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the pipes.

He proposed some kind of, I imagine it must have been a split sleeve that he could have opened up and put around the pipe. Whatever it was that he proposed we accepted. They installed these as fast as it came in.

Id. at 1088-89. Appellant initially failed to perform as required by the contract, and the Government merely ordered appellant to do so. Appellant has established no entitlement to additional compensation.

39. Boiler Header and Boiler Start-Up: Appellant allocates $7,600 of its total claim to two related items: (1) an alleged defective specification concerning installation of the boiler header piping and air expansion tanks in the boiler room and (2) the Government's alleged wrongful refusal to allow anyone but a certified factory representative to start up the boiler. Second Amended Complaint at 97-99. Specification section 1501 contains two provisions pertinent to the installation of the boiler piping. Appeal File, Appendix C, Exhibit G. First, paragraph 1501-8.2 states, "Pipes, conduits, ducts, and similar items, shall be kept close as possible to ceiling, walls and columns, to take up a minimum amount of space." Id. Second, paragraph 1501-11.1 states: "Piping and conduits, except electrical conduits run in floor construction, suspended ceiling space, or roof space shall be run parallel with the lines of the building unless otherwise noted on drawings." Id. Mr. Harrington testified that appellant's subcontractor for the work, Michaels Mechanical, installed the boiler header piping and expansion tanks in front of the boiler as the only practicable location, and installed the pipes at the height necessary for the proper operation of the expansion tanks. Transcript at 421-22. Mr. Sheridan insisted that appellant raise the piping, however, to allow greater headroom for servicemen that might work on the boiler. Id. Mr. Sheridan initially accepted appellant's suggestion to place the pipe at a 45 degree angle to provide greater clearance, and that modification was accomplished. Id. at 422-23. Exactly what Michaels was required to do to accommodate or correct the angle or height of the piping is not established by the record. Appellant alleges:

In order for the plastering contractor to plaster smoothly over the tank's top, Michael's [sic] was forced to take down expansion tanks that were hung at a minimum height elevation and piped back to the air fitting on the boiler. Furthermore, the pitch in the air piping between the expansion tanks and the air fitting on the header piping had to be maintained.

Second Amended Complaint at 98. The order precipitating this alleged work was a field memo dated February 8, 1978, which stated:

Be advised that the plaster ceiling over the expansion tanks is unacceptable. The boiler room ceiling and expansion tanks are to receive paint as outlined in finish schedule and specifications.

Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B9. How this memo affected the angled piping, or the piping precluded compliance with the memo, is unclear. If an explanation is buried in the record, appellant has failed to inform the Board. Second Amended Complaint at 97-99; Appellant's Reply Brief at 218-21. Whether or how the issue was resolved, and its quantifiable effect, if any, on appellant's prosecution of the contract, remain unproven. This claim is denied.

Concerning the boiler start up, paragraph 4.2 of specification section 1570 provides:

Burner and controls must be installed and adjusted under the direct supervision of an authorized factory representative and shall be the product of a manufacturer who maintains an adequate and responsible local service organization which stocks a full line of replacement parts.

Appeal File, Appendix C, Exhibit G. Appellant acquired the boiler from TMI Sales Corp. of Forest Hills, New York, a sales representative of the boiler's manufacturer, Peerless. Respondent's Exhibit 139. Appellant proposed using

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Sweatland Pierce Co. of Pittsfield for the boiler start up, and by letter dated April 10, 1978, TMI advised Michaels Mechanical, in full, as follows: "Sweatland and [sic] Pierce of Pittsfield, Mass, have been in the service business a long time, and we feel that they are competent to start up and service Peerless Boilers." Respondent's Exhibit 140. On April 12, 1978, Michaels Mechanical wrote to TMI, in pertinent part:

It is imperative that you comply with the boiler specification Section 1570 Par. 4.2 for subject project, which states that burner and controls be installed and adjusted by an authorized factory representative....

Your letter of April 10, 1978, which stated you "feel" that Sweatland and [sic] Pierce is competent because they "have been in the service business a long time," was laughed at and was found to be completely unacceptable by the GSA representatives and mechanical engineers.

Your unwillingness to comply promptly with the specifications on this item has caused our firm a great deal of embarrassment and lost time as we were under the impression you were sending a letter which would state that Sweatland Pierce was an authorized service representative. The letter as written says absolutely nothing.

Respondent's Exhibit 139. The Government refused to accept Sweatland Pierce Co. as an authorized factory representative; appellant faled to establish Sweatland Pierce Co. as such a representative; and appellant failed to establish any breach stemming from the Government's refusal.

40. Roof Drains and Piping System: Appellant allocates $5,900 of its total claim to delays incurred because of two items: (1) the Government's alleged wrongful initial rejection of the roof drain submittal and (2) the alleged defective design of the roof drain system and changes to the system ordered by the Government. Second Amended Complaint at 99-100. Specification section 1517 provides:

12. ROOF DRAINS

12.1 Roof drains shall be of cast-iron, of the heavy cup pattern, and each drain shall have an integral flange not less than 12 inches in diameter and a satisfactory device for securing the roof covering to make a water-tight connection. Drains installed on composition roofs shall have sheet lead flashings in addition to the integral flashings. Sheet lead shall be in accordance with Federal Specification QQ-L-201f, weighing not less than four pounds per square foot. Drains on roofs having slag or gravel shall be provided with suitable stops.

12.2 Each drain outlet shall be the same size as the downspout and shall be equipped with necessary parts to make a satisfactory watertight connection to either threaded or hub-and-spigot pipe as required.

Appeal File, Appendix C, Exhibit G. On May 5, 1977, Michaels Mechanical submitted shop drawings for "Rhody Type ILG roof drains" to the Government, which were rejected on May 13, 1977. Appellant's Exhibit 263. Michaels Mechanical resubmitted the shop drawings on May 31, 1977, and the Government approved them on June 3, 1977, under approval number 26-11. Id. The Government failed to establish any valid reason for the initial rejection, and we therefore find that rejection improper. Second, the Government determined that angle framing around the roof drains and plastic sheeting to protect ceiling insulation over entrance vestibules would be required because of a design deficiency. Appellant's Exhibit 111. The Government issued Modification Request 11 for this work on September 30, 1977, which followed a field directive of August 18, 1977. Id. Appellant initially proposed a price of $1,782 for the work, while the Government estimated a cost of $1,086. Id. Following negotiations, appellant submitted a revised estimate of $1,217, which the Government accepted on November 28, 1977, in Change Order 11. Id. Mr. Makes testified that the ordered changes affected the sequencing of work and disrupted job progress. Transcript at 662-63. In addition, the Government ordered the change

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

after the roof deck was in place, requiring an operation more difficult and expensive than if the work had been done earlier. Id. at 663. We find that the Government's initial rejection of the roof drain shop drawings and its changes to the roof drain system delayed appellant's prosecution of this and other work under the contract. See finding 4.

Mr. Makes also testified that difficulties encountered in pricing the change order adversely affected appellant's relations with its subcontractors. Appellant's original subcontractor for the angle framing work, Schenectady Steel Co., had proposed a price of $1,050 on August 2, 1977, which Mr. Sheridan rejected as too high. Appellant's Exhibit 111; Transcript at 663-64. In his initial estimate, dated August 20, 1977, Mr. Sheridan noted, "Schenectedy's [sic] price was unreasonably high. General [contractor] had difficulty finding another fabricator willing to accept such a small job." Appellant's Exhibit 111. By letter dated August 29, 1977, appellant informed the Government that a lower price had been negotiated for the same work from two outside subcontractors, Berkshire Bridge & Iron and Colvin Erectors. Appellant's Exhibit 111. Mr. Makes testified that, as a result of Mr. Sheridan's rejection of the proposal by Schenectady Steel Co., relations between appellant and that subcontractor deteriorated. Transcript at 663- 64. On this matter, however, the damages appellant seeks are not compensable, either because they are too remote or not of a contractual nature.

41. Air and Water Systems Adjustments and Tests: Appellant allocates $8,800 of its total claim to the Government's alleged arbitrary rejection of a subcontractor selected by Michaels Mechanical for the testing and adjustment of the air and water systems. Second Amended Complaint at 100-02. Specification section 1596, Air and Water System Adjustments and Tests, provides at paragraph 2.1:

> The Contractor, as part of this contract, shall obtain the services of an agency that performs the type of work hereinafter specified. Prior to commencing work under this section of the specifications, the testing agency shall have been approved by the Contracting Officer, and either shall be a Certified Member of the Associated Air Balance Council or shall have submitted adequate documentation to satisfy the Contracting Officer as to his competence. Minimum qualifications for acceptance shall be the General Membership Standards of the Associated Air Balance Council as published in AABC "National Standards for Field Measurements and Instrumentation--Total System Balance", Volume One, No. 81266, except that affiliation with manufacturers, installing contractors, or engineering firms may not preclude their acceptance.

Appeal File, Appendix C, Exhibit G. Paragraph 2.3 requires the contractor to submit for approval, within thirty days of contract award, the name of the proposed subcontractor, along with "the certified individual qualifications of all persons responsible for supervising and performing the actual work, the name of the certifying engineer, and the qualifications of the Registered Professional Engineer certifying the report." Id. Mr. Harrington testified that Mr. Sheridan rejected the subcontractor initially proposed, because "his credentials did not match what the specification called for.... We were forced to go to the next bidder to us on this particular job who did have these certain credentials." Transcript at 504-05. The specifications set forth minimum requirements that the initially proposed subcontractor failed to meet. Appellant established no waiver of those requirements and no entitlement to recover under this claim.

42. Insulation on the Ducts in the Duct Shaft: Appellant allocates $13,900 of its total claim to difficulties encountered with insulating ducts in the duct shaft and alleged impossibility of performance. Second Amended Complaint at 102-03. Paragraph 11 of specification section 1516 requires the insulation of ductwork used in the ventilating, heating, and air conditioning systems. Appeal File, Appendix C, Exhibit G. Paragraph 5 of that section specifies the type and method of insulation required. Id. Appellant constructed the wall for the central duct shaft and installed the ducts before allowing for their insulation, however. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B12; Respondent's Exhibit 31; Transcript at 1090, 1758. The construction "effectively prevented the insulators from being able to get to one side of two ducts." Transcript at 1090. The construction

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

engineer's daily diary noted on October 20, 1977, "HVAC contractor notified to begin insulation of ductwork in shaft, space is becoming limited for proper application procedure." Supplemental Appeal File, Volume 3(B), Exhibit 2AC- B10. On October 25, 1977, Mr. Dawicki issued a field memorandum to appellant advising that the ductwork "must be covered with thermal insulation, in its entirety." Id. The Government's inspection report for the week ending November 4, 1977, explains the difficulties encountered in insulating the ductwork, and their reasons:

Ductwork in penthouse was installed too close to the shaft wall to permit proper installation of insulation. Mason constructed wall before installation of ductwork. Ductwork was prefabricated in accordance with contract dwgs. sizes, but without a coordination dwg. to determine available space. Ductwork was then installed without consideration of the insulation. We informed contractor during installation of insulation, that insulation has to be complete around ductwork. Contractor continued both insulating and constructing block walls making correction of this problem more difficult. Contractor will now have extreme difficulty correcting this situation.

Id. In addition, Michaels Mechanical noted in a letter to Mr. Tierney dated March 21, 1978, and concerning insulation of the ducts, "Needless to say, this whole shaft problem was due to your decision to block up the walls of the shaft before the mechanical trades were complete." Respondent's Exhibit 31. Appellant's insulator, Johnson Asbestos, proposed four alternative solutions: (1) to insulate the rear interior of the duct, (2) to fill the opening between the duct and wall with a urethane foam, (3) to seal the opening between the duct and wall, leaving a dead air space, and (4) to seal the opening between the duct and wall and fill it with a diatomaceous earth. Transcript at 1758- 59. On January 4, 1978, the Government permitted appellant to attempt the third alternative, but it proved unfeasible. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B12; Transcript at 1090-91. On February 15, 1978, the Government finally accepted the first proposal, noting in the job meeting minutes:

278. Inside duct liner ... is approved for duct in shaft where space between duct and shaft wall is too tight to install external insulation. All piping and ductwork in duct shaft is to be insulated.

Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B12. On April 19, 1978, Mr. Sheridan wrote in his job meeting minutes, "Insulation on return air duct in shaft is accepted as being done as well as can be expected considering existing conditions." Id. Appellant has failed to establish any defect in the applicable specifications or Government responsibility for difficulties encountered by appellant when insulating the ducts.

43. The Cooling Tower: Appellant allocates $10,500 of its total claim to delays allegedly caused to the structural steel and roof work by the Government's delay in approving appellant's cooling tower submittal. Second Amended Complaint at 103-04. Contract drawing 9-M-3 requires a Baltimore Aircoil Model No. VNT-30B or equal cooling tower, to include capacity control dampers, as part of the building's air conditioning system. Appeal File, Appendix C, Exhibit H. On April 25, 1977, appellant proposed using for the cooling tower a Halstead & Mitchell model, which lacked capacity control dampers. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B13. On May 6, 1977, the Government rejected appellant's proposal, with a note attached from Greenleaf Engineers stating, "Capacity control dampers required." Id. On June 9, 1977, appellant resubmitted its proposal to use a Halstead & Mitchell cooling tower, along with an additional note that capacity control was accomplished by fan cycling. Id. On June 23, 1977, the Government again rejected the proposal, with an attached note stating, "Doesn't meet specification i.e., capacity control by damper." Id. At a jobsite meeting on July 20, 1977, however, the Government informed appellant that the proposed Halstead & Mitchell cooling tower would be approved. Id. By letter dated August 9, 1977, the Government finally issued its approval of that system as originally submitted. Id.; Transcript at 381. On June 13, 1977, however, appellant had begun erection of the structural steel. Supplemental Appeal File, Volume 1(A), Exhibit 11. On June 27, 1977, appellant had begun laying the steel floor decking. Id., Exhibit 13.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Although Mr. Sheridan's Inspection Report 15, dated July 15, 1977, noted that the "erection of structural steel and metal decking is a critical path item which is still going on, but should have been completed on June 28, 1977," the record fails to indicate any connection between those delays and that in approving the cooling tower. Id., Exhibit 15. On September 6, 1977, appellant "[b]egan installation of built up roofing," and substantially completed that work by October 17, 1977. Supplemental Appeal File, Volume 1(B), Exhibits 3, 9. Again, the record fails to indicate any connection between the job progress on this work and this delay claim. In addition, although Mr. Harrington testified that appellant experienced three months of delay in obtaining approval of the cooling tower submittal, appellant failed to prove that the submittal complied with the specification requirements. Transcript at 381- 82. That the Government ultimately waived the requirement for capacity control dampers does not establish appellant's immediate right to the approval of a nonconforming submittal. This claim is denied.

44. Unit Heater in the Penthouse: Appellant allocates $4,900 of its total claim to the Government's alleged delay of six weeks in directing appellant where to locate the unit heater in the penthouse. Second Amended Complaint at 104-05. The Government admits that "[o]n February 1, 1978 Appellant inquired into where the unit heater was to be located in the penthouse" and "avers that appellant had made the same inquiry on two previous occasions and was shown the same location for the unit heater on each occasion...." Id. at 104; Answer at paragraph B.14. Appellant fails to rebut the Government's allegation and fails to explain or prove its own. We therefore deny this claim.

45. Heating and Cooling Pipe Mains at the First-Floor Ceiling. Appellant allocates $21,200 of its total claim to the Government's requirement that appellant dismantle and rehang the first floor piping system to allow for greater clearance over the movable light fixtures. Second Amended Complaint at 105-08. Specification section 1350, Integrated Ceiling and Background (ICB) System, requires appellant to install an integrated ceiling system for the first and second floors to include "mechanical suspension system, acoustical tile or lay-in panels, air terminals, luminaires, NC background distribution system, and necessary connection and interface with other building elements, as required to provide lighting, supply and return of conditioned air, and other specified performance." Appeal File, Appendix C, Exhibit G. Paragraph 2.2.2 mandates the following in its performance requirements for the maneuverability of the system's lighting element: "Control Flexibility: The luminaire or luminaire/module combination shall have the capability of being easily and quickly relocatable in any of the three additional contiguous blank modules which form a square." Id. In addition, paragraph 2.6.1 provides the standards for "Control Accessibility" for the lighting fixtures, requiring that each be "easily removable from below without the use of tools, but when back in place, shall be held in its intended closed position." Id. The intention is to "permit normal serving, relamping and maintenance ... in a quick and efficient manner." Id. Finally, paragraph 3.1 requires appellant to coordinate the system with all other building elements to avoid any impairment of performance or installation of those elements. Id. Job meeting minutes 11, dated September 7, 1977, notes that "General Contractor has distributed ICS plan to subs for coordination," in apparent compliance with this requirement. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B15. Specification section 1501, Mechanical and Electrical Equipment General Requirements, provides at paragraph 11.1 the following requirements for the installation of piping:

> The different service pipes, valves, fittings, and similar items, shall be so installed that after the covering is applied there will be not less that 1/2 - inch clear space between the finished covering and other work and between the finished covering of parallel adjacent pipes.... Exact location of electric outlets, piping, ducts, and the like shall be coordinated to avoid interferences between lighting fixtures, piping, duct, and similar items.

Appeal File, Appendix C, Exhibit G. In addition, paragraph 8.2 states that "[p]ipes, conduits, ducts, and similar items, shall be kept close as possible to ceiling, walls and columns, to take up a minimum amount of space." Id.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Appellant's mechanical subcontractor, Michaels Mechanical, had completed installation of the piping above the first floor ceiling by the end of November 1977, and at that time was in the process of insulating the pipes. Supplemental Appeal File, Volume 1(B), Exhibits 13-15. By a field memo dated December 22, 1977, Mr. Dawicki reminded appellant of the requirements in section 1350 of "control accessibility" and of "demonstrating the capability of switching within the individual luminaire to maintain specified lighting levels." Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B15. On January 5, 1978, Mr. Sheridan issued a field memo to appellant stating:

The present location of HVAC piping in the 1st floor ceiling plenum does not provide sufficient clearance to permit locating lights under the piping. Coordination drawings were not provided as specified in section 1501-8 and requested by our 6/23/77 field memo and by our 7/22/77 letter. In accordance with specification section 1501-8.5, we are directing you to raise the conflicting piping, and because this is a coordination problem, the work is to be done at no change in contract price and/or time.

Id. The cited specification section, paragraph 1501-8.5, provides:

Any work installed prior to approval of coordination drawings shall be at the Contractor's risk. Subsequent relocations required to avoid interferences shall be made without additional expense to the Government. In case interference develops, the Government Representative will decide which work shall be relocated, regardless of which was installed first.

Appeal File, Appendix C, Exhibit G. Appellant never submitted coordination drawings for the first and second floors. Transcript at 385-86. Mr. Harrington testified, however, that Mr. Sheridan agreed that coordination drawings were not necessary because the plumbing, heating, cooling, and sheetmetal work for those floors were all done by Michaels Mechanical, and therefore, "[t]here was no need for coordination drawings.... There was no possibility of any conflict...." Id. On January 6, 1978, Michaels Mechanical performed a demonstration of the flexibility of relocating the light fixtures in an area where the piping was raised one-half inch by tightening the hangers. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B15. Mr. Sheridan tentatively approved the solution pending the concurrence of Greenleaf Engineers, the architectural engineer. Id. On January 12, 1978, Mr. Sheridan discussed appellant's proposed solution with Greenleaf. Id. Greenleaf recommended against the proposal, elaborating on its views in a letter to Caolo & Bieniek dated January 17, 1978:

It is our professional opinion that it would be improper to raise the pipes in question by just shorting up on their hangers, as suggested by Dick Ames from Michaels Mechanical.

This procedure would put undesired stresses and forces on the piping especially the pipe risers to the fan coil units above. We feel it is necessary for the contractor to rehang the piping system at the appropriate height by cutting the pipe, where necessary, to give us a system which will be supported without any imposed physical forces. It also will be necessary for the Contractor to pressure test the piping system after he completes the required work.

We will not assume any responsibility for failure in the piping system, if the Contractor raises the pipes as he suggests.

Id. By letter to appellant of January 17, 1978, Caolo & Bieniek rejected the proposed solution. Id. In addition, Mr. Sheridan informed appellant of the decision on that date. Id. Appellant had anticipated the rejection, however, and on January 13, 1978, had ordered Michaels Mechanical to raise the piping by cutting the pipes. Id. Michaels Mechanical performed that work as ordered. Id. We find that the Government merely required compliance with the contract specifications andreasonably rejected appellant's proposed deviation from them. Appellant has established no entitlement to additional compensation for correcting its originally defective work.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

46. Exterior Wall Hydrants: Appellant allocates $3,600 of its total claim to additional work required because of the Government's alleged delay in advising appellant of the exact location for exterior wall hydrants. Second Amended Complaint at 108-09. Contract drawing 9-P-1 indicates the locations against the building of piping connections for two yard hydrants that the Government originally intended to have installed in the sidewalk. Appeal File, Appendix C, Exhibit H; Transcript at 1094. Mr. Sheridan accepted appellant's suggestion that the hydrants be placed against the building, however. Transcript at 1094. That change in location of the hydrant had no effect on the pipe's location in the wall. Id. Appellant has failed to establish any additional costs incurred because of the Government's change in the location of the hydrants, from the sidewalk to the wall.

47. Bicycle Rack: Appellant allocates $6,600 of its total claim to additional costs allegedly incurred in constructing a bicycle rack and wood fence around the transformer. Second Amended Complaint at 109. On March 27, 1978, Mr. Sheridan issued a field directive to appellant, as follows:

You are directed to construct a combination bicycle rack and transformers screen as indicated on Caola [sic] & Bienick dwg. dated 3/23/78. (3 copies attached)

A modification request will be forthcoming to make the changed work a part of the contract. Please furnish us with an estimate of costs as soon as possible and before proceeding with the work.

Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B17. On April 19, 1978, appellant submitted a price proposal of $9,212.94 for the requested work. Id. On May 18, 1978, the Government issued a modified drawing for the bicycle rack and screen and asked appellant to submit a new price proposal. Id. By letter dated June 30, 1978, appellant proposed a total price, including overhead and profit, of $3,064.93. Id. By letter dated July 31, 1978, however, appellant reduced its proposed price to $2,455, as follows:

This change is as the result of our jobsite negotiation of July 19, 1978 and our telephone conversation, this date, with your Mr. B. Sheridan. The change reflects a decrease of nearly two (2) man days' wages and the removal of a fixed fee of $200.00 for the blacktop repair. The costs of $2,048.00 were increased by 10% Overhead and 9% Profit.

Id. The Government accepted appellant's proposal, issuing Change Order 38 in the amount of $2,455 on August 30, 1978. Id.; Appellant's Exhibit 14. Appellant has failed to establish any additional costs incurred, or any effect on other work performed under the contract, as a result of the Government's original field directive for the work or its subsequent change order.

48. Display Case Paint: Appellant allocates $2,800 of its total claim to costs allegedly incurred in painting a display case. Second Amended Complaint at 110. Pursuant to specification section 0570-9, appellant installed a Government furnished case for the exhibition of historical documents. At progress meetings on September 7, September 21, October 5, October 19, and November 2, 1977, the Government noted its dissatisfaction with the bronze finish of the case. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B18. On November 4, 1977, Mr. Sheridan issued a field directive to appellant stating, in full:

You are directed to paint aluminum portions of exhibit case a dark bronze color. Paint to be used should be An-a-koat touch up lacquer Duranatic # 313 (Alcoa) in aerosol cans or approved equal.

A modification request will be forthcoming to make thechanged work a part of your contract. Please furnish us with an estimate of costs as soon as possible.

Id. On January 24, 1978, appellant submitted a proposal of $292.95 for the work, which included the subcontractor's charge plus appellant's ten percent commission. Id. The Government accepted appellant's proposal, rounding the price up to $293,

and issued on March 23, 1978, Change Order 17 for that work and two other, unrelated items. Id. Appellant has offered no evidence to support entitlement to any amount beyond the contract price.

49. B.T.U. Meters and Flow Meters: Appellant allocates $2,500 of its total claim to the Government's insistence that appellant install B.T.U. meters and flow meters, as required by the contract, despite appellant's request that the requirement be deleted through a verbal value engineering incentive proposal. Second Amended Complaint 111-12. Paragraphs 39 and 40 of specification section 1570 require the installation of B.T.U. meters and flow meters as indicated on the contract drawings "or, if not shown, as directed by the Government Representative." Appeal File, Appendix C, Exhibit G. The purpose of the B.T.U. meters is to measure the temperature of the water both leaving and returning to the boiler, while the flow meters measure the volume of that water in gallons per minute. Transcript at 391. Mr. Harrington requested deletion of the items, arguing they were unnecessary, but Mr. Sheridan denied the request. Id. at 395. The only evidence appellant offered to support its argument that the meters should have been deleted as a contract requirement were first, the apparent failure of Greenleaf to include the cost in its estimate for the project and second, Mr. Harrington's testimony that a supplier "did not believe that specifications called for BTU and flow meters." Id. at 393. Mr. Sheridan testified, however, that the Pittsfield federal office building was the first building in the region to incorporate newly established energy conservation criteria, and the meters were essential to monitor and record the building's energy efficiency. Id. at 1095. Mr. Sheridan originally requested installation of the meters on the east wall of the boiler room. Id. at 394, 1096-97. However, other equipment was installed at that location before the meters' installation. Id. Mr. Sheridan therefore ordered their installation on the north wall, which appellant accomplished. Id. Appellant has failed to establish entitlement to additional compensation for complying with the contract's requirements.

50. Wage Rate Dispute: Appellant fails to quantify a loss it claims to have incurred because of Mr. Sheridan's alleged questioning of "whether or not Michael's [sic] [Mechanical] had paid according to the proper wage scale" for a steamfitter apprentice and whether "it had a problem in the wage package with the sheet metal worker local No. 63." Second Amended Complaint at 112-13. Appellant failed to brief the allegations and the Board gleans no evidence from the record to support a claim, whatever that claim may be.

51. Casing Beads: Appellant allocates $1,200 of its total claim to costs allegedly incurred as a result of a change in the ceiling breaks at the top landings of two stairwells and the installation of casing beads between adjacent walls, door frames, and light fixtures. Second Amended Complaint at 113-14; Appellant's Reply Brief at 347-50. The original design for the stairwell ceilings required a pitched soffit of forty-five degrees leading to the skylight. Transcript at 331. The Government ordered appellant's subcontractor, Davis Acoustical, to extend the level sections of the ceilings approximately one-and-one-half feet, however, in order to accommodate lighting fixtures. Id.; Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B21; Appellant's Exhibit 127. Mr. Sheridan learned of the design deficiency, which would have precluded the level placement of the lighting fixtures, while the subcontractor was performing the ceiling work. Transcript at 333, 1097-99. Although the design change interrupted the subcontractor's work and delayed its completion, Mr. Sheridan refused to consider compensating the subcontractor for additional time spent on the job. Id. at 331-33, 771, 1097-99. Mr. Sheridan also determined that the change involved no additional work, but merely a change in the location of the ceiling break. Id. at 771, 1099. The subcontractor's vice president and general manager, Mr. Kenneth Grimm, testified, however, that the ceiling as changed required more work because it increased the difficulty of the job, requiring a two-part rather than one-part framing and installation. Id. at 331. In addition, he testified to a five hour delay in completing the framing in order to determine, and obtain approval for, the required change. Id. Mr. Sheridan never issued a written directive for the framing change. Id. at 771, 1100-01.

By field directive dated January 6, 1978, the Government ordered appellant to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

"[i]nstall casing beads on the plaster ceilings where they meet plaster walls in stairwells # 1 & # 2." Supplemental Appeal File, Volume 3(B), Exhibit 2AC- B21; Appellant's Exhibit 127. By letter dated February 6, 1978, appellant submitted a statement of cost for the additional work in the amount of $423.85. Appellant's Exhibit 127. On February 9, 1978, Mr. Sheridan estimated the cost to be $83, however. Supplemental Appeal File, Volume 3(B), Exhibit 2AC-B21. By letter dated March 15, 1978, appellant increased its price by $393.25 to a total of $817, noting that the earlier itemization neglected to include additional costs incurred for caulking. Appellant's Exhibit 127. Mr. Sheridan's cost estimate, dated March 23, 1978, was for $568. Id. The parties negotiated a price of $699, initialing changes to appellant's proposal on March 22, 1978. Id. On April 5, 1978, the Government accepted that price, along with those of four other items, under Change Order 21. Id. We find that the Government's changes in the ceiling breaks and installation of the casing beads delayed appellant's prosecution of this and other work under the contract. See finding 4.

52. Rubbed Concrete: Appellant allocates $14,800 of its total claim to an assortment of allegations concerning oversupervision and breaches involving the finishing of concrete work for the building. Second Amended Complaint at 114- 16. Specification section 0330, Concrete, contains two paragraphs applicable to the claims at issue. Appeal File, Appendix C, Exhibit G. Paragraph 19 provides, in pertinent part:

FINISHING AFTER REMOVAL OF FORMS

19.1 Immediately after removal of forms and before concrete is dry, all excess projections and loose material shall be removed; honeycomb, aggregate pockets and voids over 1/2 -inch diameter and holes left by form ties cut back or undercut to solid concrete, thoroughly wetted, brushcoated with grout, consisting of equal parts Portland cement and fine aggregate, and filled with patching mortar composed of 1 part Portland cement to 2 parts fine aggregate.... Exposed patchwork shall be finished to match texture of adjacent concrete surfaces.

19.2 Smooth Finish: Exterior, exposed surfaces not otherwise noted shall be finished smooth. Mix 1 part Portland cement and 1- 1/2 parts fine aggregate with water to produce a gout having the consistency of thick paint.... Apply grout uniformly, completely filling air bubbles and holes.... After surfaces have dried thoroughly, rub vigorously with dry burlap to completely remove dried grout. There shall be no visible film of grout remaining after rubbing. The entire finishing operation for any area shall be completed the day it is started.... Finish shall extend 4 inches below grade.

19.3 Rubbed finish shall consist of smooth finish, as specified, wetted thoroughly and rubbed with carborundum stones to a finish uniform in color and texture. Mortar or grout shall not be employed during rubbing, and mortar worked up during rubbing shall be removed. Upon completion of rubbing the surfaces shall be washed thoroughly with clean water.

19.4 Before proceeding with surface treatment the Construction Engineer will select a section of wall below grade or unexposed in the finished work for finishing as a sample. This sample panel shall include one or more external corners and a flat area containing markings of two or more joints of form facing. This sample, after completion and approval by the Construction Engineer, shall serve as a standard for (smooth) (and) (rubbed) exterior concrete surfaces, and shall remain undisturbed until completion of the building.

Id. Paragraph 25 provides, in pertinent part, "RETAINING WALLS [:].... Exposed surfaces shall have smooth finish." Id.

Appellant first alleges that the Government "compelled" appellant "to acquiesce in extending" a credit for not providing a smooth finish to the concrete retaining wall. Second Amended Complaint at 115. By letter dated November 9, 1977, Mr.

Makes wrote to Frank D'Amore:

Per negotiation with your Mr. B. Sheridan, we are submitting a credit memo of ONE HUNDRED THIRTY-EIGHT AND NO/100 DOLLARS ($138.00) for the deletion of rubbing the exposed portions of the concrete retaining wall.

Please arrange to incorporate this item into a forthcoming modification request.

Appellant's Exhibit 119. On April 5, 1978, the Government accepted appellant's proposal, incorporating the deduction of $138 into Change Order 19 as item 3. Id. Pursuant to that item, the parties agreed to "[d]elete the application of cement grout specified in specification Section 0330-19.2 on the concrete retaining wall." Id. Mr. Sheridan testified that appellant requested the deletion "because at this point in time the guard rail had been installed and the paving was up," with both factors substantially increasing the difficulty of applying a smooth finish to the wall. Transcript at 1103. Paragraph 25 of section 0330 requires a smooth finish for the retaining wall, while subparagraph 19.2, addressed in Change Order 19, defines "smooth finish" and provides specifications for obtaining it. Appellant has failed to establish entitlement to any compensation arising out of the Government's waiver of the contract requirement and its acceptance of a credit for doing so.

Second, appellant alleges that the Government wrongfully required appellant to remove a permanent steel grating around the building's perimeter and apply a smooth finish to the one-and-one-half inch wide strip of concrete beneath it. Second Amended Complaint at 116; Transcript at 803. Mr. Makes testified:

[A]bout the rubbing of the concrete in the area way--that rubbing had been deleted yet, when we did the rubbing of the exterior perimeter of the building, we were required to remove the angle grating or steel grating that rests on the angle around the perimeter of the area way and rub approximately one-half inch in depth in the area way where that rubbing had already been deleted from the contract.

The area way rub finish was an exterior space and would have been rubbed in accordance with the exterior rub finishing required--it was an area that was not going to be painted or otherwise finished, it was an area that nobody was ever going to see except for somebody who pulled those grates off to put equipment in and out....

Transcript at 803. Appellant "spent approximately two days going around the perimeter of the building, doing the rubbing of the concrete." Id. at 804. Item 3 of Change Order 20, executed on April 5, 1978, provides the following, with an increase of $254 to the contract price.:

Apply a rub finish to the concrete foundation wall in the basement corridor to match that in the stairwells and delete the rub finish on the areaway walls. Holes in excess of 1/2 " diameter in the areaway will still have to the patched. (field directive 1/6/78)

Appellant's Exhibit 122. On January 17, 1978, Mr. Sheridan wrote the following in his "Findings of Fact for Contract Modification" to justify acceptance of item 3:

Basement corridor is a semi finished area and will look better with all voids filled prior to painting. Areaway walls are exposed to weather, but not to view. There is no benefit in rubbing the areaway walls and running the risk that it may not hold up to weather.

Id. The Government failed to rebut Mr. Makes's testimony that the Government had ordered application of a smooth finish to the areaway concrete beneath the grating following the earlier deletion of that requirement in Change Order 20. The order to apply a smooth finish constituted a compensable change to the contract. In addition, we find that the change affected appellant's prosecution of this and other work under the contract. See finding 4.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Third, appellant alleges it received inadequate compensation for its rub finishing of the basement corridor concrete pursuant to Change Order 20. Second Amended Complaint at 115-16. By letter dated February 1, 1978, appellant had proposed a price of $350.98 for the work. Appellant's Exhibit 122. The parties subsequently agreed upon a net price of $254, covering both the addition of the basement corridor work and the deletion of the exterior way finishing requirement. Id.; Transcript at 805-06; 1103-04. We find no reason to question the price negotiated and accepted by the parties. Appellant has failed to establish entitlement to any additional compensation under this item of its claim.

Finally, appellant alleges the Government breached paragraph 19.4 of section 0330 by inspecting the entire retaining wall rather than a sample area and by requiring appellant to fill voids in the concrete of over one-half inch in diameter. Second Amended Complaint at 115. Paragraph 19.4, however, provides only for the selection of "a section of wall ... as a sample" to "serve as a standard for (smooth) (and) (rubbed) exterior concrete surfaces." Appeal File, Appendix C, Exhibit G. The paragraph in no way limits the Government's right to ensure overall compliance with that standard. In addition, paragraph 19.1 requires appellant to fill all "voids over 1/2 -inch diameter" following removal of loose material. Id. Appellant, therefore, has failed to establish entitlement to any compensation under this item of its claim.

53. Fritz Tile on Access Panels: Appellant allocates $12,500 of its total claim to additional work and delays experienced in the setting of floor tiles allegedly ordered by Mr. Sheridan but beyond the requirements of the contract. Second Amended Complaint at 116. The fritz tile was composed of stone pieces set in a polyvinyl chloride. Transcript at 47-48; Appellant's Trial Exhibit C. The manufacturer recommended cutting the tiles with a cutter and a diamond saw, which procedure appellant's subcontractor for tile installation, Doran Associates, followed. Transcript at 48-49. During the cutting of tiles, stone chips would frequently break off. Id. at 48. The manufacturer suggested grouting the tiles with the cement used to lay them, which was the same color as the vinyl, in order to fill in the chipped areas. Id. Doran experienced great difficulty in setting the tile on certain floor panels in the hallways of the first and second floors. Id. at 47, 50-51, 1104-07. The panels were designed to be removable in order to provide access to the duct system that ran beneath those floors. Id. at 50, 1105-06; Respondent's Trial Exhibit 149B. Mr. Sheridan insisted that Doran fit the tile to the panels in a way that would hide any seam between the cover and the rest of the flooring. Transcript at 50. The contract contained no such requirement. Paragraph 8 of specification section 0900, Resilient Flooring, required no more than that "Tile lines and joints shall be kept square, symmetrical, tight, and even ... [and] Flooring shall be cut to, and fitted around, all permanent fixtures, built-in furniture and cabinets, pipes and outlets." Appeal File, Appendix C, Exhibit G. Doran incurred approximately seventy to eighty hours in setting those tiles beyond what it had initially contemplated would be required. Id. at 51. We find that the Government demanded a quality of finish beyond that required by the contract. This constructive change delayed appellant's prosecution of this and other work under the contract. See finding 4.

54. Peppermint Tests: Appellant allocates $5,800 of its total claim to costs incurred in testing the building's waste and ventilation systems and the Government's refusal to delete the specification requirements that mandated those tests. Second Amended Complaint at 117-18. Subparagraph 41.6 of specification section 1517, Plumbing, paragraph 41, Inspection and Tests, provides as follows:

After all fixtures have been permanently connected and all traps filled with water, the entire sanitary drain and vent systems shall be tested with smoke or peppermint. Where the smoke test is preferred, a pungent thick smoke shall be introduced into the system by the use of one or more smoke producing machines. The smoke shall not be produced by chemical mixtures. When the smoke appears at the stack openings on the roof, they shall be closed and a pressure equivalent to 1-inch water column shall be built up and maintained for 15 minutes before inspection starts. The entire system shall then be inspected for detection of smoke or smoke odors. Where the peppermint test is preferred, 2 ounces of oil of peppermint shall

be introduced into each stack. System shall then be closed and inspection shall be made in the same manner as specified for the smoke test.

Appeal File, Appendix C, Exhibit G. By field memorandum dated February 27, 1978, Mr. Sheridan asked appellant to "submit a schedule for performing tests/demonstrations on the following: ... 6. Peppermint or smoke test on waste and vent piping." Supplemental Appeal File, Volume 3(C), Exhibit 2AC- C4. Appellant's mechanical subcontractor, Michaels Mechanical, had made no provision in its bid proposal to perform the test. Transcript at 501. Mr. Harrington testified that the test was once used in the construction industry when the connections of traps used in fixtures were "either a leather gasket or some kind of a rubber joint." Id. at 500. Current practice, however, is to use "a ground joint, that's almost like a union connection[, which is] ... [i]n all cases ... in the water seal of the trap, or below the top level of the water of the trap." Id. Upon completing installation of the system, Michaels Mechanical had already performed a hydrostatic test in which "[w]e filled the systems with water and guaranteed that there were no leaks in it [sic]." Id. at 500-01. Mr. Harrington had never seen the peppermint or smoke test required during his years of practice and therefore deemed it unnecessary. Id. at 499-501. He described the test procedure as follows:

To put this test on, you have to block the drain going off to the street in the main sewer line. You have to be sure that every floor drain and every trap that is installed on a fixture is full of water. You have to plug the vents going through the roof. When you introduce into the system this oil of wintergreen or oil of peppermint or smoke, it is pressurized slightly, a slight pressure so that you don't blow the water out of the traps, and then the Inspector back in the old days would go around to these fixtures to see if he could detect smoke at this particular joint, or if he could detect the odor of wintergreen.

Id. at 501-02. Mr. Harrington offered the Government a credit to delete the test requirement, but Mr. Sheridan declined. Id. at 502, 1109. Mr. Sheridan cited two reasons for refusing the credit: (1) "because the test is such a simple test that I wouldn't get money back enough to cover the cost of processing a change" and (2) the test "does have some value" as "a good double check to see if the traps are working right." Id. at 1109. Michaels Mechanical was unable to obtain oil of peppermint, and Mr. Sheridan permitted the substitution of oil of wintergreen. Transcript at 501. Michaels Mechanical successfully performed the test on March 28, 1978. Supplemental Appeal File, Volume 3(C), Exhibit 2AC-C4. The contract required the test, the Government never waived the requirement, and appellant has failed to establish any entitlement to additional compensation for merely performing as the contract required.

55. Additional Bracing for the Lavatory Carriers: Appellant allocates $2,300 of its total claim to costs allegedly incurred when the Government required appellant to install additional bracing in the lavatory chair carriers. Second Amended Complaint at 118-19. Paragraphs 30, Lavatories, and 35, Fixture Supports, of specification section 1517, contain requirements for installation of the carriers at issue. Appeal File, Appendix C, Exhibit G. Subparagraph 30.3 provides, "Lavatories shall be arranged for use with concealed arm supports as hereinafter specified under 'Fixture supports'." Id. Subparagraph 35.3 provides:

Lavatory chair carriers shall consist of a pair of cast-iron feet bolted to or imbedded into the floor together with 1.660" (minimum) steel tubular upright members, horizontally adjustable alignment truss or tie rod at bottom and another at the top connected to cast-iron or steel adjustment sleeves and painted cast-iron concealed arms.

Id. Mr. Harrington described installation of the chair carriers as follows:

Your Honor, the fixtures in the men's and women's toilet rooms in this particular project are wall-hung, therefore in this case they have a built-in chair carrier, they call it. This is something that is fastened to the floor as feet. It is cast iron feet with two vertical pipe supports held in place by set screws. There

is a fitting attached to each of the vertical pipes. It is almost like a pipe T. Those are installed at the proper elevation that after the masonry walls are installed, the arms for these lavatories are screwed into these T's. These were attached to the floor. Most times the feet that come with a particular carrier like that are 10 or 12 inches long, and there is no way that they could fit into the wall. They are either cut off or broken off with a hammer. You only need one attachment in the floor to hold that in that particular place.

Transcript at 1761-62. Following the chair carriers' installation, but prior to completion of the masonry walls, Mr. Dawicki inspected the carriers by grabbing and shaking one of the pipes. Transcript at 1457, 1762. Mr. Dawicki ordered Michaels Mechanical to install additional cross bracing to stabilize the carriers. Id. The specifications establish no clear guidelines for stabilizing the carriers. Appellant was therefore installing them in accordance with industry practice. Id. at 1457, 1762. Mr. Harrington testified:

[The carrier] is not solid until the masonry walls are built up around it. It becomes a part of the masonry wall. You are looking for support for the lavatory only. The combination of the chair carrier and the masonry wall is where you get the support.

Id. at 1762. The Government failed to rebut sufficiently Mr. Harrington's testimony that installation conformed with the contract and industry practice. The Government's order of additional bracing therefore constituted a constructive change to the contract. See finding 4.

56. Ceilings in Janitor and Electrical Closets: Appellant allocates $4,300 of its total claim to delay costs incurred as a result of a contract change requiring installation of acoustical tile ceilings in the janitor and electrical closets on the first and second floors. Second Amended Complaint at 119. On February 7, 1978, Mr. Sheridan issued the following field directive:

You are directed to install suspended acoustical tile ceilings in the 1st and 2nd floor janitor and electric closets. To avoid mechanical and electrical equipment, the ceiling heights need not be consistent in these rooms, but should be located near the lights to conceal piping that crosses the rooms.

A modification request will be forthcoming to make the changed work a part of the contract. Please furnish us with an estimate of costs as soon as possible.

Supplemental Appeal File, Volume 3(C), Exhibit 2AC-C6. In his Findings of Fact for Contract Modification concerning five separate items, dated February 14, 1978, Mr. Sheridan described the work at issue and its justification as follows: "Install ceilings in 1st and 2nd floor janitor and electrical closets so that space will appear finished when open to view of tenants. (constructive change)." Appellant's Exhibit 128. By letter dated March 15, 1978, appellant proposed a cost of $617 for the additional work, which the Government accepted, along with four other items, on May 18, 1978, under Change Order 24. Supplemental Appeal File, Volume 3(C), Exhibit 2AC-C6; Appellant's Exhibit 128. Mr. Sheridan testified that no delay resulted from the change:

The ceilings were installed after whatever mechanical equipment is above them. They were only put in to heighten whatever it came out to be. There was no need for a coordination with mechanical work, or the removal or relocation of any equipment. The equipment was already up.

Q Are you saying there was a delay?

A No, there was no delay.

Transcript at 1110. Appellant's briefing of this claim is largely incoherent, explaining no bases for recovery. Appellant's Reply Brief at 308-10. Appellant fails to establish any breach or right to additional compensation.

57. Iron C Clamp: Under a heading of "Other Instances of Oversupervision," appellant allocates $3,500 of its total claim to complaints concerning three items: (1) the Government's delay in approving appellant's use of an iron C clamp, which allegedly required no approval, (2) the Government's allegedly mistaken finding of rust on the cooling tower fan blade, and (3) the Government's alleged inspection of every item procured by Michaels Mechanical for the project, including each screw, nut, and bolt. Second Amended Camplaint at 120-21. Appellant's first contention is that the C clamp hangers Michaels Mechanical used required no Governmental approval, and that the Government delayed approving the clamps for two days. Id. at 120. The Government denies the allegation. Answer at ¶ C.7. Concerning the clamps, Mr. Sheridan testified:

The contract calls for hangers to be anchored into concrete or is [sic] supported by structural steel. Chester Dawicki cited the C clamp as not being acceptable....

When the contractor asked us if they could accept it, we said if you just weld it to the steel, and he went back and did it. I think that transpired over probably-- The problem was brought to us on Monday and the solution was given on the next day.

The purpose of welding the C clamp to the steel, if there's any kind of vibration it might shake the C clamp loose.

Transcript at 1111. Mr. Dawicki explained the contract requirements and his objection to appellant's installation of the clamps, as follows:

To the best of my recollection the contract called for anchors to be welded to the structures itself. And the mechanical contractor utilized a somewhat standard type C clamp that clamps to the frames of the beams, the belt, and the specifications having called for welding the C clamps were accepted as long as the tack weld would be furnished that threaded portion of that clamp; so it couldn't loosen through vibration over time.

Id. at 1457. Appellant tacitly acknowledges the legitimacy of requiring tack welding for the clamps, stating in its reply brief: "The dispute, as alleged in the second amended complaint was not over whether the 'C' clamps should be tack welded to the structural steel...." Reply Brief at 275. Appellant fails to establish, however, that the Government either improperly required approval of the clamps or unreasonably delayed in granting it. Appellant's contradictory allegations state no intelligible claim.

58. Cooling Tower Fan Blade: Appellant's second contention in its claim entitled "Other Instances of Oversupervision" is that the Government improperly ordered replacement of the cooling tower fan blade after mistakenly determining that the blade had rusted. Second Amended Complaint at 120. Paragraphs 7, 8, and 9 of specification section 1590 provide requirements for the cooling tower. Appeal File, Appendix C, Exhibit G. Subparagraph 9.15, addressing the cooling tower fan, provides in pertinent part, "Fans shall be of the propeller type or centrifugal type with one or more wheels and shall be constructed of corrosion resistant material or of zinc coated steel." Id. Following installation of the cooling tower, the fan blade developed a discoloration that the Government determined to be rust. Transcript at 1111- 12, 1166, 1458. By field memorandum dated January 13, 1978, Mr. Dawicki advised appellant at item 6 as follows, "Fan in cooling tower is rusting and must be replaced or replated." Supplemental Appeal File, Volume 3(C), Exhibit 2AC-C7; Appellant's Exhibit 96. Appellant removed the blade, cleaned it, and varnished it. Transcript at 1112. Mr. Harrington testified:

The cooling tower fan blade was not rusted, it was discolored. It had a zinc coating on it. This is a blade that's exposed to all the elements. It's exposed to water, water vapor, the heat, the cold. The fan blade was discolored....

This was another thing that came at the tail end of the job and we were in no position or frame or mind to argue with him any more.

Id. at 438. Both Mr. Dawicki and Mr. Sheridan testified that they found the blade

was rusted, however. Id. at 1111-12, 1166, 1458. In addition, Mr. George Perry, the Government's construction management engineer assigned to the Pittsfield project, testified on direct examination:

Q. Do you recall viewing the cooling tower blades?

A. Yes.

....
Q. .... Did you ever see any rust on them?

A. Yes, I did. Near the end of the job. On one blade in particular was rusted and corroded.

Q. What makes you think it was rust? How did you know it was rust?

A. Because we looked at it very closely and somehow the finish coating either wasn't applied properly--well, I guess it wasn't applied properly because it was non-existent in these areas and the material under the finish coating was corroded. I'm not a chemist. I can't say it was rust, but it sure looked like rust.

Id. at 1356-57. Appellant, on balance, has failed to establish that the admitted discoloration was not rust, as testified to by the Government's witnesses and indicated by the field memorandum of January 13, 1978.

59. Inspections of Off-Site Items: Finally, in its claim entitled "Other Instances of Oversupervision," appellant complains of overinspection by the Government in allegedly requiring Michaels Mechanical to verify every off-site item to be used in the project. Clause 7 of the contract's General Provisions, standard form 23-A, as modified by MOD-SF23-A (June 1976), states in pertinent part:

PAYMENTS TO CONTRACTOR

(a) The Government will pay the contract price as hereinafter provided.

(b) The Government will make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates approved by the Contracting Officer. If requested by the Contracting Officer, the Contractor shall furnish a breakdown of the total contract price showing the amount included therein for each principal category of the work, in such detail as requested, to provide a basis for determining progress payments. In the preparation of estimates the Contracting Officer, at his discretion, may authorize material delivered on the site and preparatory work done to be taken into consideration. Materials delivered to the contractor at locations other than the site may also be taken into consideration (1) if such consideration is specifically authorized by the contract and (2) if the Contractor furnishes satisfactory evidence that he has acquired title to such material and that it will be utilized on the work covered by this contract.

Paragraph 12 of the General Conditions, standard form 1139, as modified by MOD-113PQ (April 1976), provides in pertinent part:

12.1 The provisions of the Clause entitled "Payments to Contractor" of the General Provisions, Standard Form 23-A, are supplemented as follows:

....
12.4 Unless otherwise provided in the specifications, material delivered that will be incorporated into the structure will be taken into consideration in computing progress payments, provided the material is delivered on the site, or is delivered to the Contractor and properly stored by him in a warehouse, storage yard or similar suitable place as may be approved by the Contracting Officer. Before each such payment is made for delivered material stored ON the site, the Contractor shall

furnish to the Contracting Officer such evidence as he may require as proof of the quantity and value of such materials. Before each such payment is made for delivered material stored OFF the site, the Contractor shall furnish the Contracting Officer properly executed bills of sale for the delivered material upon which payment is being made. The Contractor shall remain responsible for such stored materials.

Mr. Sheridan initially objected to making progress payments to Michaels Mechanical for materials that were not stored on-site. Transcript at 376, 1113-14. He agreed to make the payments only after Mr. Harrington had agreed to prove the purchase and placement of each item to be used in the building. Id. at 377, 1114-15. The requirement was beyond any stated in the contract.

Mr. Sheridan testified:

The things we didn't want to pay for, are things that are normally stocked on a job; a lot of small parts, like pipe fittings, electric conduit. Things that don't get installed in one shot; it gets installed over a long period of time.

....

I explained ... the reasons why I didn't want to pay, but I agreed that if they would help me track the material, then I would pay them for the material. So, each month they would give me a chart and they would show me what items got installed so that I would know not to keep it in the material column.

....

I would get this chart which would tell me what material had been installed, and then I would go out. Mike told me [he] didn't know where it was, so I would go out with a Michaels Mechanical representative and have him show me. This way I would be protecting the government against paying for material that was paid for in place and again paid for in storage. It's just a matter of verifying their record. In this way I managed to do the bookkeeping, and they got their payment for the materials.

Id. at 1113-15. Although Mr. Sheridan occasionally required such an inspection, however, Mr. Harrington was unable to state the number of these inspections or the amount of time they consumed. Id. at 378. Even assuming that Mr. Sheridan oversupervised this aspect of the contract, appellant failed to prove any resulting damage. We therefore deny this claim.

60. Carpet: Appellant states an unquantified claim based upon additional work required for the installation of defective carpeting supplied by the Government. The parties' exhibits and testimony thoroughly establish the extent and severity of the carpeting's defects. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D2; Appellant's Exhibits 135, 182, A, B; Transcript at 37-46. Installation of the carpeting began on February 8, 1978. Appellant's Exhibit 182. On February 9, 1978, Mr. Sheridan ordered the installers, Doran Associates, Inc., to stop installation and to unroll and inspect the carpeting. Id. Mr. Sheridan found all the carpeting defective but nonetheless ordered installation of one portion. Id. Doran's installation of the carpeting, from February 8 through 28, 1978, required a great deal more work than anticipated because of the carpeting's defects. Id.; Transcript at 41-46. By letters dated February 16 and May 15, 1978, Doran Associates submitted claims to appellant for the additional costs it had incurred. Appellant's Exhibit 182. In his "Findings of Fact for Contract Modification," dated June 23, 1978, Mr. Sheridan summarized the difficulties experienced with the carpeting, as follows:

1. Government furnished carpet had numerous defects which caused the contractor to loose [sic] time inspecting the condition of the carpet and awaiting GSA's decision to install the carpet. There was also additional work in trimming out defects, patching, removing bubbles, and trace cut seaming. The contractor should be reimbursed for his extra effort in working with the defective carpet. (Note: Rejection of this carpet would have resulted in a claim for both time and money by the contractor.)

2. The government furnished carpet not suitable for installation over the covers

to the preset floor outlets. The free edge of carpet unravels and the flap does not close without showing an unsightly seam. To protect the carpet edges and improve the appearance, the covers to the preset floor outlets must be raised and the carpet butted to the cover frame.

3. Change order # 7 increased the number of under floor junction boxes with access covers. Additional associated carpet work now being considered was overlooked at the time of settlement [sic] of CO 7.

Appellant's Exhibit 136. The parties negotiated a total price of $5,583 for appellant's direct costs of additional work, as reflected in Change Order 34, which the Government accepted on June 26, 1978. Id. That price compensated appellant based on three elements:

| | |
|---|---|
| 1. Compensation for additional work for inspection, trimming, seeming [sic], patching, and removal of bubbles in defective government furnished carpet. | $4500.00 |
| 2. In lieu of installing the carpet over the roll form deck floor outlet covers, raise the outlet covers to be flush with the top of the carpet, and trim and finish the carpet agaist [sic] the frame of the outlet covers leaving the covers exposed to view. | $665.00 |
| 3. Cut and trim carpet at new rows of sq. D. Junction boxes and install carpet in new sq. D. Junction box covers. | $418.00 |

Id. We find that the Government's supply of defective materials and the changes ordered for their installation delayed appellant's performance of this and other work under the contract. See finding 4.

61. Terra Cotta Coping: Appellant allocates $12,500 of its total claim to damages allegedly incurred as a result of the Government's delay in determining first, whether to use a lap or butt joint for the terra cotta coping, and second, whether to use caulking or mortar for its installation. Second Amended Complaint at 122. Appellant initially claimed damages for the entire period of October 1977 to the middle of March 1978, asserting that the delay "compelled Tierney to provide protection for the entire perimeter of the structure.... throughout the winter." Id. Appellant subsequently revised its claim to include only the period from January 12, 1978, to "late March" 1978, or "the remainder of the winter." Reply Brief at 297. Paragraph 4.8 of specification section 0420, Masonry, provides: "Terra Cotta Coping: Flush front and back with 5/8 -inch pitch to roof. Color shall match face brick. Tile shall meet ASTM C-126." Appeal File, Appendix C, Exhibit G. The minutes for job meeting number 5, held on May 25, 1977, note at item 33, "A/E requested mason to submit dwgs. on coping stone, providing ship laps at joints." Appellant's Exhibit 91. By letter dated May 31, 1977, however, appellant requested confirmation from Caolo & Bieniek that "[c]oncerning the terra cotta coping ... a butt joint is acceptable." Appeal File, Volume 4, Exhibit 119. By letter dated June 3, 1977, Caolo & Bieniek responded, "Butt joints on the terra cotta coping are allowed provided these joints are well caulked." Id., Exhibit 118. On June 14, 1977, Caolo & Bieniek returned appellant's submittal for coping "[a]pproved as noted" with the notation "COLOR TO BE: .", but with no color noted. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D3. The building was ready to receive the coping by the beginning of October 1977. Appellant's Exhibit 143 (progress photographs dated October 3, 1977). Appellant was advised in a letter dated December 1, 1977, that the coping manufacturer had experienced difficulties in firing the coping, and a new run of coping would be shipped at the end of December 1977. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D3. Appellant forwarded a copy of that letter to Mr. Sheridan on December 8, 1977. Id. On January 12, 1978, Caolo & Bieniek "[a]pproved as submitted" the coping following an on site inspection. Id. Appellant began installation of the coping on March 21, 1978, and completed installation on March 28, 1978. Supplemental Appeal File, Volume 1(C), Exhibits 11, 12. Appellant has pointed to no evidence in the record of a delay caused by the Government following January 12, 1978, and has waived any claim for the preceding period. Reply Briefs at 296-97. We therefore deny this claim.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

62. Lintels and Soffits: Appellant allocates $11,500 of its total claim to damages allegedly incurred through the Government's wrongful rejection of the galvanized lintels supplied, additional work required, and the Government's subsequent changes to the contract requiring the painting of all the galvanized lintels while deleting the painting of the soffits. Second Amended Complaint at 123. On June 21, 1977, the Government advised appellant "that all exposed galvanized lintels must be free of foreign matter, and excessive runs or drips prior to erection of same." Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D4. The building contained approximately sixteen lintels. Transcript at 1129. In the fall of 1977, a representative of the supplier of the lintels, Duncan Galvanizing, visited the site with Mr. Sheridan and agreed that two of the sixteen lintels had slag on them. Id. at 1130. The roughness of the slag on the lintels might have caused the mason difficulty in laying bricks. Id. On August 9, 1977, Duncan Galvanizing wrote to appellant's steel subcontractor, Schenectady Steel Company, as follows:

In regards to the eleven angle lintels on the GSA job that have been rejected by the government inspector for streaks and drips. The relevant specification--ASTM A--123--states that the smoothness of coating is a relative factor and should be determined by the end use of the product.

It is my feeling that these streaks and drips are not detremental [sic] to th [sic] protective coating that is provided by the galvanized coating. To reject them after installation for a condition that was not mentioned in the original specification does not adhere to the intent of the ASTM specification.

In order to provide a perfectly smooth surface on any hot dip galvanized component, the use of a grinder after galvanizing would be required. This is extra work that is not normally done unless called for by our customers, in which case an extra charge is justified.

I do not feel that rejection of these lintels after erection is fair or justified. Had we been aware of the extra smoothness requirement, we would have taken steps in-house to provide the required coating appearance.

Appellant's Exhibit 313. On August 28, 1977, Mr. Sheridan noted at the bottom of this letter, "Contractor was notified of our dissatisfaction before lintels were completely unloaded from truck. See diary of 6/21/77." Id. The referenced diary entry, however, fails to establish any dissatisfaction. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D4. The minutes for job meeting 11, dated September 7, 1977, note at item 183, "Gave contractor option to paint all exposed galvanized brick shelfs over window to match color of window frames in lieu of giving zinc finish a uniform appearance." Id. Mr. Al Frament of Schenectady Steel testified that the Government's requirement of a uniform finish went beyond the understanding in trade practice for galvanized steel. Transcript at 308-10. Mr. Frament stated:

[T]he lintels were galvanized which creates somewhat of a problem because they're dipped in a process where it's all heated zinc and when it comes out of course they drip, they have to drip off and everything. And the texture is not always the same. You'd get gray, you'd get silver, it depends. Some of the lintels were not acceptable I was told according to color and there might have been drips and streaks on them. I was told at a job meeting that we had to fix them. They didn't want these drips and the streaks in them.

....

So we ended up starting to come out and brush them off. We've got letters from Duncan Galvanizing who did the galvanizing stating that they haven't ever come up with such a discrepancy on how galvanized lintels are. Most people know that they're different textures and that.

....

[G]alvanizing is not a real fine finished product.

Id. Schenectady Steel had not bid on the basis of providing a finished surface, but of "[g]alvanized period." Id. at 310. By field memorandum dated September 23, 1977, Mr. Dawicki notified appellant of six "galvanized lintels that had imperfections at the exposed leg of angle, at inspection time on 9/21/77." Appellant's Exhibit 128. Three were said to have "[e]xcessive foreign matter," two had been "previously ground" effecting removal of some protective coating, and one was found to have been "field repaired by burning and welding." Id. In addition, the memorandum noted:

Some areas also had black asphaltum paint and piece marks exposed to surfaces. These must be removed. Also that if it becomes necessary to grind any surfaces to remove excessive foreign matter, these areas must be re-coated with the approved zinc rich coating.

Id. On September 26, 1977, appellant noted at the bottom of the memorandum, "We are notifying our steel subcontractors of these imperfections and will arrange for their correction." Id. In his "Findings of Fact for Contract Modification," dated February 14, 1978, Mr. Sheridan stated, in pertinent part:

4. Delete tha [sic] painting of all exterior stucco soffits. (Field directive 1/6/78)

5. Paint exposed portions of all exterior galvanized brick shelves and exposed portions of adjacent casing bead at exterior plaster soffits as follows:

a. clean with light wire brushing and wash with mineral spirits conforming with SSPC-SP1.

b. Apply prime coat of California Rustplex Acrylic Primer or approved equal.

c. Applyysecond [sic] coat of California Rustplex Acrylic or approved equal ot [sic] match white color of soffit.

Appellant's Exhibit 128. Appellant originally proposed a credit of $353 for deleting painting of the soffits and an additional cost of $1,088 for painting the lintels. Id. The parties negotiated a credit of $450 for the former and a price increase of $495 for the latter. Id. On May 18, 1978, the Government accepted those amounts under Change Order 24. Id. We find that the Government had wrongfully rejected the lintels as submitted and required additional work by appellant, beyond the scope of the contract, in attempting to obtain lintels with a smooth surface. The Government's wrongful rejection, requirements of additional work, and subsequent changes delayed appellant's prosecution of this and other work under the contract. See finding 4. We reject appellant's claim to recover its originally proposed price for the change order, however, finding no reason to question the amounts negotiated and accepted by the parties.

63. Concrete Slabs: Appellant allocates $13,200 of its total claim to increased costs allegedly incurred as a result of difficulties encountered in mixing and pouring concrete, particularly with regard to the Government's requirement that the concrete's slump not exceed four inches. Second Amended Complaint at 123-24. Appellant found the concrete very difficult to work because of the stiffness, but despite appellant's repeated requests the Government refused to allow any increase in slump. Transcript at 167, 1740. Mr. Tierney testified:

It made pouring the slabs nearly impossible, because the concrete was almost hard and you had to work and trowel and finish it and it got wavy, then it was all set and done.

Months later, we were then required to come back and grind off all the waves that we were, in effect, forced to put in earlier because we could not put a little water in the concrete.

Id. at 174. Specification section 0330 contains the general requirements for concrete, including:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

8. SLUMP

8.1 Tests shall be made in accordance with ASTM C 143, under direction of the Construction Engineer. Slump shall be within recommended limits of ACI 613, Table I, except for reinforced concrete slabs, fill and lightweight concrete maximum slump shall be 4 inches. Water content shall be reduced when best results are above maximum.

Appeal File, Appendix C, Exhibit G. Paragraph 10 provides requirements for strength tests to be performed on "test specimens for 3000 psi [pounds per square inch] strength and higher." Id. Subparagraph 10.4 states, "To facilitate testing service, the Contractor shall: ... [2] Submit to the Contracting Officer the concrete mix design he proposes to use, and make written request for approval." Id. Subparagraph 10.5.1 permits rejection of "[c]oncrete work determined to be below specified requirements by results of load tests or by structural analysis or not meeting (a) compressive strength requirements, or (b) dimensional tolerance requirements, or (c) appearance requirements, or (d) strength of structure requirements...." Id. Finally, paragraph 17 provides, in part:

17.1 Measuring, and mixing on site shall be in accordance with ACI 614.

17.2 Measuring, mixing and delivery of ready-mixed concrete with inspection and certification shall meet requirements of ASTM C 94 and as specified herein.

Id. Subparagraph 17.2 incorporates by reference the requirement of the American Society of Testing and Materials (ASTM) publication C 94, including in pertinent part the following:

10.7 When a truck mixer or agitator is approved for mixing or delivery of concrete, no water from the truck water system or elsewhere shall be added after the initial introduction of the mixing water for the batch except when on arrival at the job site the slump of the concrete is less than that specified. Such additional water to bring the slump within required limits shall be injected into the mixer under such pressure and direction of flow that the requirements for uniformity specified in Appendix XI are met. The drum or blades shall be turned an additional 30 revolutions or more if necessary, at mixing speed, until the uniformity of the concrete is within these limits. Water shall not be added to the batch at any later time. Discharge of the concrete shall be completed within 1 1/2 -h or before the drum has revolved 300 revolutions, whichever comes first, after the introduction of the mixing water to the cement and aggregates or the introduction of the cement to the aggregates. These limitations may be waived by the purchaser if the concrete is of such slump after the 1 1/2 -h time or 300-revolution limit has been reached that it can be placed, without the addition of water, to the batch. In hot weather, or under conditions contributing to quick stiffening of the concrete, a time less than 1 1/2 -h may be specified by the purchaser.

The four inch maximum slump specified in subparagraph 8.1 applies only to "reinforced concrete slabs, fill and lightweight concrete," none of which were used in the construction at issue. Transcript at 215-16. The contract fails to specify a slump for the concrete used in construction, but rather incorporates by reference Table 1 of the American Concrete Institute (ACI) standard publication 613. That table recommends maximum slumps of from three to six inches, depending upon the type of construction, although neither party presented evidence of which construction type or slump applied to the concrete at issue. On August 5, 1977, Mr. Sheridan issued a field memorandum to appellant, as follows:

In trying to achieve exactly a 4" slump to the concrete for the floor slabs, you have exceeded the 4" maximum allowed on several occasions. Since keeping the slump from exceeding 4" has been a matter of continual argument, the following measures will henceforth be observed.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Anytime the slump is measured to be 4 1/2 " or over, the truck will be allowed to remix to assure complete mixing, and then the slump will be measured a second time. If the slump still measures 4 1/2 " or over, the concrete will not be accepted and there will be no payment made on the concrete remaining in the truck.

Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D5. The Government rejected the first design mix submitted by appellant's concrete supplier, following a determination that the compressive strength of the concrete fell below a 3000 psi minimum requirement. Id.; Transcript at 1135. The Government approved the second design mix of appellant's supplier. Transcript at 1135-36. The Government ordered appellant's supplier to use 611 pounds of cement per cubic yard of concrete. Id. at 216, 273-74. This second design mix provided for a slump of four inches. Id. at 217. Mr. Tierney testified that appellant requested a change in the slump but the Government refused. Id. Only one test cylinder of concrete, registering a psi of 2970, subsequently failed to meet the minimum of 3000 psi requirement. Appellant's Exhibit 287. Mr. Sheridan nevertheless accepted that cylinder with the notation "OK this is a slab on grade." Id. The majority of the other cylinders tested substantially above the 3000 psi minimum. Id. We find that the Government's insistence on a four inch slump and refusal to allow any greater was an arbitrary imposition of a requirement beyond any set forth in the contract, and constituted a constructive change that delayed appellant's performance of this and other work under the contract. See finding 4.

64. Site Drainage: Appellant allocates $15,000 of its total claim to costs allegedly incurred in connection with redesign of the project's storm drainage system. Second Amended Complaint at 124. In April 1977, the parties determined that the site drainage system required modification. Transcript at 673-74. As originally designed, the system both lacked sufficient slope for effective draining and flowed into the city's storm drainage system at its highest contiguous point. Id. at 674. On June 8, 1977, and after the work had already been completed, Mr. Sheridan issued a field directive ordering eight specific changes to the storm drainage system. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D6; Appellant's Exhibit 101; Transcript at 673. The engineering for the drainage system changes was performed jointly by appellant's project superintendent, Mr. Makes, and the Government's resident engineer, Mr. Dawicki. Appellant's Exhibit 101. The parties incorporated the ordered changes into Change Order 1 as item 7, with appellant having proposed the contract modification on June 23, 1977, and the Government having accepted it on July 12, 1977. Id. Although appellant originally proposed a price increase of $34.61, following lengthy negotiations the parties ultimately agreed to a price reduction of $134. Id.; Transcript at 673- 76. The negotiation notes indicate, and Mr. Makes testified, that the negotiated price did not include the substantial time and efforts expended by appellant in determining that the original drainage system was defective or in engineering the individual changes ultimately agreed to. Appellant's Exhibit 101; Transcript at 675-76. We find that the defective design and subsequent change in the system delayed appellant's performance of this and other work under the contract. See finding 4.

65. Gypsum Board: Appellant allocates $5,600 of its total claim to costs allegedly incurred due to a change in the color of vinyl faced gypsum board. Second Amended Complaint at 125. By letter dated December 1, 1977, the Government ordered a change in the color of gypsum board for use in the women's lounges. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D7; Appellant's Exhibit 135. Appellant's supplier of the gypsum board, Davis Acoustical Co., wrote to appellant on December 22, 1977, acknowledging the order and stating a price increase of $105 because of the change. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D7; Appellant's Exhibit 135. Appellant forwarded a copy of that letter to the Government, appending a ten percent commission to Davis's cost, for a total price of $115.50, and requesting incorporation of the change "into an upcoming modification request." Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D7. Mr. Sheridan noted on the Government's copy of appellant's letter, "In meeting of 1/18/78, I asked why a different color women's lounges [sic] would cost more money. Makes said he would check." Id. On March 31, 1978, appellant forwarded to the Government a letter from Davis dated March 24, 1978, and stating in pertinent part:

Explanation of our claim is as follows: The teak and bone colors are not standard stock items as the specified gold burlap is. Utilizing such non- stock items required that we purchase full cartons of trim and and [sic] accessory items. Also the vertical trim pieces could only be purchased in 10' lengths which created approximately 2' pieces of waste. We had ordered and received in our warehouse the specified gold burlap material prior to G.S.A. changing colors. We had to pay additional transportation and re-stocking fees to return this material. All of the above constitute a net add of $105.00.

Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D7; Appellant's Exhibit 135. The parties incorporated the color change into Change Order 33 as item 4, in the amount of $116, as proposed by appellant on June 13, 1978, and accepted by the Government on June 26, 1978. Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D7; Appellant's Exhibit 135. Other than the time and expense incurred by Davis, which the Government recompensed as a direct cost under the change order, appellant established no cost increases or delays to the contract work, and therefore no entitlement to additional compensation.

66. Change Hardware of Corridor Doors: Appellant allocates $6,000 of its total claim to (1) allegedly inconsistent instructions concerning a field directive to provide additional items for two pairs of corridor doors and (2) an allegedly wrongful rejection of a supplier's certification. Second Amended Complaint at 125. On March 3, 1978, Mr. Sheridan issued a field directive requiring appellant "to furnish a second door closer and coordinator on both corridor door pairs.... [with] astragals ... on each for fire rating." Supplemental Appeal File, Volume 3(D), Exhibit 2AC-D8. Mr. Sheridan modified the order by a subsequent field directive dated March 23, 1978, detailing requirements and omissions for the two door pairs. Id. The parties incorporated the requirements of the second field directive into the first item of Change Order 28, which appellant proposed on June 5, 1978, and the Government accepted on June 19, 1978. Id.; Appellant's Exhibit 132. The Government accepted, without negotiated reduction, appellant's proposed price of $699 for work on the corridor doors and $1,692 for the total work performed under the contract change. Appellant's Exhibit 132. Appellant fails to identify any difficulties or delays resulting from the second field directive, nor does appellant identify any other inconsistent instructions. Appellant similarly fails to identify the supplier whose certification was allegedly rejected or any reasons why such a rejection would have been wrongful.

67. PVC Water Stops: Appellant allocates $8,500 of its total claim to an alleged constructive change requiring appellant to install PVC water stops at various footings and construction joints throughout the building's foundations. Second Amended Complaint at 125-26. Appellant specifies only one instance, however, in which a water stop was ordered installed although not otherwise required by the contract: that ordered for the elevator pit. Id.; Reply Brief at 322-23. On May 24, 1977, the Government interrupted appellant's pouring of concrete for the elevator shaft and ordered installation of a water stop in the elevator pit walls. Supplemental Appeal File, Volume 1(A), Exhibit 8; Transcript at 701-03. Mr. Sheridan's inspection report for the week of May 23 through May 27, 1977, notes:

Weekly Overview

GSA Resident temporarily stopped placement of concrete on 5/24/77 and requested that contractor install plate steel waterstop around elevator casing. As a result, a couple of yards of concrete had to be discarded because it remained in the truck too long. The contractor installed additional vinyl waterstop around the elevator pit on his own for which he should also be reimbursed.

Supplemental Appeal File, Volume 1(A), Exhibit 8. On June 8, 1977, Mr. Sheridan issued a field directive to appellant for the already completed work, noting that "[i]n accordance with your letter of May 24, 1977 ... your price of $329 extra to the contractor is hereby accepted." Id., Exhibit 10. The Government incorporated the ordered work into Modification Request 3, which it issued on June 30, 1977.

Appellant's Exhibit 103. Appellant submitted its proposal on July 7, 1977, in the amount of $329 for that item of work. Id. The Government accepted the proposal on July 26, 1977, under Change Order 3. Id. Mr. Makes originally testified that the change delayed construction of the elevator pit by several days, and subsequently delayed other work under the contract by the same period. Transcript at 686-87. He revised his estimate to several hours. Id. at 860-61. We find that the change modestly delayed this and other work under the contract for which appellant is entitled to some compensation. See finding 4. That amount is substantially less than the amount claimed. In addition, we find that appellant has established no entitlement to additional compensation for installing the other water stops, which were required under the contract.

68. Roof Deck Perforations: Appellant allocates $9,450 of its total claim to costs incurred in patching holes in the roof deck. Second Amended Complaint at 126. Paragraph 7.2 of specification section 0750 required appellant to mop the roof deck with hot asphalt in order to secure roofing insulation. Appeal File, Appendix C, Exhibit G; Transcript at 1166, 1463. The roof deck had small holes in it, however, through which the asphalt might drip either during the mopping or later, if softened on a hot day. Id. at 1166, 1463-64. Mr. Bieniek testified that "the holes in the deck were not required, nor were they specified." Id. at 1166. The Government ordered appellant to patch the holes, and appellant's foreman, Thomas Bowler, performed the work with the assistance of two carpenters and a laborer. Id. at 1166, 1463, 1736. Appellant has established no entitlement to additional compensation, and therefore this claim is denied.

69. Elevator Shaft: Appellant allocated $95,000 of its total claim to an omnibus grouping of claims concerning the following ten items: (1) elevator shaft, (2) sidewalk and tree planters, (3) spray fireproofing, (4) soil samples, (5) dent in the guardrail, (6) white oak benches, (7) door identification, (8) safety chains, (9) concrete and dedication photographs, and (10) flag pole. Second Amended Complaint at 127. Appellant seems to have abandoned the fourth, sixth, seventh and eighth claims because they have never been explained. Appellant's first claim seeks recovery for a delay incurred when Mr. Sheridan refused to allow appellant to remove an old elevator shaft until it had been determined not to be an artesian well. Reply Brief at 317-21. Appellant uncovered the shaft, which contained standing water, during excavation of the foundation. Transcript at 124. Although appellant offered to remove it immediately at no change in the contract price, Mr. Sheridan refused to permit its removal until it had been thoroughly examined. Id. at 124-25, 1141. Mr. Sheridan testified that he feared "if that casing had been driven to a point in the ground where we had pierced an aquaduct that was under pressure.... then water would have flowed into the excavation." Id. at 1141. The examination took approximately three days to complete. Id. at 125, 1142-43. The delay disrupted the excavation although it did not stop the work. Id. at 1142. On April 11, 1977, Mr. Dawicki noted in this daily diary, "Existing elevator or well casing encountered within building location. A/E to advise on final disposition of same." Supplemental Appeal File, Volume 1(A), Exhibit 2. On April 13, 1977, the Government issued a field directive to appellant "to cut existing well & casing at 2' below bottom of found[ation]. Slab and fill with concrete." Id. The Government incorporated the directed work into Modification Request 1 as item 2, which it issued on June 21, 1977. Appellant's Exhibit 101. The Government's Finding of Fact for Contract Modification acknowledged that the shaft constituted a differing site condition. Id. Appellant proposed a price of $37 change on June 23, 1977, and the Government accepted it on July 12, 1977, under Change Order 1. Id. We find that the differing site condition delayed appellant's performance of this and other work under the contract. See finding 4.

70. Sidewalk and Tree Planters: Appellant's second claim under the omnibus group is to recover costs incurred in negotiating prices for the construction of new sidewalks and the installation of tree planters that the Government originally ordered but subsequently decided not to purchase. Reply Brief at 366-76. At the time appellant began work in March 1977, the sidewalks surrounding the site had been extensively damaged from heavy equipment used by a different contractor on a neighboring, unrelated construction project. Appeal File, Volume 5, Exhibits 238, 239, 240; Appellant's Exhibit 240. In October 1977, the Government asked

appellant to submit a proposal for constructing new sidewalks. Appellant's Exhibit 163. By letter dated October 25, 1977, appellant submitted its first proposal. Id.; Appeal File, Volume 5, Exhibit 242. On November 4, 1977, appellant forwarded to the Government the proposal of J.H. Maxymillian, Inc., for "removal of old concrete walks, excavation, placement of gravel and compaction...." Appeal File, Volume 5, Exhibit 241; Appellant's Exhibit 163. On November 29, 1977, Mr. Makes and Mr. Sheridan met to negotiate the cost of Maxymillian's site work for the new sidewalk. Appellant's Exhibit 163. On December 6, 1977, the Government issued Modification Request 17 for appellant to "[c]onstruct new sidewalks including brick pavers and wheel chair ramps as indicated on Dwg. 2-S-1 Revised 11/8/77." Id. Mr. Sheridan's "Findings of Fact for Contract Modification," dated December 1, 1977, stated:

Existing city sidewalks around our project have been damaged by several contractors working on nearby projects, prior to our starting construction. The City of Pittsfield is not likely to have these sidewalks replaced in the near future since they were constructed only a few years ago. We will replace these sidewalks for esthetics.

Appellant's Exhibit 117. Negotiations between Mr. Makes and Mr. Sheridan continued on February 15 and 17, 1978. Appellant's Exhibit 163. The parties reopened negotiations on March 7, 1978, and continued them on March 9, 1978. Id. Calculation sheets from the negotiation sessions were highly detailed, reflecting extensive discussions. Id.; Appellant's Exhibits 117, 163. By letter dated March 9, 1978, appellant submitted its "firm proposal for the replacement of the existing city sidewalks" at a total price of $24,086. Appellant's Exhibit 117. The total consisted of two priced sections: $3,201 for work on the building's south side and $20,885 for work on its north and east sides. Id. On April 17, 1978, Mr. Kaprielian, deputy director of the Construction Management Division, Public Buildings Service, wrote to appellant:

You are hereby directed to proceed with the construction of new sidewalks including brick pavers and wheelchair ramps as indicated on Dwg. 2S1 revised 11/8/77, but limited to work described in north and east side alternate of your proposal dated March 9, 1978.

This work shall be performed as described in Modification Request #17 at a price not to exceed $20,885.00, which is subject to downward negotiations at a later date.

Appellant's Exhibit 163. In addition, on May 19, 1978, the Government issued a field memorandum requesting "an estimate of costs to install 4 Little Leaf Linden trees ... in precast concrete planters approximately 5' in dia[meter] and 3 1/2 ' deep along the sidewalk in front of the Federal Building." Appeal File, Volume 5, Exhibit 235. On June 14, 1978, the Government issued Modification Request 40 for the linden trees and planters. Id., Exhibit 233. By letter dated July 5, 1978, the Government cancelled both modification requests, as follows:

This is to confirm phone conversation with your Mr. Makes of 6/30/78. Modification No. 17 (New sidewalks) is hereby cancelled. Modification Request No. 40 (Planters) is also hereby cancelled and will not be reissued.

Since no work has been performed on either of these requests, no payment will be due on these two cancelled Modifications.

I want to thank you, however, for your involvement in obtaining prices for the proposals and your cooperation in these matters.

Id. Although the specific reason for cancellation of the two modification requests is unclear, a memorandum from appellant to the Government dated July 5, 1978, indicates appellant's view that the items "should be a separate contract." Appellant's Exhibit 163. Because appellant never performed any work on the two items, appellant received no compensation for its efforts in pricing and negotiating for the modification requests. Transcript at 1331-32, 1537-39. We find no evidence of bad faith in the Government's conduct of these negotiations; the

Government simply chose not to proceed with change orders to the contract. Appellant has failed to establish entitlement to compensation for negotiations it conducted that never resulted in a change to the contract.

71. Spray-on Fireproofing: Appellant's third claim in its omnibus group seeks to recover costs incurred in fireproofing the first and second floor decks of the building. Reply Briefs at 295-96. Paragraph 5 of specification section 0920, Sprayed Fire Protection, requires a fire resistance rating of one hour for the first and second floor decks. Appeal File, Appendix C, Exhibit G. Subparagraph 8.1 provides:

All structural steel and underside of steel floor of first and second floor shall be protected with sprayed coating materials as specified, except structural steel and underside of steel docks in boiler and machine rooms and steel bearing members in elevator hoistways and except steel indicated to receive equivalent fire protection of other materials or specifically identified as not requiring fire protection.

Id. In addition, subparagraph 8.11 states, "In all cases the minimum thickness [of fire protection material] shall not be less than 1/2 -inch under metal floor decks...." Id. On June 13, 1977, appellant's subcontractor, Francis P. O'Connor & Son, Inc., proposed for the floor assemblies a design that provided a fire resistance rating of one hour without the need for a spray-on fireproofing. Appeal File, Volume 3, Exhibit 96. The Government rejected the proposed elimination of fireproofing material, however, and the subcontractor submitted a second proposal on September 30, 1977, which incorporated a one-half inch spraying. Id., Exhibits 95, 96. On December 14, 1977, the subcontractor submitted a claim to appellant for the additional fireproofing in the amount of $5,182.77. Id., Exhibit 96. On January 3, 1978, appellant submitted to Mr. D'Amore a request for contract modification in the amount of $5,701.05, to include the subcontractor's claim plus appellant's ten percent commission. Id. On January 19, 1978, Mr. D'Amore denied the request, stating:

We have reviewed your letter of January 3, 1978, requesting a contract modification for certain sprayed fireproofing which you were required to apply. It is our opinion that the application of the fireproofing in question is a contract requirement.

Our opinion is based on the fact that although U.L. Design D-914 which you submitted may be a system which provides a one-hour rating, the Contract Drawings & Specifications specifically require fireproofing material be applied on the underside of the floor deck.

Since the work in question is already part of your contract, we cannot issue you a contract modification to perform it. We hope that this letter will answer any questions you may have pertaining to this matter.

This is the final branch decision. You may appeal this decision to Mr. K. Kaprielian, who is the Contracting Officer, for his consideration.

Id., Exhibit 95. We agree with Mr. D'Amore's interpretation of the specification requirements and therefore deny this claim.

72. Dent in the Guardrail: Appellant's fifth claim in its omnibus group relates to a subcontractor's denting of the guardrail, efforts to straighten the rail, and Mr. Sheridan's alleged use of the accident as leverage to obtain a price reduction for unrelated work. Reply Brief at 330-32. While paving the parking lot, appellant's subcontractor, J.H. Maxymillian Inc., bumped and dented a guardrail attached to the building's retaining wall. Transcript at 790-91, 1138-39. On November 4, 1977, Mr. Dawicki issued a field memorandum to appellant directing, in part, "Correct the damaged portion of guard rail at the retaining wall." Supplemental Appeal File, Volume 1(B), Exhibit 11. Mr. Sheridan originally insisted that appellant remove and replace the entire guardrail, but subsequently permitted appellant's subcontractor to correct the dent. Id.; Transcript at 457, 791. Maxymillian

performed the corrective work. Transcript at 791. During a building tour at the time of this hearing, Mr. Sheridan was unable to locate the point where the rail had been damaged. Id. at 791, 1140. On November 28, 1977, Mr. Sheridan issued a field directive requiring appellant "to provide 2 ft. long tapered granite curb returns extending into the landscaped areas where the present curbs meet the sidewalk at the parking lot entrances...." Supplemental Appeal File, Volume 1(B), Exhibit 15. On February 8, 1978, Mr. Sheridan issued a field directive requiring appellant "to construct a dry well ... under each fan coil unit condensate drain at the Southeast and Southwest corners of the building." Supplemental Appeal File, Volume 1(C), Exhibit 5. Both directives were incorporated into Change Order 30, which appellant proposed on June 5, 1978, and the Government accepted on June 19, 1978. Appellant's Exhibit 134. Work under both directives was performed by Maxymillian, which invoiced its cost for the granite curbs as $640 and the dry wells as $180. Id. Appellant forwarded those prices, with ten percent markups to $704 and $198 respectively, to the Government in early March 1978. Id. Change Order 30 grants appellant $385 for the granite curbs and $66 for the dry wells. Id. The parties negotiated the price reduction as a compensation for Mr. Sheridan permitting repair of the guardrail rather than its replacement. Transcript at 790, 1139-40. We find no evidence of bad faith by the Government during the negotiations; the Government agreed to relinquish what the parties apparently considered to be a viable claim in exchange for the price reduction; appellant has established no entitlement to additional compensation; and the claim is denied.

73. Concrete and Dedication Photographs: Appellant's ninth claim in its omnibus group concerns photographs that were taken for use in a brochure for the building's dedication ceremony. Reply Brief at 300-01. On May 10, 1978, Mr. Makes wrote the Caolo & Bieniek, "GSA has requested we furnish final photos ... for an 'early June' brochure for the building ceremonies. Please advise of views desired." Appellant's Exhibit 146. The Government incorporated the work into Modification Request 46, which it issued on March 19, 1979. Id. Appellant's photographer subsequently submitted an invoice in the amount of $47.25 for the work. Id. On April 2, 1979, appellant proposed a price of $650 for the " 'black and white' photographs and negatives of the exterior elevation of the building as requested by Government representatives." Id. The Government questioned the $600 markup, which appellant explained by letter dated April 17, 1979, as "reflect[ing] our costs related to coordination of the work." Id. By that letter appellant requested deletion of the markup from the proposal, however, while reserving the right to append it to the instant appeal. Id. The Government added a ten percent markup to the photographer's invoice, for a final price of $52, and accepted appellant's proposal on May 22, 1979, as Change Order 44. Id. We find that the Government issued its order for the photographs under the contract; the contract limited appellant's markup to ten percent; appellant has established no entitlement to additional sums; appellant's claim for $548 beyond the photographer's charge of $47.25 and the Government's offered markup of $4.75 is frivolous; and the claim is denied.

74. Flagpole: Appellant's tenth claim in its omnibus group concerns the Government's requirement that particular forms be completed by appellant's subcontractor for installation of the flagpole. Reply Brief at 298-99. On October 21, 1977, the Morgan-Francis Company supplied and installed a flag pole at the building. Appeal File, Volume 5, Exhibit 208. Two employees of the company accomplished the work in one hour. Id. Appellant required Morgan- Francis to submit various forms, and as of November 11, 1977, that company had complied in all cases but two: forms WH-347 and 257. Appellant's Exhibit 312. Morgan-Francis objected to the requirement, and on December 2, 1977, appellant requested instructions from Mr. D'Amore. Appeal File, Volume 5, Exhibit 207. On January 11, 1978, the Government replied, "Although we realize this subcontractor worked a very short time on this project, we cannot waive the requirement for payroll submission [WH-347] as this requirement is established by law." Id., Exhibit 206. Although Mr. Makes testified that the Government subsequently waived the requirement, Morgan-Francis completed form WH-347 on January 16, 1978. Appeal File, Volume 5, Exhibit 208; Transcript at 1847. The record fails to establish final submission of form 257, although on February 6, 1978, appellant had returned the Morgan-Francis submission of form 257, dated January 16, 1978, for corrections.

Appellant's Exhibit 312. Appellant has established no entitlement to compensation for the Government's insistence that appellant comply with legal and contractual requirements. The claim is denied.

Discussion

Appellant has raised numerous issues and legal theories in its claim to recover additional compensation for construction of the federal office building in Pittsfield. At the outset, we hold that appellant bears the burden of proving its claim as to both entitlement and quantum. See S.W. Electronics & Manufacturing Corp. v. United States, 228 Ct.Cl. 333, 335, 351- 52, 655 F.2d 1078, 1079, 1088-89 (1981); Zinger Construction Co., GSBCA No. 6568, 84-3 BCA ¶ 17,537, at 87,349-50; Pittman Construction Co., GSBCA Nos. 4897, 4923, 81-1 BCA ¶ 14,847, at 73,300-02, aff'd on reconsideration, 81-1 BCA ¶ 15,111, aff'd, 2 Cl.Ct. 211 (1983). Despite appellant's ingenious characterization of the Government's contracting activity as some species of medical malpractice, with a concomitant shift in the burden of proof under principles outlined in Razav. Sullivan, 432 F.2d 617 (D.C.Cir.1970), cert. denied, 400 U.S. 992 (1971), we adhere to the view followed in the cases cited above.

Among the issues and theories appellant asserts for recovery are ones concerning breach of contract; cardinal or constructive changes of the contract; bad faith and duress; superior knowledge; oversupervision, overinspection, and job interference; design deficiencies and defective specifications; and the propriety of total cost or jury verdict awards as compensation for all alleged losses. Appellant also seeks to recover substantial consequential damages relating to other contracts, business loss, and the sale of assets. Finally, appellant seeks to recover attorney fees and costs. Respondent denies liability under any of appellant's theories and asserts two affirmative defenses: (1) that change orders constituted accords and satisfactions for the applicable individual claim items and (2) that many of appellant's other claimed losses resulted simply from the Government's requirement that appellant comply with the contract specifications. The various legal theories and allegations are addressed below, but first the Board must consider how the individual claim items will be addressed.

Appellant has presented alternative approaches for the Board's consideration of the claims in this appeal: either as a whole, leading to a total cost award for the entire demand amount, or as a series of individual items of "allotted" values, leading to a jury verdict assessment for the same amount. Appellant's total cost approach is initially grounded on the large discrepancy between the necessary hours contemplated by both appellant and Michaels Mechanical when bidding on the job and the hours ultimately required for performance. In addition, appellant presents a wish list of items by which it hopes to significantly augment its recovery. For appellant, that list includes (1) a $176,400 profit appellant believes it should have earned on the project, as bid, (2) a $205,000 profit appellant believes it would have earned if its overrun hours had been applied to another job, (3) a $132,500 additional profit appellant believes it would have earned on a project for Williams College if appellant had not encountered the overrun and administrative difficulties it experienced with the Pittsfield federal building project, and (4) $259,000 as recompense for corporate assets appellant liquidated allegedly in order to cover losses experienced on the project. These four items total $772,900. In addition, appellant desires "between a low figure of $650,000.00 and a middle range figure of $850,000.00" in general damages for a potpourri of claimed injuries: reduced bonding capability, fear of bidding, damaged relations with suppliers and subcontractors, loss of goodwill, loss of employees, reduced net worth, increased debts, and "the total cumulative and synergistic effect on all jobs and [sic] amplified in the various claim letters." Second Amended Complaint at 139-40.

The sponsored claim of Michaels Mechanical is structured similarly, with the following wish list: (1) a $35,850 profit it expected for the project as bid, (2) a $46,650 profit Michaels believes it would have earned on its overrun hours if applied to another job, (3) a $139,000 net loss reflected on Michaels financial

statement for 1978, attributed to difficulties encountered in the federal building project although related to other jobs, and (4) a $28,000 loss directly incurred in the project. These claimed items total $249,450. In addition, Michaels hopes for "a low ... figure of $400,000 to a middle figure of $550,000, or a sum in that range" as general recompense for the collapse ofits business. Id. at 141.

These specific claims, which amount to approximately $1,622,900 for appellant and $799,450 for Michaels, are denied. Of the types of damages claimed, the majority are far too speculative and remote from the alleged breaches to be compensable. See, e.g., Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741, 743-44 (1980); H.H.O., Inc. v. United States, 7 Cl.Ct. 703, 708 (1985); Stephenson Assocs., Inc., GSBCA Nos. 6573, 6815, 86-3 BCA ¶ 19,071, at 96,349-50. As noted in Stephenson Assocs., "The general question is whether damages claimed for a breach of contract were reasonably foreseeable or, to put it another way, whether they were direct or consequential, the former being compensable, the latter not." 86-3 BCA at 96,350. Of Michaels's claims, we find particularly remote those of up to $550,000 for the collapse of its business, $139,000 for losses incurred on unrelated jobs, and a $46,650 profit Michaels believes it could have earned by applying its overrun hours to another job, had it been able to. Similarly remote are appellant's claims of $259,000 for corporate assets sold, $132,500 of additional profit allegedly lost from an unrelated job, $205,000 profit lost from the overrun hours if applied to another job, and up to $850,000 for largely speculative and unproven injuries concerning damaged business relations, loss of business opportunities, and reduced net worth.

Significantly, in Olin Jones the Court of Claims found several of these types of damage claims to be noncompensable as a matter of law. Addressing the Government's motion for partial summary judgment, the court stated:

[I]t is necessary to examine the kinds of damages sought, and to decide which resulted directly and proximately from the asserted breach, and which, even if proven at trial, would be too remote or speculative to qualify as compensable damages. The damages claimed ... can be roughly divided into two categories; those which relate to completion of this particular contract, and those which involve plaintiff's ability to obtain other contracts or work.

With respect to the first category.... Plaintiff may recover them if it can show that the Government's failure ... proximately resulted in damage of this direct type affecting this particular contract. On this aspect there can be no decision as a matter of law.

While plaintiff is thus not barred from recovering this kind of damages if it can prove them, it may not recover for damages coming within the second category described above.... Even it proven, these damages would be too remote and speculative to be recoverable. "Consequential" damages are recoverable only where they are the "natural and probable consequences of the breach complained of * * *." Ramsay, supra, 121 Ct.Cl. at 433, 101 F.Supp at 357 (damages are unavailable because the Government could not have reasonably foreseen that nonpayment of contract would put corporation on brink of bankruptcy). In William Green Construction Co. v. United States [18 CCF ¶ 82,234], 201 Ct.Cl. 616, 477 F.2d 930 (1973), cert. denied, 417 U.S. 909 (1974), we stated that in a common law suit for breach of contract (such as this):

there would be no recovery for general loss of business, the claimed loss of the entire [company's] net worth, and losses and the non-federal [contracts]--such damages are all deemed too remote and consequential. [Id. at 626, 477 F.2d at 936.]

The speculative alleged loss of future contracts and work in this case comes within the losses of outside business, outside contracts, and general company worth referred to in Green. Even if the Government had not delayed contract payments, there is no assurance that plaintiff would have received any additional contracts or work. See, Ramsey, supra, 121 Ct.Cl. at 433, 101 F.Supp. at 357. Receipt or non-receipt of future contracts is both speculative in nature and dependent on many [unrelated] factors....

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

The result is that, on remand, the trial judge may consider whether the first group of damages under Count VI (those relating to effects on this particular contract) are available, but he is foreclosed from doing so as to the second category of damages (relating to potential future work or contracts) since we hold as a matter of law that, even assuming such damages could be proven, they are too remote and indirect to be recoverable in this breach action.

225 Ct.Cl. at 743-44.

Similarly, we have previously considered and rejected claims much like those of Michaels for loss of its business and appellant for its reduced net worth. In Robert J. DiDomenico, we addressed a claim that the Government's breach of a lease brought on the lessor's financial collapse and foreclosure on the mortgage for the premises at issue. GSBCA No. 5539, 82-2 BCA ¶ 16,093, at 79,903-05, vacated on other grounds, 83-2 BCA ¶ 16,670. We stated:

Generally, financial disaster, such as the bankruptcy of a contractor or subcontractor, or loss of net worth, is not considered to be the foreseeable result, in the usual course of events, of a breach of contract so as to justify the award of compensatory damages. See William Green Construction Co. v. United States [18 CCF ¶ 82,234], 201 Ct.Cl. 616, 477 F.2d 930 (1973), cert. denied, 417 U.S. 909 (1974); Ramsey [v. United States, 121 Ct.Cl. 426, 101 F.Supp 353 (1951), cert. denied, 343 U.S. 977 (1952) ].

....

This rule applies to appellant's case; foreclosure of appellant's mortgage loan was not the natural and inevitable result of a failure to make timely rental payments. It was merely a possible one. As such, it was not reasonably foreseeable unless respondent had reason to know of appellant's particular financial circumstances.

82-2 BCA at 79,904-05.

We find that the denial of the wish lists is particularly appropriate because of appellant's failure to establish such a large number of the asserted breaches that are said to have contributed to the losses claimed. The wish lists of appellant and Michaels substantially depend upon the Board finding merit either in the total cost approach to the claimed loss or in the argument that the Government is solely and wholly culpable for each individual claim item. The Board does neither. As noted in the findings of fact, individual claims in this appeal often involved no more than appellant's failure to comply initially with contract specifications and the Government's insistence that appellant perform as the contract required. Specifically for this reason, appellant's demand for the whole of the profits expected by both itself and Michaels are also denied. The significant increases to appellant's and Michaels's costs of performing the contract due to their frequent failures to comply initially with the specifications necessarily negate recovery of the full amounts claimed.

Appellant's failure to prove the Government's culpability for all claim items also undermines the claim for total cost recovery. The total cost approach is inappropriate when the complaining party shares responsibility for the incurred losses. See S.W. Electronics & Manufacturing Corp., 228 Ct.Cl. at 347-48, 350, 655 F.2d at 1086-87; Meva Corp. v. United States, 206 Ct.Cl. 203, 220, 511 F.2d 558 (1975); WRB Corp. v. United States, 183 Ct.Cl. 409, 426 (1968); Pittman Construction Co., 81-1 BCA at 73,314-15; R.C. Hedreen Co., GSBCA No. 4841, 78-2 BCA ¶ 13,475, at 65,926. As stated in WRB Corp.:

This theory has never been favored ... and has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated.... The acceptability of the method hinges on proof that (1) the nature of the particular losses make [sic] it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

responsible for the added expense.

183 Ct.Cl. at 426. Appellant has failed to establish entitlement to total performance costs, and this claim is therefore denied.

The largest group of items concerning appellant's claim involves changes to the contract for which prices were negotiated and change orders issued. Appellant advances several arguments concerning this group. First, appellant seeks to recover for the impact of these changes on its performance of the contract, arguing that their number, nature, and timing undermined appellant's ability to complete the contract within the nine months originally planned for performance. The Government counters that the negotiated change orders constituted an accord and satisfaction of the asserted claims, barring any recovery for direct or cumulative impact on performance progress resulting from the changes.

The Board has recognized that two types of impact costs, direct and cumulative (sometimes called indirect), may be associated with contract changes, and has defined those two as follows:

The term "direct impact" refers to costs that are, more or less, the direct consequences of a change. Such costs are readily foreseeable, and a contractor is expected to recognize them in forward-pricing a change....

"Cumulative impact" costs ... are costs associated with impact on distant work, and are not readily foreseeable or, if foreseeable, as not [sic] readily computable as direct impact costs. The source of such costs is the sheer number and scope of the changes to the contract. The result is an unanticipated loss of efficiency and productivity which increases the contractor's performance costs and usually extends his stay on the job.

Haas & Haynie Corp., GSBCA Nos. 5530, 6224, 6638, 6919, 6920, 84-2 BCA ¶ 17,446, at 86,897; see also Pittman Construction Co., 81-1 BCA at 73,297-300. Such impact or delay costs are generally compensable under the Changes Clause, clause (d) of which allows for an equitable adjustment of the contract price for any change affecting the cost or time required to perform work "whether or not changed by any order." Baltimore Contractors, GSBCA Nos. 3066, 3068, 80-1 BCA ¶ 14,199, at 69,892. At issue concerning claims for either direct or indirect impact costs are (1) whether the parties intended the negotiated price and time extension, if any, for each change order to encompass the impacts at issue, and (2) whether a compensable impact occurred. With respect to the second issue, as noted in our factual determinations, supra, we have found numerous instances of compensable impact.

In addition, with respect to the first issue we hold that the parties never intended the negotiated change orders to encompass cumulative, or indirect, impact costs. This issue is essentially a restatement of that underlying the Government's affirmative defense of accord and satisfaction, for which the burden of proof lies with the Government. Chantilly Construction Corp., ASBCA No. 24138, 81-1 BCA ¶ 14,863, at 73,396. In Zinger Construction Co., the Board summarized the effect of a change order as follows:

Where ... a contractor accepts and signs without reservation or protest a bilateral contract modification making an equitable adjustment, it is barred by accord and satisfaction from later claiming an additional adjustment. That bar runs as to all claims based upon events that occurred prior to agreement; those matters that were not then in dispute and those claims specifically reserved in the contract modification are not barred.

84-3 BCA at 87,348.

During the course of the project, the Government issued forty-four change orders, addressing a total of 133 separate items. In addition, several items contained multiple parts. Of the forty-four change orders, five clearly merited no time extension. Change order numbers 2 and 15 followed from appellant's proposals

pursuant to the contract's Value Engineering Incentive Clause, at section 0015. Those changes resulted in reductions in appellant's work effort at appellant's request, and appropriately the Government granted no time extensions. Change Order 42 addressed two delay claims by appellant, as follows:

Settlement of claim for time delay due to the government owned site not being cleared for construction until after NTP [notice to proceed] was issued, and to changing the hardware on the front entrace [sic] doors which in turn delayed the fabrication and installation of the entrance doors.

Appellant's Exhibit 144. Time extensions of seven days for the delay in site availability and twenty-eight days for delays resulting from the hardware changes had previously been granted. In addition, the hardware changes constituted one of five items addressed in Change Order 10. Pursuant to Change Order 42, the parties settled the two claim items for $6,100 on November 3, 1978. By letter dated July 17, 1978, appellant submitted its first claim statement, noting:

The original contract completion date was March 23, 1978. Occupancy of the building occured [sic] on April 28, 1978. We feel entitled to the additional costs of supervision, electric and telephone during that period of twenty-six (26) working days.

....

This claim is for direct costs to David J. Tierney, Jr., Inc. only and does not alter or void any prior claims submitted by this firm for itself or for others; nor does it restrict the submittal of any legitimate claim initiated by David J. Tierney, Jr., Inc. or any subcontractor or supplier for this project in the future.

Appellant's Exhibit 144. Although the parties subsequently negotiated a lower price than appellant originally offered, appellant never withdrew its insistence that the settlement address only direct costs for the delay. Change Order 42 similarly failed to cover potential claims for cumulative impact. Appellant therefore preserved whatever cumulative impact claim it may have had concerning Change Order 10. Change Order 42, however, is simply a settlement and provides no separate basis for a cumulative impact claim.

Change Orders 43 and 44 similarly could not have contributed to any cumulative impact on contract performance. Change Order 43 simply deletes, for a credit of $30, "the requirement to furnish an electric or magnetic device for locating preset inserts in the under floor electric duct system." Appellant's Exhibit 145. Change Order 44, negotiated well after completion of the building, addressed two items. First, the Government ordered photographs of the building for use in its opening ceremonies. Second, the Government granted appellant compensation for additional bond premium resulting from the increased contract amount. Neither provides any basis for a cumulative impact claim.

All of the remaining thirty-nine change orders contained boilerplate language, immediately above the total, agreed upon price, denying any time extensions. Change Orders 31, 32, 37, and 38 each noted, "since this work will be performed after the Government's acceptance of the building for occupancy, it is not considered to be a basis for a time extension." Appellant's Exhibits 137, 138, 139, 141. The other change orders contained the following boilerplate language, or a near equivalent:

It is considered that the performance of the work described can be accomplished concurrently with the work under the basic contract. Should you disagree, a detailed explanation of how the work will delay the overall project must be submitted with your quotation.

Appellant's Exhibits 101, 103-16, 118-20, 122-36, 142, 143.

Neither statement of boilerplate clearly indicates an intent by the parties to settle appellant's potential claims for cumulative impact costs, and therefore the change orders will not now bar those claims. In addition, despite the Government's argument concerning accord and satisfaction, Change Orders 10 and 42 at least

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

demonstrate that the parties failed to view the latter piece of boilerplate as prohibiting claims even for direct impact. Although Change Order 10, which included changes to the hardware for front entrance doors, contained that boilerplate clause, the parties subsequently negotiated Change Order 42 as a "[s]ettlement of claim for time delay due ... to changing the hardware ... which in turn delayed the fabrication and installation of the entrance doors." Appellant's Exhibit 144. As appellant's letter of July 17, 1978, made clear, Change Order 42 addressed no more than the claim for direct impact costs arising out of the hardware change and the earlier delay in site availability. In addition, Mr. Sheridan's negotiation notes for pricing the various change orders indicate only the intent to address, and to allow, direct costs for the work plus a percentage markup for profit, overhead, or commission.

Furthermore, we do not find that appellant "reserved" any claim for cumulative impact costs. Rather, we find that claim was never part of the contract modification negotiations. In addition, given the nature of the damages, one would not expect it to have been. The parties impliedly agreed to exclude those costs from discussion, and they therefore played no role in the change orders to which the parties ultimately agreed. See Roberts Construction Co., GSBCA No. 5724, 81-1 BCA ¶ 15,104, at 74,732; Pittman Construction Co., 81-1 BCA at 73,313-14.

Appellant also attempts a scatter-shot of arguments, including assertions of superior knowledge, bad faith, breach of duty to negotiate in good faith, overinspection, and oversupervision on the part of the Government. Concerning the first of these, appellant contends that the Government's knowledge, or superior knowledge, that the Pittsfield construction project concerned a test program for small business set aside entitles appellant to some financial award. Appellant fails to explain how that knowledge in any way affected the parties' contractual rights and obligations. Appellant established no duty of the Government's to disclose the information, and no damage from lack of disclosure.

The next argument, essentially a general assertion of bad faith on the part of the Government, sets special focus on Mr. Sheridan. Appellant's claim specifically addresses the Government's administration of the contract and direction of the construction work. Cf. Hoel-Steffen Construction Co. v. United States, 231 Ct.Cl. 128, 139-43, 684 F.2d 843, 850-52 (1982); Haney v. United States, 230 Ct.Cl. 148, 154, 676 F.2d 584, 587-88 (1982). The burden of establishing bad faith, as asserted, is appellant's. Haney v. United States, 230 Ct.Cl. at 152, 676 F.2d at 586; see also Kalvar Corp. v. United States, 211 Ct.Cl. 192, 198-201, 543 F.2d 1298, 1301-03 (1976), cert. denied, 434 U.S. 830 (1977). Appellant failed to carry its burden. For the most part, appellant has shown Mr. Sheridan and others to be no more than zealous, stubborn negotiators, frequently difficult to reason with. In Haney, the court found far more while rejecting an assertion of bad faith, and its following observations are pertinent:

> The trial judge concluded that the defendant's officials administering this contract displayed incompetence at their tasks.... Deplorable as this may be, it is not fairly to be characterized as bad faith. There can be no doubt that an incompetent contracting and procurement official is just as likely to enhance a contractor's costs and deny for some time adjustments to which it is entitled, as he is to deplete the public fisc with reckless expenditure. The remedy is not to apply to the offenders a pejorative which we have carefully limited to offenses of a different kind.

230 Ct.Cl. at 154-55, 676 F.2d at 588. The record does establish some instances in which Mr. Sheridan impeded appellant's work through a failure to cooperate, and we have considered those in granting relief. We do not find, however, that Mr. Sheridan's actions rose to the level of bad faith. As the Haney court noted, for a finding of bad faith, "[t]he necessary and almost irrefutable proof has been equated with evidence of a 'specific intent to injure the plaintiff.' " 230 Ct.Cl. at 152, 676 F.2d at 586. Appellant's proof falls far short.

Nor has appellant established any failure by the Government, or Mr. Sheridan in particular, to negotiate in good faith. The allegation concerns the parties'

pricing of the various contract change orders, which appellant found to be a time consuming and frustrating ordeal. The Board will not, however, find a failure to negotiate in good faith simply because of hard bargaining by the Government. See, e.g., Robert L. Merwin & Co., Inc., GSBCA No. 6621, 83-2 BCA ¶ 16,745, at 83,273, motion for reconsideration denied, 83-2 BCA ¶ 16,859; 6800 Corp., GSBCA No.5880, 83-2 BCA ¶ 16,581, at 82,449-50. In 6800 Corp., we stated, "A lack of good faith bargaining may not be found merely because a party attempts to secure that which the other party deems unacceptable; it may rather be found only from conduct showing an intent not to enter into an agreement of any nature." 83-2 BCA at 82,449. Mr. Sheridan's negotiation notes demonstrate careful, and occasionally tenacious, bargaining by the parties, with concessions made by both sides in reaching a price for each change. Those notes show that the final price usually reflected a compromise between appellant's proposal and the Government's estimate. Occasionally the Government accepted the first proposal without contest. All we glean from the evidence, however, is "honest bargaining," which is all that we require. Id. Appellant, therefore, has failed to establish grounds to void the settled prices for its direct costs under the change orders.

We also reject appellant's argument that the Government somehow procured agreement to the change order prices through economic duress. To find an agreement voidable on grounds of duress, the evidence must show:

(1) One side involuntarily accepted the terms of another.

(2) Circumstances permitted no other alternative.

(3) The circumstances were the result of coercive acts of the opposite party.

Systems Technology Associates, Inc. v. United States, 699 F.2d 1383, 1387 (Fed.Cir.1983), quoting from Louisiana-Pacific Corp. v. United States, 228 Ct.Cl. 363, 367, 656 F.2d 650, 652 (1981). More than the mere existence of hard bargains or economic pressure is required to establish duress, however. Systems Technology Assocs., 699 F.2d at 1387; see also Nash Janitorial Service, Inc., GSBCA No. 6390-R, 84-2 BCA ¶ 17,355, at 86,487-88. Appellant must show that its "assent" to the change order prices "was induced by an improper threat which left the recipient with no reasonable alternative save to agree." David Nassif Assocs. v. United States, 226 Ct.Cl. 372, 385, 644 F.2d 4, 12 (1981). Appellant has completely failed to carry its burden. The price for each change was hammered out in negotiations between the parties, with concessions on both sides. For the same reasons that we found no breach of the duty to negotiate in good faith, we find neither coercion nor duress exercised by the Government.

We do find, however, that a large number of appellant's claims have merit, for the reasons stated in our Findings of Fact. Specifically, appellant is entitled to recover for those claims, or portions of claims, discussed in Findings 5, 7, 8, 10, 13, 14, 16, 18, 19, 20, 21, 25, 26, 27, 30, 31, 32, 33, 40, 51, 52, 53, 55, 60, 62, 63, 64, 67, and 69. Although the record establishes that appellant and Michaels suffered damages as a result of the Government's action, we recognize that appellant's proof of the claim amounts was less than exact. As the Court of Claims noted in S.W. Electronics, however:

The ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."

228 Ct.Cl. at 351, 655 F.2d at 1088, quoting from Electronic & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969); see also Assurance Co. v. United States, 813 F.2d 1202, 1205 (Fed.Cir.1987); Stephenson Assocs., 86-3 BCA at 96,350.

We believe the record does permit establishment, by way of a "jury verdict," of a " 'fair and reasonable approximation' of damages." S.W. Electronics, 228 Ct.Cl. at

352, 655 F.2d at 1089. Our verdict addresses both appellant's impact costs and the few claims for direct costs with which we find merit. While we would not normally use a jury verdict to compensate for direct costs, we find it appropriate to do so in this case because they constitute a relatively small part of the claims we grant. Initially, we determine that appellant's allocation method is both unworkable and wholly lacking in credibility. In order to provide some merited relief, however, we look first to the loss appellant and Michaels incurred. We find that an appropriate measure of their real loss would consist of both their net operating losses, which the Government stipulated equaled a combined total of $282,128, and the profit appellant reasonably would have expected but failed to realize on the job. It was established that no profit was made. Witnesses for appellant and the Government presented widely diverging testimony, however, concerning the issues of the profitability of other projects and appellant's expected profit for this contract. Under these circumstances, we consider it reasonable to apply the percentage for profit allowed in paragraph 23.1.2 of the contract's Changes clause, as modified by MOD-1139Q, and do so at the clause's maximum rate of ten percent. Cf. Stephenson Assocs., 86-3 BCA at 96,354. We find this rate to be reasonable given the profit anticipated by appellant under the contract.

Next, to determine the figure against which we calculate the percentage of profit we determine appellant's cost of performing the contract: We add the amount of appellant's net operating loss stipulated to by the Government, or $184,167, to appellant's total contract price of $1,471,887, which includes the original bid amount plus negotiated change orders, for a total figure of $1,656,054. Based on that amount, which was appellant's cost in performing the contract, we calculate that approximately $165,605 is the profit reasonably to have been expected.

Adding this figure to the combined net operating losses of appellant and Michaels, we therefore calculate a real loss of $447,733. To determine an amount due appellant and Michaels, we next look to where the liability settles between the parties, roughly determining the proportion of disputed claims for which the Government is liable and those for which appellant remains responsible. We have found merit in approximately forty percent of appellant's claims, breaking into a working ratio, in terms of a jury verdict, of four to six. Applying that ratio to the sum of the combined net operating losses and appellant's reasonably expected profit, or $447,733, we arrive at a figure of approximately $179,093. We deem that amount to be a "fair and reasonable approximation" of the damages due. We do not segregate the amounts to be recovered individually by appellant and Michaels, however, because appellant failed to segregate clearly the claims of each, for all but the claims for special damages which we denied above.

## Decision

The appeal is granted in part. Appellant is entitled to $179,093, plus interest as provided by 41 U.S.C. § 611 (1982).

VINCENT A. LaBELLA

Administrative Judge

We concur:

LEONARD J. SUCHANEK

Chief Administrative Judge

EDWIN B. NEILL

Administrative Judge

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1 The Board acknowledges the significant contribution to this opinion of James Johnson, Attorney-Examiner.

1988 WL 63908 (G.S.B.C.A.), 88-2 BCA P 20,806, GSBCA No. 5585, GSBCA No. 6198, GSBCA No. 7107

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works