IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BELL BCI COMPANY,

PLAINTIFF,

v.

THE UNITED STATES,

DEFENDANT.

No. 03-1613C
Judge Wheeler

# PLAINTIFF'S POST-TRIAL BRIEF

Richard O. Wolf
Charlie C.H. Lee
Robert D. Windus
Kristen A. Bennett
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com
Counsel for BELL BCI Company

Dated: December 31, 2007

# TABLE OF CONTENTS


| | | | PAGE NO. |
|---|---|---|---|
| TABLE OF AUTHORITIES | | | iv |
| I. | SUMMARY OF ARGUMENT | | 1 |
| II. | STATEMENT OF ISSUES PRESENTED | | 3 |
| III. | PROPOSED FINDINGS OF FACT | | 3 |
| | A. | PROJECT BACKGROUND | 3 |
| | B. | PARTNERING AND COURSE OF DEALING REGARDING CHANGES AND DELAY | 5 |
| | C. | THE GOVERNMENT'S DECISION TO ADD A NEW FLOOR | 7 |
| | D. | MOD. 93 AND THE GOVERNMENT'S ASSURANCE OF LIMITED FUTURE CHANGES | 9 |
| | E. | THE GOVERNMENT'S PERVASIVE CHANGES AFTER AUGUST 31, 2000 | 11 |
| | F. | SUBCONTRACTORS' CLAIMS | 15 |
| | G. | EXPERT WITNESS ANALYSIS | 21 |
| | H. | BELL PERFORMED THE TIA ANALYSIS REQUIRED BY THE CONTRACT | 21 |
| | I. | SUMMARY OF BELL'S SCHEDULE ANALYSIS | 25 |
| | J. | TIA ANALYSIS BY UPDATE PERIOD | 25 |
| | | (i) SCHEDULE UPDATE FOR SEPTEMBER 1, 2000 | 25 |
| | | (ii) SCHEDULE UPDATE FOR OCTOBER 1, 2000 | 26 |
| | | (iii) SCHEDULE UPDATE FOR NOVEMBER 1, 2000 | 28 |

**Page No.**


(iv) Schedule Update For December 1, 2000 .......... 31

(v) Schedule Update For January 1, 2001 .......... 32

(vi) Schedule Update For February 1, 2001 .......... 34

(vii) Schedule Update For March 1, 2001 .......... 36

(viii) Schedule Update For April 1, 2001 .......... 39

(ix) Schedule Update For May 1, 2001 .......... 40

(x) Schedule Update For July 2, 2001 .......... 42

(xi) Schedule Update For September 1, 2001 .......... 44

(xii) Schedule Update For December 1, 2001 .......... 45

K. Windows Analysis .......... 47

L. Liquidated Damages .......... 51

M. Cumulative Impact/Labor Inefficiency .......... 52

N. Quantum .......... 56

IV. APPLICABLE LEGAL STANDARDS .......... 64

V. ARGUMENT .......... 66

A. The Undisputed Evidence Showed That BELL Did Not Waive Or Release Its Claims For Cumulative Impact Or Inefficiency .......... 66

B. The Undisputed Evidence Showed That BELL Suffered Cumulative Impact And Inefficiency Damages .......... 69

C. BELL Proved That It Was Entitled To A Compensable Time Extension .......... 70

**PAGE NO.**


D. **BELL IS ENTITLED TO THE UNDISPUTED CONTRACT BALANCE AND PAYMENT FOR THE DISPUTED EWOS** ........................................ 71

E. **THE GOVERNMENT IMPOSED LIQUIDATED DAMAGES AND BACKCHARGES AS A REPRISAL FOR BELL SEEKING AN EQUITABLE ADJUSTMENT** ........................................ 72

F. **SUBCONTRACTORS' CLAIMS** ........................................ 73

(1) **STROMBERG'S CLAIMS** ........................................ 74

VI. **CONCLUSION** ........................................ 74

**CERTIFICATE OF SERVICE**

**APPENDIX A: SUMMARY OF DAMAGES (PLAINTIFF EXHIBIT 686 )**

**APPENDIX B: LIQUIDATION AGREEMENT DOCUMENTATION**

**APPENDIX C: SUMMARY OF DISPUTED EWOs**

**LEGAL APPENDIX**

# TABLE OF AUTHORITIES

**PAGE NO.**

**CASES**


***Ace Constructors, Inc. v. United States*,**
**70 Fed. Cl. 253 (2006)........................................ 64, 65**

***Advanced Eng'g & Planning Corp., Inc.*,**
**05-1 BCA ¶ 32,806 (2004)........................................ 74**
(Copy appended in Legal Appendix, Tab 1)

***BELL BCI Co. v. United States*,**
**72 Fed. Cl. 164 (2006)........................................ 64-68**

***Blake Constr. Co.*,**
**80-2 BCA ¶ 14,756 (1980)........................................ 66, 68**
(Copy appended in Legal Appendix, Tab 2)

***Citizens Federal Bank v. United States*,**
**474 F.3d 1314 (Fed. Cir. 2007)........................................ 64**

***David J. Tierney, Jr., Inc.*,**
**88-2 BCA ¶ 20,806 (1988)........................................ 65, 66**
(Copy appended in Legal Appendix, Tab 3) **68**

***Delco Electronics Corp. v. United States*,**
**17 Cl. Ct. 302 (1989)........................................ 64**

***Firestone Tire & Rubber Co. v. United States*,**
**195 Ct. Cl. 21, 444 F.2d 547 (1971)........................................ 68**

***George Sollitt Construction Co. v. United States*,**
**64 Fed. Cl. 229 (2005)........................................ 65**

***Jackson Constr. Co. v. United States*,**
**62 Fed. Cl. 84 (2004)........................................ 66**

***Miller Electric Co., Inc. v. United States*,**
**30 Fed. Cl. 662 (1994)........................................ 70**

**PAGE NO.**

***P.J. Dick Inc. v. Principi*,**
**324 F. 3d 1364 (Fed. Cir. 2003)........................................................................ 70**

***U.S. Indus., Inc. v. Blake Constr. Co.*,**
**671 F. 2d 539 (D.C. Cir. 1982)........................................................................... 74**

**REGULATIONS**

**Federal Acquisition Regulation § 52.242-14, Suspension of Work......................... 65**

**Federal Acquisition Regulation § 52.243-4(d), Changes.......................................... 64**

**OTHER AUTHORITIES**

**R. M. Jones, *Lost Productivity: Claims for the Cumulative Impact Of Multiple Change Orders*, 31 Pub. Cont. L.J. 1 (2001)............................................ 65, 68**
(Copy appended in Legal Appendix, Tab 4)

**J.Wickwire, T. Driscoll and S. Hurlbut, *Construction Scheduling: Preparation, Liability, And Claims*, § 10.15 (1991)...................................................... 74**
(Copy appended in Legal Appendix, Tab 5)

## I. SUMMARY OF ARGUMENT

In its Order of July 14, 2006, the Court identified the key issues to be resolved at trial which dealt with the Government's affirmative defense of accord and satisfaction. Guided by the Court's Order, the plaintiff, BELL BCI Company ("BELL"), proved the following through unrebutted testimony and evidence: (i) None of the contract modifications ("Mod.") it entered into with the defendant, the United States ("Government"), reflected a meeting of the minds to release claims for cumulative impact or inefficiency; (ii) The Government paid BELL only for the direct cost of the changed work and never provided consideration for the release of cumulative impact or inefficiency claims; (iii) The phrase"attributable to the modification" that was used in the Mods. meant only that BELL would not be paid any additional direct costs for the changes attributable to the particular Mod.; (iv) The phrase "indirect costs" used in the Mods. referred only to general and administrative costs and did not encompass cumulative impact or inefficiency; and (v) BELL did not waive its claims cumulative impact or inefficiency claims by signing Mods. without an express reservation of rights because those claims had not matured and could not reasonably have been known.

The Government did not did not call the Contracting Officer as a witness, nor did it elicit any testimony from its witnesses on these key issues. Likewise, the Government did not proffer any expert testimony to rebut BELL's cumulative impact and inefficiency analyses. Thus, the only evidence before the Court regarding these issues is BELL's unrefuted testimony.

The Government made numerous changes throughout the course of the project underlying this dispute, including the addition of a new floor during construction. BELL proved that the multitude and magnitude of the Government's changes caused a cumulative impact that severely disrupted its efficiency and ability to complete the base contract work. BELL demonstrated the

reasonableness of the damages it is seeking for cumulative impact and inefficiency, as well as to its entitlement to a compensable time extension and payment for extra work that it performed.

BELL also presented expert testimony which demonstrated by a critical path method ("CPM") schedule analysis that it was unable to achieve certain interim completion milestones because of the host of changes made by the Government. The Government did not proffer any expert or lay testimony regarding the critical path for each of the interim milestones. Hence, BELL proved that it was entitled to a compensable time extension. Moreover, testimony from and contemporaneous correspondence created by the Government's own representative at trial showed that the Government's imposition of liquidated damages and purported backcharges were mere litigation tactics done without any factual support.

BELL also demonstrated that it was entitled to payment for extra work that it performed at the Government's direction and which was documented in 58 extra work orders ("EWOs"). BELL showed that these EWOs involved extra work which it completed as directed by the Government and that its costs for performing that extra work were reasonable as set forth in its cost records.

In sum, BELL proved that it incurred compensable damages of $8,274,924.00, that the final contract completion date should be extended by 248 days, and that it was not liable for any liquidated damages or other claims asserted by the Government. For ease of reference, a copy of Plaintiff Exhibit 686 which summarized BELL's damages is attached as Appendix A hereto.

BELL also presented evidence in support of the separate REAs submitted by its subcontractors. Witnesses from Stromberg Metal Works, Inc. ("Stromberg") testified regarding the impacts and damages it incurred. Their testimony graphically underscored the inefficiency caused by the Government's actions.

## II. STATEMENT OF ISSUES PRESENTED

1. Whether BELL is entitled to an equitable adjustment to the contract price and time for the cumulative impact, inefficiency and delay damages it suffered due to the numerous changes that the Government made to its scope of work and for the extra work it performed?

2. Whether the Government met its burden to prove that, pursuant to the doctrine of accord and satisfaction, BELL released claims for cumulative impact and inefficiency to the extent that it signed Mods. without an express reservation of rights, even though such claims were unmatured and unknown at that time, there was no meeting of the minds to release such claims, and the Government did not pay any consideration for such a release?

3. Whether the Government met its burden to prove its claims against BELL for liquidated damages and backcharges given the failure of the Government's expert witness to analyze the critical path of each interim milestone and the testimony of its trial representative that there were no valid backcharges to be assessed?

4. Whether BELL's subcontractors are entitled to an equitable adjustment for the extra work and inefficiency they suffered due to the actions of the Government?

## III. PROPOSED FINDINGS OF FACT

### A. PROJECT BACKGROUND

______1. This case arises out of a dispute between BELL and the Government regarding the construction of a new laboratory building at the National Institutes of Health ("NIH") in Bethesda, Maryland (the "Project").

2. The Government retained HLM Design ("HLM"), to prepare 100% complete design plans and specifications for the Project. (Stipulation of Uncontested Material Facts ("Stip.") ¶ 2 and

¶ 10; Bell Transcript ("Tr.") 216, lines 20-25, 217, lines 1-8; Kutlak, Tr. 1242, lines 4-13)

3. The Project was originally designed as a five-story structure. (Stip. ¶10). The Government's construction budget contingency was based on the original design of a five-story structure. (Kutlak, Tr. 1242, lines 7-10).

4. On December 11, 1997, the Government solicited bids for the construction of the Project based on the five-story design. BELL was not the lowest bidder for the Project. The Government, however, determined that BELL's bid provided the best value. (Stip. ¶¶ 1 and 8).

5. On March 26, 1998, BELL entered into Contract No. 263-98-C-0102 (the "Contract") with the Government to construct the Project for the fixed-price of $63,663,745.00. The Contract established only one completion date. Pursuant to Mods., the adjusted price of the Contract is $85,048,515.00. BELL was paid a total of $84,485,399.00 under the Contract. The unpaid principal Contract balance is $563,125.00. (Stip. ¶¶ 7, 45, 46 and 47; Bell, Tr. 230, lines 21-25).

6. Work on the Project began on April 1, 1998. The Project was dedicated on June 14, 2001. BELL finished all of the changed work by February 8, 2002. (Bardin, Tr. 275, lines 17-22; Brannon, Tr. 585, lines 1-6; Kutlak, Tr. 1235, lines 21-23; Ptf. Ex. 8).

7. As finally completed, the Project has six stories and accommodates approximately 650 scientists. The Government's Project Officer, Frank Kutlak, deemed the completed Project to be an "excellent building" that was "quite an accomplishment for everybody involved." (Stip. ¶11; Kutlak, Tr. 1229, line 13 - Tr. 1230, line 4).

8. CRSS Constructors, Inc. (hereinafter "Jacobs") was the Government's construction quality manager and was considered to be an extension of the Government's staff. Brian Temme of Jacobs oversaw its work on the Project. (Stip. ¶ 3; Temme, Tr. 1008, lines 11-15).

9. Barbara Taylor was the Contracting Officer. Mr. Temme, however, was actually the one that wrote much of the Contract correspondence that the Government sent to BELL under the Contracting Officer's signature. (Temme, Tr. 1014, lines 7-16).

10. The Government did not call Ms. Taylor as a witness at trial. Rather, it designated Mr. Temme as its representative at trial. The Government paid Mr. Temme for the time he spent at trial. (Temme, Tr. 995, lines 10-12; Temme, Tr. 996, lines 2-14).

### B. PARTNERING AND COURSE OF DEALING REGARDING CHANGES AND DELAY

11. The Contract contained a section titled "PARTNERING" pursuant to which the Government stated that it "intend[ed] to encourage a partnering relationship with [BELL] and its Subcontractors." The Contract identified "Open Communications" as one of the "guiding principles of partnering" and stated that "[a]n integral part of the partnering concept is resolution of disputes in a timely, professional and non-adversarial manner." (Ptf. Ex. 5, ¶ 13 at H-28).

12. The Government maximized the Partnering concept to its advantage throughout the Project to allow extra work based on its changes to commence without it issuing a written Mod., as well as to obtain BELL's agreement to establish interim completion milestones. (Bardin, Tr. 316, line 15 - Tr. 317, line 11; Temme, Tr. 951, lines 2-12; Kutlak, Tr. 1221, line 24 - Tr. 1222, line 8).

13. Contractually, BELL was not obligated to perform extra work until the Government issued a Mod. In the spirit of Partnering, however, throughout the course of the Project BELL typically began performing extra work without waiting for the Government's issuance of a Mod. As a result, the Government obtained the benefit of avoiding delay and increased costs. (Stip. ¶16; Bardin, Tr. 279, line 14 - Tr. 280, line 8).

14. Similarly, the Government established a course of dealing with BELL regarding delay

caused by changes to the work. (Bardin, Tr. 325, lines 14-21; Bardin, Tr. 326, lines 3-18; Bardin, Tr. 333, lines 3-25; Bardin, Tr. 334, lines 5-18; Bardin, Tr. 429, lines 14-22; Bardin, Tr. 430, lines 4-20; Bardin, Tr. 431, lines 1-22; Bardin, Tr. 493, lines 18-25; Bardin, Tr. 494, lines 1-25; Bardin, Tr. 495, lines 1-2). This course of dealing manifested itself in three ways.

15. First, the Contract provided that, within 7 days of encountering a delay or receiving notice to proceed with changed work, BELL should submit a time impact analysis ("TIA") if it proposed a time extension. (Ptf. Ex. 6, Contract Specifications ("Spec.) Section 1310, § 7.01.C). The Contract, however, expressly recognized that "special circumstances" could excuse the time limits that would otherwise apply to submission of a time extension request. (Ptf. Ex. 5, Contact, Section H, ¶ 8(h)).

16. Second, from virtually the start of the Project, the Government and BELL agreed to modify the contractual provisions regarding delay claims to allow extra work to be completed as soon as possible and thereby not delay the Project. (Bardin, Tr. 431, lines 6-22; Temme, Tr. 1029, lines 16-23). For example, Mod. 93 provided for, *inter alia*, a 214 day extension of time for all prior Government changes that had been transmitted as of August 31, 2000. (Ptf. Ex. 39). Likewise, after August 31, 2000, the Government continued to make changes and agreed that BELL should proceed with performing the changes in lieu of halting its efforts and submitting TIAs. Accordingly, BELL continued to perform the changed work and did not submit TIAs at that time for the changes. (Bardin, Tr. 333, line 7 - Tr. 334, line 12; Tr. 429, line 14 - Tr. 430, line 15; Tr. 431, lines 6-22).

17. In fact, the Government made so many changes after August 31, 2000 – on the magnitude of an average of 2.5 changes a day for a period of time – that it would have been virtually impossible for BELL to issue a TIA for each change. (Bardin, Tr. 333, line 24 - Tr. 334, line 12).

18. The extraordinary magnitude of changes made by the Government was wholly unanticipated. In reliance on its 40 years of experience in construction, BELL anticipated that changes made during the course of the Project would be in the range of 5-10% of the Contract value. (Bell, Tr. 241, line 13-Tr. 242, line 2). This anticipated range was consistent with the experience of one of BELL's subcontractors, Stromberg, which also had been in business for decades. (Engle, Tr. 865, lines 3-16; Freeman, Tr. 898, lines 9-13; Freeman, Tr. 899, lines 6-15). Based on the original Contract value of $63,663,745.00, the Government's changes as represented in the agreed Mods. reflect an approximately 34% increase in the Contract value. When the payment due to BELL for extra work and its cumulative impact and inefficiency is considered, the Government's changes equal approximately 50% of the Contract value. Similarly, the Government's changes increased Stromberg's contract value by approximately 60%. (Freeman, Tr. 898, lines 9-13).

19. Third, the Government made clear to BELL that it would be a futile act for it to submit TIAs addressing the changes made after Mod. 93 by repeatedly directing BELL in writing to perform the changes without any impact to the Project schedule. BELL reasonably understood that it would be pointless to submit TIAs given the Government's directives to perform changed work without impact to the Project schedule. (Bardin, Tr. 325, line 15 - Tr. 326, line 6).

### C. THE GOVERNMENT'S DECISION TO ADD A NEW FLOOR

20. In the latter part of December 1998, the Government considered adding a new floor to the Project. At that time it recognized that adding a floor could significantly harm the Project by "turn[ing] what is a successful project into a problem project." (Ptf. Ex. 18 at p. 4).

21. The Government's concern about harming the Project came to fruition because its decision to add a new floor was made in great haste – over a period just a few weeks – and was based

on a number of erroneous assumptions regarding the nature of the new floor and the cost to build it. (Ptf. Ex. 20 at pp. 2-3).

22. The Government repeatedly represented that the new floor would be a "duplicate" of the third floor. (Ptf. Exs. 13, 15, 18, and 20; Stip. ¶¶ 22-24; Bell, Tr. 222, lines 14-23; Bardin, Tr. 303, lines 5-10). In fact, however, the Government made so many changes to the new floor that it bore little resemblance to the third floor. (Bell, Tr. 228, lines 20-25; Bardin, Tr. 308, lines 11-17).

23. Based on the erroneous assumption that the new floor would duplicate the third floor, the Government had HLM prepare a cost estimate to construct the new floor. (Kutlak, Tr. 1246, line 11 - Tr. 1247, line 11; Ptf. Ex. 18 at p. 2). Pursuant to HLM's estimate, the Government figured that the cost to add the new floor would be $11,259,436.00. (Ptf. Ex. 15). Also based on the erroneous assumption that the new floor would be a duplicate of the third floor, BELL submitted a proposal that the Government figured would cost $10,230,131.00, and would require a 92-day time extension. (Ptf. Ex. 15; Temme, Tr. 1003, line 17 - Tr. 1004, line 12).

24. Inexplicably, however, when NIH submitted its written Justification for Other Than Full and Fair Competition ("JOFOC"), the Project Officer, Mr. Kutlak, certified that "[t]he Government's independent cost estimate for the additional floor (less selected finishes) is $9,200,000.00," which was over $2 million less than what HLM had estimated. Mr. Kutlak could not explain why the JOFOC understated the estimated cost to construct the new floor by such a substantial amount. (Ptf. Ex. 20; Kutlak, Tr. 1248, line 20 - Tr. 1249, line 10).

25. The negotiations regarding the new floor proceeded in three phases. Pursuant to Mods. 5, 24 and 78, the Government agreed to extend the Contract completion date by a total of 90 days due to adding the new floor. (Stip. ¶¶ 29-37; Ptf. Exs. 712, 731 and 785).

### D. MOD. 93 AND THE GOVERNMENT'S ASSURANCE OF LIMITED FUTURE CHANGES

26. Pursuant to Mod. 78, which the Government issued unilaterally in April 2000, the Government extended the Contract completion date to September 28, 2000. (Ptf. Ex. 785).

27. By the summer of 2000, it was apparent that the numerous changes transmitted by the Government, many of which still had to be negotiated into Mods., would make it impossible for the work to be completed by September 28, 2000. (Ptf. Ex. 33; Bardin, Tr. 315, lines 3-14).

28. In late August 2000, the Government held a Partnering Meeting with BELL to negotiate a resolution of the fit-out costs of the new floor and the time impact of prior Government changes. During this Partnering Meeting, the Government represented to BELL that there would be no more than a few relatively minor additional changes to the Project and that in order to minimize impacts to the Project Schedule, the Government would pay BELL to perform these few additional changes on an accelerated basis. (Bell, Tr. 230, lines 7-17; Bardin, Tr. 317, line 19 - Tr. 319, line 2; Temme, Tr. 951, lines 2-11; Temme, Tr. 958, lines 7-12; Temme, Tr. 1027, lines 4-8; Kutlak, Tr. 1221, line 24 - Tr. 1222, line 8).

29. During this Partnering Meeting, the Government also asked BELL to agree to a series of new interim completion milestones that would allow the Government to occupy the Project on a phased basis. The Government wanted a phased occupancy so that it could move NIH personnel from other buildings that were to undergo construction renovation. As the Government put it, there was a "domino effect of renovations and construction occurring throughout the [NIH] campus" at this time. (Ptf. Ex. 83 at p. 15; Temme, Tr. 1028, line 23 - Tr. 1029, line 11).

30. BELL made it clear to the Government during that Partnering Meeting that it could agree to the proposed interim milestone completion dates based on the changes that the Government

had issued to date (*i.e.*, August 31, 2000), and with the Government's representation regarding limited future changes. (Bardin, Tr. 316, line 15 - Tr. 317, line 22).

31. BELL's focus at this time was on trying to get a realistic completion schedule from the Government to finish all of the changes that it had been issued up to that point. BELL did not know and could not know at that time that the Government's changes would cause a cumulative impact and inefficiency with regard to BELL's ability to complete its base contract work; rather, BELL's concern was with the delays caused by the changes. The Government's representations regarding limited future changes and agreement to pay BELL acceleration for such changes led BELL to conclude that it could complete the work in accordance with the proposed interim milestones. In short, there was no dispute at that time regarding cumulative impact or inefficiency and thus, no negotiation or even discussion of those issues by the parties. (Bell, Tr. 231, lines 1-8; Bell, Tr. 232, line 24 - Tr. 234, line 4; Bardin, Tr. 314, line 12 - Tr. 315, line 20).

32. Based on the foregoing representations by the Government, BELL executed Mod. 93 on October 2, 2000. (Ptf. Ex. 39; Bardin, Tr. 318, line 12 - Tr. 319, line 13).

33. Consistent with the fact that BELL did not know of any cumulative impact or inefficiency to base contract work, there is no mention of those issues in Mod. 93. Instead, Mod. 93's stated "PURPOSE" was to provide an equitable adjustment for <u>changed work</u> itemized" therein and for delays caused by Government changes. (Ptf. Ex. 39 at p. 1 and ¶¶ 4-5 (emphasis added)).

34. It is undisputed that Bell did not receive any consideration from the Government for release or waiver of any cumulative impact or inefficiency claim. (Bell, Tr. 234, lines 2-5). Mod. 93's express terms confirm that consideration was given only for delay claims. (Ptf. Ex. 39, ¶¶ 4 and 5).

35. Indeed, the Government's contemporaneous records referred to Mod. 93 as a "delay agreement." (Ptf. Ex. 34, Jacobs Monthly Report, August 2000, p. 2). Similarly, during this litigation the Government confirmed its understanding that Mod. 93 compensated BELL only for delay costs, not cumulative impact or inefficiency costs. (Ptf. Ex. 96, Kutlak Deposition Tr. p. 51, lines 10-14, and p. 53, line 6; Ptf. Ex. 79, Government Answer to Interrogatory No. 5, p. 6).

36. In ¶ 8 of Mod. 93 there is a statement that the Government is released from "further equitable adjustment attributable to the Modification." It is undisputed that the phrase "attributable to the Modification" was understood to include only the direct costs of the changed work and not to release any claims for cumulative impact or inefficiency. (Bardin, Tr. 487, line 16 - Tr. 488, line 12).

37. In ¶¶ 4 and 8 of Mod. 93 there is a reference to "indirect costs." It is undisputed that that term refers only to general and administrative costs, not cumulative impact or inefficiency costs. (Bell, Tr. 235, lines 8-22; Bardin, Tr. 322, line 11 - Tr. 323, line 15).

38. Due to the delay caused by Government changes, Mod. 93 provided for a 214-day extension of time which extended the Contract completion date until April 30, 2001. In order to accommodate the Government's need for a phased occupancy schedule to relieve the "domino effect" that was occurring at NIH, Mod. 93 established 14 interim milestone completion dates that established a liquidated damages rate of $266.00 per day for missing any individual milestone. (Stip. ¶ 37; Bardin, Tr. 312-18 - Tr. 314, line 2).

### E. <u>The Government's Pervasive Changes After August 31, 2000</u>

39. The revised schedule established by Mod. 93 was very favorable to the Government. (Temme, Tr. 1031, line 25 - Tr. 1032, line 9; Ptf. Ex. 65, NIH Minutes 10/12/2000, ¶ 1.B.5). The Government recognized, however, that future changes would jeopardize BELL's ability to complete

the work in accordance with the interim completion milestone dates. (Temme, Tr. 1032, lines 17-20; Temme, Tr. 1036, line 22 - Tr. 1037, line 1). Thus, the Government promptly directed its architect, HLM, and its design team to minimize changes. (Ptf. Ex. 39-A).

40. Likewise, the Government advised NIH personnel that it was incumbent on the Government to limit changes in order for BELL to be able to achieve the interim milestones. Just days after Mod. 93 was signed, Mr. Temme told NIH personnel that: "**Since the terms of the revised schedule are favorable to NIH, it is essential that we not make any changes to the Bell contract, because change orders potentially jeopardize completion dates.**" (Ptf. Ex. 65, NIH Minutes 10/12/2000, ¶ 1.B.5) (emphasis added).

41. Mr. Temme and Mr. Kutlak reiterated this point in subsequent monthly meetings with NIH personnel. On November 9, 2000, they advised NIH personnel that: "**Since we are pushing Bell to maintain schedules, there can be no more changes.**" (Ptf. Ex. 65, NIH Minutes 11/9/2000, ¶ 1.B.1) (emphasis added).

42. On January 11, 2000, they advised NIH personnel that they could not continue to implement changes and noted that: "**There are about (250) extra work orders pending and another (200) anticipated.**" (Ptf. Ex. 65, NIH Minutes 1/11/2001, ¶ 1.B.2) (emphasis added).

43. Contrary to the representations that it made to BELL at the August 2000 Partnering Meeting, the Government made numerous changes to the Project. In fact, after Mod. 93 was signed, the Government issued 113 additional Mods. which incorporated 216 EWOs. (Ptf. Ex. 94B, Slide 48). Mr. Kutlak simply stated that the Government's Project team was powerless to stop changes from being made by the NIH personnel that ultimately occupied the Project. (Bell, Tr. 236, line 19 - Tr. 237, line 2; Kutlak, Tr. 1234, lines 13-20).

44. On January 24, 2001, less than two weeks after again telling NIH personnel that no more changes could be made and noting that hundreds of extra work orders were pending and hundreds more were anticipated, Messrs. Temme and Kutlak decided that the Government would withhold $100,000.00 in payments to BELL "due to inadequate progress." (Ptf. Ex. 44 at p. 2; Temme, Tr. 1035, lines 9-13).

45. Moreover, again in contravention of the representations made during the Partnering Meeting, the Government directed BELL to perform the additional work "without impact to the project schedule," and it refused to authorize or compensate BELL to accelerate its manpower to accomplish that directive. (Bell, Tr. 236, lines 10-25; Bell, Tr. 264, lines 17-20; Bardin, Tr. 324, line 22 - Tr. 325, line 18; "Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact," Response to ¶ 64 at p. 43 (filed on 8/15/2005)).

46. Thus, the Government reneged on its Partnering Meeting representations and placed BELL in the untenable position of having to implement hundreds of unanticipated changes without any impact to the schedule and without being compensated for any acceleration.

47. In November 2000, before any of the interim milestone completion dates were missed, BELL notified the Government in writing that its continued issuance of changes could delay the Project and jeopardize BELL's ability to meet the interim milestone dates. BELL further notified the Government that it was improper to keep issuing changes while at the same time it refused to compensate BELL for acceleration work. Finally, BELL advised the Government that, even with acceleration, the interim milestone dates might not be achieved due to the ongoing changes. BELL sent this written notice to the Government to try to return the Government to its Partnering Meeting representations and to "raise a flag" early on regarding the delays that were being caused by the

Government's continued changes. (Bardin, Tr. 326, line 3 - Tr. 330, line 20; Ptf. Ex. 41).

48. The Government never responded to BELL's written notice. (Bardin, Tr. 331, lines 7-9). When BELL submitted proposals to the Government that included costs to do changed work on an accelerated basis, the Government struck out the acceleration costs. The Government also adopted a negotiation posture of stating that it would pay BELL one-half of the direct cost that it had requested without providing a justification for such a massive reduction. (Bardin, Tr. 331, lines 10-19; Rothrock, Tr. 516, line 6 - Tr. 517, line 5). Later, the Government informed BELL that it simply did not have the funding to pay for all of the changes. (Bell, Tr. 240, lines 8-15).

49. BELL did its best to meet the milestones and continued to notify the Government that its changes were delaying completion of the work. In February 2001, BELL notified the Government that its failure to timely negotiate changes was causing a severe cash flow problem, *i.e.*, BELL was being forced to finance the changes until the Government made payment. (Bardin, Tr. 335, line 23 - Tr. 338, line 13; Bardin, Tr. 341, line 15 - Tr. 342, line 9; Ptf. Ex. 48).

50. At about this time, the Government notified BELL that it was reserving its rights to impose liquidated damages if the interim milestones were not met. Starting in the summer of 2001, BELL notified the Government orally and in writing that BELL was reserving all its rights. BELL did so because the Government continued to reserve its rights while at the same time issuing changes that it directed BELL to perform without any acceleration payment or any extension of the schedule. Furthermore, the Government reneged on paying BELL for changes which had previously been negotiated and endorsed by the Contracting Officer. (Bardin, Tr. 342, line 19 - Tr. 345, line 5).

51. Between October 2, 2000, and April 5, 2001, the Parties entered into Mods. 94-140. As with Mod. 93, none of these Mods. provided BELL any compensation for cumulative impact or

inefficiency costs, nor were such claims in dispute or part of the negotiations for Mods. 94-140. Rather, BELL was compensated only for the direct costs of the changed work itself. (Ptf. Exs. 801-847).

52. It was not until near the end of the Project that BELL came to realize that the magnitude, scope and breadth of the Government's changes had a cumulative impact. By that time, BELL had already begun to reserve its rights. (Bardin, Tr. 316, lines 2-14).

53. On or about February 8, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. 93, BELL would have met all of the interim milestone completion dates set forth therein. (Brannon, Tr. 585, lines 1-6; Brannon, Tr. 640, lines 17-21).

54. On April 5, 2002, BELL timely submitted a REA. On July 1, 2002, the Government denied BELL's REA, as well as REAs submitted by BELL's subcontractors.. (Stip. ¶¶ 40, 42).

**F. SUBCONTRACTORS' CLAIMS**

55. BELL passed-through to the Government separate REAs, as modified, prepared by five of its subcontractors, to wit, Stromberg, ISEC, Inc. ("ISEC"), Manganaro Corporation ("Manganaro), NLP Enterprises, Inc. ("NLP"), and Young Electrical Contractors, Inc. ("Young"). (Stip. ¶ 41; Stromberg: Ptf. Exs. 67 and 1075B; ISEC: Ptf. Ex. 69; Manganaro: Ptf. Ex. 70; NLP: Ptf. Exs. 914, 915 and 915A-I; Young: Ptf. Exs. 923, 924 and 925).

56. Stromberg has fabricated and installed sheet metal duct work since 1940. It is the largest sheet metal contractor on the east coast. (Freeman, Tr. 895, line 19 - Tr. 896, line 17).

57. Stromberg's primary scope of work on the Project was the installation of metal duct in the interstitial spaces. (Freeman, Tr. 899, lines 16-20; Bussey, Tr. 855, lines 7-9). Interstitial

space was a level of open space between floors with a corrugated metal floor that was supposed to give Stromberg the open space necessary to assemble and hang duct in large quantities. (Bussey, Tr. 856, line 6 - Tr. 857, line 20).

58. Stromberg's Project team members testified about the conditions that it experienced and the damages it sustained as a result of the Government's actions. They were: Richard Freeman, with 26 years of experience (Freeman, Tr. 896, line 18 - Tr. 897, line 18); Bill Engle, with 44 years of experience (Engle, Tr. 863, line 22 - Tr. 865, line 2); and Timothy Bussey, with 24 years of experience (Bussey, Tr. 853, lines 7- 855 line 1). Each of these witnesses had worked on other NIH projects, as well as on other laboratory construction projects that had interstitial spaces. (*Id.*).

59. Due to the size and bulk of the duct work for the Project, the schedule called for Stromberg's work to be installed prior to electrical and mechanical piping which would also be located in the interstitial spaces. (Bussey, Tr. 857, line 25 - Tr. 858, line 4).

60. Stromberg began its installation work in February 1999. Up through the spring of 1999, Stromberg worked in the basement and first levels of the Project. During that time, Stromberg was able to work efficiently because the areas in which it worked had few obstructions and the Government directed only very few changes. (Bussey, Tr. 855, line 10 - Tr. 857, line 10; Engle, Tr. 866, line 20 - Tr. 867, line 15).

61. Subsequently, the Government made major revisions to each floor that caused Stromberg to have to work very inefficiently. (Freeman, Tr. 906, line 23 - Tr. 907, line 5). The most significant changes for Stromberg were those documented in the Government's Bulletins 31-34, which caused massive changes to the second, third, fifth and sixth floors. (Freeman, Tr. 903, line 23 - Tr. 904, line 22). These Bulletins were incorporated into Mods. 55, 56, 58, 77, 80 and 84. (Ptf.

Exs. 762, 763, 765, 784, 787 and 791).

62. Stromberg presented an analysis of the impact of the Government's changes on its labor productivity. Its analysis showed the pounds of duct it installed on the second, third, fifth and sixth floors and the hours its expended in order to complete installation work on those floors. (Freeman, Tr. 903, line 23 - Tr. 904, line 22; Ptf. Ex. 1075B).

63. The Government's major changes to each floor followed the same general pattern. Essentially, throughout the course of its performance, as soon as Stromberg completed the installation of duct work required by the Contract drawings, the Government issued another set of drawings to change the completed duct work. This required Stromberg to demolish a substantial amount of the work it had just installed and then reinstall additional work. In each instance, the changes came not after only Stromberg had installed its work in the interstitial space, but also after other trades had installed their work in the interstitial space as well. This even further hindered Stromberg's efforts to perform its work. This occurred throughout the Project on every level and in every area. (Engle, Tr. 865, line 17 - Tr. 866, line 5).

64. For example, in September 1999, just as Stromberg completed the rough-in of its contract work on the third level, the Government issued Bulletin 32 which required Stromberg to install an additional 14,200 lbs. of duct work over and above the approximately 40,921 lbs. of duct work called for by the base contract. (Engle, Tr. 872, line 11 - Tr. 873, line 24; Ptf. Ex. 1075B).

65. In order to comply with Bulletin 32 and other Government changes to the third floor, Stromberg had to perform an extensive amount of extra work under very poor conditions, 20% of which was demolition work. In essence, Bulletin 32 affected nearly 100% of the duct work on the third floor. (Engle, Tr. 872, line 22 - Tr. 873, line 24; Engle, Tr. 874, lines 8-13; Tr. 878, lines 1-11).

66. Stromberg's performance of the change work was hindered due to the fact that the area was no longer new construction, was not wide open, its crews had to crawl over the existing duct as well as the newly installed mechanical and sprinkler pipe to remove the old duct and install the new duct just one piece at a time, and had to compete with other trades for use of the elevators. (Engle, Tr. 873, line 8 - Tr. 878, line 11). Consequently, Stromberg could only install the duct work on the third floor at a rate of 6.26 lbs. per hour as opposed to its rate of 11.23 lbs. per hour that it had achieved in the beginning of the Project prior to the changes and when it was able to work efficiently. (Freeman, Tr. 905, lines 2-7; Ptf. Ex. 1075A; Ptf. Ex. 1075B).

67. The Government's changes to the second, fifth and sixth floors had a similar negative effect on Stromberg's installation and productivity rates, reducing its installation rates on these floors to 5.35, 6.68 and 5.57 lbs. per hour, respectively, as opposed to its average unimpacted rate of 11.23 lbs. per hour. (Engle, Tr. 867, line 16 - Tr. 869, line 23; Engle, Tr. 870, lines 2-18; Engle, Tr. 871, line 13- Tr. 872 line 10; Engle, Tr. 878, line 12 - Tr. 879, line 25; Engle, Tr. 880, lines 4-18; Ptf. Ex. 1075A; Ptf. Ex. 1075B).

68. The Stromberg witnesses emphasized the difficulty they experienced in performing the Government's required changes so late in the Project. Mr. Bussey described that the change work had to proceed very slowly due to all of the obstacles present in the tight confines of the nearly completed interstitial space. (Bussey, Tr. 858, line 17 - Tr. 859, line 4; Tr. 859, line 20 - Tr. 860, line 5). He also described the hot, humid and difficult work conditions that hindered Stromberg's progress due to the fact that, unlike the initial period of installation when the air circulation was good because the building had not been enclosed, by the time the Government made its changes, the work areas had been closed-in. (Bussey, Tr. 860, lines 6-18). He further explained that the change order

work also negatively impacted Stromberg's morale. (Bussey, Tr. 859, lines 8-15).

69. Moreover, the changes to the sixth floor included the use of 3,000 lbs. of welded stainless steel, which was far more difficult to install than the galvanized duct originally used on the Project. (Engle, Tr. 879, lines 16-25; Tr. 880, line 19 - Tr. 881, line 2). Mr. Engle described the "horrible" and "very dangerous" process to perform the changed welding work in the then cramped confined interstitial spaces. (Engle, Tr. 880, lines 4-18). He testified that the volume of the Government's changes "was so bad it became laughable after awhile." (Engle, Tr. 865, line 22 - Tr. 866, line 5).

70. When the Government first began to make major changes to Stromberg's scope of work, Stromberg placed its labor inefficiency costs in its change order proposals. However, the Government refused to review Stromberg's change order proposals because they included inefficiency costs. (Freeman, Tr. 907, line 6 - Tr. 908, line 9).

71. In an attempt to resolve the issue, Stromberg met with the Contracting Officer and BELL in the summer of 1999. At that meeting, Ms. Taylor instructed Stromberg not to place its labor inefficiency in its proposals, but rather to quantify any labor inefficiencies at the end of the Project for compensation. Stromberg proceed as the Government instructed. (Freeman, Tr. 908, line 4 - Tr. 910, line 8; Ptf. Ex. 1241).

72. In the sheet metal industry, production rates are tracked by the pounds of material installed per hour. (Freeman, Tr. 901, lines 16-21). Stromberg analyzed and quantified its labor inefficiency utilizing a measured mile approach regarding the pounds of material it installed per hour. (Freeman, Tr. 903, lines 5-11; Tr. 905, lines 2-7).

73. For the period between February 1999 and May 1999, when Stromberg's installation

of duct work proceeded without having been affected by the Government's changes to its scope of work, Mr. Freeman calculated, based on the underlying source documents pertaining to Stromberg's work on the Project, that Stromberg achieved a sheet metal field production ratio of 11.23 lbs. per manhour for the measured mile period. (Freeman, Tr. 899, line 21 - Tr. 900, line 2; Tr. 901, line 22 - Tr. 902, line 22; Freeman, Tr. 903, lines 5-11; Freeman, Tr. 905, lines 2-7; Ptf. Ex. 1075A; Ptf. Ex. 1075B; Ptf. Exs.1118-1135; Ptf. Exs. 1143-1145).

74. After the Government began making major changes to Stromberg's scope of work, Stromberg's productivity rate for its work was only 5.95 lbs. of duct installed per hour. (Freeman, Tr. 911, line 1 - Tr. 912, line 5; Ptf. Ex. 1075B).

75. Mr. Freeman also utilized the measured mile approach to ascertain the amount of time it should have taken Stromberg to perform its work under new building conditions and calculated that Stromberg should have spent 20,694 hours to install its work had Stromberg been able to install that work in the same conditions as new construction rather than as remodel work. (Freeman, Tr. 911, line 1 - Tr. 912, line 25; Ptf. Ex. 1075B).

76. Due to the conditions on the Project caused by the Government's changes, Stromberg could only install 5.95 lbs. per hour, and thus, Stromberg actually expended 39,072 hours to complete the entire installation on the second, third, fifth and sixth floors. (Freeman, Tr. 911, line 1 - Tr. 912, line 25; Ptf. Ex. 1075B).

77. Stromberg's loss of productivity (or labor inefficiency rate), was calculated by determining the difference between the actual hours expended and the hours that Stromberg should have spent to install the duct (*i.e.*, 39072-20694), thus totaling 18,377 inefficient hours. (Freeman, Tr. 911, line 1 - Tr. 912, line 25; Ptf. Ex. 1075B). Applying its average hourly rate of $44.19 (which

was based on its certified payrolls, including its burden and profit) to its 18,377 inefficient hours, Stromberg's labor inefficiency costs totaled $812,092. This loss was based solely on the change order work Stromberg performed on the second, third, fifth and sixth floors.[1] (Freeman, Tr. 913, lines 1-21).

### G. Expert Witness Analysis

78. The Court accepted BELL's expert witness, Patrick Brannon, as an expert in the areas of CPM scheduling, delay and impact analysis, labor productivity analysis, constructibility design and engineering, construction costs and damages, estimating, cost accounting, and contract administration. (Brannon, Tr. 566, lines 4-23).

79. The Government did not proffer any witness that was qualified as an expert in impact analysis or labor productivity analysis, nor did it present any evidence disputing Mr. Brannon's labor inefficiency and cumulative impact analyses.

80. Mr. Brannon based his conclusions and opinions on interviews of Project participants and his analysis of the Project record, including the CPM schedules and updates, and Contract plans and specifications, EWOs, requests for information ("RFI"), and Bell's request for an equitable adjustment. (Brannon, Tr. 570, line 1- Tr. 571, line 11; Tr. 571, line 23 - Tr. 572, line 25; Tr. 576, line 8 - Tr. 577, line 9; Tr. 709, lines 21-24).

### H. BELL Performed The TIA Analysis Required By The Contract

81. In accordance with Contract Specification Section 1310, Mr. Brannon used a time

[1] Stromberg's total costs on the Project were $7,094,000. Therefore, in order to become whole, it would need $1,068,000, excluding profit. (Freeman, Tr. 898, lines 14-20). Nevertheless, at trial Stromberg only claimed $812,092, plus interest allowed by the Court. (Freeman, Tr. 898, lines 21-23; Freeman, Tr. 913, lines 19-21). Even if Stromberg recovered $812,092, it would still be out-of-pocket approximately $250,000, excluding profit. (Freeman, Tr. 898, line 24 - Tr. 899, line 5).

impact analysis ("TIA") of the CPM schedule to determine BELL's entitlement to time extensions. (Brannon, Tr. 658, line 17 - Tr. 659, line 10). In relevant part, Contract Specification Section 1310 required the following TIA analysis:

> A. When change orders or delays are experienced by the Contractor and the Contractor requests an extension of time ... the Contractor shall submit a written Time Impact Analysis (TIA) illustrating the influence of each change or delay on the Contract completion dates or milestones utilizing the current updated Project Schedule.
>
> B. Each TIA shall demonstrate the estimated time impact based on the date the change was issued to the Contractor, the events of the delay, the status of construction at that point in time, and the event time computation of all activities effected by the change or delay. The event times used in the TIA shall be those included in the latest update of the Project Schedule in effect at the time the change or delay was encountered.

(Ptf. Ex. 6, Contract Specification Section 1310, §§ 7.01.A and B at 01310-11).

82. In Mr. Brannon's experience, on Government projects the TIA process often becomes a retrospective analysis because the contractor strives to get the changed work done and subsequently a determination is made regarding the contractor's time entitlement for the change. (Brannon, Tr. 659, lines 8-10; Tr. 659, line 21 - Tr. 660, line 11). This is precisely what occurred on this Project, *i.e.*, the Government expressly agreed that BELL should proceed with performing the changed work rather than refraining from doing such work in order to prepare and submit a prospective TIA. (Bardin, 325, lines 14-21; 326, lines 3-18; 333, lines 3-25; 334, lines 4-18; 429, lines 14-22; 430, lines 4-20; 431, lines 1-22; 493, lines 18-25; 494, lines 1-25; and 495, lines 1-2).

83. To conduct the contractually mandated TIA analysis, Mr. Brannon applied a forward looking process to examine the impact of the Government's changes on BELL's contemporaneous CPM Schedule Updates and determined BELL's entitlement to time extensions. (Brannon, Tr. 642,

lines 14-24).[2]

84. Mr. Brannon repeated the foregoing process for all the EWOs utilized in his analysis to determine the affect of the EWOs on all the individual milestones. As Mr. Brannon performed his analysis, he began to see, using the logic in the CPM schedule, how one EWO may affect one or more of the milestones. (Brannon, Tr. 679, lines 4-14).

85. Mr. Brannon did not create new schedules. Rather, he used the CPM schedule update that was in effect at the time the event occurred and inserted in that schedule a fragnet to calculate what affect the fragnet had on the schedule. (Brannon, Tr. 664, line 18 - Tr. 665, line 5). He examined a fragnet of the schedule (*i.e.* the as-planned critical path at the start of an update) and inserted into that another fragnet which represented performance of a change order, then calculated the affect of the change order fragnets on the Project milestones.[3] (Brannon, Tr. 664, lines 3-15; Tr.

---

[2] Mr. Brannon's schedule analysis utilized P-3. (Brannon, Tr. 679, lines 16-19). A demonstrative example of his analysis was presented on Slides 96-98 of Ptf. Ex. 94B. Slide 96 showed the as-planned critical plan at the start of update number 1 wherein the milestone, whether an interim milestone or Project completion, is depicted as a flag at the end of the chain of events. Slide 97 depicted in red a fragnet that has been developed, which may be multiple activities or a revision, and that fragnet is tied into the schedule. A fragnet is a creation of a fragmentary network, where new activities or revisions to existing activities with logic relationships between them are created and then tied into the contractor's schedule at the time the change occurred. (Brannon, Tr. 678, line 17 - Tr. 679, line 2). When the fragnet was tied into the schedule and the schedule was recalculated, the affect of the fragnet on the schedule was demonstrated. Slide 98 depicted the extension of a Project milestone as a result of the insertion of a fragnet. (Brannon, Tr. 663, lines 1-25; Ptf. Ex. 94B, Slides 96-98).

[3] The event times used in Mr. Brannon's TIA analysis were the early start and early finish and the late start and late finish of an activity that affected activities in the schedule in effect at that time. The TIA analysis showed how an activity would affect the schedule's float (*i.e.* performance time available before a delay would occur) as it existed at that time even though the analysis was performed after-the-fact. (Brannon, Tr. 662, lines 1-15). To eliminate the possibility of compounding the effect of multiple changes in his analysis, Mr. Brannon reviewed each change independent of the preceding changes to make an assessment of the change's potential impact. He then removed the fragnet as if the Government elected not to proceed with the change and then proceeded to input the next change into the schedule to analyze its impact. Thus Mr. Brannon's review essentially analyzed each change independently. (Brannon, Tr. 665, line 6 - Tr. 666, line 3; Ptf. Ex. 94, Brannon Report, pp. 28-29).

665, line 6 - Tr. 666, line 3; Tr. 675, lines 23-25; Tr. 676, lines 1-17; Tr. 679, lines 4-14).

86. To determine whether BELL was entitled to a time extension, Mr. Brannon took a very conservative approach. He considered only EWOs that were generated from Government changes issued after August 31, 2000. He excluded all of the disputed EWOs that the Government had not acknowledged as a change, as well as all EWOs in which BELL had not expressly reserved its rights. Therefore, the universe of EWOs available for Mr. Brannon to analyze totaled 184 EWOs. (Brannon, Tr. 670, line 7 - Tr. 671, line 25; Ptf. Ex. 94, Brannon Report, p. 26).

87. By using BELL's regular CPM Schedule Updates produced contemporaneously with its work on the Project, Mr. Brannon's process became self-correcting, *i.e.*, subsequent updates generated by BELL did not contain the after-the-fact fragnet. (Ptf. Ex. 94, p. 29).

88. Moreover, Mr. Brannon's schedule analysis considered whether there was any concurrent delay that might have occurred on the Project and determined that there was none**.** (Brannon, Tr. 666, line 4 - Tr. 667, line 10; Brannon, Tr. 678, lines 5-7).

89. After Mr. Brannon performed an initial analysis of 49 EWOs that caused a delay to one or more of the Project milestones, it was evident that BELL was entitled to a sufficient time extension to justify the actual delays that occurred.[4] It was unnecessary, therefore, for him to perform a time impact analysis of all additional changes and/or other EWOs that were in existence prior to August 31, 2000, but had not yet been finalized as a change to the Contract in the form of a modification. (Brannon, Tr. 672, lines 1-19; Ptf. Ex. 94, p. 26).

90. At trial, in lieu of reiterating the findings in his reports regarding all 49 of the EWOs

---

[4] Mr. Brannon identified the EWOs that he analyzed and the Schedule Updates and applicable fragnet (*i.e.* individual TIA schedule) inserted therein to determine the impact on the Project milestones. (Ptf. Ex. 94, pp. 30-33).

he reviewed (*see* Ptf. Ex. 94, pp. 34-215), Mr. Brannon testified in detail regarding 10 EWOs that were representative of the 49 in his overall schedule analysis.[5] Each one of the 10 EWOs was also representative of a monthly CPM Schedule Update. (Brannon, Tr. 672, line 1 - Tr. 673, line 2).

## I. SUMMARY OF BELL'S SCHEDULE ANALYSIS

91. A graphic depiction of Mr. Brannon's overall TIA analysis and results is set forth on demonstrative charts in Slides 103 through 112. (Ptf. Ex. 94B, Slides 103-112). In each one of these successive charts, each EWO was analyzed and its affect on each individual milestone was determined. There is a chart for each milestone. Slides 103 through 112 show that for each intermediate milestone and the overall substantial completion milestones (indicated as green diamonds on the Slides), a time extension was justified due to the issuance of an EWO, because the completion date of one or more of the EWOs (*i.e.* ending diamond on red bar) surpassed the contractual green diamond milestone date. (*See, generally,* Ptf. Ex. 94B, Slides 103-112; Brannon, Tr. 673, line 18 - Tr. 678, line 15; Brannon, Tr. 679, line 21 - Tr. 681 line 9).

## J. TIA ANALYSIS BY UPDATE PERIOD

### (i) SCHEDULE UPDATE FOR SEPTEMBER 1, 2000

92. During the September 2000 time period, the Government issued one change (documented in EWO 465) that delayed the Contract's substantial completion milestone by 17 calendar days. (Ptf. Ex. 94, Brannon Report, pp. 33-38).

---

[5] The 10 representative EWOs explained in detail in Mr. Brannon's trial testimony were EWOs 478, 518, 487, 525, 543, 632, 655, 678, 700 and 566. They were identified on demonstrative Slide 116. (Ptf. Ex. 94B, Slides 114-116; Brannon, Tr. 681, lines 22-25). Mr. Brannon analyzed the other 39 EWOs in the same manner as the 10 he testified to, and the analysis of those EWOs and their impact and resulting time extensions warranted on the various schedule milestones and overall substantial completion date is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94. (Brannon, Tr. 672, line 1 - Tr. 673, line 2; Ptf. Ex. 94, pp. 34-215).

93. Schedule Update N127 was the first schedule issued after the agreement documented in Mod. 93. Mr. Brannon analyzed the impact of EWO 465 on the schedule milestones. (Ptf. Ex. 94, pp. 33-38; Ptf. Ex. 341).

94. EWO 465 involved a modification to the Project design so that it would conform to the National Electric Code, and involved the approval of an offset in the placement of shower lights due to potential interferences with the vertical exhaust duct drops. (Ptf. Ex. 94, pp. 34-37; Ptf. Exs. 343-345).

95. Mr. Brannon created a fragnet of the work involved in EWO 465 and inserted it in Schedule Update N127. This showed an impact to several activities, including most of the 14 Project schedule milestones. Although the substantial completion dates for the third, fourth, fifth and sixth floors, the MEP milestone and the Contract completion milestone were influenced, the resulting delays did not move dates past the Contract-specified time frames except for the Contract completion milestone. (Ptf. Ex. 94, pp. 34-38).

96. Work associated with EWO 465 resulted in a 23 day delay to the Contract substantial completion date; this milestone slipped from an ahead-of-schedule completion of April 24, 2001 to May 17, 2001, forcing the completion of the Project behind schedule by 17 calendar days. (*Id.*)

**(ii) <u>SCHEDULE UPDATE FOR OCTOBER 1, 2000</u>**

97. During the October 2000 time period, the Government issued changes that delayed nine intermediate schedule milestones and the Contract's substantial completion milestone by 172 days. (Ptf. Ex. 94, pp. 38-63).

98. For the time period of October 2000, Mr. Brannon analyzed six (6) EWOs (461, 511, 478, 639, 483 and 484) and determined their schedule impact when fragnets of the EWOs'

performance were inserted in the Schedule Update N128 for October 1, 2000. (Ptf. Ex. 94, pp. 31-32; 38-63; Ptf. Ex. 350).[6]

99. As representative of the Government's changes affecting the Project during October 2000, Mr. Brannon specifically discussed EWO 478 during his testimony. EWO 478 was created in response to seventeen sketches from the Government that required BELL to demolish the ceiling on the second floor, existing duct work and electrical items. (Brannon, Tr. 682, line 1 - Tr. 684, line 18; Ptf. Ex. 94, pp. 46-51). In directing BELL to perform this additional work, the Government acknowledged that the demolition work was a change to the Contract that would result in a cost and/or time impact. (Brannon, Tr. 682, line 1 - Tr. 684, line 18; Ptf. Ex. 94, pp. 46-51).

100. In addition to the demolition changes, EWO 478 further required that BELL install new VAV boxes and add ceiling reinforcements in order to install newly specified duct work. On account of the long lead time in procuring the new VAV boxes specified by the Government, BELL could not begin the VAV box installation until January 2001. (Ptf. Ex. 94, pp. 46-51).

101. Consequently, the Government's changes encompassed in EWO 478 had a cumulative effect that reverberated throughout the Project since the work specified in EWO 478 had to be completed prior to the fume hood performance testing and the test and balance of the HVAC systems on the second through sixth floors. (Brannon, Tr. 682, line 1 - Tr. 684, line 18; Ptf. Ex. 94B,

---

[6] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the October 2000 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 461** incorporated the documents set forth at Ptf. Exs. 352-356. **EWO 511** incorporated the documents set forth at Ptf. Exs. 359-361. **EWO 478** incorporated the documents set forth at Ptf. Exs. 363-365. **EWO 639** incorporated the documents set forth at Ptf. Exs. 368-369. **EWO 483** incorporated the documents set forth at Ptf. Exs. 372-373. **EWO 484** incorporated the documents set forth at Ptf. Exs. 376-378.

Slides 121-124; Ptf. Ex. 94, pp. 46-51). Therefore, and as set forth in the chart in Mr. Brannon's report, the Government's changes encompassed in EWO 478 impacted seven intermediate milestones and the Contract's substantial completion date. Each of those intermediate milestones and the substantial completion date were delayed by more than 140 days due to EWO 478 alone. (Brannon, Tr. 688, lines 14-18; Tr. 689, line 15 - Tr. 691, line 6; Ptf. Ex. 94B, Slide 124).

102. Mr. Brannon also created fragnets involving the performance of EWOs 461, 511, 639, 483 and 484, the other EWOs analyzed for this time period, and inserted them into the Schedule Update N128 to analyze their schedule impact. (Ptf. Ex. 94, pp. 31-32, 38-63). When the aforementioned changes impacting performance during this time period were inserted into the October 1, 2000 Schedule Update and then analyzed by Mr. Brannon, delay to nine intermediate schedule milestones and the Contract's substantial completion milestone was evident.[7]

103. A summary chart of delays to the affected Project milestones caused by the Government's changes during the October 2000 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at p. 63 which shows that each of the interim milestones were delayed by at least 148 days and the Contract completion date was delayed by 172 days. (Brannon, Tr. 688, line 11 - Tr. 689, line 12; Ptf. Ex. 94, pp. 38-63).

**(iii) SCHEDULE UPDATE FOR NOVEMBER 1, 2000**

104. During the November 2000 time period, the Government issued changes that delayed nine intermediate schedule milestones and the Contract's substantial completion milestone. (Ptf. Ex. 94, pp. 63-76).

---

[7] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 38-63.

105. For the November 2000 time period, Mr. Brannon analyzed three (3) EWOs (497, 518 and 493) and determined their impact when fragnets of the EWOs' performance was inserted into the Schedule Update for November 1, 2000, N129. (Ptf. Ex. 94, pp. 31-32, 63-76).[8]

106. As representative of the Government's changes made to the Project during November 2000, Mr. Brannon testified in detail about EWO 518. EWO 518 was created in response to the Government's issuance of 27 sketches clarifying the design and requiring BELL to perform additional demolition work, reinforce ceilings, install new VAV boxes and duct work and revise the automatic temperature control system in the basement and on the first and second floors. (Brannon, Tr. 695, line 22 - Tr. 697, line 1; Ptf. Ex. 94, pp. 68-73).[9]

107. Slide 131 shows the fragnet activities Mr. Brannon developed including the delivery of VAV boxes. This exhibit indicates that the two longest activities were preparing and submitting proposals, which occurred concurrently with the delivery of the VAV boxes. (Brannon, Tr. 697, lines 11-21; Ptf. Ex. 94B, Slide 133).

108. The Government's changes encompassed in EWO 518 had a cumulative effect throughout the entire Project as those changes impacted several test and balance activities, the

---

[8] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the November 2000 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 497** incorporated the documents set forth at Ptf. Exs. 386-387. **EWO 518** incorporated the documents set forth at Ptf. Exs. 390-393. **EWO 493** incorporated the documents set forth at Ptf. Exs. 396-400.

[9] The facts relied upon by Mr. Brannon in analyzing this EWO included RFI #CM195 written by CRSS on November 13, 2000, and twenty-seven sketches in response to the RFI on November 20, 2000. BELL noted that there was an impact to the milestones. Demolition work was performed between November 11, 2000 and December 5, 2000, with work was completed on April 11, 2001. EWO 518 was submitted on February 12, 2001 and Contract Modification 194 was signed on March 1, 2002 for $90,923. (Brannon, Tr. 695, line 22 - Tr. 697, line 6; Ptf. Ex. 94B, Slide 130).

installation of ceiling tile and the startup and test of the automatic temperature control system. (Brannon, Tr. 695, line 22 - Tr. 697, line 1; Ptf. Ex. 94, p. 71).

109. Therefore, and as set forth in the chart in Mr. Brannon's report, Ptf. Ex. 94, at pp. 72-73, changes issued by the Government during this time period impacted all of the floors as well as eight intermediate milestones, including the first floor milestone, which was one of the most significant at this time, and the Contract's substantial completion milestone. Each of the intermediate milestones was delayed by at least 65 days and most of them were delayed by at least 100 days. (Brannon, Tr. 697, line 14 - Tr. 699, line 12).

110. Mr. Brannon also created fragnets involving the performance of EWOs 497 and 493, and inserted them into Schedule Update N129 to analyze their schedule impact. (Ptf. Ex. 94, pp. 31-32, 64-76). When the aforementioned Government changes impacting performance during this time period were inserted into the November 1, 2000 Schedule Update and then analyzed by Mr. Brannon, delay to nine intermediate schedule milestones and the Contract's substantial completion milestone was evident.[10]

111. A summary chart of delays to the affected Project milestones for this time period caused by the Government's changes during the November 2000 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at page 76 which shows that each of the nine affected interim milestones were delayed by at least 65 days, and in most instances more than 100 days, and the Contract completion date was delayed by 107 days. (Ptf. Ex. 94, pp. 31-32, 63-76).

---

[10] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 64-76.

**(iv) SCHEDULE UPDATE FOR DECEMBER 1, 2000**

112. During the December 2000 time period, the Government issued changes that delayed seven intermediate schedule milestones and the Contract's substantial completion milestone by 56 days. (Ptf. Ex. 94, pp. 76-82).

113. For the Schedule Update for December 1, 2000, Schedule N130, Mr. Brannon analyzed the effect of delays caused by EWO 530 on this period. (Ptf. Ex. 94, pp. 31-32, 76-82; Ptf. Exs. 408-412).

114. EWO 530 was created pursuant to BELL's submission of RFI #1423 requesting air device designations for the autoclave/glass washroom A and B involving the second and sixth floors. Responses to the RFI indicated there were sizing conflicts in that the supply diffusers and exhaust grill dimensions did not match the supply and exhaust duct sizes. (*Id*.).

115. The Government's changes during the December 2000 time period impacted the floors above the second floor since the schedule required that the work be performed in sequence. Consequently, BELL needed to complete the testing process on the second floor prior to moving to its work on the third floor, and then the testing would need to be completed on the third floor prior to moving to its work on the fourth floor, and so forth. (Brannon, Tr. 698, lines 5-22).

116. Mr. Brannon prepared a fragnet of the impacts from the foregoing changed work required by the Government and when this fragnet was analyzed after insertion into Schedule Update N130, several Project milestones were postponed, including the first, second, third, fourth, fifth and sixth floors, MEP and Contract completion dates, which were pushed back significantly, in each instance by at least 27 days. The Contract completion milestone was delayed, as a result of the Government's changes, by 56 days. (Ptf. Ex. 94, p. 82).

(v) SCHEDULE UPDATE FOR JANUARY 1, 2001

117. During the January 2001 time period, the Government issued changes that delayed eight intermediate schedule milestones and the Contract's substantial completion milestone by 183 days. (Ptf. Ex. 94, pp. 82-125).

118. Mr. Brannon analyzed twelve EWOs (475, 553, 554, 556, 488, 523, 560, 572, 573, 504, 574 and 487) and determined their schedule impact by inserting the EWOs' performance into Schedule Update N131. (Ptf. Ex. 94, pp. 31-32, 82-125; Brannon, Tr. 699, line 23 - Tr. 700, line 4; Ptf. Ex. 94B, Slide 137).[11]

119. As representative of the Government's changes made to the Project during January 2001, Mr. Brannon specifically discussed EWO 487. EWO 487 was created in response to architectural, electrical and mechanical revisions the Government made to the administrative suites on the fifth floor. (Brannon, Tr. 699, line 15 - Tr. 700, line 8).

120. The facts relied upon involving the analysis of EWO 487 commenced with a request for proposal based on Bulletins 75 and 89, received on October 25, 2000, that affected the architectural, electrical and mechanical revisions to several rooms on the fifth floor. On January 3, 2001, BELL wrote a letter acknowledging receipt of Bulletin 92 with a directive to proceed on the

[11] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for January 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 475** incorporated the documents set forth at Ptf. Exs. 420-428. **EWO 553** incorporated the documents set forth at Ptf. Exs. 431-434. **EWO 554** incorporated the documents set forth at Ptf. Exs. 437-440. **EWO 556** incorporated the documents set forth at Ptf. Exs. 443-444. **EWO 488** incorporated the documents set forth at Ptf. Exs. 447-450. **EWO 523** incorporated the documents set forth at Ptf. Exs. 452-457. **EWO 560** incorporated the documents set forth at Ptf. Exs. 459-460. **EWO 572** incorporated the documents set forth at Ptf. Exs. 463-465. **EWO 573** incorporated the documents set forth at Ptf. Exs. 468-470. **EWO 504** incorporated the documents set forth at Ptf. Exs. 473-478A. **EWO 574** incorporated the documents set forth at Ptf. Exs. 481-484. **EWO 487** incorporated the documents set forth at Ptf. Exs. 487-491.

fifth floor and asked for a revised plan incorporating the changes in all three Bulletins. (Brannon, Tr. 700, lines 9-19).

121. As a result of the Government's changes, BELL's completion of the drywall, duct work, ceiling grid, electrical and carpeting on the fifth floor became impacted. Consequently, such impacts reverberated throughout the other floors. (Brannon, Tr. 701, line 6 - Tr. 703, line 1; Ptf. Ex. 94B, Slides 140-142).

122. The areas of the fifth floor that are affected by EWO 487 can be seen on Slide 140 and the impact to schedule activities delayed by this EWO is depicted on Slide 141. (*Id.*; Ptf. Ex. 94B, Slides 140-141).

123. EWO 487 caused delays, as set forth in the chart in Mr. Brannon's report, Ptf. Ex. 94, at p.124, to four milestones and the Contract completion milestone. Each delay was at least 170 days. (Ptf. Ex. 94B, Slide 142; Ptf. Ex. 94, pp. 120-124).

124. In addition to testimony involving his analysis and conclusions regarding the impact of EWO 487, Mr. Brannon also created fragnets involving the performance of EWOs 475, 553, 554, 556, 488, 523, 560, 572, 573, 504 and 574 and inserted them into the Schedule Update N131 to analyze their schedule impact. (Ptf. Ex. 94, pp. 82-125). When the aforementioned changes impacting performance during this time period were inserted into Schedule Update N131 and then analyzed by Mr. Brannon, delay to eight intermediate schedule milestones and the Contract's substantial completion milestone was evident.[12]

125. A summary chart of delays to the Project milestones caused by the Government's

---

[12] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 82-125.

changes during the January 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at p. 125 and shows that each of the affected interim milestones were delayed by at least 12 days, and in most instances by more than 125 days, and the Contract completion date was delayed by 183 days. (Ptf. Ex. 94, pp. 82-125).

**(vi) <u>SCHEDULE UPDATE FOR FEBRUARY 1, 2001</u>**

126. During the February 2001 time period, the Government issued changes that delayed nine intermediate schedule milestones and the Contract's substantial completion milestone by 99 days. (Ptf. Ex. 94, pp. 125-142).

127. For the time period of February 2001, Mr. Brannon analyzed six EWOs (570, 525, 593, 600, 589 and 596) and determined their schedule impact when fragnets of the EWOs' performance were inserted in the Schedule Update N132. (Ptf. Ex. 94, pp. 31-32, 125-142; Brannon, Tr. 705, lines 8-11).[13]

128. As representative of the Government's changes made to the Project during February 2001, Mr. Brannon testified specifically about EWO 525. EWO 525 was created in response to the Governments's changes to the Project requiring that BELL add horizontal muntin bars to the type E doors and change the glass in the same doors from tempered to decorative. (Brannon, Tr. 705, lines 12-21).

---

[13] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the February 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 570** incorporated the documents set forth at Ptf. Exs. 499-503. **EWO 525** incorporated the documents set forth at Ptf. Exs. 506-512. **EWO 593** incorporated the documents set forth at Ptf. Exs. 515-517. **EWO 600** incorporated the documents set forth at Ptf. Exs. 520-525. **EWO 589** incorporated the documents set forth at Ptf. Exs. 528-529. **EWO 596** incorporated the documents set forth at Ptf. Exs. 532-533.

129. The documents relied upon by Mr. Brannon in analyzing EWO 525 included RFI 1555 issued on November 15, 2000 involving type "E" doors and RFI 93 adding horizontal muntin bars and doors, which changed from wood to hollow metal. BELL received responses to RFIs on November 21, 2000 specifying height and BELL asked for notice to proceed on November 28, 2000. A request for proposal was issued on January 26, 2001 for a change in the glass specification and EWO 525 was transmitted on February 12, 2001 for thirty-three (33) type "E" doors. (Brannon, Tr. 705, line 14 - Tr. 706, line 13; Ptf. Ex. 94B, Slide 148).

130. The work involving the doors and glass included in EWO 525 was completed on May 24, 2001. (Brannon, Tr. 706, lines 13-14).

131. The installation of these doors are very important because they affect the balancing of and operation of the air system. (Brannon, Tr. 706, line 18 - Tr. 707, line 7). The Government's changes affected the final test and balance of the HVAC systems, the completion of door and hardware installations and the final clean activities on the second floor as well as impacting every subsequent turnover date. (Ptf. Ex. 94, pp.128-133).

132. A demonstrative fragnet representation of the schedule impacts resulting from EWO 525 is set forth on Slide 150. The biggest issue on the fragnet is the actual fabrication and delivery of doors that begins in February 2001, which process continues through May 2001. (Brannon, Tr. 707, lines 8-22; Ptf. Ex. 94B, Slide 151).

133. EWO 525 impacted seven intermediate schedule milestones and the Contract's substantial completion milestone by approximately 100 days each. (Brannon, Tr. 707, line 24 - Tr. 708, line 14; Ptf. Ex. 94, pp. 128-133).

134. Mr. Brannon also created fragnets involving the performance of EWOs 570, 593, 600,

589 and 596 and inserted them into Schedule Update N132 to analyze their schedule impact. (Ptf. Ex. 94, pp. 126-142). When the aforementioned changes impacting performance during this time period were inserted into the February 1, 2001 Schedule Update and then analyzed by Mr. Brannon, delay to nine intermediate schedule milestones and the Contract's substantial completion milestone was evident.[14]

135. A summary chart of delays to the affected Project milestones caused by the Government's changes during the February 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at p.142 which shows that each of the interim milestones was delayed by at least 92 days, and in most instances more than100 days, and the Contract completion milestone was delayed by 99 days. (Ptf. Ex. 94B, pp. 126-142).

**(vii) SCHEDULE UPDATE FOR MARCH 1, 2001**

136. During the March 2001 time period, the Government issued changes that delayed seven intermediate schedule milestones and the Contract's substantial completion milestone by 113 days. (Ptf. Ex. 94, pp. 142-159).

137. For the time period of March 2001, Mr. Brannon analyzed five (5) EWOs (557, 543, 476, 515 and 620) and determined their schedule impact when fragnets of the EWOs' performance were inserted into Schedule Update N133. (Ptf. Ex. 94, pp. 31-32, 142-159).[15]

---

[14] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 126-142.

[15] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the March 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 557** incorporated the documents set forth at Ptf. Exs. 541-543. **EWO 543** incorporated the documents set forth at Ptf. Exs. 546-549. **EWO 476** incorporated the documents set forth at Ptf. Exs. 552-555. **EWO 515** incorporated the documents set forth at Ptf. Exs. 558-563. **EWO 620** incorporated the documents set forth at Ptf. Exs. 566-567.

138. As representative of the Government's changes made on the Project during March 2001, Mr. Brannon testified that EWO 543 had been created in response to changes made by the Government to the third and fourth floor air balance systems. (Brannon, Tr. 708, line 15 - Tr. 709, line 20; Ptf. Ex. 94, pp. 145-150).

139. In his analysis of EWO 543's impact on the schedule, Mr. Brannon relied on, *inter alia*, RFIs CM203 and 205 issued on December 15, 2000 for mechanical clarifications of the third and fourth floors, which added and/or deleted eighteen VAV boxes. BELL issued a memorandum on December 18, 2000 asking for an RFP or directive involving the work due to the cost and schedule issues. On March 6, 2001, CRSS issued a memorandum that asked BELL to proceed immediately and advise of the time impacts. (Brannon, Tr. 709, lines 3-20; Ptf. Ex. 94B, Slide 158).

140. These changes required that BELL procure additional materials, complete duct revisions, reinforce decking, add and delete various VAV boxes and install HVAC piping, duct work and automatic temperature controls. (Brannon, Tr. 708, line 15 - Tr. 709, line 20; Ptf. Ex. 94, pp. 145-150).

141. The fragnet depicting the issuance and performance of EWO 543, and schedule impact resulting therefrom, is contained on Slide 160. In this time frame, March 2001, the key activity in the fragnet was the delivery of material, primarily VAV boxes. During this time, modifications to the mechanical systems really drove the Project and required the new VAVs or equipment to be purchased and delivered and installed with other ongoing work, such as demolition or modification of already finished areas, and then the mechanical system was required to be completed. (Brannon, Tr. 710, lines 12-22; Ptf. Ex. 94B, Slide 160).

142. As a result of the Government's changes, there were direct impacts to the duct work,

trimout and automatic temperature controls on the third floor. Additionally, the Government's changes had a cumulative impact on the completion of several other activities on the third floor which in effect significantly pushed back the turnover dates for third through sixth floors. (Brannon, Tr. 710, line 23 - Tr. 711, line 11; Ptf. Ex. 94, pp. 145-150).

143. Therefore, and as set forth below, the Government's changes that were addressed by EWO 543 impacted all floors and delayed six intermediate milestones and the Contract completion milestone by approximately 100 days each as set forth in the chart in Mr. Brannon's report, Pt. Ex. 94, at pp. 149-150. (Ptf. Ex. 94, pp. 145-150).

144. Mr. Brannon also created fragnets involving the performance of EWOs 557, 476, 515 and 620 and inserted them into the Schedule Update N133 to analyze their schedule impact. (Ptf. Ex. 94, pp. 143-159). When the aforementioned changes impacting performance during this time period were inserted into the March 1, 2001 Schedule Update and then analyzed by Mr. Brannon, delay to seven intermediate schedule milestones and the Contract's substantial completion milestone was evident.[16]

145. A summary chart of delays to the affected Project milestones caused by the Government's changes during the March 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at page 159 which shows that each of the interim milestones was delayed by at least 18 days, and in most instances more than105 days, and the Contract completion milestone was delayed by 113 days. (Ptf. Ex. 94, pp. 143-159).

---

[16] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 143-159.

**(viii) <u>SCHEDULE UPDATE FOR APRIL 1, 2001</u>**

146. During the April 2001 time period, the Government issued changes that delayed four intermediate schedule milestones and the Contract's substantial completion milestone. (Ptf. Ex. 94, pp. 159-171).

147. For the time period of April 2001, Mr. Brannon analyzed three (3) EWOs (473, 632 and 646) and determined their schedule impact when fragnets of the EWOs' performance were inserted into Schedule Update N134. (Ptf. Ex. 94, pp. 31-32, 159-171; Ptf. Ex. 573).[17]

148. As representative of the Government's changes made during April 2001, at trial Mr. Brannon testified specifically about EWO 632. EWO 632 was created in response to the Government's changes to the Project that required that BELL reduce the pressure in the distribution pumps of the reverse osmosis system to 45 gallons per minute which in turn caused BELL to have to procure and install new pumps and a pressure relief valve. (Brannon, Tr. 711, line 12 - Tr. 712, line 20; Ptf. Ex. 94, pp. 163-167).[18]

149. EWO 632 impacted the MEP milestone and Contract completion milestone, essentially completion of all the mechanical systems in the Contract. The fragnet created, depicted

---

[17] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the April 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 473** incorporated the documents set forth at Ptf. Exs. 575-577. **EWO 632** incorporated the documents set forth at Ptf. Exs. 580-583. **EWO 646** incorporated the documents set forth at Ptf. Exs. 586-588.

[18] The documents relied upon by Mr. Brannon in his analysis of EWO 632 involved RFI 1760, written on April 20, 2001, regarding the RO system discharge pressure of 110 psi exceeding the maximum working pressure of 50 psi for faucets, which was responded to on April 27, 2001, referencing RFI CM252 specifying a reduction of system flow to 45 gpm. Temporary solutions were unacceptable and RFI CM256 was issued on May 18, 2001 directing BELL to purchase two new pumps and one pressure relief valve, which work was completed in July 2001. (Brannon, Tr. 711, line 20 - Tr. 712, line 20; Ptf. Ex. 94B, Slide 167).

on Slide 169, tracks the RFI process, the fabrication and delivery of equipment, the performance of work and how it affected the milestones, which is shown on Ptf. Ex. 94B, Slide 169. (Brannon, Tr. 712, line 21 - Tr. 713, line 7; Ptf. Ex. 94B, Slide 169).

150. The Government's changes involving EWO 632 had a cumulative impact on the MEP and Contract completion milestones, and caused a delay of 49 days and 16 days, respectively, to their completion. (Brannon, Tr. 713, lines 4-7; Ptf. Ex. 94, pp. 163-167).

151. Mr. Brannon also created fragnets involving the performance of EWOs 473 and 646 and inserted them into the Schedule Update N134 to analyze their schedule impact. (Ptf. Ex. 94, pp. 160-163, 168-170). When the aforementioned changes impacting performance during this time period were inserted into the April 1, 2001 Schedule Update and then analyzed by Mr. Brannon, delay to four intermediate schedule milestones and the Contract's substantial completion milestone was evident.[19]

152. A summary chart of delays to the affected Project milestones caused by the Government's changes during the April 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at p. 171 which shows that each of the interim milestones was delayed by at least 5 days and the Contract completion milestone was delayed by 27 days. (Ptf. Ex. 94, pp. 159-171).

**(ix) <u>SCHEDULE UPDATE FOR MAY 1, 2001</u>**

153. During the May and June 2001 time period, the Government issued changes that delayed three intermediate schedule milestones and the Contract's substantial completion milestone by 22 days. (Ptf. Ex. 94, pp. 171-183).

---

[19] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 159-171.

154. For the time period of May and June 2001, Mr. Brannon analyzed four (4) EWOs (509, 528, 653 and 655) and determined their schedule impact when fragnets of the EWOs' performance were inserted in the Schedule Update N135. (Ptf. Ex. 94, pp. 31-32, 171-183).[20]

155. As representative of the changes the Government made on the Project during May 2001, Mr. Brannon testified specifically about EWO 655. EWO 655 was created in response to the Government's changes that required that Bell adjust the air flow of 117 exhaust terminal units throughout the Project and modify the software for the exhaust terminal units. (Brannon, Tr. 713, line 18 - Tr. 714, line 14; Ptf. Ex. 94, pp. 180-182).

156. In analyzing EWO 655 and its impacts on the Contract schedule, Mr. Brannon relied upon documents including RFI CM265 written on May 18, 2001 discussing that the temperature control could not be maintained at exhaust terminals where the setting was set to zero, and the response received on May 21, 2001 instructing BELL to revise the terminal settings in 117 rooms on all floors. This work occurred between July 3, 2001 and July 17, 2001. (Brannon, Tr. 714, lines 1-12; Ptf. Ex. 94, pp. 180-182; Ptf. Ex. 94B, Slide 176).

157. The Government's changes had a direct affect on the completion of the functional performance testing for fans and fume exhaust ducts. (Brannon, Tr. 713, line 18 - Tr. 714, line 14; Ptf. Ex. 94, pp. 180-182). The Government's changes also had a cumulative effect of causing delay of the MEP and Contract completion milestones by 37 days and 2 days, respectively. (Brannon, Tr.

[20] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the May 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 509** incorporated the documents set forth at Ptf. Exs. 596-601. **EWO 528** incorporated the documents set forth at Ptf. Exs. 604-608. **EWO 653** incorporated the documents set forth at Ptf. Exs. 610-611. **EWO 655** incorporated the documents set forth at Ptf. Exs. 613-615.

713, line 18 - Tr. 714, line 14; Ptf. Ex. 94, pp. 182-183; Ptf. Ex. 94B, Slide 177).

158. Mr. Brannon also created fragnets involving the performance of EWOs 509, 528 and 653 and inserted them into the Schedule Update N135 to analyze their schedule impact. (Ptf. Ex. 94, pp. 31-32, 172-180, 182-183). When the aforementioned changes impacting performance during this time period were inserted into the May 1, 2001 Schedule Update and then analyzed by Mr. Brannon, delay to three intermediate schedule milestones and the Contract's substantial completion milestone was evident.[21]

159. A summary chart of delays to the affected Project milestones caused by the Government's changes during the May and June 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at page 183 which shows that each of the interim milestones was delayed and the Contract completion milestone was delayed by 22 days. (Ptf. Ex. 94, pp. 171-183).

**(x) SCHEDULE UPDATE FOR JULY 2, 2001**

160. During the July and August 2001 time period the Government issued changes that delayed three intermediate schedule milestones and the Contract's substantial completion milestone by 99 days. (Ptf. Ex. 94, pp. 183-203).

161. For the time period of July and August 2001, Mr. Brannon analyzed six (6) EWOs (678, 685, 686, 687, 688 and 689) and determined their schedule impact when fragnets of the EWOs' performance were inserted in the Schedule Update for July 2, 2001, Schedule NA37. (Ptf. Ex. 94, pp. 31-32, 183-203).[22]

---

[21] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 171-183.

[22] For each EWO analyzed regarding the changes made to the Project during the Schedule Update for the July 2001 time frame, Mr. Brannon reviewed the documentation pertaining to each of the items of

162. As representative of the changes the Government made on the Project during July and August 2001, Mr. Brannon testified specifically about EWO 678. EWO 678 was created in response to the Government's change that required that Bell procure and install hand rails at the north side of the Project and delete the hand rails previously installed on the south terrace. (Brannon, Tr. 716, line 23 - Tr. 717, line 17; Ptf. Ex. 94, pp. 184-188).

163. As a basis for his analysis of EWO 678, Mr. Brannon relied on, *inter alia*, Project documentation and information wherein the south terrace handrails were deleted on June 1, 2001. In that same month BELL learned that handrails were required at the steps of the north terrace, the specifications for which BELL requested in a memorandum dated June 13, 2001 – the day before the Project was dedicated on June 14, 2001. RFI CM277 was issued on July 12, 2001, which included north terrace handrail specifications. EWO 678 was transmitted on October 15, 2001, as a credit, because the new handrails cost less than the deleted handrails. (Brannon, Tr. 717, lines 2-14; Ptf. Ex. 94, pp. 184-188).

164. Although the south terrace handrails which were to be deleted were more expensive than the new handrails required by the Government's change, a delay still occurred on account of the fact that the handrails had to be fabricated, delivered and installed. (Brannon, Tr. 719, lines 1-25). In addition, the Government's changes impacted the installation of the north and south terrace railings. (Ptf. Ex. 94, pp. 184-188).

---

the changed work. Those documents are discussed in Mr. Brannon's report, Ptf. Ex. 94,and are set forth in the Ptf. Exs. as follows: **EWO 678** incorporated the documents set forth at Ptf. Exs. 622-626. **EWO 685** incorporated the documents set forth at Ptf. Exs. 628-630. **EWO 686** incorporated the documents set forth at Ptf. Exs. 632-636. **EWO 687** incorporated the documents set forth at Ptf. Exs. 638-640. **EWO 688** incorporated the documents set forth at Ptf. Exs. 643-645. **EWO 689** incorporated the documents set forth at Ptf. Exs. 647-649.

165. The Government's change as reflected in EWO 678 caused a delay to the Contract completion milestone by 99 days. (Brannon, Tr. 721, lines 3-10; Ptf. Ex. 94B, Slides 186-187; Ptf. Ex. 94, pp. 184-188).

166. Mr. Brannon also created fragnets involving the performance of EWOs 685, 686, 687, 688 and 689 and inserted them into the Schedule Update NA37 to analyze their schedule impact. (Ptf. Ex. 94, pp. 31-32, 188-203). When the aforementioned changes impacting performance during this time period were inserted into the July 2, 2001 Schedule Update and then analyzed by Mr. Brannon, delay to three intermediate schedule milestones and the Contract's substantial completion milestone was evident.[23]

167. A summary chart of delays to the affected Project milestones caused by the Government's changes during the July and August 2001 period is set forth in Mr. Brannon's report, Ptf. Ex. 94, at page 203 which shows that each of the interim milestones was delayed and the Contract completion milestone was delayed by 99 days. (Ptf. Ex. 94, pp. 188-203).

**(xi) <u>SCHEDULE UPDATE FOR SEPTEMBER 1, 2001</u>**

168. During the September 2001 time period, the Government issued changes that delayed one intermediate schedule milestone and the Contract's substantial completion milestone by 11 days. (Ptf. Ex. 94, pp. 203-210).

169. For the time period of September 2001, Mr. Brannon analyzed one (1) EWO (700) and determined its schedule impact when a fragnet detailing the creation of this EWO and performance of change work associated therewith was inserted in the Schedule Update N128. (Ptf.

---

[23] The cause and effect of these delays is explained in detail in Mr. Brannon's Report, Ptf. Ex. 94, pp. 188-203.

Ex. 94, pp. 203-210; Ptf. Exs. 656-664).

170. EWO 700 was created in response to the Government's changes that required that BELL reinforce two sections of duct work in the penthouse by modifying the exterior and interior bracing and support, install an analog differential pressure sensor in the duct to monitor high pressure readings, provide logic in the system and ensure that at least two exhaust air tunnels were open at all times on each side of the Project. (Brannon, Tr. 721, line 15 - Tr. 722, line 9; Tr. 724, lines 6-12; Ptf. Ex. 94, pp. 204-209).

171. The documents relied upon by Mr. Brannon in his analysis of EWO 700 included RFI CM 281 issued on August 22, 2001 involving the two sections of duct work that failed in the penthouse on August 16 and August 21, 2001. (Ptf. Ex. 94B, Slide 193). The fans were trying to operate beyond their capacity and the duct could not withstand the airflow and pressure drops, forcing the duct to collapse. (Brannon, Tr. 724, lines 6-12). On September 19, the Government directed BELL to install pressure sensors in the duct work and change the logic in the air system for the tunnel operations, which work was complete between September 27 and October 10, 2001. (Brannon, Tr. 722, line 19 - Tr. 723, line 3).

172. The impacts involving the issuance of EWO 700 and delays associated with performance of work involving that EWO are demonstrated on Slide 196. (Ptf. Ex. 94B, Slide 196).

173. As a result of the work required for EWO 700, the MEP and Contract completion milestones were delayed by 25 days and 11 days, respectively. (Ptf. Ex. 94, pp. 204-210).

**(xii) SCHEDULE UPDATE FOR DECEMBER 1, 2001**

174. During the December 2001 time period, the Government issued changes that delayed one intermediate schedule milestone and the Contract's substantial completion milestone. (Ptf. Ex.

94, pp. 210-213).

175. EWO 566 was created in response to a change by the Government that required that BELL install certain blank off panels. (Brannon, Tr. 728, lines 3-11; Ptf. Ex. 94, pp. 210-212; Ptf. Exs. 672-675).

176. In performing his analysis of EWO 566, Mr. Brannon relied on documents and information including RFI 1618 written on December 28, 2000 involving a conflict between the architectural and mechanical drawings with blank off panels for area way louvers, and a response which was issued on January 15, 2001 directing BELL to install blank off panels per Specification Section 10200. On January 18, 2001, BELL requested a directive to proceed and EWO 566 was transmitted on January 26, 2001 and later was revised on October 1, 2001. The work involving this EWO was completed on January 22, 2002. (Brannon, Tr. 728, lines 4-20).

177. Performance of this work impacted the MEP milestone and pushed out the Contract completion by 11 days. (Brannon, Tr. 729, lines 2-13).

178. The fragnet depicting the issuance and performance of EWO 566 and delays therefrom is represented on Slide 204. (Ptf. Ex. 94B, Slide 204).

179. EWO 566 delayed the MEP and Contract completion milestones, 23 days and 11 days, respectively. (Brannon, Tr. 729, lines 2-13; Ptf. Ex. 94, pp. 210-213).

180. In summarizing his analysis of the EWOs, Mr. Brannon concluded that: (i) Bell was entitled to an extension to the individual milestones from Mod. 93, (ii) Bell was not liable to the Government for liquidated damages, and (iii) Bell was entitled to an overall extension of the Project of 284 days, extending the Contract completion milestone from April 30, 2001 to February 8, 2002. (Brannon, Tr. 729, line 14 - Tr. 730, line 6; Ptf. Ex. 94, p. 213-215).

### K. WINDOWS ANALYSIS

181. Mr. Brannon also performed a windows analysis in order to reconcile his time impact analysis with the as-built data. (Brannon, Tr. 641, line 2 - Tr. 643, line 6; Tr. 1265, line 16 - Tr. 1266, line 12).

182. In performing the windows analysis, Mr. Brannon reviewed the events that had actually occurred on the Project to compare those events to the as-planned critical paths found in the Schedule Updates BELL had created contemporaneous to its work on the Project. (Brannon, Tr. 641, line 19 - Tr. 642, line 6). He tracked through the 14 milestones created by Mod. 93 by month, examining the individual critical paths, in order to identify where delays were indicated on the critical paths from a windows perspective. (Brannon, Tr. 643, lines 7-24). He reviewed the plan at the start of each month based on BELL's schedule it had submitted to the Government, and compared that schedule to the events on the Project as they were actually recorded within the schedule in the following month's update. (Brannon, Tr. 643, line 7 - Tr. 644, line 4).

183. Mr. Brannon's windows analysis revealed that as a result of the Government's changes to the Project, the effect of delay could be found in certain activities in the schedule, and the causation was visible through those activities which remained open (*i.e.* incomplete) month after month. (Brannon, Tr. 643, line 7 - Tr. 645, line 9).

184. The Government acknowledged that when a time impact analysis is performed it must be reconciled with the as-built data, such as by performing a windows analysis. (Scott, Tr. 1076, lines 9-24).

185. Consequently, Mr. Brannon's windows analysis, performed to reconcile his time impact analysis, reached three conclusions: (i) BELL was entitled to an extension of the various

milestones added by Mod. 93, and (ii) BELL was entitled to an extension of the entire Project period, and (iii) the Government was not entitled to liquidated damages. (Brannon, Tr. 656, lines 8-17).

186. The Government's expert, Mr. Scott, also performed a windows analysis to evaluate the extent of the delay on the Project. (Scott, Tr. 1069, line 25 - Tr. 1070, line 17). Contrary to the Contract's specifications, however, Mr. Scott never employed a time impact analysis. (Scott, Tr. 1072, line 24 - Tr. 1073, line 4).

187. Notably, Mr. Scott did acknowledge that if a contract required a TIA analysis, then case law would dictate that such analysis be performed.[24] (Scott, Tr. 1076, lines 9-24).

188. Although Mr. Scott claimed to have analyzed the delay on the Project, his analysis failed to take into account the cause of those delays he identified, and the Government introduced no other evidence to explain the same. (Brannon, Tr. 1274, lines 1-17).

189. Mr. Scott analyzed the delays on the Project by examining eight periods as representative of the Schedule Updates.

190. In Mr. Scott's analysis of Period 1 for the October 1, 2000 to November 1, 2000 Schedule Update, Mr. Scott concluded that epoxy flooring was critical and that Bell was responsible for the delay or at least was the contributing factor to delay because of a lack of manpower. (Scott, Tr. 1121, line 13 - Tr. 1125, line 12). However, his testimony was merely conclusory since he performed no analysis determining why the epoxy flooring event did not start. (Scott, Tr. 1125, line 18 - Tr. 1126, line 16). He admitted he did not know what caused the delay in Period 1. (Scott, Tr. 1125, line 18 - Tr. 1126, line 16).

---

[24] Mr. Scott further acknowledged that he was aware that the time impact analysis method was valid for quantifying delay. (Scott, Tr. 1076, line 25 - Tr. 1077, line 2).

191. In Mr. Scott's analysis of Period 2 on the Project for the November 1, 2000 to December 1, 2000 Schedule Update, he concluded that based on Weisman's Daily Reports and complaints regarding an alleged failure to manage and coordinate found in correspondence between BELL and its subcontractors, Bell was responsible for delay to the Project.[25] (Scott, Tr. 1126, line 17 - Tr. 1127, line 21; Tr. 1130, lines 14 - 25).

192. However, Mr. Scott testified that he had no personal experience in testing or balancing work, failed to review Weisman's contract, had not spoken with anyone at Weisman and had not interviewed anyone who prepared Weisman's Daily Reports.[26] (Scott, Tr. 1127, line 9 - Tr. 1129, line 1). Conversely, BELL presented testimony showing that Weisman was often unaware of changes that the Government had made, which caused the purported deficiencies noted by Weisman. (Rothrock, Tr. 528, line 21 - Tr. 531, line 15).

193. Again, Mr. Scott failed to perform any analysis of the extent to which the critical path activities were affected as result of the complaints between Bell and its subcontractors and acknowledged that since there was no casual link to any critical path activity, his analysis was simply anecdotal. (Scott, Tr. 1130, lines 14 - Tr. 1131, line 19). Consequently, Mr. Scott conceded that he did not know what caused the delay in Period 2. (Scott, Tr. 1129, lines 9-12).

194. Mr. Scott relied on Weisman's Daily Reports in analyzing Period 3, the December 1, 2000 to January 1, 2001 Schedule Update as well. (Scott, Tr. 1131, line 20 - Tr. 1132, line 4).

195. Although concluding that the delay in Period 3 could be attributed to BELL since the

---

[25] The Government retained Weisman to perform testing and balancing work. (Stip. ¶ 4).

[26] Mr. Scott relied on Weisman's reports to support his conclusion that BELL was responsible for delays in Periods 2, 3, 4, 5, 6 and 7. (Scott, Tr. 1127, lines 9-21).

items contained in Weisman's deficiency or incomplete lists were on the critical path, Mr. Scott was unable to testify as to whether Weisman had used current drawings when creating its deficiency or incomplete lists, whether Weisman had determined whether an item on its lists was actually a change, and whether Weisman's reports were even accurate. (Scott, Tr. 1132, line 20 - Tr. 1133, line 16).

196. Mr. Scott's analysis of Period 4 for the January 1, 2001 to February 1, 2001 Schedule Update also consisted of reviewing Weisman's Daily Reports in addition to reviewing a letter from Stromberg to BELL. (Scott, Tr. 1133, line 24 - Tr. 1134, line 8). As in his review of the earlier Schedule Updates, Mr. Scott could not link the issues addressed by Stromberg's letter to the critical path and acknowledged that his analysis of the same was therefore merely anecdotal. (Scott, Tr. 1134, lines 5-16).[27]

197. In his analysis of Period 5 for the February 1, 2001 to March 1, 2001 Schedule Update, Mr. Scott again cited to a Stromberg letter as representative of issues Stromberg had with schedule and receiving schedules.[28] However, Mr. Scott again failed to tie Stromberg's issues to the critical path and conceded as to all of his analyses that he had been unable to discern the cause of the delays on the Project. (Scott, Tr. 1135, lines 1-13).[29]

---

[27] It should also be noted that in his analysis of Period 4, Mr. Scott referenced the Government's withholding $100,000 from BELL due to alleged lack of performance. However, again, Mr. Scott performed no analysis to determine whether or not the Government had been justified in withholding those monies from BELL. (Scott, Tr. 1134, lines 19-25).

[28] Tellingly, although the key members of Stromberg's Project team testified at trial, the Government did not elicit any testimony from them about the correspondence that Mr. Scott cited.

[29] Mr. Scott also conceded that if the design was deficient and change orders issued because of deficiencies in the design, or if the Government issued changes to accommodate NIH staff, the Government would be responsible to BELL. (Scott, Tr. 1136, lines 4-19). Moreover, if the changes caused BELL's performance to be extended, the Government would be responsible for those delays.

198. In fact, as to the remaining three periods Mr. Scott reviewed, in addition to the prior periods one through four referenced herein, Mr. Scott admitted that short of concluding that the EWOs, with one exception, did not cause the delays on the Project, he had not conducted any analysis to determine the cause of the delay to the Project and consequently, could not testify as to what had caused the delay to the Project. (Scott, Tr. 1135, lines 7-13).

199. While Mr. Scott claimed to have analyzed each and every post-Mod. 93 EWO, except disputed EWOs, in order to determine only one affected completion, his "analysis" did not put down on paper for each EWO what work was involved, how much time it would take or prepare a fragnet or anything close to it in performing his analysis. (Scott, Tr. 1110, line 22 - Tr. 1111, line 2).[30]

## L. LIQUIDATED DAMAGES

200. Based on Mr. Brannon's time impact analysis, Bell was not liable for liquidated damages to the Government because it was entitled to extensions surpassing the contractual completion date of each intermediate milestone and an overall extension of the Contract time period. (Brannon, Tr. 647, lines 5-18).

201. Mr. Scott's "analysis" simply compared the planned finish date and the actual finish date of each milestone and summarily concluded that since BELL did not meet the planned finish date, BELL was responsible for liquidated damages. (Scott, Tr. 1138, lines 5-10).

202. Mr. Scott did not analyze the critical path to determine whether compensable or excusable delay was available to Bell for each of the intermediate milestones. (Scott, Tr. 1137, line

---

(Scott, Tr. 1136, lines 20-23).

[30] Mr. Brannon analyzed Bell's performance on the Project and concluded that until Mod. 93, BELL performed within the original Contract; as demonstrated, *supra*, the delays that arose after Mod. 93 are solely attributable to the Government. (Brannon, Tr. 607, line 6 - Tr. 611, line 2).

25 - 1138, line 4).

203. In performing his windows analysis, Mr. Scott only evaluated the longest path through the Project that led to the last milestone contained in Mod. 93, the Contract's substantial completion milestone. (Brannon, Tr. 1274, lines 1-17; Scott, Tr. 1111, lines 4-9). By conducting such a limited analysis, Mr. Scott was only able to review the activities that lead to that last milestone. (Brannon, Tr. 1274, lines 1-17; Scott, Tr. 1111, lines 15-22).

204. Mr. Scott conceded that there may have been an independent critical path to an intermediate milestone. (Scott, Tr. 1111, line 23 - 1112, line 4). Moreover, he admitted he performed no analysis of the critical path delay to any of the intermediate milestones. (Brannon, Tr. 1274, lines 1-17; Scott, Tr. 1111, lines 15-22 ).

205. Thus, by only analyzing the longest path of the Project, Mr. Scott did not consider all of the ramifications of the events that affected the fourteen intermediate milestones. (Brannon, Tr. 1284, line 19 - Tr. 1285, line 8).

## M. CUMULATIVE IMPACT/LABOR INEFFICIENCY

206. The modifications on the Project neither included the cumulative impact of the Government's changes nor expressly released BELL's cumulative impact and labor productivity claims. (Brannon, Tr. 626, line 15 - Tr. 627, line 12; Tr. 627, line 21 - Tr. 628, line 1).

207. Based on Mr. Brannon's review of Mod. 93, there was no consideration in that Modification for cumulative impact or labor inefficiency. (Brannon, Tr. 581, line 19 - Tr. 582, line 10).

208. Through Mr. Brannon's analysis of EWOs generated after Mod. 93, he concluded that the Government's changes to the Project made after August 31, 2000 had impacted BELL's labor

productivity and had a cumulative impact throughout BELL's performance of work on the Project. (Brannon, Tr. 730, lines 7-21; Ptf. Ex. 94, p. 218-219).

209. Even when a modification was executed, there was no way for Bell to have foreseen the cumulative effects of unanticipated changes or been able to determine the affect of a change until that change actually occurred. (Brannon, Tr. 628, lines 10-23).

210. With the new milestones and MEP milestone created by Mod. 93, a new Project environment was created in which virtually any change became a potential impact since the flow sequence of BELL's crews through the Project could be affected by the change and thus affect the milestones. (Brannon, Tr. 580, line 17 - Tr. 581, line 18).

211. Even after issuing Mod. 93, the Government continued to make changes to the Project throughout the remaining course of BELL's performance. (Brannon, Tr. 631, line 16 - Tr. 634, line 6).

212. Such changes reverberated throughout the Project and affected every floor. (Brannon, Tr. 631, line 16 - Tr. 634, line 6). These changes had a deleterious effect on morale and efficiency because they often required workers to destroy work in place which had been completed with great pride and skill. In effect, the laborer's prior efforts were wasted. (Rothrock, Tr. 523, lines 2-18; Bussey, Tr. 859, lines 8-15).

213. As a result of the cumulative impact of the Government's changes, Bell incurred significantly higher labor costs than it had anticipated. (Ptf. Ex. 94, p. 218-219).

214. As depicted on Slide 32, Mr. Brannon analyzed the changes and determined that there was $21 million in changes on this $63 million Project, which represented a 34% increase. Mr. Brannon testified that it is "pretty far off the charts" for a Government project to have 34% changes.

When changes get to the 20-30 % range, you see a significantly different project. (Brannon, Tr. 614, lines 11 - Tr. 616, line 7; Ptf. Ex. 94B, Slide 32).

215. Mr. Brannon conducted an analysis to determine how extensive areas of the Project were affected by the EWOs that had to be issued by indicating each EWO's location on a floor plan with pre-Mod. 93 EWOs highlighted in gray and post-Mod. 93 EWOs highlighted in red. (Brannon, Tr. 630, lines 8-25; Ptf. Ex. 94B, Slides 51-59).

216. BELL maintained a hard copy of the floor plans with the EWO location, which is demonstrated in Mr. Brannon's Slides, during the Project performance. (Brannon, Tr. 631, lines 11-12).

217. Mr. Brannon's analysis showed that virtually every part of the Project, particularly post-Mod. 93, was affected by a change. (Brannon, Tr. 631, lines 5-9).

218. Mr. Brannon's analysis also demonstrated how the changes in just a single EWO affected numerous floors. For example, EWO 478 changed duct work on numerous floors (floors three, four, five, six and mechanical penthouse). (Brannon, Tr. 631, line 24 - Tr. 632, line 7).

219. Mr. Brannon also analyzed, from a timing perspective, each individual floor plan and the location of each EWO and when it was issued. The stacked floor plans show pre-Mod. 93 EWOs in red, which are then turned to gray as the EWOs issued after Mod. 93 and up through November 2001 are added in red on a month-by-month basis. (Brannon, Tr. 633, line 6 - Tr. 634, line 6; Ptf. Ex. 94B, Slides 60-75).

220. Mr. Brannon analyzed where the changes were located on each floor and when they occurred. This was demonstrated by his graphic of each floors' plan view with the EWOs and a time line across the top, graphically demonstrating when the EWOs were issued. (Brannon, Tr. 634, line

7 - Tr. 636, line 1).

221. As Mr. Brannon noted, the Government's internal documents demonstrated its concerns over the amount of changes post-Mod. 93. (Brannon, Tr. 636, line 8 - Tr. 640, line 24).

222. In order to determine the cumulative affect of the Government's changes, Mr. Brannon analyzed the amount of earned and unearned hours expended each week.[31] (Brannon, Tr. 628, line 24 - Tr. 629, line 3; Ptf. Ex. 94, p. 227-229).

223. For approximately the past twenty years, BELL has tracked its productivity rates by requiring its foremen to record weekly the amount of units installed on a project, in order to allow BELL to compare the actual time to install the units to its estimates for a given project. Where more time is spent installing units than estimated, BELL deems that additional time unproductive. (Brannon, Tr. 743, line 11 - Tr. 745, line 2).

224. On this Project, Mr. Brannon reviewed BELL's productivity level based on those weekly records of units installed for each cost code in BELL's system. (Ptf. Ex. 94, p. 227).

225. BELL's productivity level could then be determined by comparing the actual labor expended in order to perform units of the Contract work. (Brannon, Tr. 740, line 20 - Tr. 741, line 12; Ptf. Ex. 94, p. 227).

226. Based on analysis of BELL's productivity level derived from those weekly records of units installed for each cost code in BELL's system, Mr. Brannon concluded that the majority of unearned hours or reduced productivity occurred after August 31, 2000, even though there was also unearned hours or reduced productivity that occurred prior to that date. (Brannon, Tr. 746, line 18 - Tr. 751, line 10; Ptf. Ex. 94, pp. 227-229).

---

[31] Unearned hours reflect the labor expended unproductively. (Ptf. Ex. 94, p. 227).

227. In fact, through 1999, BELL had completed a significant percentage of its base Contract work, including the addition of the fourth floor, and incurred a rate of non-productive work to productive work of 8 %.[32] (Brannon, Tr. 745, line 23 - Tr. 746, line 9; Ptf. Ex. 94, p. 229).

228. Mr. Brannon attributed half of the non-productivity factor to BELL, and set BELL's reasonable productivity for the Project at 104 % of the originally planned productivity. (Ptf. Ex. 94, p. 229).

229. Mr. Brannon then adjusted the total hours expended by 4 % to reflect the hours of BELL's unproductive work that could be attributed to BELL. The total unearned hours on the Project was then reduced by 4% of the total hours to determine the total labor productivity loss attributable to conditions created by the Government. (Ptf. Ex. 94, p. 229-230).

230. In effect, approximately 25 % of the total hours expended on the Project by BELL can be attributed to labor productivity loss on account of the conditions created by the Government's changes. (Ptf. Ex. 94, pp. 229-230).

231. The Government did not introduce any evidence disputing BELL's inefficiency claim during Mr. Scott's direct examination. In fact, Mr. Scott was not proffered as an expert on labor inefficiency, labor productivity or the quantification of costs associated therewith.

### N. QUANTUM

232. In summary, BELL claims the following damages (exclusive of subcontractor claims):

| | |
|---|---|
| **Contract Summary** | |
| Original Contract | $63,663,745 |
| Adjusted Contract Amount | $85,048,515 |

---

[32] Although BELL was adversely affected by the addition of the fourth floor, the additional work was performed at or near the same productivity rates originally planned for the Project. (Ptf. Ex. 94, p. 229).

| | |
|---|---|
| Amount Paid To Date | $84,485,390 |
| **Unpaid Balance Due on Contract** | **$563,125** |
| **Unresolved Changes (Disputed EWOs)** | **$1,610,987** |
| **Total of Contract Balance/Unresolved Changes** | **$2,174,112** |
| **BELL Extended General Conditions** *Post 4/30/01* | **$1,602,053** |
| **BELL Loss of Efficiency Costs – Entire Project** | **$2,058,456** |
| **Profit on Extended GC Costs/Inefficiency (10%)** | **$366,051** |
| **Subtotal** | **$6,200,672** |
| **Prejudgment Interest (**6% from 4/5/02 – 10/31/07**)** *Daily Interest is $1,019.29* | **$2,074,252** |
| **TOTAL BELL DAMAGES** | **$8,274,924** |

(Ptf. Ex. 686).

233. For nearly 5 ½ years the Government has relied on its liquidated damages and backcharge claims as the basis for refusing to pay the undisputed Contract balance of $563,125. In July 2002, the Government claimed that BELL was liable to it for $877,625. (Ptf. Ex. 73 at p. 7).

234. The testimony of the Government's trial representative, Mr. Temme, showed that the Government's assessment of liquidated damages and backcharges lacked any good faith basis. The Government assessed liquidated damages against BELL based on a directive from a lawyer in the NIH's Office of General Counsel to retaliate against BELL for submitting a REA. (Temme, Tr. 1017, line 1 - Tr. 1018, line 2). Furthermore, years ago the Government determined that it had no valid backcharges against BELL, but it continued to assert unfounded backcharges as a strategy for trying to settle BELL's REA. (Temme, Tr. 1018, line 20 - Tr. 1021, line 7; Temme, Tr. 1023, lines 19-23; Temme, Tr. 1026, line 2 - Tr. 1027, line 2; Ptf. Ex. 80-A).

235. In addition to incurring delay and inefficiency damages which are discussed below, BELL seeks payment of $1,610,987.00 for 58 disputed EWOs for extra work that the Government directed it to perform, but for which the Government has wrongfully refused payment. (Bardin, Tr. 291, lines 18-25; Bardin, Tr. 1253, line 24 - Tr. 1255, line 14; Ptf. Ex. 100). For ease of reference, a summary of these disputed EWOs is attached as Appendix C.

236. Included in the foregoing amount is $248,201.00, which BELL seeks to recover based on the incorrect manner in which the Government used what is known as the "Kit of Parts" ("KOP"). Under the Contract, the KOP was a unit price mechanism that addressed certain identified laboratory-related items other than casework, *i.e.*, benches, culture rooms, isotope labs, lab alcoves, cold rooms, warm rooms, and darkrooms. The KOP items involved multiple subcontractors and supplies. (Stip. ¶12).

237. The KOP anticipated minor internal changes and reconfiguration of casework pursuant to which the Government was permitted to alter the quantities of items identified in the laboratory casework and KOP unit price lists within 550 calendar days of Contract work. If the Government made more than fifty changes for casework or five changes for KOP, BELL was entitled to renegotiate the unit prices. (Bardin, Tr. 292, line 6 - Tr. 294, line 19; Ptf. Ex. 5).

238. Contrary to the requirements of the Contract, the Government made significant changes far in excess of the agreed upon allotment. The Government's alterations resulted in significant changes, including moving walls and removal and replacement of duct work, which caused substantial additional cost to BELL. Each change, whether it be an addition or a deletion via the KOP, constituted a change that counted toward the Government's five total change allotment, after which BELL was entitled to renegotiate the unit prices. The Government, however, considered

three additions and three deletions to be a net change of zero as opposed to a total of six changes and, therefore, refused to compensate BELL for the additional costs incurred. (Bardin, Tr. 294, line 20 - Tr. 295, line 13; Bardin Tr. 450, line 12 - Tr. 451, line 9).

239. The Government's narrow view of the net KOP changes failed to account for the fact that a deletion caused BELL to incur administrative and other costs and further forced BELL to give the Government a credit for the markup BELL had, as it was entitled to, built into the cost of the KOP unit prices. In other words, the Government's scheme resulted in the Government taking greater credits than it was entitled to, and forced BELL to incur the resulting costs. BELL's computation of the additional amount of $248,201.00 took into account the costs to which it was entitled for all of the Government's changes in excess of five changes and accounted for the credit improperly taken by the Government for BELL's markup on the deleted items. (Bardin, Tr. 456, lines 8-13; Bardin Tr. 461, line 9 - Tr. 463, line 15; Ptf. Exs. 247-256).

240. The Government was fully aware that BELL had reserved its rights with regard to its KOP claim and it agreed to negotiate BELL's costs after all of the KOP changes were complete. (Temme, Tr. 947, lines 15-24).

241. Mr. Brannon determined BELL's extended general condition costs as a result of delays and resulting extended performance from the Contract completion date of April 30, 2001 through Project completion on February 8, 2002. General condition costs are unassociated with the direct performance of the work, but effectively are necessary for the management of that work and includes supervision at the job site, facilities at the job site, such as trailers, fax machines, computers and those costs or conditions that are generally necessary to perform the work, which are all real costs that a contractor expends on a project. (Brannon, Tr. 737, lines 1-16; Tr. 739, lines 13-18; Tr.

740, lines 14-16).

242. In determining BELL's extended general condition costs, Mr. Brannon utilized a reasonable and accepted method of calculating extended general condition costs. (Brannon, Tr. 739, line 21 - Tr. 740, line 1). He relied on BELL's job cost records and, based on his experience and expertise, was satisfied that those records and BELL's cost controls were accurate. (Brannon, Tr. 731, line 9 - Tr. 733, line 23; Ptf. Ex. 82).

243. Mr. Brannon's analysis is supported by the fact that the general conditions cost calculation of the Government's accounting expert, Mr. Daigle, corresponded to the same figures Mr. Brannon reached under Division 1. (Brannon, Tr. 1257, line 25 - Tr. 1258, line 22). Moreover, Mr. Daigle admitted that, prior to the trial, he had failed to understand that because BELL self-performed various scopes of work, it charged general condition costs to other divisions within its job cost records. Consequently, had Mr. Daigle understood that fact, he would have reached the same dollar amount for general conditions that Mr. Brannon had reached. (Brannon, Tr. 1257, line 25 - Tr. 1258, line 22).

244. Mr. Brannon calculated the daily rate and applied the daily rate to the delay period in order to get the damage calculation. Mr. Brannon explained that he compiled all the general condition costs identified in BELL's job cost records. Those costs, which total $7,953,857, are set forth on Slide 210. Next he took the actual duration of the Project over which time this money was expended, from April 1, 1998 through February 8, 2002, or 1,410 days. To determine the daily general condition rate, Mr. Brannon divided the total general condition costs by the total number of days, and calculated a daily rate based on actual costs of $5,000,641. (Brannon, Tr. 737, line 17 - Tr. 739, line 18; Ptf. Ex. 94B, Slides 210-211).

245. Mr. Brannon determined that based on BELL's 284 days of extended performance and its $5,641 per day costs for general conditions, BELL's extended general conditions on the Project due to the Government's delay totaled $1,602,053. (Brannon, Tr. 739, line 19 - Tr. 740, line 19; Ptf. Ex. 94B, Slide 211).[33]

246. Mr. Brannon also calculated BELL's loss of labor productivity totaling $2,058,456 for the entire Project. Mr. Brannon had interviewed individuals familiar with BELL's cost reports and had worked with them on other projects and determined that based on his experience and expertise, BELL's job cost accounting records and cost controls were accurate and possess extremely detailed labor productivity tracking, which he utilized to determine their labor inefficiency costs. (Brannon, Tr. 731, line 9 - Tr. 734, line 19; Tr. 740, line 20 - Tr. 741, line 4).

247. Mr. Brannon went through BELL's cost reports and on a monthly basis analyzed the tracking of BELL's self performed work in each division. Brannon compared BELL's actual production rates on the Project to BELL's historical productivity rates developed by BELL, which BELL has created and continually updated over 20 years, which Mr. Brannon concluded were reasonable productivity rates for the work based on his familiarity with BELL and being involved with their performance on other projects where they met or exceeded their productivity levels. (Brannon, Tr. 741, line 6 - Tr. 743, line 14; Tr. 745, lines 3-14).

248. Mr. Brannon determined that BELL's estimated hours on the Project were reasonable. During the first 20 months of the Project, BELL's labor was eight percent over their labor budget, which could be attributable to some open changes, but based on review of the facts, Mr. Brannon

---

[33] During the Project, the Government estimated BELL's daily rate at $7,000 per day. (Ptf. Ex. 20; Temme, Tr. 1010, lines 14-18; Daigle, Tr. 1186, lines 13-17).

split responsibility of the eight percent overrun, four percent to the Government and four percent to BELL, after which he created a new baseline of productivity rate that utilized 104 percent (*i.e.* BELL's original expected labor budget, plus four percent attributable inefficiency) to create a new labor budget baseline for the first 20 months of the Project. This labor budget, or earned hours, is demonstrated by the blue shaded area on Mr. Brannon's graphic, Slide 213. BELL's actual hours that surpass the hours earned are shown on Slide 213 as the area shaded in red. The red area represents BELL's unproductive labor. (Brannon, Tr. 743, line 22 - Tr. 747, line 21; Ptf. Ex. 94B, Slide 213).

249. Mr. Brannon's calculations of labor inefficiency costs are set forth in Ptf. Ex. 94B, Slide 214. Mr. Brannon calculated labor inefficiency in two manners, one calculation for the productivity losses on the total Project, and a separate breakout of productivity losses solely after August 31, 2001. (Brannon, Tr. 749, lines 15-18; Tr. 750, line 24 - Tr. 751, line 12).

250. From BELL's labor records, Mr. Brannon calculated the total unproductive hours, *i.e.* hours over the labor budget, which labor budget was adjusted by four percent for BELL's own labor inefficiency during the first 20 months of performance. The total unproductive hours on the job, 93,146 man hours ("mhrs") were reduced by four percent, totaling 80,317 hours. Mr. Brannon multiplied this by the weighted average man hour costs for the Project based on BELL's records provided to Mr. Brannon by BELL's accounting for a summary of all labor costs on the Project, $33.50 per man hour. This labor inefficiency cost of $2,690,649 (*i.e.* 80,317 mhrs X $33.50 per mhr) was then adjusted, or reduced, by $632,193 for a total Project lost productivity cost of

$2,058,456.[34] (Brannon, Tr. 749, line 12 - Tr. 750, line 18; Ptf. Ex. 94B, Slide 214).

251. Mr. Brannon also followed the same procedure to calculate the productivity losses after August 31, 2000. The unproductive labor hours after August 31, 2000 total 57,333 mhrs, which were reduced by four percent, totaling 55,045 mhrs of lost productivity attributable to the Government. The total lost productivity for the time period after August 31, $1,844,021 (*i.e.* 55,045 mhrs X $33.50 per mhr), was reduced by $632,193 general conditions costs for reasons set forth above, thus totaling a loss of productivity claim by BELL of $1,844,021 for the time period after August 31, 2000. (*Id.*).

252. Based on Mr. Brannon's education, experience and expertise in calculating loss of efficiency costs, the method he used to calculate BELL's loss of efficiency costs on the Project was reasonable and in accordance with construction industry standards. (Brannon, Tr. 750, lines 19-23).

253. A reasonable markup of 10% for overhead and profit was added to the extended general condition costs. (Brannon, Tr. 752, lines 11-16).

254. Finally, Mr. Brannon applied a 6 % annual interest rate to the amount due from April 5, 2002, the submission date of BELL's REA, and October 31, 2007, the last day of the month in which the trial was held. This yielded interest due in the amount of $2,074,252. (Brannon, Tr. 752, line 11 - Tr. 753, line 18; Ptf. Ex. 94B, Slide 216).

255. In summary, BELL seeks damages of $8,274,924, exclusive of subcontractors' claims. (Brannon, Tr. 753, lines 5-11; Ptf. Ex. 94B, Slide 216; Ptf. Ex. 686).

---

[34] Mr. Brannon deducted this general conditions cost to eliminate any overlapping of costs previously included and claimed in his extended general conditions costs, because BELL records certain supervision labor, which would be labor reflected in the productivity calculations, as general conditions. Since these supervision costs would have been captured in the extended supervision calculation, Mr. Brannon has excluded them from his labor inefficiency calculations. (Brannon, Tr. 750, lines 6-18).

## IV. APPLICABLE LEGAL STANDARDS

"Damages for breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Citizens Federal Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007) (holding that trial court did not abuse discretion in applying substantial factor rather than but-for theory of causation) (citations omitted). Thus, it is within the trial court's discretion to select an appropriate causation standard and methodology for determining damages. *Id.* (citations omitted). *See also*, *Delco Electronics Corp. v. United States*, 17 Cl. Ct. 302, 320 (1989) (contractor entitled to equitable adjustment upon showing a causal connection between reasonable costs claimed and the event giving rise to the claim); Federal Acquisition Regulation ("FAR") § 52.243-4(d), Changes clause.

As a matter of law, damages do not have to be proven with mathematical exactitude; rather, "[i]t is sufficient if [a claimant] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 274 (2006) (citations omitted). Determining the reasonableness of the amount to be awarded "can only be made by reference to contemporary notions of fairness and equity, and by taking into account the totality of circumstances." *Delco*, 17 Cl. Ct. at 321. "The duty of the court then, is to determine what a reasonably prudent contractor would have done under the circumstances . . ." *Id.*

"There is a distinction in the law between: (1) a 'delay' claim; and (2) a 'disruption' or 'cumulative impact' claim. Although the two claim types often arise together in the same project, a 'delay' claim captures the time and cost of *not* being able to work, while a 'disruption' claim captures the cost of working less efficiently than planned." *BELL BCI Co. v. United States*, 72 Fed.

Cl. 164, 168 (2006) (citation omitted). "A contractor may recover for loss of efficiency if it can establish both that a loss of efficiency has resulted in increased costs and that the loss was caused by the government." *Ace Constructors*, 70 Fed. Cl. at 282 (citations omitted).

The Government is liable for unreasonable delays that it causes. *George Sollitt Construction Co. v. United States*, 64 Fed. Cl. 229, 237 (2005) (citations omitted). *See also*, FAR § 52.242-14, Suspension of Work clause. "[T]he contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." *George Sollitt Construction Co.*, 64 Fed. Cl. at 238 (citations omitted). "One established way to document delay is through the use of [CPM] schedules and an analysis of the effects, if any, of government-caused events upon the critical path of the project." *Id.* at 240 (citations omitted).

It has long been recognized that a contractor may "recover for the cumulative effect of a multitude of owner-directed changes that, when taken collectively, can be greater than the sum of the effects of the individual change orders." R. M. Jones, *Lost Productivity: Claims for the Cumulative Impact of Multiple Change Orders*, 31 Pub. Cont. L.J. 1-2 (2001). "Unlike the direct impact claim, which can be recognized when a change order is issued, the cumulative impact claim represents a claim for lost productivity on unchanged work that contractors claim is not foreseeable at the time the change order is issued. Specifically, unchanged work refers to the contract work not covered by a specific change order." *Id.* at 7. The costs associated with a cumulative impact "are not readily foreseeable" and "result in an unanticipated loss of efficiency and productivity which increases the contractor's performance costs and usually extends his stay on the job." *David J. Tierney, Jr., Inc.*, 88-2 BCA ¶ 20,806 (1988) at p. 59 (awarding cumulative impact damages).

"The party asserting an accord and satisfaction defense must establish four elements: (1)

proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration." *BELL BCI Co.*, 72 Fed. Cl. at 168, *citing*, *Jackson Constr. Co. v. United States,* 62 Fed. Cl. 84, 92 (2004). "As stated in *Jackson*, 'the Court must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with respect to the release of additional claims.'" *BELL BCI Co.*, 72 Fed. Cl. at 168. Thus, "[u]nless specifically represented otherwise, a change order should not and cannot be interpreted to discharge a claim which is not genuinely in actual or potential dispute at that time, for there can be no mutual agreement with respect to that claim. *Blake Constr. Co.*, 80-2 BCA ¶ 14,756 (1980) at p. 5 (change orders did not bar claims for impact costs). *See also*, *David J. Tierney, Jr., Inc.*, *supra* at p. 61.

## V. ARGUMENT

### A. THE UNDISPUTED EVIDENCE SHOWED THAT BELL DID NOT WAIVE OR RELEASE ITS CLAIMS FOR CUMULATIVE IMPACT OR INEFFICIENCY

The Court's Order of July 14, 2006 stated that a trial was needed to address several issues pertaining to the Government's affirmative defense of accord and satisfaction. *BELL BCI Co.*, 72 Fed. Cl. at 168-169. BELL presented unrebutted evidence that addressed each of the issues and which proved the following:

(1) None of the Mods. that BELL entered into with the Government reflected a meeting of the minds to waive or release cumulative impact or inefficiency claims.

(2) The Government never provided BELL any consideration under Mod. 93 or any other Mods. to waive or release cumulative impact or inefficiency claims.

(3) The statement in Mod. 93 and certain other Mods. that the Government is released from "further equitable adjustment attributable to the Modification" extended only to the direct costs of the changed work and was never intended or understood to did release any claims for cumulative impact or inefficiency.

(4) The phrase "indirect costs" used Mod. 93 referred only to general and administrative

costs and did not encompass cumulative impact or inefficiency costs.

(5) BELL did not waive claims for cumulative impact and inefficiency by signing Mods. without an express reservation of rights because those claims had not matured and could not have been reasonably known at the time.

(Proposed Findings of Fact ("PFF"), Section III, *supra*, ¶¶ 28-37, 50-52, 209). Despite the fact that it bore the burden of proof to establish accord and satisfaction, the Government did not proffer any testimony on the foregoing issues. Therefore, the evidence before the Court regarding the foregoing is undisputed.

As previously noted, "'the Court must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with respect to the release of additional claims.'" *BELL BCI Co.*, 72 Fed. Cl. at 168 (citation omitted). The undisputed evidence plainly showed that there was no meeting of the minds with respect to releasing cumulative impact or inefficiency claims. Indeed, the Government's contemporaneous records confirmed that delay was the only issued that the parties reached a meeting of the minds in Mod. 93

For example, in October 2000, the Government stated in writing that the Partnering Meeting at which Mod. 93 was negotiated was "aimed toward . . . settling the time impact of all changes to date." (Ptf. Ex. 39A (emphasis added)). Similarly, in its contemporaneous Monthly Reports, the Government characterized to the matters resolved in Mod. 93 as a "delay agreement." (Ptf. Ex. 34, Jacobs Monthly Report, August 2000, p. 2 (emphasis added)). The Government's contemporaneous records are consistent with the Court's previous finding that neither Mod. 93 "nor the Contracting Officer's summary of Negotiations mentions a claim for disruption, cumulative impact, or labor inefficiency" and that the payment "for delay damages in [Mod. 93] . . . did not thereby address any

claim for disruption or cumulative impact." *BELL BCI Co.*, 72 Fed. Cl. at 168.[35]

By its very nature, a cumulative impact claim "is not foreseeable at the time the change order is issued." Jones, *supra*, 31 Pub. Cont. L.J. at 7. Thus, as a matter of law, the Government is incorrect in asserting that BELL waived unknown cumulative impact or inefficiency claims by not expressly reserving its rights in Mod. 93 and other Mods. A contractor does not release an undisputed and unknown claim by "failing" to reserve its rights in a change order because "there can be no mutual agreement with respect to that claim." *Blake Constr. Co.*, 80-2 BCA ¶ 14,756 at p. 5. *Cf.*, *David J. Tierney, Jr., Inc.*, 88-2 BCA ¶ 20,806 at p. 2 ("the negotiated prices of the contract changes failed to address this cumulative impact experienced, and therefore do not preclude appellant's claim by way of an accord and satisfaction"). Again, the evidence was undisputed in showing that BELL did not know of cumulative impact and inefficiency claims when it signed Mod. 93 and other Mods. (PFF, ¶¶ 31, 33-35, 209).

If the Government wanted BELL to release unknown and undisputed claims, it could have inserted appropriate express release language into the Mods. The Government chose not to do that, however. As the drafter of the Mods., the Government "must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence." *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971). In sum, the evidentiary record showed that the Government did not – and could not – prove that BELL released its claims for cumulative impact or inefficiency pursuant to the doctrine of accord and satisfaction.

---

[35] Even during this litigation, the Government never contended that it addressed or provided any consideration to BELL for releasing or waving such claims. In its Answers to Interrogatories, the Government stated that Mod. 93 "expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000." (Ptf. Ex.79 at p. 6 (emphasis added)).

### B. THE UNDISPUTED EVIDENCE SHOWED THAT BELL SUFFERED CUMULATIVE IMPACT AND INEFFICIENCY DAMAGES

BELL presented factual and expert evidence showing that it suffered cumulative impact and inefficiency. (PFF, ¶¶ 206-231). BELL's evidence was undisputed; the Government did not offer any lay or expert testimony to refute BELL's proof. As the undisputed evidence showed:

- The Government made changes that affected every floor and nearly every aspect of the work. (PFF, ¶¶ 217-220).
- The magnitude and number of Government changes could not have been anticipated when the Contract was entered into. BELL entered into the Contract based on what were represented to be 100% complete plans and specifications. Under such circumstances, changes equal to 10% of the Contract value would be at the upper end of what might be expected. On this Project, the Government changes equaled at least 34% of BELL's Contract value, and were thereby "off the charts." (PFF, ¶¶ 18-19, 214).
- Nor could the magnitude and number of post-Mod. 93 changes be anticipated when Mod. 93 was signed. At the Partnering Meeting to negotiate Mod. 93, the Government represented that there would be limited changes thereafter and that it would pay BELL to perform future changes on an accelerated basis. Thus, BELL had no reason to anticipate a myriad of changes thereafter that would cripple its efficiency. The Government completely failed to honor its representations. Post-Mod. 93 changes affected virtually every area of the Project. (PFF, ¶¶ 28, 39-43).
- After Mod. 93, the Government's internal contemporaneous records show that it knew that it could not continue to make changes without impacting BELL's performance, yet it continued to direct BELL to make changes demanded by NIH personnel and to perform the additional work without any impact to the Project schedule. (PFF, ¶¶ 39-43, 45).
- The Government's changes frequently required completed work to be demolished. This, in turn, had a deleterious effect on morale and efficiency. (PFF, ¶ 212).
- As a result of all the Government changes, BELL incurred significantly higher labor costs than it anticipated. (PFF, ¶¶ 222-230).

BELL presented the unrebutted expert testimony and analysis of Mr. Brannon to quantify the cumulative impact of the Government's changes and the damages resulting therefrom. His analysis

showed that approximately 25% of the total labor hours that BELL expended on the Project were due to lost productivity created by the Government's changes. (PFF, ¶ 230). Mr. Brannon reached his conclusion based on his analysis of BELL's historical productivity data and its Project records, and after allocating inefficiency which could be attributed to BELL. (PFF, ¶¶ 223-229). Based on that analysis, BELL reasonably showed that incurred loss of efficiency costs of $2,058,456. (PFF, ¶ 246).

### C. BELL PROVED THAT IT WAS ENTITLED TO A COMPENSABLE TIME EXTENSION

BELL presented unrebutted testimony showing that, due to the multitude of changes made after Mod. 93, the Government expressly agreed to excuse it from having to submit TIAs within the time period referenced in the Contract. (PFF, ¶ 16). This agreement/course of dealing allowed the Government to obtain the benefit of having the changed work continue in lieu of BELL ceasing its efforts in order to prepare TIAs. (*Id.*). As a matter of law, the Government may not claim that BELL failed to timely submit TIAs. *See, e.g.*, *Miller Electric Co., Inc. v. United States*, 30 Fed. Cl. 662, 687-90 (1994) (holding that the Government waived specification and was estopped).

Notwithstanding the Government's agreement to excuse the timing of submitting TIAs, the Contract provision requiring the submission of a TIA to obtain an extension of time remained in place. (Ptf. Ex. 6, Contract Specification Section 1310, §§ 7.01.A and B at 01310-11). Accordingly, BELL submitted TIAs that Mr. Brannon prepared in accordance with the Contract requirements. (PFF, ¶¶ 83-85, 92-180). Based on following the delay analysis methodology required by the Contract, and finding no concurrent delay by BELL, Mr. Brannon determined that BELL was entitled to a 284 day compensable time extension.[36] (PFF, ¶ 180).

---

[36] Oddly, at trial the Government criticized Mr. Brannon for preparing TIAs in accordance with the Contract's requirements. The Government's criticism is unfounded because, as a matter of law, it was proper to follow the Contract. *See, e.g.*, *P.J. Dick Inc. v. Principi*, 324 F. 3d 1364, 1369 (Fed. Cir. 2003)

Pursuant to his analysis of BELL's job cost records, Mr. Brannon determined that BELL incurred extended general conditions costs of $5,641.00 per day. (PFF, ¶¶ 244-246). That rate is reasonable based not only on the underlying job cost data, but also when compared to the $7,000.00 per day figure estimated by the Government during the Project, and the incomplete calculation of the Government's accounting expert, Mr. Daigle, who admittedly understated the amount of BELL's general conditions costs. (PFF, ¶¶ 243-245). Applying the daily rate to the 284 day delay period, BELL showed that its extended general conditions due to the Government's delay totaled $1,602,053.00. (PFF, ¶ 245).

### D. BELL IS ENTITLED TO THE UNDISPUTED CONTRACT BALANCE AND PAYMENT FOR THE DISPUTED EWOS

BELL is entitled to recover the undisputed Contract balance of $563,125.00, which the Government has wrongfully withheld for well over five years. As noted above, BELL was entitled to an extension of time due to the numerous changes made by the Government. As noted below, the Government's claims for liquidated damages and backcharges are wholly unfounded and provide no justification for its prolonged withholding of the undisputed Contract balance.

Moreover, BELL is entitled to recover $1,610,987.00 for the extra work it performed pursuant to the disputed EWOs. BELL showed that it reasonably determined that the work represented in those EWOs was extra work not included in the Contract, that it performed that extra work, and that its costs are accurately reflected in its cost records. (PFF, ¶¶ 235-240). In fact, BELL showed that, with regard to several of these disputed EWOs, the Government actually reneged on

---

(because contract required a specific delay analysis to be used, the only proper way to measure delay was to use that analysis). Furthermore, in addition to employing the Contract method of determining delay, Mr. Brannon performed a Windows analysis which confirmed his findings. (PFF, ¶¶ 181-185).

the Contracting Officer's signed approval to pay. (PFF, ¶ 50).

### E. THE GOVERNMENT IMPOSED LIQUIDATED DAMAGES AND BACKCHARGES AS A REPRISAL FOR BELL SEEKING AN EQUITABLE ADJUSTMENT

After Mod. 93 was agreed to, the Government's internal contemporaneous records show that it expressly understood that BELL would be unable to meet the interim completion milestones if changes continued to be made. (PFF, ¶ 40). Thus, in its internal correspondence, the Government repeatedly stated that it was incumbent on it to stop making changes. (PFF, ¶¶ 41-42). The Government, however, proceeded to issue hundreds of changes after Mod. 93 which delayed the Project. (PFF, ¶ 43).

Contrary to the "PARTNERING" provision that it included in the Contract, the Government did not have "Open Communications" with BELL about the changes. Rather, at the same time it was telling NIH personnel that no more changes could be made because they would delay the Project, the Government was directing BELL to do the impossible, *i.e.*, implement the changes without any impact to the schedule. Adding insult to injury, the Government also reneged on the agreement it made during the Partnering Meeting to pay BELL acceleration for changed work.

The testimony of the Government's trial representative, Mr. Temme, showed that the Government's tactics towards BELL were not only outside the bounds of the Contract, but were in fact duplicitous. Mr. Temme testified that a lawyer in the NIH's Office of General Counsel directed that liquidated damages be assessed in retaliation against BELL for submitting a REA. (PFF, ¶ 234). Mr. Temme further testified that the Government had determined years ago that it had no valid backcharges against BELL, but that it maintained its backcharges claim as a strategy for negotiating BELL's REA. (*Id*.). Presumably the Government's cognizance of Mr. Temme's testimony was why

it did not even attempt to present any evidence to support the backcharges that it has wrongfully asserted against BELL since July 1, 2002.

Even without these disturbing facts, the Government's liquidated damages claim is unfounded. Each of the interim milestones established by Mod. 93 had an individual critical path. Therefore, each interim milestone had to be analyzed to determine whether there was excusable delay that would preclude the assessment of liquidated damages for failing to meet a particular milestone. It is undisputed that the Government's expert, Mr. Scott, failed to analyze the critical path for each milestone and failed to determine whether there was excusable delay with regard to any of the interim milestones. (PFF, ¶¶202-204). Conversely, BELL's expert, Mr. Brannon, did analyze the critical paths for the interim milestones and determined that Government-caused delay arising from a host of changes excused BELL from not achieving the milestones. (PFF, ¶ 200).

### F. SUBCONTRACTORS' CLAIMS

BELL's subcontractors seek recovery of the following amounts:

- Stromberg: $812,092.00 (Ptf. Ex. 1075B).
- Young: $480,000.00[37]
- Manganaro: $168,061.00 (Ptf. Ex. 70).
- ISEC: $124,552.00 (Ptf. Ex. 69).
- NLP: $105,647 (Ptf. Exs. 914, 915 and 915A-I) .

Total Subcontractor Claims: $1,690,352.

[37] During the trial, BELL reached an agreement with Young to liquidate its claims against the Government and assign them to BELL. BELL paid Young $480,000.00 for the liquidation and assignment. BELL seeks recovery only for the liquidation amount it paid Young, *i.e.*, $480,000.00. Attached as Appendix B is a copy of the agreement between BELL and Young.

**(1) STROMBERG'S CLAIMS**

Through the testimony of its witnesses and supporting documentation, Stromberg presented a detailed measured mile analysis to support its inefficiency claim. (PFF, ¶¶ 72-77). The measured mile is a widely accepted method of quantifying productivity. *See* J.Wickwire, T. Driscoll and S. Hurlbut, *Construction Scheduling: Preparation, Liability, and Claims*, § 10.15 (1991). "The measured mile approach compares the productivity of an impacted period of the project with the productivity of an unimpacted period." *Advanced Eng'g & Planning Corp., Inc.*, 05-1 BCA ¶ 32,806 (2004), *citing*, *U.S. Indus., Inc. v. Blake Constr. Co.*, 671 F. 2d 539, 547 (D.C. Cir. 1982) (noting that the "comparison of the cost of performing work in different periods is a well-established method of proving damages.").

Stromberg's measured mile analysis showed that, due the Government's changes, its sheet metal field production ratio fell from 11.23 lbs. per manhour during the unaffected period, to 5.95 lbs. of duct installed per manhour during the impacted period. (PFF. ¶¶ 73-76). Due solely to the change work Stromberg performed on the second, third, fifth and sixth floors, Stromberg incurred inefficiency costs due to the Government's changes of $812,092. (PFF, ¶ 77). The Government failed to provide any evidence to refute Stromberg's loss.

## VI. CONCLUSION

Based on the evidence adduced at trial, BELL respectfully requests that the Court render judgment in its favor finding that the Government breached the Contract and awarding BELL damages of at least the following amounts:

(1) Damages of $563,125, for the undisputed Contract balance;

(2) Damages of $1,610,987, for the disputed EWOs;

(3) Damages of $1,602,053, for extended general conditions costs and a corresponding Contract time extension of 248 days;

(4) Damages of $2,058,456, for inefficiency costs;

(5) Damages of $366,051, for a 10% profit on the extended general conditions costs and inefficiency costs;

(6) Prejudgment interest of 6% (in the amount of $1,019.29 a day) from April 5, 2002; and

(7) Such other relief that the Court deems just and proper.

In addition, with regard to the subcontractor claims, BELL respectfully requests that the Court award damages for Stromberg in the amount of $812,092; for Young in the amount of $480,000; for Manganaro in the amount of $168,061; for ISEC in the amount of $124,552, and for NLP in the amount of $105,647. In addition, BELL requests that the Court also award prejudgment interest on these claims in the amount of 6% from April 5, 2002.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

Dated: December 31, 2007

s/ Richard O. Wolf
Richard O. Wolf
Charlie C.H. Lee
Robert D. Windus
Kristen A. Bennett
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of December, 2007, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

s/ Richard O. Wolf