No. 03-1613C
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

BELL BCI COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S OPENING POST-TRIAL BRIEF**

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

KYLE CHADWICK
Senior Trial Counsel
JOAN STENTIFORD-ULMER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-0476
Fax: (202) 305-7466

Attorneys for Defendant

December 31, 2007

TABLE OF CONTENTS

STATEMENT OF ISSUES ADDRESSED. ........ 1

PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT. ........ 2

PROPOSED FINDINGS OF FACT. ........ 4

I. Erroneous Lead-Off Testimony Of Thomas Bell. ........ 5

II. Modifications Partially Extinguishing Delay And Disruption Claims. ........ 11

III. The Nature Of The Contract Work. ........ 11

IV. The Addition Of The New Fourth Floor. ........ 16

V. Bell's Schedules And Missed Milestones. ........ 17

VI. Fatal Flaws In Bell's Delay And Disruption Analyses. ........ 20

ARGUMENT. ........ 24

I. Bell's Unexcused Failures To Meet 13 Completion Milestones Entitle The Government To Liquidated Damages. ........ 24

II. The Contract Was Not Cardinally Changed. ........ 28

III. Bell And Its Subcontractors Did Not Demonstrate Compensable Disruption. ........ 30

IV. Bell's Contentions Concerning "Disputed EWOs" Remain Unclear . ........ 33

CONCLUSION. ........ 34

TABLE OF AUTHORITIES

CASES

AT&T Communics., Inc. v. WilTel, Inc.,
1 F.3d 1201 (Fed. Cir. 1993)........ 29

Blinderman Constr. Co. v. United States,
695 F.2d 552 (Fed. Cir. 1982)........ 28

Cannon Constr. Co. v. United States,
162 Ct. Cl. 94, 319 F.2d 173 (1963). ........ 30

Central Ohio Bldg. Co.,
PSBCA No. 2742, 92-1 BCA ¶ 24,399........ 24, 25

Dean Constr. Co. v. United States,
188 Ct. Cl. 62, 411 F.2d 1238 (1969). ........ 25

Green Mgmt. Corp. v. United States,
42 Fed. Cl. 411 (1998). ........ 30

Holloway Constr. Co. v. United States,
18 Cl. Ct. 326 (1989). ........ 31

Interstate Gen. Gov't Contrs., Inc. v. West,
12 F.3d 1053 (Fed. Cir. 1993)........ 26

John T. Jones Constr. Co.,
ASBCA No. 48,303, 98-2 BCA ¶ 29,892. ........ 27

Luria Bros. & Co. v. United States,
177 Ct. Cl. 676, 696, 369 F.2d 701 (1966). ........ .30

Merritt-Chapman & Scott Corp. v. United States,
208 Ct. Cl. 639, 528 F.2d 1392 (1976). ........ 27

Morganti Natl., Inc. v. United States,
49 Fed. Cl. 110 (2001), aff'd mem. (Fed. Cir. 2002). ........ 25, 28

Orlosky, Inc. v. United States,
68 Fed. Cl. 296 (2005) . ........ 33

PCL Constr. Servs., Inc. v. United States,
47 Fed. Cl. 745 (2000). ........ 27, 28

PCL Constr. Servs., Inc. v. United States,
53 Fed. Cl. 479 (2002), aff'd mem. (Fed. Cir. 2004). .................................................. . 25

River Equip. Co., Inc.,
ENG BCA No. 6042, 94-3 BCA ¶ 26,996. ................................................................ 30

Sauer Inc. v. Danzig,
224 F.3d 1340, 1347 (Fed. Cir. 2000)........................................................... 24, 25, 28

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002) (en banc)................................................................ 30

Seeds & Derham v. United States,
92 Ct. Cl. 97 (1941). ............................................................................................ 30

Servidone Constr. Corp. v. United States,
931 F.2d 860 (Fed. Cir. 1991)........................................................................ 31, 33

Sunshine Constr. & Eng'g, Inc. v. United States,
64 Fed. Cl. 346 (2005). ........................................................................................ 26

Titan Pac. Constr. Corp. v. United States,
17 Cl. Ct. 630 (1989), aff'd, 899 F.2d 1227 (Fed. Cir. 1990)......................................... 26

Transtechnology Corp. v. United States,
22 Cl. Ct. 349 (1990). .......................................................................................... 30

William F. Klingensmith, Inc. v. United States,
731 F.2d 805 (Fed. Cir. 1984)................................................................................ 25

Wilner v. United States,
24 F.3d 1397 (Fed. Cir.1994) (en banc)................................................................... 25

Wunderlich Constr. Co. v. United States,
173 Ct. Cl. 180, 351 F.2d 956 (1965). ..................................................................... 30

REGULATIONS

FAR 52.211-12 (April 1984). ............................................................................................ 14

FAR 52.232-5 (April 1989) . ............................................................................................ 15

MISCELLANEOUS

R.M. Jones, Lost Productivity: Claims for the Cumulative Impact of Multiple Change Orders, 31 Pub. Cont. L.J. 1, 4 (2001)........................................................................................... 8

R.W. Wax & W.P. Farneth, Basic Analysis For Delay And Disruption Claims, Constr. Briefings No. 2005-12. ........................................................................................ 21

The Cumulative Impact of Multiple Changes, 18 Constr. Cl. Monthly 1, 7 (May 1996) ............. 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BELL BCI COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1613C |
| | ) | (Judge Wheeler) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPENING POST-TRIAL BRIEF

Pursuant to the Court's order dated October 22, 2007, defendant, the United States, respectfully submits this opening brief concerning the trial in this matter that the Court heard from October 15 through 22, 2007.

## STATEMENT OF ISSUES ADDRESSED

1. Whether the contract entitles the United States to liquidated damages for the failure of plaintiff, Bell BCI Company ("Bell"), to meet 13 of the 14 completion milestones and, if so, in what amount.

2. Whether a comparison of (i) the completed Louis Stokes Laboratories, Building 50, at the National Institutes of Health ("NIH") campus in Bethesda, Maryland, and (ii) the planned Building 50, as reflected in the contract award documents and the contract modifications to add a new fourth floor, establishes that NIH made a "cardinal change" to the contract.

3. Whether Bell can point to any supposed breaches or changes by NIH that were not resolved by accord and satisfaction and, if so, what are plaintiff's damages.

4. Whether Bell, or the subcontractor pass-through claimants, established at trial that specific Government actions caused them to experience specific, uncompensated inefficiencies or delays and, if so, what are the damages.

PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT

We predicted in our opening statement that Bell would present "a flood of largely irrelevant information" at trial. Tr. 195:20 (Chadwick). We were correct. It was often difficult for us at trial, and it remains so in the transcript, to discern exactly what plaintiff believed it was establishing in relation to the Government's entitlement to liquidated damages, or our liability.

For example, despite much testimony by plaintiff's witnesses concerning directives issued by NIH to proceed with changes "without impact to the project schedule," Bell's construction manager, Jeremy Bardin, acknowledged on cross-examination that the agency "had a contractual right to do that," Tr. 417:2-13 (Bardin); and the gist of much of the rest of Mr. Bardin's testimony seemed to be that the NIH personnel were tough negotiators, and that he regrets that plaintiff signed certain contract modifications. E.g., Tr. 331:10-17, 391:20 – 392:6, 399:3-11 (identifying bilateral modification, without reservation, PX 843, for "fish room" work discussed on direct examination, Tr. 350:19 – 352:20), 418:8-25, 425:7-20, 436:18 – 437:2, 492:25 – 493:21, 494:20-22 ("The government was refusing to pay . . . overtime. This [letter] was a cry for help.") (all Bardin testimony).

Our primary focus here, as at trial, is upon the material elements of Bell's claims for relief. Bell seeks relief from liquidated damages assessed by the contracting officer in 2002 (as well as relief from credits and other offsets we did not pursue at trial); an unpaid contract balance of $563,125 (which we do not dispute); $1,610,987 for "unresolved changes"; and it seeks a total of $4,026,560, including profit, for delay and disruption. It is unclear, as discussed below, whether or, if so, how Bell's allegation of cardinal change, which it did not mention in its

opening statement, relates to these claimed amounts. There are also subcontractor pass-through claims, which were addressed in more or less cursory fashion at trial.

Bell failed to prove entitlement to relief from liquidated damages, much less to affirmative damages for delay, because the "theoretical entitlement" methodology used by its testifying expert, Patrick W. Brannon, has been found legally inadequate for those purposes. This "prospective" approach to schedule delay cannot be used to determine or apportion responsibility for specific days of critical path delay, as actually experienced on a project. Accordingly, the trial evidence, cited below, of Bell's dates of actual substantial completion of the contract milestones, suffices to establish our entitlement to liquidated damages of $447,678. Bell's subcontractors did not present probative evidence of entitlement for damages to Government-caused delay, independent of delays attributable to Bell or the subcontractors.

It is unclear whether Bell attempted to do so, but, in any event, it did not demonstrate at trial that the differences between Building 50 as depicted in the original contract and Building 50 as constructed amount to a cardinal, i.e., a "drastic" and "fundamental," change in the contract work. Changes made to the new fourth floor, between the floor's original design in early 1999, when it was added to the contract work, and its completion in 2001, are not drastic and, equally or more important, primarily affected one floor of a multi-story project.

Bell and it subcontractors presented only general and conclusory assertions relating to costs attributable to Government-caused disruption and inefficiency. Pursuant to precedent, it is not enough to allege, in general terms, that the volume of contract changes issued by the Government is to blame, or partly to blame, for inefficiencies experienced on the job. Inefficiency can have many causes – many of which, such as complex work, confined spaces, and

stacking of trades, were expected from the beginning to arise during the Building 50 project. Plaintiffs are required to correlate specific actions by the Government with specific losses of efficiency, in specific activities, at specific times. That was not done here. Mr. Brannon's inefficiency factor is an outright guess, and the subcontractors' evidence, while arguably somewhat more substantive, simply indicates there was inefficiency, not that the Government was the principal or direct cause, as must be proven in order to recover damages.

Assuming, for the sake of argument, that Bell could recover damages for disruption, neither it nor its subcontractors should recover for disruption attributable to work covered by any bilateral contract modification – including, but by no means limited to, modification number 93, signed in October 2000 – that includes the release set forth in modification 93, and no express reservation of rights to bring a subsequent disruption claim based upon the modification. The inability of Bell's expert to properly segregate the effects of work covered by these modifications, from the claimed damages, is an independent reason Bell cannot recover.

Finally, because, with one exception, we still do not know, after trial, just what Bell may wish to argue with respect to the approximately $1.6 million in outstanding change order requests, we must, to a great extent, respectfully await those arguments in Bell's opening brief and respond in our next brief, as appropriate.

PROPOSED FINDINGS OF FACT

We respectfully incorporate by reference the parties' joint stipulation of facts, filed on July 6, 2007. We anticipate responding, as appropriate, to Bell's post-trial proposed findings in our response brief, due on or before January 22, 2008.

I. Erroneous Lead-Off Testimony Of Thomas Bell

1.1. It is telling, given the emphasis that Bell placed upon this testimony both before and at trial, e.g., Tr. 176:15-17 (Wolf), to focus upon the misstatements and distortions of fact in the videotaped testimony of plaintiff's chief executive officer and lead witness, Thomas Bell, who was deposed de bene esse at plaintiff's Rochester, New York, headquarters in early September 2007, Tr. 210:16, 243:3-10 (Bell), and for whose testimony the trial was postponed for more than two months at plaintiff's request. Several of the errors that mar plaintiff's case were on display immediately.

1.2. At times, Mr. Bell may only have exaggerated. He testified, for example, that Bell "didn't get design documents" for the new fourth floor "for several months" after Bell received the "feasibility study" by HLM Design in late 1998. Tr. 223:7-15 (Bell); see PX 13 (dated January 8, 1999). In fact, NIH supplied Bell with initial, "not for construction" structural drawings for the new floor in mid-March 1999, PX 27 at 2, just two months after Bell had provided NIH with its informal pricing proposal, PX 16; and the agency provided construction-ready structural drawings on March 29, 1999. PX 27; Tr. 389:1-17 (Bardin). Mr. Bardin, on cross-examination, reversed Mr. Bell's version of events and asserted that "the Government immediately came out with additional drawings" in early 1999. Tr. 388:11-16 (Bardin).

1.3. Other testimony by Mr. Bell is not exaggerated but false. He testified categorically, for example, that plaintiff never "took exception" to release language included by NIH in any modification executed before approximately the Fall of 2001, because, he said, plaintiff allegedly did not realize until then that it might have a "cumulative impact" claim. He testified that plaintiff realized the possibility of such a claim "very late in the job, and I can't say if it was right

after [modification] 93 or shortly after, but I know there was a point in time where we started taking exception to the [release] language because we knew we were heading for trouble." Tr. 264:21 - 265:7 (Bell) (emphasis added); see also Tr. 255:21 - 256:9 (Bell) ("Q. . . . Why did you take exception after Mod. 93? A. Because we started to feel impact. . . . Q. To your recollection, when you began to feel the cumulative impact you began to take exception to the language in the mods? A. I would say that's correct.").

1.4. This testimony is disproved by, among other evidence, modifications 80 (PX 787 at 1-2), 81 (PX 788 at 1-2), 82 (PX 789 at 1-2), 83 (PX 790 at 1-2), 84 (PX 791 at 1-2), and 86 (PX 793 at 1-2) – each of which Mr. Bell himself signed between August 1 and September 1, 2000, that is, more than one month before the signing of modification 93. PX 800 at 1. In the final paragraphs of modifications 80-84 and 86, in 2000, plaintiff, through Mr. Bell, was already including the sentence, "This agreement does not affect the Contractor's right for [sic] damages due to any delays or disruptions that may have occurred." This sentence is obviously a reservation of, among other things, a cumulative impact claim.

1.5. Moreover, except for plaintiff's subsequent change of the words "for damages" to "to damages," and the addition of the words "as a result of this work" to the end, this is exactly the same sentence that plaintiff's construction manager, Jeremy Bardin, initially attempted to write into modification 111 in February 2001 (but later struck out and voided), PX 818 at 2, and that he began typing into some modifications, beginning with number 142, in September 2001 – when, according to Mr. Bardin's and Mr. Bell's revisionist testimony, plaintiff "began reserving its rights." Tr. 264:21 - 265:7 (Bell), 401:14 - 402:10 (Bardin); PX 849 at 2 (after ¶ 3); see also PX 851 at 2; 852 at 2. Bell cannot plausibly claim that it intended this sentence to mean something in modification 142, that the sentence did not mean in modifications 80-84 or 86.

1.6. The truth, therefore, is that plaintiff understood the desirability of, and the contractual mechanism for, reserving cumulative "disruption" claims – and had done so – before it signed modification 93, and more than a year before it inserted its reservation sentence into modification 142, in September 2001. PX 849 at 2; see Tr. 501:8-16 (Bardin). The absence of the reservation from modification 93, therefore, is meaningful.

1.7. Mr. Bell testified that when the parties were negotiating modification 93 in August 2000, plaintiff (i) knew, in principle, what a "cumulative impact" claim is, but (ii) had no information to support such a claim and (iii) "wa[sn]'t anticipat[ing] new costs" that it might claim under the heading of cumulative impact. Tr. 248:16-21, 249:18 - 250:16, 266:14-15 (Bell). Similarly, Mr. Bardin testified that Bell "had no idea of any [cumulative] impacts at th[e] time" of modification 93. Tr. 315:2 (Bardin).

1.8. Testimony by both Mr. Bardin and Mr. Brannon, however, establishes that Mr. Bardin and, had he so desired, Mr. Bell, both had at their fingertips in August 2000 cost data showing that plaintiff began experiencing escalating inefficiencies (the cause or causes of which are unproven) in late 1999 and early 2000. See Tr. 272:11 - 275:7 (Bardin) (describing, inter alia, his setting up of job cost system, including predicted inefficiency factors), 466:15-25 (Bardin), 484:9-22 (Bardin), 775:4 - 779:16 (Brannon) (describing productivity graph and confirming that Mr. Bardin continuously "had access" to the same data); PX 15 (dem. slide 49).

1.9. Mr. Brannon testified that plaintiff's job cost records show that its ratio of earned to unearned labor began to worsen, "particularly starting in mid 2000," Tr. 747:12-13 (Brannon) – as a result, he opined, of "the cumulative impact of the continuing mounting changes on the project." Tr. 780:4-16 (Brannon). Contrary to Mr. Bell's testimony, therefore, plaintiff

possessed in October 2000, when it signed modification 93, the same type of cost information, at the same level of detail, upon which it now bases its unproven allegations of "cumulative impact." Tr. 775:4 - 779:16 (Brannon); see also Tr. 628:10-23 (testifying only that Bell would not have seen cumulative impact, in late 2000, of "unknown change[s] . . . sometime in the future") (Brannon) (emphasis added). Plaintiff could see by late 2000 much of the supposed evidence of "impact" upon which it relied at trial.

1.10. Accordingly, plaintiff had every reason to know in October 2000 that, as a legal and factual matter, signing a modification without an applicable reservation of rights would release a possible cumulative impact claim. See also R.M. Jones, Lost Productivity: Claims for the Cumulative Impact of Multiple Change Orders, 31 Pub. Cont. L.J. 1, 4 (2001) ("In order to avoid prospectively relinquishing any rights to an impact claim, the current trend requires contractors to include an express reservation . . . . [C]ourts and boards . . . have regularly upheld express releases and contract language to the effect that all executed change orders act as a full and final settlement of all impacts arising out of each change order, whether the claim is known or unknown."); The Cumulative Impact of Multiple Changes, 18 Constr. Cl. Monthly 1, 7 (May 1996) ("[P]rudence dictates that contractors expressly reserve the right to such a claim when signing off on change orders.").

1.11. Mr. Bell also erroneously testified that the extent of changes by the Government on this project was "in the 50 percent range," which he clarified on cross-examination meant that the original contract price increased by approximately 50 percent. Tr. 241:17 - 242:5 (changes were "off the scale"), 254:13 - 255:1 (Bell). In truth, however, even if all changes relating to the

mutually agreed addition of the new fourth floor are included in this total, the contract price increased by approximately 34 percent. Tr. 758:22 - 759:1 (Brannon).

1.12. More relevantly, changes to the base contract work, exclusive of the added floor – but including the "kit of parts" changes to all of the other floors, which were provided for in advance by the "kit of parts" section of the contract, PX 5 at 04197-98 – increased the contract price by just 14 percent, or less than one-seventh. Less than half of that amount, moreover, post-dates modification 93, in which NIH paid for substantially all changes issued through August 2000. Tr. 759:2-13, 762:20-23, 773:15 - 774:3 (Brannon); see PX 800 at 2 (¶ 4). An increase of less than seven percent during more than a year of work after modification 93 utterly fails to support plaintiff's allegation of a "barrage of changes." Tr. 230:6 (Bell).

1.13. Mr. Bell testified without foundation that, during some unspecified period, NIH was issuing "changes at [an] average of two a day." Tr. 231:13-24 (Bell) (defining cumulative impact claims), 257:13 (Bell) ("two changes a day"). Equally without foundation, Mr. Bardin testified, "I think at one point it was 2.5 changes . . . per work day." Tr. 333:25 – 334:1 (Bardin).

1.14. In fact, the maximum number of extra work orders ("EWOs") generated by Bell during any month was 24 – i.e., an average of approximately one per work day – and in most months, there were several days on which Bell wrote no change orders. Tr. 764:21 - 765:19 (Brannon); PX 15 (dem. slide 34).

1.15. In addition to being legally irrelevant, Mr. Bell's testimony that "the first time [NIH] ever c[a]me back and said they would hold liquidated damages against us was when we turned in our REA [request for equitable adjustment in July 2002], or . . . when they knew it was

coming. They never told us they were going to hold liquidated damages," Tr. 265:11-16 (Bell), is, at best, incomplete and misleading.

1.16. Although she did not state an amount, the contracting officer reminded plaintiff of the applicability of liquidated damages in her January 3, 2001 letter noting plaintiff's failure to meet the second completion milestone (basement vivarium, the first milestone Bell missed). See PX 48 at 1 (reference block cites January 3 letter), 2 (¶ 4). And as early as February 2001, Mr. Bardin was complaining to NIH that "[t]he Government has continually stated that all rights to liquidated damages, termination and withholding of payments are reserved." PX 48 at 2 (¶ 4) (emphasis added); Tr. 402:20 – 403:7, 432:5 – 433:10 (Bardin) (". . . Q. So it wasn't true that you didn't hear about liquidated damages until you submitted the REA, right? A. That's correct."), see also Tr. 342:14-18 (Bardin), 976:18 – 978:15 (Temme).

1.17. Mr. Bell was asked in general terms on direct examination about plaintiff's conclusory summary of damages, PX 686, but revealed only a superficial understanding of it. Like plaintiff's other witnesses, he could point to no documentation of the actual costs of extra or unproductive work allegedly performed by plaintiff's subcontractors, upon whose behalf plaintiff seeks to recover in this case. Tr. 259:24 - 262:15 (Bell). He testified on cross-examination that some of the damages claimed by subcontractors "would be a liability . . . on [plaintiff's] balance sheet," but he could not explain why extra costs allegedly incurred by plaintiff's subcontractors are not shown in plaintiff's job cost records as job costs billed to it as the prime contractor. Tr. 261:18 - 262:11 (Bell); cf. Tr. 476:23 – 477:23, 481:10-17 (Bardin), 787:6 – 789:24, 795:2-25 (Brannon) (plaintiff's claims do not reconcile with "cost to complete" in job costs).

## II. Modifications Partially Extinguishing Delay And Disruption Claims

2.1. The remainder of these proposed findings, in sections II through VI below, track our July 6, 2007 statement of contested factual issues. Paragraph numbers from that document are shown in brackets below. Within the paragraphs in which the bracketed paragraph numbers from our prior filing appear, where we provide citations to the trial evidence, or where we have condensed, added to, or deleted material from our pretrial filing, the new material is also in brackets. Paragraphs below for which no prior paragraph numbers are shown in brackets are substantially new.

2.2. [Paragraphs 1.2 through 1.49 of our July 2007 filing briefly described contract modifications 93 through 140 (the latest of which was number 139, signed by Bell on April 3, 2001).] The final paragraph of each of those modifications states:

> The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to the Modification.

[PX 800 at 2 (¶ 4); PX 801 at 2 (¶ 3); PX 802 at 2 (¶ 3); PX 803 at 2 (¶ 3); PX 804 at 2 (¶ 3); PX 805 at 2 (¶ 3); PX 806 at 2 (¶ 3); PX 807 at 2 (¶ 3); PX 808 at 2 (¶ 3); PX 809 at 2 (¶ 3); PX 810 at 2 (¶ 3); PX 811 at 2 (¶ 3); PX 812 at 2 (¶ 3); PX 813 at 2 (¶ 3); PX 814 at 2 (¶ 3); PX 815 at 2 (¶ 3); PX 816 at 2 (¶ 3); PX 817 at 2 (¶ 3); PX 818 at 2 (¶ 3); PX 819 at 2 (¶ 3); PX 820 at 2 (¶ 3); PX 821 at 2 (¶ 3); PX 822 at 2 (¶ 3); PX 823 at 2 (¶ 3); PX 824 at 2 (¶ 3); PX 825 at 2 (¶ 3); PX 826 at 2 (¶ 3); PX 827 at 2 (¶ 3); PX 828 at 2 (¶ 3); PX 829 at 2 (¶ 3); PX 830 at 2 (¶ 3); PX 831 at 2 (¶ 3); PX 832 at 2 (¶ 3); PX 833 at 2 (¶ 3); PX 834 at 2 (¶ 3); PX 835 at 2

(¶ 3); PX 836 at 2 (¶ 3); PX 837 at 2 (¶ 3); PX 838 at 2; PX 839 at 2 (¶ 3); PX 840 at 2 (¶ 3); PX 841 at 2 (¶ 3); PX 842 at 2 (¶ 3); PX 843 at 2 (¶ 3); PX 844 at 2 (¶ 3); PX 845 at 2 (¶ 3); PX 846 at 2 (¶ 3); PX 847 at 2 (¶ 3); PX 848 at 2 (¶ 3).]

III. The Nature Of The Contract Work

3.1. [2.1.] The NIH Building 50 project was clearly complex. The statement of work in the solicitation warned potential bidders:

> The work of this Contract is complicated by . . . [t]he volume and complexity of the work: The Project is a large medical facility. Facilities of this type are by nature technically complex. They include varied and non-conventional finishes and extremely complex mechanical and electrical systems, which result in very "dense" construction. This dense construction in a high density of skilled trades working in a relatively small space; hence the need for extremely effective coordination scheduling. [This . . . project is especially complex due to the following innovative features:
>
> - Post-tensioned concrete superstructure
> - Variable-Air Volume HVAC System, including fume hoods
> - Energy conservation heat wheels
> - Interstitial levels . . . ]

[PX 5 at 4200-01 (§ C.1.i).] Later, the statement of work advised that a variety of "factors conspire to make for a relatively complex project which will require a Contractor thoroughly experienced with large scale underground construction projects and [that it] be extremely well organized and responsive to change." (Emphasis added.) [PX 5 at 4201 (§ iii).]

3.2. Based upon the contract, therefore, Bell knew before it began work that multiple factors that are recognized in the construction industry as tending to contribute to labor inefficiencies were likely or certain to be present at this project – including stacking of trades, concurrent operations, and factors related to the necessity to be "extremely . . . responsive to

change." See DX 17, app. B at 1-4 (Bell facsimile with copy of "MCA" inefficiency factors, including "stacking of trades," "concurrent operations," "dilution of supervision," "site access," and "ripple"); PX 683 at 1-2 (same factors); see also PX 1 at 2("The site is bounded on two sides by concurrent construction . . . .").

3.3. Accordingly, that labor efficiency allegedly declined, beginning in 1999, as, among other things, more subcontractors arrived and work spaces became increasingly enclosed and overlapping, e.g., Tr. 855:10 – 860:5 (Bussey), 875:4 – 876:12 (Engle), is neither surprising nor prima facie evidence of Government-caused disruption. Cf. Tr. 301:6-25 (Bardin) ("just a few trades" were on site in early 1999; "manpower was at the very beginning of the[] ramp-up").

3.4. [2.2.] Section H of the contract, as awarded, state[s], in part:

> [Time Extension:
>
> (g) When the contractor submits a change proposal without including a corresponding Time Impact Analysis . . ., the Contractor acknowledges that the particular change order, modifications, delay or Contract request does not require an extension of the contract time (or milestone) and the Contractor shall not thereafter be entitled to request or receive any such extension(s).
>
> Delay and Impact Costs:
>
> (h) Any proposal for delay and impact costs that is not submitted within 60 days after completion of the work identified in the change will not be considered. This requirement is in addition to the scheduling updates required for construction of the project. If there are circumstances which prevent the contractor from ascertaining delay for impact during this time, a status update, including but not limited to a critical path analysis, shall be submitted within this time and at 60 day intervals thereafter, explaining why the contractor cannot yet know the extent of the impact. If this is not done, a claim for delay will not be considered unless special circumstances are shown. This requirement is

> necessary to enable the government to respond to any claims for delay in light of conditions then current conditions.]

[PX 5 at 4231-32 (emphasis added); see also PX 6 at 210-11 (§ 7.01).]

3.5. Bell submitted no time impact analyses ("TIAs") with any EWOs after it signed modification 93 in October 2000. Tr. 252:13-21 (Bell). Accordingly, Bell admits that NIH "ha[d] a contractual right to" direct Bell to proceed with post-modification 93 EWOs without affecting the schedule. 417:2-13 (Bardin).

3.6. The contract's liquidated damages clause, FAR 52.211-12 (April 1984), provided in relevant part: "If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages . . . $3,721.00 . . . for each day of delay." PX 5 at 4204 (§ F.2(a)). Modification 93, signed in October 2000, established 14 substantial completion milestones and revised the liquidated damages clause "to reflect liquidated damages of ($3,721/14 =) $266 for each calendar day of delay to [any] . . . milestone[.]" PX 800 at 2 (¶¶ 2, 3).

3.7. [2.3.] The task of the testing and balancing representative retained by NIH, Weisman Inc. ("Weisman"), was to work with Bell to ensure that the systems were properly tested, adjusted, and balanced, and that the air flow measuring and control elements were properly calibrated. [PX 5 at 4243 (§ N), 4252 (§ IV.C); see Tr. 535:19-22 (Rothrock), 974:15 – 975:3 (Temme).]

3.8. [2.4.] [NIH's construction quality manager, and "eyes and ears" on the project, CRSS Constructors, Inc., which was acquired by Jacobs Facilities, Inc. ("CRSS/Jacobs"),] also retained a "commissioning authority," Facility Dynamics, to ensure that the systems, equipment,

and interfaces were properly installed and tested. [PX 5 at 4242 (§ E), 4246-47 (§ F); Tr. 974:15 – 975:3 (Temme).]

3.9. [2.5.] To determine Bell's monthly compensation, [an inspector] would perform a walk-through of the construction site with Bell and agree to progress achieved for each activity. Bell would then input the agreed upon progress into the schedule update and submit it for approval. Because the schedule was cost loaded, the progress achieved during each schedule update would determine how much Bell was paid for the time period. [See FAR 52.232-5 (April 1989); PX 6 at 208-10 (§§ 5.01-.02).] This process ensured that the schedule updates accurately reflected the progress achieved to date, and an agreed plan for completing the remaining work. Bell and NIH could then use the schedule to identify potential delays and/or problems, and their estimated impact on performance and the Project completion date. [PX 6 at 210 (Part 6).] In addition, Bell could identify alternatives for possible schedule recovery to mitigate potential delay and/or cost increases. [PX 5 at 4215-16 (§ b).]

3.10. Plaintiff's testifying expert, Mr. Brannon, believed, based upon hearsay, that the project schedule was not consistently cost loaded, and that NIH sometimes directed that tasks remain shown as 99 percent complete, only for payment reasons. Tr. 646:12-24 (Brannon). That is incorrect. Tr. 992:20 – 923:9 (Temme).

3.11. [2.6.] Before an area was deemed ready to be commissioned, the contract required Bell to complete and inspect the installation of systems and equipment as detailed throughout the contract documents. [See PX 5 at 4246 (§ E), 4248 (§ E).] Bell would then start, adjust, and test the mechanical equipment and systems prior to verification and performance testing. [See PX 5 at 4246 (§ E), (4249 -50 (§ H), 4252 (§ C); PX 6 at 15950-5 (§ 3.6).] [. . . ]

3.12. [2.7.] Weisman would then validate the installation of the mechanical systems and equipment. This would also include certain interior finishes and mechanical, electrical, and plumbing ("MEP") trim-out items, such as ceiling tile, variable air volume ("VAV") boxes, and diffusers, which are necessary for testing and balancing. The contract required Bell to remedy any deficiencies identified. [PX 5 at 4246 (§ E), 4248 (§ E).; see, e.g., DX 143A at 11220 (Stromberg Metal Works daily report for 2/5/01: "completing Wei[sm]an TAB punchlist").] Weisman would then perform the testing and balancing for each floor and area. Upon completion of this process, a floor [could be] deemed substantially complete. [See PX 6 at 15950-5 (§ 3.6).]

3.13. [2.8.] Although Bell's Schedule Update [for] December 31, 1998, indicated that the Project was ahead of schedule, [Brian Temme, CRSS/Jacobs's project manager for the Government, had already observed, and had discussed with Mr. Bardin, that "Bell was really falling behind almost from the get go . . . . [B]ecause [Bell] could never get as much [work] in place as they were supposed to . . ., they were basically adjusting [the schedule for] future activities so that they wouldn't be falling behind in that sense." Tr. 934:15 – 936:5 (Temme).]

IV. The Addition Of The New Fourth Floor

4.1. [2.9.] When NIH requested a [price] for adding a new fourth floor in December 1998, Bell was very interested in the additional work. NIH did not need to persuade Bell to cooperate. [Tr. 244:14 – 245:1 (Bell); 1210:7-13 (Kutlak).]

4.2. [2.10.] [Frank Kutlak, the Government's project manager, who had the idea of adding a floor to the building, spoke to Bell about it in late 1998 and early 1999, primarily through Bell's Jerry Romandino. Tr. 1210:11-21, 1211:21-23 ("the price that Jerry came back

with") (Kutlak). Mr. Romandino did not testify at trial.] NIH did not represent to Bell that the new fourth floor would replicate the third floor. The design for the third floor was used solely to develop initial price/cost estimates for the new floor, because the third floor provided the closest available approximation to the proposed fourth floor. NIH never [told Mr. Romandino or anyone else] that the third and fourth floors would in the end be identical. [Tr. 943:12 – 944:1 (Temme), 1212:16-24, 1214:1-19 (Kutlak).] Bell's allegation to that effect is irrelevant, in any event, because the changes for the new fourth floor were separately negotiated during 1999 [and 2000], based upon the actual fourth floor design and specifications. PX 712, 800; Tr. 247:1-24 (Bell).

4.3. In any event, the fourth floor was substantially as depicted in the HLM feasibility study provided to Bell. The skin of the fourth floor duplicated the skin of the other floors, as stated in the feasibility study. PX 13 at 13578; Tr. 414:1-8 (Bardin). And, consistent with the statement in the feasibility study that "[t]he interior layout of the new floor" would be "as shown in the enclosed floor plan," PX 13 at 13578, 13581, the completed floor was the same shape, and had elevators and stairwells in the same locations, as shown in the floor plan. Tr. 414:24 – 415:9 (Bardin).

4.4. Indeed, the principal difference between the completed fourth floor and the floor plan depicted in the feasibility study is that Bell fitted out only three scientific "neighborhoods" in the constructed floor, rather than the five or six (the witnesses disagree) depicted in the feasibility study. Tr. 415:17 – 416:24 (Bardin), 1214:24 – 1216:6 (Kutlak). When asked on cross-examination to point to features of the floor plan in the feasibility study that differed from the fourth floor as built, Mr. Bardin could not do so. Tr. 415:25 – 416:13 (Bardin); see

also Tr. 308:20-22 (Bardin) ("no resemblance at all except for . . . the bathroom groups, the stairwells, the infrastructure of the building") (emphasis added).

4.5. [2.11.] NIH's sole source justification dated February 10, 1999, in which NIH memorialized its decision not to solicit competitive bids to construct the new fourth floor, [PX 20,] was an internal Government document and was never shared with Bell. [See Tr. 1249:11-19 (Kutlak). (We also rely upon the absence of contrary evidence in the record.)]

V. Bell's Schedules And Missed Milestones

5.1. [3.1. Itemization of the schedule updates in plaintiff's exhibits deleted.]

5.2. [3.2. Deleted.]

5.3. [3.3.] The [actual] substantial completion dates for each milestone established in Modification 93, [PX 800 at 2,] as reflected in NIH's correspondence to Bell [and other evidence], were as follows[.] [See generally Tr. 434:20-22 (Bardin) ("Q. The [last] 13 project completion milestones were missed, right? A. To the best of my knowledge.").]

| Milestone | Substantial Completion Date |
|---|---|
| LAN Rooms | October 1, 2000 [DX 13] |
| Basement Vivarium | May 10, 2001 [DX 65] |
| Second Floor | April 11, 2001 [DX 43; PX 651 at 26, activity A00011805] |
| Elevator No. 5 | May 29, 2001 [DX 71, PX 680] |
| Basement | June 15, 2001 [DX 75] |
| Site Hardscape | December 4, 2001 [PX 680 (2/15/02 letter)] |
| Third Floor | April 10, 2001 [DX 52] |
| Fourth Floor | May 8, 2001 [DX 63] |
| Elevators 1, 2 & 3 | April 28, 2001 [See PX 680 (5/17/01 letter); DX 53 at 1-2 (4/21/01 letter notes noncompletion)] |
| All MEP Systems | September 12, 2001 [See PX 680 (10/8/01 letter)] |
| Fifth Floor | August 29, 2001 [PX 680 (8/30/01 letter); see DX 54 (7/14/01 rejection letter)] |
| Sixth Floor | August 9, 2001 [PX 680 (8/9/01 letter); but see PX 677 (unpag.), activity A00012925 (later substantial completion date)] |

| | | |
|---|---|---|
| First Floor | September 28, 2001 | [PX 18 at 1 ("Lobby" section); see DX 94] |
| Site Landscape | December 4, 2001 | [PX 680 (2/15/02 letter); see PX 677 (unpag.), activity A00010790] |

5.4. Mr. Bardin admitted in a letter to NIH dated February 20, 2001 that "[t]he reasons for" Bell's failure to meet milestones to that date "are not the responsibility of one party. . . . We realize that there are procurement delays and installation deficiencies that are not the Government's responsibility that continue to inhibit substantial completion of the project. . . . We [also] recognize that your commissioning contractor [Weisman] has been very cooperative in scheduling his work . . . ." PX 48 at 2 (paragraph after ¶ 4).

5.5. Consistent with Mr. Bardin's letter, also in February 2001, Steve Beyer, a Bell employee on the project, wrote to Manganaro Construction, a subcontractor, with a copy to Mr. Bardin, that, due to Manganaro's "fail[ure] to provide additional manpower for comebacks as agreed, . . . which Bell paid . . . for," there was incomplete work by Manganaro on every floor, affecting "production throughout the building." DX 31 at 1-4. Mr. Beyer wrote, among other things, that Manganaro's "lack of progress" on the fourth floor "will prevent other trades from complet[ing] in a timely manner," DX 31 at 3, and that "[c]ompletion of [the sixth] floor hinges on [Manganaro's] ability to complete work." DX 31 at 4; see Tr. 441:9 – 442:20 (Bardin).

5.6. Approximately two months later, on April 13, 2001 – by which time Bell had missed 11 completion milestones – William Rothrock, a Bell manager who testified at trial and reported to Mr. Bardin, Tr. 217:16-20 (Bell), 509:1-3 (Rothrock), sent a similar message to subcontractor Stromberg Metal Works, stating that Stromberg was "grossly deficient in completing [its] work" on the exhaust systems, consisting mainly of "base contract work and changes which are over 18 months old." Mr. Rothrock wrote that Stromberg's "deficiencies have already caused delays to

fume hood testing, as well as wasted efforts by Bell and its subcontractors. Stromberg will be held accountable for all costs associated with these delays . . . ." DX 49 at 1.

5.7. Stromberg, for its part, had stated in multiple March 2001 daily reports that incomplete work by another subcontractor on fourth floor fume hoods was "delaying Stromberg on completing [its] work and [Stromberg] will not be responsible for any liquidated damages." DX 143A at 11787, 11810, 11845, 11857, 11880, 11978, 11999, 12112, 12138. By contrast, there is no evidence that in April 2001, when Mr. Rothrock sent the facsimile quoted above, Stromberg's daily reports were blaming Bell, the Government, or other subcontractors for its delays or deficiencies. See DX 143A at 12232, 12318, 12555, 12578, 12595, 12656.

5.8. [3.4.] The statement in an NIH annual report issued in February 2003, that Building 50 was "completed . . . on schedule," which is quoted in paragraph 39 of the parties' statement of stipulated uncontested facts, refers to NIH's internal schedule for occupancy of the building by NIH personnel [in fiscal year 2001. PX 66 at 262. As reflected above, all of the milestones other than exterior site work were substantially complete by September 30, 2001.] The statement does not refer to Bell's schedule under the contract. [E.g., Tr. 1227:6 – 1228:9 (Kutlak) ("overall issue" of failure to enclose the building caused "significant delays" in construction); 313:15 – 314:2 (Bardin).] NIH left a "cushion" between the [construction] completion date and the planned occupancy date(s). [Tr. 953:23 – 954:9 (Temme), 1250:10-23 (Kutlak).]

VI. Fatal Flaws In Bell's Delay And Disruption Analyses

6.1. [4.1.] [. . . ] Bell achieved substantial completion of the final contract milestone[, site hardscape,] on December 4, 2001. [PX 680 (2/15/02 letter).] That was 218 calendar days past the April 30, 2001 completion date in modification 93.

6.2 [4.2.] Bell's expert, Mr. Brannon, submitted a "Time Impact Analysis" as a justification for an extension of contract time. [Mr. Brannon made reference at trial to a previously undisclosed "windows" analysis but did not present it. See Tr. 647:8-12 (Brannon). Time impact analysis using "fragnets" "establishes the projected delay from the date of the update in which the fragnet was inserted and not the actual delay." R.W. Wax & W.P. Farneth, Basic Analysis For Delay And Disruption Claims, Constr. Briefings No. 2005-12, available in Westlaw.] Mr. Brannon's application of the [TIA/fragnet] methodology and his conclusions are flawed for [reasons described here and in our argument section below].

6.3. [4.3.] Mr. Brannon attempts to change history by creating modified schedules that do not match the contemporaneous schedules used by the project management team. [Mr. Brannon cursorily denied this at trial, yet he testified no fewer than six times that the TIA/fragnet methodology is a "theoretical approach," using projected schedules, and is not a retrospective analysis of actual effects upon the critical path(s). Tr. 661:24, 663:25 – 664:1, 666:20 ("theoretical entitlement"), 702:14-15, 805:6 (answering cross-examination question about "theoretical contingencies"), 814:3; see also Tr. 674:17 (Brannon) ("explain[ing] the theory"). As Mr. Brannon testified on cross-examination, "this [analysis] is separated from what actually occurred on the project." Tr. 834:11-12 (Brannon). "Things don't happen like this. They happen differently." Tr. 836:23-24 (Brannon).]

6.4. [4.4.] Mr. Brannon's analysis is incomplete. He makes no attempt to analyze Bell's performance or concurrent delays, thereby, in effect, presuming the Government was at fault for every single delay. [E.g., Tr. 666:16-23 (Brannon) (testifying he would only look for "potential concurrency issues" if an updated schedule "[wa]s projecting completion of the milestones later

than what I had calculated as theoretical entitlement" based upon the preceding update, but "I didn't find that [here].") (emphasis added), 678:2-7 (similar); see also Tr. 825:25 – 826:4 ("A lot of these [project] activities go on concurrently . . . . So when we do these fragnets we look for activities that . . . would be anticipated to be affected by [EWOs].] (Bell's failure to address or disprove concurrent delay at trial will independently preclude any award of delay damages.)

6.5. [4.5. Deleted.]

6.6. The remainder of these proposed findings replace numbers 4.6 through 4.25 in our pretrial statement of contested facts, to conform to Mr. Brannon's testimony at trial.

6.7. Given the fundamental inability of Mr. Brannon's TIA/fragnet methodology to establish actual, rather than theoretical, excusable delay, we can briefly summarize the factual flaws in his testimony concerning the delays he attributed to 10 specific EWOs. If Bell refers in its opening post-trial brief to alleged delays relating to EWOs about which Mr. Brannon did not testify, we will address those EWOs in our next brief.

6.8. Mr. Brannon testified on cross-examination, with respect to each of the 10 EWOs, that his analysis did not reconcile – because it was not intended to reconcile – with the actual course of work relating to that EWO, or its predecessor or successor activities in the schedule. Tr. 809:2 – 810:5 (all of the following is Brannon testimony) (Bell met the MEP milestone "[l]ong before" the dates the fragnet showed EWO work "affecting" that milestone would be performed), 810:9 – 811:15 (witness did not know why Bell did not begin work on an EWO until a year after requesting notice to proceed), 812:5-21 (again, Bell met the MEP milestone before EWO work allegedly "affecting" that milestone occurred; also, witness did not know reason for eight-day gap between notice to proceed and start of work), 815:22 – 824:21 (work on EWO 478

(RFI 1459) that a fragnet showed being performed in October 2000, was performed in March and April 2001, DX 143A at 12118, 12138, 12318; Stromberg's daily report for November 20, 2000, DX 143A at 10218, still notes a constraining predecessor activity), 828:20 – 832:14 (fragnet showed completion of EWO work in April 2001, but Stromberg daily report, DX 143A at 11999, shows completion on March 22, 2001; witness "would have to look at the schedules and the logic" to determine whether there was successor work on the EWO), 832:17 – 833:25 (fifth floor administrative suite was substantially complete "[m]uch earlier" than the fragnet showed EWO work being finished), 834:20 – 839:3 (similar – substantial completion milestone was achieved before fragnet showed EWO 487 work occurring; witness did not know when EWO work actually occurred during alleged 111 days of delay), 839:6 – 842:20 (EWO work that fragnet showed occurring in May and June 2001 began in March 2001; witness did not know completion date), 843:12 – 845:11 (fragnet for EWO 632 shows EWO-related delay ending two months before actual substantial completion date achieved by Bell), 845:22 – 846:18 (witness did not know reason for approximately six-week delay between RFI response and beginning of work shown in fragnet), 847: 7 – 850:10 (fragnet shows north terrace railings installed one day before railings were delivered), 850:12 – 851:13 (did not know sequence of work for EWO 700).

6.9. EWO 678, concerning installation of north terrace railings, shows that Bell took more than three months – from June 13 to September 19, 2001 – to object to a notice to proceed transmitted by CRSS/Jacobs. PX 626 at 4. After almost another month passed, on October 15, 2001, Bell submitted EWO 678, offering a $6,866.32 credit, but stated, "Bell is not proceeding with this EWO." PX 626 at 1. Mr. Brannon's analysis fails to account for these delaying events,

which total at least 120 calendar days, in attributing 99 days of excusable delay to EWO 678. Tr. 721:3-13 (Brannon).

6.10. Mr. Brannon's inefficiency "analysis" was entirely general. He simply noted that Bell's efficiency deteriorated over time, and blamed that deterioration, in conclusory fashion, on the volume of Government changes, in general, without linking any particular efficiency losses to any particular change in the work. Tr. 745:17 – 750:18 (Brannon); PX 94 at 220-31.

6.11. The testimony and expert reports concerning subcontractors' pass-through claims were similarly diffuse. Although, unlike Mr. Brannon, the subcontractors purported to submit "measured mile" analyses to quantify lost efficiency, no evidence was adduced to link any alleged, uncompensated losses in efficiency to particular Government actions – rather than, for example, conduct by Bell or the subcontractors themselves. The subcontractors' witnesses testified they were more efficient when performing base contract work than when performing changed work. That is to be expected. The subcontractors' witnesses did not testify, however, that they were not adequately compensated, pursuant to contract modifications, for work relating to particular change orders. Tr. 853-60 (Bussey); 863-880 (Engle), 895-914 (Freeman).

## ARGUMENT

### I. Bell's Unexcused Failures To Meet 13 Completion Milestones Entitle The Government To Liquidated Damages

As demonstrated in our pretrial filing concerning conclusions of law, in order to be relieved of liquidated damages, Bell must establish both (i) the existence and (ii) the extent of excusable delay. Sauer Inc. v. Danzig, 224 F.3d 1340, 1347 (Fed. Cir. 2000); Central Ohio Bldg. Co., PSBCA No. 2742, 92-1 BCA ¶ 24,399.

The Government satisfies its burden of going forward by demonstrating that the number of days by which substantial completion was late justifies the amount of liquidated damages imposed. PCL Constr. Servs., Inc. v. United States, 53 Fed. Cl. 479, 484 (2002), aff'd mem. (Fed. Cir. 2004). We have cited that trial evidence in paragraph 5.5 above. The total number of "missed milestone days" (our term) is 1,715, of which Mr. Scott found 32 to be excusable, for a net of 1,683. DX 151 at 77-78 (Scott report).

The burden then shifts to the contractor to establish that its delay was partly or entirely excused. Sauer, 224 F.3d at 1347 ("We have affirmed the Board's finding that Sauer proved only two days of excusable delay. As a result, Sauer has not shown that it is entitled to a remission of liquidated damages greater than the remission already granted by the Board.") (emphasis added); Morganti Natl., Inc. v. United States, 49 Fed. Cl. 110, 132-40 (2001), aff'd mem. (Fed. Cir. 2002); Central Ohio, 92-1 BCA at 121,824 ("[T]he burden of going forward shifted to [the contractor] to show that any delays were excusable and that it should be relieved of all or part of the assessment."). If the contractor offers evidence of excusable delay, the Government can satisfy its burden of proof by rebutting that evidence. Sauer, 224 F.3d at 347-48; Dean Constr. Co. v. United States, 188 Ct. Cl. 62, 411 F.2d 1238, 1241-45 (1969); PCL, 53 Fed. Cl. at 484.

Similarly, to recover net damages for delay, Bell "has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir.1994) (en banc). No damages can be recovered for concurrent delay, attributable to both parties. William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984).

Mr. Brannon's application of the TIA/fragnet methodology, without rigorously reconciling projected days of delay to actual events on the project, cannot establish excusable, non-current delay, sufficient to obtain relief from liquidated damages, much less prove compensable days of delay. This Court and the court of appeals have recognized that regularly updating a project schedule is useful in contract administration, but analyses "made after project completion . . . that make adjustments to attain new and revised projected scheduling depend on theoretical contingencies" and "are of limited value." Titan Pac. Constr. Corp. v. United States, 17 Cl. Ct. 630, 637 (1989), aff'd, 899 F.2d 1227 (Fed. Cir. 1990); see also Interstate Gen. Gov't Contrs., Inc. v. West, 12 F.3d 1053, 1060 (Fed. Cir. 1993) ("The required nexus between [a] government delay and a contractor's failure to complete performance at some unspecified earlier date cannot be shown merely by hypothetical, after-the-fact projection.").

More recently, in Sunshine Construction and Engineering, Inc. v. United States, 64 Fed. Cl. 346 (2005), the Court specifically rejected the analysis of an expert who, like Mr. Brannon, inserted fragnets into plaintiff's monthly updated schedules "to determine how many days of delay occurred during a given month." Id. at 368. The Court distinguished the usefulness of preparing TIA fragnets during performance, as was contemplated here, from their lack of utility as a tool for retrospective critical path analysis in litigation. "As a practical matter," the Court found, "a scheduling change is a part of the scope of work and should be tracked for purposes of cost, delay, and future impacts, and the fragnet provides this tracking. [The Court does not find] that this approach is a recognized method for [critical path] analysis." Id. at 369 n.32. The Court agreed with the windows-type analysis performed by the Government's expert. Id. at 368-69.

We know of no reported decision in which this Court or the court of appeals has accepted the use of "theoretical" fragnets, unreconciled to actual events or subsequent schedules, to prove excusable or compensable delay. Cf. PCL Constr. Servs., Inc. v. United States, 47 Fed. Cl. 745, 801-04 (2000) (plaintiff whose contract provided for submission of fragnets "apparently has not performed and certainly has presented no in-depth critical path analysis"). "Similarly, the Boards [of Contract Appeals] g[i]ve little weight to updated, as-planned CPM [critical path management] schedules in isolation, and rel[y] on [an] as-built CPM schedule or other evidence of actual performance dates and durations to determine delays[.]" John T. Jones Constr. Co., ASBCA No. 48,303, 98-2 BCA ¶ 29,892 (rejecting fragnet analysis; citing, inter alia, J.A. Jones Constr. Co., ENG BCA No. 6252, 97-1 BCA ¶ 28,918).

As our scheduling expert, Ted M. Scott of Navigant Consulting (formerly of Marsh USA), testified at trial, a basic defect of the TIA/fragnet methodology, when applied prospectively, as Mr. Brannon did (albeit inconsistently, because he occasionally used as-built durations of activities post-dating a fragnet), rather than retrospectively, is that the analyst does not begin with actual effects upon the critical path, and then look retrospectively to discern their causes, as precedent requires. Tr. 1077:3 – 1078:21 (Scott); e.g., Merritt-Chapman & Scott Corp. v. United States, 208 Ct. Cl. 639, 528 F.2d 1392, 1398 (1976) ("[W]e must examine the factors [alleged by] the plaintiff, to determine whether they . . . were legally the cause of the [observed] delay."). Instead, the fragnet maker searches, as if in real time, for possible sources of projected, "theoretical" delay. Tr. 1073:19 – 1074:21 (Scott); 825:2 – 826:4 (Brannon).

Moreover, as noted, Mr. Brannon specifically looked only for Government-caused delays and examined none of the apparent, non-Government sources of delay, described above, which

were identified by Bell contemporaneously. As Mr. Brannon stated in his September 2004 report, "The TIA procedure . . . is basically one of determining the impact of Government Changes," and is "not a direct, after-the-fact assessment of the contractor's performance." PX 94 at 30; see also Tr. 666:16-23 (Brannon). It is exactly a direct, after-the-fact apportionment of the contractor's and the Government's respective responsibilities for the delays experienced during the course of the contract work, however, that precedent requires. E.g., Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982); Morganti, 49 Fed. Cl. at 132-40; PCL, 47 Fed. Cl. at 800-04.

Mr. Brannon testified, in effect, only that, in his opinion, Bell "should" have received certain extensions of time, had Bell timely submitted TIA fragnets in connection with some EWOs, and had the parties more or less immediately reached agreement upon the fragnets. See PX 94 at 27-28. That is irrelevant. Because Bell presented no evidence sufficient to support a finding that any particular number of days of delay experienced by Bell during the project are attributable to the Government, Bell "has not shown" entitlement to relief from liquidated damages of $447,678, at $266 per day, for 1,683 total days of unexcused delay past 13 of 14 substantial completion milestones. Sauer, 224 F.3d at 1347; see DX 151 at 77-78 (Scott report).

We will address the subcontractors' largely conclusory delay claims, as appropriate, in our next brief, in response to Bell's arguments on their behalf in its opening post-trial brief.

## II. The Contract Was Not Cardinally Changed

The index of the transcript indicates that plaintiff did not mention an alleged "cardinal change" in its opening statement. In the event Bell nonetheless intends to pursue its cardinal change claim, no trial evidence supports it.

A cardinal change will be found only if there is "an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." AT&T Communics., Inc. v. WilTel, Inc., 1 F.3d 1201, 1205 (Fed.Cir.1993) (quoting Allied Materials & Equip. Co. v. United States, 215 Ct. Cl. 406, 569 F.2d 562, 563-65 (1978)). As the parties have stipulated, under the contract as awarded, Building 50 had five above-ground stories and a full and functional basement, and contained 23,040 square meters of laboratory and office space. Stip. of Facts ¶ 10. As constructed (in the same location), Building 50 has six above-ground stories, a full and functional basement, and 27,363 square meters of laboratory and office space, that is, approximately 18.7 percent (roughly one-sixth) more than in the original specifications. Id. ¶ 11.

Bell accepted a contract to build a complex scientific research facility, with multiple scientific "neighborhoods" fit out using a deferred "kit of parts," and that is what it built. The finished building simply has one more floor – on which Bell fit out fewer neighborhoods than on the other floors. That is not a drastic alteration in the work or a material change in the bargain concerning Building 50.

Bell may argue there was a cardinal change because the fourth floor of Building 50 allegedly does not resemble the floor plan shown in the feasibility study prepared by HLM in late 1998. To begin, as a factual matter, as set forth above, that is not true: The actual fourth floor resembles the floor plan (originally that of the third floor) in all material respects. Moreover, even if Bell was surprised by the design of the fourth floor, it would make no legal difference, for at least two reasons. First, although "[t]here is no exact formula," changes to one floor of a multi-story building – not including the shape, utilities, or other infrastructure of that floor – even

if material, are not "so drastic" as to fundamentally change a construction contract. See Wunderlich Constr. Co. v. United States, 173 Ct. Cl. 180, 351 F.2d 956, 966 (1965).

Second, and equally important, trial established that Bell enthusiastically bid to construct the new floor and then agreed, in modification 93, to a "full and equitable adjustment" for the added work, expressly "releas[ing] the Government from any and all liability under this Contract for further equitable adjustment attributable to the Modification." PX 800 at 2 (¶ 4), 3 (¶ 8). The Court should give that language its plain meaning, without reference to extrinsic or parol evidence. Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc). If, at the end of the series of negotiations regarding the fourth floor, Bell "had intended to leave a [cardinal change] claim . . . open, [its] intention to do so should have been made manifest and explicit . . . ." Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F.2d 173, 177 (1963); see Seeds & Derham v. United States, 92 Ct. Cl. 97, 110 (1941); Green Mgmt. Corp. v. United States, 42 Fed. Cl. 411, 433-40 (1998) (finding accord and satisfaction relating to cardinal change claim).

We know of no parol evidence that, if considered, could arguably affect this result. Should Bell argue that such evidence exists, we will respond, as appropriate, in our next brief.

## III. Bell And Its Subcontractors Did Not Demonstrate Compensable Disruption

A contractor cannot recover damages for disruption based only upon general, unsubstantiated testimony that the Government is to blame for its inefficiencies, without linking specific Government actions to specific, documented losses of efficiency. Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 696, 369 F.2d 701, 713 (1966). "More than the mere suggestion of the probable effect of an event on efficiency is required." River Equip. Co., Inc., ENG BCA No. 6042, 94-3 BCA ¶ 26,996 at 134,467; see also Transtechnology Corp. v. United

States, 22 Cl. Ct. 349, 398 (1990) ("There is no testimony of a single specific interruption or slowdown, and therefore nothing concrete in terms of length of interruption, what happened on the production line, who made decisions about whether to keep workers in place, whether other tasks could be performed, or how often interruptions occurred."); Holloway Constr. Co. v. United States, 18 Cl. Ct. 326, 334 (1989) (rejecting claim where plaintiff adduced "very little specific evidence about inefficiency delays" and relied upon "its witnesses' impressions").

None of Bell's evidence concerning disruption satisfies these standards of specificity, either with respect to the supposed causes of inefficiency or the alleged costs. See Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (plaintiff must establish liability, causation, and extent of injury). Mr. Brannon wrote in his 2004 report, and testified on the stand, in general terms, about the sophistication of Bell's labor cost tracking system. PX 94 at 220-31; Tr. 745:17 – 750:18 (Brannon). But in the end, he did not even try to use Bell's job cost system to create a "measured mile," or to trace inefficiencies to specific labor categories, and to specific times and activities, as Bell's job cost data would have allowed. See Tr. 1175:10 – 1178:21 (Daigle); 783:5-24 (Brannon).

Instead, Mr. Brannon took a guess. He "attributed half of [Bell's unproductive labor rate] to Bell and half of it to the fact that they were getting a lot of changes . . . . I have attributed 4 percent of [the blended eight percent rate from early in the project] to Bell." Tr. 746:2-13 (Brannon). Shorn of extraneous verbiage, that is the extent of his "analysis"; the remainder is arithmetic. Even an allegedly educated guess is still a guess.

Moreover, the guess is not even logical on its own terms. As established above (paragraphs 3.1-3.3), given the complexity of this project, and the gradual arrival, after the

concrete was poured in early 1999, of more and more tradespeople, working in increasingly enclosed, confined, and overlapping spaces, one would naturally expect Bell's (and its subcontractors') efficiency rates to decline as the job progressed. Mr. Brannon provided the Court no basis to segregate these predictable effects of construction complexity, from the alleged effects of "getting a lot of changes." Tr. 746:2-13 (Brannon).

Nor has Mr. Brannon provided any basis to segregate from the claimed damages the effects of changed work for which Bell executed (for itself and its subcontractors) contract modifications without reserving the right to bring a subsequent disruption claim. Pursuant to modification 93, for reasons that have already been extensively briefed, Bell certainly should not recover for alleged inefficiencies relating to any EWOs created on or before August 31, 2000. PX 800 at 2 (¶ 4). That alone limits Bell's disruption damages to no more than Mr. Brannon's lower, post-August 2000 figure. Tr. 750:13-18 (Brannon).

There are also multiple contract modifications, however, based in part upon EWOs created after the modification 93 cut-off date (at EWO 457), that Bell executed without including its sentence reserving the right to claim disruption. These include modifications 122 (PX 829 at 2 – incorporates EWO 466), 139 (PX 846 at 2 – EWO 489); 140 (PX 847 at 2 – EWO 540); 150 (PX 857 at 2 – EWOs 512, 498, 499, and 534); and 158 (PX 865 at 2 – EWO 508). Bell would also need to demonstrate that is has eliminated all of the effects of this changed work from its inefficiency calculus – but it lacks any basis in the trial evidence to do so.

The "jury verdict" method cannot be used to correct for Bell's failure to properly establish disruption damages at trial, moreover, because Bell could have presented detailed evidence from its job cost records, and could have segregated the effects of EWOs without

reservations, but chose not to. Where, as here, "failures of damage proof [are] not due to the inexactness of the situation, but, rather, plaintiff's own failure to produce reliable information[, s]uch failure cannot be used as justification 'for lessening the burden of proof.'" Orlosky, Inc. v. United States, 68 Fed. Cl. 296, 319 (2005) (quoting S.W. Elec. & Mfg. Corp. v. United States, 228 Ct. Cl. 333, 655 F.2d 1078, 1088-89 (1981) ("After performing the rework, plaintiff should have been able to produce reliable evidence of what the rework costs were and how many units were reworked.")). Accordingly, Bell presented no probative evidence of disruption damages.

The evidence adduced by Bell upon behalf of its subcontractors, although in some respects marginally more detailed, shares the same essential flaw: There is arguably general evidence of lowered efficiency, but no evidence that Government changes – rather than, for example, the general conditions of the job, a tight labor market, poor scheduling by Bell, or mismanagement by Bell or the subcontractors – were the direct cause. It is plaintiff's burden to prove causation and damages, not our burden to disprove them. Servidone, 931 F.2d at 861.

Should Bell argue that the trial record contains evidence tying specific Government actions to specific days or amounts of lost productivity, we will respond, as appropriate, in our next brief.

IV. Bell's Contentions Concerning "Disputed EWOs" Remain Unclear

Prior to trial, Bell proposed no conclusions of law relating directly to any of the "disputed EWOs" for which it seeks to recover. In its pretrial statement of contested facts, Bell simply inserted, after paragraph 75, a chart listing rejected and unresolved EWOs, with a total face value (price) of $1,610,987.

Very little trial testimony related directly to these disputed EWOs, other than EWO 651, Bell's claim for additional compensation for the "kit of parts." However, given that, for each floor of Building 50, the price of the deferred kit of parts work was established by a bilateral modification, see PX 773 (basement and first floor), 784 (second floor), 787 (third floor), 791 (fifth floor), 800 (fourth floor and all prior floors), EWO 651 could affect only Bell's delay or disruption claims, already addressed above.

In general, NIH did not execute modifications for the disputed EWOs because it disagreed with Bell as to whether an EWO represented a change in the contract work, or the parties could not agree upon a price. To the extent Bell chooses to argue, in its post-trial brief, that NIH misinterpreted contract terms applicable to certain disputed EWOs, we will respond, as appropriate, in our next brief.

To the extent Bell may argue that the Court should accept, as reasonable, a price proposed by Bell for a given EWO, which NIH thought was unreasonable, we do not know what evidence admitted at trial could support such an argument. Moreover, Bell did not present testimony from an accounting expert; and testimony established that Bell has not adequately explained, or reconciled with the amount of its claim, the "costs to complete" shown for EWOs in its job cost records, or an accounting transfer of approximately $2.3 million, which is apparently related to EWO general conditions costs. Tr. 476:12 – 478:24 (Bardin), 786:9 – 796:21 (Brannon), 1167:3 – 1169:15 (Daigle) (" . . . [A]ny accountant . . . is going to look at a $2.2 million transfer and have questions."). Depending upon Bell's arguments, we may revisit these quantum complications, as necessary, in our next brief.

## CONCLUSION

Accordingly, the Government established at trial entitlement to liquidated damages of $447,678, whereas Bell has established no entitlement to relief, other than the undisputed contract balance.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

s/Jeanne E. Davidson
by Bryant G. Snee
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
JOAN STENTIFORD-ULMER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-0476
Fax: (202) 305-7466

Attorneys for Defendant

December 31, 2007

CERTIFICATE OF FILING

I certify that on December 31, 2007, the attached document was filed by means of the Court's electronic filing system. I understand that service is complete upon filing.

s/Kyle Chadwick