No. 03-1613C
Judge Wheeler

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

BELL BCI COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL RESPONSE BRIEF

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

KYLE CHADWICK
Senior Trial Counsel
JOAN STENTIFORD-ULMER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification U nit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202)616-0476

Attorneys for Defendant

January 22, 2008

TABLE OF CONTENTS

RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF FACT. ........................................ 1

RESPONSES TO PLAINTIFF'S EXPERT TESTIMONY.......................................................... 4

RESPONSES TO PLAINTIFF'S LEGAL ARGUMENTS. ........................................................ 16

I. Bell Presented No Cognizable Evidence Of Excusable Or Compensable Delay. ........................................................................... 16

II. Bell Presented No Cognizable Evidence Of "Cumulative" Inefficiency Damages. ........................................................................... 21

III. Bell Did Not Present A Case To Recover Damages for "Disputed EWOs"......... 24

IV. Bell Cannot Recover For Subcontractor Pass-Through Claims............................ 25

CONCLUSION. ........................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES


Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004)........................................ 2

Blake Constr. Co., GSBCA No. 4742,
80-2 BCA ¶ 14,756. ........................................ 23

CEMS, Inc. v. United States,
59 Fed. Cl. 168 (2003). ........................................ 24

Calfon Constr., Inc. v. United States,
18 Cl. Ct. 426 (1989), aff'd, 923 F.2d 872 (Fed. Cir. 1990). ........................ 24, 25

Cannon Constr. Co. v. United States,
162 Ct. Cl. 319 F.2d 173 (1963). ........................................ 23

Cavalier Clothes, Inc. v. United States,
51 Fed. Cl. 399 (2001). ........................................ 2

Daewoo Eng'g & Constr. Co. v. United States,
73 Fed. Cl. 547 (2006). ........................................ 25

Dean Constr. Co. v. United States,
188 Ct. Cl. 411 F.2d 1238 (1969). ........................................ 17

DeVito v. United States,
188 Ct. Cl. 413 F.2d 1147 (1969). ........................................ 4

Electronics Corp. v. WH-TV Broadcasting Corp.,
395 F.3d 416 (7th Cir. 2005). ........................................ 16

Hegeman-Harris & Co. v. United States,
194 Ct. Cl. 440 F.2d 1009 (1971). ........................................ 20

Interstate Circuit, Inc. v. United States,
306 U.S. 208 (1939)........................................ 2

Luria Bros. & Co. v. United States,
177 Ct. Cl. 369 F.2d 701 (1966). ........................................ 16, 21

Merritt-Chapman & Scott Corp. v. United States,
208 Ct. Cl. 528 F.2d 1392 (1976). ........................................ 19

NLRB v. Robbins Tire & Rubber Co.,
161 F.2d 798 (5th Cir. 1947). .......... 17

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000). .......... 23, 24

Orlosky, Inc. v. United States,
68 Fed. Cl. 296 (2005). .......... 23

PCL Constr. Servs., Inc. v. United States,
53 Fed. Cl. 479 (2002), aff'd mem. (Fed. Cir. 2004). .......... 17

P.J. Dick, Inc.,
VABCA No. 6020 et seq., 2003 WL 24016900. .......... 19

P.J. Dick Inc. v Principi,
324 F.3d 1364 (Fed. Cir. 2003).......... 18, 19

Propellex Corp. v. Brownlee,
342 F.3d 1335 (Fed. Cir. 2003).......... 22, 23

Sauer Inc. v. Danzig,
224 F.3d 1340 (Fed. Cir. 2000).......... 16, 17

Servidone Constr. Corp. v. United States,
931 F.2d 860 (Fed. Cir. 1991).......... 22

Sharman Co. v. United States,
2 F.3d 1564 (Fed. Cir. 1993).......... 25

Southwest Marine, Inc., DOTCAB No. 1663,
94-3 BCA ¶ 27,102. .......... 23, 24

Sternberger v. United States,
185 Ct. Cl. 401 F.2d 1012 (1968). .......... 17

Sunshine Constr. & Eng'g, Inc. v. United States,
64 Fed. Cl. 346 (2005). .......... 4, 16

Swift & Co. v. Hocking Valley Ry.,
243 U.S. 281 (1917).......... 20

Titan Pac.Constr. Corp. v. United States,
17 Cl. Ct. 630 (1989), aff'd, 899 F.2d 1227 (Fed. Cir. 1990). .......... 4

William F. Klingensmith, Inc. v. United States,
731 F.2d 805 (Fed. Cir. 1984)........................................................................................ 16

Wilner v. United States,
24 F.3d 1397 (Fed. Cir.1994)......................................................................................... 16

Wunderlich Contrg. Co, v. United States,
351 F.2d 956, 173 Ct. Cl. 180 (1965). ............................................................................ 21

Youngdale & Sons, Inc. v. United States,
27 Fed. Cl. 516 (1993). ....................................................................................... 5, 16, 17

STATUTE

28 U.S.C. § 516.............................................................................................................. 25

MISCELLANEOUS

R.W. Wax & W.P. Farneth, Basic Analysis For Delay And Disruption Claims,
Constr. Briefings No. 2005-12. ...................................................................................... 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BELL BCI COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1613C<br>(Judge Wheeler) |

DEFENDANT'S POST-TRIAL RESPONSE BRIEF

Pursuant to the Court's order dated October 22, 2007, defendant, the United States, respectfully submits this brief in response to the post-trial brief of plaintiff, Bell BCI Company.

RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

In our initial post-trial brief, we anticipated and rebutted every arguably material allegation of fact in Bell's brief (as well as several that are immaterial). See Def. Br. 4-24; Pl. Br. 3-21. As a consequence, we have only a few additional observations.

Although a blow-by-blow narrative of the decision to add a new fourth floor, a process in which Bell participated enthusiastically, Def. PFF ¶ 4.1, is irrelevant to Bell's claims for relief, it is noteworthy that Bell manager Jerry Romandino – with whom Frank Kutlak, the project manager for the National Institutes of Health ("NIH"), discussed the new floor in late 1998 and early 1999, id. ¶ 4.2 – did not testify at trial, despite having been on plaintiff's witness list.

The testimony and other "evidence" cited by Bell to support its inherently unlikely allegation that NIH "repeatedly" said the new floor "would [literally] be a 'duplicate' of the third floor," Pl. Br. 8 (¶ 22), is vague and establishes no such thing. No witness testified about any specific conversation or other communication in which Mr. Kutlak or anyone else from NIH supposedly told Bell this in so many words.

Mr. Kutlak testified, by contrast, that he advised Mr. Romandino, not that the fourth floor would be identical to any other floor, but that Bell should price it as "a typical floor, and when the question came up what does that mean, what is a typical floor, essentially it had all the same elements of the typical floors." Tr. 1214:7-9 (Kutlak). Mr. Kutlak's description proved accurate. Def. PFF ¶¶ 4.3-4.4.

Mr. Romandino – and only Mr. Romandino – could have materially controverted Mr. Kutlak's testimony as to what he told Bell to expect concerning the new floor. Should the Court find it necessary to make findings of fact in this regard, the Court should draw an inference adverse to Bell, based upon Mr. Romandino's absence from trial. See Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 420 n.28 (2001) (quoting Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.")).

It is undisputed that the vague "assurance" allegedly given by NIH to Bell, during the negotiations in August 2000 that led to modification 93, "that there would be no more than a few relatively minor additional changes to the Project," Pl. Br. 9 (¶ 28), was not reduced to writing as a modification of the contract. Tr. 250:8-21 (Bell). Modification 93 itself states, furthermore, that "[e]xcept as provided herein, all terms and conditions of [the contract], as heretofore changed, remain unchanged and in full force and effect." PX 800 at 1 (box 14). Accordingly, Bell cannot rely upon extrinsic evidence to alter the terms of modification 93 or the contract. Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1374-75 (Fed. Cir. 2004).

Although the allegation is irrelevant, because it would not establish a breach, contract changes made after August 31, 2000, the cut-off date in modification 93, were not "pervasive,"

as Bell asserts, Pl. Br. 11; certainly not for a project that was clearly described from the outset, in the statement of work, as "especially complex" and subject to change. Def. PFF ¶¶ 1.12-1.14, 3.1, 3.2. As we established, the overwhelming majority of changes, by dollar value, predated modification 93 and are encompassed by it. Id. ¶ 1.12.

Bell relies upon a demonstrative exhibit purporting to track changes in the building with red dots, Pl. PFF ¶¶ 216-17; but Bell presented no evidence as to which, if any, of those changes were allegedly material and not merely, for example, deletions of features, or minor clarifications of the specifications. Moreover, Bell's dots do not reflect which changes were fully priced by the many bilateral modifications – including modification 93, but also later ones – in which Bell reserved no rights. E.g., PX 843, 847, 865.

Bell's allegation that "the Government made clear . . . that it would be a futile act for [Bell] to submit TIAs [time impact analyses] addressing the changes made after Mod 93 by repeatedly directing BELL in writing to perform the changes without any impact to the Project schedule," Pl. Br. 7 (¶ 19), is unfounded. As noted in our initial brief, Jeremy Bardin, Bell's construction manager, properly testified that NIH "ha[d] a contractual right to" direct Bell to proceed without schedule relief when Bell did not timely submit TIAs in accordance with section H of the contract. Tr. 417:6-13 (Bardin); see PX 5 at 4231-32; see also PX 6 at 210-11 (specification § 7.01); Tr. 252:13-21 (Bell). There is no colorable argument to the contrary.

Nor is there any record evidence that NIH said it would not consider TIAs, if Bell chose to submit them, i.e., that submittal would be "futile," as Bell alleges. At the same time, had the contracting officer not told Bell to proceed without time extensions when it submitted no TIAs, Bell would almost certainly be arguing that NIH "waived" the project schedule. See Pl. Br. 70;

cf. DeVito v. United States, 188 Ct. Cl. 979, 413 F.2d 1147, 1153-54 (1969). She was properly doing her job. To the extent Bell may attempt to use its "futility" argument to excuse its testifying expert's legally deficient reliance at trial upon "theoretical" TIA "fragnets," unreconciled to the actual course of events on the project, we address that issue below.

RESPONSES TO PLAINTIFF'S EXPERT TESTIMONY

We would not want the Court to lose sight of the overriding principle, established in our initial brief, that, as a matter of law, the fragnets created by plaintiff's expert, Patrick Brannon, and Mr. Brannon's superficial opinions concerning disruption, are not probative and cannot aid the Court, as the trier of fact, or plaintiff, in meeting its burdens of proof. Def. Br. 25-28, 30-33.

In its brief, Bell summarizes the fragnets that Mr. Brannon prepared with respect to dozens of EWOs, which were not among the 10 EWO fragnets about which he testified at trial, and that we addressed in our opening brief. Pl. Br. 25-46; see Def. Br. 22-24, 26-28. By addressing certain of these additional fragnets here, we should not be understood to suggest that Mr. Brannon's prospective, "theoretical" TIA methodology, which "is separated from what actually occurred on the project," Tr. 834:11-12 (Brannon), might have been probative, but for errors in his fragnets. The methodology itself is misplaced in litigation and does not address the elements Bell must establish to obtain relief from liquidated damages or affirmative damages for delay. Def. Br. 26 (citing, inter alia, Titan Pac.Constr. Corp. v. United States, 17 Cl. Ct. 630, 637 (1989), aff'd, 899 F.2d 1227 (Fed. Cir. 1990), and Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. 346, 368-69 & n.32 (2005)).

The pervasive inconsistencies, noted below, between Mr. Brannon's fragnets and the actual course of performance are symptomatic of the underlying deficiency of his prospective

approach to quantifying delay. The inconsistencies also disprove Mr. Brannon's direct testimony, as a rebuttal witness, that he reconciled his fragnets with the "as-built critical path" and performed a "causal analysis" of delays on this project. Tr. 1271:4-6, 1276:14 – 1277:3, 1285:2-8 (Brannon).

Mr. Brannon is even inconsistent with himself. For example, his expert report states that in November 2000, EWO 497 created a controlling delay with respect to the contract completion milestone. PX 94 at 72-73. In his rebuttal report, however, Mr. Brannon opined that EWO 493 created the critical path delay in completion during that month. PX 94C at 19. Confusing things still more, Bell alleges in its brief that the critical path delays in November 2000 were caused by EWO 518. Pl. PFF ¶¶ 108-09. Bell's inability to settle upon an alleged cause of delay reflects the imprecise and subjective nature of the purely prospective fragnets.

We rebut Bell's efforts to justify or excuse Mr. Brannon's approach, based upon case law and the contract, in the next section of this brief.

Although Mr. Brannon discussed 49 EWOs in his report, he opined, based upon his fragnets, that only 24 of the 49 contributed to delays in achieving milestones. (Bell's brief obscures this fact.) The fragnets for those 24 EWOs are deficient and do not correspond to the as-built schedule. In every instance, either (1) there is evidence in the trial record demonstrating that the actual performance dates of the EWO-related work were not the dates in the fragnet, or (2) there is no evidence of the as-built dates at all. Cf. Youngdale & Sons, Inc. v. United States, 27 Fed. Cl. 516, 552-53 (1993) ("[G]iven the failure of the plaintiff to point to any probative corroborating evidence . . . specifically explicating activities on the critical path, and how the duration of each was established, save rank speculation, the court was completely unable to

verify any of [plaintiff's expert's] assertions . . . ."). We also address eight EWOs to which Mr. Brannon did not attribute critical path delays, but as to which Bell's brief is ambiguous.

EWO 465: Bell alleges, based upon a fragnet, that this EWO caused 23 days of delay. Pl. PFF ¶¶ 92-96. However, pursuant to bilateral modification 121, signed by Thomas Bell in December 2000, Bell was paid $887 in "full compensation for" EWO 465, "including both Contract cost and Contract time," and Bell "release[d] the Government from any and all liability under this Contract for further equitable adjustment attributable to this Modification." PX 828 at 2. Mr. Brannon testified on cross-examination that EWO 465 was resolved by a modification containing no reservation as to time impact, and was not "material." Tr. 769:3-25 (Brannon).

EWO 478: Bell alleges that this EWO, which involved replacement of ductwork and variable air volume boxes, caused 140 days of delay to eight milestones, including contract completion. Pl. PFF ¶ 101. Mr. Brannon's fragnet indicates that the EWO work delayed the start of the activity "Complete Trim-Out A.T.C." (A00011962A) until April 30, 2001. PX 350. However, the as-built schedule establishes that this activity finished on April 12, 2001 – 18 days before the start date in the fragnet. PX 670 at 28. The alleged delay is purely theoretical, i.e., imaginary. Moreover, as established at trial, Mr. Brannon ignored the evidence in the Stromberg Metal Works daily reports that unfinished work by another company delayed Stromberg's start of work on this EWO from November 2000 through January 2001. Def. PFF ¶¶ 5.6-5.7, 6.8.

EWO 461: Bell's brief does not allege a duration of delay associated with this EWO. Pl. PFF ¶ 102. Bell took 186 calendar days – from March 1 to September 18, 2000 – to respond to NIH's response to Bell's request for information (”RFI") 1148, relating to EWO 461. PX 352, 354. Mr. Brannon inexplicably attributes this six-and-a-half-month lag to the Government. PX

357. Mr. Brannon alleged during discovery that EWO 461 delayed drywall and epoxy flooring in the basement. See PX 94 at 67-68. However, his fragnet does not show the completion of drywall as constrained by EWO 461 work; and, in reality, both drywall and epoxy flooring were completed before the EWO work. PX 357; PX 670 at 15, 16. Again, the delay is imaginary.

EWO 511: Bell does not allege a specific duration of delay associated with this EWO. Pl. PFF ¶ 102. Mr. Brannon's fragnet shows the EWO work (installing door stops on walls in laboratory alcoves) constraining the start of "2nd Floor Final Clean." PX 362. There is no record evidence that installing some door stops would delay all final cleaning. Moreover, the activity "Install Doors & Hardware" (R00011970) was completed on February 2, 2001, 26 days before the completion date in the fragnet; and final cleaning (activity A00011982) began on February 6, 2001, and thus was not delayed by this EWO. PX 670 at 28.

EWO 639: Bell does not allege a specific duration of delay associated with this EWO. Pl. PFF ¶ 102. Mr. Brannon's fragnet shows the EWO work (installing door strikes on the second floor) beginning on December 27, 2000, and finishing on January 2, 2001. PX 370. There is no evidence in the trial record of the as-built performance dates of the EWO work.

EWO 483: Bell does not allege a specific duration of delay associated with this EWO. Pl. PFF ¶ 102. Bell submitted a zero-cost change proposal relating to RFI 1471. PX 373. There is no explanation in the record as to why Bell should recover costs now. Mr. Brannon's fragnet indicates that Bell started work on the EWO 104 calendar days after receiving a notice to proceed, but he inexplicably attributes this entire 104 days to the Government. PX 374. There is no evidence in the record of the as-built of performance dates of the EWO work.

EWO 484: Bell does not allege a specific duration of delay associated with this EWO. Pl. PFF ¶ 102. Mr. Brannon's fragnet shows the work on the EWO (plumbing revisions) as occurring from May 14 through May 21, 2001, PX 350, but there is no evidence of the as-built dates. Moreover, Bell substantially completed the basement vivarium, where the EWO work was performed, on May 10, 2001, Def. PFF ¶ 5.3, four days before the fragnet shows the work starting.

EWO 497: Bell does not allege a specific duration of delay associated with this EWO. Pl. PFF ¶ 110. NIH paid Bell acceleration costs (except with respect to Stromberg) to avoid affecting the schedule. PX 387. Mr. Brannon's fragnet shows the ceiling grid work for the EWO occurring between November 15 and 17, 2000. PX 388 (activity X497300). Bell's cost proposal is dated January 18, 2001, however, PX 387; and there is no evidence of the as-built performance period. Indeed, although the fragnet indicates successor activities (installing ceramic tile, wall coatings, epoxy flooring, and light fixtures, activities A00011084 (B-L), A00011109 (B-L), A00011114, and A00011942 (2-3)) could not start November 2000, the as-built schedule establishes that all of those activities began three to nine months earlier. PX 670 at 16, 28.

EWO 518: Bell attributes a variety of milestone delays, of between 65 and 100 days, to this EWO. Pl. PFF ¶¶ 108-09. The Stromberg Metal Works daily reports establish that work began on EWO 518 (second floor duct work) no later than January 16, 2001, DX 143A at 10899, which is five weeks earlier than the start date of February 22, 2001 in the fragnet. PX 394. There is no evidence of the as-built duration of the work.

EWO 493: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 110. Although Mr. Brannon's fragnet indicates work on this EWO (second floor stainless steel tables) could not start until March 6, 2001, PX 394, the ISEC daily reports establish

that it began on January 10, 2001, 56 days earlier. PX 143A at 10832. There is no evidence of the as-built duration of the work. Nor is there evidence to support Mr. Brannon's logic ties showing the activities "Erect Env. Rooms" (A00011764 (2-1)) and "Final Wall Coatings" (A00011972 (2-3)) as constrained by the EWO until March 2001. PX 394. The as-built schedule establishes that those activities started in May and June 2000. PX 670 at 26, 28.

EWO 530: Bell attributes various milestone delays, of between 27 and 56 days, to this EWO. Pl. PFF ¶ 116. But whereas the fragnet indicates work on the EWO (changes to ducts in the auto-clave room) did not start until February 5, 2001, PX 413, the Stromberg daily reports establish that the work began no later than January 10, 2001, 26 calendar days earlier. PX 143A at 10832. Moreover, there is no evidence of the as-built duration of the work; and the as-built schedule establishes that activities that the fragnet shows as delayed until February 2001 – including "Install Ceiling Tile" (A00011854 (2-2)), "Trim Out Electrical" (A00011868 (2-2)), and "Trim Out Plumbing" (A00011852 (2-2)) – all began no later than October 2000 and, therefore, were not constrained by the EWO work. PX 670 at 26, 27.

EWOs 475, 488, and 504: These are three of the 12 EWOs that Bell notes Mr. Brannon reviewed to assess delays in January 2001. Pl. PFF ¶ 124. Each of them, however, was resolved by a bilateral contract modification under which Bell received "full compensation for" the EWO work, including "Contract time," and did not reserve the right to claim delay. PX 839 at 2 (modification 132, for $145,942 – incorporates EWO 475); PX 841 at 2 (modification 134, for $128,400 – incorporates EWO 488); PX 843 at 2 (modification 136, for $67,709.90 – incorporates EWO 504). Bell's inattention to these valuable modifications is inexplicable, at this late date.

EWO 487: Bell alleges that this EWO delayed five milestones, by at least 170 days. Pl. PFF ¶ 123. Mr. Brannon's fragnet shows the EWO work beginning on March 5, 2001, and delaying substantial completion of the fifth floor until October 8, 2001. PX 492. However, there is no evidence of the as-built duration of the work; and substantial completion of the fifth floor was achieved on August 29, 2001, 40 days earlier than projected in the fragnet. DX 93.

EWO 556: Bell alleges that this EWO delayed project completion by an unstated amount of time. Pl. PFF ¶ 124. However, this change simply deleted three wing walls in the vivarium, at no cost. PX 444. No evidence in the record explains or supports Bell's allegation that its administrative work on this EWO – preparing a no-cost change order – "delayed" any project work. See PX 445.

EWO 573: Bell alleges that this EWO delayed project completion by an unstated amount of time. Pl. PFF ¶ 124. The fragnet shows the work (duct work on the fourth floor) beginning on May 24, 2001. PX 471. However, Stromberg began that work no later than April 25, 2001, 29 days earlier, DX 143A at 12578; and there is no evidence of the as-built duration of the work. Moreover, whereas the fragnet indicates that a successor activity, "Install Ceiling Tile" (A00061650 (4-3)), could not start until June 1, 2001, the as-built schedule establishes that this activity began in January 2001 and finished in March 2001. PX 670 at 40.

EWO 574: Bell alleges that this EWO delayed project completion by an unstated amount of time. Pl. PFF ¶ 124. Mr. Brannon's fragnet shows the work, relocating sprinkler heads in the basement, occurring between January 24 and 29, 2001. PX 485. However, the daily reports in the record establish that other work was occurring in the basement at that time, DX 143A at 11025-97; and there is no evidence of when the EWO work was actually performed.

EWO 525: Bell alleges that this EWO affected eight completion milestones by approximately 100 days. Pl. PFF ¶ 133. However, to take one example, Bell achieved substantial completion of the second floor on March 26, 2001, Def. PFF ¶ 5.3, 77 days earlier than the date of June 11, 2001 shown the fragnet. PX 513. Equally important, there is no evidence in the record of the as-built sequence or duration of this work.

EWO 589: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 134. This is perhaps Mr. Brannon's most egregious fragnet. EWO 589 resulted from NIH's response to RFI 1678. PX 528. The work consisted of field cutting a "vision light" (window) into one door in the basement corridor, for a proposed price of $650.70. PX 528, 529. Mr. Brannon's fragnet inexplicably shows this one minor modification (which his narrative mistakenly describes as "installing an electric light") delaying the achievement of 10 milestones by up to 92 days. PX 531. Moreover, although Bell's price proposal is dated April 10, 2001, PX 529, the fragnet does not show the work beginning for three more weeks, on May 1, 2001, PX 530; and there is no evidence of the actual procurement or performance periods.

EWO 543: Bell alleges that this EWO affected seven milestones by approximately 100 days. Pl. PFF ¶ 142. The fragnet shows the work (installing variable air volume boxes) beginning on May 30, 2001, and delaying the completion of the third floor until July 17, 2001. PX 550. However, Stromberg's daily reports show that EWO work began on the third floor no later than March 29, 2001, 62 days earlier than in the fragnet, DX 143A at 12112; and Bell achieved substantial completion of the third floor on April 10, 2001, 98 days earlier than shown in the fragnet. Def. PFF ¶ 5.3. Similarly, whereas the fragnet projects completion of the fourth floor on

July 25, 2001, that floor was substantially complete on May 8, 2001, 78 days earlier. Id. Finally, there is no evidence of the as-built sequence or duration of this work.

EWO 515: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 144. Mr. Brannon's fragnet shows the rework of an acoustical grid on the second floor occurring during 22 days, from February through May 2001. PX 564. But there is no evidence that the EWO work occurred at that time, or took that long. On the other hand, in this same time period, Bell was blaming the subcontractor, Manganaro Construction, for "incomplete work" and "lack of progress," which, according to Bell, was delaying "production throughout the building." Def. PFF ¶ 5.5. Mr. Brannon ignored the evidence of Manganaro's delays.

EWO 473: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 151. Although NIH acknowledged in October 2000 that EWO 473 was a contract change, PX 576, Mr. Brannon's fragnet mistakenly shows the electrical work relating to this EWO as constrained by the review and acceptance of Bell's cost proposal (for $683.79) until April 10, 2001. PX 578. There is no evidence as to when Young Electric actually began or finished the few hours of work. See PX 575. Nor this there any evidence to support Mr. Brannon's logic tie showing Young's work on this EWO as constraining the completion of second floor casework, PX 578, given that the EWO work was on the third floor. PX 575.

EWO 632: Bell alleges that this EWO affected the MEP and contract completion milestones. Pl. PFF ¶ 150. But, as established at trial, see Def. PFF ¶ 6.8, there is no evidence that this EWO (involving pumps and a pressure valve) affected the critical path when the work was performed. Mr. Brannon's fragnet shows the work delaying substantial completion of the MEP systems until July 5, 2001. PX 575. However, Bell did not achieve that milestone until

more than two months later, on September 12, 2001. Def. PFF ¶ 5.3. There is no evidence that (1) EWO 632 affected the critical path to the September 2001 date, or that (2) the MEP milestone, in turn, lay on the critical path to contract completion during this time in 2001.

EWO 646: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 151. Although Bell's price proposal (for $1,844.66), dated November 15, 2001, states that "Bell is not proceeding with this EWO," PX 588, Mr. Brannon's fragnet inexplicably shows the work being performed more than six months earlier, on May 7 and 8, 2001. PX 589. Moreover, although the fragnet shows the completion of the activity "Perform Work – RFI #1764" delaying the start of the second floor "trim out" (activity A00011962 (2-3)), PX 589, the as-built schedule establishes that, to the contrary, trim out began before the RFI 1764 work was finished and was, therefore, not constrained by it. PX 670 at 28.

EWO 509: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 158. Although Bell's cost proposal is dated August 13, 2001, PX 600, Mr. Brannon's fragnet inexplicably shows a start date for the activity "Submit Proposal" of September 28, 2000 – in effect, blaming a phantom 319 days of built-in "delay" on the Government. PX 602. Equally important, there is no evidence of the as-built performance dates.

EWO 653: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 158. Mr. Brannon's fragnet indicates that work on this EWO, involving the "north fire department connection," PX 611, could not begin until Bell completed the activity "Prepare/Submit Proposal – CM-RFI #653" (X653200) on July 11, 2001. PX 612. However, NIH issued a notice to proceed on May 21, 2001, PX 610; and Bell's price proposal (for $3,228.62) is dated July 5, 2001, and states that "Bell is proceeding with this EWO." PX 611.

There is no evidence that proposal preparation was a constraining activity, or of when the procurement or the work relating to this EWO actually occurred.

EWO 655: Bell alleges that the work on this EWO "occurred between July 3 . . . and July 17, 2001," and affected the MEP milestone by 37 days and contract completion by two days. Pl. PFF ¶¶ 156-57. However there is no evidence in the record to explain why Bell did not begin the work until 43 calendar days after receiving the notice to proceed on May 21, 2001, an amount of time that swallows the entire alleged delay. PX 613.

EWO 678: Bell alleges that this EWO, a credit change to the north terrace railings, delayed contract completion by 99 days. Pl. PFF ¶¶ 162-65. Again, Mr. Brannon did not use as-built performance dates. His fragnet shows the work being completed on December 18, 2001, PX 627, which is 21 days after the actual finish date of November 27, 2001 for activity A00010858 ("Install N. Terrace Railings"). PX 670 at 11. He also ignored delays by Bell, totaling more than 120 days – a duration that exceeds the delay period alleged by Bell – in negotiating this EWO. Def. PFF ¶ 6.9.

EWO 685: Bell's brief does not allege a specific duration of delay attributable to this EWO. Pl. PFF ¶ 166. Mr. Brannon's fragnet shows the EWO work delaying completion of the sixth floor until September 11, 2001, PX 63; but Bell achieved that milestone 33 days earlier, on August 9, 2001. Def. PFF ¶ 5.3. There is no evidence of the as-built performance dates of the EWO work.

EWO 700: Bell alleges that this EWO delayed achievement of the MEP milestone by 25 days, until October 21, 2001, and delayed contract completion by 11 days. Pl. PFF ¶ 173. However, the MEP systems were substantially complete on September 12, 2001, 39 days earlier

than the completion date in the fragnet, wiping out all of the alleged delay. Def. PFF ¶ 5.3. And there is no evidence of the as-built performance dates of the EWO work.

EWO 566: Bell alleges that this EWO delayed achievement of the MEP milestone by an unstated amount of time and affected contract completion by 11 days. Pl. PFF ¶ 177. The fragnet shows MEP substantial completion being delayed until January 4, 2002, PX 214 – 114 days after Bell achieved that milestone, on September 12, 2001. Def. PFF ¶ 5.3. There is no relation to the as-built schedule. Furthermore, as established at trial, Mr. Brannon cannot explain why Bell did not complete this work (worth $6,300) for a full year after receiving the notice to proceed in January 2001. Tr. 811:9-21 (Brannon). Moreover, NIH ultimately paid Bell acceleration costs so as not to affect the schedule. PX 675 at 1 (Taylor signature and box 3), 3.

In four short paragraphs, Bell cites Mr. Brannon's conclusory testimony that, in addition to creating fragnets, he performed a "windows" delay analysis, which allegedly produced similar or consistent results. Pl. Br. 47 (¶¶ 181-83, 185). As we noted, however, Def. PFF ¶ 6.2, no such analysis was disclosed to us in discovery or presented to the Court at trial.

Mr. Brannon's expert report, PX 94, contains 191 pages of "time impact analysis" and no "windows" analysis. At trial, Mr. Brannon testified only in the most general terms that, sometime before preparing his TIA fragnets, he engaged in "what I would term a windows approach or more characterized as [sic] a review looking back on the project . . ."; and he vaguely summarized some of his alleged conclusions. Tr. 641:19 – 646:10 (Brannon).

Mr. Brannon's conclusory synopsis of a "black box" analysis has no relevance to this case, as his bald opinions cannot "assist the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. "An expert who supplies nothing but a bottom line supplies nothing of

value to the judicial process." Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005); see also Youngdale, 27 Fed. Cl. at 552-53; Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 369 F.2d 701, 713 (1966).

With regard to Mr. Brannon's superficial and speculative inefficiency "analysis," we have little or nothing to add here. See Def. Br. 30-33. Paragraphs 226 through 229 of Bell's brief, Pl. Br. 55-56, accurately disclose Mr. Brannon's rationale for "attribut[ing] half of [Bell's] non-productivity factor to BELL" and half to Government changes. Id. at 56 (¶ 228). That is, those paragraphs confirm that he has no rationale. He guessed. He did not use Bell's vaunted cost accounting system in any illuminating way. See Def. PFF ¶¶ 1.8, 1.9; Def. Br. 30-31. As discussed below, Bell's disruption claim is essentially a modified total cost claim.

## RESPONSES TO PLAINTIFF'S LEGAL ARGUMENTS

### I. Bell Presented No Cognizable Evidence Of Excusable Or Compensable Delay

As established in our post-trial brief, because Mr. Brannon's "theoretical" fragnets are "separated from what actually occurred on the project," Tr. 834:11-12 (Brannon), and are only forecasts of "the projected delay from the date of the update in which the fragnet was inserted," rather than yardsticks of "the actual delay," R.W. Wax & W.P. Farneth, Basic Analysis For Delay And Disruption Claims, Constr. Briefings No. 2005-12, Bell cannot carry its burden to prove that actions by the Government proximately caused actual delays on the project. Sauer Inc. v. Danzig, 224 F.3d 1340, 1347 (Fed. Cir. 2000); William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984); see Sunshine Constr., 64 Fed. Cl. at 368-69 & n.32.

We bear no burden of proof as to the existence, or the extent, of compensable delay. E.g., Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir.1994) (en banc). With respect to

Bell's claim for relief from liquidated damages, based upon alleged excusable delay, we satisfied our initial burden by demonstrating the as-built substantial completion dates and the grounds for our liquidated damages calculation. Def. PFF ¶¶ 3.6, 5.3; Sauer, 224 F.3d at 1347; PCL Constr. Servs., Inc. v. United States, 53 Fed. Cl. 479, 484 (2002), aff'd mem. (Fed. Cir. 2004).

Because, owing to the legal insufficiency of Mr. Brannon's TIA methodology, Bell did not present substantial evidence of the existence of excusable delay at trial, we need not "rebut" Bell's evidence to establish entitlement to liquidated damages. Cf. Dean Constr. Co. v. United States, 188 Ct. Cl. 62, 411 F.2d 1238, 1241-45 (1969). Misdirected and unsupported opinion testimony such as Mr. Brannon's "'carries its own death wound'" and is not "compelling or substantial" even if not contradicted by another witness. Sternberger v. United States, 185 Ct. Cl. 528, 401 F.2d 1012, 1016-17 (1968) (quoting NLRB v. Robbins Tire & Rubber Co., 161 F.2d 798, 800 (5th Cir. 1947)); see also Youngdale, 27 Fed. Cl. at 552-53. Assuming, for the sake of argument, a rebuttal is necessary, we have provided it in our briefs, citing the trial record, and through the testimony of our scheduling expert, Ted Scott, contrasting the TIA/fragnet and windows methodologies. Tr. 1069:25 – 1078:21 (Scott).

Bell criticizes Mr. Scott for not pointing out all individual sources of delay in his windows analysis, and for not seeking out excusable delay (which would not entitle Bell to damages), milestone-by-milestone. Pl. Br. 48-51. But those are not defendant's burdens under the law.

Given the respective burdens of proof, set forth above and in our post-trial brief, and the substantive invalidity of Mr. Brannon's TIA approach, Mr. Scott's testimony – which we stand fully behind – was principally valuable to the Court, we respectfully submit, to demonstrate how project delay is properly analyzed and quantified in retrospect, for purposes of proof at trial.

Tr. 1079:10 – 1109:19 (Scott). In any event, although Bell complains about Mr. Scott's focus upon whether he could identify Government-caused delay, rather than delay in general, Bell does not establish that Mr. Scott's windows analysis should have come to a different result as to defendant's liability for delay. Pl. Br. 48-51.

Bell cites no legal or other authority supporting the use of hypothetical, forward-looking fragnets, such as Mr. Brannon's, to prove excusable delay, much less compensable delay, in litigation. In a footnote, Bell cites P.J. Dick Inc. v Principi, 324 F.3d 1364, 1369 (Fed. Cir. 2003), for the proposition that "as a matter of law, it was proper [for Bell] to follow the Contract" by relying upon Mr. Brannon's fragnets at trial. Pl. Br. 70 n.36.

Nothing in P.J. Dick supports that argument. The issue in P.J. Dick was only "whether the language of the contract required the Board [of Contract Appeals] to analyze the [delaying] effect of each [of a series of six] change[s] separately," rather than treating the changes as "combined directives" having a "unitary effect." 324 F.3d at 1369.

The court of appeals held that the statement in the Suspension of Work Clause (which is not at issue here) that time extensions for suspension orders "will be based upon the current computer-produced calendar-dated schedule for the time period in question and all other relevant information," id. (emphasis added by the court), meant that "the only way of determining the effect of the changes was to analyze each of them using the current computer schedule. Thus, if the changes did have a unitary effect, it had to be demonstrated by the computer model, not . . . testimony . . . ." Id.

The P.J. Dick court clearly was not requiring the board to confine its analysis to "current," forward-looking schedules, as of the date of each change, simply because the contract referred to "current" schedules. P.J. Dick does not endorse reliance upon theoretical fragnets in litigation.

To the contrary, the court directed the board to "determine whether [the] delay claims that it found were not controlling because of the 'combined directive' delay . . . became controlling as a result of any reduction in the 'combined directive' delay and analyze them accordingly." Id. at 1369-70 (emphasis added). That is, the court instructed the board, in accordance with precedent, to determine the total delay by examining the actual course of contract performance. Cf. Merritt-Chapman & Scott Corp. v. United States, 208 Ct. Cl. 639, 528 F.2d 1392, 1398 (1976). (On remand, the parties in P.J. Dick stipulated to a judgment of less than one-third of the $1,918,262 initially awarded by the board. P.J. Dick Inc., VABCA No. 6020 et seq., 2003 WL 24016900.)

Furthermore, as Bell concedes, if the Court were to "follow the Contract" here, with respect to evidence of delay, Pl. Br. 70 & n.36, Bell would be deemed to have "acknowledge[d]," as a matter of law, that the change orders for which it did not submit TIAs during performance "do[] not require an extension of the contract time (or milestone) and the Contractor shall . . . not be entitled to request or receive any such extension(s)." Def. PFF ¶ 3.4. Assuming the contractual requirement that Bell submit TIAs with its EWOs, or forever waive the right to claim delay, will not be enforced here, see Pl. Br. 70 (arguing NIH waived requirement of timely TIAs), then Bell has no basis to argue it is entitled to rely upon that same unenforced provision, by relying upon hypothetical fragnets, years after contract performance.

In short, if the contract provision relating to TIAs no longer applies – then it no longer applies.

Bell asserts that Mr. Scott "acknowledge[d] that if a contract required TIA analysis, then case law would dictate that such analysis be performed." Pl. Br. 48 (¶ 187). To begin, even had Mr. Scott so testified, he would have misstated the law, and his testimony could not bind us or the Court. See Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 289 (1917); Hegeman-Harris & Co. v. United States, 194 Ct. Cl. 574, 440 F.2d 1009, 1012 (1971).

In fact, Mr. Scott said no such thing. His relevant testimony is as follows.

> Q. Based on your experience, if you have a contract such as this one . . . that says that a TIA should be submitted if a contractor is seeking time during the performance . . . but you're looking after performance to try to quantify delay, does that mean you should use the time impact approach?
>
> A. Well, it's my understanding that . . . caselaw says that yes, you can use the time impact analysis, but it must be reconciled with the as-built data. When you do that, [as] I said, it's very similar to the [w]indows analysis. In fact, most textbooks and reference books that I've read . . . sometimes they . . . say [both methods are] the best method for defining delay or quantifying delay retrospectively.
>
> Q. So you're aware of statements that the time impact analysis method is valid for quantifying delay?
>
> A. Yes.
>
> Q. And the method that is valid, is that the same method that Mr. Brannon described and applied in his testimony?
>
> A. No, it's not.
>
> Q. Well, how can that be?
>
> A. Well, because, [as] I said, when you use the TIA retrospectively you're reconciling it with the actual as-built data, which is not what Mr. Brannon did.

Tr. 1076:9 – 1077:11 (Scott) (emphasis added).

Mr. Scott testified that TIA "can" be properly performed in retrospect, but that Mr. Brannon did not do so. Tr. 1077:23 – 1078:21 (Scott). Mr. Scott did not say that the choice of a method of retrospective delay analysis should be governed by the type of analysis that was required by the contract during performance. We know of no authority for that notion.

Finally, even assuming Bell could prove the causation or excusability of delays, it never explained at trial exactly how its general conditions costs, from which Mr. Brannon derived his daily rate for delay damages, were calculated. See Pl. PFF ¶¶ 243-44. As our damages expert, Colin Daigle, a certified public accountant, testified at trial, the alleged daily rate cannot be reconciled with Bell's job cost records without demonstrating, at a minimum – as Mr. Brannon did not – that (1) the general conditions costs for divisions 2-15 are not duplicated elsewhere in Bell's damages claims, and (2) Bell's post hoc accounting adjustment of approximately $2.3 million, relating to EWO-related general conditions, has been taken into account. Tr. 1167:10 – 1175:5 (Daigle). Upon this record, Bell's alleged daily rate is essentially conclusory.

Accordingly, we are entitled to $447,678 in liquidated delay damages, see DX 151 at 77-78, and Bell is entitled to no delay damages.

II. Bell Presented No Cognizable Evidence Of "Cumulative" Inefficiency Damages

"[T]he mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury nor provide a sufficient basis for making a reasonably correct approximation of damages." Luria Bros., 369 F.2d at 713 (citing Wunderlich Contrg. Co. v. United States, 351 F.2d 956, 968, 173 Ct. Cl. 180, 199 (1965)). That is exactly what Bell presented at trial, however.

Bell's post-trial brief confirms that, although clad in a great deal of excess verbiage, the cumulative impact claim developed by Mr. Brannon is, in reality, only a modified total cost claim, i.e., a claim for the costs of "unbid" unproductive labor, minus an unexplained four percent credit for the Government. Compare Pl. Br. 55-56 (¶¶ 227-29), 69 with Propellex Corp. v. Brownlee, 342 F.3d 1335, 1338-39 (Fed. Cir. 2003). To recover upon this type of claim, however, plaintiff "must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." Id. (citing Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir.1991)).

Bell proved none of these. To the contrary, according to Bell and Mr. Brannon, Bell could have demonstrated its inefficiency losses for various types of labor directly, by connecting the alleged losses to particular activities. Pl. Br. 55 (¶ 223) ("For approximately the last twenty years, BELL has tracked its productivity rates by requiring its foremen to record weekly the amount of units installed . . . ."); Tr. 783:19-24 (Brannon) ("A. . . . [Y]es, you could look at the unproductive labor and see what cost categories [are] coming up month by month. Q. And [t]hat would be line-by-line in the cost report, right? A. Yes."). Bell simply chose not to proffer that analysis.

Bell presented no evidence at trial, moreover, to show that the productivity rates it used for its bid were reasonable, e.g., reflected complex scientific projects similar to Building 50. Similarly, Mr. Brannon made no attempt to identify, quantify, or exclude increased labor costs attributable to the performance difficulties that Bell itself acknowledged to NIH during the project, see Def. PFF ¶ 5.4, or to establish the extent to which the differing productivity rates experienced in the early and later periods of Bell's performance are explained by the fact that entirely different work was being performed, in increasingly crowded spaces. See id. ¶¶ 3.2-3.3.

Because Bell could have addressed these matters, but chose not to, its disruption claim cannot be salvaged by the application of a "jury verdict," and the claim fails in its entirety. Propellex, 342 F.3d at 1343-44; Orlosky, Inc. v. United States, 68 Fed. Cl. 296, 319 (2005); Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 92-97 (2000).

Assuming, for the sake of argument, that these deficiencies do not doom Bell's cumulative impact claim, Bell faces the further insuperable difficulty that it cannot segregate from its claim any inefficiencies that should be attributed to extra work for which Bell executed modifications without reserving the right to seek disruption costs.

We demonstrated in our post-trial brief that, contrary to its allegations, Bell was well aware, when it executed modification 93 in October 2000, that its labor productivity had been declining, and that, in order to preserve the ability to file a "cumulative impact" disruption claim, it should expressly reserve that claim in modifications. Def. PFF ¶¶ 1.3-1.10.

Cumulative disruption was not an "unknown claim" in late 2000. See Pl. Br. 68 (citing Blake Constr. Co., GSBCA No. 4742, 80-2 BCA ¶ 14,756). Instead, given what Bell already knew, this was a predictable claim that Bell was obligated to reserve, or be deemed to have released. See Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F.2d 173, 177 (1963); Southwest Marine, Inc., DOTCAB No. 1663, 94-3 BCA ¶ 27,102 ("Since . . . appellant's accounting system was quite capable of monitoring and recording disruption manhours, if appellant experienced cumulative disruption to the extent it has asserted, . . . it similarly was not beyond its capabilities to have recorded some of those cumulative disruptive manhours and to have sought compensation for them during its negotiations on the change requests.").

Thus, pursuant to the doctrine of accord and satisfaction, as explained in our prior briefs, Bell should not recover disruption damages for work predating August 31, 2000, the date set forth in modification 93. PX 800. Nor, moreover, should Bell recover for any disruption relating to modifications that cover EWOs created after the modification 93 cutoff date, and that contain no reservation of rights – including, without limitation, modifications 121, 122, 139, 140, 150, and 158. See Def. Br. 32. As we noted, Bell lacks any basis in the trial record to segregate the unrecoverable costs relating to EWOs covered by modifications post-dating number 93. Id.

For all of these reasons, the Court should award no damages to Bell for cumulative disruption.

III. Bell Did Not Present A Case To Recover Damages For "Disputed EWOs"

Bell devotes just seven paragraphs of its brief to a high-level recitation of its claim for $1,610,987 for work allegedly performed pursuant to multiple unresolved EWOs. Pl. Br. 60-62 (¶¶ 235-40), 71-72. This claim (actually a collection of claims) has been effectively abandoned.

Among other things, Bell fails (with one exception) even to argue that NIH imposed constructive changes by misinterpreting the contract, see, e.g., CEMS, Inc. v. United States, 59 Fed. Cl. 168, 201-19 (2003); Northrop Grumman, 47 Fed. Cl. at 62-78, and the record contains no evidence of the reasonableness of Bell's costs to perform these EWOs. Absent evidence, for each EWO, that an agency representative with actual contracting authority directed Bell to perform work not required by the contract, and that the costs Bell incurred as a result were necessary and not excessive, Bell cannot recover. E.g., Calfon Constr., Inc. v. United States, 18 Cl. Ct. 426, 438 (1989), aff'd, 923 F.2d 872 (Fed. Cir. 1990).

In the exception noted above, Bell argues it incurred damages of $248,201 because NIH allegedly misinterpreted the "kit of parts" provision of the contract. Pl. Br. 58-59. Assuming there could be room to dispute the meaning of the kit of parts provision, however (and Bell barely alludes to that legal argument), Bell's damages "evidence" – its alleged markups on kit of parts items, which Bell argues should have been excluded from the amounts credited to NIH when kit of parts items were deleted – is entirely conclusory. There is no proof in the trial record of the actual differences between the prices charged by Bell's vendors, and Bell's marked up prices to NIH. See PX 247-256 (kit of parts EWOs).*

IV. Bell Cannot Recover For Subcontractor Pass-Through Claims

Bell cites no probative trial evidence to support the pass-through claims of subcontractors Young, Manganaro, ISEC, or NLP; it simply cites the claims submitted to Bell by these subcontractors, which lack documentary support. Pl. Br. 73. In any event, these subcontractors' claims for damages for delay and extra work are, upon their face, derivative of, and dependent upon the merits of, Bell's delay claim and its claims for damages for "disputed EWOs," which we have already addressed.

The remaining pass-through claim, upon behalf of Stromberg Metal Works, was the subject of some non-expert trial testimony, purporting to support a measured-mile calculation of disruption damages. See Pl. PFF ¶¶ 70-77; cf. Daewoo Eng'g & Constr. Co. v. United States, 73

* The final argument in Bell's brief, concerning the good faith grounds for back charges and credits claimed by the contracting officer in July 2002, Pl. Br. 72-73, was not raised before trial and is, in any event, irrelevant to Bell's damages claims. Id. at 74-75. Assuming it is relevant, the contracting officer was fully justified in withholding the contract balance in 2002, in light of the amount of liquidated damages and other Government claims. When Bell filed suit in 2003, the agency lost authority to take further action relating to claims under the contract. Sharman Co. v. United States, 2 F.3d 1564, 1571-72 (Fed. Cir. 1993) (citing 28 U.S.C. § 516).

Fed. Cl. 547, 580-81 (2006) ("The measured mile approach to damages is a form of total cost calculations that requires subjective judgment calls by [an] expert . . . ."). Among other things, however, the lay Stromberg witnesses failed to link the alleged inefficiencies to particular EWOs, to allow the Court to determine whether, for example, Stromberg has already been compensated for an inefficiency factor, or whether Bell executed modifications releasing the right to claim disruption damages pertaining to changed work.

Stromberg's claim includes, for example, work on the second floor, which, as Bell notes, is addressed by bilateral modification 55, Pl. PFF ¶ 61, which provided "fair and equitable compensation" for the work and "release[d] the Government from any and all liability . . . for further equitable adjustment attributable to the Modification," the standard language that bars a later disruption claim. PX 784 at 2 (¶ 3). There is no basis in the trial record to segregate the costs of Stromberg's second-floor work from its other, allegedly disrupted work.

Nor is there evidence to support attributing Stromberg's allegedly reduced efficiency "solely" to Government changes, Pl. Br. 74, rather than to other factors affecting the project, see Def. PFF ¶¶ 3.2-3.3, or Stromberg's own performance problems, about which Bell complained during the project. Id. ¶ 5.6.

Finally, and most fundamental, there is no evidence to support Stromberg's asserted "average hourly rate of $44.19," Pl. PFF ¶ 77; and, even if there were such evidence, there is no evidence demonstrating that the allegedly disrupted work on the relevant floors was performed by Stromberg's "average" mix of workers, to justify the Court's using that conclusory average rate in a damages calculation.

For all of these reasons, the subcontractor pass-through claims are unsupported, or inadequately supported, and merit no relief.

CONCLUSION

Accordingly, we respectfully renew our request that the Court enter a final order, based upon the trial evidence and briefing, denying Bell relief from liquidated damages of $447,678 and all other relief, apart from the undisputed contract balance.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
JOAN STENTIFORD-ULMER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-0476

Attorneys for Defendant

January 22, 2008

CERTIFICATE OF FILING

I certify that the attached document was filed electronically on January 22, 2008. Service is complete upon filing and is made by means of the Court's electronic system. Parties and others may access this filing through the Court's system.

s/Kyle Chadwick