IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BELL BCI COMPANY,

PLAINTIFF,

v.

THE UNITED STATES,

DEFENDANT.

No. 03-1613C
Judge Wheeler

# PLAINTIFF'S POST-TRIAL REPLY BRIEF

Richard O. Wolf
Charlie C.H. Lee
Robert D. Windus
Kristen A. Bennett
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com
Counsel for BELL BCI Company

Dated: January 22, 2008

# TABLE OF CONTENTS


**PAGE NO.**

**TABLE OF AUTHORITIES** ........ ii

**I. SUMMARY** ........ 1

**II. BELL'S RESPONSE TO THE GOVERNMENT'S PROPOSED FINDINGS OF FACT** ........ 5

**III. ARGUMENT** ........ 27

**A. THE GOVERNMENT FAILED TO PROVE ACCORD AND SATISFACTION** ........ 27

**B. THE GOVERNMENT IS NOT ENTITLED TO LIQUIDATED DAMAGES; RATHER, BELL IS ENTITLED TO A COMPENSABLE TIME EXTENSION** ........ 28

**C. THE EVIDENCE SUPPORTS A FINDING OF CARDINAL CHANGE** ........ 31

**D. BELL AND ITS SUBCONTRACTORS DEMONSTRATED COMPENSABLE DISRUPTION** ........ 34

**E. BELL CLEARLY STATED ITS POSITION REGARDING THE DISPUTED EWOS – IT IS ENTITLED TO PAYMENT FOR THE EXTRA WORK IT PERFORMED** ........ 35

**IV. CONCLUSION** ........ 36

**CERTIFICATE OF SERVICE**

**APPENDIX 1**

**APPENDIX 2**

# TABLE OF AUTHORITIES

**PAGE NO.**

**CASES**

***Atlantic Dry Dock Corp. v. United States*,**
**773 F. Supp. 335 (M.D. Fla. 1991)........ 10, 32**

***BELL BCI Co. v. United States*,**
**72 Fed. Cl. 164 (2006)........ 27, 28**

***Blake Constr. Co.*,**
**80-2 BCA ¶ 14,756 (1980)........ 9, 10, 33**

***Cannon Constr. Co. v. United States*,**
**319 F.2d 173 (1963)........ 33**

***David J. Tierney, Jr., Inc.*,**
**88-2 BCA ¶ 20,806 (1988)........ 9, 10**

***Design and Production, Inc. v. United States*,**
**18 Cl.Ct. 168 (1989)........ 35**

***Essex Electro Engineers, Inc. v. Danzig*,**
**224 F.3d 1283 (Fed. Cir. 2000)........ 35**

***Green Management Corp. v. United States*,**
**42 Fed. Cl. 411 (1998)........ 33**

***PCL Construction Services, Inc. v. United States*,**
**53 Fed. Cl. 479 (2002)........ 28**

***Seeds & Derham v. United States*,**
**92 Ct. Cl. 97 (1941)........ 33**

**REGULATIONS**

**Federal Acquisition Regulation § 52.243-4(d), Changes........ 35**

**PLAINTIFF'S POST-TRIAL REPLY BRIEF**

## I. SUMMARY

In its opening Brief, the plaintiff, BELL BCI Company ("BELL"), focused on the evidence presented at trial which answered the key questions raised by the Court in its Order of July 14, 2006, regarding the affirmative defense of accord and satisfaction asserted by the defendant, the United States ("Government"). The undisputed evidence showed that: (i) there was no meeting of the minds between BELL and the Government to release claims for cumulative impact or inefficiency; (ii) the Government never provided any consideration to BELL to release cumulative impact or inefficiency claims; (iii) the phrase "attributable to the modification" which was used in the contract modifications ("Mods.") involved only direct costs for the changes attributable to the particular Mod.; (iv) the phrase "indirect costs" used in the Mods. referred only to general and administrative costs; and (v) BELL did not waive its cumulative impact or inefficiency claims by signing Mods. without an express reservation of rights because those claims had not matured, could not reasonably have been known, and were not released therein.

BELL's opening Brief also showed that the undisputed evidence established that the Government's numerous changes to the work caused a cumulative impact that decreased BELL's labor efficiency and adversely impacted BELL's ability to complete the unchanged work. Furthermore, the evidence fully supported BELL's entitlement to a compensable time extension and its claims for payment for additional work. Finally, BELL's opening Brief showed that the evidence supported the separate claims of its subcontractors. In particular, witnesses for Stromberg Metal Works, Inc. ("Stromberg") testified regarding the inefficiencies and impacts caused by the Government's actions.

Conversely, the Government's opening Brief did not focus on the evidence that was actually presented, nor the issues that the Court directed the parties to address.[1] Rather, the Government's opening Brief offered an admixture of incorrect legal and factual assertions, and rhetoric laced with *ad hominem* attacks. Among other things, the Government wrongly tried to shift the burden of proof regarding accord and satisfaction to BELL by framing the issue to be addressed as whether BELL "can point to any supposed breaches or changes by NIH that were not resolved by accord and satisfaction . . ." As this Court has already ruled, it is the Government's burden to prove the existence of accord and satisfaction; BELL does not have to prove the negative.

The Government's attempt to shift the burden of proof is easily dealt with. A more troubling issue is presented by the Government's unfounded attacks on BELL's witnesses, particularly Mr. Thomas Bell, and the Government's incorrect assertions regarding the testimony of the witnesses. The Government goes so far as to accuse Mr. Bell of giving "false" testimony. As discussed in detail below, the Government's accusation is demonstrably unsupported.

Ironically, the record shows not only that the Government's effort to smear BELL and its witnesses is devoid of merit, but that the Government – not BELL – is the party that has repeatedly made assertions of fact throughout the course of this litigation that have been proven to be untrue. For example, from the time that the Complaint was filed in this matter in 2003, the Government vehemently denied that, when Mod. 93 was negotiated, it represented to BELL that few changes would be made thereafter and that it would pay BELL to perform any such changes on an accelerated basis. Indeed, the Government asserted to this Court that it was "absurd" for BELL to claim that

[1] This was consistent with the Government's decision not call its Contracting Officer as a witness and its complete failure to elicit any testimony from its witnesses regarding the key accord and satisfaction questions that the Court wanted the parties to address.

such representations had been made. (*See* Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 48 at pp. 32-33, filed 8/15/05). At trial, however, both of the Government's witnesses confirmed that the Government had in fact represented to BELL that future changes would be limited and that acceleration costs would be paid. (*See* Plaintiff's Post-Trial Brief, Proposed Findings of Fact ("PFF"), ¶ 28 at p. 9).[2]

Moreover, as noted in the Government's internal contemporaneous records and affirmed by testimony of its own witnesses, the Government admitted that it had to cease issuing changes to BELL in order for BELL to be able to meet the various interim milestone dates, yet it proceeded to issue hundreds of changes with the directive that BELL implement them without any impact to the schedule and without payment to accelerate. Similarly, the Government's own documents and the testimony of its trial designee, Mr. Brian Temme, showed that it assessed liquidated damages in retaliation for BELL filing a Request for Equitable Adjustment ("REA") and that it asserted baseless backcharges as a tactic to try to force BELL to settle its claims. (*See* PFF, ¶ 234 at p. 57).[3]

---

[2] There are numerous other instances during the course of this litigation in which the Government has made an assertion that was utterly untrue. For example, the Government previously asserted to this Court that it was an "uncontroverted fact" that BELL had "jointly" designed the new floor that was added during construction. (*See* Defendant's Proposed Findings of Uncontroverted Fact, ¶ 4 at p. 2, filed 6/3/05). At trial, however, the Government conceded that BELL was not involved in designing the new floor. (*See* Stipulation of Uncontested Material Facts ("Stip."), ¶ 21). The Government previously asserted to this Court that it was "untrue" that it ever represented to BELL that the new floor would be a duplicate of the third floor. (*See* Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 20 at p. 12, filed 8/15/05). Contrary to the Government's assertion, its own records show that it repeatedly stated in writing that that the new floor would duplicate the third floor. (*See* Plaintiff Exhibits ("Ptf. Ex.") 13, 15, 18, and 20; Stip. ¶¶ 22-24). The Government's cavalier use of epithets such as "false," "untrue" and "absurd" is singularly inappropriate given that in every instance, its own documents and witnesses reveal its accusations to be baseless.

[3] The Government acknowledges that it did not pursue its backcharge claims at trial. *See* Government Brief at p. 2. The Government ignores the fact, however, that since July 2002, it has used those claims as a basis for refusing to pay BELL any part of the undisputed Contract balance.

The final and fatal blow to the Government's claim for liquidated damages is delivered by the analyses of the parties' respective expert witnesses. BELL's expert, Mr. Patrick Brannon, presented two methodologies which proved that BELL was entitled to a compensable time extension and was not, therefore, liable for liquidated damages. First, Mr. Brannon performed the time impact analysis ("TIA") expressly required by the Contract. Second, he performed a "windows" analysis which reconciled his TIA with the as-built data. (*See* PFF, ¶¶ 181-185).

In its Brief, the Government chides Mr. Brannon for performing the TIA mandated by the Contract. The Government's position makes no sense: Having made the preparation of a TIA a contractual requirement, the Government cannot now complain that it is inappropriate to use that form of analysis. Even more puzzling, however, is the Government's assertion that Mr. Brannon "did not present" his windows analysis at trial. In fact, Mr. Brannon testified at length regarding his windows analysis and the conclusions drawn therefrom. (*See* PFF, ¶¶ 181-185; Ptf. Ex. 94C; Ptf. Ex. 94D; Brannon Transcript ("Tr."), 1265, line 16 - Tr. 1266, line 12; Brannon, Tr. 1270, line 1 - Tr. 1272, line 5). Once again, the Government has made an assertion that is demonstrably incorrect.

In contrast to Mr. Brannon's analyses, the Government's expert, Mr. Ted Scott, did not perform the TIA required by the Contract. Although Mr. Scott did perform a type of windows analysis, he failed to take into account the cause of those delays he identified. (*See* PFF, ¶ 186 and ¶ 188). Furthermore, Mr. Scott failed to analyze the independent critical paths for each of the interim milestones; he analyzed only the final completion milestone. Thus, he failed to determine whether there was excusable delay with regard to any of the interim milestones, and could not rebut Mr. Brannon's analysis of each of the independent critical paths and his conclusion that BELL was entitled to a compensable time extension due to Government-caused delays. (*See* PFF, ¶¶ 203-205).

The Government's inflammatory rhetoric cannot change or diminish the evidence that was actually presented at trial. Pursuant to the evidence and applicable law, BELL proved that the Government breached the Contract and that BELL is entitled to the damages it has claimed for delay, cumulative impact, inefficiency and additional work performed. The evidence further showed that BELL's subcontractors were damaged by the Government's breach of contract, thereby entitling them to the damages they seek.

## II. BELL'S RESPONSE TO THE GOVERNMENT'S PROPOSED FINDINGS OF FACT

The Government's Brief asserts a number of Proposed Findings of Fact (hereinafter referred to as "Dft. PF."). BELL hereby responds to a number of those assertions in the order that they were presented by the Government and in accordance with the paragraph number designations that it used.

Dft. PF, ¶ 1.1: The Government incorrectly cites to Tr. 176, lines 15-17, as proof that BELL placed emphasis on the testimony of Mr. Bell. As that transcript cite shows, BELL's counsel simply identified Mr. Bell as the person in a photograph that was standing directly next to Congressman Stokes on the day that the project underlying this dispute (the "Project") was dedicated. BELL has not given greater or less emphasis to the testimony of Mr. Bell than any other witness that testified. The Government's conclusory assertion that Mr. Bell made "misstatements and distortions of fact" is not true.[4] The Government's citation to Tr. 210, line 16 and Tr. 243, lines 3-10, shows that Mr. Bell accurately testified that he was being examined at BELL's headquarters because he was undergoing medical treatment. It is a matter of record that, as the Government states, the trial was postponed at BELL's request because Mr. Bell's treatment precluded him from being able to testify

---

[4] In subsequent paragraphs below, BELL refutes the Government's specific allegations regarding Mr. Bell's testimony by noting that the transcript citations do not support the Government's contentions.

at the time the trial was originally scheduled. BELL's request was entirely proper.

Dft. PF, ¶ 1.2: The Government incorrectly asserts that Mr. Bell may have "exaggerated" when he testified that BELL did not receive the design documents for the new floor "for several months" after it received the Government's Feasibility Study. (Bell, Tr. 223, lines 7-15). The Government's Feasibility Study is dated January 8, 1999. (*See* Ptf. Ex. 13). On March 29, 1999, the Government's Contracting Officer signed Change Order No. 029, which the Government's Brief claims provided "construction-ready structural drawings."[5] (*See* Ptf. Ex. 27). It is undisputed that the Government did not issue what it purported to be final design plans for the new floor until September 30, 1999. (*See* Stip., ¶ 34). Thus, Mr. Bell did not exaggerate by referring to this period of time as "several months."

Dft. PF, ¶ 1.3, ¶ 1.4, ¶ 1.5 and ¶ 1.6: The Government incorrectly asserts that Mr. Bell gave "false" testimony regarding when BELL believed it was being impacted by a possible cumulative impact and reserved its rights. The Government is disingenuous in making that assertion. As the transcript cited by the Government shows, Mr. Bell was asked by counsel for BELL and the Government specifically about what occurred after Mod. 93 and the reservation of rights language in Mods. that were signed thereafter. (BELL, Tr. 255, line 21 - Tr. 256, line 9; BELL, Tr. 264, line 21 - Tr. 265, line 7.) At no time did the Government examine Mr. Bell about Mods. signed before Mod. 93. In fact, counsel for the Government did not show Mr. Bell a single document during his

[5] Change Order No. 029 reflects yet another instance in which the Government has made a factual assertion that it is wholly incorrect. When BELL cited to Change Order No. 029 during the summary judgment proceedings, the Government represented to this Court that: "There was no document on this project formally called a change order." (*See* Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 38 at p. 25, filed 8/15/05 (emphasis in original)). The Government's repeated willingness to sacrifice the truth in order to cast aspersions on BELL is puzzling.

entire cross-examination.

As the record shows, there were over 200 Mods. issued on the Project, with the first one being issued in 1998. (*See* Stip., ¶ 44; Ptf. Ex. 708). It would be appropriate, therefore, for the Court to take judicial notice that it is unreasonable for the Government to impugn Mr. Bell's integrity because he may not have committed the terms of each and every Mod. to memory, particularly when the Government did not show him copies of any Mods. during his cross-examination. Notwithstanding that, Mr. Bell's testimony that BELL did not know of a cumulative impact to the unchanged work prior to Mod. 93 was true and corroborated by other witnesses, as well as by the reasonable inferences that can be drawn from the Government's own documents regarding the necessity to stop issuing changes. (Bardin, Tr. 316, lines 2-14; Rothrock, Tr. 521, line 19 - Tr. 522, line 5; Brannon, Tr. 628, lines 10-23; Ptf. Ex. 34; Ptf. Ex. 39A; Ptf. Ex. 65).

Despite the fact that it never cross-examined Mr. Bell about Mods. prior to Mod. 93, nor showed him copies of those Mods., the Government asserts that reservation language in several Mods. predating Mod. 93 "disproved" Mr. Bell's testimony. In fact, those prior Mods. do not "disprove" Mr. Bell's testimony in any regard. If the Government had actually bothered to cross-examine Mr. Bell about those prior Mods., instead of merely besmirching his integrity, it would have learned that, just as the testimony of the Stromberg witnesses showed, the reservation in those pre-Mod. 93 Mods. was due to the unique circumstances surrounding Stromberg's claims for impacts to the changed work; they had nothing to do with BELL's cumulative impact claim for impacts to the base contract work.

As the evidence showed, Stromberg was one of the first subcontractors on site and had essentially completed its base contract work when the Government began to issue numerous changes.

(Engle, Tr. 865, line 19 - Tr. 866, line 5; Freeman, Tr. 910, lines 18-25; Brannon, Tr. 1281, line 24 - Tr. 1282, line 12). Stromberg's inefficiency and impact claims, therefore, deal with its inability to complete its change work efficiently. (Freeman, Tr. 913, lines 11-18). The reservation language in Mods. 80, 84 and 86 identified by the Government was inserted because Stromberg had notified BELL and the Government of the inefficiency it was encountering in completing changed work.[6] (Freeman, Tr. 906, line 23 - Tr. 907, line 20; Freeman, Tr. 908, line 10 - Tr. 910, line 8).

Thus, the purpose for which rights were reserved in these pre-Mod. 93 Mods. had nothing to do with, nor any bearing on, BELL's cumulative impact claims. As the record shows, the reservation language in these few Mods. simply dealt with the impacts to the changed work that affected Stromberg.

Dft. PF, ¶ 1.7, ¶ 1.8, ¶ 1.9 and ¶ 1.10: BELL's witnesses testified that BELL did not know of a possible cumulative impact claim until near the end of the Project. (Bell, Tr. 266, lines 14-15; Bardin, Tr. 316, lines 2-14; Rothrock, Tr. 521, line 19 - Tr. 522, line 5; Brannon, Tr. 628, lines 10-23). The Government did not offer any factual or expert testimony to rebut BELL's cumulative impact claim. Nevertheless, the Government asserts that, as a legal and factual matter, BELL's cost records provided it with information sufficient to know that it had a cumulative impact claim. The Government's assertion fails for three reasons.

First, the Government ignores the fact that BELL's job cost records were not prepared or maintained as a litigation tool to determine the existence of a cumulative impact claim. (Bardin, Tr.

---

[6] Mods. 80 and 81 were signed by the parties on the same date. Mods. 82 and 83 were deductive modifications. The reservation in all of these Mods. appears to have been typed in by the Government. The Government, however, did not examine any of its own witnesses or any of BELL's witnesses about these Mods.

500, lines 16-24). The analysis needed to determine, analyze and quantify a cumulative impact claim that Mr. Brannon performed was not one which BELL reasonably could have been expected to perform during the Project construction. (Brannon, Tr. 801, lines 3-10).

Second, and more importantly, the Government ignores the fact that it expressly represented to BELL during the Partnering Meeting to negotiate Mod. 93 that few changes would be issued thereafter, and that it would pay BELL to perform any such changes on an accelerated basis. (Bell, Tr. 231, lines 1-8; Bell, Tr. 232, line 24 - Tr. 234, line 4; Bell, Tr. 250, lines 3-7; Bardin, Tr. 314, line 12 - Tr. 315, line 20; Bardin, Tr. 317, lines 4-22; Bardin, Tr. 318, line 12 - Tr. 319, line 13). Thus, based on the Government's representations, BELL had no reason to suspect a cumulative impact would prevent it from completing the unchanged work when it agreed to Mod. 93. (Bell, Tr. 250, lines 3-7; Bardin, Tr. 317, lines 4-22).

Third, given the Government's representations, there was no reason for BELL to foresee a cumulative impact claim at that time. Indeed, the Government's own internal documents confirm that it knew that it was incumbent on it not to make changes to BELL's work after Mod. 93 was executed. (*See*, *e.g.*, Ptf. Exs. 34, 39A and 65). As the undisputed evidence further showed, BELL's focus was on trying to keep up with the changes being issued by the Government and meet the interim milestone dates; cumulative impact was not on its "radar screen" until well after Mod. 93 was signed. (Bardin, Tr. 316, lines 2-14).

Moreover, contrary to the Government's assertion, as a matter of law, a contractor does not release an undisputed and unknown claim by "failing" to reserve its rights in a change order because "there can be no mutual agreement with respect to that claim." *See*, *e.g.*, *Blake Constr. Co.*, 80-2 BCA ¶ 14,756 at p. 5; *David J. Tierney, Jr., Inc.*, 88-2 BCA ¶ 20,806 at p. 2 and p. 74 ("the

negotiated prices of the contract changes failed to address this cumulative impact experienced, and therefore do not preclude appellant's claim by way of an accord and satisfaction" and rejecting accord and satisfaction defense based on contract modifications because cumulative impact claims were "never part of the contract modification negotiations."); *Atlantic Dry Dock Corp. v. United States*, 773 F. Supp. 335, 339 (M.D. Fla. 1991) (holding that language in modification expressly releasing disruption claim was ambiguous with regard to release of a cardinal change claim and "[t]hus, this Court cannot infer an intent to release the cardinal change claim from any direct reference to the release provision.").[7] If the Government had wanted BELL to release unknown claims, it could have inserted appropriate release language in the Mods. The Government, however, did not do that.

Furthermore, the Government did not elicit any testimony from its two fact witnesses, Messrs. Temme and Kutlak, to establish whether the Government intended BELL to release claims for cumulative impact and inefficiency, or to set forth the Government's understanding of the meaning of the release language in Mod. 93 and other Mods.[8] Likewise, the Government did not call its Contracting Officer as a witness. Thus, BELL's testimony on those issues, which established that BELL did not know of cumulative impact and inefficiency claims and did not intend to release such claims under the limited release language in Mod. 93 and other Mods., is unrebutted. It is reasonable to infer that the Government's witnesses would have corroborated the testimony of BELL's

---

[7] Copies of *Blake Constr. Co.* and *David J. Tierney, Jr, Inc.* were appended to BELL's opening Brief.

[8] Messrs. Temme and Kutlak's contemporaneous records, however, show that they understood that release language to in Mod. 93 to embrace only delay claims. (*See* Ptf. Ex. 34 at p. 2 (referring to negotiation of a "delay agreement"); Ptf Ex. 39A (stating that Mod. 93 negotiations were "aimed toward . . . settling the time impact of all changes to date.")).

witnesses on these issues, or else presumably the Government would have had them state their contrary understanding on the record.

Dft. PF, ¶ 1.11, ¶ 1.12, ¶ 1.13 and ¶ 1.14: The Government incorrectly asserts that Mr. Bell "erroneously testified" regarding the extent of the changes made by the Government. Mr. Bell correctly testified that the changes made by the Government were "in the 50 percent range," as measured by an increase of the original Contract price. (Bell, Tr. 254, lines 13-21). The original Contract price was $63,663,745.00. (*See* Stip, ¶ 7). The adjusted Contract price is $85,048,515.00. BELL is seeking an equitable adjustment of $8,274,924.00, exclusive of interest. The subcontractor claims seek $1,690,352.00, exclusive of interest. These claims, exclusive of interest, would adjust the Contract price to $95,013,791.00. That adjusted Contract price amount is certainly "in the 50 percent range" as Mr. Bell testified.

The Government's effort to discredit Mr. Bell also misses the point, because by any reasonable measure the changes made by the Government were extraordinary and unexpected. It is indisputable that, in the agreed upon Mods. alone, the Government's changes reflect an approximately 34% increase in the Contract value. The evidence from witnesses other than Mr. Bell showed that the expected range of changes on a construction project is only in the range of 5-10% of the Contract price. (Engle, Tr. 865, lines 3-16; Freeman, Tr. 898, lines 9-13; Freeman, Tr. 899, lines 6-15). BELL's expert, Mr. Brannon, testified that when changes get to the 20-30% range, you see a significantly different project and that the changes made by the Government were "pretty far off the charts." (Brannon, Tr. 614, lines 11 - Tr. 616, line 7; Ptf. Ex. 94B, Slide 32). The Government offered no fact or expert testimony to dispute this evidence.

Equally unavailing is the Government's assertion that there was no foundation for Mr. Bell

and Mr. Bardin to testify that the Government changes sometimes were at the rate of two or more a day. (Bell, Tr. 257, lines 13-14; Bardin, Tr. 333, line 24 - Tr. 334, line 4). Messrs. Bell and Bardin's testimony was confirmed several times. First, the Government's own contemporaneous documents showed that, after Mod. 93 was issued, the Government did in fact issue changes at the rate described by Messrs. Bell and Bardin. (Ptf. Ex. 65, NIH Minutes 1/11/2001, ¶ 1.B.2; Temme, Tr. 1034, line 20 - Tr. 1035, line 8). Mod. 93 covered changes transmitted prior to September 1, 2000. (Ptf. Ex. 39). As noted in the Government's contemporaneous records, on January 11, 2000, its witnesses, Messrs. Temme and Kutlak, advised NIH personnel that they could not continue to implement changes and noted that:

**There are about (250) extra work orders pending and another (200) anticipated.**

(Ptf. Ex. 65, NIH Minutes 1/11/2001, ¶ 1.B.2). Thus, in the space of approximately 4 ½ months (*i.e.*, from September 1, 2000-January 11, 2001), the Government recognized approximately 450 changes were pending or anticipated. Under any scenario, this equates to at least an average of 2 or more changes per work day.

Dft. PF, ¶ 1.15 and ¶ 1.16: The Government wrongly asserts that Mr. Bell was "misleading" when he testified that, "I think the first time [the Government] ever come back and said they would hold liquidated damages against us was when we turned in our REA, or shortly right around that period, when they knew it was coming." (Bell, Tr. 265, lines 11-15). The Government bases its assertion on a letter from its Contracting Officer to BELL. The Government's reliance on this letter is misplaced, because it never cross-examined Mr. Bell about the letter. If the Government wanted to challenge Mr. Bell's recollection, it should have shown him the document in question. There is simply no basis for the Government to accuse Mr. Bell of being "misleading" when it never

examined him about this letter.

It is regrettable that the Government shows no compunction in making unfounded allegations against Mr. Bell. The Government's action is particularly egregious in this instance because, irrespective of the Government's failure to actually cross-examine Mr. Bell about the letter in question, its own internal documentation and the testimony of its own trial designee fully corroborated Mr. Bell's recollection as to when the Government actually assessed liquidated damages. (*See* Ptf. Ex. 61; Temme, Tr. 1016, line 3 - Tr. 1017, line 16). On January 15, 2002, the Government's trial designee, Mr. Temme, notified the Contracting Officer in writing about possibly assessing liquidated damages against BELL. (Temme, Tr. 1016, lines 3-16; Ptf. Ex. 61). Mr. Temme testified that an attorney in NIH's General Counsel's Office had directed that liquidated damages be assessed only if BELL submitted a claim. Specifically, Mr. Temme testified:

> ***Q.*** **So . . . this lawyer from the Office of General Counsel had given an instruction that liquidated damages were not to be included unless Bell submitted a delay claim, correct?**
>
> ***A.*** **Yes.**
>
> ***Q.*** **And then you go on to say to Ms. Taylor there, "Maybe you should show Jeff the letter Bell sent you recently, which said they would be submitting a claim within 60 days and ask if we should start holding for LDs based on that letter." LDs refers to liquidated damages, correct?**
>
> ***A.*** **Yes.**
>
> ***Q.*** **And in fact as we saw in the contracting officer's final decision, which you were the author, LDs were held as a result, correct?**
>
> ***A.*** **Yes.**

(Temme, Tr. 1017, lines 11-16). In short, there was nothing "misleading" about Mr. Bell's recollection. To the contrary, he accurately recalled the punitive manner in which the Government

assessed liquidated damages.

Dft. PF, ¶ 1.17: The Government wrongly asserts that Mr. Bell had a "superficial" understanding of the damages that BELL is claiming. In fact, Mr. Bell testified accurately as to the damages for which BELL is seeking recovery. (Bell, Tr. 240, line 16 - Tr. 241, line 12). The Government's criticism of Mr. Bell is particularly unfounded given that BELL's testimony regarding its damages was thoroughly presented by the factual testimony of Mr. Bardin and the expert testimony of Mr. Brannon.

Dft. PF, ¶ 2.1, ¶ 2.2, ¶ 3.1, ¶ 3.2 and ¶ 3.3: In ¶ 2.2 of Dft. PF, the Government correctly quotes the final paragraph that appeared in Mod. 93 and various Mods. thereafter. This paragraph was one that the Court highlighted in its July 14, 2006 Order as containing several issues that should be addressed at trial. The Government failed, however, to offer any testimony to explain what the terms in that paragraph meant and what the parties' intent was vis-a-vis those terms. Conversely, BELL presented unrebutted testimony showing that:

- None of the Mods. that BELL entered into with the Government reflected a meeting of the minds to waive or release cumulative impact or inefficiency claims.

- The Government never provided BELL any consideration under Mod. 93 or any other Mods. to waive or release cumulative impact or inefficiency claims.

- The statement in Mod. 93 and certain other Mods. that the Government is released from "further equitable adjustment attributable to the Modification" extended only to the direct costs of the changed work listed therein and was never intended or understood to release any claims for cumulative impact or inefficiency.

- The phrase "indirect costs" used in Mod. 93 referred only to general and administrative costs and did not encompass cumulative impact or inefficiency costs.

(*See* Bell, Tr. 231, lines 1-8; Bell, Tr. 232, line 24 - Tr. 234, line 5; Bell, Tr. 235, lines 8-22; Bardin,

Tr. 314, line 12 - Tr. 315, line 20; Bardin, Tr. 318, line 12 - Tr. 319, line 13;Bardin, Tr. 322, line 11 - Tr. 323, line 15; Bardin, Tr. 487, line 16 - Tr. 488, line 12; PFF, ¶¶ 28-37).

In ¶ 3.1 and ¶ 3.2 of Dft. PF, the Government incorrectly conflates BELL's general understanding of what can constitute a cumulative impact with when BELL knew that it was being affected by cumulative impact. General knowledge of the definition of a cumulative impact does not *ipso facto* mean that a contractor knows that changes issued on a job are causing a cumulative impact. Once again, the Government ignores key undisputed facts that establish why BELL did not and could not know of a cumulative impact when it entered into Mod. 93.

First, BELL entered into the Contract based on what were represented to be 100% complete plans and specifications. (*See* Stip., ¶ 2 and ¶ 10; Bell Tr. 216, line 20 - Tr. 217, line 8; Kutlak, Tr. 1242, lines 4-13). On that basis, it was reasonable to expect changes that would be in the range of 5-10% of the Contract price. (Bell, Tr. 241, line 13-Tr. 242, line 2; Engle, Tr. 865, lines 3-16; Freeman, Tr. 898, lines 9-13; Freeman, Tr. 899, lines 6-15).

Second, the Government expressly represented to BELL during the Partnering Meeting at which Mod. 93 was negotiated that few changes would be made thereafter and that any changes made would include payment for acceleration. (Bell, Tr. 230, lines 7-17; Bardin, Tr. 317, line 19 - Tr. 319, line 2; Temme, Tr. 951, lines 2-11; Temme, Tr. 958, lines 7-12; Temme, Tr. 1027, lines 4-8; Kutlak, Tr. 1221, line 24 - Tr. 1222, line 8). BELL made it clear to the Government during that Partnering Meeting that it could agree to the proposed interim milestone completion dates based on the changes that the Government had issued to date (*i.e.*, August 31, 2000), and with the Government's representation regarding limited future changes. (Bardin, Tr. 316, line 15 - Tr. 317, line 22).

Third, it is undisputed that the Government made numerous changes after Mod. 93 and refused to authorize or compensate BELL to accelerate its manpower. (Bell, Tr. 236, lines 10-25; Bell, Tr. 264, lines 17-20; Bardin, Tr. 324, line 22 - Tr. 325, line 18; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 64 at p. 43, filed 8/15/05). In light of these facts, there was no basis for BELL to suspect that it would suffer a cumulative impact either when it entered into the Contract or when it agreed to Mod. 93. Rather, based on the Government's representations, BELL reasonably assumed that it would be able to complete its work in accordance with the interim milestones established by Mod. 93. The Government's continuous changes, however, made that impossible. (Brannon, Tr. 640, lines 17-21).

Dft. PF, ¶ 3.4 and ¶ 3.5: The Government correctly notes that Section H of the Contract expressly required the submission of a TIA to support any extension of time. In accordance with the Contract's requirements, BELL submitted a TIA. (Brannon, Tr. 658, line 17 - Tr. 659, line 10). Elsewhere in its Brief, however, the Government criticizes BELL for submitting a TIA. The Government's position is indefensible.

Furthermore, the Government fails to address the undisputed evidence which showed that the Government waived the requirement for BELL to submit a TIA during the Project and the parties' course of dealing for resolving time extension requests after Mods. had been executed. As the evidence showed, the Government and BELL agreed to modify the contractual provisions regarding delay claims to allow extra work to be completed as soon as possible and thereby not delay the Project. (Bardin, Tr. 430, line 4 - Tr. 431, line 22). Indeed, Mod. 93 granted a 214 day extension of time for all prior Government changes that had been transmitted as of August 31, 2000. (Ptf. Ex. 39).

After August 31, 2000, as the Government continued to make changes, it agreed that BELL should proceed with performing the changes in lieu of halting its efforts and submitting TIAs. (Bardin, Tr. 333, line 7 - Tr. 334, line 12; Tr. 429, line 14 - Tr. 430, line 15; Tr. 431, lines 6-22). The Government also made it clear to BELL that it would be futile to request a time extension because it repeatedly directed BELL to perform changed work without any impact to the schedule. (Bardin, Tr. 325, line 15 - Tr. 326, line 6).

The Government asserts that BELL "admits" that the Government had the right to direct BELL to proceed with changes after Mod. 93 without affecting the schedule. The Government ignores the fact, however, that contemporaneous with the Government issuing such directives, BELL notified the Government that BELL might raise a claim for delay. (Bardin, Tr. 334, lines 13-18; Kutlak, Tr. 1237, line 9 - Tr. 1238, line 14[9]; Ptf. Ex. 41). Thus, the Government was well aware that BELL did not "admit" that the Government was free to make numerous changes and then require BELL to complete the changes without any impact to the schedule or any additional payment.

Dft. PF, ¶ 3.5, ¶ 3.6, ¶ 3.7, ¶ 3.8, ¶ 3.9, ¶ 3.10, ¶ 3.11, ¶ 3.12 and ¶ 3.13: In ¶ 3.13 of Dft. PF, the Government cites to Mr. Temme's testimony that, in his opinion, BELL was behind schedule "almost from the get go . . ." The contemporaneous records that Mr. Temme and other Government

---

[9] As noted above, the Government's inflammatory accusations against Mr. Bell are based on questions that he was not asked on cross-examination, and documents that he was not shown. The cited reference to the testimony of the Government's witness, Mr. Kutlak, involves cross-examination about Mr. Kutlak's direct testimony in which he incorrectly asserted that BELL did not give the Government notice of possible delay to the schedule caused by post-Mod. 93 changes. On cross-examination, BELL showed Mr. Kutlak Ptf. Ex. 41which refreshed his recollection and that he then relied upon to correct his direct testimony. BELL does not suggest that Mr. Kutlak gave "false" or "misleading" direct testimony just because he initially testified incorrectly. BELL is constrained to point out, however, that the foregoing does underscore that cross-examination and supporting documentation are the proper tools for establishing an evidentiary point. Regrettably, with regard to Mr. Bell, the Government has employed only invective.

representatives prepared state the opposite. On January 14, 1999, just prior to the Government's decision to add the new floor, Mr. Temme stated in writing: "We note that BELL is currently on schedule with zero float." (*See* Ptf. Ex. 15 at p. 2). On January 15, 1999, Mr. Kutlak stated in writing that "[t]he project currently is on schedule . . ." (*See* Ptf. Ex. 16, "Schedule" at p. 3).

The record also shows that, due the numerous changes made by the Government after it decided to add the new floor, it extended the Project schedule by 214 calendar days via Mod. 93. (*See* Ptf. Ex. 39, ¶ 2 at p. 2 (reflecting "a contract completion date of April 30, 2001")). Thus, at least up through Mod. 93, the Government conceded that BELL was on schedule. Stated differently, the Government would not have extended the schedule by 214 calendar days if it thought that BELL was behind schedule.

Furthermore, after Mod. 93, Mr. Temme and other Government representatives recognized that it was incumbent on the Government to cease making changes because additional changes would impact BELL's ability to meet the interim milestone dates. (*See* Ptf. Exs. 34, 39A and 65; Temme, Tr. 1032, lines 10-20; Temme, Tr. 1034, lines 9-24). Nevertheless, the Government continued to make hundreds of changes after Mod. 93. (Temme, Tr. 1034, line 9 - Tr. 1035, line 8; Ptf. Ex. 65, NIH Minutes 1/11/01, ¶ 1.B.2). These changes made it impossible for BELL to meet the interim milestones. (Brannon, Tr. 640, lines 17-21; Ptf. Ex. 94; Ptf. Ex. 94A).

<u>Dft. PF, ¶ 4.1, ¶ 4.2, ¶ 4.3, ¶ 4.4 and ¶ 4.5</u>: The Government incorrectly asserts that it "did <u>not</u> represent to BELL that the new fourth floor would replicate the third floor." (Government's Brief, ¶ 4.2 at p. 17 (emphasis in original)). In fact, the Government's Feasibility Study regarding the new floor, which it gave to BELL to submit a price proposal, stated that the both the exterior and

the interior of the new floor would "be a duplication of the third floor . . ."[10] (*See* Stip, ¶ 22; Ptf. Ex. 13 at p. 6, Bates No. NIH-2-13578). Based on the Government's representation, BELL reasonably understood that the new floor would duplicate the third floor. (Bell, Tr. 245, lines 2 -18). Moreover, the Government repeated its representation that the new floor would "duplicate" or "repeat" the third floor in several other contemporaneous documents. (*See* Ptf. Ex. 15 at p. 1; Ptf. Ex. 18 at p. 1; Ptf. Ex. 20, ¶ 2c at p. 4). In short, the Government's own contemporaneous records wholly refute its assertion that it never represented that the new floor would duplicate the third floor.

Dft. PF, ¶ 5.1, ¶ 5.2, ¶ 5.3, ¶ 5.4, ¶ 5.5, ¶ 5.6, ¶ 5.7 and ¶ 5.8: The Government mistakenly relies on correspondence by and between BELL and two of its subcontractors, Stromberg and Manganaro Corporation ("Manganaro"), to imply that delays to the Project were not the fault of the Government. There is no evidence, however, that the issues discussed in this correspondence involved any critical path delay. In fact, the Government's scheduling expert, Mr. Scott, admitted that this correspondence is merely anecdotal and that he did no analysis to tie the correspondence to any critical path delay. (Scott, Tr. 1130, line 14 - Tr. 1131, line 19). On the other hand, BELL's scheduling expert, Mr. Brannon, analyzed whether BELL caused any concurrent delay and determined that it had not. (Brannon, Tr. 666, line 4 - Tr. 667, line 10; Brannon, Tr. 678, lines 5-7).

The Government tries to distance itself from the statements that NIH submitted to the Congress pursuant to its statutory reporting requirements under the Government Performance and Results Act ("GPRA"), 31 U.S.C. §§ 1115, *et seq*. (*See* Ptf. Ex. 66). It is undisputed that, in

---

[10] BELL presumes that the Government is not making a distinction between the word "replicate" that is used in Dft. PF ¶ 4.2 and the word "duplicate" that is used in the Government's Feasibility Study. If the Government is making that distinction, then it is literally correct in asserting that the Feasibility Study did not state that the new floor would "replicate" the third floor. Substantively, however, such a hyper-literal distinction is meaningless.

February 2002, NIH submitted its "Final FY 2003 GRPA Annual Performance Plan" ("GRPA Report") in which it reported that "**NIH completed construction of the Stokes Laboratories building [50] on schedule** . . . NIH met its long-term goal to complete construction of the Louis Stokes Laboratories building in FY 2001" (*Id.* at p. 4 (emphasis in original); Stip., ¶ 39). The Government suggests that BELL's schedule is not referred to in that GRPA Report. The Government overlooks the fact, however, that GRPA Report stated that the construction was completed in FY 2001, whereas in this litigation, the Government contends that BELL is liable for liquidated damages because the construction was not complete until well after that time period. (Scott, Tr. 1096, line 25, Tr. 1097, line 4) (claiming that final milestone was achieved December 4, 2001).

Although not related to the GRPA Report, in ¶ 5.8 of Dft. PF the Government cites to the direct testimony by Mr. Kutlak regarding purported "significant delays" in construction, particularly involving the roof of the building. On cross-examination, Mr. Kutlak could not recall what year those purported "significant delay" issues regarding the roof, etc. arose. (Kutlak, Tr. 1233, lines 13-25). But, Mr. Kutlak did confirm that the Government had relied on its expert witness for all delay analysis. (Kutlak, Tr. 1234, lines 2-8). Notably, the Government's scheduling expert, Mr Scott, did not identify this purported "significant delay" regarding the roof as an impact to the critical path. These facts, along with the fact that Mod. 93 was executed in October 2000 and provided for a 214-day time extension, show that the Government's reference to "significant delays" is irrelevant.

<u>Dft. PF, ¶ 6.1, ¶ 6.2, ¶ 6.3, ¶ 6.4, ¶ 6.5, ¶ 6.6, ¶ 6.7, ¶ 6.8, ¶ 6.9, ¶ 6.10 and ¶ 6.11</u>: The Government incorrectly asserts in ¶ 6.2 of Dft. PF that "Mr. Brannon made reference at trial to a previously undisclosed 'windows' analysis but did not present it." In fact, Mr. Brannon disclosed

his windows analysis when he was deposed by the Government in 2005 (*see* Brannon Deposition Tr. 26, line 18 - Deposition Tr. 27, line 16, copy appended as Appendix 1 hereto), as well as in his Rebuttal Report (*see* Ptf. Ex. 94A). Furthermore, Mr. Brannon did present his windows analysis at trial; indeed, he testified at length about it on both direct and cross-examination. (Brannon Tr. 641, line 19 - Tr. 646, line 24; Brannon, Tr. 656, line 5 - Tr. 657, line 2; Brannon, Tr. 667, lines 2-10; Brannon, Tr. 687, lines 7-13; Brannon, Tr. 802, line 24 - Tr. 803, line 6; Brannon, Tr. 804, line 23 - Tr. 805, line 2; Brannon, Tr. 1265, line 16 - Tr. 1266, line 12). As Mr. Brannon testified, he used his windows analysis to reconcile his TIA with the as-built data. (Brannon, Tr. 641, line 13 - Tr. 642, line 24).

The Government also incorrectly asserts that Mr. Brannon engaged in "creating modified schedules that do not match the contemporaneous schedules used by the project management team." Mr. Brannon testified that he did not create new schedules to use in his analysis. Rather, he used the updated schedule that was in effect at any given time period. (Brannon, Tr. 664, line 18 - Tr. 665, line 5). These are the exact same updated schedules that were used by the Government. (Brannon, Tr. 1265, line 23 - Tr. 1266, line 6).

In ¶ 6.4 of Dft. PF, the Government wrongly asserts that Mr. Brannon made no attempt to analyze possible concurrent delays or to analyze BELL's performance. In fact, Mr. Brannon expressly performed those analyses. (Brannon, Tr. 666, line 4 - Tr. 667, line 10; Brannon, Tr. 678, lines 5-7). Based on his analyses, he determined that there was no concurrent delay for which BELL was responsible. (*Id.*).

The Government's assertion that Mr. Brannon's analysis established only "theoretical" and not actual delay is incorrect. The Government continues to ignore the fact that Mr. Brannon

reconciled his TIA to the actual as-built data. (Brannon, Tr. 1265, line 16 - Tr. 1266, line 12). The Government also mistakenly deems it probative that Mr. Brannon could not always recall the specific date a particular event occurred. Given the length and complexity of the underlying Project, it is unrealistic to expect any person to commit the dates of all events to memory. The simple fact is that Mr. Brannon's written reports fully set forth the dates of the relevant events and the significance of the events in question. (Ptf. Exs. 94 and 94A). A thorough discussion of Mr. Brannon's schedule analysis and the documentation and testimony supporting it was set forth in BELL's opening Brief at pp. 25-48.

The Government's contention that Mr. Brannon's inefficiency analysis was "entirely general" is easily refuted by the record. A thorough recitation of Mr. Brannon's analysis is set forth at pp. 52-56 of BELL's opening Brief. To reiterate, among other things, Mr. Brannon analyzed each individual floor plan, the location on each floor of where changes were made and the date when the changes were made. (Brannon, Tr. 633, line 6 - Tr. 636, line 1; Ptf. Ex. 94B, Slides 60-75). He analyzed the relevant documentation underlying the changes and met with the appropriate Project personnel to obtain additional information about the changes. (Brannon, Tr. 570, line 1 - Tr. 571, line 4). He also analyzed BELL's labor reports and made adjustments to account for unproductive work that could be deemed BELL's responsibility. (Ptf. Ex. 94, pp. 227-230). Based on this thorough analysis, Mr. Brannon concluded that approximately 25 % of the total hours expended on the Project by BELL was attributable to labor productivity loss on account of the conditions created by the Government's changes. (Ptf. Ex. 94, pp. 229-230).

In sum, the record shows that Mr. Brannon did a thorough analysis and quantification of the changes that caused BELL to incur inefficiency. His analysis was supported by the testimony of

several witnesses about the inefficiencies caused by the Government's changes. (Rothrock, Tr. 523, lines 2-18; Bussey, Tr. 859, lines 8-15) Conversely, the Government did not proffer an expert on labor inefficiency, labor productivity or the quantification of costs associated therewith, and did not introduce any evidence disputing BELL's inefficiency claim.

Like BELL, Stromberg provided specific evidence of the cause and effect of its inefficient performance of work. (Freeman, Tr. 906, line 23 - Tr. 907, line 5). The most significant changes for Stromberg were those documented in the Government's Bulletins 31 through 34, which caused massive changes to the second, third, fifth and sixth floors. (Freeman, Tr. 903, line 23 - Tr. 904, line 22).

In proving causation, Stromberg provided evidence that the Government made major and significant changes on the above-identified floors that involved an increased volume of duct work on the magnitude of 25-50 %, on a poundage basis, as compared to Stromberg's base contract work on those floors. (Freeman, Tr. 907, lines 6-13). The Government's decision to issue this tremendous volume of changes to Stromberg's work came at a time when Stromberg had completed its rough-in work in the second and third floor interstitial spaces and was 75% complete with its fifth and sixth floor interstitial space rough-in. (Engle, Tr. 867, line 16 - Tr. 869, line 23; Tr. 872, lines 11-21; Tr. 873, lines 8-21; Tr. 878, line 18 - Tr. 879, line 9).

Due to the timing and scope of the changes, Stromberg was forced to do its work under adverse conditions, making the performance of such work more difficult and very inefficient, and thus more costly. Stromberg's testimony explained the specific affect of these late and major changes to its work as follows:

- Because most, if not all, of its base contract work in the affected interstitial spaces

was complete, the change work was no longer new construction, but essentially remodel work. (Bussey, Tr. 855, lines 7-9; Engle, Tr. 871, line 19 - Tr. 872, line 10; Freeman, Tr. 908, lines 4-8; Freeman, Tr. 912, lines 17-25).

- When the Government issued a change, Stromberg had to demobilize its crew and then remobilize both men and equipment down to the second level. (Bussey, Tr. 858, lines 5-13). The changes reached the point where, as soon as Stromberg would complete the installation of its duct work as required by the Contract drawings, the Government would then issue another set of drawings to change the completed duct work. This practice occurred throughout the Building on every level and in every area. (Engle, Tr. 865, line 17 - Tr. 866, line 1).

- Given the conditions on the Project, the fact that the area was no longer new construction or wide open and that the crews had to crawl over the existing duct and pipe to remove the old duct and install the new duct, Stromberg had to install the duct one piece at a time. (Engle, Tr. 875, lines 4-19).

- By the time the changes occurred on the Project, there was by then congested use of the elevators by other trades. Stromberg spent ten to fifteen minutes per trip waiting for an elevator. The impact of the delays caused by the wait time for the elevators is demonstrated by the fact that the Government's changes to the third floor added 14,200 pounds of duct requiring 70 trips via elevator for Stromberg's crews to haul that additional duct to the third floor and the demolition work set forth in Bulletin 32 required that Stromberg remove demolished duct by way of another 50 trips. (Engle, Tr. 873, line 8 - Tr. 877, line 14).

- The changed work also required that Stromberg cut sections of the stainless steel, weld new fittings in and install new airtight dampers. (Engle, Tr. 879, lines 16-25; 880, line 19 - 881, line 2). At trial, Mr. Engle described that Stromberg's installation of the changed welding work as "horrible" because "welding is really tough ... you've got to get right up there to weld it, and our guys had to basically crawl over top of stuff, lay on their back, lay on their belly, to make these connections. You could no longer put big pieces together and with welded stuff we'll do that so we'll - the welds will be easier, and you only have one or two tough welds to make. So the whole time they're doing this they got this 3,000 degree welding torch in their hand. So it's very dangerous and very time consuming." (Engle, Tr. 880, lines 4-18).

- The experienced Stromberg witnesses emphasized the difficulty they experienced in performing the Government's required changes so late in the Project. For example, Mr. Bussey described that the change work had to proceed very slowly due to all of the obstacles present in the tight confines of the nearly completed interstitial space. (Bussey, Tr. 858, line 17 - Tr. 859, line 4).

- Mr. Bussey also described that, when Stromberg installed the initial duct work, the Building had no windows, so air circulation was very good. (Bussey, Tr. 860, lines 6-10). However, by the time the Government issued the change work, the windows had been closed in so that when Stromberg installed the changed work, it was operating in hot, humid and difficult work conditions. (Bussey, Tr. 860, lines 11-18).

- Mr. Bussey compared the conditions under which Stromberg installed the change work with working in an attic in summer. He said, "[Y]ou get up there and do something, you start sweating, and you know the heat takes the energy out of you." (Bussey, Tr. 860, lines 11-18).

- Mr. Bussey further explained that the change order work also impacted Stromberg's morale since the changed work was essentially remodel work that was "just so much harder climbing over equipment and poles on your side and it's just - it's hard." (Bussey, Tr. 859, lines 8-15).

- Mr. Engle, Stromberg's Project Manager, explained that, due to the Government's changes, "[i]t was so bad it became laughable after awhile." (Engle, Tr. 865, line 22 - Tr. 866, line 5).

- The changed work also had to be performed very slowly. (Bussey, Tr. 858, lines 17-22). Based on his observations, Mr. Bussey concluded that it had taken Stromberg twice the amount of time to install the change order duct due largely to the fact that the interstitial space was no longer open. (Bussey, Tr. 858, line 23 - Tr. 859, line 4).

The record also shows that there is no support for the Government's assertion in ¶ 6.11 that Stromberg "did not testify . . . that they were not adequately compensated . . . for work pertaining to change orders." When confronted with the inefficient performance caused by the Government's changes, Stromberg advised the Government and sought compensation for its labor inefficiency in change orders to be issued by the Government. (Freeman, Tr. 907, lines 6-13). Stromberg's unrebutted testimony explained that the Government refused to review Stromberg's change order proposals because of Stromberg's inclusion of its inefficiency costs. (Freeman, Tr. 907, lines 14-20). The Government required that Stromberg not price its change orders to address the conditions actually encountered on the Project but, rather, price the changes as a new job instead of a remodel

project. (Freeman, Tr. 908, lines 4-9).

In an attempt to resolve the costs of the changes, Stromberg met with the Government's Contracting Officer. (Freeman, Tr. 908, lines 4-14). At that meeting, the Contracting Officer instructed Stromberg not to place its labor inefficiency in its proposals but rather, to quantify any labor inefficiencies at the end of the Project once those costs became known. (Freeman, Tr. 908, line 10 - 910, line 8). Following that meeting, Mr. Freeman wrote a letter to BELL reiterating the Contracting Officer's instruction to exclude Stromberg's inefficiency costs included in change order proposals. (Freeman, Tr. 908, line 10 - 910, line 8; Pl. Ex. 1241). Major changes affecting Stromberg's work were addressed in Mods. 80, 84 and 86, and BELL reserved rights to assert claims for impacts to that work. (*See* Ptf. Exs. 787, 791 and 793).[11] The Government failed to rebut this testimony and, as noted previously, did not even call its Contracting Officer as a witness.

Thus, Stromberg proved the cause and effect of its inefficiency claim, and linked that inefficiency to the timing, scope and conditions of performance of the Government's changes. Contrary to the Government's assertions, almost the entirety of Stromberg's testimony, and particularly that of Mr. Freeman, involved the fact that the change orders issued did not adequately compensate Stromberg for its cost to perform its work. (Bussey, Tr. 853 - Tr. 861; Engle, Tr. 863 - Tr. 882; Freeman, Tr. 895 - Tr. 914).

Finally, Stromberg proved the damages incurred and resulting from its inefficient

---

[11] Each of these modifications were initially issued as unilateral modification by the Government on a not to exceed cost basis, which were later set forth in bilateral modifications. Mods. 55 and 77 (*see* Ptf. Exs. 762 and 784) set forth the Government's changes to Stromberg's work outlined by Bulletin 31; Mods. 56 and 80 (*see* Ptf. Exs. 763 and 787) set forth the Government's changes to Stromberg's work outlined by Bulletin 32; Mods. 57 and 84 (*see* Ptf. Exs. 764 and 791) set forth the Government's changes to Stromberg's work outlined by Bulletin 33; and Mods. 58 and 86 (*see* Ptf. Exs. 765 and 793) set forth the Government's changes to Stromberg's work outlined by Bulletin 34.

performance of work caused by the Government's changes. The measured mile is a reasonable basis for computation of Stromberg's damages. The measured mile identified by Stromberg was reasonable as demonstrated by its close proximity to the production rate that Stromberg used in its estimate/bid on the Project. (Freeman, Tr. 905, lines 2-17; Ptf. Ex. 1075A). Utilizing this measured mile production rate as a baseline production measure, Stromberg calculated its labor inefficiency costs, which methodology and support was neither challenged nor contradicted by the Government.

## III. ARGUMENT

### A. THE GOVERNMENT FAILED TO PROVE ACCORD AND SATISFACTION

Conspicuously absent from the Government's Brief is an express argument that it proved its affirmative defense of accord and satisfaction. *See* RCFC 8(c) (listing accord and satisfaction as an affirmative defense). Instead, the Government's Brief (*see* ¶ 3 at p. 1) incorrectly framed the issue as whether BELL proved that its claims were not resolved by accord and satisfaction. As a matter of law, it is not BELL's burden to prove the non-existence of accord and satisfaction. Rather, as this Court has previously held, it is the Government's burden to prove accord and satisfaction:

> **The party asserting an accord and satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration.**

*Bell BCI Co. v. United States*, 72 Fed. Cl. 164, 168 (2006) (citation omitted). In further discussing the Government's burden to prove accord and satisfaction, this Court held that the language in the Mods. did not address claims for disruption and cumulative impact and that various key terms were undefined and potentially ambiguous. *Id.*, 72 Fed. Cl. at 168-69.

As noted in BELL's opening Brief (*see* pp. 9-15), BELL presented unrebutted evidence regarding the parties' intent and the meaning of the key undefined and potentially ambiguous terms

used in the Mods. That evidence established, *inter alia*, that there was no meeting of the minds regarding releasing claims for cumulative impact and inefficiency, that those claims were neither known nor in disputed when the Mods. at issue were signed, and that no consideration was given for the release of such claims. Accordingly, the Government has failed to meet its burden to prove accord and satisfaction.

### B. THE GOVERNMENT IS NOT ENTITLED TO LIQUIDATED DAMAGES; RATHER, BELL IS ENTITLED TO A COMPENSABLE TIME EXTENSION

This Court previously held that, "[b]ecause of the parties' change to 14 milestone completion dates in Modification No. 093, and the assessment of liquidated damages against each milestone, this project in reality has 14 completion dates instead of just one." *BELL BCI Co.*, 72 Fed. Cl. at 170. The Government's assertion that it is entitled to liquidated damages is based on its contention that it "proved" that BELL did not meet certain of the interim milestone dates that were established in Mod. 93. The Government's assertion is incorrect, because it failed to analyze the critical path for each of the milestones to determine the cause of delay, failed to prove that its assessment of liquidated damages was proper, and failed to rebut BELL's expert analysis showing excusable and compensable delay for the interim milestones in question.

It is well-settled that "[t]he government has 'the ultimate burden of persuasion as well [as] the initial burden of going forward to show that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing.'" *PCL Construction Services, Inc. v. United States*, 53 Fed. Cl. 479, 484 (2002) (citation omitted). The Government's burden includes showing "that the period for which the [liquidated damages] assessment was made was proper.'" *Id*. at 484 (citation omitted). "The general rule . . . that, once the government has met

its initial burden of going forward, the contractor must prove excusable delays to be relieved of all or part of the liquidated damages assessed, has not been applied, however, when the government has contributed to the delay of the completion of the contract." *Id*. The Government did not meet its burden of proof.

The Government concedes that there is a critical path for each the 14 interim milestone completion dates. (Scott, Tr. 1111, lines 10-14; Scott, Tr. 1137, lines 21-24). Mr. Scott, however, who testified as the Government's scheduling expert, admitted that he did not analyze the critical path to determine whether compensable or excusable delay was available to Bell for each of the 14 intermediate milestones. (Scott, Tr. 1137, line 25 - Tr. 1138, line 4). He testified that he only evaluated the longest path through the Project that led to the last milestone contained in Mod. 93, the Contract's substantial completion milestone. (Scott, Tr. 1111, lines 4-9). By conducting such a limited analysis, Mr. Scott was only able to review the activities that lead to that last milestone. ( Scott, Tr. 1111, lines 15-22; Brannon, Tr. 1274, lines 1-17).

Conversely, BELL's expert, Mr. Brannon, did analyze the critical path for each of the relevant interim milestones and determined the cause and effect of delays for each of those critical paths. (Brannon, Tr. 679, lines 4-19). Mr. Brannon's analysis showed that BELL was not liable for liquidated damages to the Government but rather, that BELL was entitled to extensions surpassing the contractual completion date of each intermediate milestone and an overall compensable time extension of the Contract time. (Brannon, Tr. 647, lines 5-18).

The Contract contains several provisions dealing with time extensions and expressly states that time extensions are to be determined in accordance with a TIA. (*See* Ptf. Ex. 5, Contact, Section H, ¶ 8(h); (Ptf. Ex. 6, Contract Specifications Section 1310, § 7.01.C). Contrary to the Contract's

requirements, the Government's expert, Mr. Scott, never performed a TIA. (Scott, Tr. 1072, line 24 - Tr. 1073, line 4). Mr. Scott did acknowledge, however, that if a contract required a TIA, then case law would dictate that such an analysis be performed. (Scott, Tr. 1076, lines 9-24). He further testified that the TIA is a valid method for quantifying delay. (Scott, Tr. 1076, line 25 - Tr. 1077, line 2).

BELL, through Mr. Brannon, performed the TIA required by the Contract. (Brannon, Tr. 802, lines 7-20). The Government asserts that Mr. Brannon's TIA should be rejected because he purportedly failed to reconcile it with actual events. The Government's assertion is incorrect. Mr. Brannon testified in detail regarding how he reconciled his TIA with actual events through his windows analysis. (Brannon, Tr. 641, line 2 - Tr. 643, line 6; Tr. 1265, line 16 - Tr. 1266, line 12). Mr. Brannon testified that he took a number of steps in that reconciliation process, including the following:

- He reviewed the events that had actually occurred on the Project to compare those events to the as-planned critical paths found in the Schedule Updates BELL had created contemporaneous to its work on the Project. (Brannon, Tr. 641, line 19 - Tr. 642, line 6).

- He tracked through the 14 milestones created by Mod. 93 by month, examining the individual critical paths, in order to identify where delays were indicated on the critical paths from a windows perspective. (Brannon, Tr. 643, lines 7-24).

- He reviewed the plan at the start of each month based on BELL's schedule it had submitted to the Government, and compared that schedule to the events on the Project as they were actually recorded within the schedule in the following month's update. (Brannon, Tr. 643, line 7 - Tr. 644, line 4).

- He explained how his windows analysis revealed that as a result of the Government's changes to the Project, the effect of delay could be found in certain activities in the schedule, and the causation was visible through those activities which remained open (*i.e.* incomplete) month after month. (Brannon, Tr. 643, line 7 - Tr. 645, line 9).

- Based on this reconciliation process, he concluded: (i) BELL was entitled to an extension of the various milestones added by Mod. 93; (ii) BELL was entitled to an extension of the entire Project period; and (iii) the Government was not entitled to liquidated damages. (Brannon, Tr. 656, lines 8-17).

The Government's Brief (*see* p. 28) is also incorrect in asserting that "BELL presented no evidence sufficient to support a finding that any particular number of days delay experienced by BELL during the project are attributable to the Government . . ." Through Mr. Brannon, BELL presented substantial evidence showing in detail how specific Government changes delayed the relevant interim milestones. BELL respectfully directs the Court's attention to pp. 25-52 of its opening Brief which discusses, in detail, the evidence presented which proves the specific delays caused by the Government and BELL's entitlement to a compensable time extension. Mr. Scott's failure to perform a TIA or to analyze the cause of any particular delay precluded the Government from offering rebuttal to the evidence that BELL presented.

### C. THE EVIDENCE SUPPORTS A FINDING OF CARDINAL CHANGE

BELL alleged cardinal change as an alternative to its claim for breach of contract. (*See* Complain, Count IV). "Whether a change is cardinal is principally a question of fact, requiring that each case be analyzed individually in light of the totality of the circumstances." *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 600-01 (2000). Depending on the circumstances, a single change – such as adding an additional floor during construction – or a combination of changes, may constitute a cardinal change. *See* P. Bruner and P. O'Connor, *Construction Law*, § 4:15 ("Although adding a wing or an additional floor to the building under construction is indicative of a potential 'cardinal' change, multiple changes within the structure itself, which have significant disruptive effect on the contractor's performance, cost and time, may also constitute a 'cardinal' change.") (copy submitted

as Appendix 2).

The Government asserts that "no trial evidence" would support a claim for cardinal change. BELL respectfully submits that the evidence before the Court regarding the numerous and pervasive changes made by the Government during construction would support a finding that a cardinal change occurred. The Government's focus on the addition of the new floor and Mod. 93 is misplaced. As the noted in BELL's opening Brief (*see* pp. 52-56), the evidence showed that there were numerous other Government-directed changes that severely impacted the performance of the work. The magnitude of the changes was, as Mr. Brannon testified, "off the charts" and reached the range where you essentially see a significantly different project than what was originally expected. (Brannon, Tr. 614, lines 11 - Tr. 616, line 7; Ptf. Ex. 94B, Slide 32).

The Government also incorrectly asserts that the language in Mod. 93 precludes BELL from asserting a cardinal change claim. This variant of the accord and satisfaction argument raised by the Government during the summary judgment proceedings fails for the same reasons discussed herein and in BELL's opening Brief with regard to the Government's contention that BELL was barred from claiming cumulative impact and inefficiency. Once again, the Government has failed to prove accord and satisfaction because, *inter alia*, there is no evidence that, when Mod. 93 was signed, there was dispute regarding cardinal change and a meeting of the minds to resolve the dispute, nor any consideration for releasing such a claim.

As a matter of law, Mod. 93 (nor any of the other Mods.) can be interpreted as a release of such claims. *Atlantic Dry Dock Corp.*, 773 F. Supp. at 339 (holding that language in modification expressly releasing disruption claim was ambiguous with regard to release of a cardinal change claim and "[t]hus, this Court cannot infer an intent to release the cardinal change claim from any direct

reference to the release provision.").

The other cases cited by the Government do not support its accord and satisfaction argument. In *Cannon Constr. Co. v. United States*, 319 F.2d 173, 175-77 (1963), the claimant submitted a delay claim proposal which expressly stated that it was not seeking lost profits based on delay. It then signed a modification stating that it provided "full compensation for said delays." *Id.*, 319 F.2d at 175. Subsequently, the claimant made a claim for lost profits due to delay. Given these circumstances, it is not surprising that the court held that the claimant's claim was barred. *Id.* at 177.

Similarly, in *Seeds & Derham v. United States*, 92 Ct. Cl. 97, 110 (1941), the court held that the claimant knew that the modification it signed was intended to cover delay and it belatedly asserted a claim for additional payment only when it happened to read a subsequent decision of the court and tried to avail itself of that later ruling. Finally, in *Green Management Corp. v. United States*, 42 Fed. Cl. 411, 439-440 (1998), the court found that there was a meeting of the minds between the parties and rejected the claimant's assertion that it signed the contract modification under duress. In contrast, the unrebutted evidence here showed no meeting of the minds, and certainly no express discussion, regarding a claim for cardinal change (or cumulative impact and disruption).

BELL also submits that the Government's assertion that any claim is waived unless it is expressly reserved, even if such claim is unknown or unmatured, is contrary to public policy as well as the case law. Such a narrow construction would force contractors to fully reserve all unknown claims until a project was concluded. This in turn would impede the timely and cost efficient bidding and administration of public contracts. The better position is that noted previously in *Blake Constr. Co.*, 80-2 BCA ¶ 14,756 at p. 5, and which is in harmony with the principles of accord and

satisfaction: "Unless specifically represented otherwise, a change order should not and cannot be interpreted to discharge a claim which is not genuinely in actual or potential dispute at that time, for there can be no mutual agreement with respect to that claim."[12]

### D. BELL AND ITS SUBCONTRACTORS DEMONSTRATED COMPENSABLE DISRUPTION

The Government makes the conclusory assertion that neither BELL nor its subcontractors demonstrated compensable disruption due to changes made by the Government. As noted above, BELL and its subcontractors presented detailed evidence identifying and quantifying the disruption that they suffered. *See* Section II, *supra*, at pp. 22-25. *See also*, BELL's opening Brief at pp. 15-21, 52-56, 69-70 and 74. In sum, the record is replete with evidence showing with great specificity the disruption caused by the Government and the damage it caused BELL and its subcontractors.

Conversely, the Government did not proffer any competing expert or fact testimony to refute the evidence that BELL presented. Its effort to label Mr. Brannon's analysis as a "guess" is belied by the testimony and documentation that Mr. Brannon presented, and plainly does not rebut that evidence. (Brannon, Tr. 614, lines 11 - Tr. 616, line 7; Brannon, Tr. 626, line 15 - Tr. 627, line 12; Brannon, Tr. 627, line 21 - Tr. 628, line 1; Brannon, Tr. 628, line 24 - Tr. 629, line 3; Brannon, Tr. 630, lines 8-25; Brannon, Tr. 631, lines 5-9; Brannon, Tr. 631, line 24 - Tr. 632, line 7; Brannon, Tr. 633, line 6 - Tr. 636, line 1; Brannon, Tr. 730, lines 7-21; Brannon, Tr. 740, line 20 - Tr. 741, line 12; Brannon, Tr. 745, line 23 - Tr. 746, line 9; Brannon, Tr. 746, line 18 - Tr. 751, line 10; Ptf. Ex.

---

[12] Even in the event that the Government's argument is accepted, BELL is still entitled to recover damages for delay, cumulative impact and inefficiency. At trial, BELL identified every Mod. in which it expressly reserved its rights. (*See* Ptf. Ex. 94B, Slide 48; Brannon, Tr. 625, line 24 - Tr. 630, line 7). An analysis of just those specific Mods. demonstrates that BELL is entitled to a compensable time extension, that liquidated damages may not be assessed, and that BELL is entitled to damages for cumulative impact and inefficiency. (*See* Ptf. Ex. 94B, Slides 48-50; Brannon, Tr. 625, line 24 - Tr. 630, line 7).

94, pp. 218-219 and 227-230; Ptf. Ex. 94B, Slides 32, 51-59 and 60-75).

### E. BELL CLEARLY STATED ITS POSITION REGARDING THE DISPUTED EWOS – IT IS ENTITLED TO PAYMENT FOR THE EXTRA WORK IT PERFORMED

The Government's Brief (*see* p. 33) incorrectly states that "[p]rior to trial, BELL proposed no conclusions of law relating directly to any of the 'disputed EWOs' for which it seeks to recover." On July 6, 2007, BELL filed Plaintiff's Proposed Conclusions of Law. BELL's first proposed conclusion of law, which cited to the Federal Acquisition Regulation's Changes clause, § 52.243-4(d), and case law discussing entitlement to an equitable adjustment, *Design and Production, Inc. v. United States*, 18 Cl.Ct. 168, 196 (1989) and *Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283, 1289, 1292 (Fed. Cir. 2000), stated the following:

> **With regard to entitlement to an increase in the Contract price for extra work, BELL will demonstrate that it submitted 58 extra work orders ("EWOs") to the Government pertaining to additional work that it performed. The evidence will show that this work was not called for in the Contract, that the Government required BELL to perform said work, and that the Government wrongly refused to compensate BELL. BELL will demonstrate that the Contract price should be increased by $1,610,987.00, for its performance of this additional work.**

Plaintiff's Proposed Conclusions of Law at p. 11, filed 7/6/07. Thus, contrary to the Government's assertion, prior to trial, BELL did in fact expressly propose a conclusion of law regarding the disputed EWOs.

Moreover, at trial, BELL presented evidence to support its claim for payment. (Bardin, Tr. 291, lines 18-25; Bardin, Tr. 1253, line 24 - Tr. 1255, line 14; Ptf. Ex. 100). This evidence showed that BELL reasonably determined that the work represented in those EWOs was extra work not included in the Contract, that it performed that extra work, and that its costs are accurately reflected in its cost records. (*Id.*; Bardin, Tr. 456, lines 8-13; Bardin Tr. 461, line 9 - Tr. 463, line 15; Ptf. Exs.

247-256). Moreover, BELL showed that the Government reneged on several of these EWOs after the Contracting Officer had given signed approval to pay BELL. (Bardin, Tr. 342, line 19 - Tr. 345, line 5).

## IV. CONCLUSION

For the foregoing reasons, as well as those presented in its opening Brief, BELL respectfully requests that the Court render judgment in its favor finding that the Government breached the Contract and awarding BELL damages of at least the following amounts:

(1) Damages of $563,125, for the undisputed Contract balance;

(2) Damages of $1,610,987, for the disputed EWOs;

(3) Damages of $1,602,053, for extended general conditions costs and a corresponding Contract time extension of 248 days;

(4) Damages of $2,058,456, for inefficiency costs;

(5) Damages of $366,051, for a 10% profit on the extended general conditions costs and inefficiency costs;

(6) As to the subcontractor claims, damages for Stromberg in the amount of $812,092, damages for Young in the amount of $480,000, damages for Manganaro in the amount of $168,061, damaged for ISEC in the amount of $124,552, and damages for NLP in the amount of $105,647;

(7) Prejudgment interest of 6% on damages owed to BELL (in the amount of $1,019.29 a day) from April 5, 2002;

(8) Prejudgment interest of 6% on damages owed to the subcontractors; and

(9) Such other relief that the Court deems just and proper.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

Dated: January 22, 2008

s/ Richard O. Wolf

Richard O. Wolf
Charlie C.H. Lee
Robert D. Windus
Kristen A. Bennett
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia 22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of January, 2008, I caused a true and correct copy of the foregoing to be served via the Court's ECF procedures on defendant's counsel:

Kyle Chadwick
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530

s/ Richard O. Wolf